**No. 21-10376**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MICHAEL KAIL,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
No. CR-18-00172
Hon. Beth Labson Freeman

_____

**EXCERPTS OF RECORD - VOLUME 1 OF 12**

_____

Lisa A. Mathewson
Mathewson Law LLC
123 South Broad Street, Suite 1320
Philadelphia, PA 19109
(215) 399-9592
lam@mathewson-law.com

*Attorney for Appellant Michael Kail*

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>Michael Kail | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br><br>USDC Case Number: CR-18-00172-001 BLF<br>BOP Case Number: DCAN518CR00172-001<br>USM Number: 24887-111<br>Defendant's Attorney: Julia Mezhinsky Jayne and Ashley Riser, retained |

**Date of Original Judgment: 12/14/2021**
**(or Date of Last Amended Judgment)**
**THE DEFENDANT:**

☐ pleaded guilty to count(s): _____

☐ pleaded nolo contendere to count(s): _____ which was accepted by the court.

☑ was found guilty on counts: 1 through 4 and 6 through 29 of the Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343, 1346 | Wire Fraud | 7/9/2014 | 1-4; 6-19 |
| 18 U.S.C. § 1341, 1346 | Mail Fraud | 3/14/2014 | 20-22 |
| 18 U.S.C. § 1957 | Money Laundering | 10/24/2014 | 23-29 |

The defendant is sentenced as provided in pages 2 through  8  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count: 5 of the Indictment

☐ Count(s) _____ is/are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/14/2021
Date of Imposition of Judgment

Signature of Judge
The Honorable Beth Labson Freeman
United States District Judge
Name & Title of Judge

February 2, 2022
Date

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

| DEFENDANT: Michael Kail | Judgment - Page 2 of 8 |
|---|---|
| CASE NUMBER: CR-18-00172-001 BLF | |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
     30 months. This term consists of 30 months on each of Counts 1 through 4 and 6 through 29, to be served concurrently.

The appearance bond is hereby exonerated, or upon surrender of the defendant as noted below.  Any cash bail plus interest shall be returned to the owner(s) listed on the Affidavit of Owner of Cash Security form on file in the Clerk's Office.

☑     The Court makes the following recommendations to the Bureau of Prisons:
        The defendant be designated to FCI Safford in Arizona.

☐     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

    ☐     at _____ am/pm on _____ (no later than 2:00 pm).

    ☐     as notified by the United States Marshal.

☑     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑     on 3/8/2022 (no later than 2:00 pm); however, the defendant was granted bond pending appeal.

    ☐     as notified by the United States Marshal.

    ☐     as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

| DEFENDANT:  Michael Kail | Judgment - Page 3 of 8 |
|---|---|
| CASE NUMBER:  CR-18-00172-001 BLF | |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: <u>3 years. This term consists of three years on each of Counts 1 through 4 and 6 through 29, to run concurrently.</u>

## MANDATORY CONDITIONS OF SUPERVISION

1) You must not commit another federal, state or local crime.

2) You must not unlawfully possess a controlled substance.

3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4) ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5) ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: Michael Kail

Judgment - Page 4 of 8

CASE NUMBER: CR-18-00172-001 BLF

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of RELEASE, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must follow the instructions of the probation officer related to the conditions of supervision.
5) You must answer truthfully the questions asked by your probation officer.
6) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with, for example), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
7) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by these and the special conditions of your supervision that he or she observes in plain view.
8) You must work at least part-time (defined as 20 hours per week) at a lawful type of employment unless excused from doing so by the probation officer for schooling, training, community service or other acceptable activities. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
9) You must not communicate or interact with someone you know is engaged in criminal activity. You must not associate, communicate, or interact with any person you know has been convicted of a felony, unless granted permission to do so by the probation officer.
10) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

☑ If the probation officer determines that you pose a risk to a third party, the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk. *(check if applicable)*

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision upon a finding of a violation of probation or supervised release.

(Signed) _____

    Defendant                                    Date

_____

    U.S. Probation Officer/Designated Witness          Date

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Michael Kail | Judgment - Page 5 of 8 |
| CASE NUMBER: CR-18-00172-001 BLF | |

## SPECIAL CONDITIONS OF SUPERVISION

1. You must not maintain a position of fiduciary capacity without the prior permission of the probation officer.

2. You must pay any restitution, fine and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

3. You must not open any new lines of credit and/or incur new debt without the prior permission of the probation officer.

4. You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

5. You must cooperate in the collection of DNA as directed by the probation officer.

6. You must submit your person, residence, office, vehicle, or any property under your control, including any computers, cell phones, and other electronic devices, to a search. Such a search must be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. You must warn any residents that the premises may be subject to searches.

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Michael Kail | Judgment - Page 6 of 8 |
| CASE NUMBER:  CR-18-00172-001 BLF | |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | Assessment | Fine | Restitution | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $2,800 | $50,000 | $500,000 | N/A | N/A |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Netflix, Inc.<br>Attn: Megan Wikramanayake<br>100 Winchester Circle<br>Los Gatos, CA 95032 | | $500,000 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | | $500,000 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the fine/restitution.

    ☐ the interest requirement is waived for the fine/restitution is modified as follows:

    _____

---

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

ER-7

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

| DEFENDANT: Michael Kail | Judgment - Page 7 of 8 |
|---|---|
| CASE NUMBER: CR-18-00172-001 BLF | |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows*:

**A** ☐ Lump sum payment of _____ due immediately, balance due

   ☐ not later than _____ , or
   ☐ in accordance with ☐ C, ☐ D, or ☐ E, and/or ☐ F below); or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties: **A special assessment of $2,800, restitution of $500,000, and a $50,000 fine is due. When incarcerated, payment of criminal monetary penalties are due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program. Once the defendant is on supervised release, restitution and the fine must be paid in monthly payments of not less than $1,000 or at least 10 percent of earnings, whichever is greater to commence no later than 60 days from placement on supervision. Notwithstanding any payment schedule set by the Court, the United States Attorney's Office may pursue collection through all available means in accordance with 18 U.S.C. §§ 3613 and 3644(m). Restitution and fine payments shall be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s): _____

☑ The defendant shall forfeit the defendant's interest in the following property to the United States: $700,000 money judgment.

---

* Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245C (Rev. AO 09/19-CAN 12/19) Amended Judgment in Criminal Case

DEFENDANT: Michael Kail                                              Judgment - Page 8 of 8
CASE NUMBER: CR-18-00172-001 BLF

☐   The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the defendant's responsibility for the full amount of the restitution ordered.**

ER-9

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of California

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| Michael Kail | ) | USDC Case Number: CR-18-00172-001 BLF |
| | ) | BOP Case Number: DCAN518CR00172-001 |
| | ) | USM Number: 24887-111 |
| | ) | Defendant's Attorney: Julia Mezhinsky Jayne and Ashley Riser, Retained |

**THE DEFENDANT:**

☐ pleaded guilty to count(s):

☐ pleaded nolo contendere to count(s): which was accepted by the court.

☑ was found guilty on counts: <u>1 through 4 and 6 through 29 of the Indictment</u> after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1343, 1346 | Wire Fraud | 7/9/2014 | 1-4; 6-19 |
| 18 U.S.C. §§ 1341, 1346 | Mail Fraud | 3/14/2014 | 20-22 |
| 18 U.S.C. § 1957 | Money Laundering | 10/24/2014 | 23-29 |

The defendant is sentenced as provided in pages 2 through  8  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on counts: <u>5 of the Indictment.</u>

☐ Count(s) dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/14/2021
_____
Date of Imposition of Judgment

_____
Signature of Judge

The Honorable Beth Labson Freeman
United States District Judge
_____
Name & Title of Judge

December 16, 2021
_____
Date

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Michael Kail                                                                    Judgment - Page 2 of 8
CASE NUMBER: CR-18-00172-001 BLF

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
30 months. This term consists of terms of 30 months on each of Counts 1 through 4 and 6 through 29, to be served concurrently.

The appearance bond is hereby exonerated, or upon surrender of the defendant as noted below.  Any cash bail plus interest shall be returned to the owner(s) listed on the Affidavit of Owner of Cash Security form on file in the Clerk's Office.

☑  The Court makes the following recommendations to the Bureau of Prisons:
    The defendant be designated to FCI Safford in Arizona.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  on  (no later than 2:00 pm).

    ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑  on 3/8/2022 (no later than 2:00 pm).

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at
_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

ER-11

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Michael Kail                                                      Judgment - Page 3 of 8
CASE NUMBER: CR-18-00172-001 BLF

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:  3 years. This term consists of terms of three years on each of Counts 1 through 4 and 6 through 29, to run concurrently.

## MANDATORY CONDITIONS OF SUPERVISION

1)     You must not commit another federal, state or local crime.

2)     You must not unlawfully possess a controlled substance.

3)     You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4) ☑  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5) ☑  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6) ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7) ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

ER-12

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| DEFENDANT: Michael Kail | Judgment - Page 4 of 8 |
|---|---|
| CASE NUMBER: CR-18-00172-001 BLF | |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of RELEASE, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must follow the instructions of the probation officer related to the conditions of supervision.
5) You must answer truthfully the questions asked by your probation officer.
6) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with, for example), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
7) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by these and the special conditions of your supervision that he or she observes in plain view.
8) You must work at least part-time (defined as 20 hours per week) at a lawful type of employment unless excused from doing so by the probation officer for schooling, training, community service or other acceptable activities. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
9) You must not communicate or interact with someone you know is engaged in criminal activity. You must not associate, communicate, or interact with any person you know has been convicted of a felony, unless granted permission to do so by the probation officer.
10) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

☑ If the probation officer determines that you pose a risk to a third party, the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk. *(check if applicable)*

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision upon a finding of a violation of probation or supervised release.

(Signed) _____

Defendant                                          Date

_____

U.S. Probation Officer/Designated Witness        Date

ER-13

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Michael Kail | Judgment - Page 5 of 8 |
| CASE NUMBER: CR-18-00172-001 BLF | |

## SPECIAL CONDITIONS OF SUPERVISION

1.  You must not maintain a position of fiduciary capacity without the prior permission of the probation officer.

2.  You must pay any restitution, fine and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

3.  You must not open any new lines of credit and/or incur new debt without the prior permission of the probation officer.

4.  You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

5.  You must cooperate in the collection of DNA as directed by the probation officer.

6.  You must submit your person, residence, office, vehicle, or any property under your control, including any computers, cell phones, and other electronic devices, to a search. Such a search must be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation. You must warn any residents that the premises may be subject to searches.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Michael Kail | Judgment - Page 6 of 8 |
| CASE NUMBER: CR-18-00172-001 BLF | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | Assessment | Fine | Restitution | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 2,800 | $ 50,000 | To Be Determined | N/A | N/A |

☐ The determination of restitution is deferred until <u>February 11, 2022</u>. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the.

    ☐ the interest requirement is waived for the  is modified as follows:

---

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Michael Kail | Judgment - Page 7 of 8
CASE NUMBER: CR-18-00172-001 BLF

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows*:

**A** ☐ Lump sum payment of _____ due immediately, balance due

       ☐ not later than  , or
       ☐ in accordance with    ☐ C,   ☐ D, or   ☐ E, and/or    ☐ F below); or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of _ over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of _ over a period of  (e.g., months or years), to commence  (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
**A $2,800 Special Assessment and $50,000 fine is due. When incarcerated, payment of criminal monetary penalties are due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program. Once the defendant is on supervised release, the fine must be paid in monthly payments of not less than $1,000 or at least 10 percent of earnings, whichever is greater, to commence no later than 60 days from placement on supervision. Notwithstanding any payment schedule set by the court, the United States Attorney's Office may pursue collection through all available means in accordance with 18 U.S.C. §§ 3613 and 3644(m). Fine payments shall be made to the Clerk of U.S. District Court, Attention: Financial Unit, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States: $700,000 money judgment.

---

* Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT:  Michael Kail                                                                  Judgment - Page 8 of 8
CASE NUMBER:  CR-18-00172-001 BLF

☐       The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all
or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the
defendant's responsibility for the full amount of the restitution ordered.**

ER-17

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00172-BLF |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | OCTOBER 19, 2021 |
| | ) | |
| KAIL, | ) | PAGES 1-80 |
| | ) | |
| DEFENDANT | ) | |
| | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFF:        **BY:  COLIN CHRISTOPHER SAMPSON**
                          **CHRIS KALTSAS**
                          UNITED STATES ATTORNEY'S OFFICE
                          NORTHERN DISTRICT OF CALIFORNIA
                          TAX DIVISION
                          450 GOLDEN GATE AVENUE, BOX 36055
                          SAN FRANCISCO, CA 94102

FOR THE DEFENDANT:        **BY:  JULIA MEZHINSKY JAYNE**
                          JAYNE LAW GROUP
                          803 HEARST AVE.
                          BERKELEY, CA 94710

PROBATION                 BY:  KYLE POLLACK

OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

```
1          SAN JOSE, CALIFORNIA              OCTOBER 19, 2021

2                        P R O C E E D I N G S

3      (COURT CONVENED AT 9:23 A.M.)

4          THE CLERK:  CALLING CASE 18-0172.  UNITED STATES V.

5      MICHAEL KAIL.

6          COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

7              MR. KALTSAS:  GOOD MORNING, YOUR HONOR.

8      CHRIS KALTSAS AND COLIN SAMPSON FOR THE UNITED STATES.

9              THE COURT:  GOOD MORNING, MR. KALTSAS, MR. SAMPSON.

10             MS. JAYNE:  GOOD MORNING, YOUR HONOR.

11     JULIA JAYNE APPEARING WITH MICHAEL KAIL WHO IS PRESENT.

12             THE COURT:  GOOD MORNING, MS. JAYNE.

13         MR. KAIL, GOOD MORNING.

14         PLEASE BE SEATED, EVERYONE.

15         ALL RIGHT.  WE HAVE A LOT OF WORK TO DO ON THIS CASE.

16     YOUR BRIEFING IS EXTENSIVE, AND SO I HAVE BIFURCATED THIS, WHAT

17     WAS ORIGINALLY SET TO BE A SENTENCING HEARING, INTO A HEARING

18     ON THE GOVERNMENT'S REQUEST FOR A PRELIMINARY ORDER OF

19     FORFEITURE, AND THEN THE REMAINDER OF THE SENTENCING ISSUES.

20         AS I READ YOUR BRIEFS, CLEARLY THERE IS SOME OVERLAP IN

21     THE ISSUES THAT I NEED TO CONSIDER IN DETERMINING THE DEFENSE

22     REQUEST FOR A REDUCTION IN THE FINE IN THE FORFEITURE BASED ON

23     THE 8TH AMENDMENT.  AND SO I DID HAVE TO LOOK AT SOME OF THE

24     SENTENCING REPORT ON THE CALCULATIONS.

25         I ALSO RECOGNIZE THAT THERE ARE EXTENSIVE OBJECTIONS TO
```

1    THE CALCULATIONS, AND WE WILL NEED TO FIGURE OUT EXACTLY HOW WE

2    ARE GOING TO GET TO THE END OF THE ROAD ON THIS AND WHERE

3    THERE'S A RIGHT TO A HEARING AND WHERE THERE IS NOT.

4        SO ONE OF MY CONCERNS WAS THAT I DO LOSE JURISDICTION IN

5    THE CASE AFTER SENTENCING, AND SO THIS FORFEITURE ISSUE NEEDS

6    TO BE RESOLVED.  I DON'T WANT THINGS LEFT OVER AFTER

7    SENTENCING, BECAUSE I MAY LOSE JURISDICTION, SO I HAVE SOME

8    CONCERN ABOUT THAT.

9        I'M ALSO CONCERNED, MR. SAMPSON, YOU CAN HELP ME ON THIS,

10   AND PERHAPS BECAUSE IT HAS TO DO WITH THE SENTENCING ITSELF,

11   IT'S NOT CLEAR TO ME AT SENTENCING THAT -- ON WHICH ISSUES THE

12   DEFENSE WOULD HAVE A RIGHT TO AN EVIDENTIARY HEARING.

13       I BELIEVE ON RESTITUTION, THAT IF IT'S NOT AGREED TO, THAT

14   THERE IS A RIGHT TO A HEARING.  AND I BELIEVE RESTITUTION CAN

15   BE DEALT WITH AFTER JUDGMENT, BUT I'M NOT CONCERNED WITH THAT

16   BECAUSE WE OFTEN HAVE DONE THAT OR SUGGESTED IT AND THEN THE

17   PARTIES AGREE.

18       I'VE NEVER HAD A CONTESTED RESTITUTION HEARING, BUT I DO

19   BELIEVE THAT THAT CAN BE SEPARATE.  THE FORFEITURE AND THE

20   FINES AND ENHANCEMENT FOR THE AMOUNT OF THE LOSS THAT WOULD

21   CONTRIBUTE TO THE ENHANCED OFFENSE LEVEL, ALL NEED TO BE DONE

22   BEFORE I PRONOUNCE JUDGMENT.

23       SO I NEED YOUR VIEW ON THAT, I NEED MS. JAYNE'S VIEW ON

24   THAT SO THAT I PROVIDE SUFFICIENT TIME TO ACCOMPLISH ALL OF

25   THAT.

1    SO JUST IN TERMS OF THE OVERALL -- BEFORE WE GET INTO THE

2    ISSUES ON THE FORFEITURE, MR. SAMPSON, MR. KALTSAS, DO YOU HAVE

3    ANY THOUGHTS ON THAT?

4    MR. SAMPSON:  YES, YOUR HONOR.

5    JUST INITIALLY, THE GOVERNMENT'S VIEW, I HAVE DONE A

6    CONTESTED RESTITUTION HEARING, THEY ARE NOT COMMON, BUT THEY

7    HAPPEN.  THEY DO NOT HAVE TO HAPPEN AT THE TIME OF THE

8    SENTENCING.  IT IS IN THE ECONOMY SCALE, YOU CAN DO IT AT THE

9    TIME OF SENTENCING AND IT TYPICALLY MAKES SENSE.  IT CAN BE

10   DETERMINED LATER BECAUSE IT DOES NOT CONTRIBUTE TO THE LOSS

11   CALCULATIONS AND THE CALCULATIONS UNDER THE GUIDELINES.

12   THE COURT:  OKAY.

13   MR. SAMPSON:  SO IF YOUR HONOR CANNOT FIND THE TIME

14   OR WANTS TO BIFURCATE, I THINK THAT'S POSSIBLE.

15   REGARDING WHAT CAN AND CANNOT BE DISPUTED AT SENTENCING,

16   YOUR HONOR, I'M ACTUALLY NOT SURE THAT THERE'S ANYTHING RELATED

17   TO THE OFFENSE CALCULATION OR 3553(A) THAT CANNOT BE DISPUTED.

18   THE COURT:  SO IS THERE A RIGHT TO A FURTHER

19   EVIDENTIARY HEARING?

20   MR. SAMPSON:  MY BELIEF IS THAT IF IT RELATES TO THE

21   OFFENSE CALCULATION, THEN IT CAN BE DISPUTED.

22   THE COURT:  THE WORD "DISPUTE" IS NOT WORKING FOR ME.

23   MR. SAMPSON:  I'M SORRY, YOUR HONOR, THAT IT CAN

24   RELATE TO AN EVIDENTIARY HEARING.

25   I THINK THE COMPLICATED ISSUE HERE IS THAT WE HAVE A

```
1    TRIAL.  SO THE GOVERNMENT IS LARGELY LOOKING AT THE EVIDENCE
2    THAT IT PRESENTED UNDER A HIGHER STANDARD, AND THERE'S VERY
3    LITTLE EVIDENCE OUTSIDE OF THAT SWATH OF EVIDENCE THAT THE
4    GOVERNMENT PRESENTED THAT IS GOING TO RELATE TO THOSE
5    SENTENCING FACTORS, PERHAPS ABHORRENT BEHAVIOR IS THE ONLY ONE.
6         SO IF YOUR HONOR WOULD LIKE MORE BRIEFING ON THAT, I'M
7    HAPPY TO GIVE IT.  THOSE ARE MY INITIAL THOUGHTS.
8         THE COURT:  OKAY.  AND BEFORE WE CONCLUDE TODAY, WE
9    WILL COME BACK TO THIS, BUT I CERTAINLY APPRECIATE THAT THE
10   GOVERNMENT MAY FILE A SENTENCING BRIEF WHERE YOU SIMPLY TAKE
11   THE LOSS CALCULATIONS THAT AFFECT THE SENTENCING, THE
12   ENHANCEMENT, AND YOU JUST GIVE ME CITATIONS TO THE RECORD, AND
13   REST ON THAT.  AND THEN TURN IT TO THE DEFENSE, IF MS. JAYNE
14   WISHES TO BRING WITNESSES, I'VE NEVER HAD A HEARING ON IT, SO
15   I'M A LITTLE BIT IN THE DARK ON IT.
16        MS. JAYNE, YOUR VIEW?
17        MS. JAYNE:  YEAH.  THANK YOU, YOUR HONOR.
18        I AGREE WITH MR. SAMPSON THAT RESTITUTION CERTAINLY CAN
19   OCCUR LATER AND IT CAN BE AN EVIDENTIARY HEARING.  I BELIEVE --
20   MY MEMORY IS NOT WORKING RIGHT NOW, BUT I BELIEVE I'VE ALSO
21   DONE THE FORFEITURE WHERE IT WAS ALMOST LIKE A CONTINUED
22   SENTENCING, AND WE HAVE DONE THE FORFEITURE AT A SEPARATE
23   HEARING AFTERWARDS.
24        BUT IN TERMS OF TAKING ANY ADDITIONAL EVIDENCE, AND I
25   DON'T KNOW THAT THE COURT NECESSARILY LOSES JURISDICTION, FOR
```

1    EXAMPLE, THE COURT MAY HAVE BRIEFING ON BAIL PENDING APPEAL

2    AFTER JUDGMENT, WHICH IS APPROPRIATE, BUT NOT AS LOSS

3    JURISDICTION.

4         THE COURT:  THAT'S COLLATERAL.  FORFEITURE IS PART OF

5    THE JUDGMENT, AND MY RESEARCH SHOWED THAT I NEED TO HAVE THAT

6    TAKEN CARE OF.  I DON'T KNOW THAT YOU ARE ENTITLED TO AN

7    EVIDENTIARY HEARING ON ANYTHING ABOUT -- WELL, I DON'T THINK

8    THERE'S ANYTHING LEFT FOR AN EVIDENTIARY HEARING ON THE HOUSE

9    ITSELF, BECAUSE WE HAVE A JURY VERDICT ON THAT, AND YOU HAVE

10   YOUR ARGUMENT WHICH WE WILL GET TO IN A MOMENT.

11        ON THE ISSUE OF THE STOCK, UNDER 32.2, I THINK IT'S E, I

12   DO NEED TO MAKE FINDINGS, BECAUSE IT'S ARGUED THAT THESE ARE

13   AFTER LOCATED ASSETS, AFTER THE INDICTMENT THAT IS.

14        MS. JAYNE:  WELL, YOUR HONOR, I THINK WE WILL ADDRESS

15   THAT TODAY, BUT IN TERMS OF WHAT IS AND ISN'T ENTITLED TO AN

16   EVIDENTIARY HEARING, I THINK IT'S RESTITUTION.

17        I THINK I WILL CONCEDE THAT OTHERWISE LOSS ON SENTENCING,

18   I HAVE NOT SEEN THAT OF A SEPARATE EVIDENTIARY HEARING WHERE

19   THERE'S BEEN A TRIAL.  MY UNDERSTANDING IS IF THE COURT HEARS

20   FROM WITNESSES, IT'S MORE ABOUT EMOTIONAL IMPACT, THINGS LIKE

21   THAT.

22        THE COURT:  SURE.  OKAY.

23        THAT'S VERY HELPFUL, BECAUSE AT A HIGH LEVEL, IT'S MY GOAL

24   TO SET ASIDE SUFFICIENT TIME SO THAT ALL OF THESE THINGS CAN BE

25   ACCOMPLISHED.

1      OKAY.  THAT IS JUST WHAT I NEEDED.  AND I WILL RECOMMEND

2    NOW SO THAT YOU CAN PLAN, IS THAT THE ISSUE OF RESTITUTION WILL

3    NOT BE TAKEN UP AS A CONTESTED MATTER WHEN I SET THE

4    SENTENCING.  YOU MAY HAVE REACHED AN AGREEMENT ON IT AND I'M

5    GOING TO URGE THE PARTIES TO CONTINUE TO TALK ABOUT AN AGREED

6    AMOUNT OF RESTITUTION.  IT IS MANDATORY.

7      THERE IS GOING TO BE SOME AMOUNT, EVEN TO THE EXTENT IT IS

8    THE AMOUNT THAT IS THEN COMPLETELY SET OFF FROM THE CIVIL

9    LAWSUIT, I THINK THAT WOULD PROBABLY BE THE FLOOR, IS THE

10    AMOUNT THAT HAS ALREADY BEEN PAID.  SO IT WOULD BE A COMPLETE

11    SETOFF.

12      BUT IT SEEMS TO ME THAT AS IN MOST CASES, THAT THERE IS A

13    REASONABLE OPPORTUNITY FOR THE PARTIES TO COME TO AN AGREEMENT.

14    AND SO I'M GOING TO PUT THAT ASIDE FOR NOW BECAUSE YOU ARE NOT

15    GOING TO TALK ABOUT RESTITUTION.  I KNOW WHAT THE GENERAL

16    NUMBERS ARE AND I THINK THE GENERAL NUMBERS THAT I HAVE ARE

17    SUFFICIENT FOR ME TO CONSIDER THE FACTORS FOR THE FORFEITURE.

18      ALL RIGHT.

19      MS. JAYNE:  YOUR HONOR, IF I UNDERSTAND CORRECTLY,

20    YOUR HONOR IS SAYING THAT WHEN WE DO SENTENCING, WE WILL NOT BE

21    HANDLING RESTITUTION AT THAT TIME.  AND WHETHER THAT BE AT A

22    HEARING LATER OR A RESOLUTION WITH US, IT'S GOING TO BE AFTER.

23      THE COURT:  IT WILL BE AFTER, BUT I'M GOING TO

24    ENCOURAGE YOU TO CONTINUE TO TALK.  IT MAY BE THAT BETWEEN NOW

25    AND SENTENCING THAT YOU ACTUALLY REACH A RESOLUTION ON THAT.

1              MS. JAYNE:  UNDERSTOOD.

2              THE COURT:  THERE COMES A TIME IN EVERY CASE WHERE

3      THE PARTIES UNDERSTAND EACH OTHER'S POSITIONS AND UNDERSTAND

4      THE GAP BETWEEN THE TWO POSITIONS, AND THAT OFTEN GIVES THE

5      OPPORTUNITY TO REACH A REASONABLE RESOLUTION OF THE MATTER.

6          I'M NOT INVOLVED IN ANY OF THAT.  I JUST WANT YOU TO KNOW

7      WE ARE NOT GOING TO HAVE AN EVIDENTIARY HEARING AT THE

8      SENTENCING.  AND I'M GOING TO GIVE YOU -- I'M GOING TO URGE YOU

9      TO START THAT SETTLEMENT PROCESS, BECAUSE RESTITUTION IS

10     MANDATORY, IT'S NOT A -- WHETHER THERE'S RESTITUTION, IT'S HOW

11     MUCH, OKAY.

12             MS. JAYNE:  OKAY.

13             THE COURT:  AND MR. SAMPSON, MR. KALTSAS, YOU DON'T

14     DISAGREE WITH THAT?

15             MR. SAMPSON:  NO, YOUR HONOR.  I DON'T DISAGREE.  WE

16     WILL ATTEMPT TO HAVE THAT DISCUSSION.

17             THE COURT:  YES.  OKAY.

18         SO ON THE FORFEITURE, WE HAVE TWO DISTINCT ISSUES TO DEAL

19     WITH ON FORFEITURE, AND SO I WOULD LIKE TO DEAL WITH ONE AT A

20     TIME.

21         I WOULD LIKE TO START WITH THE STOCK ISSUE.

22             MR. KALTSAS:  YOUR HONOR, IF I MAY, THE GOVERNMENT --

23             THE COURT:  I'M SORRY, I CAN'T HEAR --

24             MR. KALTSAS:  YOUR HONOR, MY APOLOGIES, YOUR HONOR.

25     CAN YOU HEAR ME NOW?

1      THE COURT:  PULL THAT CLOSER TO YOU, MR. KALTSAS, YOU

2  WILL FIND IT MORE COMFORTABLE.

3      MR. KALTSAS:  ONE VERY IMPORTANT CORRECTION,

4  YOUR HONOR, AFTER DISCUSSING THIS FURTHER WITH COUNSEL AND

5  AGENTS, IT TURNS OUT WE DID HAVE POSSESSION OF THE SUMOLOGIC

6  STOCK, SO I JUST WANT TO MAKE SURE I PUT THAT ON THE RECORD.

7      THE COURT:  THAT YOU DID HAVE --

8      MR. KALTSAS:  WE HAD SEIZED THE SUMOLOGIC STOCK

9  CERTIFICATE.  WE WEREN'T AWARE OF THAT UNTIL WE LOOKED FURTHER

10 INTO THE EVIDENCE, BUT WE DID HAVE POSSESSION OF IT, SO I

11 WANTED TO MAKE SURE I PUT THAT ON THE RECORD.

12     THE COURT:  SO YOU SEIZED THE SUMOLOGIC STOCK

13 CERTIFICATE?

14     MS. JAYNE:  THE PHYSICAL PIECE OF PAPER, I BELIEVE IS

15 WHAT THEY HAVE.

16     MR. KALTSAS:  THAT'S RIGHT, YOUR HONOR.  THE FACT

17 THAT WE HAD KNOWLEDGE OF IT, MAYBE NOT AT THE TIME OF THE

18 TRIAL, BUT AT LEAST WE HAD THAT PAPER IN OUR POSSESSION.

19     THE COURT:  WELL, I DON'T KNOW HOW BIG A CHANGE THAT

20 IS IN TERMS OF --

21     MR. KALTSAS:  THE GOVERNMENT WOULD ARGUE THAT IT'S

22 NOT A SUBSTANTIAL CHANGE.  MAINLY BECAUSE IN THE INDICTMENT,

23 MR. KAIL WAS MADE AWARE THAT ANY PROCEEDS OF THE CRIMES THAT HE

24 COMMITTED FOR WHICH HE WOULD BE CONVICTED, ARE SUBJECT TO

25 FORFEITURE.  THAT'S PARAGRAPH 34 OF THE INDICTMENT, YOUR HONOR.

1          THE COURT:  WELL, I UNDERSTAND THAT.

2       BUT WHEN YOU -- WHEN THERE WAS A REQUEST FOR A JURY TRIAL

3    IN REGARD TO THE TRACING OR THE NEXUS FOR THE HOME, THAT WOULD

4    HAVE BEEN THE TIME FOR YOU TO SEEK A JURY VERDICT ON THE

5    SUMOLOGIC STOCK, WOULDN'T IT?

6          MR. KALTSAS:  THAT IS CORRECT, YOUR HONOR.

7       WHAT I WILL SAY IS THIS INFORMATION DID COME A LITTLE BIT

8    LATER, TO THE FOREFRONT OF THE GOVERNMENT'S KNOWLEDGE.

9       THAT SAID, EVEN BEING THAT, THERE IS NO RIGHT TO A JURY

10   TRIAL, NECESSARILY, THERE ISN'T A CONSTITUTIONAL ONE, THERE IS

11   A STATUTORY ONE.

12         THE COURT:  WELL, THERE'S A STATUTORY ONE.  YOU WANT

13   ME TO VIOLATE THE STATUTE?

14         MR. KALTSAS:  ABSOLUTELY NOT, YOUR HONOR.

15      BUT IT IS IN THE RULE, AND WE HAVE THE SUMOLOGIC STOCK FOR

16   NOW.

17            THE COURT:  SUMOLOGIC IS THE PUBLICLY HELD COMPANY?

18            MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

19            THE COURT:  WELL, THAT'S A BIG CHANGE.

20            MR. KALTSAS:  IT IS, YOUR HONOR.

21            THE COURT:  BECAUSE I WOULD -- AND WAS THE SEIZURE

22   BEFORE THE INDICTMENT OR AFTER THE INDICTMENT?

23            MR. KALTSAS:  IT WAS BEFORE, YOUR HONOR.

24            THE COURT:  OKAY.  SO THE GOVERNMENT HAD KNOWLEDGE OF

25   THE SUMOLOGIC.

1       YOU HAD CONSTRUCTIVE KNOWLEDGE OF ANYTHING IN YOUR

2    POSSESSION BEFORE THE INDICTMENT.

3         MR. KALTSAS:  I BELIEVE IT WAS BEFORE THE INDICTMENT,

4    I'M NOT ENTIRELY SURE.

5         MR. SAMPSON:  YES, YOUR HONOR.

6     THE STOCK CERTIFICATES WERE SEIZED IN 2015.  THERE WAS NO

7    LITIGATION OVER IT AT ALL.  THE GOVERNMENT HAD COPIES OF IT,

8    BATES STAMPED IT, PRODUCED IT, BUT WE DO HAVE THE ORIGINALS,

9    WE'VE DETERMINED.

10        THE COURT:  OKAY.

11     WELL, LET ME TAKE IT OFF THE TABLE.  THAT MAY TAKE

12    SUMOLOGIC OFF THE TABLE, BECAUSE I DON'T KNOW HOW THAT WOULD BE

13    DIFFERENT.  AND I'M SORRY, I DON'T HAVE RULE 32 HERE, THAT'S

14    WHAT I NEED.

15        MS. JAYNE:  AND YOUR HONOR, I BELIEVE THE GOVERNMENT

16    HAD NOTICE OR ACCESS TO THE STOCK AS WELL.  THE GOVERNMENT WAS

17    WELL AWARE THAT MR. KAIL WAS GUARANTEED STOCK OPTIONS AND

18    EVERYTHING HE HAD WAS SEIZED FROM HIS HOME.

19     THE GOVERNMENT OF COURSE HAD ACCESS TO THE OWNERS OF THOSE

20    COMPANIES.  THAT INFORMATION WAS KNOWN TO THE GOVERNMENT FROM

21    THE START.  IT WASN'T A SHOCK THAT MR. KAIL GOT THESE

22    PARTICULAR STOCKS.  WHETHER HE CONTINUED TO HOLD THEM WAS NOT

23    REALLY KNOWN, THE GOVERNMENT, AGAIN, EASILY HAD ACCESS TO THAT

24    BY SPEAKING TO THE OWNERS OF THE COMPANY, PARTICULARLY WHEN A

25    COMPANY HAS NOT GONE PUBLIC, HAS NOT BEEN SOLD, YOU CAN DO

1    NOTHING BUT HOLD THOSE PARTICULAR SHARES, OTHER THAN NETSKOPE

2    REMOVED SOMEHOW, SAYING WE ARE TAKING THESE BACK FROM YOU.

3         THE COURT:  WELL, MS. JAYNE, WHAT MR. KALTSAS ARGUES

4    IN HIS PAPERS IS THAT THE GOVERNMENT WAS UNAWARE THAT THE

5    OPTIONS HAD BEEN EXERCISED.

6         AND THE EXERCISE OF THE OPTION IS WHAT HE ARGUES CREATES

7    THE OWNERSHIP, NOT THE -- SO THE OPTIONS THAT ARE NEVER

8    EXERCISED, YOU DON'T HAVE AN OWNERSHIP INTO IN THE COMPANY

9    UNTIL YOU COMPLETE THE CONDITION PRECEDENT PAYING YOUR OPTION

10   PRICE FOR THE SHARES.

11        MS. JAYNE:  I DON'T THINK HE'S SAYING THEY DIDN'T

12   KNOW ABOUT THIS EXERCISE, THAT WAS PART OF THEIR TRIAL, THAT

13   WAS PART OF THEIR ARGUMENT, THAT WAS PART OF THEIR SPREADSHEETS

14   AT TRIAL, HOW MUCH -- THESE CHECKS WHERE HE EXERCISED HIS

15   OPTIONS WERE PART OF THE TRIAL.  I THINK HE ALWAYS KNEW THEY

16   EXERCISED.

17        THE COURT:  IS THAT RIGHT, MR. SAMPSON?

18        MR. SAMPSON:  YES, YOUR HONOR.

19        WE HAVE THE BANK RECORDS INDICATING HE PAID $80,798 IN

20   2015, YOUR HONOR.  BUT WE DON'T HAVE THE STOCK CERTIFICATES,

21   THEY WERE NOT SEIZED IN THE SEARCH WARRANT.  I'M TALKING ABOUT

22   NETSKOPE.

23        WE DID NOT KNOW, THREE YEARS LATER, THAT MR. KAIL STILL

24   POSSESSED THEM.  WE REALLY HAD NO KNOWLEDGE.  WE HAD SEEN, I

25   BELIEVE IN HIS G-MAIL, THAT HE HAD BEEN E-MAILED A PDF WITH

1    STOCK CERTIFICATES, BUT THAT'S NOT THE CERTIFICATE.

2         THE COURT: BUT MR. SAMPSON, UNDER THE CASE

3    AUTHORITY, I HAD UNDERSTOOD THAT IF A DEFENDANT COMES INTO

4    POSSESSION OF PROPERTY AND THEN SPENDS IT, YOU CAN STILL

5    FORFEIT THE VALUE.

6      AND PARTICULARLY WITH THINGS LIKE GAMBLING PROCEEDS OR

7    DRUGS, THAT YOU CAN GET FORFEITURE, EVEN IF THE MONEY IS NOT

8    STILL SITTING UNDER THE BED AND HAS BEEN SPENT ON LAVISH

9    LIFESTYLE. THERE WAS THE ONE COLORFUL QUOTE, I THINK IN ONE OF

10    THE CASES ABOUT -- WELL -- SO KNOWLEDGE THAT THE OPTIONS HAD

11    BEEN EXERCISED AT THE TIME OF THE INDICTMENT.

12         AND I MEAN, AND EVIDENCE OF IT, IT SEEMS THAT I'M JUST --

13    THIS IS REALLY JUST THE LINE OF DEMARCATION BETWEEN THE RIGHT

14    TO A JURY TRIAL UNDER THE STATUTE AND TO A COURT DETERMINATION

15    AFTER.

16         MR. SAMPSON: YOUR HONOR, IF I MAY.

17      SO RULE 32.2, I BELIEVE IS --

18         THE COURT: I'M LOOKING ON E, AT SUBSEQUENTLY LOCATED

19    PROPERTY, IS THAT WHAT YOU'RE --

20         MR. KALTSAS: I'M GOING TO REFER THE COURT TO

21    RULE 32.2(B)(5)(A).

22         THE COURT: (E)(5)?

23         MR. KALTSAS: (B)(5).

24         THE COURT: (B)(5). THANK YOU.

25         MR. KALTSAS: AND YOUR HONOR (B)(5)(A) SPECIFICALLY

1  AUTHORIZES A JURY TRIAL WHEN THERE IS "SPECIFIC PROPERTY --

2  WITH RESPECT TO THE FORFEITURABILITY OF SPECIFIC PROPERTY IF

3  THE JURY RETURNS A GOVERNMENT VERDICT."

4      UNDER NETSKOPE FLOATING IN THE ETHER, BUT WHAT WE DIDN'T

5  KNOW WAS WHETHER THE ACTUAL SPECIFIC SHARES EXISTED.  SO WHILE

6  SPECIFIC PROPERTY IS SUBJECT TO A JURY TRIAL, YOUR HONOR, A

7  FORFEITURE MONEY JUDGMENT IS NOT.  A FORFEITURE MONEY JUDGMENT

8  IS SOMETHING THAT THE COURT DETERMINES.

9      THE COURT:  SO THE FORFEITABILITY OF SPECIFIC

10  PROPERTY AS TO VALUE, I APPRECIATE THAT.  IF IT RETURNS A

11  GUILTY VERDICT.

12      SO HERE, YOU ARE TALKING ABOUT THE SPECIFIC PROPERTY OF

13  THE STOCK CERTIFICATES OR THE SHARES.

14      MR. KALTSAS:  THAT'S RIGHT.  AND NOT JUST THE VALUE.

15      THE COURT:  AND NOT THE VALUE.

16      MR. KALTSAS:  RIGHT.

17      THE COURT:  AND THAT'S REALLY -- I GUESS MY POINT IS

18  THAT IT APPEARS THAT YOU HAD KNOWLEDGE OF THE SPECIFIC PROPERTY

19  AT THE TIME.

20      MS. JAYNE:  AND YOUR HONOR, I AGREE WITH WHAT

21  MR. KALTSAS JUST SAID, ABSOLUTELY.

22      IF THEY WERE SEEKING A MONEY JUDGMENT, WE WOULD NOT HAVE

23  THE RIGHT TO A JURY TRIAL.  THE RULE IS CLEAR ON THAT.  BUT

24  THIS IS NOT AN ISSUE OF SEEKING A MONEY JUDGMENT, THIS IS THE

25  EQUIVALENT OF PROPERTY.

1    AND I DON'T SEE ANYTHING IN THE RULE ABOUT KNOWLEDGE,

2    THERE WASN'T SUBSEQUENTLY LOCATED PROPERTY THAT COULD HAVE

3    BEEN -- THAT EASILY COULD HAVE BEEN; A, IN THE INDICTMENT, B,

4    IN A BILL OF PARTICULARS, C, BROUGHT TO A JURY TRIAL.

5    MR. KAIL DID DEMAND HIS RIGHT TO A JURY TRIAL, AND

6    OTHERWISE THE EXCEPTION TO CONSUME THE RULE.  YOU CAN HAVE A

7    JURY TRIAL, EXCEPT YOU CAN'T HAVE A JURY TRIAL.  BUT HE

8    DEMANDED THAT RIGHT.  AND THIS IS NOT, AND I THINK MR. KALTSAS

9    IS CONCEDING THIS IS NOT A MONEY JUDGMENT.

10    MR. KALTSAS:  THAT'S RIGHT, YOUR HONOR.

11    THIS IS A FORFEITURE OF SPECIFIC PROPERTY.  BUT WHAT THE

12    GOVERNMENT WOULD NOTE HERE IS THEY DIDN'T ACTUALLY HAVE

13    KNOWLEDGE MR. KAIL STILL POSSESSED THE STOCK OPTIONS.

14    THE COURT:  I GUESS I'M -- FROM WHAT YOU ARE TELLING

15    ME YOU ALL DID, YOU ACTUALLY HAD SEIZED AND HAD POSSESSION OF

16    THE SUMOLOGIC STOCK.  AND I REALLY APPRECIATE YOUR CANDIDNESS,

17    MR. KALTSAS, AT BRINGING THAT UP RIGHT AWAY.

18    AND ON THE NETSKOPE, IT APPEARS THAT YOU -- I MEAN, I

19    APOLOGIZE, MY MEMORY OF THE TRIAL IS NOT AS SPECIFIC, BUT THAT

20    YOU PUT ON EVIDENCE OF THE PAYMENT TO EXERCISE THE OPTIONS.

21    AND THERE'S -- I DON'T KNOW WHY YOU THOUGHT THAT THOSE SHARES

22    DIDN'T -- THAT THE CERTIFICATES OR THE SHARES THEMSELVES, THE

23    OWNERSHIP OF THE SHARES WASN'T SPECIFIC PROPERTY AT THE TIME OF

24    TRIAL.

25    MR. KALTSAS:  IT WASN'T SO MUCH, YOUR HONOR, THAT IT

1    WAS SPECIFIC PROPERTY AT THE TIME OF TRIAL, WE DIDN'T KNOW

2    THAT, WE JUST DIDN'T KNOW THAT MR. KAIL STILL POSSESSED THEM.

3    WE DIDN'T KNOW THAT HE STILL HAD THE PHYSICAL OWNERSHIP OF

4    THOSE SHARES.  WE THOUGHT HE MIGHT HAVE DISPOSED OF THEM

5    BECAUSE WE DIDN'T FIND ANY SPECIFIC CERTIFICATES OF THAT.

6        IT WASN'T UNTIL HE TESTIFIED AT TRIAL THAT WE LEARNED HE

7    STILL HAD PHYSICAL POSSESSION OF THOSE CERTIFICATES.  WHEREAS,

8    THE SUMOLOGIC STOCK, WE DIDN'T SEIZE THEM, WE JUST DIDN'T KNOW

9    UNTIL JUST PRIOR TO THIS HEARING, WHICH IS WHY WE BROUGHT IT

10   UP, YOUR HONOR.

11        MS. JAYNE:  YOUR HONOR, I DON'T BELIEVE A DISTINCTION

12   SHOULD BE DRAWN BETWEEN A PHYSICAL PIECE OF PAPER LAYING IN HIS

13   HOUSE VERSUS A PDF, WHICH MR. SAMPSON JUST SAID THEY HAD PDF OF

14   THOSE SHARES, BUT NOT A FLOATING PIECE OF PAPER, AND THAT'S NOT

15   REALLY A SIGNIFICANT DISTINCTION.

16        AND AS NOTED, YOUR HONOR, IF THERE WAS KNOWLEDGE THAT

17   MR. KAIL EXERCISED, AND THAT COMPANY REMAINS A PRIVATE COMPANY

18   THAT HASN'T BEEN ACQUIRED, THERE'S NOTHING HE KNOWS.  MOREOVER,

19   THE GOVERNMENT WORKED WITH THE OWNERS OF THOSE COMPANIES AND

20   THAT INFORMATION WAS THERE.

21        THE COURT:  WELL, IT CERTAINLY -- THERE'S A

22   LIMITATION ON SELLING SHARES OF A PRIVATE COMPANY IN AN OPEN

23   MARKET, BUT THAT DOESN'T MEAN THAT ONE CAN'T SELL THEM BACK TO

24   THE COMPANY.

25        AND MOST -- I DO NOT KNOW ANYTHING ABOUT NETSKOPE, BUT

1    FRANKLY, MOST COMPANIES HAVE A WAY OF CASHING OUT THEIR SHARES

2    OF PEOPLE WHO LEAVE THE COMPANY IN ANY PARTICULAR WAY.

3        AND SO I GUESS WHAT'S INTERESTING ABOUT THIS IS THAT I

4    THINK THERE'S A TECHNICAL RULING HERE THAT I NEED TO MAKE

5    BECAUSE OF THE RIGHT TO JURY TRIAL UNDER THE STATUTE.  BUT IT

6    WILL THEN JUST CHANGE THE EQUATION ON THE 8TH AMENDMENT

7    ANALYSIS, BECAUSE I HAVE TO LOOK AT THE TOTALITY OF THE

8    CIRCUMSTANCES ON A FAIR LINE.

9        BUT MR. KALTSAS, I JUST DON'T THINK THAT UNDER THESE

10   CIRCUMSTANCES, THAT THE GOVERNMENT HAS BEEN ABLE TO SHOW THAT

11   THERE IS SUBSEQUENTLY LOCATED PROPERTY THAT WOULD ALLOW YOU TO

12   PROVE FORFEITABILITY WITHOUT A RIGHT TO A JURY TRIAL ATTACHING

13   TO THE DEFENSE.

14       MR. KALTSAS:  AND YOUR HONOR, THE GOVERNMENT

15   DEFINITELY CONCEDES THAT WITH RESPECT TO SUMOLOGIC.

16       WITH RESPECT TO NETSKOPE, AS YOUR HONOR MENTIONED, THERE'S

17   ALWAYS THE POSSIBILITY OF GETTING RID OF THE STOCK IN SOME

18   FORM.  IT COULD BE SOLD BACK TO THE COMPANY, IT COULD BE GIVEN

19   TO RELATIVES OR FRIENDS OR SOMETHING LIKE THAT.

20       AND I THINK IT SPEAKS VOLUMES THAT WE DID FIND SOME

21   CERTIFICATES FOR SUMOLOGIC BUT DIDN'T FIND ONE FOR NETSKOPE.

22   THE DISTINCTION THERE IS PRETTY CRITICAL BECAUSE THERE WASN'T

23   THE SOLID KNOWLEDGE THE GOVERNMENT HAD WITH RESPECT TO ONE AS

24   TO THE OTHER, WHICH IS WHY WE ARE CALLING IT SUBSEQUENT

25   PROPERTY, ONLY BECAUSE WE WERE ABLE TO CONFIRM POSSESSION OF

1    THAT AT TRIAL.

2         EVEN WITH RESPECT TO A COMPANY, FOR EXAMPLE, BEING ABLE TO

3    BUY BACK STOCK, THERE'S NO WAY THEY WOULD HAVE NECESSARILY --

4    IF IT WAS GIVEN TO RELATIVES OR SOMETHING LIKE THAT, OR IF

5    MR. KAIL SOLD IT, WHICH IS WHY WE ARE CALLING IT SUBSEQUENTLY

6    LOCATED.

7         MS. JAYNE:  YOUR HONOR, JUST TO BRIEFLY ADDRESS THE

8    SUBSECTION E OF SUBSTITUTE PROPERTY.

9         I'M NOT EVEN SURE WHY WE ARE HAVING THE DISCUSSION,

10   BECAUSE THE RULE APPEARS CLEAR THAT AFTER A COURT'S ORDER OF

11   FORFEITURE, IF THERE'S SOME PROPERTY THAT WAS FORFEITABLE THAT

12   WAS LOCATED AFTER THE ORDER WAS ENTERED OR SUBSTITUTE PROPERTY

13   THAT QUALIFIES FOR FORFEITURE UNDER AN APPLICABLE STATUTE.

14        THIS IS NOT -- TO BE AS NOTED IN MY BRIEF, SUBSTITUTE

15   PROPERTY, IT HAS TO BE THE SUBSTITUTION, HAS TO BE THE FAULT OF

16   THE --

17        THE COURT:  I DON'T SEE THIS AS SUBSTITUTE.  I THINK

18   WE ARE ONLY TALKING ABOUT E(1)(A), AND I'M LOOKING AT THE WORD,

19   IS SUBJECT TO FORFEITURE UNDER AN EXISTING FORFEITURE OR UNDER

20   AN EXISTING ORDER OF FORFEITURE, BUT WAS LOCATED AND

21   IDENTIFIED.

22        MS. JAYNE:  AFTER THE ORDER WAS ENTERED.

23        THE COURT:  AFTER THE ORDER WAS ENTERED.

24        SO THIS WAS NOT IDENTIFIED.  WELL, I HAVEN'T ENTERED AN

25   ORDER.

```
1              MS. JAYNE:  EXACTLY.

2         THIS REFERS TO IF THERE'S -- AN ORDER OF FORFEITURE, THEN

3    SOME TIME DOWN THE ROAD, THEY FINALLY FOUND WHATEVER IT IS THEY

4    WERE TRYING TO FORFEIT.  THEY COULDN'T FIND IT AT THE TIME OF

5    FORFEITURE.

6         SO FOR EXAMPLE, THERE'S SOME JEWELRY THAT THEY WANTED TO

7    SEEK, WE CAN'T FIND IT, AND THEN WE LOCATE IT LATER.  THIS

8    ISN'T EVEN THAT FACT SCENARIO.

9              THE COURT:  THERE HAS TO BE A PROVISION FOR

10   ADJUDICATION BETWEEN THE TIME OF VERDICT AND THE TIME OF THE

11   PRELIMINARY FORFEITURE ORDER, BECAUSE I'M NOT GOING TO HAVE A

12   NEW JURY COME IN.

13             MS. JAYNE:  BUT THE GOVERNMENT COULD -- THE

14   GOVERNMENT WAS AWARE.

15        AND AGAIN, THE FACT THAT MR. KAIL WAS ISSUED STOCK

16   OPTIONS, HE EXERCISED THE STOCK OPTIONS, THE WITNESSES

17   TESTIFIED ABOUT THOSE.  BOTH COMPANIES ISSUED PAPERWORK

18   RELATING TO THOSE, THAT WHETHER HE HAS THEM IN HIS HOUSE OR

19   GAVE IT TO A RELATIVE, I DON'T EVEN KNOW HOW YOU COULD GIVE IT

20   TO A RELATIVE, BUT SPECIFICALLY WE ARE TALKING ABOUT

21   HYPOTHETICALS.

22        NETSKOPE STOCK, AND THE GOVERNMENT CAN EASILY CONTACT THE

23   WITNESS FROM NETSKOPE TO CONFIRM THIS, IT DOESN'T GET SOLD BACK

24   TO THE COMPANY.  THERE ISN'T -- THERE'S A LIMITATION ON OPEN

25   MARKET SELLING.
```

1    THE GOVERNMENT AGAIN, WITHIN THE SCOPE OF THEIR

2  INVESTIGATION, THEY HAVE ACCESS TO ALL OF THAT INFORMATION THAT

3  THEY PRESUMED, OR WE WILL JUST ASSUME HE DOESN'T HAVE IT

4  ANYMORE.  THAT'S CERTAINLY NOT THE STANDARD.  IT'S LIKE, OH,

5  GOSH, WE DIDN'T KNOW ABOUT THIS CATEGORY WHATSOEVER.  THEY ARE

6  JUST MAKING A PRESUMPTION.

7    AND I DON'T KNOW IF THEY DID, OR IT WAS SIMPLY JUST AN

8  OVERSIGHT THAT THEY DIDN'T KNOW THAT HE STILL HAD IT.  WHY

9  WOULD YOU ASSUME HE DIDN'T?  HE CAN'T DO ANYTHING WITH IT.  I

10  MEAN, THE PRESUMPTION IS HE CAN'T DO ANYTHING WITH IT.

11    SO THE STANDARD HERE IS NOT OH, WELL WE ARE JUST ASSUMING

12  HE -- WE WILL ASSUME THAT HE DID SOMETHING WITH IT, AND WE ONLY

13  LEARNED THIS AFTER HE TESTIFIED.

14    I DON'T SEE ANYWHERE WHERE THIS STANDARD IS THE

15  PRESUMPTION AGAINST MR. KAIL VERSUS THE PRESUMPTION IS HE HAS

16  IT, BECAUSE THAT'S WHAT THE EVIDENCE SHOWED FROM THE DAY THAT

17  THEY DID THE SEIZURE.

18    THE COURT:  SO I DON'T THINK IS -- I GUESS I'M MAKING

19  SOME DISTINCTIONS HERE.  I HAVE SOME CONCERNS THAT THE

20  GOVERNMENT DID NOT HAVE KNOWLEDGE, EVEN CONSTRUCTIVE KNOWLEDGE

21  OF THE EXISTENCE OF THE NETSKOPE STOCK CERTIFICATES DURING

22  TRIAL, IT WAS ONLY AT THE TRIAL WHERE EVIDENCE CAME FORWARD

23  WHEN IT WAS TOO LATE TO SEEK A JURY VERDICT ON THAT.

24    AND THE FACT THAT THEY COULD HAVE PERFORMED AN

25  INVESTIGATION, I DON'T THINK IS THE QUALIFYING CONDUCT.  I

1    THINK HAVING THE SUMOLOGIC CERTIFICATES IN THEIR HANDS IS VERY

2    DIFFERENT, THAT'S A REALLY GOOD EXAMPLE, AND I'M TRYING TO

3    DETERMINE WHETHER UNDER THE LAW, WHAT THEY ACTUALLY KNEW, OR

4    I'M GOING TO DEEM THEM TO KNOW, ABOUT NETSKOPE IS THE SAME OR

5    DIFFERENT.  AND I'M TRYING TO DRAW THAT LINE.

6         SO I WOULD TAKE OFF THE TABLE, QUESTIONS THEY COULD HAVE

7    ASKED, HIDING PLACES THEY COULD HAVE LOOKED IN, BUT DIDN'T.  I

8    THINK THAT'S DIFFERENT.

9         AND WITH JEWELRY, FOR EXAMPLE, THEY COULD EXERCISE

10   SUBSEQUENT SEARCH WARRANTS EVERY DAY UNTIL THEY LOCATED THE

11   JEWELRY, BUT THAT'S NOT THE POINT.  AND ASKING NETSKOPE ABOUT

12   THE STATUS AGAIN WOULD BE FURTHER INVESTIGATION, WHICH IS

13   NOT -- I MEAN, I CAN'T TELL THAT THEY WOULD HAVE EVEN LEARNED

14   THAT.  I DON'T KNOW HOW COOPERATIVE NETSKOPE WAS, I DON'T KNOW

15   WHETHER THAT IS INFORMATION THEY HOLD CLOSELY AND WOULD REQUIRE

16   A COURT ORDER TO GIVE IT UP.  I MEAN, PRIVATE COMPANIES

17   GENERALLY DON'T DISCLOSE WHO THEIR INVESTORS ARE, SO I DON'T

18   KNOW THIS PARTICULAR COMPANY AND WHAT IT WOULD HAVE DONE.

19        MS. JAYNE:  WELL, YOUR HONOR, I THINK THE GOVERNMENT

20   CONCEDED ALREADY THEY HAD THE PDF, IT WAS IN ELECTRONIC FORMAT,

21   BUT I DON'T KNOW WHETHER THIS DISTINCTION --

22        MR. KALTSAS:  YOUR HONOR, IT'S RELEVANT TO THE EXTENT

23   THAT WE KNOW SUMO WAS IN MR. KAIL'S HANDS.  EVEN IT DOESN'T

24   ALIENATE IT AT SOME POINT.

25        THE COURT:  SO I'M NOT UNDERSTANDING THAT DIFFERENCE

1     MR. KALTSAS, HELP ME OUT.

2        MR. KALTSAS:  RIGHT.

3     SO TO THE EXTENT THAT SOMEONE HAS A PHYSICAL STOCK

4     CERTIFICATE IN THEIR POSSESSION, THAT MEANS THAT THE STOCK IS

5     IN THEIR POSSESSION.

6     THERE'S NO WAY MR. KAIL COULD HAVE GIVEN IT TO ANYONE

7     ELSE, THERE'S NO WAY MR. KAIL COULD HAVE SOLD IT TO SOMEBODY

8     ELSE OR BACK TO THE COMPANY.

9     WITH RESPECT TO NETSKOPE, THERE IS NO EVIDENCE OF THAT,

10    THERE IS -- WE DON'T KNOW WHO POSSESSED IT AT THE TIME.

11       THE COURT:  LET ME ASK AN EXAMPLE.

12    SOMETHING THAT IS NEGOTIABLE, I UNDERSTAND THESE MAY NOT

13    BE NEGOTIABLE, I WANT TO TAKE THAT ISSUE OUT.  SO IF I HAVE A

14    HUNDRED DOLLAR BILL IN MY HAND, I CAN ANY GO DOWN TO THE STORE

15    AND BUY SOMETHING WITH IT.  BUT IF I HAVE A PHOTOGRAPH OF A

16    HUNDRED DOLLAR BILL, ALL I HAVE IS A PHOTOGRAPH OF A HUNDRED

17    DOLLAR BILL AND IT'S NOT WORTH ANYTHING.

18    SO IT DOES SEEM TO ME THAT THAT MAY BE THE EXAMPLE THAT

19    YOU ARE TRYING TO MAKE THAT A PDF OF A STOCK CERTIFICATE TELLS

20    YOU NOTHING ABOUT THE STATUS OF OWNERSHIP IN THE CURRENT TIME.

21     AM I ON THE RIGHT WAVELENGTH THERE?

22       MR. KALTSAS:  PRECISELY.

23    WITH THAT PHOTOGRAPH A HUNDRED DOLLAR BILL VERSUS HAVING

24    IT IN THEIR E-MAIL, YOU MIGHT HAVE IT, BUT YOU JUST DON'T KNOW.

25     SO IN THIS CASE, WE HAD NO IDEA THAT MR. KAIL ACTUALLY

1    POSSESSED THE NETSKOPE STOCK.  UNLIKE THE SUMOLOGIC STOCK, HE

2    DID HAVE IT IN HIS POSSESSION AT THE TIME OF OUR SEARCH

3    WARRANT.

4          THE COURT:  AND SO IT'S THE GOVERNMENT'S POSITION

5    THAT AT TRIAL, DURING MR. KAIL'S CROSS-EXAMINATION, HE

6    TESTIFIED THAT HE THEN CURRENTLY OWNED THE SHARES THAT HE HAD

7    EXERCISED IN NETSKOPE.

8          IS THAT A SUMMARY OF THE TRIAL TESTIMONY?

9          MR. SAMPSON:  YES, YOUR HONOR.

10    I CAN TELL YOUR HONOR I WAS SURPRISED TO LEARN AT TRIAL

11    WHEN I ASKED MR. KAIL IF HE STILL HELD THE STOCK, AND HE SAID

12    YES.  I WAS SURPRISED BY THAT BECAUSE WE HAD SEEN THE PDF,

13    WHICH YOU CAN'T SELL THE PDF, AND WE DIDN'T SEIZE IT.

14    WHILE I CONCEDE AND I DON'T WANT TO GET TOO FAR INTO THE

15    GOVERNMENT'S THINKING IN TERMS OF THE CHARGES --

16          THE COURT:  NO, I UNDERSTAND, YES.

17          MR. SAMPSON:  BUT YOUR HONOR, THESE WERE

18    CONSIDERATIONS WE MADE WHEN WE WERE ANALYZING FORFEITURE.

19    SUMO WAS AN OVERSIGHT WITH RESPECT TO WHAT YOU ALLEGE, THE

20    FACT THAT WE HELD THE PHYSICAL -- IT'S NOT A BEARER BOND, BUT

21    THE PHYSICAL CERTIFICATE.  BUT WITH THE REST, WE DIDN'T KNOW.

22    AND SO THE GOVERNMENT ISN'T SUPPOSED TO ALLEGE FORFEITURE

23    OF A FERRARI IF IT DOESN'T KNOW THAT THE DEFENDANT OWNS A

24    FERRARI.

25          THE COURT:  THE PICTURE OF THE FERRARI ISN'T ENOUGH.

1      OKAY.  MS. JAYNE, LET ME TURN BACK TO YOU THEN.

2          MS. JAYNE:  YOUR HONOR, I AM NOT SEEING A DISTINCTION

3   BETWEEN HAVING AN ELECTRONIC COPY VERSUS A PHYSICAL COPY.  IF

4   HE LOST THE PHYSICAL PAPERWORK, THE PHYSICAL CERTIFICATE, HE

5   WOULD STILL OWN STOCK IN SUMOLOGIC.

6      SO IT DOESN'T -- IT'S SORT OF A THING OF, I GUESS BACK IN

7   THE DAY, THAT'S THE ONLY WAY THAT IT WAS DONE, IT WAS THROUGH

8   PHYSICAL PAPERWORK.  BUT THE FACT THAT HE HAD IT PHYSICALLY

9   VERSUS SCANNED TO HIS COMPUTER.

10         THE COURT:  AS TO MR. KAIL'S OWNERSHIP, I AGREE WITH

11  YOU COMPLETELY.  WE ARE TALKING ABOUT THE GOVERNMENT'S

12  KNOWLEDGE.  THAT'S THE PROBLEM HERE.

13     I THINK YOU ARE EXACTLY RIGHT THAT THE CERTIFICATE IS A --

14  I MEAN, IT'S -- BECAUSE THEY ARE NOT NEGOTIABLE.  SOME

15  CERTIFICATES ARE, THESE ARE NOT NEGOTIABLE, THEY ARE ONLY

16  EVIDENCE OF AN OWNERSHIP INTEREST IN THE COMPANY.

17     BUT WE ARE TALKING ABOUT THE GOVERNMENT'S KNOWLEDGE, AND

18  IF IT'S AN AFTER-LOCATED.

19         MS. JAYNE:  WHEN IT'S NOT AFTER-LOCATED, BECAUSE THE

20  GOVERNMENT IS DRAWING THE DISTINCTION BETWEEN WELL, WE

21  EFFECTIVELY KNEW OR SHOULD HAVE KNOWN ABOUT SUMO BECAUSE WE

22  TOOK IT, BUT NETSKOPE -- FIRST OF ALL, THEY TOOK IT, SO THEY

23  ARE SAYING THAT TOLD US HE STILL OWNS IT.  THAT DOESN'T

24  ACTUALLY TELL YOU HE STILL OWNS IT.

25     NUMBER TWO, THEY ALSO TOOK NETSKOPE.  THEY HAD THAT

1    INFORMATION, THEY ARE SAYING THERE'S A DISTINCTION BETWEEN THE

2    FACT THAT IT WAS SCANNED.  THEY HAD THE INFORMATION THAT HE

3    HELD THE STOCK BECAUSE THERE'S NO OTHER -- THEY HAVE NO OTHER

4    INFORMATION.

5            THE COURT:  WELL, THEY HAD BANK RECORDS TOO THAT HE

6    HAD PAID THE OPTION PRICE.

7            MS. JAYNE:  ONCE THEY KNEW HE EXERCISED IT, I'M NOT

8    SURE WHERE WE ARE GETTING FROM THAT, THAT THE GOVERNMENT

9    ASSUMED THAT HE NO LONGER HELD IT.  THERE'S NOTHING TO SUGGEST

10   HE DIDN'T HOLD IT AT THAT TIME.

11           THE COURT:  LET ME MOVE THE CONVERSATION A LITTLE

12   BIT.

13       WHAT THEN WOULD PREVENT THE GOVERNMENT FROM NOW SEEKING

14   SUBSTITUTE PROPERTY FOR THE VALUE OF THOSE SHARES WHERE WE ARE

15   OUT OF THE ISSUE OF JURY TRIAL?

16       I DON'T KNOW WHY THEY COULDN'T SEEK SUBSTITUTE PROPERTY

17   FOR THE VALUE, ESPECIALLY SINCE NETSKOPE IS PRIVATELY HELD.

18   AND THAT WAS GOING TO BE MY NEXT LINE OF QUESTIONING AFTER WE

19   GOT THROUGH THIS AS TO WHETHER I COULD ORDER THE SEIZURE OF

20   STOCK CERTIFICATES THAT ARE NOT NEGOTIABLE, AND WHERE I DON'T

21   KNOW THAT I CAN FORCE NETSKOPE TO BE -- AND GIVE OWNERSHIP OF

22   PART OF ITS COMPANY TO THE UNITED STATES GOVERNMENT WHEN IT'S

23   PRIVATELY HELD.

24       SO I DON'T KNOW THE ANSWER TO THAT, IT WAS JUST

25   INTERESTING TO ME.  A PUBLICLY HELD COMPANY IS JUST EASY, OF

1    COURSE, BECAUSE ANYONE CAN BUY THE STOCK FROM ANY SHAREHOLDER.

2        MR. KALTSAS, DID YOU THINK ABOUT THAT?

3            MS. JAYNE:  SORRY, YOUR HONOR, CAN I RESPOND TO

4    PROPERTY?

5        YOUR HONOR SAID THIS ISN'T SUBSTITUTE PROPERTY, THE

6    FORFEITURE STATUTE PROVIDES FOR SUBSTITUTE ASSETS ONLY WHEN

7    ACTS OF THE DEFENDANT HAVE CAUSED THE PROPERTY, WHICH

8    CONSTITUTES OR IS DERIVED FROM PROCEEDS TRACEABLE TO THE

9    OFFENSE OF CONVICTION, TO BE UNAVAILABLE.

10       ACTS OF THE DEFENDANT.  THE FACT THAT THIS IS NOT MONEY,

11   IS NOT AN ACT OF THE DEFENDANT, IT WAS ALWAYS IN THE FORM OF

12   NON -- YOU KNOW, OF STOCK SHARES.  IT WASN'T AN ACT OF HIS THAT

13   HE MADE IT SO.  THAT'S THE ONLY TIME THAT SUBSTITUTE PROPERTY

14   EVEN ENTERS THE EQUATION.  SO WE DON'T GET THERE.

15       AND YOUR HONOR, ONE ARGUMENT THAT I WOULD LIKE TO ADD, AND

16   IT MAY BE MOOT IF BOTH OF THOSE WERE ENTITLED TO A JURY TRIAL,

17   IS THAT THERE'S NO WAY TO DIFFERENTIATE WHICH ASPECTS OF THESE

18   STOCK OPTIONS WERE RELATED TO NETFLIX AND WHICH ASPECTS OF

19   THOSE -- IT'S NOT VISIBLE -- WERE THE RESULT OF MR. KAIL'S

20   WORK.

21           THE COURT:  YOUR ARGUMENT, I ACTUALLY -- IN READING

22   YOUR PAPERS, I REJECT THAT ARGUMENT.  WE HAVEN'T HAD ARGUMENT

23   ON THAT.  THAT GOES TO SOME OTHER ISSUES AS WELL.  I'M NOT

24   PERSUADED BY YOUR ARGUMENT THERE.

25           MS. JAYNE:  OKAY.

1        AND THE REASON THAT I BROUGHT IT UP IS WHEN THE STOCK

2    OPTIONS WERE ISSUED, THERE WAS A CONTRACT ASSOCIATED WITH THOSE

3    THAT OUTLINED THE WORK THAT MR. KAIL HAD TO DO TO EARN THAT

4    THOSE.  YOU HAVE TO DO THIS, THIS, AND THIS.

5        THE COURT:  AND THAT WAS ALWAYS YOUR ARGUMENT, THAT

6    IT WAS INDEPENDENT OF NETFLIX.  BUT THAT WAS NOT THE EVIDENCE

7    AS I PERCEIVED IT AT TRIAL, OR AS I BELIEVE THE JURY PERCEIVED

8    IT.

9        MS. JAYNE:  WELL YOUR HONOR, SOME OF THIS OCCURRED

10    BEFORE NETFLIX EVEN HAD THE CONTRACT.

11        FOR EXAMPLE, NETSKOPE, I BELIEVE IT WAS TWO YEARS MR. KAIL

12    WORKED FOR THEM HELPING THEM DEVELOP THEIR PRODUCT.  IT WAS

13    INDEPENDENT OF ANY OTHER COMPANY.  HE PUTS IN HOURS HELPING

14    THEM DEVELOP THEIR PRODUCT.

15        THE COURT:  I DON'T THINK THESE CRIMINAL STATUTES

16    DRAW THE DISTINCTION BETWEEN THE SWEAT LABOR AND THE HONEST

17    SERVICES FRAUD OF DOING IT, IN THE POSITION OF AUTHORITY THAT

18    MR. KAIL HAD AT THE TIME AND IN DEROGATION OF HIS OBLIGATIONS

19    TO HIS EMPLOYER.

20        SO YOU KNOW, I THINK THE JURY ALREADY MADE THOSE DECISIONS

21    ACTUALLY, IT'S NOT FOR ME, I'M NOT A FACT FINDER HERE.  BUT I'M

22    NOT -- THOSE STOCK OPTIONS WERE GIVEN AT THE INCEPTION OF THE

23    AGREEMENT, AND THEY VESTED OVER TIME.  SO PRESUMABLY, HE COULD

24    HAVE BEEN -- HE COULD HAVE LOST HIS ADVISOR CONTRACT BEFORE

25    THEY MISSED IT, BUT -- WHICH APPARENTLY DIDN'T HAPPEN.

1    I'M JUST -- I'M REALLY FOCUSED ON WHETHER THE DEFENDANT

2    HAD THE RIGHT TO A JURY TRIAL ON THE NETSKOPE PROPERTY, WHICH

3    IT NOW WOULD HAVE BEEN DEPRIVED OF IF I WERE TO ORDER

4    FORFEITURE.

5        IT'S A VERY -- IT'S AN EASILY ARTICULATED QUESTION, AND

6    THEN THE ANSWER IS WHERE WE GET A LITTLE FUZZY ON THIS, ON THE

7    PROPERTY.

8        I'M JUST TRYING TO -- MR. KALTSAS, I THINK YOU HAD SOME

9    CASES IN HERE ABOUT AFTER-ACQUIRED.  I DON'T THINK I COPIED

10   THEM BECAUSE I DIDN'T THINK THAT WAS THE ISSUE.

11       MS. JAYNE:  AND YOUR HONOR, JUST SORRY, ONE QUICK

12   POINT.

13       AT WORST, LET'S SAY AT WORST, THE GOVERNMENT LEARNS IT

14   WHEN HE TESTIFIES.  HE HAD A SEPARATE FORFEITURE TRIAL.  AT

15   THAT POINT, THE GOVERNMENT CERTAINLY KNEW IT.  AT THAT POINT

16   WHEN HE'S ASSERTING -- HE COULD HAVE WAIVED THAT AT THAT POINT

17   AND SAID, YOU KNOW WHAT, FORGET IT, LET'S GO TO TRIAL ON THIS

18   OR CONCEDE IT.

19       AT THAT POINT, THE GOVERNMENT STILL HAD AN OPPORTUNITY,

20   AFTER HE TESTIFIED, TO BRING IT TO THE JURY.  THEY CHOSE NOT

21   TO.  THEY FORFEITED -- THEY ESSENTIALLY FORFEITED THE RIGHT TO

22   HAVE THE JURY DECIDE IT BECAUSE THEY KNEW AT THAT POINT.

23       MR. KALTSAS:  YOUR HONOR, I DON'T THINK THAT'S

24   ACCURATE.  ONLY BECAUSE TO ACTUALLY ADD SOMETHING -- WE WOULD

25   HAVE HAD TO DO A BILL OF PARTICULARS, AND WE WERE IN THE MIDDLE

1    OF TRIAL AT THAT POINT.  SO I THINK IT WOULD HAVE BEEN

2    IMPRACTICAL OR IMPOSSIBLE TO DO SO.

3        I DON'T KNOW THE CASE LAW SURROUNDING, CHANGING THE

4    INDICTMENT IN THE MIDDLE OF TRIAL, BUT I JUST DON'T FORESEE

5    THAT BEING A POSSIBILITY.

6        MS. JAYNE:  BUT IT WAS A SEPARATE TRIAL, IT WAS A

7    SEPARATE TRIAL AFTER THE VERDICT.  THAT IT WAS INCONVENIENT, I

8    DON'T THINK MR. KAIL SHOULD LOSE HIS RIGHT TO A JURY TRIAL

9    BECAUSE IT MAY HAVE BEEN --

10       THE COURT:  WELL, I DON'T THINK IT'S INCONVENIENT

11   BECAUSE IT WAS THE SAME JURY.  WE DON'T EMPANEL A SEPARATE JURY

12   AFTER WE -- RECESS FOR THE GRAND JURY TO ISSUE A SUPERSEDING

13   INDICTMENT AND HAVE AN ARRAIGNMENT AND -- I DON'T THINK THAT --

14       MS. JAYNE:  NO, YOUR HONOR, BUT THERE COULD HAVE BEEN

15   A BILL OF PARTICULARS AT THAT TIME.  THE ISSUE WAS NOT UNRIPE

16   TO GO TO THE JURY AT THAT POINT.

17       MR. KALTSAS:  YOUR HONOR, I DON'T KNOW PARTICULARLY

18   THE CASE LAW SURROUNDING THE BILL OF PARTICULARS FOR AN

19   INDICTMENT IN THE MIDDLE OF TRIAL, BUT I CAN'T FORESEE --

20       THE COURT:  I WOULD HAVE TO THINK THE DEFENDANT WOULD

21   HAVE CERTAIN RIGHTS TO DELAY THAT.

22       MR. KALTSAS:  PRECISELY, YOUR HONOR.

23       THE COURT:  SO MR. KALTSAS, I KNOW IN YOUR BRIEF YOU

24   CITED A LINE OF CASES ON THIS ISSUE OF AFTER-LOCATED PROPER,

25   WHICH I DON'T HAVE ANY OF THEM HERE BECAUSE I DIDN'T THINK THAT

1    WAS THE PRIMARY ISSUE, BUT IF YOU CAN DIRECT ME IN YOUR BRIEF.

2              MR. KALTSAS:  SURE, YOUR HONOR.

3         I WOULD DIRECT YOU TO PAGE 3.

4              THE COURT:  PAGE?

5              MR. KALTSAS:  THREE OF THE REPLY BRIEF.

6         AND I THINK THE MOST SALIENT CASE HERE WOULD BE UNITED

7    STATES V. LAZARENKO.  IT IS A LENGTHY ONE, BUT IT IS IN THIS

8    DISTRICT.

9         AND IT GOES INTO DETAIL ABOUT THE REQUIREMENTS OF

10   RULE 32.2(A) WHICH SPECIFICALLY EXPLAINS PRECISELY WHAT YOU

11   NEED IN AN INDICTMENT AND WHAT YOU DON'T.

12        AND RULE 32.2(A) DOES GIVE THE GOVERNMENT WIDE LATITUDE IN

13   TERMS OF GENERALLY SEEING THINGS IN AN INDICTMENT AND NOT GOING

14   TO LIST OUT EVERY SINGLE ITEM.

15        AND WHERE THE LOST INFORMATION COMES IN, THE GOVERNMENT

16   DOESN'T KNOW WHAT'S FORFEITABLE, THAT'S WHAT RULE 32.2(E) IS

17   FOR.  AND THAT GOES -- I THINK THE CASE THERE IS STILL

18   LAZARENKO, IT GOES INTO PRETTY GOOD DETAIL ABOUT THAT.  BUT

19   ALSO UNITED STATES V. DUBOC CASE, I THINK THAT'S HOW YOU

20   PRONOUNCE IT, AND THAT WAS JUST A PLACE THERE TO EXPLAIN TO THE

21   COURT HOW FAR OUT, HOW WIDE RANGING RULE 32.2(E) ACTUALLY IS.

22   YOU COULD REVISIT FORFEITURE AFTER VARIOUS PERIODS OF TIME, IT

23   JUST GIVES THE COURT BROAD POWER TO AMEND FORFEITURE OR TO EVEN

24   ORDER A NEW ONE AT A CERTAIN POINT.

25             IF THE COURT WOULD LIKE, THE GOVERNMENT COULD ALSO PROVIDE

1    A 2 OR 3-PAGE BRIEF PROVIDING CASE LAW TO THIS POINT BY TONIGHT

2    OR TOMORROW, WHICHEVER THE COURT PREFERS.

3         THE COURT:  SO I'M ALSO NOTING THIS FROM YOUR BRIEF,

4    THE QUOTATION FROM LAZARENKO THAT -- I GUESS I'M LOOKING AT THE

5    BRIEF ITSELF ON PAGE 4.  YOU ARGUE, TO THE EXTENT RULE 32.2

6    PROVIDES FOR A JURY TRIAL ON FORFEITURE ISSUES, A JURY TRIAL

7    NEED NOT -- NEED ONLY TAKE PLACE ON FORFEITABILITY OF PROPERTY

8    ALREADY NAMED IN THE INDICTMENT, AND THERE IS NO RIGHT TO A

9    JURY TRIAL WITH RESPECT TO PROPERTY ADDED TO A PRELIMINARY

10   ORDER OF FORFEITURE AFTER CONVICTION.

11   SO CLEARLY YOU ARE ADDING THIS TO THE PRELIMINARY ORDER

12   AFTER CONVICTION.

13        MR. KALTSAS:  THAT'S RIGHT.

14        THE COURT:  YOU DIDN'T IDENTIFY THIS PROPERTY IN THE

15   INDICTMENT.  I'M JUST TURNING TO THE INDICTMENT ITSELF, YOU

16   HAVE A GENERIC NOTICE OF FORFEITURE.

17        MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

18   RULE 32.(E)(3) SPECIFICALLY PROVIDES THERE'S NO JURY TRIAL

19   PERMITTED FOR PROPERTY ADDED UNDER --

20        THE COURT:  I'M LOOKING TO SEE IF THE HOUSE ITSELF IS

21   MENTIONED IN THE INDICTMENT.

22        MR. KALTSAS:  I BELIEVE IT IS, YOUR HONOR.

23        THE COURT:  AND IT IS, YES.

24   SO THE RIGHT TO A TRIAL BY JURY WAS AFFORDED FOR THE

25   PROPERTY IDENTIFIED IN THE INDICTMENT.  AND YOU TOOK CARE OF

1    THAT.  AND THAT RIGHT WAS EXERCISED.  AND THERE IS A VERDICT.

2        AND THEN THIS WOULD BE YOUR QUOTATION, I WANT TO SEE IF

3    THAT'S -- THAT'S YOUR ARGUMENT, I WANT TO MAKE SURE I HAVE THIS

4    CASE NOW.

5        MS. JAYNE:  YOUR HONOR, I FEEL LIKE WE ARE GETTING --

6    32, SUBSECTION E IS A WHOLE DIFFERENT ANIMAL.  WE ARE DECIDING

7    WHAT SHOULD GO IN THE PRELIMINARY ORDER OF FORFEITURE.  THIS IS

8    RELATING TO PROPERTY.

9        THIS SAYS, SUBJECT TO FORFEITURE UNDER AN EXISTING ORDER,

10   BUT WAS LOCATED AND IDENTIFIED AFTER THAT ORDER.  THIS ISN'T

11   RELATING TO WHAT SHOULD GO IN THAT ORDER TO BEGIN WITH.  THAT'S

12   WHERE WE ARE AT.  WE ARE NOT AT PROPERTY LOCATED AFTER THE

13   PRELIMINARY ORDER OF FORFEITURE.  WE ARE DETERMINING -- WE

14   DON'T GET TO (E) JUST YET, WE ARE DETERMINING WHETHER MR. KAIL

15   HAD THE RIGHT TO A JURY TRIAL TO SPECIFIC PROPERTY.

16       THERE'S NOTHING IN THIS RULE ABOUT -- AND WITH RESPECT TO

17   THE CASES, THAT HAS TO COMPARE TO WHETHER THE DEFENDANT

18   ASSERTED A RIGHT TO JURY TRIAL AS TO SPECIFIC PROPERTY.

19       THERE'S NOT EVEN A DISCUSSION ABOUT KNOWLEDGE VERSUS NOT

20   KNOWLEDGE, IT'S -- THE RULE ISN'T RELATING TO WHETHER THE

21   GOVERNMENT KNEW ABOUT SOMETHING, IT'S WHETHER LOCATED AND

22   IDENTIFIED AFTER THE FACT, NOT WHETHER IT WAS KNOWN TO EXIST.

23       SO THESE ARE MIXED ISSUES THAT ARE BEING PRESUMED ON A

24   PRE-PRELIMINARY ORDER OF FORFEITURE.  AGAIN, THE GOVERNMENT DID

25   KNOW, BUT MORE IMPORTANTLY, THIS IS SPECIFIC PROPERTY THAT

1    MR. KAIL HAD A JURY -- I DON'T THINK ANYBODY IS DISPUTING HE

2    HAD A JURY TRIAL. I DON'T SEE ANYTHING IN THE CASE LAW THAT

3    SAYS IF THE GOVERNMENT FIGURES OUT LATER, THAT IT SHOULD HAVE

4    INCLUDED IT, THAT SOMEHOW THAT'S SUBSEQUENTLY LOCATED PROPERTY.

5    THAT'S NOT WHAT THIS RELATES TO.

6         MR. KALTSAS: YOUR HONOR, THAT'S WHAT RULE 32.2(A) IS

7    FOR, WHICH IS WHY THE GOVERNMENT DOESN'T HAVE, LIKE MR. SAMPSON

8    SAID, IT'S SPECIFICALLY COVERED UNDER THE PROCEEDS AND UNDER

9    THE MONEY LAUNDERING SECTIONS OF THE INDICTMENT.

10    AND RULE 32.2(E) IS MEANT TO BE A STOPGAP, SO IF THE

11    GOVERNMENT DOES LOCATE SUCH SPECIFIC PROPERTY AFTER THE FACT,

12    IT DID DO SO.

13    WHAT THE DEFENDANT IS SUGGESTING IN THIS CASE IS

14    ESSENTIALLY AN UNLUCKY BLACK HOLE WHERE THE GOVERNMENT WOULD

15    FIND SOMETHING AT TRIAL OR BETWEEN TRIAL AND SENTENCING, THERE

16    WOULD BE NO WAY TO PURSUE FORFEITURE OF IT BECAUSE IT WASN'T

17    FOUND AT THE TIME OF INDICTMENT BUT ALSO WASN'T FOUND AFTER

18    SENTENCING.

19    THAT JUST CAN'T BE THE CASE, OTHERWISE THAT WOULD PROVIDE

20    DEFENDANTS A LOOPHOLE FOR WHICH TO ENJOY THE ELICIT PROCEEDS,

21    AND CAN GO ON WITH THEIR LIVES, WITH THE GOVERNMENT UNABLE TO

22    GO AFTER FORFEITURE IN ANY CAPACITY.

23    THAT SIMPLY ISN'T THE CASE, YOUR HONOR.

24         THE COURT: SO MR. KALTSAS, LET'S GO BACK TO

25    SUBDIVISION E.

1      MS. JAYNE ARGUES THAT WE DON'T EVEN GET THERE BECAUSE (E)

2  ONLY COMES INTO PLAY AT ANY TIME AFTER AN ORDER OF FORFEITURE.

3  THE COURT MAY, AT ANY TIME, ENTER AN ORDER OF FORFEITURE OR

4  AMEND AN EXISTING ORDER TO INCLUDE -- OH, I SEE, "MAY."

5      SO THE PRELIMINARY ORDER OF FORFEITURE COMES CLOSE AFTER

6  THE VERDICT, WHICH IS WHAT YOU FILED.

7          MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

8          THE COURT:  SO IT DOESN'T COME BEFORE, IT COMES

9  AFTER.  AND -- ALL RIGHT.

10     SO I'M GLAD TO TAKE AN ADDITIONAL TWO PAGES OF BRIEFING

11  FROM YOU, IF YOU WISH.  IT APPEARS TO ME THAT THE SUMOLOGIC IS

12  CONCEDED BY THE GOVERNMENT, NOT SUBJECT TO FORFEITURE.  AND ON

13  THE NETSKOPE, IT APPEARS TO ME THAT IT IS SUBJECT TO

14  DETERMINATION UNDER SUBDIVISION (E) BY THE COURT, AND THAT I

15  WOULD THEN MAKE A DETERMINATION OF THE NEXUS TO THE CRIME.

16     I THINK I HAVE THAT EVIDENCE IN THE RECORD.  THE

17  GOVERNMENT IS POINTING ME TO THAT.  AND MS. JAYNE, YOU ARE NOT

18  SUGGESTING THAT YOU HAVE OTHER EVIDENCE TO SUBMIT; IS THAT

19  CORRECT?

20          MS. JAYNE:  WELL, I MEAN, I CAN POINT THE COURT TO

21  PARTICULAR EXHIBITS THAT SHOW THAT THE NETSKOPE STOCK WAS

22  ISSUED BEFORE NETFLIX WAS EVEN IN THE PICTURE, THAT IT WAS

23  SUBJECT TO -- AND THERE IS CASE LAW, BY THE WAY, YOUR HONOR.

24          THE COURT:  IT WAS ISSUED BEFORE WHAT?

25          MS. JAYNE:  IT WAS ISSUED BEFORE NETFLIX WAS EVEN IN

1      THE PICTURE.

2              THE COURT:  I'M SORRY, YOU ARE SAYING BEFORE MR. KAIL

3      WAS EMPLOYED BY NETFLIX?

4              MS. JAYNE:  NOT BEFORE HE WAS EMPLOYED BY NETFLIX,

5      BEFORE THERE WAS A CONTRACT WITH NETFLIX, BEFORE NETSKOPE CAME

6      IN THE DOOR.

7              THE COURT:  OKAY.  I DON'T KNOW WHAT YOU MEAN BY

8      "CAME IN THE DOOR" YOU MEAN SIGN THE CONTRACT?  BECAUSE THAT

9      WAS THE WHOLE POINT OF THE HONEST SERVICES ON A SERVICES FRAUD

10     CONVICTION, IS THE JURY FOUND MR. KAIL WAS INVOLVED IN A SCHEME

11     TO PROMOTE THESE STARTUP COMPANIES AND OTHER COMPANIES TO HIS

12     BENEFIT AND TO MOVE THEM IN THE DIRECTION OF CONTRACTS WITH

13     NETFLIX.  BUT AS LONG AS HE WAS EMPLOYED BY NETFLIX WHEN HE

14     ARRANGED THE DEAL WITH NETSKOPE, IT'S COVERED BY THE

15     CONVICTION.

16             MS. JAYNE:  BUT THERE IS CASE LAW THAT EVEN

17     FORFEITURE IS SUBJECT TO A RULE OF PROPORTIONALITY.

18             THE COURT:  WELL, THAT'S A DIFFERENT ISSUE, THE

19     PROPORTIONALITY.

20             MS. JAYNE:  AND THAT'S WHAT I'M GETTING AT, THE

21     PROPORTIONALITY GOES TO WHETHER THESE STOCK OPTIONS ARE ONE

22     HUNDRED PERCENT IN EXCHANGE FOR A CONTRACT, OR THE

23     PROPORTIONALITY IS, WELL, I HAD TO WORK 20 HOURS A WEEK TO EARN

24     THESE STOCK OPTIONS.

25          AND THERE'S CASE LAW IN THE WIRE FRAUD AND RICO ANALYSIS,

1    IN TERMS OF SALARIES AND WHAT NOT, WHAT PROPORTION OF THIS WORK

2    WAS IN EXCHANGE FOR THIS ALLEGED SCHEME.

3         THE COURT:  AND WHAT WORK WOULD YOU DIRECT ME TO?

4         MS. JAYNE:  I WOULD DIRECT YOUR HONOR TO UNITED

5    STATES V. SIMON, 12 F.4TH 1, IN THE FIRST CIRCUIT, AUGUST 2021,

6    AND THAT CITES TO CADDEN.

7         THE COURT:  IS THAT IN YOUR BRIEF?

8         MS. JAYNE:  NO, YOUR HONOR, THAT ACTUALLY IS NOT.

9         THE COURT:  OKAY.  WELL, THEN IT MEANS I DIDN'T MISS

10   IT.

11        MR. SAMPSON:  IT POSTDATES THE TRIAL, YOUR HONOR.

12        THE COURT:  SEEMS TO.

13        MS. JAYNE:  YES.  AND CADDEN, I HAVE THE PIN CITE,

14   965 F.3D AT 37.  THAT'S QUOTED IN THIS SIMON CASE.  AND I'M

15   LOOKING FOR THE FULL CITE.

16        THE COURT:  THAT WAS AT 67?

17        MS. JAYNE:  THE CADDEN CITE WAS 965 F.3D AT 37.

18        THE COURT:  OH, SORRY, I MISHEARD YOU.

19        MS. JAYNE:  AT 37.

20     AND IT DISCUSSES FORFEITURE IN THE CONTEXT OF, A RICO

21   CONSPIRACY THAT'S MAIL FRAUD, BUT IT IS SUBJECT TO

22   PROPORTIONALITY ANALYSIS, MEANING HOW MUCH OF THIS WAS DUE TO

23   THE FRAUD VERSUS HOW MUCH WAS RECEIVED, OTHER WORK THAT WAS

24   PERFORMED.  AND THAT'S A SEPARATE DISCUSSION.

25        THE COURT:  UNLESS YOU WERE PLANNING TO SHOW ME,

1       AND -- OKAY, I MEAN, I'M NOT DISAGREEING THE PROPORTIONALITY,

2       BUT WHAT EVIDENCE WOULD YOU SUBMIT THAT THE WORK WAS -- YOU GET

3       RIGHT INTO THE WHOLE ARGUMENT THAT LET'S DEDUCT, AS THE

4       GOVERNMENT SUGGESTS, DEDUCT FROM MR. KAIL'S SALARY, THE MONEY

5       THAT HE WAS PAID BY HIS EMPLOYER WHILE HE WAS OFF DOING ALL OF

6       THIS OTHER WORK.

7               MS. JAYNE:  WELL, ONE, I CAN POINT THE COURT TO, FOR

8       EXAMPLE, EXHIBIT 451, EXHIBIT 666, IT OUTLINES WHAT IT IS THAT

9       HE WILL BE DOING IN EXCHANGE FOR THOSE STOCK OPTIONS, WHAT WORK

10      HE HAS TO PERFORM.

11          AND THE REASON THAT I BROUGHT UP THE TIMING IS IMPORTANT

12      TO THAT PROPORTIONALITY BECAUSE IF HE'S PUTTING IN TWO YEARS

13      OF -- AND NETFLIX HAS NO PROBLEM WITH HIM HAVING SIDE JOBS,

14      NETSKOPE WAS UNDISPUTEDLY A CONSULTING AGREEMENT WHERE NETFLIX

15      DOES NOT HAVE A PROBLEM WITH PEOPLE WORKING ON THE SIDE.  THERE

16      WERE A NUMBER OF YEARS WHERE HE WORKED --

17              THE COURT:  I GUESS THAT'S NOT HOW I HEARD THE

18      EVIDENCE.

19              MR. KALTSAS:  YOUR HONOR, THAT'S JUST NOT WHAT THE

20      JURY DECIDED.

21          FRANKLY, THESE PROCEEDS --

22              THE COURT:  THIS WAS ALL QUID PRO QUO, DIDN'T THE

23      JURY FIND ALL OF THIS WAS QUID PRO QUO?

24              MS. JAYNE:  THE JURY WAS NEVER ASKED WHAT SPECIFIC

25      ITEM, WHETHER IT WAS THIS MANY SHARES.

1    THE JURY WAS NEVER ASKED FOR THAT SPECIFICITY ON WHAT WAS

2    THE QUID PRO QUO.  THE JURY WAS NEVER SPECIFICALLY DELINEATED.

3    AND WE KNOW FROM THE EVIDENCE, AGAIN, THAT MR. KAIL

4    ACTUALLY DID WORK FOR THESE COMPANIES AND INTRODUCED THEM TO

5    OTHER COMPANIES, WORKING ON THEIR PRODUCT DEVELOPMENT.  HE HAD

6    A SIDE JOB WITH THESE COMPANIES.

7    THE PROBLEM IS THE CONFLICT, IT'S NOT THAT THEY ARE NOT

8    ALLOWED TO HAVE SIDE JOBS, AND THAT'S A SEPARATE ISSUE OF

9    WHETHER IT'S A CONFLICT OR NOT, BUT THE FACT THAT HE WAS DOING

10   INITIAL WORK FOR NETSKOPE, AGAIN WHEN NETSKOPE WAS JUST

11   STARTING OUT, THERE WAS NOTHING TO SHOW TO NETFLIX, BECAUSE HE

12   WAS HELPING THEM WITH THEIR PRODUCT DEVELOPMENT.  IN THE VERY

13   BEGINNING, IN 2012, HE WAS GIVEN STOCK OPTIONS AND A SILENCING

14   AGREEMENT.

15   MR. SAMPSON:  YOUR HONOR, THERE WAS A VERDICT FORM,

16   THE JURY LISTENED TO THE GOVERNMENT'S EVIDENCE, THEY LISTENED

17   TO MR. KAIL TESTIFY ABOUT HOW HARD HE WORKED AND THAT HE DIDN'T

18   HAVE A CONFLICT, AND THEY REJECTED IT.

19   AND THE COURT ISSUED AN ORDER DENYING THE RULE 29 AND

20   RULE 33 MOTION, AND YOUR HONOR'S FINDINGS WERE EXTENSIVE, AND

21   WE SHOULD NOT BE RELITIGATING IT IN THE CONTEXT OF FORFEITURE.

22   THE COURT:  SO I'M JUST LOOKING FOR -- I'M JUST

23   LOOKING AT THE VERDICT FORM HERE.

24   SO THE JURY FOUND THE CRIME TO BE COMMITTED UPON THE

25   SIGNING OF THE ADVISORY AGREEMENT.  THERE, THAT WAS THE CRIME,

1    AND EVERYTHING ELSE WAS THE PROCEEDS OF THE CRIME, IS WHAT IT

2    SEEMS TO ME, WHICH IS WHAT I'M LOOKING FOR HERE, IN TERMS OF

3    NEXUS.

4         AND THE PROPORTIONALITY OF THE WORK, IT SEEMS TO ME WITH

5    THE HONEST SERVICES WIRE FRAUD CONVICTION, THAT NONE OF THIS

6    WORK WAS DEDUCTIBLE UNRELATED TO THE CRIME ITSELF, IT WAS THE

7    CRIME.  AND WHETHER THEORETICALLY ONE COULD HAVE A SIDE JOB IS

8    REALLY BESIDE THE POINT OF THIS CONVICTION, IT SEEMS TO ME.

9    I'M ACTUALLY MORE CONCERNED ABOUT THIS BEING A PRIVATE COMPANY

10   AND THE GOVERNMENT SEIZING THE SHARES OF A PRIVATELY HELD

11   COMPANY.

12        MS. JAYNE:  AND YOUR HONOR, ONE MORE ON THAT POINT OF

13   THE PRIVATE COMPANY.

14        THE GOVERNMENT KEEPS ASSERTING THAT WE KNEW HE EXERCISED

15   NETSKOPE, WE KNEW THAT HE HAD THOSE AFTER HE EXERCISED THAT HE

16   HAD STOCK, PRIVATELY HELD STOCK.  WE KNEW THAT.

17        WHAT EVIDENCE IS THERE THAT THE GOVERNMENT IS PUTTING

18   FORTH THAT WE JUST PRESUME THAT HE TOOK SOME SECRET ACTION

19   TO -- ALL THESE THINGS TO GET RID OF THAT STOCK?  THE

20   PRESUMPTION IS THAT THOSE THINGS WOULDN'T HAVE HAPPENED.  THE

21   GOVERNMENT IS CLAIMING WE DIDN'T KNOW THAT HE STILL HAD IT,

22   EVEN THOUGH WE FOUND IT, EVEN THOUGH WE SAW IT, EVEN THOUGH WE

23   KNEW HE EXERCISED IT, EVEN THOUGH IT'S A PRIVATELY HELD COMPANY

24   THAT HAD NOT BEEN ACQUIRED, WE DIDN'T KNOW.

25        IT BELIES BELIEF THAT THE GOVERNMENT WOULDN'T PRESUME THAT

1    HE ACTUALLY DOES HAVE IT, BECAUSE IT'S SO DIFFICULT TO NOT HAVE

2    IT.

3            MR. KALTSAS:  YOUR HONOR, KNOWLEDGE ISN'T A MATTER OF

4    PRESUMPTION, KNOWLEDGE IS A MATTER OF HAVING SOMETHING IN YOUR

5    HAND THAT SAYS -- KNOWLEDGE ISN'T A MATTER OF PRESUMING ONE

6    THING OR ANOTHER, THERE IS NO PRESUMPTION EITHER WAY, IT'S JUST

7    A MATTER OF WHAT THE GOVERNMENT KNEW OR DIDN'T KNOW, AND WE

8    JUST FRANKLY DIDN'T KNOW.

9            MS. JAYNE:  EXCEPT THAT YOU HAD IT PHYSICALLY AND YOU

10   KNEW IT AT TRIAL, THAT HE EXERCISED THOSE OPTIONS, THAT YOU

11   KNEW THAT HE HAD THE SHARES.

12           THE COURT:  ALL RIGHT.

13       SO IT APPEARS TO ME, BECAUSE I WANT TO MOVE ON FROM THIS,

14   THAT THE GOVERNMENT DID -- HAS ESTABLISHED THAT THIS ASSET DOES

15   QUALIFY UNDER RULE 32.2(E) AS SUBSEQUENTLY LOCATED PROPERTY,

16   AND THEREFORE TRIAL BY JURY IS NOT REQUIRED.

17           MS. JAYNE:  BUT YOUR HONOR, THAT WOULD MEAN THAT THIS

18   IS DISCOVERED AFTER THE ORDER OF FORFEITURE.

19           THE COURT:  WELL, THAT'S THE THING, THAT'S A LITTLE

20   TRICKY BECAUSE THIS WAS CERTAINLY DISCOVERED BEFORE THE

21   PRELIMINARY, THE MOTION, BUT I AM NOT SEEING IT.

22       ALL RIGHT.  THEN I GUESS I'M IN ABSENCE OF CASE LAW ON

23   THIS, I'M IN ABSENCE OF AUTHORITY OF WHAT HAPPENS BETWEEN THE

24   PERIOD OF TIME BETWEEN VERDICT.

25           MR. KALTSAS:  THE GOVERNMENT WOULD INCLUDE THAT IN

1      ITS TWO-PAGE BRIEF, YOUR HONOR.

2            THE COURT:  AND WE WILL GET SUBSEQUENT BRIEFING.

3            MR. KALTSAS:  AND YOUR HONOR, JUST TO ANSWER YOUR

4      QUESTION ABOUT WHAT MIGHT HAPPEN TO THE STOCK IF THE GOVERNMENT

5      SEIZES IT, THE MARSHALS DO HAVE A COMPLEX ASSETS DIVISION IN

6      D.C. AND THEY HANDLE STUFF LIKE THIS ALL THE TIME.  THINGS LIKE

7      REAL PROPERTY, CRYPTOCURRENCY, THE PRIVATE STOCK.  I CAN

8      CONSULT WITH THEM ABOUT HOW THEY WOULD GO ABOUT HANDLING IT,

9      BUT I'M SURE THIS IS NOT THE BIGGEST CASE THEY'VE GOT.

10            THE COURT:  OR WE WILL JUST BE LEFT HOLDING A

11      CERTIFICATE.

12            MR. KALTSAS:  THAT'S PROBABLY THE WORST THAT COULD

13      HAPPEN, YOUR HONOR.

14            THE COURT:  ALL RIGHT.  MONETIZING IT IS NOT OUR

15      CONCERN.

16            MR. KALTSAS:  CORRECT.

17            THE COURT:  OKAY.  SO I'M LOOKING FOR SUBSEQUENT

18      BRIEFING ON THIS ISSUE OF -- IT'S REALLY THE ISSUE OF WHETHER

19      THERE IS A RIGHT TO A JURY TRIAL, WHICH OF COURSE CANNOT HAPPEN

20      NOW.

21            AND THE GOVERNMENT -- AND I THINK THE FACTS ARE

22      UNDISPUTED, THE GOVERNMENT DISCOVERED THE EXISTENCE OF THE

23      NETSKOPE SHARES DURING TRIAL AND BEFORE IT EVEN FILED ITS

24      REQUEST FOR PRELIMINARY FORFEITURE ORDER.

25            RULE 32.2(E) TALKS ABOUT AFTER-LOCATED PROPERTY, AFTER THE

1    FORFEITURE ORDER, AND SO THERE MAY BE SOME CASE LAW OR EVEN

2    NOTES, I DON'T HAVE THE DETAILED VERSION HERE, BUT YOU WILL --

3         MS. JAYNE:  AND JUST TO ADD TO THAT FACT PATTERN,

4    YOUR HONOR, ALSO DISCOVERED PRIOR TO THE JURY TRIAL ON

5    FORFEITURE.

6         MR. KALTSAS:  I THINK YOUR HONOR JUST FOUND THAT.

7         THE COURT:  NO, I'M SATISFIED THAT THE GOVERNMENT DID

8    NOT HAVE KNOWLEDGE OF THE EXISTENCE OF THE NETSKOPE SHARES

9    UNTIL MR. KAIL'S TESTIMONY AT TRIAL.

10        MS. JAYNE:  RIGHT.  BUT THAT WAS PRIOR TO THE

11   FORFEITURE TRIAL.  THAT WAS --

12        THE COURT:  YES.

13        MS. JAYNE:  PRIOR TO THE FORFEITURE TRIAL.

14        THE COURT:  YES, IT WAS.  BUT IT WAS NOT PROPERTY

15   SPECIFICALLY INCLUDED IN THE INDICTMENT.

16        MR. KALTSAS:  CORRECT, YOUR HONOR.

17        THE COURT:  SO I WILL JUST GET SOME ADDITIONAL

18   BRIEFING, AND THEN WE CAN MOVE ON ON THAT.

19        MS. JAYNE, I DON'T HAVE ANY EVIDENCE, I CAN'T JUST TAKE

20   YOUR ARGUMENT NOW, ALTHOUGH YOU ARE VERY ARTICULATE ON YOUR

21   FEET ON THIS, BUT ON THIS ISSUE OF PROPORTIONALITY, DID YOU

22   BRIEF THAT OR IS THAT IN YOUR SENTENCING BRIEF?

23        MS. JAYNE:  THERE'S --

24        THE COURT:  I WISH YOU HAD READ THE RULES AND

25   UNDERSTAND THAT YOU HAD A 25-PAGE LIMIT.

1    MS. JAYNE:  I ACTUALLY RECALL THE COURT SAYING WE

2  HAVE NO LIMIT AT SENTENCING.  I THINK THE COURT SAID, OF COURSE

3  I'M NOT GOING TO PLACE ANY LIMITS ON YOU AT SENTENCING.

4    THE COURT:  I DON'T RECALL THAT, IF I SAID THAT,

5  BUT -- WELL, AND IF I'M NOT READY AT THE NEXT HEARING, THEN WE

6  WON'T HAVE IT THEN EITHER.  I'VE NEVER SEEN A 53-PAGE BRIEF.  I

7  THOUGHT IT WAS RIDICULOUS, BUT --

8    MS. JAYNE:  YOUR HONOR, THERE WERE JUST SO MANY

9  ISSUES TO COVER, BECAUSE IT WAS POST-TRIAL AND BECAUSE EVERY

10  LINE ITEM IS SO CRITICAL.  I JUST -- I DIDN'T KNOW HOW TO NOT

11  ADDRESS THAT IN ADDITION TO THE TYPICAL 3553(A) FACTORS TO

12  ADDRESS.  AND A NUMBER OF THOSE PAGES WERE TABLE OF CONTENTS.

13    THE COURT:  OKAY.  ALL RIGHT.  SO I WILL GET THAT

14  BRIEFING, HOW MUCH TIME DO YOU NEED ON THAT?

15    MR. KALTSAS:  YOUR HONOR SAID SHE WANTED IT LIMITED

16  TO TWO PAGES?

17    THE COURT:  WELL, I WILL MAKE THAT THREE, BECAUSE I

18  THINK TWO MAY NOT BE ENOUGH.  AND IT IS ON THE ISSUE OF THE

19  32.3(E) DISCOVERY OR LOCATION OF ASSETS.

20    MR. KALTSAS:  SURE.  I COULD PROBABLY HAVE THAT TO

21  YOU AS SOON AS TOMORROW EVENING OR THURSDAY.

22    THE COURT:  I'M NOT EVEN GOING TO BE HERE.  I'M GOING

23  TO BE GONE UNTIL NEXT WEEK, SO I DON'T NEED IT THAT FAST.

24    CAN I HAVE IT MONDAY?

25    MR. KALTSAS:  MONDAY SOUNDS GREAT, YOUR HONOR.

```
1                    THE COURT:  OKAY.
2              AND MS. JAYNE, CAN YOU FILE YOURS ON MONDAY AS WELL?
3                    MS. JAYNE:  YOUR HONOR, I HAVE A FAMILY COMMITMENT
4      THIS WEEKEND WITH FAMILY COMING ON THURSDAY, A BIG FAMILY.
5                    THE COURT:  I'M AWAY TOO, I UNDERSTAND THAT
6      COMPLETELY.
7                    MS. JAYNE:  SO I CANNOT WORK THIS WEEKEND.
8                    THE COURT:  UNDERSTOOD.
9              WHEN IS YOUR FAMILY LEAVING?
10                   MS. JAYNE:  THEY ARE LEAVING MONDAY.
11                   THE COURT:  OKAY.  YOU KNOW WHAT, I'M NOT GOING TO
12     GET IN THE WAY OF YOUR FAMILY, SO HOW ABOUT FRIDAY?
13                   MS. JAYNE:  I WOULD APPRECIATE THAT.
14             THANK YOU VERY MUCH.
15                   THE COURT:  MR. KALTSAS, I WILL GIVE YOU UNTIL FRIDAY
16     IF YOU WANT SIMULTANEOUS BRIEFING, OR YOU CAN FILE YOURS AND
17     LET MS. JAYNE RESPOND.  I DON'T KNOW IF IT REALLY MATTERS.
18                   MR. KALTSAS:  I CAN FILE IT MONDAY, YOUR HONOR.
19                   THE COURT THAT'S VERY NICE.
20             OKAY.  AND SO NEXT FRIDAY FOR THE DEFENSE.  I DON'T KNOW
21     WHAT DAY, I DON'T HAVE A CALENDAR.
22                   MS. JAYNE:  THAT WOULD BE --
23                   MR. KALTSAS:  OCTOBER 29TH.
24                   THE COURT:  OKAY.
25             MS. JAYNE, THAT WILL GIVE YOU A LITTLE BREATHER WITH YOUR
```

1    OTHER OBLIGATIONS.

2        LET'S SEE, IT'S 10:30, WE NEED TO TAKE A SHORT BREAK, AND

3    THEN I DO HAVE THIS SENTENCING, AND I WILL PROBABLY GET THAT IN

4    BETWEEN.  SO YOU ARE GOING TO HAVE EFFECTIVELY A HALF-HOUR

5    BREAK.  AND THEN -- AND YES, LET'S DO THAT, BUT I WANT TO GET

6    THE SENTENCING DONE BECAUSE I ASSUME THE DEFENDANT ARRIVED.

7            THE CLERK:  YES, YOUR HONOR.

8        I BELIEVE THEY ARE IN THE HALLWAY.

9            THE COURT:  OKAY.  SO WE WILL TAKE A TEN-MINUTE

10   BREAK.

11       WE WILL COME BACK AND DO THE PLEA AND THEN WE WILL COME

12   BACK AND ARGUE THE ISSUE ON THE HOUSE.

13           MS. JAYNE:  THANK YOU.

14       AND THAT'S UNDER SEAL, RIGHT?

15           THE CLERK:  YES, CORRECT.

16           THE COURT:  RIGHT.

17       (RECESS FROM 10:26 A.M. UNTIL 10:38 A.M.)

18       THE COURT:  OKAY.  WE ARE BACK ON THE RECORD.  ALL COUNSEL

19   AND PARTIES ARE PRESENT.

20       MR. KAIL, I'M GOING TO SWITCH GEARS NOW TO THE ISSUE OF

21   FORFEITURE OF THE HOUSE.

22       AND HERE, THE ISSUE, BECAUSE WE DO HAVE A JURY VERDICT,

23   THE ISSUE IS THE APPROPRIATENESS OF THE FINE UNDER THE 8TH

24   AMENDMENT.  AND I GATHER FROM THE BRIEFING IT'S THE

25   GOVERNMENT'S POSITION THAT IT IS THE DEFENSE BURDEN TO

1    ESTABLISH THAT THE REQUESTED FORFEITURE WOULD BE GROSSLY

2    DISPROPORTIONAL.

3         IS THAT CORRECT, MR. KALTSAS?

4         MR. KALTSAS:  THAT IS CORRECT, YOUR HONOR.

5         THE COURT:  I HAVE A QUESTION, AND I THINK I KNOW THE

6    ANSWER, BUT I'M NOT CERTAIN, MAYBE IT'S BESIDE THE POINT, BUT

7    THE GOVERNMENT IS SEEKING FORFEITURE OF THE HOME IN ITS

8    ENTIRETY, IT IS SUBJECT TO A SIGNIFICANT MORTGAGE.  IS THE

9    MORTGAGE LEFT WITH MR. KAIL AND THE HOUSE GOES TO THE

10   GOVERNMENT FREE AND CLEAR, OR DO YOU TAKE IT SUBJECT TO --

11        MR. KALTSAS:  WE TAKE IT SUBJECT TO THE MORTGAGE,

12   YOUR HONOR.

13        THE COURT:  OKAY.  THAT MAKES A BIG DIFFERENCE.

14        MR. KALTSAS:  AND OF COURSE THERE WILL BE THE

15   OPPORTUNITY FOR THIRD PARTIES TO SERVE INTEREST IN THE PROPERTY

16   ONCE THE PRELIMINARY ORDER HAS BEEN ENTERED.

17        THE COURT:  AND SO THAT MORTGAGE IS ROUGHLY

18   1.7 MILLION; IS THAT CORRECT?

19        MR. KALTSAS:  THAT SOUNDS RIGHT TO ME, YOUR HONOR.

20        THE COURT:  AND AGAIN, I DON'T NEED TO DEAL IN

21   SPECIFICS FOR THE FORFEITURE, BUT IN REASONABLE GENERALITIES

22   HERE, IT APPEARS THAT THE HOUSE IS WORTH APPROXIMATELY

23   3.3 MILLION AS OF TODAY.

24        IS THIS A REASONABLE ESTIMATE?

25        MR. KALTSAS:  THAT SOUNDS REASONABLE, YOUR HONOR.  OF

1    COURSE THIS CHANGES VERY QUICKLY, BUT I THINK THAT SOUNDS

2    RIGHT.

3            THE COURT:  OKAY.

4        AND SO THE ACTUAL MAXIMUM THE GOVERNMENT WOULD TAKE WOULD

5    BE THAT 1.6 MILLION, IF I WERE TO GRANT YOUR REQUEST.

6            MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR, AFTER WE

7    PAY OFF ALL THE LIENS ON THE PROPERTY.

8            THE COURT:  OKAY.

9        I JUST NEED TO -- I JUST NEED TO KNOW THE NUMBERS THAT I'M

10   WORKING WITH.  AND THE GOVERNMENT HAS THEM SUGGESTED AS AN

11   ALTERNATIVE, IF I DON'T ORDER THAT THE HOUSE GO TO THE

12   OWNERSHIP OF THE GOVERNMENT, BUT THAT THERE BE A MONEY

13   JUDGMENT.  AND I UNDERSTAND THAT THE DEFENSE WOULD LIKE A MONEY

14   JUDGMENT AND JUST ARGUES A MUCH LOWER AMOUNT; IS THAT CORRECT,

15   MS. JAYNE?

16           MS. JAYNE:  CORRECT, YOUR HONOR.

17           THE COURT:  OKAY.

18       SO JUST TO GET STARTED, I AM NOT REALLY CONSIDERING

19   TRANSFERRING THE OWNERSHIP OF THE HOUSE ITSELF TO THE

20   GOVERNMENT.  IT'S PRETTY STRAIGHTFORWARD.  I DON'T SEE

21   DISPLACING A FAMILY FROM THE HOME THAT THEY'VE LIVED IN FOR

22   MANY YEARS.  AND THIS CAN BE -- THE GOVERNMENT IS NOT LOOKING

23   TO OWN THE HOME AND RENT IT TO SOMEBODY ELSE, SO IT MAKES SENSE

24   TO BE TALKING ABOUT THE PROPER AMOUNT OF THIS FORFEITURE.

25       SO WITH THAT IN MIND, AND THAT REALLY HELPS ME QUITE A

1    BIT, I AM -- I THINK THAT MOST -- THE MOST HELPFUL CASE TO ME

2    IS UNITED STATES V. BEECROFT, AT 825 F.3D 991, WHERE THE

3    NINTH CIRCUIT LAYS OUT THE FACTORS TO CONSIDER WHEN WEIGHING

4    THE GRAVITY OF AN OFFENSE UNDER THE 8TH AMENDMENT.  AND IT IS

5    VERY HELPFUL, AND THE GOVERNMENT, I THINK IN YOUR REPLY,

6    MR. KALTSAS, YOU WENT THROUGH THOSE FACTORS AND APPLIED YOUR

7    REASONING TO THEM.

8         I'M NOT SURE, MS. JAYNE, THAT YOU ACTUALLY DID IT, AND I

9    WILL CERTAINLY HEAR FROM YOU ON THAT, THE GOVERNMENT SUGGESTS

10   THAT IF I CONVERT THIS TO A MONEY JUDGMENT, THAT THE AMOUNT

11   WOULD BE $700,000.

12        MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

13        THE COURT:  SO AGAIN, HAVING DETERMINED THAT THE

14   SUMOLOGIC SHARES ARE NOT AVAILABLE FOR SEIZURE AND FORFEITURE,

15   AND THE NETSKOPE MAY NOT BE, I WOULD LIKE TO HEAR ARGUMENT FROM

16   YOU AS TO WHETHER THAT WOULD AFFECT MY CONSIDERATION OF THE

17   MONEY JUDGMENT HERE ON THE FORFEITURE OF THE HOME, BECAUSE IT'S

18   MY UNDERSTANDING THAT I'M TO LOOK AT ALL OF THE CONDUCT IN THE

19   CASE AND TO MAKE A REASONABLE DETERMINATION BASED ON ALL OF THE

20   CONDUCT.  SO I WOULD LIKE TO HEAR FROM YOU ON THAT.  OTHERWISE,

21   I WOULD LIKE TO HEAR ABOUT THE FACTORS AND YOUR VIEW OF THEM.

22        SO LET ME START WITH THE GOVERNMENT.

23        MR. KALTSAS:  OF COURSE, YOUR HONOR.

24        SO WITH RESPECT TO THE TOUCHSTONE OF THIS TEST, IT DOES

25   STEM FROM THE BAJAKAJIAN CASE IN THE SUPREME COURT, AND

1    ULTIMATELY WHAT THE COURT SHOULD FOCUS ON IN THESE CASES IS OF

2    COURSE THE GRAVITY OF THE OFFENSE PROPORTIONAL TO THE AMOUNT OF

3    FORFEITURE, AS WELL AS WHAT THE PURPOSE OF CRIMINAL FORFEITURE

4    IS IN THE FIRST PLACE, WHICH IS TO PUNISH AND TO DETER CRIMINAL

5    ACTIVITY.

6         AND I THINK IN THIS PARTICULAR CASE, FORFEITURE IN THE

7    AMOUNT OF $700,000, AS REFLECTED IN THE VALUE OF THE HOME,

8    WOULD BE APPROPRIATE AND PROPORTIONAL TO THE GRAVITY OF THE

9    OFFENSE HERE.

10        YOUR HONOR IS CORRECT, THAT ALL THE CONDUCT IN THE CASE AS

11   WELL AS THE FORFEITURE IN ITS ENTIRETY SHOULD BE CONSIDERED.  I

12   THINK THE SECOND BEECROFT FACTOR SPEAKS TO THAT, WHICH IS THE

13   RELATION OF THIS PARTICULAR VIOLATION TO OTHER ILLEGAL

14   ACTIVITIES IN THE CASE.

15        SO TAKING COUNT 2 IN ISOLATION, AS THE DEFENDANT SUGGESTS,

16   THE AMOUNT OF $70,000 ISN'T APPROPRIATE BECAUSE THIS IS A MUCH

17   LARGER CASE THAN SIMPLY A $70,000 DEPOSIT USED ON A DOWN

18   PAYMENT TOWARDS A HOME.

19        THIS CASE REPRESENTS A WIDE RANGE OF HARMS, THE NATURE AND

20   EXTENT -- WE WILL GO THROUGH THE FACTORS INDIVIDUALLY,

21   YOUR HONOR, BUT WITH RESPECT TO THE SECOND ONE IN PARTICULAR,

22   OF COURSE MR. KAIL IS CONVICTED OF A LARGE NUMBER OF SPECIFIC

23   CRIMES IN FURTHERANCE OF THE SCHEME TO UNDERMINE HIS -- TO

24   UNDERMINE HIS TRUST AT NETFLIX, TO USE HIS POSITION OF POWER TO

25   ENSURE THAT FLEDGLING STARTUPS WOULD GET A PIECE OF THE ACTION

1    OF NETFLIX, AND TO ENSURE THAT MR. KAIL PROFITED FROM THAT.

2        I THINK THE FIRST FACTOR IS ALSO VERY RELEVANT IN THIS

3    CASE, YOUR HONOR, THE NATURE AND EXTENT OF THE CRIME.  AND IT

4    KIND OF GOES HAND IN HAND WITH THE SECOND FACTOR.

5        YOU KNOW, THIS CRIME WASN'T NECESSARILY A ONE-OFF, IT

6    WASN'T JUST A TRANSFER, IT WAS A SCHEME THAT LASTED A NUMBER OF

7    YEARS.  AND IT TARNISHED NETFLIX'S IMAGE IN WAYS THAT WOULD

8    PROBABLY BE HARD TO REPAIR.  IT TARNISHED PROBABLY THE

9    STARTUPS' IMAGE AS WELL BECAUSE THEY'RE THE ONE THAT ENGAGED IN

10   A PAY TO PLAY SCHEME WITH MR. KAIL.

11       AND HE PREYED ON THESE LITTLE STARTUPS, SOME OF THEM

12   LITTLE, SOME OF THEM MUCH LARGER, BUT HE PREYED ON THEIR DESIRE

13   TO HAVE CONTRACTS WITH NETFLIX IN ORDER TO ENSURE THAT HE WOULD

14   PROFIT ALL THE EXPENSE THAT NETFLIX ENTRUSTED HIM WITH.  AND IT

15   IS A SERIOUS CRIME, YOUR HONOR.

16       I THINK THE OTHER CASES WHERE SOME FORFEITURES WERE FOUND

17   EXCESSIVE, LIKE THE $100,000 CASE, THE ONE THAT'S APPROXIMATELY

18   $120,000, THOSE WERE ALL CURRENCY REPORTING CRIMES.

19       THIS ISN'T ONE OF THOSE, THIS IS SOMETHING THAT THE MONEY

20   LAUNDERING STATUTE WAS INTENDED TO, OR SERIOUSLY INTENDING TO

21   PUNISH.  I THINK THAT'S THE A BIG FACTOR IN THE CADDEN CASE,

22   WHY THEY FOUND THAT EXCESSIVE.

23       IN THIS CASE, IT'S NOT SOMEONE JUST WANDERING ACROSS THE

24   BORDER WITH MORE THAN $10,000, THIS IS A SERIOUS MONEY

25   LAUNDERING OFFENSE, SERIOUS FRAUDS, AND IT'S IN THE SAME

1    NEIGHBORHOOD AS DRUG DEALERS AND OTHER FOLKS THAT THE MONEY

2    LAUNDERING STATUTES WERE MEANT TO PUNISH.

3         WE COVERED THE FIRST FACTOR, AND I THINK THE FIRST AND

4    SECOND FACTORS DO GO HAND IN HAND.

5         I THINK THE THIRD FACTOR IS ALSO IMPORTANT TO THE COURT'S

6    ANALYSIS, AND THIS IS THE OTHER PENALTIES APPLICABLE IN THE

7    CASE.  IN THIS CASE, MR. KAIL IS SUBJECT TO A SUBSTANTIAL

8    GUIDELINE PRISON SENTENCE OF 97 TO 121 MONTHS.

9         THE COURT:  SO THAT'S NOT -- LET ME JUST GO BACK

10   TO -- YES, 97 TO 121, THAT'S CORRECT.

11        MR. KALTSAS:  AND YOUR HONOR, HE'S ALSO SUBJECT TO A

12   GUIDELINES MAXIMUM FINE OF, I BELIEVE $350,000.

13        AND SO WHEN VIEWING THE CASE IN LIGHT OF THOSE FACTS AND

14   PENALTIES, AND THE GUIDELINE PENALTIES ARE OF COURSE MORE OF

15   KIND OF A TELL OF WHERE THE COURT SHOULD GO, I THINK THE

16   BEECROFT CASE SPOKE TO THAT BECAUSE IT'S PERSONALIZED TO

17   DEFENDANT.

18        WHEN VIEWING IT IN LIGHT OF THAT, I THINK $700,000 MAKES A

19   LOT OF SENSE.  OTHER CASES HAVE GONE ABOVE AND BEYOND THE TWO

20   TYPES OF MAXIMUM FINE IN DETERMINING EXCESSIVENESS.  AND

21   ESPECIALLY IN LIGHT OF THE SERIOUSNESS OF THIS CRIME, DOUBLE

22   THE AMOUNTS OF THE MAXIMUM FINE, SORT OF BEGINS TO GET TO WHAT

23   CRIMINAL FORFEITURE IS MEANT TO DO, WHICH IS DEPRIVE THE

24   DEFENDANT OF HIS GAINS.

25        AND ESPECIALLY WHEN YOU CONSIDER THIS IS A MONEY

1    LAUNDERING CHARGE, IF IT'S LIMITED TO $70,000, WOULD SORT OF

2    SUCK THE ENERGY RIGHT OUT OF THE MONEY LAUNDERING FORFEITURE IN

3    THE FIRST PLACE, WHICH ISN'T NECESSARILY LIMITED TO PROCEEDS,

4    BUT ANYTHING THAT'S "INVOLVED IN THE CRIME."

5         SO I THINK LIMITING IT TO SOMETHING AS SMALL AS $70,000

6    WOULD COMPLETELY SUCK THE AIR OUT OF ALL THE CRIMINAL

7    FORFEITURE'S PURPOSE.  IT WOULD NOT REFLECT THE SERIOUSNESS OF

8    THE CRIME, AND IT CERTAINLY IS COMPLETELY DISPROPORTIONATE TO

9    THE GRAVITY OF THE OFFENSES THAT MR. KAIL COMMITTED.

10        AND THAT LEADS TO THE FOURTH ELEMENT, WHICH IS THE NATURE

11   AND EXTENT OF THE HARM.

12        OF COURSE I KNOW THERE IS ARGUMENT ON THIS, BUT THE

13   NATURE, THE HARM TO NETFLIX IN THIS CASE IN PARTICULAR WAS

14   SIGNIFICANT.  YOU KNOW, REPUTATIONALLY, THEY OF COURSE SUFFERED

15   AS SOMEONE WHOSE REPUTATION WAS KNOWN TO AT LEAST NINE

16   COMPANIES AS A PLACE WHERE PAY TO PLAY WAS TOLERATED, IF NOT

17   ENCOURAGED.

18        THESE STARTUPS AS WELL, YOU KNOW, THIS HAS BEEN A VERY

19   PUBLIC CASE WITH LOTS OF COVERAGE, I'M SURE THEIR REPUTATION

20   DIDN'T COME OUT OF THIS ANY BETTER THAN BEFORE.  AND OF COURSE

21   THIS IS ALL REFLECTIVE OF THE TECHNOLOGY INDUSTRY WHERE ETHICS

22   ARE UNDER A MICROSCOPE ON THE NATIONAL SCALE, RIGHT.

23        SO THIS IS SOMETHING WHERE THE HARM ISN'T JUST LIMITED TO

24   ONE LARGE COMPANY, ALTHOUGH THAT IS SIGNIFICANT, IT GOES

25   BROADER THAN THAT AND IMPLICATES A WHOLE CULTURE THAT'S AT RISK

1    OF CONSTANT -- IT'S UNDER A MICROSCOPE CONSTANTLY.  SO FOR

2    MR. KAIL TO SUGGEST $70,000 IN LIGHT OF ALL OF THAT, I THINK

3    COMPLETELY IS UNDERWHELMING.

4         AND YOUR HONOR WAS CORRECT WITH RESPECT TO THE BURDEN IN

5    THIS CASE.  THE BURDEN DOES REST ON THE DEFENDANT TO PROVE THAT

6    THE PROPOSED FORFEITURE ISN'T GROSSLY DISPROPORTIONATE OF THE

7    CRIME.

8         I THINK IN LIGHT OF ALL OF THAT, I DON'T THINK THERE'S A

9    WAY FOR THE DEFENDANT TO OVERCOME THAT A $70,000 MONEY

10   FORFEITURE JUDGMENT IS IN FACT GROSSLY DISPROPORTIONATE TO THE

11   GRAVITY OF THE OFFENSE HERE.

12        THE COURT:  MR. KALTSAS, WOULD YOUR VIEW OF THE

13   EVIDENCE FROM THE TRIAL REGARDING THE STOCK OPTIONS THAT WERE

14   EXERCISED AND IN MR. KAIL'S OWNERSHIP, ALSO AFFECT THE SIZE OF

15   THE POTENTIAL MONEY JUDGMENT HERE?

16        MR. KALTSAS:  YOUR HONOR, I BELIEVE SO.

17        BECAUSE THE FORFEITURE SHOULD BE TAKEN AS A WHOLE, SINCE

18   IT IS ONE PART OF THE SENTENCE.  SO TO THE EXTENT THAT ONE PART

19   GOES DOWN, I THINK IT LEAVES ROOM FOR ANOTHER PART TO GO UP, SO

20   AS TO REFLECT THE GRAVITY.

21        THE COURT:  AND I DON'T MEAN IN THE SENSE OF

22   CONVERTING THE LOSS ON THE STOCK SHARES TO A MONEY JUDGMENT,

23   IT'S JUST THAT HAD, FOR EXAMPLE, I FOUND THAT BOTH OF THOSE

24   SETS OF STOCK CERTIFICATES WERE FORFEITABLE, AND THAT WOULD

25   HAVE BEEN IN THE 3 TO $4 MILLION RANGE, THAT MIGHT HAVE CAUSED

1    ME TO REDUCE THE PENALTY REGARDING THE HOUSE, JUST IN THE

2    OVERALL SCHEME OF THE PURPOSE OF IT BEING GROSSLY

3    DISPROPORTIONAL TO THE TOTAL CRIME.

4         WOULD YOU AGREE WITH THAT?

5              MR. KALTSAS:  I THINK THAT WOULD BE FAIR, YOUR HONOR.

6              THE COURT:  AND SO FOR ASSETS NOT WITHIN THE REACH, I

7    MEAN, THE PHYSICAL ASSET, SUMOLOGIC LET'S SAY, IS NOT SUBJECT

8    TO FORFEITURE AT THIS POINT, BUT IT STILL WAS A GAIN.

9              MR. KALTSAS:  THAT'S RIGHT, YOUR HONOR.

10        AND YOU KNOW, THERE'S ONE THING I THINK THAT'S IMPORTANT

11   TO KEEP IN MIND HERE, WHICH IS THAT THE DIFFERENTIATION BETWEEN

12   THE TWO TYPES OF NEXUS WE ARE TALKING ABOUT, YOU HAVE PROCEEDS

13   OF A CRIME, THERE IS AN ARGUMENT TO BE MADE THAT THOSE ARE NOT

14   OVER-EXCESSIVE, BECAUSE THEY REPRESENT DEFENDANT'S DIRECT GAIN,

15   WHEREAS SOMETHING LIKE MONEY LAUNDERING, THE 8TH AMENDMENT IS

16   MORE PRESSING HERE BECAUSE THERE IS ROOM FOR INTERPRETATION.

17        SO TO THE EXTENT THAT WE ARE LOOKING TO WHAT'S APPROPRIATE

18   WITH RESPECT TO A MONEY LAUNDERING CHARGE, I THINK WHAT

19   YOUR HONOR IS SAYING DEFINITELY MAKES SENSE.

20             THE COURT:  OKAY.

21        AND I AM INTERESTED AND OFFICER POLLACK, YOU MAY NOT

22   ACTUALLY KNOW THE DETAILS OF THIS PRESENTENCE REPORT BECAUSE

23   YOU DIDN'T PREPARE IT, BUT JUST GENERALLY, THIS IS REALLY A

24   QUESTION, THE GUIDELINE IS SUGGESTED, AND MAY BE SUBJECT TO

25   OBJECTION, BUT I HAVE A GENERAL QUESTION.

1        THE GUIDELINE SHOWS THAT THE MAXIMUM FINE FOR EACH COUNT

2     IS $250,000 AND THAT THE GUIDELINE, THE COMPOSITE GUIDELINE IS

3     $30,000 TO $300,000.  AND THAT'S NOT -- THAT'S CLEARLY NOT A

4     PER COUNT GUIDELINE, AND SO I'M A LITTLE SURPRISED BY HOW LOW

5     THE CEILING IS FOR 27 COUNTS OF CONVICTION.

6        COULD YOU SHED LIGHT ON JUST THAT GENERAL QUESTION?

7            PROBATION OFFICER:  IN TERMS OF WHY IT'S SO LOW?

8            THE COURT:  WHY IT'S SO LOW.

9            PROBATION OFFICER:  DOES THE COURT HAVE OPTIONS?

10           THE COURT:  BECAUSE IF I JUST ADD $250,000 FOR EACH

11    COUNT, MR. KALTSAS DID THE ARITHMETIC, AND IT WOULD BE 6.75

12    MILLION DOLLARS.  SO DO THE GUIDELINES ACTUALLY WALK THROUGH

13    THIS LOWER AMOUNT?  IT JUST SURPRISED ME.

14           PROBATION OFFICER:  I CAN LOOK IT UP, YOUR HONOR.  I

15    DON'T KNOW THE EXACT ANSWER.

16           THE COURT:  OKAY.  THANK YOU.

17       ALL RIGHT.  MR. KALTSAS, ANYTHING ELSE YOU WANTED TO ARGUE

18    AT THIS POINT?

19           MR. KALTSAS:  NOT AT THIS POINT, YOUR HONOR.  I WILL

20    JUST RESPOND TO WHATEVER DEFENSE COUNSEL HAS.

21           THE COURT:  OKAY.

22       MS. JAYNE.

23           MS. JAYNE:  THANK YOU, YOUR HONOR.

24       I'M GOING TO START A LITTLE BIT OUT OF ORDER, JUST ON THE

25    LAST POINT THAT WAS MADE WITH RESPECT TO HOW TO CONSIDER THE

1    STOCK IN THE EQUATION.

2        SO FORFEITURE RELATES TO EITHER THE HOUSE, WHICH WAS

3    RELATED TO THE MONEY LAUNDERING, OR A MONEY JUDGMENT.  AND

4    HERE, WHETHER OR NOT THE STOCKS WERE BEING FORFEITED, IT'S NOT

5    A SUBSTITUTE MONEY JUDGMENT; AND TWO, THE VALUE OF THAT

6    PARTICULAR STOCK SHOULD NEVER BE CONDITIONED ON MARKET

7    CONDITIONS.

8        AND THIS IS BRIEFED IN MY SENTENCING MEMO, BUT THE PRESENT

9    VALUE IS NOT THE MEASURE THAT WE WOULD EVALUATE IN ANY EVENT,

10   BECAUSE -- AND THERE'S PLENTY OF CASE LAW ON THIS, DEFENDANTS

11   SHOULDN'T BE PENALIZED BASED ON WHAT HAPPENS IN A PARTICULAR

12   MARKET.

13       FOR EXAMPLE, IF SUMOLOGIC OR NETSKOPE WERE TO SIMPLY TANK,

14   LOOK AT THERANOS, THAT STOCK IS WORTHLESS, IF SOMETHING WERE TO

15   COME OUT ABOUT THOSE STOCKS, IT WOULD BE WORTHLESS.

16       SO ESPECIALLY IN A PRIVATELY HELD COMPANY, IT'S ALL

17   SPECULATIVE.  AND REGARDLESS, WE DO NOT LOOK AT ITS VALUE BASED

18   ON TODAY, AND FRANKLY, WHEN THAT PROBATION REPORT WAS WRITTEN,

19   IT WAS MORE VALUABLE THAN IT IS TODAY.

20           THE COURT:  THAT'S INTERESTING.  THAT'S A GOOD POINT.

21           MS. JAYNE:  SO IF WE ARE LOOKING AT THE HOUSE, WHY

22   WAS THE HOUSE EVEN SUBJECT TO FORFEITURE?  WHY?  BECAUSE

23   $70,000, AND THE JURY FOUND THIS AND THIS WAS RELATED TO

24   COUNT 24, BECAUSE $70,000 WAS PROVIDED TO THE TITLE COMPANY.

25   THAT $70,000 WAS OF THE COMMISSIONS FROM THE STAR AND/OR NET

1    MERGE, AND THAT WAS THE CONNECTION THERE, AND THE JURY FOUND

2    THAT.  THE HOUSE WAS PURCHASED FOR 2 POINT SOMETHING WITH A

3    MORTGAGE AND IS CURRENTLY, AS YOUR HONOR NOTED, $3.3.

4        SO IF YOU LOOK AT THAT $70,000, FROM MY ANALYSIS, THE

5    CURRENT VALUE OF THE HOME IS 46 TIMES, 46 TIMES THE ACTUAL

6    AMOUNT THAT WAS INVOLVED IN THE OFFENSE.  AND THE STATUTORY

7    MAXIMUM IS $250,000, IT'S 13 TIMES THE STATUTORY MAXIMUM.

8        AND IN ONE OF THE CASES CITED BY THE GOVERNMENT, ON

9    PAGE 5, $100,348, 354 F.3D 1110, THAT CASE HELD THAT FORFEITURE

10   BETWEEN 3 AND 20 TIMES GREATER THAN THE MAXIMUM FINE WOULD BE

11   UNCONSTITUTIONALLY EXCESSIVE.

12       HERE, WE ARE TALKING ABOUT 13 TIMES.

13       THE COURT:  BUT YOU ARE TRYING TO ISOLATE COUNT 24

14   FROM THE REMAINDER OF THE VERDICT.  AND I DON'T THINK THAT

15   BEECROFT SUGGESTS THAT.  I THINK THAT BEECROFT LOOKS AT THE

16   FACTOR TWO, WHETHER THE VIOLATION WAS RELATED TO OTHER ILLEGAL

17   ACTIVITIES, AND THE NATURE AND EXTENT OF THE CRIME.

18       I DON'T SEE ANY ISOLATION OF ONE COUNT FROM THE OTHERS.

19   AND THIS GENERAL -- THE GOVERNMENT ARGUED -- MR. SAMPSON ARGUED

20   EXTENSIVELY IN THE POST-TRIAL MOTION, THIS WAS A SCHEME TO

21   DEFRAUD, NOT A SPECIFIC ACT TO DEFRAUD.

22       MS. JAYNE:  BUT THE CRIME AT ISSUE, THE NATURE AND

23   EXTENT OF IT IS THE MONEY LAUNDERING.

24       THE COURT:  I THINK THE CRIME AT ISSUE IS THE ENTIRE

25   CASE.

1    MS. JAYNE:  BUT THAT'S NOT WHAT THE MONEY LAUNDERING

2    RELATED TO.  THE HOUSE WAS TIED SPECIFICALLY TO COUNT 24.

3    OTHER PROCEEDS MAY RELATE TO THE SCHEME IN GENERAL, A BUNCH OF

4    EXTRA CASH AND WHAT NOT, THAT MAY RELATE TO THE OTHER COUNTS,

5    BUT THE FORFEITURE OF THE HOUSE IS -- WHY ELSE WOULD WE BE

6    RELATING IT TO COUNT 24?

7    AND THE ONLY REASON THE HOUSE WOULD EVEN BE IN THERE, IF

8    THE HOUSE WASN'T RELATED TO THE MONEY LAUNDERING, THAT $70,000

9    HADN'T HAD BEEN DEPOSITED, WE WOULDN'T SEE THE HOUSE IN THE

10   INDICTMENT.  THAT PARTICULAR NATURE AND EXTENT OF THE CRIME IS

11   RELATED AGAIN TO THE MONEY LAUNDERING.

12   AND THE EXTENT FOR THE HARM CAUSED TO THAT FACT,

13   YOUR HONOR, I WOULD JUST DIRECT YOUR HONOR'S RECOLLECTION TO

14   THE TESTIMONY OF DAVID WELLS.  HE WAS ASKED WHAT MIGHT BE THE

15   ECONOMIC HARM TO NETFLIX FROM THIS, AND HE SAYS AROUND 2 OR

16   $300,000.  THAT WAS HIS TESTIMONY.  AND IF YOU PUT ALL THE

17   CONTRACTS -- AND I UNDERSTAND THE GOVERNMENT'S ARGUMENT IS THAT

18   THESE ARE THE GUIDELINES AND IT'S ALL THE CONTRACTS, IT'S

19   SIMPLY INCONSISTENT WITH THE TESTIMONY.

20   AND FROM THE GOVERNMENT'S OWN ASSET FORFEITURE POLICY

21   MANUAL, THE RELEVANT FACTORS NOTED TO CONSIDER AS TO WHETHER

22   SOMETHING IS GROSSLY DISPROPORTIONATE AS TO WHETHER SOMETHING

23   SHOULD BE FORFEITED AND THE QUANTITY OF IT, IS THE SERIOUSNESS

24   OF THE OFFENSE, IT IS ALSO THE EXTENT OF THE OWNER'S

25   INVOLVEMENT IN OR KNOWLEDGE OF THE USE OF THE PROPERTY IN THE

1      COMMISSION OR CONCEALMENT OF THE CRIMINAL ACTIVITY.

2           THE EXTENT OF MR. KAIL'S USE OR KNOWLEDGE OF THE PROPERTY

3      WAS AGAIN, IT WAS A $70,000 DEPOSIT, THE HOUSE HAD NOTHING MORE

4      TO DO WITH ANY OF THE OTHER CONDUCT.  THE EXTENT TO WHICH THE

5      PROPERTY WAS INVOLVED IN CRIMINAL ACTIVITY, AGAIN, THE PROPERTY

6      WAS INVOLVED TO THE TUNE OF $70,000.  AND THERE'S OTHER

7      CONSIDERATIONS ON IDENTIFIABLE VICTIMS AND THE VALUE AND EQUITY

8      IN THE PROPERTY.

9           YOUR HONOR, MR. KAIL, AS THE GOVERNMENT HAS NOTED, AND AS

10     THE COURT EARLIER NOTED, IS SUBJECT TO POTENTIALLY RESTITUTION,

11     TO A MAXIMUM FINE OF $250,000.  AND NOW THE QUESTION IS IN

12     RELATION TO THAT MONEY LAUNDERING OFFENSE, WHAT IS THE

13     APPROPRIATE AMOUNT OF THE HOUSE TO FORFEIT?

14          AND I KNOW I'M REITERATING THIS, BUT IT DOES COME BACK TO

15     HOW MUCH WAS THAT HOUSE INVOLVED IN THIS OFFENSE, AND THE HOUSE

16     WAS NOT INVOLVED IN MORE THAN JUST $70,000.

17          THE COURT:  WELL, I DON'T THINK THAT THE 8TH

18     AMENDMENT LOOKS AT THE INVOLVEMENT OF THE HOUSE.  THE ENTIRE

19     ASSET IS SUBJECT TO FORFEITURE.  AND I AM LOOKING AT -- I AM

20     TRYING TO LOOK AT IT IN THE CONTEXT OF THE CASE IN GENERAL.

21     AND YOU ARE SUGGESTING THAT I LOOK AT THE MAXIMUM FINE FOR THE

22     SINGLE COUNT.  THAT'S NOT THE WAY THE GOVERNMENT ARGUED IT.

23     BUT EVEN IF IT WERE, THE $250,000 MAXIMUM, THIS WOULD BE JUST

24     THAT UNDER THREE TIMES THE MAXIMUM FINE THAT APPEARS TO BE

25     ACCEPTABLE UNDER NINTH CIRCUIT DECISIONS.  AND IN THE SCOPE, IN

1    THE FULL SCOPE OF THE CASE, IT MAY ACTUALLY BE A MODEST AMOUNT

2    COMPARED TO ALL OF THE GAIN.

3           MS. JAYNE:  WELL, AS FAR AS -- I'M NOT SURE WHAT ALL

4    OF THE GAIN IS BECAUSE MR. --

5           THE COURT:  WELL, IT'S SUMOLOGIC AND NETSKOPE THAT WE

6    HAVE BEEN TALKING ABOUT TODAY.  THOSE ARE WORTH MILLIONS, OR ON

7    PAPER HAD THAT VALUE.  AND I AGREE IT FLUCTUATES AND IT COULD

8    TANK, AND SO TAKING THE ASSET IS A CLEANER WAY THAN CONVERTING

9    IT.

10           MS. JAYNE:  BUT YOU ALSO LOOK AT -- IF THE COURT IS

11   LOOKING AT THE OVERALL PICTURE, THE HARM TO NETFLIX, AND

12   CONSISTENTLY, I THINK WITNESSES TESTIFY THAT THE CONFLICT OF

13   INTEREST WAS THE PROBLEM, THAT NOBODY EVER SAID NONE OF THESE

14   CONTRACTS SHOULD HAVE TAKEN PLACE, NETFLIX DIDN'T SUE A

15   SINGLE --

16           THE COURT:  THAT IS A DIFFERENT TRIAL, THAT'S NOT

17   WHAT I HEARD AND THAT'S NOT WHAT THE JURY HEARD.  I'M BASING

18   THAT ON THE CONVICTION.  THE JURY DIDN'T SAY THIS WAS A MINOR

19   ETHICAL BOO BOO THAT SHOULDN'T BE IN THE COURTROOM, THEY

20   CONVICTED, VIRTUALLY ACROSS THE BOARD.

21           MS. JAYNE:  THEY DID.

22       BUT WHEN YOU LOOK AT THE NETFLIX WITNESSES AND WHETHER

23   THEY SAID THERE WAS FINANCIAL LOSS TO THEM FROM THE CONTRACTS,

24   AND AGAIN I REITERATE THAT THEY USED THE PRODUCT AND THEY NEVER

25   WENT BACK AND SAID HEY, WAIT A MINUTE, WE WANT OUR MONEY BACK

1    FROM THESE PARTICULAR VENDORS.

2        AND IN THAT 8TH AMENDMENT ANALYSIS, THE REASON I COMPARE

3    IT TO THE $70,000 IS BECAUSE THAT'S WHERE -- I THINK THAT'S

4    WHERE THE ANALYSIS BEGINS, IN TERMS OF WHAT'S DISPROPORTIONATE.

5    AND THAT'S WHY I PUT OUT THOSE FIGURES IN TERMS OF THIS MANY

6    TIMES, BECAUSE THAT'S THE CRITICAL NUMBER TO DO THE ANALYSIS

7    FROM, NOT THE, OH, WELL HE COULD POTENTIALLY PROFIT.  AGAIN,

8    THAT WOULD BE A DIFFERENT ANALYSIS OF A DIFFERENT SEIZURE.

9        BUT THE HOUSE ITSELF MUST BE EVALUATED.  AGAIN, THAT'S WHY

10   THE MANUAL SAYS, HOW IS THIS PROPERTY INVOLVED IN THE CONDUCT?

11   AND OFTEN TIMES YOU WILL SEE IN FORFEITURE, THE HOUSE IS USED

12   AS A PLACE WHERE DRUG ACTIVITY OCCURS AND IT'S A CRITICAL PART

13   OF THE OPERATION.  HERE IT WAS ALMOST INCIDENTAL TO EVEN THE

14   CONVICTIONS, BECAUSE IT WAS ONE TRANSACTION THAT THE HOUSE WAS

15   INVOLVED IN, OTHERWISE IT HAD NOTHING TO DO WITH ANY OF THE

16   CONVICTIONS, OTHERWISE WE WOULD HAVE SEEN ADDITIONAL CHARGES

17   WITH RESPECT TO THAT.

18       SO IN THAT COMPARISON, I THINK THE COURT SHOULD EVALUATE

19   THE PROPORTIONALITY WITH RESPECT TO THAT FIGURE BECAUSE IT IS

20   RELEVANT.  AND THAT'S WHAT THE JURY WAS DECIDING.

21       AND IN CONJUNCTION WITH, AS I UNDERSTAND THE COURT'S

22   DIRECTIVE, THERE'S GOING TO BE ADDITIONAL RESTITUTION, AND YOU

23   KNOW, AND THE GOVERNMENT IS SEEKING AN ADDITIONAL FINE.  AND

24   THE TOTALITY, I MEAN, AT THIS POINT, MR. KAIL'S INCOME HAS

25   BEEN, AS I POINTED OUT, HAS BEEN OVERSTATED BY A LITTLE OVER

1     $2 MILLION IN THE PSR.  I THINK THAT WAS JUST A

2     MISUNDERSTANDING OF HOW HE HAD DELINEATED HIS ASSETS.

3           THE COURT:  DO HIS ASSETS INCLUDE THE SUMOLOGIC AND

4     NETSKOPE SHARES?

5           MS. JAYNE:  SUMOLOGIC, IT DOES.

6           THE COURT:  HOW ABOUT NETSKOPE?  IT HAS A VALUE.

7           MS. JAYNE:  IT DOESN'T, BECAUSE FOR EXAMPLE, HE

8     EXERCISED THOSE SHARES, BECAUSE IT ALL DEPENDS ON WHEN THE

9     COMPANY GETS ACQUIRED, WHAT ORDER SOMEBODY IS IN, HOW IT

10    HAPPENS.  THEY DON'T HAVE TANGIBLE VALUE TO DATE.

11          THE COURT:  I SEE.

12          MS. JAYNE:  SUMO IS.

13     WHAT HAPPENED WAS HE WAS ASKED ABOUT CHARLES SCHWAB, THEN

14    HE LISTED THE STOCKS IN THAT CHARLES SCHWAB ACCOUNT.  SO HIS

15    TOTAL ASSETS, INCLUDING I THINK THE HOUSE, WAS ABOUT

16    $6 MILLION.  AND THE HOUSE IS -- I MEAN, I THINK THE PROBATION

17    OFFICER NOTED, MR. KAIL IS LIVING MODESTLY.

18    THIS ISN'T AN EXAMPLE OF JUST BLATANT SPENDING ON VARIOUS

19    ITEMS.  AND YOU KNOW -- OR SOMEBODY WHO WAS UNEMPLOYED AT THIS

20    POINT LIVING IN THE BAY AREA WITH SIGNIFICANT MORTGAGE.

21    TO SOMEBODY WHO IS IMPOVERISHED, IT'S A LOT OF MONEY.  TO

22    SOMEBODY WHO HAS A HOME AND CHILDREN TO SUPPORT AND HE HAS ONE

23    CAR BETWEEN THE TWO OF THEM, HOW MANY YEARS WILL THAT LAST?

24          THE COURT:  I THINK IT'S A REAL STRETCH TO SAY THAT

25    THERE'S ONE CAR IN THE FAMILY BECAUSE THEY CAN'T AFFORD A

```
1    SECOND CAR.  YOU CAN'T REALLY BE SAYING THAT.  I BELIEVE YOU

2    THAT THERE'S ONE CAR.

3         MS. JAYNE:  WHAT I'M SAYING IS THEY ARE LIVING

4    MODESTLY TO ACCOUNT FOR, I THINK IN PART, THE LACK OF PRESENT

5    INCOME, THE UNCERTAIN FUTURE.

6         IT'S NOT THAT, YEAH, HE COULD SPEND ALL HIS MONEY AND HAVE

7    NO SAVINGS, BUT I THINK THEY ARE TRYING TO BE CONSERVATIVE

8    ABOUT --

9         THE COURT:  ALL RIGHT.

10        AND I WILL CERTAINLY ASK THE PROBATION OFFICER TO TAKE A

11   LOOK AT THE ASSET ISSUE SO THAT WE CAN GET THAT CORRECTED FOR

12   SENTENCING.

13        AND WHAT YOU SAY MAKES SENSE, I JUST -- THEY WILL HAVE TO

14   TAKE A LOOK AT WHAT THEY REVIEW TO SEE WHAT THAT IS.  WE WILL

15   GET THAT REVIEWED.

16        EVEN IF I WERE TO ISOLATE COUNT 24, MR. KAIL IS LOOKING AT

17   A MAXIMUM SENTENCE OF TEN YEARS ON MONEY LAUNDERING.  THAT'S A

18   SIGNIFICANT SENTENCE, WITH A GUIDELINE FOR THE CASE OF 97 TO

19   121 MONTHS.  FOR THE SINGLE COUNT 24 MONEY LAUNDERING, HE'S

20   LOOKING AT A MAXIMUM FINE OF $250,000, BUT IF WE LOOK AT THE

21   ENTIRE CASE, HE'S FACING A TOTAL FINE OF 6.75 MILLION.

22        IT'S NOT CLEAR TO ME WHICH -- WHETHER I LOOK AT COUNT 24

23   ALONE, BECAUSE IT'S THE MONEY LAUNDERING, OR IF I LOOK AT THE

24   CASE AS A WHOLE.

25        THERE WILL BE MANDATORY RESTITUTION, THERE ARE GOING --
```

1    THERE WILL BE A CONSIDERATION OF A FINE.  AND THE SAME 8TH

2    AMENDMENT LIMITATION ON FINE WOULD BE APPLIED, BUT A GUIDELINE,

3    I THINK PROBABLY PRESUMPTIVELY PASSES CONSTITUTIONAL MUSTER.

4         AND SO THE GUIDELINE THAT'S SUGGESTED IN THE PRESENTENCE

5    REPORT IS 30,000 TO 300,000.  YOU MENTION 350, I DON'T SEE THAT

6    IN THE VERSION THAT I HAVE.

7              MR. KALTSAS:  I MIGHT HAVE MISREAD THAT.

8              THE COURT:  YEAH, THAT'S OKAY.

9         AND SO MS. JAYNE, WHAT I'M REALLY LOOKING AT HERE IS THAT

10   EVEN UNDER BEECROFT AND THE OTHER CASES, THAT THE GOVERNMENT'S

11   REQUEST IS, IN MY VIEW, REALLY REASONABLE UNDER THE TOTALITY OF

12   THE CIRCUMSTANCES, AND UNDER THE BEECROFT FACTORS AND AS THAT

13   CASE IS DECIDED UNDER -- AND I'M GOING TO SPELL THIS FOR THE

14   COURT REPORTER -- U.S. V. BAJAKAJIAN.

15             MR. KALTSAS:  THAT'S PRETTY GOOD, YOUR HONOR.

16             THE COURT:  I'M NOT -- THE ONES THAT I SEE THAT ARE

17    OVERTURNED, ARE A HUNDRED TIMES, A THOUSAND TIMES, THE

18    GOVERNMENT HAS JUST APPEALED JUDGE RAKOFF'S ORDER FROM THE

19    SOUTHERN DISTRICT OF NEW YORK AS OF LAST WEEK, WHICH HAD CAUGHT

20    MY ATTENTION PREVIOUSLY UNTIL IT WENT UP ON APPEAL AND THEN I

21    DECIDED NOT TO RELY ON IT IN PARTICULAR.

22             MS. JAYNE:  BUT I HOPE YOUR HONOR, AT THIS POINT, IS

23    NOT MAKING A DECISION AS TO WHAT THE APPROPRIATE GUIDELINES

24    ARE, BECAUSE I THINK --

25             THE COURT:  I'M NOT DECIDING THE APPROPRIATE

1    GUIDELINES.

2         MS. JAYNE:  AND TO THE POINT OF THIS IS THE GUIDELINE

3    RANGE, THE COURT HASN'T MADE THAT DETERMINATION.

4         THE COURT:  IT IS A TEN-YEAR MAXIMUM, AND I CAN

5    SENTENCE UP TO THE MAXIMUM.

6         MS. JAYNE:  I UNDERSTAND THE MAXIMUMS, BUT OUR

7    ARGUMENT WAS THAT THE FINE IS, I THINK 2 TO $20,000 IN TERMS OF

8    THE GUIDELINE CALCULATION.  WHEREVER THAT COMES OUT AT THIS

9    POINT, I WOULD HOPE THE COURT WOULD RELY ON --

10        THE COURT:  SO I DON'T LOOK AT THE MAXIMUM, BECAUSE I

11   AM NOT LIMITED BY THE GUIDELINES, AND AS I CAN VARY LOWER, I

12   CAN VARY HIGHER.  AND SO THIS IS A SERIOUS CRIME, COUNT 24 BY

13   ITSELF IS A SERIOUS CRIME WITH A TEN-YEAR MAXIMUM PRISON

14   SENTENCE.  AND THE FINE IS MAXIMUM OF $250,000, WHICH I HAVE

15   THE AUTHORITY TO IMPOSE.

16        AND SO I'M LOOKING FOR THE PROPORTIONALITY OR TO MAKE SURE

17   THAT THIS ISN'T GROSSLY DISPROPORTIONAL TO THE CRIME AND TO THE

18   PENALTIES THAT MR. KAIL WOULD BE FACING.  AND I AM JUST NOT

19   SATISFIED THAT YOU'VE MET THE BURDEN OF SHOWING IT TO BE

20   GROSSLY DISPROPORTIONAL.

21        MS. JAYNE:  WELL YOUR HONOR, AGAIN, I THINK BECAUSE

22   WE ARE STARTING AT DIFFERENT POINTS, I'M STARTING AT THE

23   ASSESSMENT THAT THE HOUSE WAS -- IF THIS WAS CONVERTED TO

24   MONEY, WE WOULD BE TALKING ABOUT $70,000.  FOR EXAMPLE, HE TOOK

25   $70,000 AND DID SOMETHING WITH IT, WE WOULD BE TALKING ABOUT

1    SEIZING THAT $70,000.  IT'S BECAUSE IT WENT INTO A HOUSE THAT

2    WE ARE EVEN HAVING A DISCUSSION ABOUT THE HOUSE.

3         THE COURT:  BUT THE GOVERNMENT CITED THIS CASE U.S.

4    V. KIVANC, 714 F.3D 782, FROM THE FOURTH CIRCUIT TALKING ABOUT

5    COMMINGLING LEGITIMATE AND ILLEGITIMATE FUNDS.  THE ENTIRE

6    PROPERTY IS SUBJECT TO FORFEITURE.

7       HERE, BECAUSE IT'S THE FAMILY HOME, I AM NOT SERIOUSLY

8    CONSIDERING FORFEITURE OF THE HOME.

9         MS. JAYNE:  I THINK THE COMMINGLING, AND I MADE THIS

10   ARGUMENT IN ADVANCE OF TRIAL, THAT HAS TO DO WITH THE OTHER

11   MONEY LAUNDERING STATUTE.  THAT HAS TO DO WITH 1956.  I BRIEFED

12   THIS PRETTY EXTENSIVELY.

13        THE COURT:  THIS CASE INVOLVES SECTION 1957.

14        MS. JAYNE:  IF YOUR HONOR COULD PLEASE DIRECT ME TO

15   THE PAGE ON THE COURT'S BRIEF.

16        THE COURT:  OH, I'VE GOT THE CASE ITSELF HERE, SORRY.

17        MS. JAYNE:  TO SEE WHERE WE ARE AT, SORRY.

18      THE NAME OF THE CASE AGAIN?  I'M SORRY.

19        THE COURT:  KIVANC.

20     SO COUNT 24 WAS UNDER SECTION 1957.  THE KIVANC CASE

21   WAS -- REFERENCES -- SORRY, HERE WE ARE.  I'M LOOKING AT PAGE,

22   IT WAS A LONG CASE, I ONLY COPIED A FEW PAGES OF IT, PAGE 794.

23        MS. JAYNE:  I ASKED MR. KALTSAS TO HELP ME.

24        THE COURT:  SO WHAT THE CASE SAYS IS UNDER 981(A)(1),

25   ANY REAL OR PERSONAL PROPERTY "INVOLVED IN" A MONEY LAUNDERING

1    TRANSACTION IN VIOLATION OF SECTION 1957, IS SUBJECT TO CIVIL

2    FORFEITURE.

3        SECTION 981(A)(1)(A), CONSEQUENTLY, WHEN LEGITIMATE FUNDS

4    ARE COMMINGLED WITH PROPERTY INVOLVED IN MONEY LAUNDERING OR

5    PURCHASED WITH CRIMINALLY DERIVED PROCEEDS, THE ENTIRE

6    PROPERTY, INCLUDING THE LEGITIMATE FUNDS, IS SUBJECT TO

7    FORFEITURE.

8        I DON'T KNOW THAT THE NINTH CIRCUIT HAS EVER ISSUED A

9    DECISION TO THE CONTRARY.  THE FOURTH CIRCUIT HERE CITES A

10   NUMBER OF OTHER CIRCUITS BUT NOT THE NINTH.  AND SO --

11       MR. KALTSAS:  AND YOUR HONOR, FOR AN ANALOGOUS CASE

12   IN THE NINTH CIRCUIT, ONE THAT DOESN'T NECESSARILY TOUCH THIS

13   ISSUE AS DIRECTLY AS KIVANC, I LOOK TO UNITED STATES V. LO.

14   THAT ONE WAS WHERE IT DEALT WITH THE PROCEED SIDE OF THINGS,

15   BUT IT WAS A HOLDING THAT HELD THAT TO THE EXTENT THE PROCEEDS

16   OF CRIME ARE SOMETHING LIKE STOCK, FOR EXAMPLE, THAT STOCK IS

17   STILL FORFEITABLE BECAUSE IT STILL CONSTITUTES PROCEEDS.

18       I THINK THAT'S ANALOGOUS TO THIS CASE, TO THE EXTENT THAT

19   IF YOU INVOLVE SOMETHING IN MONEY LAUNDERING, YOU ARE NOT JUST

20   TAKING THE MONEY ITSELF OUT BECAUSE THAT WOULD COMPLETELY ERASE

21   THE PURPOSE OF A MONEY LAUNDERING CONVICTION.  YOU ARE

22   LAUNDERING DIRTY MONEY WITH CLEAN MONEY FOR THE PURPOSE OF

23   HIDING THE FACT THAT IT'S DIRTY, OR IN THE CASE OF 1987, YOU

24   SPENT THE MONEY ITSELF.

25       SO THE FORFEITURE IS MUCH BROADER, IF YOU LOOK AT

1    982(A)(1), ON ITS FACE IS MUCH BROADER THAN 981(A)(1)(C) WHICH

2    LIMITS IT TO PROCEEDS, TRACEABLE, TO THE ACT.

3        SO THE GOVERNMENT ARGUES THAT $70,000 WOULD BE APPROPRIATE

4    IF WE WERE JUST DEALING WITH PROCEEDS HERE, IF WE WERE JUST

5    DEALING WITH SOMETHING LIKE THIS.  BUT BECAUSE WE ARE DEALING

6    WITH MONEY LAUNDERING, THE FORFEITURE IS MUCH BROADER.

7        AND OF COURSE TO THE EXTENT THAT WE ARE DEALING WITH A, TO

8    THE EXTENT WE ARE DEALING WITH MONEY LAUNDERING A, THE JURY

9    ALREADY CONCLUDED THAT THIS HOUSE WAS INVOLVED IN MONEY

10   LAUNDERING, RIGHT, SO IT ISN'T JUST THE $70,000, IT'S THE HOME

11   IN ITS ENTIRETY.

12       AND THE PURPOSE, JUST TO GET BACK TO THE EXCESSIVE FINES

13   ANALYSIS UNDER THE 8TH AMENDMENT, WHAT WENT INTO A HOME ISN'T

14   NECESSARILY PART OF THE ANALYSIS.  WE ARE LOOKING AT THE CASE

15   AS A WHOLE.  CONTRARY TO WHAT THE DEFENDANTS SAID, IT'S NOT

16   LOOKING AT THIS IN ISOLATION, THE SECOND FACTOR OF THE

17   BAJAKAJIAN TEST OR BEECROFT TEST, SPECIFICALLY REQUIRES THE

18   COURT TO -- AND REQUIRES IS A STRONG WORD, BUT IT DIRECTS THE

19   COURT TO LOOK AT ALL OF THE OFFENSES, ALL THE ILLEGAL

20   ACTIVITIES THAT OCCURRED IN THE CONTEXT OF THE CASE, NOT JUST

21   THE STATUTE ITSELF.

22       MS. JAYNE:  YOUR HONOR, I APOLOGIZE, BUT I DIDN'T SEE

23    THAT CASE IN THE GOVERNMENT'S BRIEF.

24       MR. KALTSAS:  YOUR HONOR, I'M SORRY, I JUST OPENED UP

25    TO IT, IT'S ACTUALLY IN THE OPENING BRIEF WHICH IS WHY --

1          THE COURT:  OKAY.

2          MR. KALTSAS:  IT'S ON PAGE 4, LINES 10 AND 11.

3          MS. JAYNE:  THE PRELIMINARY APPLICATION, YOU MEAN?

4          MR. KALTSAS:  YES.

5          MS. JAYNE:  OKAY.

6          MR. KALTSAS:  BUT YES, YOUR HONOR.

7       SO FOR THAT REASON, THE GOVERNMENT ASSERTS THAT THE

8    $70,000 IS PLAINLY INAPPROPRIATE, AND ESPECIALLY IN LIGHT OF

9    THE NATURE OF THE HARM AND ALL THE OTHER ILLEGAL ACTIVITIES,

10   AND IT'S ESPECIALLY APPROPRIATE IN LIGHT OF OTHER NINTH CIRCUIT

11   CASES, AS YOUR HONOR MENTIONED, PROVIDING FOR THREE TIMES MORE

12   OR EVEN MORE IN SOME CASES AS BEING ALLOWED UNDER THE EXCESSIVE

13   FINES ANALYSIS.

14          THE COURT:  SO I'M LOOKING AT PAGE 4, THANK YOU FOR

15   THAT CITATION WHERE YOU DO REFERENCE THE LO CASE.

16       AND THIS IS WHAT I WAS GETTING AT WITH MS. JAYNE, AND I

17   WILL MAKE SURE THAT I AGREE WITH YOUR CONCLUSION, BUT THAT THE

18   FORFEITURE REACHES THE PROCEEDS OF AN ENTIRE SCHEME OR COURSE

19   OF CONDUCT, NOT JUST THOSE PROCEEDS SPECIFICALLY ATTRIBUTED TO

20   EACH COUNT.

21       I WANT TO LOOK AT LO TO SEE IF THAT IS FAIR, BECAUSE I

22   DIDN'T PULL THAT CASE, AND I APOLOGIZE FOR THAT, BUT THAT PUTS

23   THIS IN A DIFFERENT VIEW THAN JUST COUNT 24.

24          MR. KALTSAS:  AND I COULD BE WRONG ABOUT THAT,

25   YOUR HONOR, BUT I'M GOING TO DESTROY THE NAME CASE, THE AFRIYIE

1    CASE.

2         THE COURT:  YES, I HAVE THAT ONE.  AND THAT IS

3    A-F-R-I-Y-I-E.

4         MR. KALTSAS:  THAT'S 929 F.3D 63, I DIRECT THE COURT

5    TO PAGE 73.

6         THE COURT:  YES.

7         MR. KALTSAS:  AND SECOND CIRCUIT 2019.

8         THE COURT:  AND THERE, THE SECOND CIRCUIT SAYS, WE

9    HOLD AS A MATTER OF LAW, FORFEITURE MAY EXTEND TO THE

10   APPRECIATION FUNDS ACQUIRED THROUGH ILLEGAL TRANSACTIONS IN AN

11   INSIDER TRADING SCHEME.

12        MR. KALTSAS:  AND SO THAT'S RELEVANT TO A HOME TOO,

13   YOUR HONOR.

14        THE COURT:  YES.

15        MR. KALTSAS:  SO TO THE EXTENT THAT A HOME GAINS

16   VALUE WHEN YOU PUT MONEY INTO IT, THAT'S SIMILAR.

17        THE COURT:  YES.

18      MS. JAYNE, ANY OTHER COMMENTS BEFORE WE CONCLUDE?

19        MS. JAYNE:  I APOLOGIZE, I DID NOT HAVE A CHANCE TO

20   LOOK AT THAT CASE.

21        THE COURT:  THERE ARE A LOT OF THEM.

22        MS. JAYNE:  YEAH, I WAS FOCUSED ON THE REPLY AND HAD

23   FORGOTTEN THAT AN ORIGINAL APPLICATION HAD ANY CASE LAW IN IT,

24   SO I WOULD LIKE THE OPPORTUNITY TO LOOK AT THAT.

25        THE COURT:  WELL, THAT TIME HAS PASSED.

1     MS. JAYNE:  YEP, OKAY.

2     SO I WOULD NOTE THAT IT SEEMS THAT THE GOVERNMENT, AND

3     PERHAPS THE COURT, ARE CONCLUDING THAT REALLY THAT MONEY

4     LAUNDERING COUNT IS KIND OF IRRELEVANT, OR THE $70,000 IS NOT

5     REALLY RELEVANT HERE.  WE ARE NOT GOING TO LOOK AT THAT, AND IT

6     BEARS NO WEIGHT IN THIS.

7     AND I WOULD URGE THE COURT TO CONSIDER THE FACT THAT

8     THAT'S ACTUALLY WHAT THE JURY CONSIDERED.  THAT'S ACTUALLY THE

9     AMOUNT THAT IF THERE'S ANY DOLLAR FIGURE THAT IS CONCRETELY

10    SUBJECT TO FORFEITURE AND ANALYSIS, IT'S THAT NUMBER.  SO IT

11    CAN'T HAVE NO RELEVANCE TO THIS ANALYSIS.

12    LET'S JUST LOOK AT --

13    THE COURT:  SO THAT WOULD BE OUTSIDE OF MY READING OF

14    BAJAKAJIAN AND BEECROFT ON THE FACTORS.  AND THE NINTH CIRCUIT

15    QUOTING THE SUPREME COURT, A PUNITIVE FORFEITURE VIOLATES THE

16    EXCESSIVE FINES CLAUSE IF IT IS GROSSLY DISPROPORTIONAL TO THE

17    GRAVITY OF THE DEFENDANT'S OFFENSE, NOT TO THE VALUE OF THE

18    LAUNDERED MONEY.  THAT'S NOT A CONSIDERATION.

19    WHEN WE LOOK MORE GRANULARLY AT THE FOUR FACTORS, NOWHERE

20    IS THERE A FACTOR THAT COULD LOOK AT THE AMOUNT OF THE

21    LAUNDERED FUNDS.  AND ALL THE CASE LAW TALKS ABOUT COMMINGLED

22    FUNDS CAN BE TAKEN, APPRECIATED VALUE CAN BE TAKEN IN

23    FORFEITURE.  SO I LOOK AT THE OFFENSE.

24    ALL RIGHT.  THIS HAS BEEN VERY HELPFUL.  THESE ARE VERY

25    DIFFICULT ISSUES.  AT THE END OF THE DAY, EACH DECISION I MAKE

1    WILL INFORM THE NEXT DECISION.  AND AS I SAID, WHEN I LOOK AT A

2    FINE, I WILL BE LOOKING AT WHAT THE FORFEITURE HAS BEEN,

3    BECAUSE I THINK THAT THE 8TH AMENDMENT IS GOING TO REQUIRE

4    MR. KAIL GET FAIR CONSIDERATION OF THE TOTALITY OF THE

5    PUNISHMENT AND NOT IN ISOLATION.  AND SO TO THE EXTENT ONE

6    FINDING IS HIGHER, THE NEXT ONE HAS THE POTENTIAL OF BEING

7    LOWER TO TAKE THAT INTO ACCOUNT.

8         I ACTUALLY FIND THAT THE GOVERNMENT'S REQUEST FOR A MONEY

9    JUDGMENT OF $700,000 IS REASONABLE.  I THINK A HIGHER AMOUNT

10   COULD HAVE BEEN SUSTAINED AS WELL.

11       AS I SAID, I NEVER CONSIDERED HAVING THE HOME FORFEITED,

12   AND THE CONSEQUENCES ON THE FAMILY SEEMED GROSSLY

13   DISPROPORTIONAL TO THE OFFENSES.  BUT THIS CASE WAS ABOUT MONEY

14   AND ILL GOTTEN GAINS, AS MONEY LAUNDERING IS, AND I'M EVEN

15   LOOKING AT ONLY COUNT 24 IN ISOLATION, THE MAXIMUM FINE IS

16   $250,000 AND THE MAXIMUM PENALTY IS TEN YEARS.

17       IF I WERE TO CONSIDER THE TOTALITY OF THE CASE, THE

18   MAXIMUM FINE IS OVER $6 MILLION AND THE EXPOSURE IS 20 YEARS IN

19   PRISON FOR EACH OF THE FRAUD CLAIMS.  I'M NOT ACTUALLY

20   CONSIDERING THAT, I WOULD CONSIDER -- AND I'M NOT LOOKING AT

21   THE GUIDELINE YET BECAUSE WE DON'T HAVE A CONSIDERATION OF IT,

22   BUT I'M NOT BOUND BY THE GUIDELINE, AND SO I AM LOOKING AT

23   THAT.

24       AND SO THIS WOULD BE -- THE $700,000 REQUESTED, I THINK IS

25   WELL WITHIN THE RANGE OF A REASONABLE FORFEITURE FOR THE CRIME

1    AT ISSUE HERE AND THE TOTALITY OF THE CRIMINAL CONDUCT UNDER

2    BEECROFT AND BAJAKAJIAN.  AND IN CONSIDERING THE NATURE AND

3    EXTENT OF THE CRIME AND WHETHER THE VIOLATION WAS RELATED TO

4    OTHER ILLEGAL ACTIVITIES, I AGREE WITH THE GOVERNMENT, THESE

5    WERE VERY SERIOUS CRIMES, THAT THE MONEY LAUNDERING REFLECTS

6    THE CONCEALMENT OF A SCHEME THAT TOOK PLACE OVER A SIGNIFICANT

7    PERIOD OF TIME INVOLVING A NUMBER OF ILLEGAL ACTIVITIES, AS

8    FOUND BY THE JURY.

9        IN TERMS OF OTHER PENALTIES THAT MAY BE IMPOSED FOR THE

10   VIOLATION, I WOULD -- I WILL CONSIDER A FAIR AND REASONABLE OR

11   NOT GROSSLY DISPROPORTIONAL FINE IN CONJUNCTION WITH THIS

12   FORFEITURE.  BUT LOOKING AT THE OTHER PENALTIES THAT MAY BE

13   IMPOSED, THERE IS A SIGNIFICANT PRISON SENTENCE THAT IS FACING

14   MR. KAIL THAT FACTORS INTO THE SIZE OF THIS.  AND THIS $700,000

15   IS UNDER THREE TIMES THE MAXIMUM FINE FOR COUNT 24, AND A SMALL

16   PROPORTION OF THE MAXIMUM FINE FOR THE ENTIRE CONVICTION.  AND

17   SO THAT WILL BE MY CONCLUSION.

18       SO AS WE FINISH UP THIS MORNING, WE NEED TO SET THE

19   SENTENCING HEARING.  IT'S NOT CLEAR TO ME WHETHER THAT WILL BE

20   EVIDENTIARY OR NOT.

21       MR. KALTSAS:  YOUR HONOR, BEFORE WE PROCEED, DID YOU

22   WANT THE GOVERNMENT TO SUBMIT AN ORDER TO THE EFFECT OF THE

23   COURT'S RULING?

24       THE COURT:  YES, I WILL NEED AN ORDER.

25       AND I HAVEN'T RULED YET ON -- IF YOU WOULD LIKE A

1    PRELIMINARY ORDER ON THE 700,000 NOW, THAT'S FINE, BUT I HAVE

2    NOT MADE A DETERMINATION ON THE NETSKOPE SHARES, WHICH ARE

3    GOING TO BE BRIEFED A LITTLE BIT MORE FOR ME.

4        MR. KALTSAS:  SO WE WILL WAIT FOR THAT, YOUR HONOR.

5        THE COURT:  I THINK SO.  IT'S NOT AN ASSET THAT WILL

6    BE DISSIPATED AT THIS POINT, I THINK WE ARE NOT WORRIED ABOUT

7    THAT.

8        MR. KALTSAS:  THAT'S RIGHT, YOUR HONOR.

9        MS. JAYNE:  AND YOUR HONOR, IT SOUNDS LIKE IT WOULD

10    NONETHELESS BE A PRELIMINARY ORDER, BECAUSE A FINAL ORDER WOULD

11    COME LATER.  AND WE WOULD BE ASKING FOR A STAY, SO THERE'S A

12    LOT OF STEPS BEFORE SOMETHING ACTUALLY HAPPENS WITH THAT.

13        THE COURT:  THAT'S CORRECT.

14    AND THE PRELIMINARY ORDER ONLY -- THAT THEN STARTS THE

15    TIME FOR ANY THIRD PARTY TO STEP FORWARD.  BUT NO ONE CAN STEP

16    FORWARD UNTIL THEY KNOW WHAT THE FORFEITURE IS.

17    SO WHETHER SOMEONE CAN STEP FORWARD ON A MONEY JUDGMENT OR

18    NOT, I DON'T KNOW.  BECAUSE IT'S NOT AN ASSET PER SE LIKE A

19    HOME WHERE THERE MIGHT BE A COMMUNITY PROPERTY INTEREST.

20    I DON'T KNOW AND THAT'S NOT FOR ME, THAT WILL COME TO ME,

21    I DON'T MAKE THOSE DECISIONS AS TO WHETHER A THIRD PARTY WOULD

22    COME FORWARD.

23    IF I WERE TO SAY THAT THE SHARES WERE SEIZABLE AND

24    FORFEITABLE, THEN I COULD EASILY SEE A THIRD PARTY CLAIM,

25    BECAUSE THAT IS PROPERTY AS OPPOSED TO A MONEY JUDGMENT.

1      MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

2      WITH ALL SPECIFIC PROPERTY, THE GOVERNMENT FULLY INTENDS

3   TO ENGAGE IN ALL THE NOTICE PROCEDURES AND NOTIFY ALL PARTIES

4   WITH POTENTIAL DIRECT CLAIMS.

5      THE COURT:  AND MS. JAYNE, I UNDERSTAND THE ISSUES ON

6   STAY, WE ARE A LONG WAY FROM THAT NOW BECAUSE WE HAVEN'T HAD

7   SENTENCING YET.  BUT YOU ARE CONTESTING IN YOUR SENTENCING

8   MEMO, THE ENHANCEMENT FOR THE VALUE OF THE -- FOR THE

9   ENHANCEMENT FOR THE AMOUNT OF THE LOSS.  I THINK THAT'S WHERE

10  THE ENHANCEMENT IS FOR THE AMOUNT OF THE LOSS.

11      MS. JAYNE:  RIGHT.  THE GOVERNMENT HAS A PLUS --

12      THE COURT:  AND IT'S NOT CLEAR TO ME WHETHER THE

13  AMOUNT OF THE LOSS IS THE SAME AS THE RESTITUTION AMOUNT.  THEY

14  MAY BE SIMILAR.

15      MR. SAMPSON:  THEY ARE DIFFERENT, YOUR HONOR.

16      THE COURT:  THEY'RE DIFFERENT.  OKAY.

17      MR. SAMPSON:  AND THAT'S BECAUSE OF THE CIVIL

18  SETTLEMENT AND PAYMENT.

19      THE COURT:  OH, THAT'S A SETOFF, I UNDERSTAND THAT.

20  BUT THE AMOUNT BEFORE THE SETOFF, THAT MAY BE THE SAME.

21      BUT I DON'T THINK SO BECAUSE THE PROBATION OFFICER SAYS

22  THAT IT WAS, HE'S CALCULATING, OR SHE, 1.5 MILLION.  I THINK

23  NETFLIX IS SEEKING RESTITUTION AS TO ONLY SOME COMPANIES.

24      MS. JAYNE:  AND THE GOVERNMENT'S ANALYSIS OF LOSS IS

25  EVERY SINGLE COMPANY.

1      MR. SAMPSON:  THAT'S NOT CORRECT, YOUR HONOR.

2      THE GOVERNMENT'S VIEW OF RESTITUTION IS IN LINE WITH

3    NETFLIX'S, WHICH WAS THAT THE TOTAL LOSS WAS 1.722, I THINK

4    MILLION.

5      AND THE GOVERNMENT'S VIEW IS THAT THE LOSS IS SOMEWHAT --

6    THE GOVERNMENT'S VIEW WAS THAT IT WAS RIGHT ABOVE 2 MILLION.

7    THEY ARE NOT DRASTICALLY OFF, BUT THERE ARE A FEW DIFFERENCES.

8      BUT YOUR HONOR, I BELIEVE THAT NETFLIX'S REQUEST FOR

9    RESTITUTION TAKES INTO ACCOUNT WHAT WAS ALREADY PAID, AND IS

10   1.2 SOMETHING.

11      THE COURT:  MS. JAYNE, HOW ARE WE GOING TO DETERMINE

12   THE AMOUNT OF LOSS THAT IS SET FORTH IN PARAGRAPH 26 OF THE

13   PRESENTENCE REPORT?  I THINK YOU BOTH SAID TO ME THIS IS NOT AN

14   EVIDENTIARY HEARING ON THIS.  AM I GOING TO CONSIDER THE

15   EVIDENCE YOU PUT IN YOUR BRIEFS, AND THAT WILL BE -- AND THEN

16   YOUR ARGUMENT AT THE SENTENCING HEARING?

17      MR. SAMPSON:  THE GOVERNMENT'S VIEW, YOUR HONOR, IS

18   THERE IS A ROBUST TRIAL RECORD, AND EVERY ISSUE THAT THE COURT

19   NEEDS TO CONSIDER, OTHER THAN THE ABHORRENT BEHAVIOR, BECAUSE

20   THERE WAS A LATER ACT THAT WAS NOT PART OF THIS TRIAL, AND WE

21   SUBMITTED THAT ONE EXHIBIT, BUT EVERY OTHER ISSUE, YOUR HONOR,

22   IS SUPPORTED IN THE TRIAL RECORD AND THE EXHIBITS IN THE JURY

23   VERDICT.

24      AND SO THE GOVERNMENT'S VIEW IS THAT THE VICTIM DOES NOT

25   NEED TO BE DRAGGED BACK IN HERE TO PROVIDE WITNESSES TO PROVIDE

```
1     TESTIMONY ABOUT THE LOSS, THAT IT IS RIPE FOR A DECISION BASED

2     ON THE TRIAL EVIDENCE.

3              THE COURT:  MS. JAYNE?

4         AND I'M ONLY TALKING ABOUT THE ENHANCEMENT, I'M NOT

5     TALKING ABOUT RESTITUTION, I WANT TO BE CLEAR ON THAT.

6              MS. JAYNE:  RIGHT, I UNDERSTAND.

7         AND I DON'T KNOW THAT I HAVE ANY BASIS TO DISAGREE,

8     BECAUSE THE WITNESSES FROM NETFLIX TESTIFIED, AND I WOULD ASK

9     THE COURT ACTUALLY TO RELY ON THE TRIAL RECORD MORE SO THAN

10    ANYTHING.

11             THE COURT:  SO THAT'S ALL IN YOUR BRIEFS AND I CAN

12    FOLLOW --

13             MS. JAYNE:  YES.

14             THE COURT:  EXCELLENT.  OKAY.

15             MR. SAMPSON:  IF YOUR HONOR NEEDS A BINDER WITH THE

16    EXHIBITS THAT WE REFERRED TO, WE CAN PREPARE THAT.

17             THE COURT:  THAT WOULD BE HELPFUL, THAT WOULD BE

18    REALLY HELPFUL.

19             MR. SAMPSON:  OKAY.

20             THE COURT:  OKAY.  THEN IN TERMS OF SETTING THE

21    SENTENCING HEARING, DO WE HAVE ANYTHING ON NOVEMBER 12TH?

22             THE CLERK:  NO, WE DO NOT.

23             MR. SAMPSON:  I WILL BE AVAILABLE.

24             THE COURT:  THANK YOU.

25             MS. JAYNE:  YEAH, I THINK THAT'S FINE, YOUR HONOR.
```

1           THE COURT:  OKAY.

2           MS. JAYNE:  I WAS JUST LOOKING SINCE THE DAY BEFORE

3     IS A HOLIDAY.

4           THE COURT:  I WANTED TO POINT THAT OUT TO YOU, IT'S

5     AN UNUSUAL DAY, BUT IT MEANS MY WORK LOAD IS A LITTLE BIT

6     LIGHTER.

7           MR. SAMPSON:  I LOOK IT AS LEAVE, BUT I'M HAPPY TO

8     WORK.

9           THE COURT:  THANK YOU.  I KNOW.

10        I COULD DO IT ON MONDAY THE 15TH IF THAT WOULD BE EASIER

11    FOR EVERYONE.

12          MS. JAYNE:  IF MR. SAMPSON WAS GOING TO TAKE THE DAY

13    OFF, I MEAN --

14          THE COURT:  IF YOU WOULD PREFER THAT, I'M GLAD TO DO

15    THAT, IT MAKES NO DIFFERENCE TO ME.

16          MR. SAMPSON:  I WOULD SLIGHTLY PREFER THE MONDAY.

17       THANK YOU, YOUR HONOR.

18          THE COURT:  SURE.

19       OKAY.  LET'S SET THAT AT 9:00 FOR SENTENCING.

20       OFFICER POLLACK?

21          PROBATION OFFICER:  I AM AVAILABLE.  AND IF I'M NOT

22    AT THAT POINT, SOMEBODY ELSE WILL BE.

23          THE COURT:  OKAY.  GOOD.

24       WELL THEN MANY, MANY PEOPLE HAD DECIDED TO TAKE THAT

25    LITTLE DAY OFF, WE GET FEW ENOUGH OF THEM.

1    MS. JAYNE:  THAT WILL BE NOVEMBER 15TH AT 9:00 A.M.

2    THE COURT:  SO MONDAY THE 15TH.  MONDAY THE 15TH.

3    OKAY.

4    AND BY THEN I WILL HAVE BEEN ABLE TO MAKE MY RULING ON THE

5    ASSET.

6    ALL RIGHT.  IT'S BEEN A LONG MORNING.  I THANK YOU FOR THE

7    COURTESY OF THE BREAK FOR THE OTHER MATTER.

8    ANYTHING ELSE, MR. SAMPSON, MR. KALTSAS?

9    MR. SAMPSON:  NO, YOUR HONOR.

10   WE WILL TRY TO GET YOU THOSE EXHIBITS WITHIN A WEEK.

11   WE WILL GET YOU THAT BRIEFING MY MONDAY, YOUR HONOR.

12   THE COURT:  THANK YOU.

13   MS. JAYNE, ANYTHING ELSE BEFORE WE BREAK?

14   MS. JAYNE:  I DON'T BELIEVE SO, NO.

15   THANK YOU.

16   THE COURT:  ALL RIGHT.  GOOD.  THANK YOU ALL.

17   (THE PROCEEDINGS WERE CONCLUDED AT 11:52 A.M.)

18

19

20

21

22

23

24

25

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00172-BLF |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | NOVEMBER 16, 2021 |
| | ) | |
| KAIL, | ) | PAGES 1-59 |
| | ) | |
| DEFENDANT | ) | |
| | ) | |
| _____ | ) | |

10            TRANSCRIPT OF PROCEEDINGS
11     BEFORE THE HONORABLE BETH LABSON FREEMAN
             UNITED STATES DISTRICT JUDGE
12

13          A P P E A R A N C E S

14

15   FOR THE PLAINTIFF:     **BY:  COLIN CHRISTOPHER SAMPSON**
                      **CHRIS KALTSAS**
16                 UNITED STATES ATTORNEY'S OFFICE
                 NORTHERN DISTRICT OF CALIFORNIA
17                 TAX DIVISION
                 450 GOLDEN GATE AVENUE, BOX 36055
18                 SAN FRANCISCO, CA 94102

19   FOR THE DEFENDANT:     **BY:  JULIA MEZHINSKY JAYNE**
                 JAYNE LAW GROUP
20                 803 HEARST AVE.
                 BERKELEY, CA 94710
21

22

23   OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                       CERTIFICATE NUMBER 13185
24

25     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
        TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        SAN JOSE, CALIFORNIA              NOVEMBER 16, 2021

 2                      P R O C E E D I N G S

 3        (COURT CONVENED AT 10:14 A.M.)

 4            THE CLERK:  CALLING CASE 18-0172.  UNITED STATES V.

 5    MICHAEL KAIL.

 6        COUNSEL, PLEASE STATE YOUR APPEARANCES.

 7            MR. SAMPSON:  GOOD MORNING, YOUR HONOR.

 8        COLIN SAMPSON AND CHRISTOPHER KALTSAS, AND ASSISTED BY

 9    LORI WORTHEN FOR THE GOVERNMENT.

10            THE COURT:  GOOD MORNING.

11            MS. JAYNE:  GOOD MORNING, YOUR HONOR.

12        JULIA JAYNE ON BEHALF OF MIKE KAIL WHO IS PRESENT.

13            THE COURT:  GOOD MORNING.

14        YES.  WE ARE GOING TO MOVE THOSE MICROPHONES CLOSE.  WITH

15    THE MASKS, IT'S DIFFICULT.

16        AND I HAVE MR. POLLAK HERE FROM PROBATION.

17            PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

18        KYLE POLLAK U.S. PROBATION.

19            THE COURT:  GOOD MORNING.  THANK YOU FOR BEING HERE.

20        OKAY.  AND GOOD MORNING MR. KAIL.

21        THIS IS THE TIME SET FOR SENTENCING.  I WILL SAY WE HAVE A

22    LOT OF WORK TO DO.  LET ME MAKE A COMMENT ABOUT FORFEITURE

23    BEFORE WE GO FORWARD, THAT HAS BEEN FULLY SUBMITTED TO THE

24    COURT.  AND ALTHOUGH I WILL BE ISSUING A WRITTEN ORDER, AND

25    THAT SHOULD GO OUT MAYBE LATER TODAY OR TOMORROW, I WANTED TO
```

3

1    LET YOU KNOW THAT MY CONCLUSION IS THAT AS TO THE SUMOLOGIC AND

2    NETSKOPE STOCK, THE GOVERNMENT PRESENTED THE COURT WITH THREE

3    OPTIONS AND SUBMITTED IT TO THE COURT'S DISCRETION AS TO WHICH

4    OF THE THREE OPTIONS TO ADOPT.

5        YOU WILL SEE IN MY WRITTEN ORDER, I FIND THAT MR. KAIL

6    ASSERTED HIS RIGHT TO A JURY TRIAL, AND THAT CERTAINLY AS TO

7    THE SUMOLOGIC STOCK, WHICH THE GOVERNMENT HAD EVIDENCE OF IN

8    ITS POSSESSION YEARS BEFORE TRIAL, AND AS TO THE NETSKOPE STOCK

9    WHICH THE GOVERNMENT LEARNED OF NO LATER THAN TRIAL, THERE WAS

10   NO MODIFICATION TO THE VERDICT FORM FOR THE SECOND PHASE OF THE

11   JURY'S WORK, AND THEREFORE I AM NOT GOING TO ORDER FORFEITURE

12   OF SPECIFIC PROPERTY.

13       THE GOVERNMENT SUGGESTS AS OPTION 2, THAT I COULD AWARD A

14   FORFEITURE OF MONEY JUDGMENT.  I FIND THE DEFENSE ARGUMENTS

15   AGAINST THAT COMPELLING AS A WORKAROUND THE RIGHT TO A JURY

16   TRIAL, AND THEREFORE I DON'T FIND THAT APPROPRIATE.

17       I THINK THAT THE GOVERNMENT ALWAYS HAS THE RIGHT TO FILE A

18   SEPARATE CIVIL ACTION.  I'M NOT COMMENTING ON WHETHER THAT IS

19   VIABLE OR NOT, BUT ONLY THAT THE STATUTE ALLOWS FOR IT.  AND

20   THAT IS MY CONCLUSION FOR THE TWO STOCKS.

21       AND SO MS. JAYNE, OBVIOUSLY THERE'S NOTHING TO COMMENT ON,

22   WHETHER THE GOVERNMENT FILES A SEPARATE ACTION, ALL DEFENSES

23   WILL BE AVAILABLE.  ONE WOULD PRESUME IF IT'S FILED, IT WILL BE

24   RELATED TO THIS CASE AND I WILL HANDLE IT.  BUT I HAVE NOTHING

25   TO DO WITH ASSIGNMENT OF CASES, AND SO I WILL WAIT AND SEE ON

1    THAT.

2         MR. KALTSAS, IF YOU COULD ANSWER ONE QUESTION FOR ME.  IN

3    A CIVIL ACTION, IS THERE A RIGHT TO A JURY TRIAL?

4         MR. KALTSAS:  THERE IS, YOUR HONOR.

5         THE COURT:  OKAY.  THAT'S WHAT I PRESUMED, AND

6    THEREFORE THAT REALLY ADDRESSES THE DEFENSE CONCERNS.

7         ALL RIGHT.  SO THEN THE SECOND ONE WAS THE FAMILY

8    RESIDENCE.  I THINK I HAD RULED ON THAT WHEN YOU WERE HERE, AND

9    NOTHING HAS CHANGED MY MIND ON IT.  THE PARTIES BOTH AGREE THAT

10   MONEY JUDGMENT WAS APPROPRIATE, THE AMOUNT IS WHAT WAS UNDER

11   DISPUTE UNDER THE 8TH AMENDMENT, AND THE $700,000 AMOUNT I HAD

12   TENTATIVELY DETERMINED WILL BE THE COURT'S ORDER.

13        SO I WANTED THAT AS BACKGROUND SO THAT WE COULD GO INTO

14   THE SENTENCING WITH THAT UNDERSTOOD.  OF COURSE THERE'S A BIG

15   HOLE FOR THE STOCK, BUT THAT'S, I THINK, THE BEST THAT WE COULD

16   GET TO ON THE FORFEITURE ISSUE.

17        ALL RIGHT.  SO WITH SENTENCING, THIS IS MORE COMPLICATED

18   THAN MANY SENTENCINGS, AND SO WE NEED TO JUST WORK CAREFULLY

19   THROUGH EVERYTHING.

20        JUST SO THAT YOU UNDERSTAND HOW I WANT TO PROCEED, AND I

21   JUST NEED TO GET ALL MY PAPERS OUT, THERE'S SORT OF A LOT GOING

22   ON, AND THERE ARE A NUMBER OF OBJECTIONS TO THE PRESENTENCE

23   REPORT, WHICH I CERTAINLY WANT TO ADDRESS, AND THEN I THINK THE

24   OTHER SIGNIFICANT AREA THAT WE ARE GOING TO NEED TO FOCUS ON

25   TODAY IS MY DETERMINATION OF THE AMOUNT OF THE LOSS.

1    AND SO LET ME JUST GET STARTED ON SOME OF THE

2    PRELIMINARIES WHICH I AM REQUIRED TO GO THROUGH.

3        HAVE BOTH ATTORNEYS RECEIVED THE PRESENTENCE REPORT?

4            MR. SAMPSON:  YES, YOUR HONOR.

5            MS. JAYNE:  YES, YOUR HONOR.

6            THE COURT:  AND ARE THERE ANY OTHER DOCUMENTS TO

7    SUBMIT TO ME TODAY?

8            MR. SAMPSON:  NONE OTHER THAN WHAT'S IN THE RECORD

9    ALREADY, YOUR HONOR.

10            THE COURT:  AND I HAVE RECEIVED AND REVIEWED THAT.

11        I'VE RECEIVED AND REVIEWED THE PRESENTENCE REPORT AND THE

12    SENTENCING MEMORANDA SUBMITTED BY EACH PARTY.  THE DEFENSE

13    SUBMITTED A SIGNIFICANT NUMBER OF LETTERS, I HAVE REVIEWED ALL

14    OF THOSE.

15        ARE THERE GOING TO BE ANY WITNESSES OR EVIDENTIARY HEARING

16    REQUESTED TODAY?

17            MR. SAMPSON:  YOUR HONOR, THE GOVERNMENT DOESN'T

18    BELIEVE SO.  WE INTEND TO SUBMIT ON THE EVIDENCE THAT WAS

19    INTRODUCED AT TRIAL AND THE EVIDENCE THAT HAS BEEN SUBMITTED TO

20    DATE.

21        A REPRESENTATIVE FROM NETFLIX, THE VICTIM IN THIS CASE, IS

22    HERE TODAY, AND THEY WISH TO SPEAK UNDER 18 USC 3771 AT THE

23    APPROPRIATE TIME.

24            THE COURT:  YES.

25            MR. SAMPSON:  BUT WE DO NOT INTEND TO CALL ANY LIVE

```
 1     WITNESSES, YOUR HONOR.

 2              THE COURT:  OKAY.

 3          MS. JAYNE?

 4              MS. JAYNE:  SAME, YOUR HONOR.  WE ARE RELYING ON THE

 5     TRIAL EVIDENCE AND THE SUBMISSIONS.

 6          AND YOUR HONOR, JUST TO NOTE, THERE WAS AN AMENDED PSR.  I

 7     PRESUME THE COURT HAS THAT.

 8              THE COURT:  THE ONE THAT I HAVE IS CALLED REVISED

 9     PRESENTENCE INVESTIGATIVE REPORT, AND IT'S DATED -- WELL, LET'S

10     SEE, I -- IT WAS REVISED NOVEMBER 12, 2021.

11              MS. JAYNE:  YES, YOUR HONOR.

12              THE COURT:  SO I HAVE THE MOST CURRENT ONE.  GOOD.

13          OKAY.  AND MR. SAMPSON, THE VICTIM NETFLIX HAS BEEN

14     NOTIFIED AND IS PRESENT AND WISHING TO MAKE A STATEMENT TODAY;

15     IS THAT CORRECT?

16              MR. SAMPSON:  I UNDERSTAND THEY DON'T NEED TO MAKE A

17     STATEMENT RIGHT NOW.

18          THEY ARE HERE, AND IF YOUR HONOR COULD CONFIRM THAT YOU

19     READ THE LETTER THAT WAS ATTACHED TO THE GOVERNMENT'S

20     SENTENCING MEMORANDA FROM COUNSEL FOR NETFLIX?

21              THE COURT:  I RECEIVED A LETTER FROM THE LAW FIRM OF

22     KECKER VAN NEST & PETERS; IS THAT THE LETTER YOU ARE REFERRING

23     TO.

24              MR. SAMPSON:  YES, YOUR HONOR.

25              THE COURT:  ALL RIGHT.  THAT'S DATED SEPTEMBER 20,
```

1    2021.  I DID READ IT.  I HAVE REVIEWED IT AND I DO RECOGNIZE

2    THE AMOUNT THAT NETFLIX IS REQUESTING FOR RESTITUTION.

3         IT'S NOT CLEAR TO ME WE WILL GET TO RESTITUTION TODAY.  IT

4    REALLY DEPENDS ON THE DEFENSE VIEW OF HOW IT WISHES TO CONCLUDE

5    THAT ISSUE.  THERE IS A RIGHT TO A SEPARATE EVIDENTIARY HEARING

6    ON RESTITUTION.  BUT LET'S PUT THAT ASIDE FOR NOW.  IT IS A

7    MATTER OF WORKING THROUGH ALL OF THIS.

8         MS. JAYNE, YOU AND MR. KAIL HAVE READ AND DISCUSSED THE

9    PRESENTENCE REPORT?

10             MS. JAYNE:  WE HAVE, YOUR HONOR.

11             THE COURT:  ALL RIGHT.

12        MR. KAIL, DO YOU KNOW WHAT YOU HAVE BEEN CONVICTED OF?

13             THE DEFENDANT:  YES.

14             THE COURT:  ALL RIGHT.

15        THAT'S COUNTS 1 THROUGH 4 AND 6 THROUGH 19, WIRE FRAUD,

16   WHICH IS FELONY VIOLATION OF 18 U.S. CODE SECTION 1343 AND

17   1346.  AND COUNTS 20 TO 22, MAIL FRAUD.

18        I DO NOTE THE CONVICTION OF ONLY ON A SERVICES FRAUD ON

19   COUNT 20, WHICH ARE FELONY VIOLATIONS OF 18 U.S. CODE

20   SECTION 1341 AND 1346.  COUNTS 23 TO 29, MONEY LAUNDERING,

21   FELONY VIOLATIONS OF 18 U.S. CODE SECTION 1957.

22        FOR EACH OF COUNTS 1 THROUGH 4 AND 6 THROUGH 22, EACH

23   CARRIES A MAXIMUM PRISON TERM OF 20 YEARS, MAXIMUM SUPERVISED

24   RELEASE OF THREE YEARS, MAXIMUM FINE OF $250,000 OR TWICE THE

25   GAIN OR LOSS, MANDATORY SPECIAL ASSESSMENT OF $100 FOR EACH

1    COUNT, RESTITUTION AND FORFEITURE.

2         EACH OF COUNTS 23 TO 29 CARRIES A MAXIMUM PRISON SENTENCE

3    OF TEN YEARS A MAXIMUM FINE OF $250,000, MAXIMUM SUPERVISED

4    RELEASE OF THREE YEARS, MANDATORY SPECIAL ASSESSMENT OF $100

5    PER COUNT, RESTITUTION AND FORFEITURE.

6         THERE ARE OBJECTIONS TO ITEMS IN THE PRESENTENCE REPORT.

7    LET'S SEE IF WE CAN GO OVER THOSE NOW.

8         MS. JAYNE SHOULD I LOOK AT THE OBJECTIONS AS SET FORTH --

9              MS. JAYNE:  I THINK IT MIGHT BE EASIEST TO START ON

10   PAGE 7 OF MY SENTENCING MEMO.

11        AT THE TOP IT SAYS PAGE 14, BUT THAT'S BECAUSE IT INCLUDES

12   THE TABLE OF CONTENTS, BUT IT'S ACTUALLY PAGE 7 AT THE BOTTOM

13   RIGHT.  THAT JUST HAS PARAGRAPH BY PARAGRAPH.  THAT'S PROBABLY

14   EASIEST.

15             THE COURT:  THAT'S HOW I LOOKED AT IT, AND THANK YOU.

16        YOU ARE ASSERTING -- CONTINUE TO ASSERT ALL THOSE

17   OBJECTIONS?

18             MS. JAYNE:  YES, YOUR HONOR.

19             THE COURT:  THAT'S FINE.

20             MS. JAYNE:  IT STARTS WITH PARAGRAPH 2, AND I THINK

21   THE COURT DID NOTE, ONE OF THE COUNTS THERE WAS A NOT GUILTY ON

22   COUNT 20, AND THAT WASN'T INCLUDED IN PARAGRAPH 2.

23             THE COURT:  YES, THAT IS ACCURATE.

24        OFFICER POLLAK, CAN WE HAVE THAT CORRECTION MADE TO

25   PARAGRAPH 2?

1    PROBATION OFFICER:  YES, YOUR HONOR.

2    THE COURT:  THANK YOU.  I WILL SUSTAIN THE OBJECTION

3  TO PARAGRAPH 2.

4    THE NEXT OBJECTION IS AS TO PARAGRAPH 7.

5    MS. JAYNE:  YOUR HONOR, SOME OF THESE OBJECTIONS ARE

6  CONTENTIONS WITH THE PHRASING AND SOME ARE AS TO FACTS.

7    SO PARAGRAPH 7 HAD A NUMBER OF DIFFERENT ITEMS IN IT, AND

8  SO I THINK EACH PARAGRAPH THERE KIND OF ADDRESSES A DIFFERENT

9  ASPECT OF IT.  IT'S ONE PARAGRAPH IN THE PSR, BUT I HAVE BROKEN

10  IT UP INTO A COUPLE DIFFERENT PARAGRAPHS IN THE OBJECTION.

11    THE COURT:  IN LOOKING AT -- YES, THAT'S ACCURATE.

12    CERTAINLY YOU HAVE MADE A NUMBER OF SPECIFIC OBJECTIONS.

13  IT WOULD BE MY VIEW TO SUSTAIN THIS OBJECTION IN PART, TO

14  MODIFY PARAGRAPH 2 OF 7, INSTEAD OF DIRECT NETFLIX BUSINESS TO

15  STARTUP COMPANIES, TO CHANGE IT TO A NUMBER OF STARTUP

16  COMPANIES, TO INDICATE IT WAS LESS THAN ALL OF THE STARTUPS

17  THAT WERE WORKED WITH.

18    LET ME LOOK AT THE REMAINDER OF YOUR -- YOU ALSO OBJECT TO

19  THE OPEN DNS, AND RELATE IQ.

20    MS. JAYNE:  YES, OPEN DNS WAS A DIFFERENT EMPLOYEE

21  WHO WAS AN ADVISOR AND HAD SIGNED THE CONTRACT.  THAT WASN'T

22  MR. KAIL.  SO ON ITS FACE, THAT SHOULDN'T EVEN BE IN THERE.

23    THE COURT:  MR. SAMPSON, I DON'T KNOW THE NAMES OF

24  THOSE COMPANIES, I DON'T KNOW WHERE THAT INFORMATION CAME FROM.

25    MR. SAMPSON:  YOUR HONOR, IT'S POSSIBLE THAT THAT'S

1    REALLY A REFERENCE TO ONE LOGIN, WHICH WAS ONE THAT DID COME UP

2    WHEN MR. KAIL TESTIFIED.  I'M NOT SURE, BUT WE ARE NOT

3    INCLUDING IT AS PART OF THE FRAUD LOSS, YOUR HONOR.  THESE

4    COMPANIES WERE PART OF THE 404(B).  SO WE DON'T OBJECT TO THE

5    COURT NOT CONSIDERING THOSE AS PART OF SENTENCING.

6         THE COURT:  ALL RIGHT.

7         OFFICER POLLAK, WOULD YOU MODIFY PARAGRAPH 7 TO DELETE

8    REFERENCE TO THOSE COMPANIES.

9         PROBATION OFFICER:  I CAN DO THAT, YOUR HONOR.

10         THE COURT:  I THINK THAT'S PROBABLY WORTH DOING.

11         I DON'T THINK IT ADDS ANYTHING TO THE CONSIDERATION AND SO

12    I WILL SUSTAIN ON THAT OBJECTION.

13         PROBATION OFFICER:  IS THIS THE SENTENCE STARTING ON

14    TOP OF PAGE 5?

15         THE COURT:  THE UNCHARGED RELEVANT CONDUCT INCLUDED.

16         PROBATION OFFICER:  GOT IT.

17         THE COURT:  MS. JAYNE, IS THAT CORRECT?

18         MS. JAYNE:  CORRECT.

19         THE OTHER ONES, MR. POLLAK, WERE PART OF THE TRIAL.

20         PROBATION OFFICER:  OKAY.

21         THE COURT:  I THINK THAT COVERS PARAGRAPH 7; IS THAT

22    CORRECT?

23         MS. JAYNE:  YES, THANK YOU.

24         THE COURT:  GOING ON TO THE OBJECTION, PARAGRAPH 8,

25    MY VIEW OF OBJECTION TO PARAGRAPH 8 WAS THAT THERE WAS A

1    DISAGREEMENT IN WHAT THE EVIDENCE SHOWED AT TRIAL.

2         MR. SAMPSON DO YOU HAVE ANY COMMENT ON THAT?

3              MR. SAMPSON:  YOUR HONOR, MY RECOLLECTION OF THIS,

4    THIS WAS AN E-MAIL EXCHANGE BETWEEN MR. KAIL AND EXECUTIVES

5    ABOUT WHAT THE LOSS OF THAT CONTRACT WOULD MEAN IN TERMS OF THE

6    COMPANY'S FINANCIALS.

7         SO THE GOVERNMENT STANDS BY ITS CONTENTION THAT THE

8    155,000 WAS TO AVOID EITHER WHAT'S KNOWN AS A E-BOOKING OR

9    REVENUE RECOGNITION ISSUE FOR PLATFORA, SO WE THINK IT'S

10   APPROPRIATE FROM THE EVIDENCE.

11             THE COURT:  MS. JAYNE, YOUR COMMENT?

12             MS. JAYNE:  AND YOUR HONOR, MY RECOLLECTION OF THE

13   REFERENCE HERE IS THERE WERE CONVERSATIONS WITHIN PLATFORA WITH

14   RESPECT TO THE $155,000 AND HOW AND WHY THAT SHOULD BE

15   COLLECTED.  THAT WASN'T FOR MR. KAIL, THAT WAS INTERNALLY TO

16   PLATFORA.

17        IT WASN'T A COMPLAINT THAT YOU DID THIS, NOW WE OWE THIS,

18   IT WAS INTERNALLY A DISCUSSION AND THEN BEN WERTHER AND

19   MR. ASHER THEN MADE A DECISION THAT THEY WOULD AGREE TO A

20   SETTLEMENT OF THAT AMOUNT AND THEN INFORMED MR. KAIL AND OTHERS

21   AT NETFLIX THAT THAT WOULD BE SATISFACTORY, IN THEIR VIEW,

22   SATISFACTION OF THE REMAINDER OF THE CONTRACT.

23             THE COURT:  ALL RIGHT.

24        I AM GOING TO OVERRULE THAT OBJECTION.  I THINK THE

25   EVIDENCE COULD BE FAIRLY SUMMARIZED AS IT IS IN PARAGRAPH 8.

1        MS. JAYNE:  AND THE FIRST OBJECTION WAS SORT OF THE

2  CONCLUSION THAT HE HAS PROFITED WHEN THOSE HAVEN'T BEEN SOLD.

3        THE COURT:  WELL, IT GOES TO HIS NET WORTH, IT'S

4  PROPERTY HE OWNS.  I THINK THAT IS NOT A CONCLUSION I WOULD

5  DRAW FROM UNSOLD STOCK.  IT CAN BE POSTED AS COLLATERAL, IT HAS

6  MUCH VALUE AND COULD BE SOLD IN A NANOSECOND BECAUSE IT'S A

7  PUBLICLY TRADED COMPANY.

8        AS TO PARAGRAPH 9, REGARDING SUMOLOGIC, I WILL OVERRULE

9  THE OBJECTION.

10        MS. JAYNE:  AND THEN I SIMPLY NOTED THAT TO COMPLETE

11  THE DESCRIPTION OF SUMOLOGIC, THIS WAS A BIT ONE-SIDED IN TERMS

12  OF THERE WAS A QUOTE ABOUT MR. KAIL INDEED COMPLAINING TO SUMO

13  THAT THERE WERE SOME ISSUES THAT THEY WERE HAVING AND THEN

14  THERE WAS CONTRARY TESTIMONY THAT IT WAS USEFUL.

15        THE COURT:  SO THE PRESENTENCE REPORT IS NOT A TIME

16  TO LIST ALL THE EVIDENCE ON EITHER SIDES OF AN ISSUE.

17        I APPRECIATE THAT THAT IS SOMETHING THAT I CONSIDERED AND

18  THE NINTH CIRCUIT MAY HAVE AN OPPORTUNITY TO CONSIDER.

19        MS. JAYNE:  OKAY.

20        AND MY INTENTION WAS TO COMPLETE THE PICTURE ON SOME OF

21  THE FACTS.  AND INDEED, OFTEN TIMES AS HERE, THE PROBATION

22  REPORT RELIES ON REPORTS THAT ARE WRITTEN BEFORE TRIAL, AND I

23  THINGS LIKE THAT.

24        AND SO FOR EXAMPLE, YOU WILL SEE IN SOME OF THESE

25  PARAGRAPHS, IT'S SORT OF -- IT'S AN OPINION PIECE, SO TO SPEAK,

1    AS PERHAPS TO WHAT CAME IN AT TRIAL.

2         THE COURT:  I DON'T THINK PROBATION HAS AN OPINION ON

3    ANYTHING, I THINK THEY ARE ATTEMPTING TO PRESENT A FAIR VERSION

4    OF THE FACTS ESTABLISHED AND SUPPORTED BY THE JURY VERDICT.

5         MS. JAYNE:  AND I THINK WHAT I'M GETTING TO

6    PARAGRAPH 10, FOR EXAMPLE, IT SAYS HE DIDN'T LIST HIS ROLE ON

7    LINKEDIN BECAUSE OF HIS RECEIPT.

8         I THINK THAT'S SORT OF A JUMP IN INFERENCE ON WHY OR WHY

9    NOT SOMETHING MAY OR MAY NOT HAVE LISTED, BECAUSE WE DON'T

10   KNOW, BECAUSE WE DON'T HAVE THE LINKEDIN PAGE FROM 2012.

11        THE COURT:  MR. SAMPSON, ANY OTHER COMMENTS?

12        MR. SAMPSON:  YOUR HONOR, THE LINKEDIN IS IMPORTANT

13   BECAUSE MR. KAIL ARGUES THAT HE OPENLY DISCLOSED HIS ADVISORY

14   ROLES.  BUT I BELIEVE MY MEMORY IS THAT ON CROSS-EXAMINATION, I

15   ASKED HIM IF HE LISTED HIS REFERRAL ARRANGEMENTS, HE DIDN'T

16   BELIEVE THAT HE HAD.

17        AND THE REASON THAT'S IMPORTANT, YOUR HONOR, IS A REFERRAL

18   PARTNERSHIP ARRANGEMENT IS OBVIOUSLY SOMETHING IN WHICH YOU GET

19   A CUT, IT IS OBVIOUS THAT THE PURPOSE OF BEING IN A REFERRAL

20   ARRANGEMENT IS YOUR COMPENSATION.  THAT WOULD HAVE BLOWN THE

21   WHOLE THING WIDE OPEN.

22        SO THE GOVERNMENT ASSERTS THAT ONE OF THE REASONS THAT

23   MR. KAIL DIDN'T DISCLOSE THOSE TWO WERE BECAUSE IT WOULD HAVE

24   BEEN RELEVATORY OF HIS TAKING OF THE RECEIPTS.

25        THE COURT:  ALL RIGHT.

1    AND I THINK THOSE ARE REASONABLE INFERENCES THAT THE JURY

2    COULD HAVE DRAWN FROM THE EVIDENCE.  I WILL OVERRULE THE

3    OBJECTION TO PARAGRAPH 10.

4         THE OBJECTION TO PARAGRAPH 11, I THINK THAT THE -- IN YOUR

5    FIRST SENTENCE, I ACTUALLY THINK THAT THE EVIDENCE, THERE WAS

6    SUFFICIENT OR SUBSTANTIAL EVIDENCE SUBMITTED THAT MR. KAIL MADE

7    IT CLEAR THAT COMPANIES LOOKING TO DO BUSINESS WITH NETFLIX'S

8    IT OPERATIONS HAD TO DO BUSINESS WITH HIM AS WELL.

9         I WILL OVERRULE THE OBJECTION TO PARAGRAPH 11.  THE

10   OBJECTION TO PARAGRAPH 12 HAS TO DO WITH THE EVIDENCE REGARDING

11   FRANK SLOOTMAN.  AND I THINK THAT IS A FAIR RECITATION OF THE

12   EVIDENCE.  I WILL OVERRULE THE OBJECTION TO PARAGRAPH 12.

13        THERE IS AN OBJECTION TO PARAGRAPH 13, THE DEFENSE WISHES

14   THE SUMMARY TO INCLUDE THE "COMPLETE TESTIMONY AT TRIAL, NOT

15   JUST THE GOVERNMENT'S SPIN."  I THINK THAT THE SUMMARY FAIRLY

16   REFLECTS THE JURY'S VERDICT, AND THEREFORE I WILL OVERRULE THE

17   OBJECTION TO PARAGRAPH 13.

18        OKAY.  I THINK THAT COVERS THE SPECIFIC OBJECTIONS; IS

19   THAT CORRECT, MS. JAYNE?

20        MS. JAYNE:  THAT'S RIGHT, YOUR HONOR, AS FAR AS

21   PRE-LOSS.

22        THE COURT:  JUST THE OBJECTIONS TO THE PRESENTENCE

23   REPORT.  WE ARE AT A VERY PRELIMINARY STAGE HERE.

24        MS. JAYNE:  RIGHT, RIGHT.  AND WHEN I SAY THE

25   OBJECTIONS TO THE LOSS CALCULATION --

15

```
1           THE COURT:  THAT'S A DIFFERENT MATTER.

2           MS. JAYNE:  YEAH.

3           THE COURT:  THAT'S A SENTENCING ENHANCEMENT, AND WE

4    WILL TAKE THAT COMPLETELY SEPARATELY.  BUT I THINK I'VE GOTTEN

5    THROUGH YOUR OBJECTIONS AS SET FORTH AT PAGES 7, 8 AND 9.

6       OKAY.

7           MS. JAYNE:  THAT'S CORRECT.  THANK YOU.

8           THE COURT:  ALL RIGHT.

9       IN CALCULATING THE OFFENSE LEVEL IN COUNT GROUP ONE, WHICH

10   INCLUDES ALL COUNTS OF CONVICTION, THE BASE OFFENSE LEVEL IS

11   SEVEN.

12      PRETRIAL SERVICES RECOMMENDS, UNDER GUIDELINE 2(B)1.1, AN

13   INCREASE OF PLUS 16 LEVELS FOR A LOSS CALCULATION OF MORE THAN

14   $1.5 MILLION AND LESS THAN $3.5 MILLION.

15      PROBATION FURTHER RECOMMENDS AN INCREASE OF PLUS TWO FOR

16   SOPHISTICATED MEANS, AN INCREASE OF PLUS ONE FOR CONVICTION OF

17   MONEY LAUNDERING, AN INCREASE OF PLUS TWO FOR ABUSE OF POSITION

18   OF PRIVATE TRUST UNDER GUIDELINE 3(B)1.3, AN INCREASE OF PLUS

19   TWO FOR OBSTRUCTION OF JUSTICE REGARDING DEFENDANT'S TRIAL

20   TESTIMONY, AND AN ADJUSTED OFFENSE LEVEL OF 28.

21      SO I CERTAINLY RECOGNIZE THAT THERE ARE A NUMBER OF

22   OBJECTIONS TO THE CALCULATION OF THE OFFENSE LEVEL.  I BELIEVE

23   THAT THE GOVERNMENT IS NOT SEEKING AND WOULD AGREE WITH THE

24   DEFENSE THAT AN INCREASE OF PLUS TWO FOR SOPHISTICATED MEANS

25   WOULD NOT BE REQUESTED; IS THAT RIGHT?
```

1      MR. SAMPSON:  YES, YOUR HONOR.  WE ARE NOT REQUESTING

2   IT.

3      WE UNDERSTAND YOUR HONOR MAY DISAGREE, BUT WE BELIEVE THAT

4   OF THE TWO POTENTIAL TWO-POINT ENHANCEMENTS, THE ABUSE OF

5   POSITION OF TRUST IS MORE APPOSITE.

6      THE COURT:  OKAY.  THANK YOU.

7      AND SO THE GOVERNMENT'S POSITION IS THAT IT WOULD BE AN

8   OFFENSE LEVEL OF 26?

9      MR. SAMPSON:  I BELIEVE IT'S 28, YOUR HONOR.

10     THERE'S AN OBSTRUCTION OF JUSTICE ENHANCEMENT THE

11   GOVERNMENT IS ARGUING FOR.

12     THE COURT:  OH, I SEE.

13     PROBATION IS DOING THOSE IN THE ALTERNATIVE.  FOR BOTH

14   OBSTRUCTION AND -- YES, 28.  THANK YOU.

15     OKAY.  ALL RIGHT.  LET'S NOW FOCUS ON THE LOSS

16   CALCULATION.

17     FIRST OF ALL, THERE IS AN ISSUE REGARDING THE BURDEN OF

18   PROOF ON LOSS CALCULATION.  THE GOVERNMENT ARGUES THAT

19   PREPONDERANCE IS SUFFICIENT, AND THE DEFENSE SUGGESTS CLEAR AND

20   CONVINCING EVIDENCE.

21     IN MY REVIEW OF THE CASES YOU CITED TO ME, IT APPEARS THAT

22   LOSS CALCULATION IS BASED UPON THE CONDUCT ON WHICH THE JURY

23   RENDERED A VERDICT OF GUILTY, THAT PREPONDERANCE OF THE

24   EVIDENCE IS ALL THAT'S REQUIRED.  I COULD CERTAINLY CONSIDER

25   RELATED CONDUCT THAT COULD EVEN BE ACQUITTED CHARGES OR

1    UNCHARGED CONDUCT, WHICH IS NOT BEING OFFERED; IS THAT CORRECT,

2    MR. SAMPSON?

3              MR. SAMPSON:  THAT'S RIGHT, YOUR HONOR.

4              THE COURT:  ALL RIGHT.

5         SO IN READING THE CASES, I BELIEVE THE GOVERNMENT RELIED

6    ON U.S. V. RILEY.

7              MR. SAMPSON:  RILEY, YES.

8              THE COURT:  I AGREE WITH THE GOVERNMENT.

9         MS. JAYNE, DO YOU HAVE ANYTHING ELSE TO ADD?

10             MS. JAYNE:  BEYOND WHAT'S IN MY MEMO, AND WHEN I

11   LOOKED BACK AT SOME OF THE CASES AND WHAT IS CONSIDERED SORT OF

12   A SUFFICIENT LEVEL TO TRIGGER THE CLEAR AND CONVINCING

13   STANDARD, AND SOME OF THE FACTORS THAT JUST WERE NOTED WERE

14   FOUR LEVELS HIGHER, DOUBLE SENTENCES, THINGS LIKE THAT.

15        BUT I UNDERSTAND THE COURT'S POSITION, AND I WASN'T

16   DISTINGUISHING BETWEEN RELEVANT CONDUCT, IT WAS JUST THE

17   DISPARITY BETWEEN THE GOVERNMENT AND THE DEFENSE.

18             THE COURT:  OKAY.  THANK YOU.

19        SO MY DETERMINATION IS PREPONDERANCE OF THE EVIDENCE IS

20   THE PROPER STANDARD.

21        FOR THE AMOUNT OF LOSS, THIS GETS COMPLICATED HERE AS

22   WELL, I THINK MAYBE THE BEST PLACE FOR ME TO LOOK IS THE

23   GOVERNMENT'S SENTENCING MEMO.

24             MR. SAMPSON:  YOUR HONOR, PAGE 7 ON THE ECF HEADER,

25   PAGE 3 ON THE MEMO.

1    THE COURT:  LET ME JUST SAY THAT MAYBE I JUST

2    COULDN'T LOCATE IT IN THE MATERIALS I HAD.

3    ON THIS CHART, THIS IS IN DOCUMENT 270, ECF 270, AND

4    PAGE 7 AS THE ECF PAGE NUMBER, PAGE 3 OF THE ACTUAL DOCUMENT

5    ITSELF, THE GOVERNMENT LISTS A QUANTIFIABLE LOSS AT

6    $2,020,068.80.

7    I RECOGNIZE THE DEFENSE BELIEVES THAT IS ZERO.  I HAVE A

8    COUPLE OF COMMENTS FOR THE GOVERNMENT FIRST AND THEN I WILL

9    TURN TO THE DEFENSE.

10   MR. SAMPSON, I AM ABLE TO FIND IN THE EVIDENCE, THE

11   TESTIMONY FROM TRIAL, SIGNIFICANT TESTIMONY AS TO NUMERIFY,

12   NETENRICH AND VISTARA, THAT THE PRODUCTS WERE COMPLETELY

13   UNSUITED FOR NETFLIX'S PURPOSES AND THEREFORE PROVIDED NO

14   VALUE.

15   AS TO PLATFORA, THAT IS SEPARATE, THAT IS SETTLEMENT OF A

16   CONTRACT, SO IT'S A DIFFERENT CIRCUMSTANCE.  I'M ABLE TO LOCATE

17   SIGNIFICANT EVIDENCE THAT THE SETTLEMENT WAS NOT NECESSARY

18   UNDER THE CONTRACT, THE TERMINATION OF THE CONTRACT WAS

19   SUFFICIENT, THEREFORE ANY PAYMENT WAS NOT TO NETFLIX'S

20   ADVANTAGE.  IT'S DOCURATED, AND MAYBE BECAUSE I JUST DON'T

21   REMEMBER THE TESTIMONY AND COULDN'T FIND IT, AND OF COURSE, I

22   SAW MR. GORBANSKY'S TESTIMONY, BUT OF COURSE HE WAS NOT

23   TESTIFYING THAT HIS PRODUCT WAS UNSUITED, AND THE OTHER NETFLIX

24   EMPLOYEES WHO TESTIFIED WERE KIND OF SCATTERED THROUGHOUT THE

25   TRIAL.  SO I WAS STRUGGLING TO LOCATE IT.

1    I LOOKED BACK AT YOUR FILING FOR THE MOTION FOR ACQUITTAL

2    AND FOR YOUR PAPERS FOR SENTENCING, AND I ACTUALLY COULDN'T

3    LOCATE ANY EVIDENCE THAT WAS SIMILAR TO WHAT I FOUND FOR THE

4    OTHER COMPANIES WHERE NETFLIX EMPLOYEES TESTIFIED THE PRODUCT

5    WAS NEVER ROLLED OUT OR IT WAS -- FROM THE GET GO, MR. KAIL WAS

6    TOLD THE PRODUCT WAS UNSUITED FOR NETFLIX.

7    SO HELP ME OUT ON DOCURATED.

8    MR. SAMPSON: YES, YOUR HONOR.

9    IF YOUR HONOR RECALLS FROM THE TRIAL TESTIMONY, AND THE

10   EXHIBITS, I THINK WERE IN THE 500 TO 520 SERIES, I COULD POINT

11   YOUR HONOR TO THE ACTUAL CONTRACT IN A DOCUMENT, DOCURATED WAS

12   A DOCUMENT CURATION SERVICE, AND IT WAS THE ONE IN WHICH, AND

13   THE JURY DID ACQUIT AS TO COUNT 5, BUT THE EVIDENCE AT TRIAL

14   THAT WAS ADMITTED SHOWED THAT THERE WAS A SPRING 2013 90-DAY

15   PROOF OF CONCEPT, THERE WAS AN OFFSITE MEETING AWAY FROM

16   NETFLIX BETWEEN MR. KAIL MR. GORBANSKY AND HIS SPOUSE. AND

17   WITHIN A COUPLE OF DAYS, THERE WAS A CONTRACT. I THINK IT WAS

18   $21,500, LET ME CONFIRM THAT, AND IT WAS, AGAIN, THAT WAS

19   COUNT 5, AND THE JURY DID NOT FIND HIM GUILTY.

20   BUT YOUR HONOR, MR. KAIL WAS GIVEN OPTIONS AT THAT TIME.

21   HE EXERCISED THOSE OPTIONS IN JUNE OF 2013. IN JANUARY OF

22   2014, DOCURATED, MR. GORBANSKY, MR. COGNEY SENT HIM SOME KIND

23   OF RENEWAL. ACTUALLY, THEY SENT HIM AN AMENDED AGREEMENT WITH

24   MORE OPTIONS, AND I BELIEVE IT WAS LATE FEBRUARY OR EARLY

25   MARCH, MR. KAIL SIGNED A SECOND CONTRACT WITH DOCURATED, IT WAS

1    $120,000, I THINK IT WAS VERY UNLIMITED USERS.

2         YOUR HONOR, I BELIEVE IT WAS MR. CHELF, I THINK -- I

3    BELIEVE IT WAS MR. CHELF WHO TESTIFIED THAT IT WAS A PROGRAM

4    THAT WAS SUPPOSED TO BE FOR NETFLIX'S LEGAL DEPARTMENT.  I

5    BELIEVE HE TESTIFIED, AND THIS IS ALL DISPUTED OF COURSE, HE

6    TESTIFIED THAT IT WAS FOR, I THINK IT WAS FOR MAC, OR IT WAS

7    INTERNET-BASED.  THERE WAS ASPECTS OF IT THAT MADE IT NOT

8    USEABLE, AND IT WAS REPLACED WITH A CUSTOM BUILT PROGRAM.

9         AND I THINK THERE'S A DISPUTE ABOUT WHETHER THAT

10   CUSTOM-BASED PROGRAM WAS CALLED SHERLOCK, BUT IT WAS REPLACED

11   WITH A HOME-BUILT NETFLIX ENGINEER-BUILT SOLUTION, AND THAT,

12   MR. KAIL WAS INVOLVED IN THAT REPLACEMENT.

13        SO YOUR HONOR, IT'S THE GOVERNMENT'S POSITION THAT IT WAS

14   A CONTRACT THAT WAS NOT USEFUL TO THE COMPANY, IT WAS ENTERED

15   INTO BECAUSE OF THE IRREVOCABLE CONFLICT OF INTEREST MR. KAIL

16   HAD AND THAT IT WAS A LOSS OF $120,000 TO THE COMPANY.

17             THE COURT:  THAT'S HELPFUL.  THANK YOU FOR REMINDING

18   ME OF THAT.

19             MR. SAMPSON:  AND I WOULD ALSO JUST ADD, YOUR HONOR,

20   THAT IT DOESN'T CHANGE THE GUIDELINES.

21             THE COURT:  OH, I UNDERSTAND THAT, BUT I HAVE TO COME

22   UP WITH A NUMBER, AND SO EACH ONE OF THESE HAS TO BE BASED IN

23   SUBSTANTIAL EVIDENCE.

24             SO MR. SAMPSON, THE OTHER ISSUE THAT MS. JAYNE RAISES, AND

25   I THINK SHE'S CERTAINLY CORRECT ON THE LAW, IS THAT WE ARE

1    LOOKING AT THE NET LOSS AND NOT THE VALUE OF THE CONTRACT

2    ITSELF.

3         YOU DIDN'T ADDRESS THAT ISSUE IN YOUR PAPERS, AND SO IT

4    GETS A LITTLE COMPLICATED IN HOW I DETERMINE AN AMOUNT.  THESE

5    PRODUCTS, I MEAN, FOR EXAMPLE, WITH VISTARA, I BELIEVE THAT

6    PRODUCT WAS ROLLED OUT, WASN'T IT?

7         MR. SAMPSON:  SO IT'S UNFORTUNATE THAT IT COMPLICATES

8    THINGS, YOUR HONOR.  WE TRIED TO MAKE IT EASY, AND THAT IS, YOU

9    WILL SEE WE DON'T ALLEGE A LOSS FROM SUMO, WE DON'T ALLEGE A

10   LOSS FROM ELASTIBOX.  THOSE WERE ALMOST MILLION DOLLAR

11   CONTRACTS.  WE ARE TARGETING THE CONTRACTS THAT WE BELIEVE DID

12   NOT HAVE ANY VALUE, THAT'S THE EASIEST WAY TO DEMONSTRATE THAT

13   THERE WAS TRULY A LOSS AND NOT TO TRY TO SPLIT THE BABY

14   SOMEHOW.

15        WITH RESPECT TO VISTARA, YOUR HONOR, YOU MIGHT RECALL THE

16   TESTIMONY OF MR. FRY, MS. SPRAGUE.  MS. SPRAGUE HAD AN EXCHANGE

17   WITH A VISTARA EMPLOYEE ABOUT NOT USING THE PRODUCT.  I THINK

18   THE WORDS WERE IT'S NOT DEPLOYED IN ANY SPACES THAT I'M AWARE

19   OF.

20        THE COURT:  YEAH.

21        MR. SAMPSON:  AND THAT WAS AFTER MR. KAIL LEFT.

22        SO ALMOST THREE YEARS INTO THE CONTRACT, $1.385 MILLION,

23   AND IT WASN'T BEING USED.

24        AND MR. FRY TESTIFIED THAT HE TESTED IT.  HE BELIEVES THEY

25   WERE TESTING IT, BUT HE DIDN'T THINK IT WAS DEPLOYED IN ANY

1    WAY, AND I THINK HE SAID IT NEVER GOT TO THE POINT "WHERE WE

2    TRUSTED IT."

3         SO YOUR HONOR, THE GOVERNMENT'S ALLEGATION HERE IS THAT

4    YES, MR. KAIL RECEIVED THE 15 PERCENT COMMISSION ON THAT

5    1.38 MILLION, THAT IS CERTAINLY A FRAUD LOSS, BUT THE

6    GOVERNMENT'S CONTENTION, UNLIKE NETENRICH, IS THAT THE ENTIRETY

7    OF THAT SERVICE, AS EXPENSIVE AS IT WAS, WAS NOT, WHILE NETFLIX

8    WAS PAYING FOR A FULL ROLLOUT, IT WASN'T BEING USED.

9         THE COURT:  OKAY.

10        AND NETENRICH, BY COMPARISON, WAS THE COMMISSION RECEIVED

11   ON -- THESE WERE THE ENGINEERS THAT WERE BROUGHT OVER TO

12   NETFLIX.

13        MR. SAMPSON:  THAT'S RIGHT.

14        WE ARE NOT ALLEGING THAT THERE'S A LOSS RELATED TO --

15   OTHER THAN THE PERCENTAGE MR. KAIL RECEIVED.

16        THE COURT:  OKAY.

17        AND IT WOULD BE FAIR TO SAY THAT THERE WAS VALUE RECEIVED.

18        MR. SAMPSON:  I WOULDN'T DISPUTE THAT.

19        THE COURT:  OKAY.  GOOD.

20        AND THAT'S CERTAINLY WHAT YOUR MEMO SUGGESTS AS WELL, IT'S

21   ONLY THE COMMISSION.

22        MR. SAMPSON:  AND IF YOUR HONOR WANTS TO DISCUSS

23   PLATFORA, I'M HAPPY TO.

24        THE GOVERNMENT WOULD NOT ALLEGE IT AS A SETTLEMENT, WE

25   ALLEGE IT'S A PAYMENT TO USE THE CONTRACT.  THE CONTRACT WAS

1    MONTHLY PAYMENTS, IT CANCELLED ON TIME, THERE WASN'T ANYTHING

2    ELSE DUE.

3          THE COURT:  YEAH.  I UNDERSTAND THAT.

4          ALL RIGHT.  THANK YOU.  THOSE WERE MY QUESTIONS TO YOU.

5    BUT THAT DOESN'T SOLVE MS. JAYNE'S OBJECTIONS, SO I JUST WANTED

6    TO TALK ABOUT THOSE.

7          LET ME TURN THEN TO THE DEFENSE.

8          MS. JAYNE, YOU WANTED TO RELY ON THE RECORD, AND OF COURSE

9    WE ARE NOT RELITIGATING THE JURY VERDICT, SO THIS DOES GET TO

10   BE DIFFICULT.  BUT YOU'VE CITED TO ME CORRECTLY THE NET VALUE

11   IS MY DETERMINATION, BUT I DON'T HAVE ANY -- I HAVE SOME

12   GENERALITIES FROM YOU, BUT NOTHING ELSE.

13         HOW CAN YOU HELP ME ON THAT?

14         MS. JAYNE:  YOUR HONOR, I WILL GO BACK TO PERHAPS

15   WHERE THE COURT STARTED WITH THE GOVERNMENT, WHICH IS FOR

16   EXAMPLE, DOCURATED.

17         THE COURT:  OKAY.

18         MS. JAYNE:  AND I THINK THE COURT WILL SEE

19   THROUGHOUT, MY FOCUS HAS BEEN ON, LET'S CONSIDER THE PARTICULAR

20   WITNESSES' CROSS-EXAMINATION TESTIMONY AS WELL, BECAUSE IN SOME

21   INSTANCES, THEY WALK BACK SOME OF THEIR TESTIMONY.

22         SO WITH DOCURATED, I UNDERSTAND THAT ON DIRECT, MR. CHELF

23   SAID IT WAS FOR THE LEGAL DIVISION.  AND IT ABSOLUTELY WAS NOT.

24   I THINK NOWHERE --

25         THE COURT:  I NEED THAT MICROPHONE A LITTLE CLOSER TO

1     YOU, I'M SORRY.

2          MS. JAYNE:  AND I UNDERSTAND THAT MR. CHELF, AT LEAST

3     ON DIRECT, HAD A RECOLLECTION THAT THAT PRODUCT WAS FOR THE

4     LEGAL DIVISION, BUT THAT WILL BE FOUND NOWHERE IN ANY OF THE

5     DOCURATED EXHIBITS, NONE OF THEIR CONTRACTS, NONE OF THE

6     TESTIMONY, IT WAS SIMPLY NEVER INTENDED FOR THE LEGAL DIVISION.

7          AND MR. CHELF ULTIMATELY WAS CROSS-EXAMINED, THAT COULD HE

8     BE INCORRECT, I THINK HE ADMITTED THAT.  AND HE EVEN ADMITTED

9     THAT IT'S POSSIBLE MR. KAIL DIDN'T CANCEL THE CONTRACT, BECAUSE

10    I THINK IF WE LOOK AT THE DATES, IT WAS STILL IN PLACE.  AND

11    THEN MR. KAIL LEFT.

12         SO THERE'S NO SUPPORT FOR THE NOTION THAT IT WAS REPLACED

13    BY MR. KAIL, THAT IT WAS CANCELLED BY MR. KAIL.  AND THE

14    RELIANCE ON THIS SINGLE WITNESS, WHO APPEARS TO BE POTENTIALLY

15    CONFUSING THIS PRODUCT WITH A DIFFERENT ONE, HE HAS A

16    RECOLLECTION THAT SOME PRODUCT THAT WAS USED IN THE LEGAL

17    DIVISION WAS REPLACED.

18         THAT WAS NOT DOCURATED.  DOCURATED WAS THAT CONTRACT, THE

19    SECOND CONTRACT, BY THE WAY, WAS SENT -- WAS INTENDED FOR THE

20    MARKETING DEPARTMENT, AND THE CONTRACT WAS SENT TO MULTIPLE

21    INDIVIDUALS, MIKE KAIL AND SABRY TOZIN, AFTER THE INITIAL FPNA

22    TEAM, LIKE A PRODUCT THAT WAS LIMITED TO 30 USERS.

23         AND SO THEREAFTER, WE SEE IN THE DOCUMENTS THAT IT WAS

24    REQUESTED BY ANOTHER DIVISION, AGAIN NOT LEGAL, AND THE

25    CONTRACT WAS SENT OUT, IT WAS USED BY MARKETING, IT HAS NOTHING

1    TO DO WITH LEGAL.

2         SO THERE IS REALLY ZERO EVIDENCE THAT THE PRODUCT WAS

3    USELESS, THAT IT WAS REPLACED.  CERTAINLY AT SOME POINT IN

4    TIME, ALL OF THESE VENDORS CEASED TO WORK AT NETFLIX WHEN THEY

5    HAD CONCERNS ABOUT MR. KAIL.  BUT THAT'S NOT -- AND THAT'S

6    INTERESTING WITH RESPECT TO VISTARA AS WELL, BUT THAT'S

7    CERTAINLY NOT REFLECTIVE OF WHETHER THEY USED AND WHETHER THAT

8    PRODUCT HAD VALUE.

9         SO OUR CONTENTION IS WITH DOCURATED, IT WAS SOUGHT OUT BY

10   A DIFFERENT DIVISION, MARKETING DIVISION, THE EXHIBITS -- FOR

11   EXAMPLE, I CITED TO 1060, SUPPORT THAT THE MARKETING DIVISION

12   ACTUALLY REVIEWED THAT CONTRACT, REQUESTED THAT CONTRACT, AND

13   IT WAS USED BY THE MARKETING DIVISION.  AND THERE'S JUST

14   NOTHING IN THE RECORD TO SUGGEST THAT IT WASN'T.

15        AND A SINGLE RELIANCE ON TESTIMONY THAT WAS ULTIMATELY

16   IMPEACHED, IS NOT SUFFICIENT, EVEN AT A PREPONDERANCE

17   STANDARD -- AGAIN, I URGE THE COURT TO LOOK AT THE STATEMENT

18   FOR DOCURATED, IT'S NOT A LEGAL PRODUCT.

19        AND IT'S POSSIBLE THIS PERSON FORGOT AND HAD IT CONFUSED

20   WITH SOMETHING ELSE, BECAUSE THERE WAS A PRODUCT CALLED

21   SHERLOCK THAT WAS INTENDED FOR LEGAL THAT WAS REPLACED.

22        SO THAT'S WITH RESPECT TO DOCURATED.

23        VISTARA, IT GETS A LITTLE TECHNICAL HERE.  SO VISTARA

24   ORIGINALLY WAS A SINGLE PANE OF GLASS, AND A STATEMENT OF WORK

25   WAS FOR THE SINGLE PANE OF GLASS.  THAT'S A PLATFORM.  THAT'S

1    NOT ADD-ONS, THAT'S A PLATFORM.

2        THAT WAS INSTALLED AND RAN FOR A COUPLE YEARS.  AND WHEN

3    YOU LOOK AT THAT STATEMENT OF WORK, WHICH IS EXHIBIT 209, IT

4    SPECIFICALLY OUTLINES IT'S ONE TO PROVIDE ALERTS, INVENTORY

5    VIEWS, REPORTS BASED ON DATA, AND IT WAS GOING TO BE USED BY

6    THE NETWORK OPERATIONS CENTER.

7        LATER WE SEE IN EXHIBITS, ROB FRY REQUESTING ADD-ONS.

8    THIS IS WHERE WE GET INTO --

9            THE COURT:  REQUESTING WHAT?

10           MS. JAYNE:  ADD-ONS.  YOU KNOW, YOU CAN BUY A PRODUCT

11    AND THEN IT HAS ADD-ONS.

12       SO EVEN IN THE ORIGINAL STATEMENT OF WORK, THERE WAS

13    OPTIONS TO ADD ON AND EXPAND THE PRODUCT.

14       FOR EXAMPLE, EXHIBIT 1015, ROB FRY REQUESTS ASSET

15    MANAGEMENT FEATURES.  THAT'S NOT THE PLATFORM ITSELF.  THAT'S

16    ALREADY IN PLACE.  AND THIS IS JANUARY 2014.  EXHIBIT 1134

17    SHOWS THAT THE TEAM, INCLUDING MS. SPRAGUE ARE DISCUSSING

18    ADDING ON THERE.

19       WHETHER THAT WORKED, WHETHER IT WORKED OUT DOESN'T TAKE

20    AWAY FROM THE FACT THAT IT WAS INSTALLED ON THOUSANDS OF

21    MACHINES AND WAS RUNNING.  MR. FRY TESTIFIED CONSISTENTLY THAT

22    I THINK HIS FINAL WORD WAS, HE WOULD HAVE ULTIMATELY PUT THEM

23    INTO FULL PRODUCTION WITH ALL THESE ADD-ONS.  HE LIKED THE

24    PRODUCT, HE CONTINUES TO SEEK MORE AND MORE ADD-ONS.

25       SOME OF THOSE ADD-ONS MAY NOT HAVE WORKED, SOME MAY HAVE.

1    BUT THE FACT THAT THEY WERE GENERATING REPORTS ON THOUSANDS OF

2    VIRTUAL MACHINES, NO ONE DISPUTED THAT THAT WAS RUNNING AND

3    THAT WAS IN PLACE.

4         AND AS NOTED IN MY SENTENCING MEMO, THERE WAS A NUMBER OF

5    QUOTES EVEN FROM MR. FRY, THAT THEY CONTINUED TO SHOW PROGRESS,

6    HE WANTED TO EXPAND ITS USE, THAT HE DIDN'T EXPECT IT ALL TO

7    WORK AT ONCE.

8         AND HE DIDN'T HAVE AN OPINION, HE KNEW IT WAS THERE FOR

9    SEVERAL YEARS, HE JUST DIDN'T INQUIRE OR IT WASN'T HIS BUSINESS

10   TO KNOW WHETHER THEY WERE BEING PAID FOR A NUMBER OF YEARS.

11        AND I THINK ANYBODY IN THIS INDUSTRY WOULD BE SURPRISED IF

12   A COMPANY WAS DOING A -- WHATEVER YOU CALL IT, PROOF OF CONCEPT

13   OR NOT, THAT THEY WOULD BE RUNNING A PRODUCT, HAVING MEETINGS

14   ONCE A MONTH, ENGAGING TONS OF INDIVIDUALS, ALL FOR FREE.

15        SO WHILE HE DIDN'T OPINE ON WHETHER THEY WERE GETTING PAID

16   OR NOT, I THINK LOGIC DICTATES THIS COMPANY WAS NOT WORKING FOR

17   FREE FOR THREE YEARS.  AND AS A RESULT, THAT ENTIRETY OF THAT

18   CONTRACT SIMPLY CAN'T BE THE BASIS OF LOSS WHEN NETFLIX

19   RECEIVED A BENEFIT FROM IT.

20        NOW IF WE COULD CALCULATE, FOR EXAMPLE, THESE ADD-ONS

21   WHICH COST X, THEY WERE NOT BENEFICIAL TO NETFLIX.  LET'S SAY

22   THAT'S WHERE WE GET TO, WELL, YOU DON'T SUBTRACT THE ENTIRE

23   AMOUNT, YOU WOULD SUBTRACT THOSE FEATURES WHICH, FOR EXAMPLE

24   DIDN'T WORK OUT, WHICH ASHLEY SPRAGUE, EVEN THOUGH SHE ATTENDED

25   MULTIPLE MEETINGS AND REQUESTED, ALONG WITH ROB FRY, THESE

1    ADD-ONS, IF THEY DIDN'T WORK OUT, SO BE IT.  IF THERE WAS AN

2    ARGUMENT THAT THAT SHOULD HAVE BEEN VIEWED AS LOSS, IF THE

3    COURT CAN'T FIGURE IT OUT, THAT'S WHEN WE GET TO GAIN.  BUT

4    ONLY IF THE COURT ISN'T ABLE TO FIGURE IT OUT.

5        IF THERE'S SIMPLY NO LOSS, BECAUSE YOU LOOK AT THE

6    $1 MILLION VERSUS HOW MUCH -- UNFORTUNATELY, I CAN'T OPINE ON

7    THE SAVINGS, I DON'T HAVE ACCESS TO THAT INFORMATION OR IF THAT

8    CAN BE QUANTIFIED TEN YEARS LATER, THE SAVINGS NETFLIX

9    RECEIVED, BUT THEY USED THE PRODUCT.

10       IT'S UNDISPUTED THEY GENERATED REPORTS.  THIS ISN'T, OH

11   LOOK, I BOUGHT A MIXER AND I MADE 45 COOKIES.  IT'S NOT LIKE

12   THAT.  WHAT IT'S DOING IS RUNNING REPORTS, GENERATING

13   INFORMATION FROM THE NETWORK OPERATION CENTER TO MONITOR THIS,

14   TO MONITOR WHAT'S HAPPENING IN THE BACKGROUND.

15       THAT'S THE BEAUTY OF THIS PRODUCT WHICH BECAME, NOW EVERY

16   COMPANY HAS SINGLE PANE OF GLASS.  EVERY SINGLE TECH COMPANY.

17   BUT BACK THEN, IT WAS REALLY A NOVEL IDEA.

18       AND SO WITH RESPECT TO, IF THE COURT CAN'T FIGURE OUT HOW

19   MUCH OF THAT $1 MILLION SHOULD BE SUBTRACTED, THEN WE ARE

20   SIMPLY AT THE PLACE WHERE WE GET TO GAIN.

21           THE COURT:  DO I HAVE THE EVIDENCE OF THE GAIN?

22           MS. JAYNE:  YOU HAVE THE EVIDENCE -- THE ONLY -- IF

23   WE GET TO GAIN, THE EVIDENCE OF THE GAIN IS THE COMMISSIONS.

24           THE COURT:  SO WERE THERE COMMISSIONS ON VISTARA?

25           MS. JAYNE:  THERE WERE.

1     NETENRICH AND VISTARA WERE THE TWO COMPANIES THAT WERE

2     COMMISSION-BASED.

3          SO FOR VISTARA, I CAN PULL THAT IN A MOMENT.  AND IT ISN'T

4     NECESSARILY GAIN BECAUSE I THINK THERE IS ZERO TESTIMONY THAT

5     THE PRICE FOR VISTARA WAS INFLATED FOR THOSE COMMISSIONS, THERE

6     WAS JUST NO TESTIMONY OF THAT.

7          IN FACT, TO THE CONTRARY, THE WITNESSES CONSISTENTLY

8     TESTIFIED, THIS IS THE PRICE.  THE PRICE IS THE PRICE.  THEY'RE

9     NOT TACKING ON.  EVEN IF IT WASN'T MR. KAIL WHO WAS RECEIVING

10    THE COMMISSION, SOMEONE ELSE WOULD BE RECEIVING THE COMMISSION.

11          THE COURT:  WELL, THAT WAS THE DEFENSE EVIDENCE,

12    THAT'S WHAT YOU DEVELOPED, BUT I DON'T THINK THAT'S WHAT THE

13    JURY RELIED ON.  IT'S HARD TO KNOW WHAT THE JURY RELIED ON, BUT

14    THERE WAS A CONVICTION HERE.

15          MS. JAYNE:  RIGHT.  BUT WHAT I'M TALKING ABOUT IS

16    LOSS.  THE COMMISSIONS ARBITRATE LOSS.

17          SO THE GOVERNMENT ASSERTS THAT ON NETENRICH, WHICH OF

18    COURSE NETFLIX USED THOSE ENGINEERS, THEY USED THEM EVEN AFTER

19    MR. KAIL WAS GONE.  ALL THE PAYMENTS TO THE ENGINEERS WERE

20    ABSOLUTELY LEGITIMATE.  SO THE GOVERNMENT ARGUES THAT --

21          THE COURT:  YOU KNOW, MS. JAYNE, I GUESS WHERE YOU

22    ARE REALLY LOSING ME IS YOUR POSITION IS SO EXTREME THAT IT

23    LACKS CREDIBILITY.  THAT THIS FRAUDULENT SCHEME THAT A JURY

24    LITERALLY THREW THE BOOK AT MR. KAIL ON, CONVICTING HIM OF ALL

25    BUT ONE COUNT, IT WAS JUST NO BIG DEAL, IT JUST DIDN'T MATTER

1    BECAUSE IT DIDN'T HURT NETFLIX, IT DIDN'T HURT ANYBODY AND

2    EVERYTHING WAS JUST FINE.

3        I RESPECT THE JURY'S VERDICT.  I THINK THEY HAD

4    SUBSTANTIAL EVIDENCE.  AND SO I'M REALLY STRUGGLING TO FIND ANY

5    CREDIBILITY TO YOUR EXTREME POSITION.

6        AND SO I WANT YOU TO BE ABLE TO MAKE ALL YOUR ARGUMENTS,

7    BUT I REALLY WANT YOU TO KNOW, I DON'T EVEN KNOW HOW TO LATCH

8    ON TO ANY OF THIS.

9        MS. JAYNE:  YOUR HONOR, PERHAPS IT'S COMING ACROSS AS

10   TOO EXTREME.

11       WHAT I'M TRYING TO FOCUS ON IS THERE IS NOT EVIDENCE TO

12   SUGGEST -- EVIDENCE THAT WAS PRESENTED THAT NETFLIX SHOULDN'T

13   HAVE PAID THESE AMOUNTS, THAT IT WAS A WASTE.  WE HAVE CASES

14   WHERE VENDORS -- I'M SORRY, WHERE THE VICTIMS TESTIFY, WE

15   WOULDN'T HAVE PAID FOR THIS, THIS WAS A LOSS TO US, WE ARE OUT

16   THIS AMOUNT OF MONEY.

17       THE COURT:  SO I DID HAVE WITNESSES TESTIFY, YOU

18   KNOW, WHEN YOUR BOSS BRINGS A PRODUCT IN AND SAYS INSTALL IT

19   AND WORK WITH IT, THE STAFF DOES THAT.  BUT THEY ALSO TESTIFIED

20   AT THE END, YEAH, WE DID THIS, WE WORKED WITH IT, IT JUST

21   WASN'T SUITED FOR US.

22       SO THE FACT THAT THEY DEVOTED TIME TO WORKING ON IT

23   ACTUALLY WAS UNDERCUT BY THE MORE SENIOR STAFF MEMBERS, ASHLEY

24   SPRAGUE, WHO TOOK OVER AFTERWARDS, SAYING -- BASICALLY HER

25   TESTIMONY WAS, THIS WAS A LOT OF JUNK THAT WE WERE SADDLED FOR

1    A LONG TIME AND WE CUT IT OUT AS SOON AS WE COULD.

2            MS. JAYNE:  EXCEPT THAT'S NOT WHAT SHE TESTIFIED TO.

3            THE COURT:  WELL, I'M OVERSTATING IT, PERHAPS, BUT

4    NOT BY A LOT.

5            MS. JAYNE:  SHE -- I UNDERSTAND THAT HER TESTIMONY

6    THEN WAS, I'M NOT AWARE OF IT, ALTHOUGH HER NAME IS ON MULTIPLE

7    E-MAILS AND SHE ADMITTED SHE ATTENDED TONS OF MEETINGS FOR

8    VISTARA, SHE KNEW IT WAS THERE FOR SEVERAL YEARS, I GUESS SHE

9    JUST ASSUMED IT WAS FOR FREE.

10           BUT WE STILL GET TO THE PLACE WHERE, LET'S NOT FORGET IN

11   KICKBACKS CASES, THERE IS TESTIMONY THAT COMES OUT FROM THE

12   VICTIM AS TO SPECIFIC WASTE, SPECIFIC LOSS.

13           BUT HERE, EVEN ROB FRY SAID THE COMPANIES THAT MR. KAIL

14   INTRODUCED, WHICH ONE HUNDRED PERCENT OF WITNESSES SAID HE

15   NEVER PRESSURED THEM TO WORK ON ANYTHING, MADE SENSE.

16           EVEN VISTARA, HE SAID I WOULD HAVE CONTINUED WITH THEM.

17   THAT'S WHAT HE SAID, I WOULD HAVE CONTINUED WITH THEM.  WHY

18   WOULD HE SAY THAT IF IT WAS ALL JUST A BIG WASTE OF TIME?

19           AND I THINK I CITED THAT REPEATEDLY IN MY MOTIONS AND IN

20   THE SENTENCING MEMO.  SO I LOOK TO THE WITNESSES WHO TESTIFIED,

21   AND THEY HAD EVERY OPPORTUNITY TO SAY, THIS DOLLAR AMOUNT WAS A

22   LOSS, WE SHOULDN'T HAVE PAID IT OUT, THIS WAS A WASTE OF

23   PRODUCT, WE REVIEWED EVERYTHING, WE HAD SEVEN YEARS TO REVIEW

24   THIS, AND THEY DIDN'T SAY THAT.

25           I THINK AT MOST, DAVID WELLS, AT ONE POINT, AND I PULLED

1    OUT HIS TESTIMONY, SAID WE ESTIMATED THE LOSS TO BE -- SAID

2    SOMETHING ABOUT TWO TO $300,000.  AND HE SAID, THAT SOUNDS LIKE

3    A LOT, I KNOW.  AND I CAN CITE THAT.

4        BUT OTHERWISE, BOTH THE LAW FIRM AND NETFLIX, BEFORE THESE

5    PEOPLE TESTIFIED, HAD YEARS TO RECREATE THIS AND COME IN AND

6    TELL THE TRUTH ABOUT THAT, AND THEY DIDN'T BECAUSE I THINK IT

7    WOULD HAVE BEEN DISINGENUOUS FOR THEM TO SAY, WE DIDN'T USE

8    THOSE PRODUCTS, THEY WERE USELESS.

9        THE COURT:  WELL, NO, ACTUALLY NOT.  IT IS THE

10   GOVERNMENT'S BURDEN OF PROOF HERE, AND I MUST FIND BY A

11   PREPONDERANCE, AND IT'S CERTAINLY FAIR FOR YOU TO ARGUE THE

12   GOVERNMENT HASN'T MET ITS BURDEN, AS OPPOSED TO SAYING THERE

13   WAS NO LOSS.

14       WHEN YOU SAY THERE WAS NO LOSS, YOU LOSE ME, BUT I

15   ACKNOWLEDGE THAT'S NOT YOUR BURDEN OF PROOF.

16       MS. JAYNE:  THANK YOU, YOUR HONOR.

17       AND I APPRECIATE THAT I SHOULD BE RESTATING IT AS THE

18   GOVERNMENT HASN'T MET ITS BURDEN, BECAUSE WE DON'T HAVE ACTUAL

19   TESTIMONY IDENTIFYING ANYBODY SAYING THERE WAS OF ZERO BENEFIT

20   OR WE SHOULD NOT HAVE PAID THIS, OR AT THE TIME, THIS DIDN'T

21   ADVANCE OUR MISSION OF ONE HUNDRED PERCENT IT IN THE CLOUD.

22       AND SO THAT'S -- YOU KNOW, I THINK YOUR HONOR COULD TAKE

23   MY ARGUMENTS WITH RESPECT TO LACK OF EVIDENCE AS TO VISTARA.

24       AND AS TO NETENRICH, I BELIEVE YOU ONLY GET TO THE 275 IF

25   YOU LOOK AT GAIN.  BECAUSE THE GOVERNMENT HASN'T PROVEN THAT

1    NETFLIX OVERPAID BY $275,000, THAT THAT WAS SOMEHOW INSERTED

2    INTO THE HOURS THAT THE ENGINEERS WORKED, THE RATE.

3         THE RATE WAS ALWAYS 120 IN THE CONTRACT WHEN IT WAS

4    PRESENTED, THAT WAS NETFLIX'S STANDARD RATE, THE ENGINEERS WERE

5    PAID 120 OR LESS PER HOUR.

6         THE GOVERNMENT DOESN'T DISPUTE THAT THE ENGINEERS' HOURS

7    WERE NEEDED, BECAUSE I THINK NETFLIX WITNESSES TESTIFIED, I

8    WANTED THEM, I WANTED MORE, I'M THE ONE WHO ACTUALLY SUPERVISED

9    THEM, SOMETIMES I APPROVED THEIR INVOICES.

10        SO THEY WORKED LEGITIMATELY, AND AT 120 PER HOUR, THAT

11   275, WE WOULD ONLY GET TO IF THE COURT WAS NOW IN THE WORLD OF

12   GAIN.

13             THE COURT:  OKAY.

14             MS. JAYNE:  WE DIDN'T DISCUSS NUMERIFY, AND THAT ONE

15   IS A BIT CONFUSING TO ME, I MUST ADMIT, AS TO WHERE THE

16   GOVERNMENT PROVED THAT THE $85,000, OR THAT PRODUCT WAS OF A

17   LOSS TO NETFLIX, WHEN THE VERY WITNESSES WHO TESTIFIED ABOUT

18   NUMERIFY SPOKE SO POSITIVELY ABOUT IT.

19             THE COURT:  WELL, THAT'S INTERESTING, I WENT BACK AND

20   READ MR. CHELF'S TESTIMONY, AND WHAT I GLEAM FROM IT IS THAT HE

21   TOLD MR. KAIL THAT NUMERIFY WAS NOT A FIT FOR NETFLIX BUT THEY

22   WENT FORWARD ANYWAY.

23        SO I WILL GO BACK AND LOOK AT IT, BUT I DID LOOK AT HIS

24   TESTIMONY, THE GOVERNMENT DIRECTED ME THERE.

25             MS. JAYNE:  AND I HAD CITED SOME, I THINK I WENT BACK

1    ON THAT IN CROSS-EXAMINATION, AND MR. CHELF ADMITTED WELL, IT

2    WAS A GOOD PRODUCT AND THAT'S WHY I GAVE A TESTIMONIAL.  I GAVE

3    A WRITTEN TESTIMONIAL.

4         IN FACT, CHELF GAVE A VIDEO TESTIMONIAL WHICH HE ADMITTED

5    HE SHOULD HAVE SOUGHT PERMISSION FOR, HE DIDN'T SEEK

6    PERMISSION, THIS WAS EVEN AFTER MR. KAIL LEFT.

7         AND I ASKED MR. CHELF, I WENT BACK AND LOOKED, WHEN YOU

8    GAVE THAT TESTIMONIAL, THAT WAS A POSITIVE REVIEW OF NUMERIFY

9    AT NETFLIX, WAS THAT TRUE, WERE YOU REPORTING WHAT YOU WERE

10   EXPERIENCING?  YES.

11        MS. SPRAGUE, SAME THING.  I BELIEVE A YEAR AFTER MR. KAIL

12   LEFT, SHE ALSO GAVE A PROMOTIONAL TESTIMONIAL AS TO NUMERIFY

13   AND RENEWED THE CONTRACT ONE YEAR LATER FOR THE SAME EXACT

14   PRODUCT.

15        SO AGAIN, IF WE LOOK AT MR. CHELF, NOT ONE WHERE OH, I

16   TOLD HIM IT WASN'T A GOOD FIT, I'M NOT SURE WHAT OR WHY, IF WE

17   TAKE THAT IN ISOLATION, SURE, BUT IF WE LOOK AT THE TOTALITY OF

18   HIS TESTIMONY, HE WALKED THAT BACK AND HE SAID HE LIKED THIS

19   PRODUCT, THAT'S WHY HE WENT OUT OF HIS WAY TO TALK ABOUT

20   NUMERIFY.  AND NETFLIX CONTINUED TO USE THEM IN THAT FIRST

21   YEAR, AND APPARENTLY IN THE SECOND YEAR AFTER MR. KAIL WAS

22   GONE.  THEY COULD HAVE SAID FORGET IT, BUT MS. SPRAGUE RENEWED

23   IT.  AND THAT SPEAKS TO ITS BENEFIT.

24        SO IF THAT IS THE CASE, THAT $85,000, THERE'S SIMPLY A

25   LACK OF EVIDENCE THAT THE GOVERNMENT HAS PRESENTED THAT THAT

1   WAS WASTEFUL OR USELESS OR PAID BY NETFLIX WITH NOTHING IN

2   RETURN.

3           THE COURT:  LET ME TURN BACK TO MR. SAMPSON.

4       I DO NEED PREPONDERANCE OF THE EVIDENCE HERE.

5           MR. SAMPSON:  YES.

6           THE COURT:  IF I WERE TO LOOK TO DETERMINE THAT THE

7   VISTARA CONTRACT, THAT IT IS TOO COMPLEX TO SEPARATE THE

8   BENEFIT FROM THE LOSS, AND INSTEAD LOOK TO THE GAIN, WHAT WAS

9   THE AMOUNT OF THE COMMISSION THERE?

10          MR. SAMPSON:  $207,750.

11      BUT YOUR HONOR, I'M NOT SURE THAT IT'S CORRECT THAT

12  YOUR HONOR CANNOT DETERMINE THE LOSS AMOUNT.

13          THE COURT:  HOW AM I GOING TO SPLIT THE NUMBERS?

14          MR. SAMPSON:  WELL, YOUR HONOR, I UNDERSTAND WE ARE

15  AT LOGGERHEADS, BUT THE NUMBER IS THE ENTIRE AMOUNT.  AND I CAN

16  CITE ONLY TO YOUR HONOR'S ORDER DENYING A NEW TRIAL.

17          THE COURT:  YEAH.

18          MR. SAMPSON:  AND I CAN GET THERE, JUST NOT ON A

19  PREPONDERANCE STANDARD, YOUR HONOR, BUT I BELIEVE A CLEAR AND

20  CONVINCING.

21      YOUR HONOR QUOTED MR. FRY WHO SAID "IT WAS GOING TO TAKE A

22  WHILE FOR IT TO GET WHERE WE NEEDED THEM TO BE FOR THEM TO

23  REPLACE THE EXISTING TOOLS WE ALREADY IMPLEMENTED."

24      YOUR HONOR, THAT'S A BIG STATEMENT.  NETFLIX ALREADY HAD

25  TOOLS AND VISTARA WAS DUPLICATIVE OF THOSE TOOLS.  AND I THINK

1    THE ARGUMENT THE DEFENSE IS MAKING, THAT WELL, MR. KAIL SIGNED

2    A CONTRACT AND SO THEY GOT THE BENEFIT OF THE BARGAIN, THAT

3    STRIKES EXACTLY AS TO WHAT IS PERNICIOUS ABOUT KICKBACK AND

4    BRIBERY ON A SERVICES FRAUD, WHICH IS THAT HE WAS HOPELESSLY

5    CONFLICTED WHEN HE ENTERED INTO IT.

6         AND YOUR HONOR, THE CLAIM THAT THEY WERE USING IT OR THAT

7    IT WAS RUNNING REPORTS, YOUR HONOR, MS. SPRAGUE SHORTLY AFTER

8    MR. KAIL LEFT, SAID I DON'T THINK THIS IS BEING USED IN ANY

9    SPACES THAT I'M AWARE OF, AND SHE HAD HIS JOB AFTER THAT.

10        AND SO YOUR HONOR, FRY TESTIFIED IT WAS THE "WRONG

11   SOLUTION."  AND MS. SPRAGUE SAID "NETFLIX HAD OTHER TECHNOLOGY

12   THAT WAS DOING A BETTER JOB."

13        YOUR HONOR, THIS WAS AN UNNECESSARY EXPENSE, ONE HUNDRED

14   PERCENT.

15             THE COURT:  WHAT ABOUT NUMERIFY?

16             MR. SAMPSON:  NUMERIFY, YOUR HONOR, I WANT TO FINISH

17   THE QUOTE THAT MS. JAYNE STARTED, WHICH WAS THAT SHE SAID THAT

18   MR. CHELF TESTIFIED THAT IT WAS A GOOD PRODUCT.  HE SAID THAT.

19        THE REST OF HIS SENTENCE WAS, IT WASN'T RIGHT FOR NETFLIX.

20   AND HE EXPLAINED THAT IT WASN'T RIGHT FOR NETFLIX BECAUSE

21   NETFLIX DIDN'T USE THE DEEP ENGLISH -- I BELIEVE NUMERIFY WAS A

22   WAY TO ANALYZE IT TICKETS, AND THE LANGUAGE IN IT TICKETS, AND

23   THAT NETFLIX DIDN'T HAVE THAT MODEL, THEY HAD MORE OF A -- THIS

24   IS A ROUGH TERM, BUT A GENIUS-TYPE MODEL FOR THEIR IT NEEDS.

25        BY THE WAY, THAT BRINGS ME BACK TO VISTARA, WHICH WAS THAT

1    VISTARA WAS AN ASSET MANAGEMENT TOOL, AND NETFLIX WAS A SINGLE

2    CAMPUS COMPANY AT THE TIME.  SOME VERY LARGE PERCENTAGE OF THE

3    EMPLOYEES WERE ON SITE AND NOT REMOTE, AND THAT MAKES REMOTE

4    ASSET MANAGEMENT LESS NECESSARY.  SO THAT'S JUST ANOTHER POINT

5    FOR VISTARA.

6         BUT YOUR HONOR, FOR NUMERIFY AND IT'S $85,000, IT WAS A

7    PRODUCT THAT MAY HAVE BEEN A GOOD PRODUCT BUT IT WASN'T A FIT

8    FOR NETFLIX'S NEEDS.  THAT'S WHY THE GOVERNMENT CONTENDS THAT

9    THE LOSS ON THAT IS 85,000.

10         MS. JAYNE:  YOUR HONOR, IF I COULD JUST BRIEFLY

11    COMMENT ON VISTARA BEFORE WE MOVE TOO FAR AWAY.

12         THE TOOLS MR. SAMPSON JUST REFERENCED, THAT IS NOT THE

13    SINGLE PANE OF GLASS THAT IS THE NETWORK SYSTEM, THE TOOLS THAT

14    WERE DISCUSSED ARE THE ONES THAT I REFERENCED, THEY ARE LIKE

15    ADD-ONS.

16         MR. FRY TESTIFIED THAT THERE WERE TOOLS THEY WERE DEALING

17    WITH AND THOSE MIGHT NOT HAVE BEEN A GOOD FIT, BUT IT WASN'T A

18    COMMENTARY ON A SINGLE PANE OF GLASS PLATFORM THAT WAS OF THE

19    BASIS THAT WAS THE ENTRY WAY INTO NETFLIX.  WE HAVE THE

20    EXHIBITS, THE EVIDENCE THAT THEY WERE CONSISTENTLY RUNNING AND

21    PRODUCING REPORTS, NOT ACTUALLY FOR MR. FRY OR MS. SPRAGUE, FOR

22    THE NETWORK'S OPERATION CENTER, WHICH WE HEARD TESTIMONY ABOUT

23    IS PEOPLE SITTING IN A NETWORK CENTER MONITORING.  THAT WASN'T

24    ACTUALLY MR. FRY'S JOB.

25         TO THE EXTENT HE SOUGHT THESE ADD-ONS, AND WE SEE THAT IN

1    THE CONTRACT, SOMETIMES THE PRICE INCREASES BECAUSE THEY ARE

2    CONSIDERING THESE OTHER TOOLS.  MR. SAMPSON CALLED THEM "TOOLS"

3    AND THAT'S EXACTLY WHAT THEY WERE.  THE ORIGINAL THING IS A

4    PLATFORM THEN THERE ARE TOOLS.

5         MR. SAMPSON:  YOUR HONOR, I BELIEVE THAT THE INVOICES

6    REFLECTED THE PRICE INCREASE BECAUSE THE RATE INCREASE.  AND

7    ADDITIONALLY, THEY WENT FROM MONTHLY BILLING TO QUARTERLY

8    BILLING OVER TIME.

9         BUT YOUR HONOR, THESE ADD-ONS, THE GOVERNMENT HAS A VERY

10   CONTRARY VIEW TO THIS.  I'M NOT -- I DON'T BELIEVE, I BELIEVE

11   THERE'S ONE SOW, STATEMENT OF WORK FOR VISTARA, I DON'T THINK

12   THERE WERE CONSTANT REVISIONS WHERE THINGS WERE BEING

13   AUTHORIZED TO BE ADDED ON.

14        IN FACT, YOUR HONOR, I BELIEVE, AND I DON'T THINK THIS WAS

15   DEVELOPED AT THE TRIAL, BUT YOUR HONOR, I THINK THE

16   GOVERNMENT'S CONTRARY VIEW TO THIS TESTIMONY ABOUT ADD-ONS IS

17   THAT MR. FRY WAS REQUESTING THINGS THAT VISTARA DIDN'T OFFER.

18   HE WAS REQUESTING FUNCTIONALITY THAT THEY DIDN'T HAVE IN THEIR

19   PRODUCT.  HE SAID, WE DIDN'T TRUST IT ENOUGH TO USE IT.

20        AND SO YOUR HONOR, THAT'S THE GOVERNMENT'S CONTRARY VIEW.

21   WE THINK IT'S SUPPORTED BY THE EVIDENCE.

22        THE COURT:  ALL RIGHT.

23        SO I HATE TO DO THIS TO YOU, AND IT'S GOING TO CAUSE A

24   DELAY, BUT I ACTUALLY NEED FROM THE GOVERNMENT, AND I WILL

25   RECEIVE IT FROM THE DEFENSE AS WELL, BUT THAT'S NOT -- I REALLY

1    WANT IT FROM THE GOVERNMENT -- EACH OF THESE COMPANIES AND THE

2    AMOUNT AND THE EXHIBITS OR TRIAL TRANSCRIPT PAGES THAT SUPPORT

3    YOUR POSITION ON THESE NUMBERS.

4         I DON'T HAVE IT.  I JUST DON'T HAVE IT.  I HAVE IT FOR

5    SOME.  I HAD NOTHING ON DOCURATED, I COULDN'T FIND ANYTHING IN

6    THE PAPERS ON DOCURATED, AND I JUST NEED A LIST.

7         BECAUSE YOU GIVE ME -- ON THE FRAUD LOSS, YOU DEVOTE A

8    PAGE TO THAT, AS OPPOSED TO SUPPORTING YOUR -- AND IF IT'S IN

9    ONE OF YOUR OTHER FILINGS, I CAN GO LOOK AT THOSE, BUT I DID GO

10   BACK TO YOUR NEW TRIAL BRIEFING AND I DIDN'T SEE IT THERE

11   EITHER.

12        MS. JAYNE:  AND YOUR HONOR IS LOOKING FOR WHAT?  I'M

13   SORRY, I PERHAPS DIDN'T QUITE UNDERSTAND.

14        THE COURT:  I WANT THE EVIDENCE THAT THE GOVERNMENT

15   WOULD LIKE ME TO RELY ON THAT THESE LOSS AMOUNTS ARE SUPPORTED

16   BY A PREPONDERANCE OF THE EVIDENCE.  THAT'S WHAT I'M LOOKING

17   FOR.  JUST THE CITATIONS, NOT ABOUT IT.

18        AND IF YOU HAVE ALREADY DONE THAT, I WILL JUST APPRECIATE

19   YOU REFERRING ME TO THE PAGE NUMBERS, BECAUSE I LOOKED BACK AT

20   YOUR BRIEFS IN OPPOSITION TO THE MOTION FOR NEW TRIAL, AND YOU

21   HAVE A SECTION FOR EACH OF THE COMPANIES STARTING AT PAGE 13.

22        SO FOR VISTARA, FOR EXAMPLE, YOU SAY THAT MR. KAIL

23   APPROVED VISTARA PRODUCT ON 2,000 DEVICES WHILE HIS TEAM

24   MEMBERS BELIEVED THE PRODUCT WAS AN UNPAID PILOT AND WAS NOT IN

25   PRODUCTION AT NETFLIX AND PERHAPS NOT USED AT ALL.  NO

1    CITATION.  THAT'S WHERE I'M STRUGGLING HERE IS THEY NEED THE

2    CITATION TO THE EVIDENCE.

3         MS. JAYNE PROPERLY HOLDS THE COURT TO FINDING BY, AND I

4    AGREED WITH YOU, PREPONDERANCE OF THE EVIDENCE, AND I BELIEVE

5    THAT DOCURATED IS IN HERE -- YEAH, YOU GIVE ME A NUMBER OF

6    EXHIBITS THERE.

7         MR. SAMPSON:  AND YOUR HONOR, WHILE WE WERE SITTING

8    HERE, I FOUND THE RELEVANT PAGES IN THE TRIAL TRANSCRIPT FOR

9    MR. CHELF AND HIS CROSS FROM MS. JAYNE.  AND I THINK THE MOST

10   ILLUMINATING IS 1695 TO 1696 IN WHICH MS. JAYNE SAID, "CAN YOU

11   SAY WITH CONFIDENCE, SITTING HERE TODAY THAT DOCURATED WAS USED

12   FOR THE LEGAL DEPARTMENT?"  AND HE SAID, "FROM MY RECOLLECTION,

13   YES."

14        AND SHE FOLLOWED UP, "YOU SAID THAT DOCURATED, YOU THINK

15   IT WAS CANCELLED WHEN MR. KAIL WAS STILL AT NETFLIX?"

16        AND HE INDICATED THAT THAT WAS -- HE BELIEVED SO.

17        AND SO DOCURATED WAS, TO HIS MEMORY, WAS USED BY THE LEGAL

18   DEPARTMENT, THAT IT WAS REPLACED WITH A HOMEGROWN OR

19   NETFLIX-CREATED SOLUTION.

20        AND YOUR HONOR, I BELIEVE THAT EXHIBITS 555 AND 559 ARE

21   THE E-MAILS BETWEEN MR. KAIL AND MR. GORBANSKY, 555.  THE

22   ADDENDUM TO THE ADVISORY AGREEMENT WHICH WAS THE 2014 THE

23   SECOND 120,000.

24        THE COURT:  SURE.

25        SO THE ISSUE IS NOT THE TIMING OF THE ADVISORY AGREEMENTS

1  IN THE CONTRACTS.  THAT'S NOT THE ISSUE.  I'M JUST TRYING TO --

2  MY ISSUE HERE ON THE LOSS IS MUCH NARROWER, I'M TRYING TO FIND

3  THE EVIDENCE THAT SUPPORTS THERE WAS NO VALUE TO NETFLIX.

4      YOU KNOW, YOU COULD HAVE TWO COMPANIES SELLING INK PENS,

5  BOTH OF WHICH ARE OF EQUAL QUALITY, AND IT COULD BE A VIOLATION

6  OF THESE LAWS TO TAKE MONEY ON THE SIDE FROM ONE COMPANY TO BUY

7  THEM.  BUT THE VICTIM STILL GETS INK PENS THAT HAVE INK AND ARE

8  USED FOR WRITING.  THEY GET COMPLETE VALUE.

9      SO THIS IS MUCH MORE NARROW.  I'M NOT NOW CONCERNED WITH

10  THERE BEING EVIDENCE OF THE QUID PRO QUO, AND SO THAT'S WHY I

11  NEED THIS CHART FROM YOU AS TO THE EVIDENCE.  DIRECT ME TO THE

12  EXHIBIT AND THE TRANSCRIPT PAGES THAT SUPPORT THE ABSENCE OF

13  VALUE FOR EACH OF THESE COMPANIES.  THAT'S WHAT I NEED.

14      MR. SAMPSON:  YOUR HONOR, SO I UNDERSTAND, I'M HAPPY

15  TO DISCUSS TIMING ON THAT, BUT THE GOVERNMENT'S VIEW TODAY IS

16  THAT WE POINTED YOUR HONOR TO PLENTIFUL VISTARA, AND THE

17  COMMISSIONS THAT WE ALLEGE FROM NETENRICH.  AND WE ARE NOT

18  ALLEGING THAT THE REST OF IT WAS A FRAUD LOSS.  AND THE

19  PLATFORA, I BELIEVE YOUR HONOR CAN MAKE FINDINGS ON THAT.

20      THE COURT:  PLATFORA, I'M COMFORTABLE WITH, AND

21  NETENRICH IS THE COMMISSION, I'M COMFORTABLE WITH THAT.

22      MR. SAMPSON:  AND SO IT SOUNDS LIKE THE DELTA IS

23  DOCURATED AND POTENTIALLY NUMERIFY?

24      THE COURT:  AND VISTARA.

25      MR. SAMPSON:  YOUR HONOR --

1      THE COURT:  I JUST NEED TO BE ABLE TO CITE -- IF YOU

2   WANT THIS TO HOLD UP ON APPEAL.

3      MR. SAMPSON:  I UNDERSTAND, YOUR HONOR.

4      AND YOUR HONOR, IN YOUR HONOR'S ORDER DENYING THE NEW

5   TRIAL, I THINK YOUR HONOR CITED THREE WITNESSES ABOUT VISTARA,

6   ROB FRY, SORBY, CHELF AND ASHLEY SPRAGUE.  AND THERE'S RECORD

7   CITATIONS THERE, AND WE BELIEVE THAT AMPLY SUPPORTS

8   GOVERNMENT'S ARGUMENT THAT THERE WAS NO VALUE.

9      THAT'S WHAT WE WOULD POINT TO FOR VISTARA IN A

10  SUPPLEMENTAL BRIEFING.

11     I'M NOT PUSHING BACK TO SAY WE SHOULDN'T DO IT,

12  YOUR HONOR, WE ARE HAPPY TO BRIEF WHAT YOUR HONOR NEEDS; BUT I

13  BELIEVE THAT UNLESS WE ARE DOING A RESTITUTION HEARING TODAY --

14     THE COURT:  WE ARE NOT.

15     MR. SAMPSON:  -- WHICH IT SOUNDS LIKE WE ARE NOT.

16     THE COURT:  I THINK THAT REALLY IS DIFFERENT ISSUES

17  ON RESTITUTION.

18     MR. SAMPSON:  YES.

19     THE COURT:  SO I WILL GO BACK AND LOOK AT MY NEW

20  TRIAL ORDER ON VISTARA REGARDING FRY, SPRAGUE AND THE TESTIMONY

21  THAT I CITED.  AND IF YOU WANT TO SUBMIT THAT, I CAN QUICKLY

22  JUST --

23     MR. SAMPSON:  YOUR HONOR, THAT'S DOCUMENT 264, PAGE 4

24  TO 5.

25     THE COURT:  4 TO 5.  THANK YOU.

1    OKAY.  AND I HAVE SPECIFIC CITATIONS IN MY ORDER WHICH IS

2    MY ROAD MAP.  THANK YOU.

3    SO I DON'T NEED ANYTHING MORE ON VISTARA.  I WILL LOOK AT

4    THAT FOR THIS SPECIFIC ISSUE, IT'S A DIFFERENT ISSUE I'M

5    LOOKING AT.  AND SO THE DEFENSE UNDERSTANDS, IN THE NEW TRIAL

6    IT WAS WHETHER A CRIME WAS COMMITTED, HERE I'M LOOKING AT THE

7    NUMBER, AND SO THAT ONE IS FINE.

8    SO YOU WILL GIVE ME INFORMATION ON DOCURATED AND NUMERIFY.

9    MR. SAMPSON:  YES, YOUR HONOR.

10   THE GOVERNMENT --

11   THE COURT:  AND IT MAY BE THAT YOU -- IF YOU ARE

12   COMFORTABLE WITH VISTARA, GIVEN THE SENTENCING RANGES, YOU

13   MIGHT SIMPLY SAY THAT YOU WON'T BE SUBMITTING ANYTHING MORE.  I

14   WILL GIVE YOU THE TIME TO SUBMIT IT.

15   MR. SAMPSON:  YOUR HONOR IS TEN SECONDS AHEAD OF ME.

16   I BELIEVE THE GOVERNMENT'S POSITION IS THE 1.385 MILLION

17   FROM VISTARA, AND YOU ADD THE PLATFORA, YOU ARE ALREADY AT 1.5.

18   THE COURT:  WE CAN ALL DO THAT MATH.

19   ALL RIGHT.  YOU DON'T WISH TO SUBMIT ANYTHING MORE, AND

20   THAT'S FINE WITH ME.

21   MR. SAMPSON:  PERHAPS AT RESTITUTION.

22   THE COURT:  YES.

23   YOU CAN SUBMIT -- WE WILL NOT BE WAIVING IT FOR

24   RESTITUTION, NOR CAN WE, BECAUSE THAT'S THE VICTIM'S MONEY AND

25   NOT THE GOVERNMENT'S.

1    MR. SAMPSON: AND I SHOULD ADD THE MEET AND CONFER

2    WAS NOT SUCCESSFUL THAT YOUR HONOR DIRECTED. SO WE MAY END UP

3    LITIGATING THE RESTITUTION.

4         THE COURT: WELL, WE CAN GET TO THAT.

5    SO I CAN'T GO FORWARD NOW UNTIL I HAVE A LOSS AMOUNT,

6    WHICH WAS -- AND I WILL NOW HAVE TO GO BACK AND LOOK AT THIS

7    EVIDENCE FOR THE AMOUNTS, WHICH I HAVE NOT DONE IN THE KIND OF

8    DETAIL THAT I THINK IS REQUIRED.

9         MS. JAYNE: YOUR HONOR, MAY I SUBMIT SOMETHING AS

10   WELL THAT INCLUDES ADDITIONAL TESTIMONY FROM THESE SAME

11   WITNESSES POTENTIALLY?

12        THE COURT: IT'S JUST A LIST OF EXHIBITS AND

13   TRANSCRIPT PAGES AND NO COMMENTARY WHATSOEVER. COMPANY,

14   DOCUMENTS, TRANSCRIPT PAGES, NOTHING ELSE.

15        MS. JAYNE: OKAY. AND THE COURT HAS THOSE, WE DON'T

16   NEED TO ACTUALLY GIVE YOU --

17        THE COURT: I DON'T KNOW IF I HAVE THEM. I DIDN'T

18   BUY A TRANSCRIPT. I DON'T HAVE THEM, SO I GUESS YOU ARE GOING

19   TO HAVE TO PROVIDE THEM TO ME. I'M SORRY.

20        MS. JAYNE: I WILL DO THAT AS AN EXHIBIT THEN.

21   OKAY. SIMILAR TO EXHIBITS OR DOES THE COURT HAVE

22   EXHIBITS?

23   I WILL SUBMIT IT AS EXHIBITS TO THE CASE.

24        THE COURT: I APPRECIATE THAT. I DON'T THINK WE ARE

25   TALKING ABOUT A LOT.

1    LET'S USE SOME OF THIS TIME TO GO THROUGH SOME OF THE

2    OTHER ISSUES.

3    IN PARAGRAPH 28, THERE'S NO OBJECTION TO THE ADDITION OF A

4    PLUS ONE LEVEL FOR MONEY LAUNDERING.

5    IN REGARD TO PARAGRAPH 30 REGARDING ABUSING A POSITION OF

6    TRUST, PRIVATE TRUST, AND THE GOVERNMENT IS SUGGESTING -- THIS

7    IS WHERE I GOT -- OH, OKAY.  SO THE GOVERNMENT IS SUGGESTING

8    ONLY THE PARAGRAPH 30, THE POSITION OF TRUST UNDER 3(B)1.3, AND

9    NOT SEEKING THE OBSTRUCTION OF JUSTICE UNDER 3(C) 1.1, CORRECT?

10    MR. SAMPSON:  I DON'T THINK THAT'S CORRECT,

11    YOUR HONOR.  WE ARE SEEKING ABUSE OF POSITION OF TRUST.

12    THE COURT:  YES.

13    MR. SAMPSON:  AND OBSTRUCTION OF JUSTICE AT TRIAL.

14    AND WE CITED A FEW --

15    THE COURT:  BUT THEN THE ADJUSTED OFFENSE LEVEL IS

16    30, AND YOU TOLD ME YOU WERE SEEKING 28, THAT'S WHERE I GOT

17    CONFUSED.

18    MR. SAMPSON:  NO, YOUR HONOR.  OUR ARGUMENT FOREGOES

19    SOPHISTICATED MEANS.

20    THE COURT:  OH, SOPHISTICATED MEANS, I BEG YOUR

21    PARDON.  I AM LOOKING FOR WHERE THAT.

22    MR. SAMPSON:  I THINK IT'S 2(B)1.1 --

23    THE COURT:  NO, I'M LOOKING AT THE PARAGRAPH NUMBER

24    WHERE THAT'S BEEN REQUESTED.

25    PROBATION OFFICER:  PARAGRAPH 27.

1            MS. JAYNE:  IN THE PSR, YOUR HONOR?  27.

2            THE COURT:  OH, 27.  OKAY.

3         OFFICER POLLAK, IS THERE SOMETHING ABOUT SOPHISTICATED

4    MEANS THAT YOU THOUGHT WAS PRESENT HERE?

5            PROBATION OFFICER:  YOUR HONOR, ALL I CAN CITE IS TO

6    OFFICER GREER'S LAST SENTENCE IN PARAGRAPH 27 WHICH STARTS,

7    "WITH THE DEFENDANT'S USE OF UNIX," I THINK THAT'S WHAT SHE

8    RELIED ON.

9            THE COURT:  ALL RIGHT.  THANK YOU.

10        I WILL DENY THE SOPHISTICATED MEANS.

11        IN REGARD TO ABUSE OF A POSITION OF PRIVATE TRUST,

12   MS. JAYNE, YOUR ARGUMENT IS THAT THAT'S AN ELEMENT OF THE

13   OFFENSE AND SHOULD NOT BE ADDED.

14           MS. JAYNE:  THAT'S IN PART OF THE ARGUMENT, CORRECT.

15   THAT'S PAGE 34 OF MY BRIEF.

16           THE COURT:  YEAH.

17        MR. SAMPSON?

18           MR. SAMPSON:  YOUR HONOR, THAT MAY WELL BE THE CASE

19   FOR ON A SURFACES FRAUD, BUT THE DEFENDANT WAS CONVICTED OF THE

20   ALTERNATIVE THEORIES, AND IT IS NOT AN ELEMENT OF THE WIRE

21   FRAUD ITSELF, SO THAT'S THE REASON THE GOVERNMENT ASSERTS THAT

22   THAT'S APPLICABLE.

23           THE COURT:  OKAY.

24        ALL RIGHT.  I WILL INCREASE BY TWO LEVELS UNDER 3(B)1.3.

25   I DO AGREE THAT ABUSE OF A POSITION OF PRIVATE TRUST IS NOT AN

1    ELEMENT OF WIRE FRAUD AND MAIL FRAUD, WHICH ARE SEPARATE

2    VERDICTS BY THE JURY ON ALL BUT COUNT 20.  BUT THERE ARE

3    MULTIPLES, AND SO THE TWO LEVEL ENHANCEMENT WOULD BE

4    APPROPRIATE.

5         AND THEN FOR THE OBSTRUCTION OF JUSTICE, I ALWAYS FIND

6    THAT ONE A DIFFICULT ONE, BECAUSE A DEFENDANT IS IN A DIFFICULT

7    POSITION ON WHETHER TO TESTIFY OR NOT AND HOW THAT WOULD BE

8    PERCEIVED.

9         MS. JAYNE, ANY FURTHER COMMENTS ON THAT?

10        MS. JAYNE:  WELL, I THINK YOUR HONOR, SOME OF THE

11   CASES WHERE IT WAS APPLIED ARE INSTRUCTIVE.

12        I CITED TO THOSE WHERE WITNESSES ARE MATERIALLY

13   CONTRADICTING SPECIFIC DOCUMENTS OR HAVE BEEN, HAVE GIVEN

14   INTERVIEWS AND THEN ARE INCONSISTENT ON THE STAND, WHERE

15   WITNESSES WILLFULLY OBSTRUCTED THE ADMINISTRATION OF JUSTICE,

16   WHERE OTHER WITNESSES -- FOR EXAMPLE, THERE WAS, IN UNITED

17   STATES V. GARROW, WHICH I CITED ON PAGE 35, THAT WAS WARRANTED

18   WHEN A DEFENDANT FIRST TESTIFIED CONTRARY, HE HAD PREPARED A

19   SWORN AFFIDAVIT.

20        HERE, MR. KAIL ESSENTIALLY ASSERTED HIS INNOCENCE, THAT

21   WAS THE CRUX OF HIS TESTIMONY, WHERE HE WAS, AS NOTED, WHEN HE

22   WAS DISHONEST, HE ADMITTED TO BEING DISHONEST TO HIS EMPLOYER.

23   WHERE HE MADE ERRORS, HE OWNED UP TO THOSE.

24        THERE'S A DISPUTE ON WHETHER HE LISTED SOMETHING ON

25   LINKEDIN OR NOT.  THAT COULDN'T BE MATERIAL IN ANY EVENT.  BUT

48

1    OTHERWISE, OTHER THAN ASSERTING THAT, I DIDN'T ENGAGE IN FRAUD.

2    THERE REALLY WASN'T ANY CONTRADICTORY TESTIMONY, PER SE.  AND

3    SO OTHER THAN PENALIZING HIM FOR ASSERTING HIS RIGHT TO TRIAL,

4    THERE'S REALLY NOTHING TO POINT TO TO SHOW THAT HE GAVE FALSE

5    TESTIMONY THAT WAS WILLFUL INTENT.

6              THE COURT:  MR. SAMPSON?

7              MR. SAMPSON:  YOUR HONOR, THERE IS A DIFFERENT

8    BETWEEN SPIN AND FALSE TESTIMONY.  WE RECOGNIZE THAT.

9         MR. KAIL'S TWO DAYS OF TESTIMONY WAS FULL OF SPIN, BUT WE

10   BELIEVE IT WAS ALSO -- THERE WERE POINTS AT WHICH HE GAVE FALSE

11   TESTIMONY TO TESTIFY FALSELY ABOUT THE REASONS.

12        FOR EXAMPLE, REMEMBER YOUR HONOR, HE THOUGHT PLATFORA WAS

13   NOT A PERSONALITY FIT FOR HIM.  BUT THE EVIDENCE OVERWHELMINGLY

14   INDICATED IT WAS BECAUSE MR. HASTINGS CONFRONTED HIM ABOUT IT,

15   BECAUSE HE WAS ABOUT TO BE CAUGHT WITH THE DOWNFALL OF THAT

16   CONTRACT AND THAT DEPLOYMENT AT NETFLIX.

17        AND IN THE GOVERNMENT'S CROSS WHEN HE DIDN'T RECALL THINGS

18   THAT IN REDIRECT HE VERY SPECIFICALLY REMEMBERED, I THINK

19   YOUR HONOR COULD FIND, IN USING THE ROJAS CASE, YOUR HONOR

20   COULD FIND OBSTRUCTION IS APPROPRIATE IN THIS CASE.

21        AND WE DON'T HAVE ANYTHING FURTHER.

22             THE COURT:  OKAY.

23        I CERTAINLY AGREE THAT THE JURY, BASED ON ITS VERDICT,

24   FACTORED IN MR. KAIL'S TESTIMONY AND CONVICTED HIM REGARDLESS

25   OF THAT TESTIMONY.

1    I AM NOT GOING TO FIND OBSTRUCTION OF JUSTICE, I THINK IT

2    IS A FAIRLY HIGH STANDARD AND I AM NOT SATISFIED THERE'S BEEN

3    ANY SPECIFIC MATERIAL STATEMENT AND TESTIMONY THAT WOULD

4    QUALIFY FOR OBSTRUCTION OF JUSTICE.

5    AND SO LEAVING THE LOSS AMOUNT AT THE RECOMMENDATION,

6    ALTHOUGH IT'S NOT MY FINDING, WE WOULD AT LEAST BE DOWN TO AN

7    ADJUSTED OFFENSE LEVEL OF 26.  I HAVE MADE NO RULING ON THE

8    FRAUD LOSS.

9    MS. JAYNE:  RIGHT.

10    THE COURT:  SO I AM JUST -- EVEN PRESUMING THAT IT

11    REMAINS AT 1.5 MILLION OR GREATER, THE ADJUSTED OFFENSE LEVEL

12    WOULD AT LEAST BE REDUCED TO 26.  IT MAY BE REDUCED FURTHER IF

13    I AM NOT SATISFIED WITH THE EVIDENCE THE GOVERNMENT POINTS ME

14    TO, I HAVE TO GO BACK AND -- YOU ARE GOING TO EACH GIVE ME A

15    SUBMISSION, I WILL GIVE YOU A WEEK TO DO THAT.

16    OF COURSE THE CRIMINAL HISTORY LEVEL IS ONE, AND NO ONE IS

17    DISPUTING THAT.  IF THE ADJUSTED OFFENSE LEVEL IS 26, THE

18    GUIDELINE WILL BE 63 TO 78 MONTHS.

19    I WILL SAY THAT I AM LEANING TOWARD FINDING AT LEAST

20    1.5 MILLION, BUT I DO WANT THAT EVIDENCE SET FORTH.  I WANT TO

21    READ IT AGAIN.  I WILL TAKE THOSE SUBMISSIONS.

22    MR. SAMPSON:  AND AGAIN, I'M SORRY TO BEAT A DEAD

23    HORSE, BUT THAT'S DOCURATED AND NUMERIFY?

24    THE COURT:  YES, BECAUSE THAT'S THE EVIDENCE YOU

25    POINT TO IN YOUR NEW TRIAL MOTION.  SO YOU HAVE ALREADY

1    SUBMITTED THAT.

2         MS. JAYNE WAS GIVEN ME THE OPPORTUNITY TO GIVE ME A LIST

3    FOR THOSE THREE AS WELL.

4         SO EVEN COMING DOWN TO 26 IS A BIG ADJUSTMENT IN THE

5    GUIDELINE.  SO MY QUESTION THEN IS, IN THE TIME REMAINING THIS

6    MORNING, THIS SENTENCE WILL BE PRONOUNCED ORALLY.

7         YOU ARE COMING BACK, BECAUSE I CAN'T -- I'M NOT GOING TO

8    WRITE AN ORDER ON SENTENCING, IT'S GOING TO BE DONE HERE IN

9    COURT, OF COURSE, IT JUST GIVES ME A CHANCE TO LOOK AT THE

10   RECORD MORE CLEARLY.  I THINK I HAVE TO WRITE AN ORDER ON THE

11   FRAUD LOSS TO HAVE A ROAD MAP, ESSENTIALLY, OF WHAT I'VE RELIED

12   ON BECAUSE IT IS A PREPONDERANCE OF THE EVIDENCE STANDARD.

13        AND I WILL -- WHAT WE HAVE REMAINING, OF COURSE, IS A VERY

14   SIGNIFICANT PART OF THE SENTENCING HEARING, AND THAT IS TO HEAR

15   FROM MS. JAYNE AND TO HEAR FROM MR. KAIL AND TO HEAR FROM

16   NETFLIX, IF THEY WISH TO MAKE AN ORAL PRESENTATION, AND THEN TO

17   HEAR FROM THE GOVERNMENT AND FROM PRETRIAL SERVICES.

18        I THINK THAT, IN MY VIEW, THOSE COMMENTS WOULD ALL BE

19   BETTER MADE ONCE I'VE DETERMINED THE FRAUD LOSS.

20        MS. JAYNE, DO YOU AGREE WITH THAT?

21             MS. JAYNE:  I DO, YOUR HONOR.

22             THE COURT:  OKAY.

23        NOW LET ME MOVE ON TO THE ISSUE OF RESTITUTION.  THANK YOU

24   FOR DOING THE MEET AND CONFER.  ONCE I DETERMINE THE FRAUD

25   LOSS, THAT MAY ALSO ASSIST YOU IN DETERMINING WHETHER YOU CAN

1    CONTINUE TO WORK ON A RESOLUTION OF THE RESTITUTION ISSUE.

2    I DO NOTE ON THE RESTITUTION THAT THERE IS NO REQUEST BY

3    NETFLIX TO REGAIN THE SALARY IT PAID MR. KAIL.  SO THAT'S

4    ACTUALLY OFF THE TABLE AT THIS POINT.  THAT'S NOT REALISTICALLY

5    BEFORE ME; IS THAT CORRECT, MR. SAMPSON?

6    MR. SAMPSON:  I DON'T PLAN TO ASK FOR RESTITUTION,

7    AND THE COMPANY IS NOT ASKING FOR IT.

8    THE COURT:  IT APPEARS THAT THE NETFLIX REQUEST IS

9    THE SAME AS THE GOVERNMENT'S FRAUD LOSS CALCULATION; IS THAT

10    CORRECT?

11    MR. SAMPSON:  ALMOST, YOUR HONOR.

12    THE COURT:  IT MAY BE A LITTLE BIT LOWER.

13    MR. SAMPSON:  IT ACTUALLY IS A LITTLE DIFFERENT, AND

14    THAT'S BECAUSE THE NETFLIX LETTER REDUCES THE VISTARA AMOUNT BY

15    THE TOTAL COMMISSIONS FOR BOTH VISTARA AND NETENRICH.  IT WAS

16    ALL PART OF ONE CIVIL SETTLEMENT.

17    SO THE GOVERNMENT WENT FURTHER AND DEDUCTED THE SETTLEMENT

18    AMOUNTS FROM THE DIVIDED LOSSES, AND WE COME UP WITH A SLIGHTLY

19    DIFFERENT NUMBER, YOUR HONOR.

20    THE COURT:  NO, NO, NO, LET ME BACK UP.

21    WELL, I'M ONLY GOING TO AWARD RESTITUTION OF WHAT THE

22    VICTIM IS ASKING FOR.  I'M NOT GOING TO GIVE -- AND SO I'M

23    LOOKING AT THE LETTER SUBMITTED BY NETFLIX ASKING FOR THE FULL

24    AMOUNT PAID TO VISTARA, WHICH IS THE SAME AMOUNT THE GOVERNMENT

25    IS REQUESTING WAS FRAUD LOSS, THE PLATFORA SETTLEMENT AMOUNT

```
1      WHICH IS IDENTICAL TO THE GOVERNMENT'S REQUEST, THE NUMERIFY

2      AMOUNT, ALSO IDENTICAL, AND THE DOCURATED AMOUNT.  WHAT'S

3      MISSING FROM HERE IS THE -- THERE'S NO REQUEST FOR THE

4      NETENRICH ON, WHICH IS --

5              MR. SAMPSON:  AND THAT'S BECAUSE THAT PART THAT HAS

6      ALREADY BEEN -- THERE'S NO PAYMENT OWED BECAUSE THERE WAS A

7      SETTLEMENT.

8              THE COURT:  WELL, I ACTUALLY READ THIS DIFFERENTLY.

9      I READ NETFLIX AS SAYING THE TOTAL PAYMENTS ARE

10     1.7 MILLION, NETFLIX REQUESTS 1.2 MILLION TO ACCOUNT FOR THE

11     SETTLEMENT.

12     I'M LOOKING AT HOW NETFLIX CALCULATED THE 1.7 MILLION, AND

13     THEY DO NOT INCLUDE THE 285,000.

14             MR. SAMPSON:  I THINK IT'S 275.

15             THE COURT:  275.

16             MR. SAMPSON:  YES.  IT'S NOT COUNTED BECAUSE IT'S

17     ALREADY -- AND THAT'S WHY OUR NUMBERS ARE DIFFERENT,

18     YOUR HONOR.  SO I'M NOT ADVOCATING FOR MORE THAN THE COMPANY IS

19     REQUESTING, I'M JUST --

20             THE COURT:  OKAY.

21             MS. JAYNE:  YOUR HONOR, I BELIEVE IT'S NOT INCLUDED

22     BECAUSE THERE'S JUST A COMMISSION, THERE WASN'T ESSENTIALLY A

23     LOSS TO NETFLIX ON THAT.

24     THE 275 IS JUST A COMMISSION AND NETFLIX RECEIVED THAT 275

25     FROM MR. KAIL IN ADDITION TO THE --
```

```
1              THE COURT:  NO, NO.  YOU ARE DOUBLE COUNTING THE

2       DEDUCTION.

3              FIRST YOU COME UP WITH THE AMOUNT OF RESTITUTION, AND THEN

4       NETFLIX COMPLETELY CREDITS BACK THE SETTLEMENT.  UNLESS YOU ARE

5       TELLING ME MORE THAN THE AMOUNT WAS PAID BACK.

6              MS. JAYNE:  NO, NO, NO.

7       I'M SAYING NETFLIX, WHEN THEY CALCULATED THEIR LOSS, THEY

8       DON'T INCLUDE NETENRICH AT ALL BECAUSE THEY DON'T VIEW THAT AS

9       A LOSS.  HOWEVER, THEY DO CREDIT ALL THE MONEY THAT MR. KAIL

10      PAID THEM.

11             THE COURT:  YES.

12             MS. JAYNE:  THE GOVERNMENT VIEWS NETENRICH AS A LOSS

13      FOR THE GUIDELINES PURPOSES, BUT NETFLIX DOES NOT.

14             THE COURT:  OKAY.

15      AND THAT CAN HAPPEN ON THE RESTITUTION, THEY CAN BE TWO

16      DIFFERENT AMOUNTS.  I HAVE NO PROBLEM WITH THAT.  OKAY.

17      SO WHEN I DECIDE THE FRAUD LOSS, THEN IT WILL ALSO BE AN

18      OPPORTUNITY TO DETERMINE WHETHER THERE'S GOING TO BE A FURTHER

19      EVIDENTIARY HEARING ON RESTITUTION.

20             MS. JAYNE:  CORRECT.

21             THE COURT:  OKAY.  I THINK I'VE GONE AS FAR AS I CAN

22      TODAY.

23      LET ME FURTHER COMMENT THAT AS A RESULT OF THE ADDITIONAL

24      BRIEFING YOU NEED TO DO AND SEARCH THROUGH THE RECORD, THE

25      SPECTER OF A CIVIL FORFEITURE CASES, AND IT'S UP TO YOU TO
```

1    ESTIMATE THE ODDS THAT THAT WILL BE FILED, AND THE POTENTIAL OF

2    A RESTITUTION HEARING, ALL OF WHICH COSTS ATTORNEYS FEES AND

3    EFFORT, WHETHER IT DOESN'T CONTINUE TO BE WORTHWHILE TO REACH

4    RESOLUTION ON ALL OF THESE AMOUNTS, INCLUDING THE FRAUD LOSS,

5    INCLUDING THE FORFEITURE, AND INCLUDING THE RESTITUTION.

6         AND THIS IS THE TIME WHEN YOU CAN HAVE FRUITFUL

7    DISCUSSIONS.  I WILL DO MY JOB, IT'S COMPLETELY SEPARATE.  I'M

8    GOING TO HAVE YOU ALL COME BACK, WELL NEXT WEEK IS A HOLIDAY

9    WEEK, SO I'M NOT GOING TO BE SEEING YOU NEXT WEEK.  AND I'M

10   SURE YOU WILL HAVE ENOUGH TIME THIS WEEK TO GET ME THAT

11   SUBMISSION.  YOU MAY FIND YOU ONLY NEED A COUPLE OF HOURS TO

12   PUT THAT TOGETHER AND YOU CAN GIVE THAT TO ME BY FRIDAY.  I'M

13   NOT GOING TO REQUIRE ANYTHING BE DUE NEXT WEEK.

14        AND SO I WOULD BE LOOKING AT HAVING YOU COME BACK -- SO

15   DECEMBER 7TH IS REALLY JUST PACKED FOR ME.  SO I THINK I'M

16   LOOKING AT DECEMBER 14TH.

17        TIFFANY, DOES THAT LOOK AVAILABLE?

18             THE CLERK:  YOUR HONOR, IT'S ABOUT THE SAME AS THE

19   7TH.  YOU HAVE A SENTENCING HEARING AND POSSIBLY AN EVIDENTIARY

20   HEARING AND THEN A CHANGE OF PLEA AND SEVERAL STATUS

21   CONFERENCES.

22             THE COURT:  WELL, I THINK I WANT TO DO IT BEFORE THE

23   END OF THE YEAR.  SO LET'S DO THAT.

24        WE MAY NOTIFY YOU TO COME AT -- ACTUALLY, MAYBE WE SHOULD

25   JUST SET IT AT 10:30.

1      MS. JAYNE:  YOUR HONOR, I HAVE A HEARING THAT MORNING

2   AT 9:00 A.M. THAT'S REMOTE, SO THE LATER THE BETTER FOR ME.  I

3   MAY HAVE TO DO IT, LIKE, IN MY CAR OR SOMETHING.

4      THE COURT:  DOES 10:30 WORK?

5      MR. SAMPSON:  THE 14TH IS GREAT.  I WILL BE OUT ON

6   EXTENDED LEAVE AFTER THAT.

7      THE COURT:  OKAY.  THAT TAKES CARE OF THAT.  OKAY.

8      MR. SAMPSON:  THANK YOU.

9      THE COURT:  AND I THINK WE CAN FINISH THIS UP.

10     SO IF A REPRESENTATIVE FROM NETFLIX -- NOW, THEY ARE HERE

11  TODAY, IF THEY WOULD LIKE TO MAKE THEIR STATEMENT TO THE COURT

12  NOW SO THAT THEY DON'T HAVE TO COME BACK, I WANT TO GIVE

13  NETFLIX THAT OPTION.

14     MR. SAMPSON:  YOUR HONOR, I DON'T THINK THEY INTEND

15  TO MAKE A STATEMENT TODAY.  I BELIEVE THAT RIGHT CONTINUES IN

16  CASE THEY WANT TO MAKE THAT IN DECEMBER.

17     THE COURT:  ABSOLUTELY.  BUT I JUST OFFER IT TODAY AS

18  A CONVENIENCE, BUT IT'S NOT FOREGONE.

19     MR. SAMPSON:  THANK YOU, YOUR HONOR.

20     THE COURT:  OKAY.

21     MS. JAYNE:  AND YOUR HONOR, TO BE CLEAR, THE DEADLINE

22  FOR THE FILING OF THE CHART IS, I WAS A LITTLE CONFUSED, IT WAS

23  THIS WEEK OR IT'S NOT?

24     THE COURT:  I WAS ASKING WHETHER YOU COULD DO IT BY

25  THIS WEEK, BUT I WOULD LIKE IT NO LATER THAN DECEMBER 3RD, THAT

1     WOULD GIVE YOU THE FULL WEEK AFTER THE HOLIDAY.

2          MS. JAYNE:  THANK YOU.

3          THE COURT:  AND I WOULD LIKE THAT BY 5:00 P.M. SO

4     THAT I SEE IT.  I DON'T WANT A MIDNIGHT FILING ON A FRIDAY.

5          AND IT'S A CHART, I WANT TO BE REALLY CLEAR, WITH THE

6     ATTACHED PAGES AND EXHIBITS.  NO DISCUSSION, NO SUMMARY, PAGE

7     AND LINE NUMBER, EXHIBIT NUMBER.  IF THERE'S A SPECIFIC PAGE IN

8     THE EXHIBIT, IT IS ALSO APPRECIATED TO DIRECT ME TO THE PAGE.

9          MR. SAMPSON:  YES, YOUR HONOR.

10          MS. JAYNE:  ALL RIGHT.

11     THANK YOU, YOUR HONOR.

12          THE COURT:  WELL, THIS IS A LONG PROCESS, I THINK

13     IT'S WORTHWHILE TO TAKE IT CAREFULLY, ALTHOUGH I CERTAINLY

14     RECOGNIZE YOU ALL PUT AN EXTRAORDINARY AMOUNT OF TIME INTO

15     THIS.

16     I THINK I CAN GO AHEAD AND ISSUE THE PRELIMINARY ORDER OF

17     FORFEITURE AND GET THAT DONE, AND THEN THAT WILL START THE

18     NOTICE PERIOD FOR ANY THIRD PARTIES, CORRECT, MR. KALTSAS?

19          MR. KALTSAS:  THAT IS CORRECT, YOUR HONOR.

20          THE COURT:  OKAY.  GOOD.

21     WELL, I THINK THEN --

22          MS. JAYNE:  DOES THE PRELIMINARY ORDER START THAT OR

23     FINAL ORDER?

24          MR. KALTSAS:  THE PRELIMINARY ORDER WILL.

25          THE COURT:  MR. KALTSAS, YOU ARE THE EXPERT.

1      MR. KALTSAS:  THE PRELIMINARY ORDER WILL START THE

2  NOTICE PERIOD AND THEN NOTHING IS FINALIZED UNTIL THERE'S A

3  FINAL.

4      SO ONCE A PRELIMINARY GOES OUT, ANY INDIVIDUAL HAS

5  STANDING TO CONTEST ANYTHING AT THAT TIME.

6      THE COURT:  YES.

7      AND I KNOW THAT THE LAW REQUIRES THAT THE FORFEITURE ORDER

8  GO OUT BEFORE JUDGMENT, BECAUSE I CERTAINLY LOSE JURISDICTION

9  OVER THOSE ISSUES, I BELIEVE.  BUT THE RESTITUTION DOES NOT,

10 THAT CAN GO ON.  IF THERE'S A RESTITUTION HEARING, THAT CAN

11 OCCUR AFTER JUDGMENT.

12     MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

13     AND JUST FOR YOUR HONOR'S CONVENIENCE, IN THE FUTURE, YOU

14 COULD JUST GENERALLY ORDER FORFEITURE, JUST KNOW THAT THERE

15 WILL BE FORFEITURE, AND THEN DECIDE WHAT THE SPECIFIC

16 FORFEITURE WILL BE AT A FUTURE HEARING.

17     THE COURT:  OH, INTERESTING.  OKAY.

18     MR. KALTSAS:  SO THAT'S ALL THAT RULE 32.2 REQUIRES.

19     THE COURT:  OKAY.  BUT I OF COURSE HAD TO DETERMINE

20 WHICH ASSETS.

21     MR. KALTSAS:  OF COURSE.

22     THE COURT:  AND THAT GOT COMPLICATED HERE, DIDN'T IT.

23     ALL RIGHT.  MR. SAMPSON, ANYTHING ELSE?

24     MR. SAMPSON:  NO, YOUR HONOR.

25     JUST TO SUMMARIZE, THE COURT HAS MADE CERTAIN FINDINGS

1    WITH RESPECT TO CERTAIN GUIDELINES PROVISIONS, WHICH YOUR HONOR

2    WILL PROBABLY REITERATE ON THE 14TH.

3              THE COURT:  YES.

4              MR. SAMPSON:  WE WILL FILE OUR FILINGS, NOT BRIEFS,

5    BUT FILINGS ON THE 3RD, AND IT DOES NOT SOUND TO ME IF THERE IS

6    A CONTESTED RESTITUTION ISSUE, IT WILL NOT BE ON THE 14TH.

7              THE COURT:  THAT'S RIGHT.

8         AND I THINK THAT IT'S REASONABLE TO NOT MAKE A FINAL

9    DECISION ON THAT ISSUE UNTIL I MAKE THE FRAUD LOSS

10   DETERMINATION AND THE DEFENSE KNOWS THAT THE RESTITUTION AMOUNT

11   IS ESSENTIALLY CAPPED BY THE NETFLIX LETTER.

12             MR. SAMPSON:  YES.

13             THE COURT:  EVEN THOUGH THE FRAUD LOSS IS NOT.

14             MR. SAMPSON:  UNDERSTOOD, YOUR HONOR.

15             THE COURT:  OKAY.  THANK YOU ALL.

16        IT'S CERTAINLY MORE COMPLICATED THAN OTHERS THAT I HAVE

17   WORKED ON, AND I APPRECIATE ALL THE HARD WORK YOU PUT INTO IT.

18        ALL RIGHT.  I THINK WE'RE ADJOURNED THEN FOR THIS MORNING.

19        (THE PROCEEDINGS WERE CONCLUDED AT 11:45 A.M.)

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5    UNITED STATES OF AMERICA,        )   CR-18-00172 BLF
                                      )
6                   PLAINTIFF,        )   SAN JOSE, CALIFORNIA
                                      )
7         VS.                         )   DECEMBER 14, 2021
                                      )
8    MICHAEL KAIL,                    )   PAGES 1-84
                                      )
9                   DEFENDANT.        )
     ─────────────────────────────    )

10

11

12              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE BETH LABSON FREEMAN
13            UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S :

16   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  KYLE * WALDINGER
17                              CHRISTOPHER * KALTSAS
                           *450 GOLDEN GATE AVENUE, BOX 36055
18                         SAN FRANCISCO, CALIFORNIA  94102

19   FOR THE DEFENDANT:    JAYNE LAW GROUP
                           BY:  JULIA M. JAYNE
20                         483 9TH STREET, SUITE 200
                           OAKLAND, CALIFORNIA  94607

21

22   PROBATION OFFICER:    KYLE POLLAK

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595

24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1     SAN JOSE, CALIFORNIA                    DECEMBER 14, 2021

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 10:30 A.M.)

 4           THE COURT:  GOOD MORNING, EVERYONE.  PLEASE BE

 5     SEATED.

 6         ALL RIGHT.  LET'S CALL THE CASE AND GET YOUR APPEARANCES.

 7           THE CLERK:  CALLING CASE 18-0172, UNITED STATES

 8     VERSUS MICHAEL KAIL.

 9         COUNSEL, PLEASE STATE YOUR APPEARANCES.

10           MR. WALDINGER:  GOOD MORNING, YOUR HONOR.

11         KYLE WALDINGER FOR THE UNITED STATES.  I'M JOINED TODAY BY

12     CHRISTOPHER KALTSAS.

13           MR. KALTSAS:  GOOD MORNING, YOUR HONOR.

14           THE COURT:  GOOD MORNING.

15         MR. WALDINGER, THANK YOU FOR MAKING THE TRIP.

16           MR. WALDINGER:  YOU'RE WELCOME, YOUR HONOR.

17         AND MR. SAMPSON COULD NOT BE HERE.  HE'S A NEW FATHER.

18           THE COURT:  OH, WELL, THAT'S A GOOD REASON TO NOT BE

19     HERE.  IT'S NOT LIKE HE'S TAKING IT EASY, THEN.

20           MR. WALDINGER:  NO, HE'S NOT.

21           MS. JAYNE:  GOOD MORNING, YOUR HONOR.

22         JULIA JAYNE ON BEHALF OF --

23         (AUDIO INTERRUPTION.)

24           THE COURT:  SORRY.

25           THE CLERK:  SORRY, YOUR HONOR.
```

1          MS. JAYNE:  NO WORRIES.

2       -- ON BEHALF OF MR. KAIL, WHO'S PRESENT.

3          THE COURT:  GOOD MORNING, MS. JAYNE.

4       GOOD MORNING, MR. KAIL.

5       ALL RIGHT.  THIS IS THE TIME THAT WE SET FOR THE CONTINUED

6    SENTENCING HEARING.

7       IN A CERTAIN WAY, WE'RE GOING TO TAKE A STEP BACK, I

8    THINK, SO THAT WE CAN MAKE SURE THAT EVERYTHING HAS BEEN

9    COVERED.

10       I DID RECEIVE THE SUPPLEMENTAL BRIEFS THAT YOU SUBMITTED

11    THAT GAVE ME THE CITATIONS TO THE RECORD FOR THE FRAUD LOSS,

12    WHICH IS REALLY, I'D SAY, THE STICKING POINT RIGHT NOW BEFORE

13    WE GO FURTHER INTO THE SENTENCING DISCUSSION.

14       AND I REALLY APPRECIATE THE WORK THAT YOU DID ON THOSE,

15    THOSE MEMOS.

16       I HAVE SOME REMAINING QUESTIONS BEFORE I DETERMINE THE

17    FRAUD LOSS.

18       AND BEFORE I GO ANY FURTHER, MR. POLLAK, WOULD YOU LIKE TO

19    STATE YOUR APPEARANCE?  GOOD MORNING.

20          OFFICER POLLAK:  YES.  KYLE POLLAK FOR U.S.

21     PROBATION.

22          THE COURT:  ALL RIGHT.  GOOD MORNING.

23       I'VE BEEN THROUGH THE BRIEFING WHAT SEEMS LIKE FIVE

24    DIFFERENT TIMES, UPSIDE DOWN AND RIGHT SIDE UP, TO REALLY MAKE

25    SURE, MR. KALTSAS, THAT I UNDERSTAND THE COMPONENTS OF THE

1    FRAUD LOSS THAT YOU ARE SUBMITTING.

2         I CERTAINLY KNOW WHAT THE PRESENCE REPORT SETS FORTH,

3    BUT I WANT TO MAKE SURE THAT I'M REVIEWING THE SPECIFICS.

4         IT APPEARS TO ME THAT YOU ARE REQUESTING CALCULATION OF

5    FRAUD LOSS REGARDING NUMERIFY, DOCURATED, VISTARA, AND

6    PLATFORA.

7         IS THAT CORRECT?

8         MR. WALDINGER:  YOUR HONOR, I THINK ALSO THE

9    GOVERNMENT IS REQUESTING TO INCLUDE THE COMMISSIONS PAID BY

10   NETENRICH TO MR. KAIL IN THE AMOUNT OF APPROXIMATELY 275,000.

11        THE COURT:  OKAY, MR. WALDINGER.  SO I -- IT DID LOOK

12   THAT WAY FROM YOUR PAPERS, BUT -- SO LET ME PURSUE THAT ONE

13   FIRST.

14        MR. WALDINGER:  YEP.

15        THE COURT:  MS. JAYNE MAKES THE ARGUMENT THAT THE

16   COMMISSIONS WOULD BE THE -- COULD ONLY BE CONSIDERED IN THE

17   ALTERNATIVE CALCULATION OF GAIN FROM THE FRAUD, AND NOT FRAUD

18   LOSS, ABSENT ANY EVIDENCE IN THE TRIAL RECORD THAT NETFLIX PAID

19   OVER THE MARKET RATE FOR WHAT IT RECEIVED, AND NETENRICH WAS --

20   THAT WAS THE -- WAS THAT THE ENGINEERS?

21        MR. WALDINGER:  THAT'S CORRECT, YOUR HONOR.

22        THE COURT:  ALL RIGHT.  SO IT'S MY RECOLLECTION FROM

23   THE EVIDENCE THAT -- OR I THINK HERE IT MAY BE THE ABSENCE OF

24   EVIDENCE -- THAT THE GOVERNMENT DID NOT SUBMIT EVIDENCE THAT

25   THESE ENGINEERS, AT $120 AN HOUR, WERE PAID MORE THAN THE FAIR

1    MARKET RATE, AND THERE WAS NO EVIDENCE THAT THEY -- THAT THEIR

2    WORK WAS UNNECESSARY.

3        AND SO ALTHOUGH I COULD ALTERNATIVELY CONSIDER THE GAIN

4    FROM THE SCHEME AS THE -- FOR THE SENTENCING ENHANCEMENT, I

5    CAN'T CONSIDER THE COMMISSION IN THE FRAUD LOSS CATEGORY.

6        NOW, MS. JAYNE, I DON'T KNOW WHETHER I'VE DONE JUSTICE TO

7    YOUR ARGUMENT, BUT I BELIEVE THAT YOU MADE THAT DIVISION.

8            MS. JAYNE:  YOUR HONOR, EVERYTHING -- I AGREE WITH

9    EVERYTHING YOUR HONOR SAID, EXCEPT FOR THE WORD "ALTERNATIVE,"

10   AND I CAN ADDRESS THAT AT A LATER POINT.

11       BUT IT'S TRUE THAT THE, THAT THE COMMISSIONS COULD ONLY BE

12   CONSIDERED IF THE COURT COULD NOT MAKE A REASONABLE

13   DETERMINATION OF LOSS.

14       BUT IT -- BUT THOSE COMMISSIONS DO NOT GO INTO THE LOSS TO

15   NETFLIX CATEGORY.

16           THE COURT:  OKAY.

17           MS. JAYNE:  AND LATER, IF YOUR HONOR WILL PERMIT,

18   I'LL ADDRESS THAT.

19           THE COURT:  THANK YOU.

20       SO, MR. WALDINGER, THAT'S MY CONCERN ABOUT MY INABILITY TO

21   CONSIDER THE COMMISSIONS.  IT MAY BE ILL-GOTTEN GAINS FROM THE

22   GOVERNMENT'S PERSPECTIVE AND FROM THE JURY'S PERSPECTIVE, BUT

23   NOT A FRAUD LOSS FOR THE ENHANCEMENT.

24           MR. WALDINGER:  I UNDERSTAND WHAT YOUR HONOR IS

25   SAYING, AND I DID TRY TO SCOUR THE RECORD FOR THAT, AND I DON'T

1    HAVE A CITATION FOR YOU TO SHOW THAT THE NETENRICH PAYMENTS FOR

2    THOSE ENGINEERS WERE UNJUSTIFIED OR WEREN'T THE MARKET RATE.

3         I THINK THE WAY THE GUIDELINES WORK, AND WHAT I'M HEARING

4    YOUR HONOR SAY, IS THAT THERE MIGHT BE A LOSS, BUT THE NOTES TO

5    THE GUIDELINE, THE 2B1.1, SAY YOU GIVE CREDIT FOR THE FAIR

6    MARKET VALUE OF THOSE.

7              THE COURT:  YES.

8              MR. WALDINGER:  I DON'T HAVE ANYTHING MORE TO ADD.  I

9    THINK I KNOW HOW YOUR HONOR'S RULING'S GOING TO GO ON THAT.

10        I THINK IT DOESN'T CHANGE WITH RESPECT TO THE OTHER

11   FOUR --

12             THE COURT:  SO WE'LL GET TO THE OTHER FOUR, AND I DO

13   APPRECIATE THAT.

14        I'D LIKE TO GO THROUGH EACH OF THEM SEPARATELY, AND THEN

15   WE'LL TALK ABOUT THEM IN GENERAL.

16        SO JUST SO THAT I HAVE A CLEAR RECORD HERE, HAVING NO

17   EVIDENCE THAT THEY -- THAT NETFLIX RECEIVED LESS THAN VALUE AT

18   $120 AN HOUR FOR THESE ENGINEERS, I WILL NOT CALCULATE THE

19   COMMISSIONS PAID TO MR. KAIL FROM NETENRICH AS PART OF THE

20   FRAUD LOSS.

21        THEN LET ME MOVE ON TO NUMERIFY.

22        I WAS -- I ACTUALLY BECAME CONFUSED IN LOOKING AT THE

23   SUPPLEMENTAL RECORD.  IT APPEARS THAT NUMERIFY WAS A THREE-YEAR

24   CONTRACT.  YEAR ONE WAS PAID DURING MR. KAIL'S TENURE AT

25   NETFLIX.  YEAR TWO WAS PAID AFTER HE LEFT AND MS. SPRAGUE, WHO

1    TOOK OVER MR. KAIL'S RESPONSIBILITIES, OR MOST OF HIS

2    RESPONSIBILITIES, ACTUALLY APPROVED THE INVOICE FOR YEAR TWO.

3         SO MY FIRST QUESTION, MR. WALDINGER, IS, ARE YOU SEEKING

4    TO COUNT AS FRAUD LOSS THE YEAR ONE CONTRACT OR THE YEAR TWO

5    CONTRACT?

6         MR. WALDINGER:  MY UNDERSTANDING IS THAT IT'S THE

7    YEAR TWO CONTRACT BASED ON MY REVIEW.

8         THE COURT:  SO MS. SPRAGUE SIGNED THAT CONTRACT.

9    THAT'S CLEAR.  I THINK THAT'S UNDISPUTED THAT SHE SIGNED THE

10   INVOICE FOR IT.

11        AND LET ME JUST GET YOUR SUPPLEMENTAL HERE.

12        WELL, IT WOULD BE NICE IF I KEPT MY PAPERS IN THE RIGHT

13   ORDER.

14        AH, HERE WE GO.  OKAY.

15        MR. WALDINGER:  YOUR HONOR, IF I COULD JUST CORRECT

16   MYSELF?  I THINK -- I DON'T KNOW THAT WE'VE BEEN CLEAR IN OUR

17   PRIOR PAPERS, BUT IT SEEMS TO ME THAT IT'S, IT'S THE FIRST YEAR

18   OF THAT CONTRACT THAT WE WOULD BE CLAIMING.

19        THE COURT:  THAT WOULD MAKE MORE SENSE TO ME.

20        AND, MR. KALTSAS, IS THAT YOUR UNDERSTANDING AS WELL?

21        MR. KALTSAS:  IT IS, YOUR HONOR, AND THERE IS SOME

22   TESTIMONY TO THAT FROM MR. REWARI, R-E-W-A-R-I.

23        THE COURT:  YEAH.  THOSE MICROPHONES WITH THESE MASKS

24   REALLY NEED TO BE PULLED REALLY CLOSE.  THANK YOU.

25        MR. KALTSAS:  WILL DO, YOUR HONOR.

8

1        MR. WALDINGER:  I THINK THE POINT ABOUT THE SECOND

2    YEAR IS THAT THE GOVERNMENT HAS BEEN TRYING TO REBUT THE

3    ARGUMENT THAT, WELL, THIS MUST BE A VALID CONTRACT BECAUSE

4    ASHLEY SPRAGUE RE-UPPED IT FOR A SECOND YEAR.

5        THE COURT:  YEAH.

6        MR. WALDINGER:  THE POINT WE'VE MADE IS THAT IT WAS A

7    THREE-YEAR CONTRACT, SORT OF A RARE OCCURRENCE IN ANY EVENT FOR

8    A START-UP CONTRACT BEING THREE YEARS.

9        SO EVEN -- MS. SPRAGUE DIDN'T SIMPLY CANCEL THE CONTRACT

10   THAT MR. KAIL HAD ENTERED INTO DURING HIS TIME AT NETFLIX.

11       BUT WE'RE -- YOU KNOW, OF THE TWO YEARS OR SO THAT WERE

12   PAID, I THINK THE GOVERNMENT'S ONLY SEEKING TO FIND LOSS FOR

13   THAT FIRST YEAR FOR 85,000.

14       THE COURT:  OKAY.  WELL, FRANKLY, I THINK THAT'S A

15   REASONABLE APPROACH.  I'M NOT SURE I'LL BE GRANTING THAT AS

16   FRAUD LOSS.  BUT HAVING MS. SPRAGUE, WHO SIGNED THE SECOND

17   YEAR, I THINK THAT WOULD HAVE BEEN A TOUGHER ARGUMENT TO MAKE.

18       SO I APPRECIATE THE CONSIDERATION THE GOVERNMENT HAS GIVEN

19   THERE.

20       AND I SEE -- AND I CERTAINLY SEE THE OUTLINE THAT YOU GAVE

21   ME OF THE LACK OF UTILITY OF THE PRODUCT ITSELF FOR NETFLIX

22   PURPOSES.

23       AND I READ THE DEFENSE OPPOSITION AS LARGELY RELATED TO

24   MR. SHETH AND MS. SPRAGUE GIVING QUOTES AND POSITIVE COMMENTS

25   ABOUT NUMERIFY AFTER MR. KAIL LEFT.

1    I DON'T KNOW THAT THAT ACTUALLY GOES -- SAYS ANYTHING

2    ABOUT WHETHER NUMERIFY WAS A GOOD FIT FOR NETFLIX AS OPPOSED TO

3    JUST BEING A GOOD PRODUCT FOR SOMEBODY ELSE.

4    SO ANYTHING ELSE, MR. WALDINGER, YOU WANTED TO ADD ON

5    NUMERIFY?

6    MR. WALDINGER:  NO, YOUR HONOR.

7    THE COURT:  MS. JAYNE, ANY COMMENTS?

8    MS. JAYNE:  YES, YOUR HONOR.

9    I BELIEVE THE GOVERNMENT, UP UNTIL TODAY, HAS TAKEN THE

10   POSITION, AS YOU CAN SEE FROM THE CHART, IT REFERENCED -- IT

11   REFERENCED VARIOUS QUOTES BY ASHI SHETH, ET CETERA, AND I'M

12   TRYING TO FIND THE QUOTE IN THE GOVERNMENT'S SENTENCING MEMO.

13   MY UNDERSTANDING IS WE WERE TALKING ABOUT THE SIGNING OF THE

14   SECOND CONTRACT.

15   BUT NONETHELESS, LET'S SAY WE LOOK AT THE FIRST CONTRACT.

16   THERE IS -- THE GOVERNMENT HASN'T PRESENTED ANY EVIDENCE THAT

17   THAT FIRST CONTRACT WAS NOT USEFUL TO NETFLIX, USED BY NETFLIX.

18   THE DOCUMENTS THAT, INDEED, WE REFERENCED HAD TO DO WITH

19   RESPONDING TO THE SECOND CONTRACT PRIMARILY.

20   BUT I THINK THE -- SOME OF THE TESTIMONY EXHIBITED

21   NETFLIX'S VIEW OF NUMERIFY.

22   MS. SPRAGUE CERTAINLY HAD DISCRETION TO NOT RENEW THAT

23   CONTRACT, TO NOT GIVE A PUBLIC STATEMENT REGARDING THE

24   USEFULNESS OF NUMERIFY.

25   SO DID ASHI SHETH.  IF THEY CONSIDERED IT TO BE NOT A GOOD

1     FIT FOR NETFLIX, NOT A USEFUL PRODUCT, A BIG LOSS TO NETFLIX, I

2     THINK WE WOULDN'T HAVE SEEN THEM, EVEN AFTER MR. KAIL'S

3     DEPARTURE, SPEAKING SO FAVORABLY TOWARDS NUMERIFY.

4          ASHI SHETH DID NOT ONLY A WRITTEN TESTIMONIAL, HE DID A

5     VIDEO AS WELL.

6          AND THE REASON THAT MS. SPRAGUE PRESUMABLY WOULD HAVE

7     RENEWED THE CONTRACT IS BECAUSE NETFLIX WAS USING IT.  SHE

8     WASN'T -- WE DIDN'T HEAR TESTIMONY, "I RENEWED IT, BUT THEN WE

9     THREW IT IN THE GARBAGE."

10         SO THERE ISN'T REALLY ANY TESTIMONY WITH REGARD TO -- YOU

11    KNOW, LOOKING AT MR. REWARI, FROM HIS PERSPECTIVE, IT WAS IN

12    USE AND THEN IT WAS SOUGHT EVEN FURTHER.

13         THERE IS A COMPLETE LACK OF EVIDENCE THAT THAT FIRST YEAR

14    PRODUCT WAS NOT USED AND USEFUL TO NETFLIX.

15             THE COURT:  ALTHOUGH I DO CREDIT THE TESTIMONY OF THE

16    NETFLIX EMPLOYEES ABOUT THE CORE FIT OF THE NUMERIFY PRODUCT,

17    IN HAVING TO DETERMINE THIS TO BE A FRAUD LOSS BY A

18    PREPONDERANCE OF THE EVIDENCE, I ACTUALLY THINK THAT THE FACT

19    THAT MS. SPRAGUE RENEWED THE CONTRACT, OR PAID THE INVOICE FOR

20    YEAR TWO OF THE CONTRACT -- I DON'T THINK IT WAS A RENEWAL, I

21    THINK SHE WAS PAYING FOR YEAR TWO -- BUT THE FACT THAT SHE DID

22    THAT WITHOUT ANY EVIDENCE THAT SHE SOUGHT TO TERMINATE THE

23    CONTRACT OR TO HAVE ANY CONVERSATION WITH NUMERIFY TO MODIFY IT

24    ACTUALLY TIPS THE BALANCE AND I FIND THE GOVERNMENT HAS NOT

25    PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT THAT WAS A LOSS.

1       SO I WILL NOT ALLOW THE NUMERIFY $85,000 TO BE A -- TO BE

2   CONSIDERED A FRAUD LOSS.

3       LET'S GO ON THEN TO DOCURATED.  THE AMOUNT THERE IN

4   QUESTION IS $120,000.

5       THERE IS SOME CONFLICT IN THE EVIDENCE AS TO WHETHER

6   MR. SHETH'S DIRECT EXAMINATION WAS CORRECT, OR ACCURATE I

7   SHOULD SAY, ABOUT IT BEING USED IN LEGAL ONLY AND A BAD FIT.

8       MS. JAYNE POINTS OUT IN DETAIL HER CROSS-EXAMINATION OF

9   THE WITNESS, WHICH SHE ARGUES ESTABLISHED THAT HE WAS MISTAKEN

10  IN HIS BELIEF THAT IT WAS ONLY USED IN LEGAL AND NOT A GOOD

11  FIT.

12      SO, MR. WALDINGER, OTHER COMMENTS ON DOCURATED?

13          MR. WALDINGER:  I DON'T.  I KNOW THAT THERE WAS

14  TESTIMONY, INCLUDING BY MS. SPRAGUE, THAT THE PRODUCT WAS NOT

15  USEFUL TO NETFLIX.

16      MR. SHETH, I BELIEVE, TESTIFIED -- AND MAYBE THIS IS WHAT

17  IS CONTESTED BY MS. JAYNE -- THAT THE PRODUCT DIDN'T WORK WITH

18  APPLE DEVICES AT ALL, AND THAT ULTIMATELY MR. SHETH TESTIFIED

19  THAT THE PRODUCT DIDN'T ADD VALUE TO THE TEAM FOR IT.

20      THAT'S ALL I HAVE ON THAT, YOUR HONOR.

21          THE COURT:  OKAY.

22      MS. JAYNE?

23          MS. JAYNE:  YES, YOUR HONOR.

24      ONE OF THE REASONS THAT WE SUBMITTED THE ACTUAL CONTRACT

25  WITH DOCURATED IS TO SHOW THAT THERE'S NO MENTION OF -- IT WAS

1    NEVER INTENDED FOR LEGAL.  THERE'S NO TESTIMONY OTHER THAN

2    MR. SHETH THAT IT WAS FOR LEGAL.  THE CONTRACT ITSELF DOESN'T

3    REFERENCE A LEGAL DEPARTMENT.

4         IN FACT, THE FIRST CONTRACT WAS FOR FP&A, AND THE SECOND

5    ONE WAS FOR MARKETING.  THAT WAS VERY CLEAR.

6         AND I THINK EVENTUALLY MR. SHETH, I THINK, BACKED OFF HIS

7    TESTIMONY THAT, "OH, MR. KAIL CANCELLED IT.  I THINK IT WAS

8    POSSIBLE IT WAS STILL IN PLACE WHEN HE LEFT.  IT'S POSSIBLE

9    THAT I DIDN'T DISCUSS IT WITH HIM."

10        AND THE PRODUCT THAT HE CLAIMED SUPERSEDED IT IS UNRELATED

11   TO THE SERVICE THEY ACTUALLY PROVIDED.  IT DIDN'T HAVE TO DO

12   WITH MACS.

13        AND WE'RE LOOKING AT THIS TEN YEARS BACK, AND SO MR. SHETH

14   TEN YEARS LATER SAYING, "I THINK IT WAS THIS ONE AND IT WASN'T

15   USEFUL" IS NOT THE SAME AS LOOKING AT WHAT HAPPENED IN THAT

16   ACTUAL TIME PERIOD.

17        LET'S LOOK AT THE CONTRACT, WHAT IT WAS FOR, THE EMAILS

18   THAT CORROBORATE THAT AFTER FP&A USED THE PRODUCT, IT WAS THE

19   MARKETING DEPARTMENT THAT SOUGHT OUT A SUPPLEMENTAL CONTRACT,

20   AND THAT PARTICULAR CONTRACT WAS NOT SENT ONLY TO MR. KAIL, BUT

21   TO HIS COLLEAGUES AS WELL.  IT WAS REVIEWED BY THE MARKETING

22   TEAM.

23        SO WE HAVE TO MAKE SURE THAT THIS ISN'T, YOU KNOW, "WELL,

24   NOW THAT WE LOOK BACK TEN YEARS LATER, IT WASN'T THAT GREAT,"

25   BUT THAT WAS HAPPENING THOSE MANY YEARS AGO.  AND THE FACT WAS,

1    AS CORROBORATED BY THE EMAILS, THAT THE TEAMS WERE USING --

2    THIS IS SETTING ASIDE THE FACT THAT TEAMS TESTED OUT AND

3    REVIEWED ANY PRODUCT BEFORE MR. KAIL SIGNED A CONTRACT.

4        BUT IN THIS INSTANCE, THE EMAILS CORROBORATE THE

5    USEFULNESS AND THE DEMAND FOR AN ADDITIONAL DEPARTMENT.  THERE

6    WAS NO EVIDENCE THAT MR. KAIL PUSHED IT ON THE MARKETING TEAM,

7    THE MARKETING TEAM SOMEHOW DIDN'T NEED IT, BUT ACTUALLY THEY

8    REQUESTED IT, AND WE SEE THAT THROUGH THE CORRESPONDENCE AND

9    THE CONTRACT ITSELF.

10        THE COURT:  SO YOU PROVIDED TO ME THE TESTIMONY FROM

11    MR. GORBANSKY.  HE WAS AT DOCURATED, WASN'T HE?

12        MS. JAYNE:  HE WAS.  THAT WAS -- AND HE -- THAT WAS

13    PART OF MY SUBMISSION WAS THAT HE EXPLAINED WHAT THE CONTRACT

14    WAS FOR, IT WAS FOR FP&A, THAT THEY MET WITH JUSTIN SLATEN AND

15    SABRY TOZIN TO GO OVER THAT, AND THEN LATER THAT IT CAME ABOUT

16    THAT THE MARKETING DIVISION HAD SOUGHT OUT ADDITIONAL

17    MANAGEMENT OF THAT DIGITAL ASSET THROUGH DOCURATED.

18        THE COURT:  ALL RIGHT.

19        ANYTHING ELSE, MR. WALDINGER?

20        MR. WALDINGER:  I DON'T HAVE ANYTHING TO ADD,

21    YOUR HONOR.

22        THE COURT:  ALL RIGHT.  SO THE PREPONDERANCE OF THE

23    EVIDENCE, A CLOSE CALL CAN STILL FALL ON THE SIDE OF THE

24    GOVERNMENT.

25        I DO NOT CREDIT MR. GORBANSKY'S TESTIMONY TO THE SAME

1    EXTENT THAT I TESTIFY -- THAT I CREDIT THE WITNESSES FROM

2    NETFLIX.

3         I TAKE MS. JAYNE'S POINT THAT THIS IS A TEN YEAR LOOKBACK.

4    I THINK THAT CERTAINLY IS AN APPROPRIATE REMINDER THAT MEMORIES

5    FADE AND PEOPLE MISREMEMBER THINGS.

6         BUT IN LOOKING AT THE TESTIMONY FROM MS. SPRAGUE AND FROM

7    MR. SHETH, I AM SATISFIED THAT ALTHOUGH THE PRODUCT MAY NOT

8    HAVE BEEN DIRECTED TO THE LEGAL DEPARTMENT, IT WAS NOT EVER A

9    GOOD FIT FOR NETFLIX BECAUSE IT DID NOT WORK WITH THE -- WITH

10   THEIR MAC PRODUCTS; AND ULTIMATELY, RATHER THAN WORKING WITH

11   THIS PRODUCT, NETFLIX DESIGNED ITS OWN PRODUCT, WHICH LEADS ME

12   TO ALSO CREDIT MS. SPRAGUE'S TESTIMONY THAT IT WAS NEVER A GOOD

13   FIT BECAUSE IT DOESN'T APPEAR THAT THERE WAS EVER ANY NEED TO

14   GO OUTSIDE FOR THAT PRODUCT.

15        AND SO I WILL COUNT THE $120,000 AS A FRAUD LOSS, FINDING

16   THAT NETFLIX OBTAINED NO VALUE FROM THE DOCURATED CONTRACT.

17        ALL RIGHT.  THE MOST -- I MEAN THE ONE --

18        MS. JAYNE:  EXCUSE ME, YOUR HONOR.

19        JUST FOR CLARITY, YOUR HONOR'S FINDING THAT THERE WAS --

20   THERE'S NO OFFSET FOR WHATEVER SAVINGS NETFLIX REALIZED BY

21   USING A DOCUMENT CREATION SYSTEM FOR THEIR MARKETING?

22        THE COURT:  I HAVE NO EVIDENCE OF THE SAVINGS.  IT

23   WOULD BE SPECULATION ON MY PART.

24        AND ALTHOUGH I DON'T NEED -- IN SENTENCING, I DON'T NEED

25   TO APPLY THE RULES OF EVIDENCE TO THE SAME STANDARD, I STILL

1    HAVE NO BASIS ON WHICH TO CREDIT, AND I HAVE AMPLE TESTIMONY

2    FROM THE NETFLIX EMPLOYEES THAT THERE WAS NO VALUE.

3         AND WHAT I -- WHAT I ALSO CONSIDER FROM THE TESTIMONY OF

4    ALL OF THE WITNESSES, I MEAN REALLY ON BOTH SIDES, WAS THAT

5    NETFLIX INVESTED IN THESE START-UPS BY ASSIGNING ITS ENGINEERS

6    TO WORK WITH THE DEVELOPMENT OF A PRODUCT TO DETERMINE IF IT

7    WAS A GOOD FIT.

8         THAT'S WHY THERE WERE OFTEN THE UNPAID START-UP TIMES

9    WHERE THE NETFLIX INVESTMENT WAS ITS ENGINEER TIME AND THE

10   COMPANY WAS DONATING ITS TIME AS WELL TO SEE IF IT WAS A GOOD

11   FIT.

12        WHAT THIS EVIDENCE SHOWS IS THAT MANY OF THE -- OF THESE

13   PARTICULAR COMPANIES ENDED UP WITH PAID PILOT PROGRAMS, WHICH

14   WAS A SURPRISE TO SOME OF THE NETFLIX WITNESSES WHO TESTIFIED

15   BECAUSE IT WAS MORE COMMON THAT THE PILOT WAS UNPAID.

16        AND SO I CREDIT THAT TESTIMONY IN MAKING THE DETERMINATION

17   THAT THERE WAS NO VALUE RECEIVED.

18        ALL RIGHT.  MOVING ON TO VISTARA, THIS IS -- AS I SAY,

19   THIS IS THE DRIVER HERE.  THIS IS THE TOTAL CONTRACTS OF

20   $1,385,000.

21        AND I AM INCLINED TO CREDIT ALL OF THAT AMOUNT WITH NO

22   VALUE BECAUSE THE EVIDENCE SUBMITTED TO ME SHOWS THAT THERE WAS

23   NO ROLLOUT, IT WAS NEVER TRUSTED, AND NETFLIX HAD OTHER

24   TECHNOLOGY THAT WAS ALREADY DOING A BETTER JOB.

25        MR. WALDINGER, YOUR COMMENTS THAT YOU HAVE?

1        MR. WALDINGER:  I DON'T HAVE ANYTHING TO ADD,

2    YOUR HONOR.

3        IT -- I THINK THERE WAS TESTIMONY BY NETFLIX EMPLOYEES, IT

4    WAS UNCLEAR WHAT WAS BEING DELIVERED BY THE VISTARA PRODUCT,

5    AND I THINK THE COURT HAS ALREADY FOUND IN THE COURT'S RULE 29

6    RULING THAT THE EVIDENCE SUPPORTS THE CONCLUSION THAT NETFLIX

7    WAS ECONOMICALLY HARMED BY SIGNING THIS KIND OF CONTRACT, THE

8    VISTARA CONTRACT, FOR AN INFERIOR PRODUCT.

9        AND THAT'S -- THAT'S ALL I HAVE ON VISTARA RIGHT NOW,

10   YOUR HONOR.

11           THE COURT:  ALL RIGHT.

12       MS. JAYNE, COMMENTS?

13           MS. JAYNE:  YES, THANK YOU, YOUR HONOR.

14       JUST TO BACK UP JUST ONE MOMENT.

15       OF COURSE THE VERDICT DOESN'T ADDRESS THE ISSUE OF NET

16   LOSS.

17           THE COURT:  NO.

18           MS. JAYNE:  AND THIS HAS NEVER BEEN, NOR IS IT, A

19   CASE OF SHAM CONTRACTS.

20       FOR EXAMPLE, THERE ARE KICKBACK CASES THAT WE SEE WHERE

21   THERE ARE ENTIRELY FABRICATED CONTRACTS, FOR EXAMPLE, NO

22   SERVICES DELIVERED, NO WORK DONE WHATSOEVER, AND THE GOVERNMENT

23   HAS NEVER CLAIMED THAT TO BE THE CASE HERE WHERE THESE ARE JUST

24   FABRICATED, SHAM CONTRACTS.

25       AND I BELIEVE IT'S UNCONTESTED THAT THIS TECHNOLOGY WAS

1    IMPLEMENTED, INCLUDING VISTARA AND OTHERS, IMPLEMENTED IN SOME

2    WAY THAT WAS USED BY CERTAIN DIVISIONS OF NETFLIX, MAYBE SOME

3    TEAMS MORE THAN OTHERS, MAYBE CERTAIN FEATURES MORE THAN

4    OTHERS.  THE TECHNOLOGY WENT THROUGH VARIOUS IMPLEMENTATIONS,

5    DEVELOPMENT, ROLLOUTS.

6         BUT THE QUESTION REALLY IS WHETHER NETFLIX TRULY RECEIVED

7    NOTHING OF VALUE IN EXCHANGE FOR THE MONEY PAID.

8         AND AS THE FINAZZO CASE TELLS US, ECONOMIC HARM OCCURS

9    WHEN A PRICE A VICTIM PAYS IS UNJUSTIFIABLY INCREASED OR A

10   LOWER QUALITY PRODUCT IS RECEIVED.

11        WITH RESPECT TO VISTARA, IT IS UNDISPUTED THAT THEIR

12   SINGLE PANE OF GLASS WAS MONITORING OVER 2000 DEVICES.  I THINK

13   EVEN MS. SPRAGUE -- AND I INCLUDED THE CITATION -- KNEW THAT IT

14   WAS INSTALLED ON THOUSANDS OF DEVICES.  THAT WAS ON PAGE 1846

15   OF HER TESTIMONY.  IT WAS ON THOUSANDS OF MACHINES.

16        AND WHAT IS IT DOING ON THOSE MACHINES?  IT'S SENDING

17   REPORTS TO THE NETWORK'S OPERATIONS CENTER.  THE EXHIBITS THAT

18   I SUBMITTED REFERENCE THIS NOC REPEATEDLY.

19        SO IT'S -- DURING THE TESTIMONY, I TRIED TO LIKEN IT TO

20   MALWARE, YOU KNOW, SOMETHING RUNNING IN THE BACKGROUND.  BUT

21   THAT'S WHAT IT'S DOING.  IT'S RUNNING ON THE MACHINES.  I THINK

22   THERE WAS SOME TESTIMONY THAT OTHERWISE IT WOULD REQUIRE 2,000

23   HUMANS SITTING THERE MONITORING EVERY MACHINE.

24        THIS IS AN EFFICIENT WAY TO MONITOR WHAT IS HAPPENING, FIX

25   PATCHES, ALL IN ONE FELL SWOOP INSTEAD OF FIXING MACHINE BY

1  MACHINE.

2      NOW, THAT WAS -- THE FIRST VISTARA CONTRACT WAS THE SINGLE

3  PANE OF GLASS.

4      WE SEE THROUGH EMAILS IN 2014 ROB FRY -- I DON'T THINK

5  MR. KAIL IS EVEN ON THE EMAILS -- ROB FRY REQUESTS SUPPLEMENTAL

6  IMPLEMENTATION.  WE SEE HIM REQUESTING THAT, "WE WANT TO EXPAND

7  IT IN THIS PARTICULAR MANNER."

8      AND THAT'S WHEN WE GET THE ADDENDUM TO VISTARA.  THAT'S IN

9  2014, ONLY AFTER WE SEE IN THE EMAILS ROB FRY REQUEST IT FROM

10 VISTARA.

11     THEN MR. KAIL IS INFORMED BY MR. KUNAPARAJU, "THIS IS WHAT

12 WE'VE BEEN REQUESTED.  THIS IS WHAT WE'RE GOING TO BE DOING."

13     THE CONTENTS OF THAT ADDENDUM ARE INITIALLY IN AN EMAIL,

14 AND THEN THE ADDENDUM GETS SIGNED BY MR. KAIL AFTER THAT'S

15 REVIEWED -- OBVIOUSLY HE HAS TO HAVE SOME OVERSIGHT INTO WHAT'S

16 BEING REQUESTED -- AND THEN THERE'S A SUPPLEMENTAL CONTRACT FOR

17 ADDITIONAL FEATURES.

18     THE COURT:  WELL, BUT I'M LOOKING AT THE EXHIBITS YOU

19 GAVE ME AND I'M LOOKING AT MR. KAIL'S EMAIL TO MR. KUNAPARAJU

20 SAYING, "I DON'T THINK THIS IS GOING TO BE POSSIBLE AND THE

21 BIGGER CONCERN IS THE TEAM'S OVERALL DISSATISFACTION WITH

22 VISTARA.  SOMEONE ON YOUR TEAM SHOULD MONITOR THAT CLOSELY."

23     THAT'S MAY 9, 2013.

24     MS. JAYNE:  AND THAT'S RELATING NOT TO THIS

25 PARTICULAR IMPLEMENTATION BECAUSE THAT WAS A YEAR LATER.

1    MR. KAIL WAS CONTINUALLY, I THINK WE'VE SEEN THROUGH ALL

2    THE VARIOUS EMAILS AND ALL THE VENDORS, CONTINUALLY CRITICIZING

3    THE VENDORS, PUSHING THEM HARDER, PUSHING THEM HARDER.  I THINK

4    EVERYBODY SAID THIS WAS ONE OF THE TOUGHEST CUSTOMERS.  "IT'S

5    NOT GOOD ENOUGH.  DO BETTER.  PEOPLE ARE COMPLAINING," AND AS

6    THEY SHOULD.  THIS IS A START-UP.

7         THE COURT:  I'M JUST LOOKING FOR THE EMAIL FROM

8    MR. FRY ASKING FOR MORE.  I'M JUST NOT PUTTING MY FINGERS ON

9    IT.

10        MS. JAYNE:  YES.  LET ME SEE WHICH PAGE OF MY

11   ATTACHMENT THAT WOULD BE.  ONE MOMENT, PLEASE.  I'M LOOKING AT

12   MY VISTARA.

13        (PAUSE IN PROCEEDINGS.)

14        MS. JAYNE:  I HAVE THE EMAIL WHERE -- SO ON PAGE --

15   I'M LOOKING FOR WHERE I HAVE THE PAGE OF THE -- EXHIBIT 221-1

16   IS WHEN IT'S THEN BEING FORWARDED TO MR. KAIL.

17        BUT MR. FRY EMAILING IS AT -- FOR EXAMPLE, HERE IT IS ON

18   PAGE 29 OF 39 OF DOCKET 287-7.

19        THE COURT:  THANK YOU.  YES, I'M THERE.

20        MS. JAYNE:  AND THEN ALSO THE NEXT PAGE, ROB FRY

21   SAYS, "REACHING BACK OUT."

22        AND THEN ON PAGE 32 OF 39, "CHECKING BACK IN.  WOULD LOVE

23   TO GET THAT GOING SO I CAN BEGIN RAMPING UP.  VISTARA IS DOING

24   GREAT.  ONE OF MY DIRECTORS WOULD LIKE TO HAVE YOU ONSITE TO

25   SEE IF OUR GOALS FOR ASSET MANAGEMENT" --

1           THE COURT:  OKAY.  HOLD ON.  HOLD ON.

2           MS. JAYNE:  SORRY.

3           THE COURT:  I CAN'T -- I'M JUST --

4           MS. JAYNE:  SORRY.  IT'S ESSENTIALLY FROM PAGE 20 --

5           THE COURT:  I DON'T SEE MR. FRY BEING THE INSTIGATOR

6  OF EXPANDING THE VISTARA PRODUCT.

7           MS. JAYNE:  SO ON PAGE 32, ROB FRY REACHES OUT TO

8  VISTARA, CHRIS JOSEPH, SAYING THAT HE'D LOVE TO GET THAT GOING.

9           THE COURT:  WELL, THAT DOESN'T TELL ME THAT HE --

10  WELL, HE'S STILL GOT MR. KAIL AS HIS BOSS AT THIS TIME.

11          MS. JAYNE:  RIGHT.  BUT HE ALSO TESTIFIED MR. KAIL

12  NEVER PRESSURED HIM TO DO ANYTHING, AND THAT EVERY PRODUCT

13  MR. KAIL INTRODUCED MADE SENSE.

14          THE COURT:  OKAY.

15          MS. JAYNE:  AND THEN HE COMES BACK ON THE NEXT PAGE

16  AND SAYS, "REACHING BACK OUT TO YOU."  THIS IS AGAIN TO CHRIS.

17  AGAIN, THIS IS -- MR. KAIL IS NOT EVEN ON THESE EMAILS.

18  ROB FRY REQUESTS AN ADDITIONAL MEETING.

19        AND THEN ON PAGE 29, "LOOKING FOR ACKNOWLEDGMENT ABOUT

20  ASSET MANAGEMENT AND YOUR INTEREST IN PURSUING THIS FURTHER."

21        THIS IS -- AGAIN, THIS IS THE EXPANSION, THE ASSET

22  MANAGEMENT.

23        AND THEN THE RESPONSE FROM MAHESH IS, "YES, WE CAN

24  DEMONSTRATE THAT TO YOU.  WE CAN MEET."

25        AND THEN SHORTLY -- I THINK HE SAID THERE WERE MANY

1    MEETINGS, AND MR. KAIL WAS NOT EVEN PRESENT FOR ALL OF THEM.

2        ON PAGE 28 -- ON PAGE 38 OF 39 OF MY EXHIBITS, THERE IS

3    ALSO -- THIS IS ONE OF THE EXHIBITS AT TRIAL THAT DISCUSSED

4    WHAT ROB TOLD THEM ABOUT EXPANDING AND THE NETFLIX OPERATION

5    CENTER.

6        LET ME JUST TURN TO HIS TESTIMONY.

7            THE COURT:  OKAY.

8            MS. JAYNE:  MY POINT BEING, IN SOME INSTANCES --

9    FIRST OF ALL, VISTARA WAS USED, WAS ON THESE DEVICES.

10       THEREAFTER, TO THE EXTENT IT WAS EXPANDED, IT WASN'T AT

11    THE BEHEST OF MR. KAIL.

12           THE COURT:  THANK YOU.

13           MS. JAYNE:  I'M JUST LOOKING TO SEE IF THERE'S ANY

14    OTHER CITATION FROM THE TRANSCRIPT.

15       AND ULTIMATELY, ON PAGE 12 -- SORRY.  THERE'S SO MANY

16    DIFFERENT PAGE NUMBERS, I'M GETTING CONFUSED.

17           THE COURT:  I KNOW.  ME, TOO.

18           MS. JAYNE:  MY ATTACHMENT, 287-8, PAGE 12 OF 35 AT

19    THE TOP IS WHAT IT SAYS.

20           THE COURT:  YES, I'M ON THAT ONE.

21           MS. JAYNE:  MR. FRY IS ASKED, "DID YOU RECOMMEND IN

22    FAVOR OF GOING WITH VISTARA?

23    "I DID, YES."

24       AND I THINK HIS TESTIMONY IS HE WOULD HAVE CONTINUED TO

25    WORK WITH THEM.

1       BUT, OF COURSE, A LOT OF THESE CONTRACTS, ONCE EVERYTHING

2   WAS UNCOVERED, THEY WERE CANCELLED, NOT NECESSARILY BECAUSE OF

3   THEIR LACK OF USEFULNESS, BUT BECAUSE OF THE -- SOME OF THE

4   ISSUES THAT WERE UNCOVERED.

5       AND MR. FRY TESTIFIED THAT IT WAS FOR YEARS THAT HE WORKED

6   WITH VISTARA AND THAT HE HELD NO OPINION AND DID NOT KNOW

7   WHETHER THEY WERE PAID OR NOT, BUT LOGIC DICTATES THE COMPANY

8   IS NOT GOING TO BE WORKING FOR SEVERAL YEARS, WHICH VISTARA WAS

9   IN PLACE FROM 2012 TO 2014.

10      AND WE CONTINUE WITH MR. FRY'S TESTIMONY, WHO SAYS HE

11  NEVER FELT PRESSURED, THAT ALL MR. KAIL SAID WAS, TAKE A LOOK

12  AT IT, AND THAT'S IT.

13      AND HE -- AND HE SAID THAT "ONE OF THE THINGS THAT THEY

14  DID REALLY WELL WAS DISCOVERY/INVENTORY.  THAT WAS A POSITIVE

15  THING FOR THEM.  THAT'S ONE OF THE REASONS I WAS TAKING SO MUCH

16  ATTENTION.  THIS WAS A CHALLENGE FOR US, AND IT WAS SOMETHING

17  THEY DID WELL."

18         THE COURT:  SO --

19         MS. JAYNE:  AND SO WE LOOK AT --

20         THE COURT:  GO AHEAD.  I BEG YOUR PARDON.

21         MS. JAYNE:  WE LOOK AT, IN THIS TWO AND A HALF YEAR

22  TIME PERIOD, HAS THE GOVERNMENT MET ITS BURDEN OF SHOWING THAT

23  NETFLIX HAD ABSOLUTELY NO BENEFIT?

24      AND IT'S -- TO BE CLEAR, THE COURT -- THE COURT SHOULDN'T

25  CONFUSE THE GOVERNMENT'S FAILURE TO MEET ITS BURDEN WITH A LACK

1    OF INFORMATION IN TERMS OF A REASONABLE ESTIMATE OF HOW MUCH

2    THESE BENEFITS WERE.

3              THE COURT:  OKAY.  SO IN LOOKING AT -- AND I DO THINK

4    THAT PAGE 1141 FROM THE TRANSCRIPT, WHICH IS PAGE 12 OF 35 FROM

5    YOUR SUBMISSION, IS AN IMPORTANT PAGE.  IN FACT, THE GOVERNMENT

6    CITES THIS AS WELL.

7         AND I'M READING THE WHOLE PAGE BECAUSE IT SEEMS LIKE

8    THAT'S A GOOD IDEA RATHER THAN THE SNIPPETS THAT YOU'VE EACH

9    PROVIDED TO ME.

10        WHAT I SEE HERE FROM MR. FRY IS "THERE WERE SEVERAL TEAMS

11   THAT WERE TESTING IT" AT LINE 19.  "WE DID A LOT OF TESTING OF

12   THE DIFFERENT SYSTEMS."

13        AND THEN SKIPPING DOWN TO LINE -- I'LL JUST READ THE WHOLE

14   THING BECAUSE I DON'T WANT TO SKIP.  "BECAUSE THIS IS A VERY

15   BROAD KIND OF ENCOMPASSING PIECE OF SOFTWARE, IT AFFECTED A LOT

16   OF DIFFERENT INTERNAL TEAMS.

17        DID WE DO A BROAD ROLLOUT?  NO, ONLY BECAUSE WE NEVER

18   TRUSTED IT" -- AND I'LL REPEAT THAT -- "WE NEVER TRUSTED IT OR

19   GOT IT TO THE POINT WE TRUSTED IT ENOUGH TO REPLACE THE

20   EXISTING TOOLS."

21        AND BASED ON THAT TESTIMONY FROM MR. FRY ALONE, THAT THIS

22   WAS ONLY TESTING, THAT IT WAS BEING USED ON TOP OF EXISTING

23   TOOLS, THAT NETFLIX RECEIVED ALL THE VALUE FROM ITS EXISTING

24   TOOLS AND THIS JUST DIDN'T PAN OUT, THIS WAS A THREE YEAR PILOT

25   THAT WAS PAID HANDSOMELY AT NO VALUE TO NETFLIX, AND SO I FIND

1  THAT THE GOVERNMENT HAS PROVED BY A PREPONDERANCE OF THE

2  EVIDENCE THAT THERE IS A FRAUD LOSS FOR THE VISTARA CONTRACT,

3  THAT IT IS THE FULL AMOUNT REQUESTED, AND I CREDIT THIS

4  PARTICULAR PAGE OF THE TRANSCRIPT, PLUS THE OTHER PAGES THAT

5  THE GOVERNMENT HAS PROVIDED TO ME.

6      ALL RIGHT.  AND THEN THE LAST ONE THAT WE WOULD BE LOOKING

7  AT IS PLATFORA.  THAT ONE IS MUCH SIMPLER.  THIS WAS A CONTRACT

8  THAT MR. LIU -- L-I-U -- CANCELLED.  AND THEN, THROUGH -- THEN

9  MR. KAIL ARRANGED FOR THE SETTLEMENT OF SOMETHING, IT'S NOT

10  CLEAR WHAT IT WAS A SETTLEMENT OF, A PAYMENT OF $155,000.

11      IT -- AND SO, MR. WALDINGER, ANY COMMENTS YOU WANT TO MAKE

12  THERE?

13          MR. WALDINGER:  NO.  I THINK THIS ONE IS ONE OF THE

14  ONES WE TALKED ABOUT THAT IS THE MOST CLEAR CUT, YOUR HONOR.

15  THIS SEEMS TO BE A WAY TO HELP OUT PLATFORA BY MAKING THAT

16  FINAL $155,000 PAYMENT.

17      I KNOW THAT THERE WAS EVIDENCE THAT PLATFORA NEEDED IT IN

18  ORDER TO NOT -- IN ORDER TO NOT HAVE TO DEBOOK REVENUE, AND

19  THAT THERE WERE CONVERSATIONS AND CORRESPONDENCE BETWEEN

20  MR. KAIL AND EXECUTIVES AT PLATFORA ABOUT THIS PROBLEM WITH THE

21  CONTRACT BEING ENDED AFTER JUST A FEW MONTHS.

22      AND SO I THINK THERE IS AMPLE EVIDENCE THAT THAT $155,000

23  PAYMENT WAS NOT JUSTIFIED AND IS NOT -- HAD NO BENEFIT AT ALL

24  TO NETFLIX.

25          THE COURT:  ALL RIGHT.

1       AND, MR. WALDINGER, I HAD NOT ASKED FOR A SUPPLEMENTAL ON

2   PLATFORA.  THAT'S WHY IT'S NOT IN YOUR FINAL BRIEF TO ME.

3       AND YOU -- MR. SAMPSON HAD DIRECTED ME TO THE MOTION FOR

4   ACQUITTAL PAPERS, AND I JUST WANT TO SAY, I AM -- I DID PULL

5   DOCUMENT 251, AND AT PAGE 11 OF 30 OF THE GOVERNMENT'S BRIEF,

6   THE FIRST BULLET HAS TO DO WITH PLATFORA.  THAT'S WHAT I WAS

7   RELYING ON.

8       AND I DON'T KNOW THAT THERE'S -- THAT THERE WERE OTHER

9   CITATIONS TO THE RECORD.

10      MR. WALDINGER:  I DO THINK THAT THERE ARE SOME,

11  YOUR HONOR, WITH RESPECT TO PLATFORA.  THE FACT THAT IT WASN'T

12  ACTUALLY WORKING, THERE WAS TESTIMONY BY TONY RALPH AROUND

13  PAGE 250 --

14      THE COURT:  UM-HUM.

15      MR. WALDINGER:  -- AND AT 269.  IN FACT, MR. RALPH

16  TESTIFIED THAT "PLATFORA WAS USING OUR RESOURCES TO HELP EVOLVE

17  THAT SOLUTION," UNQUOTE, MEANING THAT DURING THE COURSE OF THAT

18  RELATIONSHIP, PLATFORA WAS GETTING MORE FROM THE PRODUCT THAN

19  NETFLIX WAS.

20      MR. RALPH ALSO TESTIFIED, QUOTE, "I DON'T BELIEVE WE EVER

21  GOT VALUE FROM IT," UNQUOTE.  I THINK THAT WAS ON ABOUT

22  PAGE 276.

23      AND THERE WERE A NUMBER OF DOCUMENTS THAT SUGGESTED WHY

24  THIS $155,000 CAME ABOUT.  EXHIBIT 331, EXHIBIT 333, DEFENSE

25  EXHIBIT 1111 AND 1110, AND I THINK 1110 WAS THE EXHIBIT IN

1    WHICH THE PLATFORA EXECUTIVES WERE SPEAKING ABOUT THE FACT THAT

2    THEY HAD BOOKED $225,000 AS ANNUAL RECURRING REVENUE, OR ARR,

3    BUT HAD ONLY GOTTEN 70,000 TO DATE, AND SO THAT THEY NEEDED

4    THAT $155,000 SO THAT THEY DID NOT HAVE TO DEBOOK THAT REVENUE.

5         BASED ON ALL OF THE EVIDENCE, I THINK THAT THE COURT CAN

6    PROPERLY CONCLUDE THAT NETFLIX MADE AN UNNECESSARY PAYMENT TO

7    PLATFORA, THAT PAYMENT WAS MEANT TO KEEP PLATFORA HAPPY AND

8    PERHAPS -- AND NOT HAVE PLATFORA MAKE A BIG STINK WITH NETFLIX,

9    DURING WHICH NETFLIX MAY HAVE FOUND OUT ABOUT MR. KAIL'S

10   RELATIONSHIP WITH PLATFORA.

11        THE COURT:  MS. JAYNE?

12        MS. JAYNE:  YES, THANK YOU, YOUR HONOR.

13        FIRST, HOW DID THE 155,000 NUMBER COME ABOUT?  WE HAVE THE

14   INTERNAL CORRESPONDENCE WITH THE PLATFORA EXECUTIVES IN TERMS

15   OF HOW THEY REACHED THAT NUMBER, NOT ONLY THEIR TESTIMONY, BUT

16   THEIR EMAILS SHOWED THAT THEY DEBATED WHETHER THEY SHOULD

17   PURSUE THE REMAINDER OF THE CONTRACT AND DECIDED THAT RATHER

18   THAN KEEP THEM TO -- EVEN THOUGH THEY BELIEVED THEY WERE

19   LEGALLY ENTITLED TO THEM, THAT THIS WOULD BE A COMPROMISE

20   INSTEAD OF PLAYING OUT THE REST OF THE TIME OF THE CONTRACT,

21   BUT THE 155 FOR THE BALANCE OF THAT YEAR WOULD BE MORE JUST.

22        AND THAT'S HOW THAT FIGURE CAME ABOUT INTERNALLY WITHIN

23   PLATFORA.

24        THE COURT:  YES.  WELL, AND I DON'T -- I HAVE NO

25    REASON TO DOUBT THAT FROM THEIR VIEWPOINT, THAT WAS A

1       REASONABLE COMPROMISE.

2               THE QUESTION IS, GIVEN THAT MR. LIU CANCELLED THE

3       CONTRACT, DID NETFLIX RECEIVE ANY VALUE FROM PAYING A

4       SETTLEMENT WHERE THE EVIDENCE LOOKED AS THOUGH IT COULD SIMPLY

5       WALK AWAY FROM A CONTRACT THAT DIDN'T WORK?

6               MS. JAYNE:  WELL, THE QUESTION IS NOT ONLY DID

7       NETFLIX RECEIVE BENEFIT FROM THAT 155, BUT DID NETFLIX RECEIVE

8       BENEFIT IN TOTALITY?  WHAT ARE THE COST SAVING FROM USING

9       PLATFORA?

10              THE COURT:  NO, NO.  THAT'S AT ISSUE AT ALL.  THIS IS

11      JUST PAYMENT OF THE SETTLEMENT.

12          I'M NOT -- I ACTUALLY AM NOT ASKED TO LOOK AT WHETHER IT

13      RECEIVED VALUE FOR THE AMOUNTS OF THE CONTRACT THAT IT

14      PREVIOUSLY PAID.  THIS IS JUST THE AMOUNT IT PAID FOR

15      TERMINATING THE CONTRACT AND WHETHER IT WAS TO FURTHER CONCEAL

16      THE FRAUD, TO FURTHER ENHANCE MR. KAIL'S OPPORTUNITY TO HAVE

17      HIS ADVISOR RELATIONSHIP WITH PLATFORA.

18          SO I DON'T SEE IT AS -- WHAT I SEE IS A FAILED COMPANY.  I

19      MEAN, WE SPENT HOW MANY DAYS OF TRIAL ON THE PLATFORA?  AND

20      CLEARLY THERE WAS TESTIMONY THAT I BELIEVE THE JURY CREDITED

21      THAT EVEN PLATFORA THOUGHT THAT THIS WAS PAY-TO-PLAY.

22          SO THAT'S NOT TESTIMONY ONE FORGETS WHEN IT COMES FROM THE

23      HIGH LEVEL EMPLOYEES OF A COMPANY.

24              MS. JAYNE:  TO THE COURT'S FIRST POINT, WHETHER THERE

25      WAS -- WHETHER THERE WAS SOMETHING SURREPTITIOUS ABOUT THAT

1    155,000, I THINK MR. WALDINGER SAID TO KEEP PLATFORA HAPPY, ET

2    CETERA.

3            THE COURT:  RIGHT.

4            MS. JAYNE:  THE REASON I RAISE THOSE INTERNAL EMAILS

5    IS THERE ISN'T ANY TESTIMONY THAT MR. KAIL WAS IN ON THIS

6    155,000, THAT IT WAS INTENDED TO KEEP SOMETHING SECRET, THAT IT

7    WAS SOMETHING TO HELP HIDE THE ADVISOR AGREEMENT.

8            THERE SIMPLY WAS NO CORRELATION IN THE TESTIMONY OR ANY OF

9    THE EXHIBITS THAT THAT 155,000 WAS SOME KIND OF A HUSH PAYMENT.

10           AND, IN FACT, IT WAS.  AGAIN, PLATFORA'S PERSPECTIVE ON

11   THIS DOES MATTER BECAUSE IF THEY'RE AGREEING THAT WE'RE, "OH,

12   LET'S DO THIS TO KEEP EVERYTHING ON THE DOWN LOW," THEY'VE COME

13   UP WITH THIS FIGURE.

14           MR. KAIL, THEY'RE PRESENTING IT TO HIM -- ALL WE HAVE IS

15   THAT IT WAS PRESENTED TO MR. KAIL, MR. KAIL REVIEWED IT AS,

16   "WELL, I SUPPOSE IT'S BETTER THAN LETTING THIS DRAG OUT," AND

17   AGREED TO THAT FIGURE.

18           AND THEN THERE IS, YOU KNOW, SOME BACKGROUND ON WHEN THE

19   CONTRACT WAS CANCELLED, WHAT YINGKUAN LIU WAS SAYING TO

20   PLATFORA, BECAUSE SOME OF THE EXHIBITS I SUBMITTED SHOW THAT HE

21   WAS STILL CONTINUING TO ENGAGE WITH THEM IN TERMS OF THEIR 3.0

22   ROLLOUT WELL INTO -- PAST THE DATE THAT THEY HAD ACTUALLY

23   DELIVERED IT.

24           THE COURT:  BUT, MS. JAYNE, IT'S MY RECOLLECTION FROM

25   THE TESTIMONY THAT MR. LIU, WHEN HE TERMINATED THE CONTRACT,

1   BELIEVED THAT THE CONTRACT PROVIDED THE OPPORTUNITY TO

2   TERMINATE IT AT THAT TIME AND TO WALK AWAY.

3        THAT MADE THE PAYMENT A GIFT TO PLATFORA.

4        MS. JAYNE:  HE DID NOT GIVE ANY TESTIMONY ABOUT WHAT

5   WOULD HAPPEN IN TERMS OF MONEY.

6        THE COURT:  NO, BUT --

7        MS. JAYNE:  WHAT HE SAID WAS --

8        THE COURT:  THE TESTIMONY WAS -- THE BASIS ON WHICH

9   HE ISSUED THE TERMINATION WAS THAT HE BELIEVED THAT HE WAS --

10  THAT NETFLIX HAD THE RIGHT TO DO SO.

11       HE DIDN'T BELIEVE -- I DON'T THINK HE -- MY RECOLLECTION

12  IS THAT HE, HE TESTIFIED THAT HE UNDERSTOOD AT THE TIME THAT

13  NETFLIX WAS ENTITLED TO TERMINATE THE CONTRACT ON THE BASIS

14  THAT IT TERMINATED IT AND AT THE TIME IT TERMINATED IT.

15       MR. KALTSAS OR MR. WALDINGER, AM I MISREMEMBERING?

16       MR. KALTSAS:  YOUR HONOR, THAT'S MY RECOLLECTION OF

17  THE TRIAL TESTIMONY.  THERE WAS -- NETFLIX COULD HAVE WALKED

18  AWAY AT ANY TIME, BUT CHOSE TO PAY THE $155,000.

19       MS. JAYNE:  YOUR HONOR, HE SIMPLY DIDN'T OFFER ANY

20  TESTIMONY ABOUT WHETHER THEY COULD OR COULDN'T OR WHAT

21  HAPPENED.

22       HE SIMPLY SAID, "YES, I WAS TERMINATING THE CONTRACT."

23       BUT HE OFFERED ABSOLUTELY NO OPINION ON THE VALIDITY OF

24  THAT, WHETHER HE HAD THE RIGHT TO DO THAT.  HE SIMPLY HAD

25  ACKNOWLEDGED THAT -- FIRST OF ALL, TERMINATING A CONTRACT, THE

```
1    FACT THAT HE RECOGNIZED THAT IT'S TERMINATION OF, QUOTE, A

2    CONTRACT, MEANS THAT THERE COULD BE CONSEQUENCES AS A RESULT OF

3    THAT TERMINATION.

4         BUT HE OFFERED NO OPINION ON RIGHT, WRONG, WHAT MIGHT

5    HAPPEN.  HE SIMPLY -- AND HE WAS NEVER ASKED, "WELL, DID YOU

6    THINK THAT YOU HAD THE RIGHT TO DO THAT?  DID YOU THINK THAT

7    YOU WOULD AVOID A SUBSEQUENT PAYMENT?"

8         NEVER ASKED THAT, NEVER GAVE THAT OPINION.  I RECALL THAT

9    TESTIMONY, AND I WOULD URGE THE GOVERNMENT TO POINT TO

10   OTHERWISE IN THE TRANSCRIPT, BECAUSE IT'S NOT THERE.

11        HE DID SAY HE UNDERSTOOD HE WAS TERMINATING A, QUOTE,

12   CONTRACT.  THAT WAS CLEAR.  I THINK I ASKED HIM THAT.

13        AND BY THAT, I WAS IMPLICATING THAT WHEN YOU TERMINATE A

14   CONTRACT, THERE COULD BE CONSEQUENCES.  IT'S NOT A CONCLUSION

15   OF A CONTRACT.  IT'S NOT A TERMINATION OF A TRIAL PERIOD.  IT'S

16   THE TERMINATION OF WHAT IS IN A CONTRACT, PERIOD.  AND AS WE

17   ALL KNOW, TERMINATION OF CONTRACTS CAN OFTEN LEAD TO

18   CONSEQUENCES.

19            THE COURT:  WELL, TERMINATION DOESN'T MEAN ANYTHING.

20   YOU CAN TERMINATE A CONTRACT BECAUSE THERE'S A TERMINATION

21   CLAUSE, AND THEN YOU'RE NOT -- YOU'RE NOT BREAKING THE

22   CONTRACT.

23        SO I -- I DON'T HAVE THE DOCUMENTS THAT WERE SUBMITTED

24   WITH THE, WITH ALL THOSE OTHER BRIEFS HERE.

25            LET ME SEE.  MAYBE I DO.  LET'S SEE.  I HAVE THE
```

1    GOVERNMENT'S ORIGINAL SENTENCING EXHIBITS, BUT I DON'T BELIEVE

2    ANY OF THAT IS HERE.

3        SO, MR. WALDINGER, I NEED A LITTLE HELP HERE.  I DON'T

4    WANT TO MAKE A -- I DON'T WANT TO MISREMEMBER ON THIS.  WAS

5    THERE -- DO WE HAVE A COPY OF THE CONTRACT ITSELF THAT HAD A

6    TERMINATION CLAUSE OR A LETTER OR AN INTERNAL EMAIL FROM

7    MR. LIU THAT WOULD EXPLAIN HIS THINKING AT THE TIME WHEN HE

8    CANCELLED IT?  AND I'M PUTTING YOU ON THE SPOT BECAUSE IT WAS A

9    LONG TRIAL.

10        MR. WALDINGER:  I THINK WE DO HAVE THE PLATFORA

11    LICENSE AGREEMENT.  THAT IS, I BELIEVE, EXHIBIT 326.

12        THE COURT:  EXHIBIT 816?

13        MR. WALDINGER:  3 -- EXCUSE ME.  EXHIBIT 326.

14        THE COURT:  326.

15        MR. WALDINGER:  AND THERE WAS -- 327 WAS A PLATFORA

16    ORDER FORM.

17        THE COURT:  326.  I ACTUALLY HAVE 326 FROM YOUR

18    SENTENCING BRIEF.

19        THERE IS A TERMINATION CLAUSE THAT PROVIDES THAT THE

20    CONTRACT WAS NON-TERMINABLE DURING ITS FIRST YEAR, AND THAT IT

21    WOULD NOT AUTOMATICALLY RENEW FOR ADDITIONAL ONE YEAR TERMS

22    UNLESS EITHER PARTY PROVIDES THE OTHER WITH NOTICE OF ITS

23    INTENT TO RENEW AT LEAST 90 DAYS PRIOR TO THE END OF THE

24    THEN-CURRENT TERM.

25        MS. JAYNE:  YOUR HONOR, THE --

1           THE COURT:  AND OF COURSE THERE ARE THE BREACH TERMS.

2           MS. JAYNE:  AND ALSO, JUST TO DIRECT THE COURT TO

3     MR. LIU'S TESTIMONY AT DOCUMENT 287-6 --

4           THE COURT:  I'M SORRY, WHICH DOCUMENT?

5           MS. JAYNE:  THE TRANSCRIPT OF MR. LIU, IT WAS

6     ATTACHED TO MY -- THIS MOST RECENT FILING, DOCUMENT 287-6.

7           PART OF THE ISSUE WITH PLATFORA IS THAT THEY HAD TO

8     DELIVER 3.0.  THE CONTRACT ALLOWED FOR TERMINATION BEFORE 3.0

9     WAS DELIVERED.

10          MR. LIU ACKNOWLEDGED THAT EVEN THOUGH THEY GAVE US 3.0, IT

11    STILL DIDN'T WORK FOR THEM OR THEY DIDN'T FIND IT A GOOD FIT.

12    THAT'S WHY THE CONTRACT WAS TERMINATED.

13          BUT 3.0 WAS DELIVERED, AND THAT WAS THE TERMS OF THE

14    CONTRACT.  WE DELIVER -- YOU CAN TERMINATE BEFORE WE DELIVER

15    THAT, BUT ONCE WE'VE BUILT IT, WORKED ON IT, AND DELIVERED

16    IT -- AND OF COURSE THERE'S A LOT OF BACK AND FORTH AS IT'S

17    BEING DEVELOPED.

18          BUT IT WAS TERMINATED, THE CONTRACT WAS TERMINATED AFTER

19    ITS DELIVERY.  MR. LIU ACKNOWLEDGED THAT, AFTER ITS DELIVERY.

20          THAT'S WHY PLATFORA, AS YOU SEE FROM THE CORRESPONDENCE,

21    SINCE THAT WAS ACTUALLY DELIVERED, THAT THEY DECIDED NOT TO USE

22    IT, THEY ULTIMATELY DIDN'T LIKE IT, WHATEVER, THAT'S NOT IN THE

23    TERMS OF THE CONTRACT.  YOU CAN CHANGE YOUR MIND ABOUT IT.

24          BUT THE FACT THAT IT WAS DELIVERED TRIGGERED PLATFORA

25    SAYING, "HEY, YOU OWE US MONEY TECHNICALLY FOR ANOTHER TWO

1    YEARS, BUT WE'LL ALLOW JUST THIS ONE YEAR."

2           THE COURT:  SO IN YOUR CROSS-EXAMINATION OF MR. LIU,

3    HE TESTIFIED THAT HE WASN'T TERMINATING THE CONTRACT FOR

4    FAILURE TO DELIVER 3.0.

5           MS. JAYNE:  CORRECT.

6           THE COURT:  AND IT WASN'T TERMINATED BECAUSE 3.0

7    DIDN'T WORK.

8        I'M LOOKING AT PAGE 370 OF THE TRANSCRIPT.

9           MS. JAYNE:  RIGHT.

10       THERE WERE -- AND I THINK LATER, I DON'T KNOW IF I

11   ATTACHED IT, HE SAID THAT THERE WERE SO MANY -- THERE WERE A

12   NUMBER OF REASONS THAT PLATFORA ULTIMATELY DIDN'T END UP BEING

13   A GOOD FIT.  THEY CHANGED SOME OF THE OTHER THINGS THEY WERE

14   WORKING ON.

15       BUT PLATFORA DELIVERED WHAT WAS ASKED OF THEM.

16          THE COURT:  SO I CERTAINLY UNDERSTAND IT WAS

17   PLATFORA'S VIEW THAT THE CONTRACT COULD NOT BE TERMINATED JUST

18   WITH A WALK AWAY.

19          MS. JAYNE:  IT'S DISCOVERY -- ESSENTIALLY THEY BUILT

20   WHAT WAS ASKED, NETFLIX DETERMINED, HMM, WE DECIDED IT'S NOT

21   REALLY GOING TO WORK FOR US.

22       BUT ONCE SOMEBODY, FOR EXAMPLE, HAS, YOU KNOW, LET'S SAY

23   CUSTOM BUILT A SHELF, ONCE THEY DELIVERED IT AND YOU CHANGE

24   YOUR MIND, IT DOESN'T FIT IN YOUR HOUSE --

25          THE COURT:  SO I HAVE PLATFORA'S VIEW THAT THAT'S NOT

1      THE WHOLE STORY.

2          AND, MR. WALDINGER, I DON'T HAVE THE TESTIMONY HERE THAT

3      WOULD GIVE THE OTHER SIDE FOR ME TO MAKE A DETERMINATION.

4          PLATFORA CLEARLY BELIEVED THE CONTRACT COULDN'T BE

5      TERMINATED AND THAT WAS WHY THEY WERE ENTITLED TO A COMPROMISE

6      ON THE AMOUNTS DUE.

7          BUT I DON'T HAVE -- I'M MISSING THE OTHER SIDE.  I JUST

8      DON'T HAVE THE TRANSCRIPTS HERE.  I DON'T KNOW WHAT I'M

9      SUPPOSED TO LOOK AT.

10         MR. WALDINGER:  AND I'M NOT AS DEEP INTO THE

11     TRANSCRIPTS AS YOUR HONOR.  I'M JUST GOING BACK TO 326, AND

12     YOUR HONOR WAS REFERRING TO THE TERM AND TERMINATION PROVISION.

13         THE COURT:  RIGHT.

14         MR. WALDINGER:  AND IT -- THE FIRST SENTENCE TALKS

15     ABOUT AN INITIAL SUBSCRIPTION TERM.

16         THE COURT:  UH-HUH.

17         MR. WALDINGER:  THAT, MY UNDERSTANDING, WAS ONLY

18     SEVEN MONTHS.  SO THAT'S -- THAT'S WHAT WE'RE TALKING ABOUT.

19         AND THEN UPON AN EXPIRATION OF THE INITIAL SUBSCRIPTION

20     TERM, THERE WOULD BE RENEWALS FOR ONE YEAR.

21         THE COURT:  SO I NEED TO SEE THE LETTER -- I NEED TO

22     SEE THE TESTIMONY OF -- THE DIRECT TESTIMONY OF MR. LIU.

23         MR. WALDINGER:  I DO HAVE ALL THE TRANSCRIPTS HERE IN

24     MINUSCRIPT FORM.

25         THE COURT:  I DON'T THINK HIS TESTIMONY WAS THAT

1    LONG.  MAYBE YOU CAN FLIP THROUGH THE DIRECT TESTIMONY, BECAUSE

2    THAT'S ALL HE TESTIFIED ABOUT.  I DON'T THINK HIS WAS THAT

3    EXTENSIVE.

4            MR. WALDINGER:  AND ABOUT WHAT PAGE WAS THAT,

5    YOUR HONOR?

6            THE COURT:  OH, I HAVE NO IDEA.  I'M SORRY.

7        I WAS LOOKING AT HIS CROSS-EXAMINATION AT PAGE 370.  SO

8    MAYBE THAT'LL HELP ORIENT YOU IN THE -- THAT'S HIS CROSS, SO IT

9    WOULD BE BEFORE THAT, OBVIOUSLY.

10           MR. WALDINGER:  OKAY.  I BELIEVE I'VE FOUND IT.  ONE

11   MOMENT.

12           (PAUSE IN PROCEEDINGS.)

13           MR. KALTSAS:  AND, YOUR HONOR, WHILE MR. WALDINGER

14   LOOKS AT THAT, I'D LIKE TO DIRECT THE COURT TO MR. KAIL'S CROSS

15   TESTIMONY.  THAT IS VOLUME, I BELIEVE IT IS 11 -- REGARDLESS,

16   IT'S ON PAGE 2325 WITH RESPECT TO HIS UNDERSTANDING OF THE

17   TERMINATION OF THE PLATFORA CONTRACT.  I BELIEVE THAT'S

18   RELEVANT.

19           THE COURT:  I'M SORRY.  WHAT ARE YOU LOOKING AT

20   THERE?

21           MR. KALTSAS:  THE CROSS OF MR. KAIL, YOUR HONOR.

22           THE COURT:  AT -- I DON'T KNOW WHAT PAGE YOU'RE -- HE

23   DIDN'T TESTIFY -- I DON'T KNOW WHAT YOU'RE REFERRING TO.  IS

24   THAT PAGE 25 OF 35 OF MS. JAYNE'S SUBMISSION?  IS THAT WHAT

25   YOU'RE REFERRING ME TO?

1           MR. KALTSAS:  I'M REFERRING YOU TO THE TRANSCRIPT.  I

2    APOLOGIZE, YOUR HONOR.

3           THE COURT:  THE ACTUAL TRANSCRIPT?

4           MR. KALTSAS:  THE ACTUAL TRANSCRIPT.

5           THE COURT:  PAGE 25 OF THE TRIAL?

6           MR. KALTSAS:  PAGE 2325.

7           THE COURT:  OH, 2325.  NOT 23 TO 25.

8           MR. KALTSAS:  YES.  MY APOLOGIES, YOUR HONOR.

9           THE COURT:  OKAY.  I DON'T HAVE THAT HERE.  CAN

10   YOU -- IS THERE SOMETHING YOU WANTED TO READ TO ME?

11          MR. KALTSAS:  SURE, YOUR HONOR.

12       AND IT'S JUST -- ON PAGE 2325, THAT WAS THE SECTION OF THE

13   CROSS-EXAMINATION WHERE MR. SAMPSON ASKED MR. KAIL ABOUT

14   EXACTLY WHAT THE PURPOSE OF THIS $155,000 WAS, AND SO IN THE

15   CONTEXT OF DISCUSSION OF EXHIBIT NUMBER 1110, 1110, MR. SAMPSON

16   ASKED, "DO YOU SEE MR. ASHER AND MR. WERTHER ARE DISCUSSING

17   THAT 155,000 NUMBER; CORRECT?"

18          MR. KAIL ANSWERS, "CORRECT.

19       "AND IT RELATES TO PLATFORA'S BOOKINGS ACCORDING TO

20   MR. ASHER; CORRECT?

21       "THAT'S WHAT HE WROTE, YES.

22       "IT'S TO AVOID SOME KIND OF ACCOUNTING ISSUE OR DEBOOKING.

23       "DO YOU SEE THAT?

24       "I DO."

25       AND THEN THE NEXT QUESTION IS, "SO THAT $155,000 NUMBER

1    CAME FROM PLATFORA, DID IT NOT?

2        "IT DID, YES."

3        AND LATER IN THAT TESTIMONY, MR. KAIL TESTIFIED THAT PART

4    OF THE, PART OF THE MOTIVATION BEHIND THAT $155,000 WAS TO END

5    THINGS CLEANLY.

6        THE COURT:  SURE.

7        MR. KALTSAS:  IT DIDN'T NECESSARILY COME FROM A

8    CONTRACT, IT JUST CAME FROM PLATFORA ITSELF, AND THAT THE

9    ENTIRE PURPOSE OF THAT $155,000 NUMBER, DESPITE SYLVIA SUNDHOLM

10   NOT KNOWING EXACTLY WHAT THAT NUMBER WAS FOR AND THE GENERAL

11   CONFUSION AT NETFLIX OVER THAT NUMBER WAS TO ENSURE THAT THERE

12   WOULD BE NO MESSINESS SURROUNDING THE TERMINATION OF THE

13   CONTRACT.

14       THE COURT:  SO I GUESS -- THANK YOU, MR. KALTSAS.

15       BUT WHAT I'M REALLY LOOKING FOR IS TO DETERMINE WHETHER IT

16   WAS REASONABLE FOR NETFLIX TO, FROM MY STANDPOINT, THAT NETFLIX

17   HAD THE RIGHT TO TERMINATE THE CONTRACT FOR NO CAUSE, BUT JUST

18   BECAUSE OF THE TIMING OF THE TERMINATION.

19       AND THAT'S WHAT MR. WALDINGER IS FRANTICALLY LOOKING

20   THROUGH THE DIRECT TESTIMONY ON, AND I CAN'T HELP HIM BECAUSE I

21   DON'T HAVE IT HERE.

22       MR. KALTSAS:  YES, YOUR HONOR.

23       MR. WALDINGER:  YOUR HONOR, THE ONLY THING THAT I

24   COULD FIND WAS ON PAGE 335 OF THE TRANSCRIPT, AND MR. KALEBA

25   ASKED MR. LIU, "DID YOU MAKE THIS DECISION ON YOUR OWN OR DID

1    YOU DISCUSS THIS WITH ANY MEMBERS OF YOUR TEAM?"

2         MR. LIU'S ANSWER WAS, "I THINK I TALKED TO MIKE BEFORE I

3    SENT IT."

4         HE'S REFERRING TO AN EMAIL ON WHICH HE WAS TERMINATING

5    PLATFORA.

6         AND THEN MR. LIU SAYS, "I SAID WE WANTED TO SEND OUT THIS

7    NOTICE, WE'RE NOT GOING TO EXTEND."

8         I THINK THAT THE USE OF THE WORD "EXTEND" REFLECTS

9    MR. LIU'S CORRECT UNDERSTANDING THAT THEY WERE AT THE END OF

10   THE INITIAL SUBSCRIPTION PERIOD AND THAT THERE WAS AN OPTION TO

11   THEN RE-UP FOR A YEAR.

12        AND I KNOW YOUR HONOR HAS EXHIBIT 236.

13             THE COURT:  YEP.

14             MR. WALDINGER:  I'M ALSO LOOKING AT EXHIBIT -- EXCUSE

15   ME.  326.

16             THE COURT:  326, YES.

17             MR. WALDINGER:  I'M ALSO LOOKING AT EXHIBIT 327,

18   WHICH WAS AN ORDER FORM THAT PRETTY SPECIFICALLY SETS OUT, IN

19   TABLE 3 OF THAT EXHIBIT, A PAYMENT SCHEDULE.

20             THE COURT:  I HAVE THAT.

21             MR. WALDINGER:  SETTING FORTH INVOICES 1 THROUGH 7,

22   WHICH WOULD HAVE TOTALLED $70,000, AND CONTEMPLATES THE ANNUAL

23   FEES NOT BEGINNING UNTIL APRIL 29TH OF 2014.

24        I THINK READING EXHIBITS 326 AND 327 TOGETHER, ALONG WITH

25   MR. LIU'S TESTIMONY, ALONG WITH THE EXHIBITS FROM THE APRIL

1    2014 EMAILS, OR EMAIL FROM MR. LIU TO THE FOLKS AT PLATFORA,

2    THAT THAT WAS AN INFLECTION POINT.  THAT'S WHERE NETFLIX COULD

3    SIMPLY HAVE WALKED AWAY WITHOUT ANY PENALTIES.

4         THE EMAIL FROM MR. LIU TO MR. DE MARTINO AT PLATFORA,

5    WHICH IS AT GOVERNMENT EXHIBIT 629, ALSO REFLECTS MR. LIU'S

6    UNDERSTANDING, AT LEAST TO SOME EXTENT, OF WHAT THE CONTRACT

7    REQUIRED, WHICH WAS A WRITTEN NOTIFICATION.

8              THE COURT:  RIGHT.  WHAT WAS THE DATE OF THE EMAIL

9    CANCELLATION?

10              MR. WALDINGER:  APRIL 18TH OF 2014.

11              THE COURT:  SO THAT INVOICE WOULD HAVE BEEN DUE --

12              MR. WALDINGER:  ON 4-29.

13              THE COURT:  -- ON 4-29.

14              MS. JAYNE:  YOUR HONOR, SO LONG AS WE'RE LOOKING AT

15    EXHIBIT 327, THAT TABLE SAYS --

16              THE COURT:  I'M GOING BACK TO THE TERMINATION.

17              MS. JAYNE:  RIGHT.  BUT THE INVOICE SHOWS THAT --

18              THE COURT:  SO I'M LOOKING -- THIS IS THE INFLECTION

19    POINT HERE BETWEEN THE INITIAL TERM AND THE FIRST RENEWAL;

20    CORRECT?

21              MR. WALDINGER:  FOR THE INITIAL ANNUAL SUBSCRIPTION.

22              THE COURT:  SO THERE WAS THE SEVEN MONTH TERM THAT IS

23    OUTLINED IN EXHIBIT 327, SEVEN MONTH INVOICE SCHEDULE; CORRECT?

24              MR. WALDINGER:  CORRECT.

25              MS. JAYNE:  THAT ENDS ON MARCH 30TH.

1        THE COURT:  RIGHT.  AND THEN THERE'S THE ANNUAL FEES

2   FOR YEAR ONE DUE ON INVOICE NUMBER 8 ON APRIL 29, 2014;

3   CORRECT?

4        MR. WALDINGER:  CORRECT.

5        THE COURT:  AND THEN THERE IS -- AND YOU'RE RECITING

6   TO ME A CANCELLATION DATE OF APRIL 18, 2014; CORRECT?

7        MR. WALDINGER:  CORRECT, YOUR HONOR.

8        THE COURT:  SO I'M NOW LOOKING AT THE TERMINATION

9   CLAUSE.  "UPON EXPIRATION OF THE INITIAL SUBSCRIPTION TERM,"

10  THAT'S THE SEVEN MONTHS, "THIS AGREEMENT WILL NOT AUTOMATICALLY

11  RENEW FOR ADDITIONAL ONE YEAR TERMS UNLESS EITHER PARTY

12  PROVIDES THE OTHER WITH NOTICE OF ITS INTENT TO RENEW AT LEAST

13  90 DAYS PRIOR TO THE END OF THE CURRENT TERM."

14  I'M NOT AWARE -- I WAS NOT PRESENTED, IN THE TRIAL, WITH A

15  RENEWAL, INTENT TO RENEW NOTICE.

16  SO IT APPEARS THAT MR. LIU CANCELLED BECAUSE THERE WAS NO

17  WRITTEN RENEWAL NOTICE WITHIN THE 90 DAYS, AT LEAST 90 DAYS

18  BEFORE THAT TERM.  IT SEEMS THAT'S STRAIGHTFORWARD TO ME.

19        MR. WALDINGER, MR. KALTSAS, AM I CORRECT?

20        MR. WALDINGER:  I THINK THAT'S RIGHT.  I'M NOT AWARE

21  OF ANY NOTICE OF AN INTENT TO RENEW.

22        THE COURT:  THERE'S NOTHING IN THE CONTRACT THAT SAYS

23  UPON DELIVERY OF 3.0, THE CONTRACT AUTOMATICALLY RENEWS.  I

24  DON'T SEE THAT.

25        MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

1       THE COURT:  OKAY.  I DO FIND, BY A PREPONDERANCE OF

2  THE EVIDENCE, THAT THE PAYMENT OF $155,000 TO PLATFORA, MADE

3  AFTER NETFLIX TERMINATED THE CONTRACT, AND HAVING GONE THROUGH

4  THE EVIDENCE OF THE TIMELINE OF THE TERMINATION, WAS A -- WAS

5  PART OF THE FRAUD LOSS FOR WHICH THERE WAS NO VALUE TO NETFLIX

6  BECAUSE IT APPEARS FROM THE CONTRACT THEY HAD THE RIGHT TO WALK

7  AWAY AT THAT POINT.

8       ALL RIGHT.  SO WITH ALL OF THAT, I -- THIS HAS BEEN A

9  LENGTHY DISCUSSION OVER AN IMPORTANT ISSUE WHICH WILL INFORM ME

10  OF THE GUIDELINE.

11       I AM FINDING, BY A PREPONDERANCE OF THE EVIDENCE, FRAUD

12  LOSS OF $1,385,000 FROM VISTARA, $155,000 FROM PLATFORA, AND

13  $120,000 FROM DOCURATED.  MY MATH TELLS ME THAT IS $1,645,000.

14       MR. WALDINGER:  I COME UP WITH 1,660,000.

15       THE COURT:  OKAY.  LET'S -- LET ME DO IT THE

16  OLD-FASHIONED WAY.

17       MR. KALTSAS:  THAT'S WHAT I GOT TOO, YOUR HONOR.

18       THE COURT:  YES, I SEE MY MISTAKE.  I DIDN'T CARRY

19  THE 1.

20       OKAY.  ALL RIGHT.  THANK YOU.

21       THAT WAS A NECESSARY DISCUSSION AND I APPRECIATE THE

22  EFFORT ON THAT.

23       ALL RIGHT.

24       MS. JAYNE:  YOUR HONOR, I UNDERSTAND THE COURT HAS

25  MADE ITS RULING, BUT JUST IF I COULD -- THERE WAS ONE THING I

1    WANTED TO ADD TO THE RECORD.  I JUST WANTED TO MAKE A COMMENT,

2    IF I COULD, JUST AS TO EXHIBIT 327, JUST VERY BRIEFLY.

3         THE COURT:  YES.

4         MS. JAYNE:  JUST TO POINT OUT THAT THE INVOICE DATE

5    ON THE PAYMENT SCHEDULE IS THROUGH MARCH 30TH, 2014.  NETFLIX

6    GETS INVOICED ONE MONTH LATER.  BUT ESSENTIALLY APRIL 1ST IS

7    WHEN THE ANNUAL FEES BEGIN IF YOU LOOK AT THE TIMELINE SET

8    FORTH, AND MR. LIU SENT THAT EMAIL APRIL 18TH AFTER THAT -- THE

9    SEVEN MONTH INVOICE SCHEDULE ENDED ON MARCH 30TH.

10        THE COURT:  BUT THERE'S NO AUTOMATIC RENEWAL PER THE

11   CONTRACT, AND I HAVE NO -- THERE WAS NO EVIDENCE THAT NETFLIX

12   SENT A NOTICE OF INTENT TO RENEW AND, THEREFORE, MR. LIU HAD

13   THE AUTHORITY UNDER THE CONTRACT TO TERMINATE IT.

14        MS. JAYNE:  YOUR HONOR, TO THIS MOMENT, I STILL CAN'T

15   FIND THAT -- WHERE YOUR HONOR WAS READING FROM, THE 90 DAYS AND

16   THE INTENT TO RENEW.

17        THE COURT:  OKAY.

18        MS. JAYNE:  WOULD YOU PLEASE DIRECT ME TO THAT?

19        THE COURT:  I'LL BE GLAD TO.  I'M LOOKING AT

20   EXHIBIT 326.

21        MS. JAYNE:  326.

22        THE COURT:  AND I'M LOOKING AT 326-3, TERM AND

23   TERMINATION, PARAGRAPH 9 OF THE CONTRACT.

24      DO YOU HAVE THAT?

25        MS. JAYNE:  I'M PULLING IT UP RIGHT NOW.

1             THE COURT:  OKAY.

2         (PAUSE IN PROCEEDINGS.)

3             MS. JAYNE:  I'M SORRY, WHICH PAGE OF THAT?  I DO HAVE

4  THE EXHIBIT.

5             THE COURT:  3- -- 326-3, PARAGRAPH 9.

6         (PAUSE IN PROCEEDINGS.)

7             MS. JAYNE:  JUST ONE MOMENT, YOUR HONOR.

8             THE COURT:  OF COURSE.

9         (PAUSE IN PROCEEDINGS.)

10           MS. JAYNE:  YOUR HONOR, I APOLOGIZE BECAUSE I DON'T

11  RECALL TESTIMONY ON THIS, WHETHER THIS 90 DAYS IS AFTER THE

12  THREE YEARS, OR IF THE 90 DAYS REFERS TO SOMEWHERE IN THE

13  MIDDLE OF THIS PARTICULAR CONTRACT, BECAUSE THE ORDER FORM

14  DOESN'T REFLECT THESE TERMS, AND THAT'S WHY I'M A LITTLE

15  CONFUSED AS TO WHEN OR HOW THIS 90 DAYS EVEN APPLIES.

16      BECAUSE IT'S A THREE YEAR CONTRACT, I DON'T KNOW IF THIS

17  IS REFERRING TO, AGAIN, AFTER THE CONCLUSION OF THAT.

18           THE COURT:  THAT IS A -- THAT IS A FAIR POINT.

19           MS. JAYNE:  BECAUSE THIS ISN'T A, QUOTE, RENEWAL ON

20  THE ORDER FORM, WHEREAS THIS TERM AND TERMINATION TALKS ABOUT,

21  I THINK, AT THE END OF THE ENTIRE AGREEMENT, IT'S NOT GOING TO

22  AUTOMATICALLY RENEW.

23      WHEREAS HERE, IT APPEARS YEAR ONE IS DUE ON THIS DATE,

24  YEAR TWO IS DUE ON THIS DATE.

25           THE COURT:  SO IT LOOKS AS THOUGH INITIAL

1    SUBSCRIPTION TERM IS A DEFINED TERM, SO WE NEED TO SEE IF WE

2    CAN FIND THAT.

3           MR. WALDINGER:  YOUR HONOR, I DON'T THINK IT'S

4    DEFINED, OR I DIDN'T FIND IT IN 326.

5           THE COURT:  IT SAYS, WHICH WILL BE SPECIFIED IN ANY

6    ORDER FORMS.

7           MR. WALDINGER:  AND THAT'S 327.

8           MS. JAYNE:  WHICH IS THE THREE YEAR TERM.

9           THE COURT:  OH, MS. JAYNE, YOU MAY BE CORRECT ON

10   THIS.  IF YOU LOOK UP AT THE TOP, THE INITIAL TERM, 9-30-13

11   THROUGH 9-29-16.

12          MS. JAYNE:  ON EXHIBIT 326, RIGHT.

13          THE COURT:  I THINK I -- I REALLY APPRECIATE YOUR

14   VIEW ON THAT.

15       MR. WALDINGER, I THINK MS. JAYNE MAY BE CORRECT THAT THE

16   INITIAL TERM IS DEFINED.  THE CONTRACT SAYS IT'LL BE DEFINED IN

17   THE INVOICE.

18       IT DOES APPEAR TO BE DEFINED AS THREE YEARS, TERMINATION

19   IN THE MIDDLE OF THE THREE YEARS WAS NOT ALLOWED EXCEPT FOR

20   CAUSE, AND MR. LIU DID NOT TESTIFY TO CAUSE.

21          MR. WALDINGER:  WELL, 327 DOES TALK ABOUT AN INITIAL

22   TERM, BUT DOESN'T USE THE PHRASE "INITIAL SUBSCRIPTION."

23          THE COURT:  I THINK THAT'S CLOSE ENOUGH.  I THINK

24   THAT THAT IS A REASONABLE INTERPRETATION.

25       IT MAKES NO DIFFERENCE BECAUSE I STILL COME UP WITH

1     1,505,000 IN FRAUD LOSS IF I DISALLOW PLATFORA.

2          AND I WILL DISALLOW IT ON A PREPONDERANCE OF THE EVIDENCE.

3     I'M SATISFIED THAT MS. JAYNE HAS CALLED INTO QUESTION

4     SUFFICIENTLY THE GOVERNMENT'S EVIDENCE ON WHETHER MR. LIU COULD

5     TERMINATE THE CONTRACT WITHOUT ANY CONSEQUENCE OR LIABILITY TO

6     NETFLIX, WHICH IS REALLY THE ISSUE.  IT IS NOT PROOF.

7          BUT HERE IT DOES APPEAR THAT THE GOVERNMENT HAS NOT

8     ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE THAT MR. LIU

9     HAD -- WAS CORRECT IN SIMPLY WALKING AWAY WITH HIS TERMINATION,

10    AND IF HE COULD NOT SIMPLY WALK AWAY, SOME RESOLUTION OF A

11    DISPUTE BETWEEN NETFLIX AND PLATFORA WOULD HAVE BEEN

12    APPROPRIATE, AND THE EXACT AMOUNT PAID IS NOT SOMETHING THAT

13    THIS COURT WOULD DELVE INTO.

14         I THINK THE THRESHOLD IS WHETHER OR NOT THERE WAS A VALID

15    DISPUTE BETWEEN THE PARTIES, AND I THINK MS. JAYNE'S CAREFUL

16    READING HAS PROVIDED THAT TO ME.

17         AS I SAID, UNDER THE GUIDELINES, IT DOESN'T MAKE --

18         MR. WALDINGER:  AND, YOUR HONOR, I DON'T WANT TO KEEP

19    COMING BACK AT YOU, BUT IF YOU TURN TO THE SECOND PAGE, THOUGH,

20    OF EXHIBIT 327 --

21         THE COURT:  YES.

22         MR. WALDINGER:  -- IT TALKS ABOUT, UNDER PARAGRAPH 2,

23    TERMINATION FOR CAUSE.

24         THE COURT:  327 OR 326?

25         MR. WALDINGER:  327.

1      THE COURT:  OKAY.

2      MR. WALDINGER:  "THIS ORDER FORM SPECIFIES THAT THE

3  CUSTOMER MAY TERMINATE THIS ORDER FORM FOR CAUSE IN THE EVENT

4  PLATFORA FAILS TO DELIVER PRODUCT WITH THE FUNCTIONS AND IN

5  ACCORDANCE WITH THE ROADMAP CAPABILITIES DOCUMENTED IN

6  APPENDIX A.  CUSTOMER SHALL EXERCISE THIS RIGHT BY PROVIDING

7  PLATFORA WRITTEN NOTICE ON 4-28-14.  IF EXERCISED, THE ORDER

8  FORM WILL TERMINATE AS OF 4-28-14 AND THE CUSTOMER SHALL HAVE

9  NO FURTHER LIABILITY FOR OR ANY ANNUAL FEES UNDER THIS ORDER

10  FORM THEREAFTER."

11      THE COURT:  YES, THAT'S CORRECT.

12      BUT IN READING MR. LIU'S TESTIMONY, IT DOES NOT APPEAR HE

13  WAS TERMINATING IT FOR FAILURE TO DELIVER THE PRODUCT WITH THE

14  FUNCTIONS IN ACCORDANCE WITH THE ROADMAP.  HE DID NOT TESTIFY

15  THAT IT FAILED THE ROADMAP CAPABILITIES DOCUMENTED IN

16  APPENDIX A.

17      MR. WALDINGER:  ALL RIGHT.  FAIR ENOUGH, YOUR HONOR.

18      THE COURT:  AND THAT WOULD HAVE BEEN A WHOLE TRIAL BY

19  ITSELF.  THAT'S WHY COMPANIES SETTLE CASES, AND WE UNDERSTAND

20  THAT.

21      SO I THINK IT'S -- YOU KNOW, AGAIN, THESE GET TO BE CLOSE

22  CALLS.  IT'S A -- I HAVE TO LOOK AT THE ABSENCE OF EVIDENCE.

23      IT IS THE GOVERNMENT'S BURDEN, AND I DO FIND THAT THERE IS

24  A GAP IN THE EVIDENCE ON THIS THAT WE HAVE DEVOTED, I THINK, A

25  REASONABLE AMOUNT OF TIME IN PURSUING.

1    AND SO I WILL EXCLUDE PLATFORA AND EXCLUDE IT FROM THE

2  TOTAL FRAUD LOSS, WHICH THEN BRINGS ME TO A FRAUD LOSS OF

3  $1,505,000.

4    OKAY.  UNDER THE GUIDELINE, HOWEVER, THAT PROVIDES AN

5  ENHANCEMENT OF 16 LEVELS.

6         MS. JAYNE:  IT APPEARS THAT IT'S 5,000.01.

7         THE COURT:  I'M SORRY?

8         MS. JAYNE:  IT APPEARS THAT IT'S $5,000.01 OVER.

9         THE COURT:  YES, IT IS.  AND, YOU KNOW, THERE'S --

10  YES, IT IS.

11    OKAY.  MS. JAYNE, AT OUR LAST HEARING, I WENT THROUGH THE

12  RECITATION OF THE COUNTS OF CONVICTION AND THE MAXIMUM

13  SENTENCES.

14    DO YOU NEED THAT REPEATED?  I KNOW IT'S ON THE RECORD, BUT

15  I AM JUST ASKING IF YOU FEEL THAT YOU AND MR. KAIL WOULD NEED

16  THAT REPEATED.

17         MS. JAYNE:  THE COUNTS OF CONVICTION AND THE MAXIMUM

18  PENALTIES?  NO.

19         THE COURT:  OKAY.  THAT'S THE ONLY THING I'M ASKING

20  ABOUT.

21    AND WE THEN GOT TO THE POINT IN OUR DISCUSSION LAST TIME

22  ON THE CALCULATION OF THE ADJUSTED OFFENSE LEVEL, AND I'D LIKE

23  TO PICK UP THERE.

24    THERE WAS -- I BELIEVE THAT I HAD MADE A DETERMINATION ON

25  ALL OF THE ENHANCEMENTS AND REDUCTIONS, AND I'M LOOKING AT THE

1    PRESENTENCE REPORT STARTING AT PARAGRAPH 25, AND MY NOTES SHOW

2    THAT I HAD DISALLOWED THE OBSTRUCTION OF JUSTICE ENHANCEMENT.

3        LET'S SEE.  I'M SORRY.  I HAD DISALLOWED THE SOPHISTICATED

4    MEANS ENHANCEMENT OF PLUS 2.

5        I HAD ALLOWED, AND I THINK EVERYONE AGREED IT WAS

6    MANDATORY, THE PLUS 1 FOR MONEY LAUNDERING.

7        AND THE SOPHISTICATED MEANS, I BELIEVE THE GOVERNMENT WAS

8    NOT REQUESTING THAT.

9        IS THAT CORRECT?

10       MR. WALDINGER:  THAT'S CORRECT, YOUR HONOR.

11       THE GOVERNMENT WAS REQUESTING THE ABUSE OF POSITION OF

12   TRUST, BUT NOT THE SOPHISTICATED MEANS ENHANCEMENT.

13       THE COURT:  ALL RIGHT.

14       I WILL ENHANCE FOR THE ABUSE OF POSITION OF PRIVATE TRUST,

15   AND I DO FIND -- I THINK WE WENT THROUGH THIS LAST TIME --

16   ALTHOUGH THAT MIGHT BE AN ELEMENT OF THE HONEST SERVICES FRAUD

17   CONVICTIONS, IT IS NOT AN ELEMENT OF THE MONEY AND WIRE FRAUD

18   AND, THEREFORE, I WILL ENHANCE BY PLUS 2.

19       AND THEN THERE'S NO REQUEST FOR THE OBSTRUCTION OF

20   JUSTICE, OR IS THAT STILL A REQUEST?

21       MS. JAYNE:  I THINK YOUR HONOR MADE A RULING ON THAT.

22       THE COURT:  I THINK I MADE A RULING THAT I WAS

23    DENYING THAT.  THAT'S MY RECOLLECTION.

24       MR. KALTSAS:  THAT'S CORRECT, YOUR HONOR.

25       THE COURT:  THANK YOU.  OKAY.

1     THAT PROVIDES ME WITH AN ADJUSTED OFFENSE LEVEL OF 25:  7

2     AS THE BASE OFFENSE LEVEL, PLUS 16 FOR THE FRAUD LOSS THAT

3     WE'VE CALCULATED, PLUS 1 FOR MONEY LAUNDERING, AND PLUS 2 FOR

4     ABUSE OF A POSITION OF TRUST.

5           MR. WALDINGER:  SO THAT COMES TO 26, YOUR HONOR.

6           THE COURT:  YES, 26, THANK YOU.  IT DOES.

7     ALL RIGHT.  AND THE CRIMINAL HISTORY IS 1.

8     THAT PROVIDES TO ME AN ADJUSTED OFFENSE LEVEL OF 63 TO 78

9     MONTHS.

10    AND SO, MS. JAYNE, I RECOGNIZE THAT YOU DISAGREE WITH THE

11    FRAUD LOSS CALCULATION, AND THAT IS NOTED FOR THE RECORD.

12    BUT IS THERE ANY OTHER DISAGREEMENT WITH THE COURT'S

13    CALCULATION OF THE ADJUSTED OFFENSE LEVEL?

14          MS. JAYNE:  I MADE MY RECORD, I BELIEVE, IN MY

15    SENTENCING MEMO REGARDING THE ROLE IN THE OFFENSE.  THERE'S NO

16    BASIS TO ARGUE WITH RESPECT TO THE MONEY LAUNDERING

17    ENHANCEMENT.

18    SO I THINK THAT'S COMPLETE.

19          THE COURT:  OKAY.  ALL RIGHT.

20    DOES THE GOVERNMENT HAVE ANY OBJECTION TO THE COURT'S

21    DETERMINATION OF THE ADJUSTED OFFENSE LEVEL OR THE GUIDELINE?

22          MR. WALDINGER:  THE GOVERNMENT HAD REQUESTED THE

23    COURT APPLY THE OBSTRUCTION ENHANCEMENT, SO I JUST SUBMIT ON

24    THAT, YOUR HONOR.

25          THE COURT:  OKAY.

1        MR. WALDINGER:  BUT I UNDERSTAND YOU'VE MADE THE

2    RULING.

3        AND I THINK IT IS OTHERWISE CORRECT.

4        THE COURT:  THANK YOU.

5        ALL RIGHT.  THAT BRINGS ME TO THE END OF MY OBLIGATION TO

6    CALCULATE AND DETERMINE THE GUIDELINE SENTENCE.  THAT WAS

7    DIFFICULT IN THIS CASE.

8        THAT PUTS ASIDE ANY RESTITUTION REQUEST.  THAT'S NOT

9    BEFORE ME RIGHT NOW.

10       AND SO WE NOW, AT THIS POINT, HAVE REACHED THE POINT WHERE

11   I WOULD -- AND I WILL -- HEAR FROM MS. JAYNE AND FROM MR. KAIL.

12       I THINK IT MAY MAKE SENSE FOR US TO TAKE A SHORT BREAK SO

13   THAT I DON'T HAVE TO INTERRUPT YOU, AND I'M PREPARED TO JUST

14   KEEP GOING, ASSUMING THAT WE CAN CONCLUDE BY APPROXIMATELY --

15   WOULD APPROXIMATELY 30 MINUTES MORE ON THE RECORD, WOULD THAT

16   BE REASONABLE?

17       MS. JAYNE:  YES.

18       THE COURT:  ALL RIGHT.  I THINK MAYBE WE SHOULD TAKE

19    A BREAK, THOUGH.  IT'S BEEN A LONG MORNING.

20       SO LET'S TAKE A TEN MINUTE BREAK.

21       MS. JAYNE:  THANK YOU.

22       THE CLERK:  COURT IS IN RECESS.

23       (RECESS FROM 11:49 A.M. UNTIL 12:00 P.M.)

24       THE COURT:  PLEASE BE SEATED, EVERYONE.

25       ALL RIGHT.  THANK YOU FOR THAT BREAK.

1    MS. JAYNE, LET ME TURN TO YOU TO HEAR YOUR COMMENTS NOW

2    THAT WE'VE SET THE GUIDELINE AS REALLY ONLY THE STARTING POINT.

3         MS. JAYNE:  THANK YOU, YOUR HONOR.

4    I'LL JUST START BY, OF COURSE, REMINDING THE COURT AND

5    EVERYONE THAT IT'S SENTENCING AN INDIVIDUAL, NOT

6    SILICON VALLEY, NOT A CLASS OF OFFENDERS.  AND, OF COURSE, A

7    SENTENCE IMPOSED SOLELY OR MAINLY TO MAKE AN EXAMPLE OF THE

8    DEFENDANT VIOLATES THE SUPREME COURT'S DIRECTIVE THAT

9    SENTENCING MUST BE INDIVIDUALIZED TO A PARTICULAR DEFENDANT.

10        AND I NOTICED, IN THE GOVERNMENT'S SENTENCING MEMO, THEIR

11   INSISTENCE ON MAKING MR. KAIL AN EXAMPLE TO, QUOTE, "WOULD-BE

12   BRIBE TAKERS" OR, QUOTE, "INDUSTRY EXECUTIVES AND VENTURE

13   CAPITALISTS," END QUOTE.

14        THAT UNDERMINES THE NEED TO VIEW MR. KAIL'S UNIQUE HISTORY

15   AND CHARACTERISTICS, AND HIS UNIQUE HISTORY REVEALS A MAN WHO

16   IS GENEROUS, HARD WORKING, AND ONE WHO CONSISTENTLY SEEKS

17   OPPORTUNITIES TO MAKE OTHERS SHINE.

18        EVEN IN THIS COURTROOM TODAY ARE HIS WIFE, WHO HAS SAT IN

19   THIS COURTROOM EVERY SINGLE DAY OF EVERY SINGLE HEARING, EVERY

20   TRIAL, AND HAD THE COURTROOM BEEN OPEN, I THINK YOUR HONOR

21   WOULD HAVE SEEN ADDITIONAL PEOPLE HERE AS WELL, AND SOME OF HIS

22   COLLEAGUES HAVE COME TODAY AS WELL.  ONE ACTUALLY HAD TO LEAVE

23   EARLY.

24        AND NOT ONLY FRIENDS, BUT OTHER COLLEAGUES AT NETFLIX AS

25   WELL REPEATEDLY PRAISED HIM FOR HELPING THEM SUCCEED.  EVEN

1    MS. SPRAGUE, WHO TESTIFIED IN THIS TRIAL, WAS MENTORED AND THEN

2    PROMOTED BY MR. KAIL WHILE HE WAS THERE.

3         AND PRIOR TO THIS TRIAL, MS. SPRAGUE'S 360 REVIEWS OF HIM

4    SHOWED THAT SHE WAS GRATEFUL FOR THE NEW TECHNOLOGY THAT HE

5    BROUGHT IN AND FOR THE OPPORTUNITIES HE PROVIDED HER.

6         MANY OTHERS SHARED THIS VIEW.

7         DID HE JUGGLE MANY ROLES AND RESPONSIBILITIES AT BOTH WORK

8    AND HOME?  INDEED.

9         BUT REMEMBER THAT HIS PEERS IN THOSE 360 REVIEWS WROTE

10   THAT HE WAS, QUOTE, "ONE OF THE HARDEST WORKING PEOPLE AT

11   NETFLIX WHO HAD A HUGE IMPACT ON NETFLIX'S INFRASTRUCTURE IN A

12   SHORT AMOUNT OF TIME."

13        AND EMPLOYEES WROTE THEY DIDN'T EXPECT EVERY COMPANY HE

14   INTRODUCED TO HAVE A ROLE AT NETFLIX.

15        AND, IMPORTANTLY, A CONSISTENT THEME FROM HIS EMPLOYEES

16   WAS THAT NO ONE UNDER HIM EVER FELT PRESSURED TO WORK ON

17   ANYTHING.

18        AND SO WE SEE MR. KAIL IS HARD WORKING AND AMBITIOUS, BUT

19   HE NEVER INTENDED TO HURT ANY PERSON OR COMPANY.

20        AND THOUGH WE'RE NOT HERE TO DEBATE THE MERITS OF THE

21   CONVICTION, THE COURT SHOULD LOOK TO THE OFFENSE FROM THE LENS

22   OF THE ENTIRETY OF HIS LIFE AND HIS ACCOMPLISHMENTS, ESPECIALLY

23   SINCE THE OFFENSE CONDUCT DATES BACK NEARLY TEN YEARS.

24        FOR ONE, MR. KAIL ACCOMPLISHED REED HASTINGS' EXTREMELY

25   AGGRESSIVE AND AMBITIOUS GOAL OF I.T. IN THE CLOUD.

1    MR. HASTINGS AND NETFLIX CAN'T DENY THAT AT THAT TIME, THEIR

2    TECHNOLOGICAL PROWESS AND ADVANCEMENT WAS DUE IN PART TO THE

3    ACCOMPLISHMENT OF THIS SPECIFIC MISSION.

4        AND, OF COURSE, MR. KAIL DIDN'T DO IT SINGLE HANDEDLY.  IT

5    TOOK HIS TEAM, PLUS NEW TECHNOLOGY, TO GET THERE.  AND HE

6    HAPPENED TO HAVE NOT ONLY GREAT VISION, BUT HE KNEW HOW TO

7    IMPLEMENT IT, AND HE SUCCEEDED.

8        ON THE FLIP SIDE, MR. KAIL HAS SPENT THE LAST SEVEN YEARS

9    PAYING AN ENORMOUS PRICE FOR THESE ALLEGATIONS.  HIS NAME WAS

10   IN THE PRESS FROM THE TIME NETFLIX SUED HIM CIVILLY.  HE'S

11   INCURRED LEGAL FEES SINCE NOVEMBER 2014.  AS A RESULT, HE LOST

12   HIS JOB IMMEDIATELY AFTER THE VERDICT.  AND HE'S TAKEN THESE

13   LESSONS TO HEART.

14       AS HE WROTE IN THE P.S.R., HE KNOWS THAT HAD HE BEEN MORE

15   TRANSPARENT, THIS ALL COULD HAVE BEEN AVOIDED.

16       AND HE IS, OF COURSE, HYPERSENSITIVE TO CONFLICT OF

17   INTERESTS NOW AND WOULD EVER MAKE SUCH A MISTAKE AGAIN.  NO

18   SPECIFIC DETERRENCE IS NEEDED HERE.

19       AS FOR THE QUESTION OF WHETHER SOMEONE ELSE WOULD BE

20   ADEQUATELY DETERRED BY THE CONSEQUENCES AND PENALTIES IMPOSED

21   ON MR. KAIL FOR HIS CONVICTION, EVEN WITH THE DEFENDANT'S

22   REQUEST, WHILE GIVEN THE VERY STEEP AND PUBLIC CONSEQUENCES

23   HE'S ALREADY EXPERIENCED OVER THE LAST SEVEN YEARS, WE SUBMIT

24   THAT THE ANSWER IS YES.

25       IF GENERAL DETERRENCE HAS ANY EFFECT WHATSOEVER, THOUGH

1    STUDIES DON'T SUPPORT SUCH A FINDING, THE SENTENCE WE ARE

2    ASKING THIS COURT TO IMPOSE WILL DETER ANY REASONABLE PERSON

3    WHO CONSIDERS TAKING KICKBACKS.

4         CONTRARY TO WHAT THE GOVERNMENT MIGHT SAY, CRIME PAYS,

5    GIVEN THE COLLATERAL DAMAGE EXPERIENCED BY MR. KAIL AND HIS

6    FAMILY, IT'S UNLIKELY THAT ANY FATHER OF YOUNG CHILDREN WOULD

7    LOOK AT HIS CIRCUMSTANCE, EVEN BEFORE HE'S BEEN SENTENCED, AND

8    CONCLUDE, THAT'S WORTH IT.

9         THE SHAME, THE STRESS, THE EXPENSE, THE REPUTATIONAL

10   DAMAGE, ALL OF THAT IS EXPOSED AS GENERAL DETERRENCE.

11        THUS, EVEN IF THE COURT HAS DISAGREED WITH OUR SENTENCING

12   GUIDELINES, A SENTENCE TO BE SERVED IN THE ABYSMAL ENVIRONMENT

13   THAT IS NOW THE BUREAU OF PRISONS WITH ITS RELIANCE ON SOLITARY

14   CONFINEMENT, POOR CONTROL OF COVID, LACK OF FAMILY VISITS, AND

15   GENERAL DESPAIR, INCARCERATION IS NOT NECESSARY TO ACCOMPLISH

16   THE GOALS OF SECTION 3553(A) IN THIS CASE.

17        MR. KAIL IS THE SOLE PROVIDER FOR HIS FAMILY, BUT MOST

18   IMPORTANTLY, HE'S THE FATHER TO TWO BOYS WHO ARE IN THE YEARS

19   WHEN THEY PROBABLY NEED THEIR FATHER THE MOST, 13 AND 10 YEARS

20   OLD.  TO LOSE THEIR FATHER FOR AN EXTENDED PERIOD OF TIME

21   BECAUSE HE'S IN PRISON DURING THESE YEARS WILL CAUSE

22   IMMEASURABLE TRAUMA FOR THESE BOYS.

23        AND AS NOTED IN MY SENTENCING MEMO, COURTS DO DEPART

24   DOWNWARD WHEN CONSIDERING THE ARBITRARINESS OF THE LOSS

25   GUIDELINES.  THERE ARE NUMEROUS EXAMPLES OF LARGE DEPARTURES

1    AND MINIMAL TO NO CUSTODY TIME WHERE FRAUD LOSS IS

2    SIGNIFICANTLY GREATER THAN HERE.

3         FOR EXAMPLE, EVEN JUST IN VERY RECENT TIMES -- I LOOKED UP

4    SOME KICKBACKS CASES THROUGHOUT THE COUNTRY.  FOR EXAMPLE, EVEN

5    IN THE CENTRAL DISTRICT OF CALIFORNIA THIS YEAR, A KICKBACK

6    SCHEME INVOLVING $500,000 IN FRAUDULENT MEDICAL BILLS, A 15

7    MONTH SENTENCE IN THE MEDICAL FIELD.

8         THIS YEAR, IN THE EASTERN DISTRICT OF VIRGINIA, AN

9    $8 MILLION HEALTHCARE FRAUD KICKBACK SCHEME WHERE THE

10   HEALTHCARE PROFESSIONALS LITERALLY STOLE FUNDS AND SCAMMED THE

11   HEALTHCARE SYSTEM, SENTENCES RANGED FROM ONE TO FOUR YEARS.

12        IN 2020, THE DISTRICT OF VERMONT, A $2.5 MILLION BRIBE

13   RELATING TO THE VETERAN'S, VETERAN'S AND GOVERNMENT'S

14   CONTRACTS, A PROBATION ONLY SENTENCE.

15        IN 2019, A DISTRICT OF FLORIDA PHARMACY KICKBACK INVOLVING

16   $6 MILLION IN RESTITUTION, ONE YEAR OF CUSTODY FOR ONE

17   DEFENDANT, PROBATION FOR ANOTHER.

18        ALSO IN THE DISTRICT OF FLORIDA IN 2019, A $2.8 MILLION

19   KICKBACK SCHEME INVOLVING A DOCTOR ORDERING UNNECESSARY LAB

20   TESTS, 18 MONTH SENTENCE.

21        AND IN MY SENTENCING MEMO, WITHOUT GOING OVER IT, I CITED

22   TO MANY OTHER JUDGES' PERSPECTIVES IN GENERAL ANALYSIS OF THE

23   SENTENCING GUIDELINES AND HOW THOSE LOSS NUMBERS HAVE INCREASED

24   SO EXPONENTIALLY OVER THE YEARS.

25        AND, THEREFORE, I WOULD SUBMIT TO THIS COURT THAT THE

56

1    SENTENCE PROPOSED, WHICH WE'RE PROPOSING, HAS AT LEAST A YEAR

2    OF HOME CONFINEMENT.

3         AND WHILE SOME MAY SCOFF AT THE IDEA THAT MR. KAIL COULD

4    GO AND SPEAK PUBLICLY ABOUT THE MISTAKES THAT LANDED HIM IN

5    THIS POSITION IN THE FIRST PLACE, THE MERITS OF HOW TO HANDLE

6    YOURSELF AS AN EXECUTIVE WHEN IT COMES TO CONFLICTS OF

7    INTEREST, TO REALLY SPREAD A MORE SIGNIFICANT MESSAGE RATHER

8    THAN JUST SITTING IN A PRISON JUST KILLING TIME ESSENTIALLY, WE

9    SUBMIT THAT THAT WOULD BE APPROPRIATE IN THIS CASE WHERE,

10   AGAIN, LOOKING BACK, THESE WERE NOT -- THIS IS NOT THE TYPICAL

11   CASE WHERE YOU SEE JUST OUTRIGHT FRAUDULENT CONTRACTS, NOTHING

12   DELIVERED, CONSPIRACY BETWEEN THE PARTIES.

13        THAT'S NOT WHAT WE HAVE HERE.

14        AND IT'S REALLY A CASE OF LOOKING BACK AND MAKING

15   JUDGMENTS ABOUT PRODUCTS.  I THINK WE'VE DISCUSSED ALL DAY

16   TODAY OF WHETHER THIS WAS A GOOD, QUOTE, FIT.  LOOKING BACK,

17   WAS THIS A GOOD FIT?

18        AND, OF COURSE, WHEN IT COMES TO START-UPS, THAT'S SO, SO

19   SUBJECTIVE.

20        MR. KAIL, OTHER THAN THESE, WHAT, TWO AND A HALF YEARS,

21   HAS AN IMPECCABLE HISTORY.

22        AND THOSE LETTERS ARE EARNEST.  THEY RECOGNIZE NOT ONLY,

23   WE'RE AWARE OF HIS CONVICTION, WE STAND BY HIM NONETHELESS.

24   EVERYONE FROM PROFESSIONALS TO LAWYERS TO PEOPLE OF VARYING

25   BACKGROUNDS SAY THAT HE HAS BEEN THERE FOR US AND HE HAS

ER-210

1    EXHIBITED EXCEPTIONAL HONESTY, GIVEN CERTAIN OPPORTUNITIES, HAS

2    DECLINED THEM.

3         AND IN THE ENTIRE SCOPE OF THIS CASE AND OUR CURRENT

4    ENVIRONMENT, I WOULD SUBMIT TO THE COURT THAT ALL OF THE

5    FACTORS, ALL OF THE REASONS THAT THE COURT IS TO CONSIDER WHAT

6    IS AN APPROPRIATE PENALTY IN THIS CASE, IN ADDITION TO ALREADY

7    WE KNOW THE FINANCIAL CONSEQUENCES OF A FORFEITURE, AND WE

8    HAVEN'T YET DISCUSSED RESTITUTION, IT IS A SIGNIFICANT PENALTY

9    FOR MR. KAIL.  HIS REPUTATIONAL DAMAGE IS FOREVER.

10        HOWEVER, THERE ARE PEOPLE WILLING TO EMPLOY HIM, WHO

11   BELIEVE IN HIM.  IF HE IS GIVEN THE OPPORTUNITY TO REMAIN OUT

12   OF CUSTODY, HE WILL CONTINUE TO SUPPORT HIS FAMILY.  ONCE HE

13   KNOWS WHAT HIS FUTURE LOOKS LIKE, HE WILL ABSOLUTELY CONTINUE

14   TO DO THAT, BE THERE FOR HIS SONS, AND IT WOULD NOT BE AN

15   UNREASONABLE OUTCOME, ESPECIALLY WHEN YOU LOOK ACROSS THE BOARD

16   AT WHAT HAPPENS IN OTHER INSTANCES WITH FAR GREATER AND MORE

17   TRAUMATIZING LOSS.

18        YOUR HONOR, WHEN I HAVE A CLIENT WHO ENTERS A PLEA, THEY

19   ALWAYS SPEAK TO THE COURT, ALWAYS.

20        BUT IT'S A -- IT'S A UNIQUE SITUATION AFTER TRIAL WHERE

21   SOMEBODY HAS, YOU KNOW, HAS NOT WAIVED THEIR APPELLATE RIGHTS.

22   AND SO MR. KAIL DID SUBMIT A WRITTEN STATEMENT IN THE P.S.R.,

23   BUT MY ADVICE IS THAT HE NOT MAKE A STATEMENT AT THIS TIME AND

24   ALLOW ME TO SPEAK ON HIS BEHALF.

25        SO WHILE I KNOW THE COURT ENJOYS HEARING, THIS IS A

1    CIRCUMSTANCE WHERE I'VE ASKED HIM NOT TO SPEAK.

2         THANK YOU.

3              THE COURT:  ALL RIGHT.  MS. JAYNE, THANK YOU.

4         MR. KAIL, I AM GOING TO TURN TO YOU BECAUSE IT IS YOUR

5    RIGHT TO MAKE A STATEMENT TO THE COURT, CERTAINLY IN

6    CONSULTATION WITH YOUR ATTORNEY.

7         BUT THIS IS YOUR OPPORTUNITY TO MAKE A STATEMENT.  DO YOU

8    WISH TO DO SO?

9              THE DEFENDANT:  I DO NOT, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  THANK YOU.

11        ALL RIGHT.  MR. WALDINGER, COMMENTS FOR THE GOVERNMENT?

12             MR. WALDINGER:  BRIEFLY, YOUR HONOR.

13        THE GOVERNMENT IS RECOMMENDING A SENTENCE OF IMPRISONMENT

14   HERE.  MR. KAIL WAS A HIGH POWERED SILICON VALLEY EXECUTIVE WHO

15   USED HIS POSITION OF AUTHORITY TO TAKE ADVANTAGE OF SMALL

16   COMPANIES SEEKING A WELL-KNOWN CLIENT BY OBTAINING PORTIONS OF

17   THEIR COMPANIES, WITH THE INFERENCE THAT HE'D ADVOCATE FOR THEM

18   AT NETFLIX.  MANY OF THESE COMPANIES' PRODUCTS HAD NO PLACE AT

19   NETFLIX OR WERE NOT A GOOD FIT.

20        MR. KAIL PUT HIS OWN INTERESTS OVER THOSE OF THE COMPANY

21   HE WORKED FOR.

22        IT WAS AN EXTENSIVE SCHEME THAT EMPLOYED -- THAT RELATED

23   TO AT LEAST NINE SEPARATE COMPANIES, AND THERE WAS TESTIMONY AT

24   TRIAL THAT THE DEFENDANT'S STRATEGY APPEARED TO BE, QUOTE,

25   PAY-TO-PLAY.

1     AS I'VE SAID, THIS WAS AN ABUSE OF POSITION, OF POWER THAT

2     MR. KAIL HELD AT NETFLIX.

3     AND AS THE COURT HAS FOUND TODAY, THERE WAS ACTUAL HARM TO

4     NETFLIX FROM THAT CONDUCT.

5     IN ADDITION TO HARM TO NETFLIX, MR. KAIL ALSO PREYED ON

6     START-UP COMPANIES WHO NEEDED VISIBILITY AND FUNDS, AND HE

7     LEVERAGED HIS POWER TO SQUEEZE COMPENSATION OUT OF THEM.

8     HE ALSO HURT NETFLIX'S REPUTATION BY PORTRAYING ITS

9     PROCUREMENT PROCESS WAS ONE MIRED IN PAY-TO-PLAY.

10    THE CONDUCT WAS NOT ABERRANT.  IT TOOK COURSE, TOOK PLACE

11    OVER THE COURSE OF MORE THAN TWO YEARS, DURING WHICH TIME THE

12    DEFENDANT CLEARLY KNEW WHAT HE WAS DOING WAS WRONG AND

13    QUESTIONABLE AND HID HIS CONDUCT FROM OTHERS AT NETFLIX.

14    AND MS. JAYNE HAS TALKED ABOUT GENERAL DETERRENCE.  I KNOW

15    THERE'S A LOT OF DEBATE ABOUT THAT AND ABOUT WHETHER GENERAL

16    DETERRENCE WORKS.

17    CONGRESS THINKS IT DOES.

18    THE COURT:  UM-HUM.

19    MR. WALDINGER:  DETERRENCE IS ONE OF THE -- GENERAL

20    DETERRENCE IS ONE OF THE CONSIDERATIONS THAT THIS COURT MUST

21    GIVE.

22    AND I SUBMIT THAT CASES INVOLVING WHITE COLLAR CRIMES

23    PRESENT A SPECIAL OPPORTUNITY FOR THE COURT TO ACHIEVE THE GOAL

24    OF GENERAL DETERRENCE.

25    AS OTHER COURTS HAVE NOTED, ECONOMIC AND FRAUD-BASED

1    CRIMES ARE MORE RATIONAL, CRUEL, AND CALCULATED THAN SUDDEN

2    CRIMES OF PASSION OR OPPORTUNITY.  IT MAKES WHITE COLLAR CRIMES

3    PRIME CANDIDATES FOR DETERRENCE.

4         AND SO WITH THAT, YOUR HONOR, I WOULD SUBMIT.  THE

5    GOVERNMENT HAS REQUESTED A GUIDELINE SENTENCE, AND WE REPEAT

6    THAT RECOMMENDATION HERE.

7         THE COURT:  MS. WALDINGER, MS. JAYNE HAS GIVEN ME

8    EXAMPLES OF SENTENCES FOR SIMILAR CRIMES THROUGHOUT THE COUNTRY

9    THAT ARE FAR LOWER THAN WHAT IS REQUESTED HERE, AND BY HER

10   RECITATION OF THE AMOUNT OF THE FRAUD LOSS, CLEARLY THE

11   GUIDELINE WOULD BE AT LEAST THE LEVEL THAT I'VE CALCULATED, IF

12   NOT GREATER.

13        DO YOU HAVE A COMMENT ON THAT?

14        MR. WALDINGER:  I -- YOU KNOW, I THINK PEOPLE,

15   LAWYERS, FOCUS ON THE CASES THAT ARE HELPFUL TO THEM, AND I --

16   I ONCE, YOUR HONOR, HAD A WHOLE LIST OF CASES IN THIS DISTRICT,

17   EMBEZZLEMENT CASES, AND I FOUND THAT IT'S NOT VERY PERSUASIVE

18   TO THE COURT OFTEN TO POINT THEM OUT.

19        BUT I WILL RESPOND BRIEFLY JUST WITH A CASE THAT I JUST

20   HAD IN FRONT OF JUDGE BREYER WHICH DID INVOLVE KICKBACKS AND IT

21   FOUND UNDISCLOSED CONFLICTS OF INTEREST THAT JUDGE BREYER DID

22   NOT FIND TO BE, TO CAUSE A LOSS.

23        BUT IT DID INVOLVE A KICKBACK TOTALING 1.15 MILLION, AND

24   THAT WAS A CASE CALLED BHIKHA, B-H-I-K-H-A.  AND THIS YEAR,

25   THAT DEFENDANT PLEADED GUILTY.  THAT DEFENDANT ACCEPTED

1    RESPONSIBILITY.

2         THE TOTAL AMOUNT OF UNDISCLOSED CONFLICTS RESULTED IN

3    GAINS TO THE DEFENDANT OF MANY MILLIONS OF DOLLARS, AGAIN,

4    KICKBACKS OF ONLY ABOUT A MILLION.

5         BUT I BELIEVE JUDGE BREYER IMPOSED A THREE YEAR SENTENCE

6    IN THAT CASE.

7         SO I WOULD DISTINGUISH THAT CASE WITH, YOU KNOW, A

8    SLIGHTLY LOWER FINDING IN KICKBACKS, ALTHOUGH THERE WAS ALSO A

9    FINDING OF UNPAID TAXES, WHICH I THINK I WOULD HAVE TO SAY THE

10   LOSS AMOUNT WAS SLIGHTLY HIGHER.

11        BUT THAT DEFENDANT ACCEPTED RESPONSIBILITY, TOOK

12   RESPONSIBILITY FOR HIS CRIMES.

13        AND I THINK IT -- WHAT I THINK IS IMPORTANT FROM THE CASE

14   THAT I JUST CITED AND THE CASES THAT MS. JAYNE CITED IS THAT

15   PRISON IS AN APPROPRIATE REMEDY, AND I THINK THE QUESTION FOR

16   THE COURT -- BECAUSE YOU'RE SITTING UP THERE AND I'M SITTING

17   DOWN HERE -- IS WHAT YOUR HONOR THINKS IS APPROPRIATE.

18        AND I THINK THAT ONE, ONE THING THAT THE COURT SHOULD TAKE

19   INTO ACCOUNT IS THAT COURTS DO FIND THAT PRISON IS APPROPRIATE

20   IN CASES LIKE THIS WHERE THERE HAS BEEN LOSS, WHERE THERE HAS

21   BEEN AN ABUSE OF POSITION OF TRUST THAT HAPPENED OVER A PERIOD

22   OF TIME.

23        I WOULD ALSO SAY THAT CASES LIKE THIS ARE HARD TO DETECT

24   IN THAT CONSIDERATIONS OF GENERAL DETERRENCE ALSO ARGUE FOR AN

25   IN PRISON SENTENCE HERE, BECAUSE THE ATTRIBUTE OF IT BEING

1    DIFFICULT TO DETECT TENDS TO INCREASE THE EXPECTED BENEFITS OF

2    THE CRIME.

3         AND I THINK, YOU KNOW, THIS WAS SOMEWHAT OF A

4    SELF-FULFILLING PROPHESY FOR MR. KAIL, BECAUSE AS THESE

5    CONTRACTS ARE BEING ENTERED INTO AND NOBODY FOUND OUT ABOUT

6    THEM, I THINK THAT IT EMBOLDENED HIM TO CONTINUE THE BEHAVIOR.

7         I'VE DONE A LOT OF CASES IN SILICON VALLEY OVER THE YEARS,

8    AND WHAT I -- WHAT I WOULD SAY IS A PRISON SENTENCE HERE OF ANY

9    KIND, AND CERTAINLY A SIGNIFICANT PRISON SENTENCE, WILL RING

10   LIKE A BELL IN SILICON VALLEY.  IT WILL BE HEARD AND IT, IT

11   WILL DETER PEOPLE.  IT WILL KEEP PEOPLE ON THE STRAIGHT AND

12   NARROW.

13        I -- THERE WAS AN AUTHOR, I THINK ALDO LEOPOLD, WHOSE

14   FAMOUS QUOTE IS THAT ETHICAL BEHAVIOR -- AND I'M PROBABLY

15   MISQUOTING IT -- BUT ETHICAL BEHAVIOR IS DOING WHAT'S RIGHT,

16   EVEN WHEN NO ONE IS WATCHING.

17        AND I'M TOO JADED TO BELIEVE THAT PEOPLE WILL ACTUALLY

18   CHANGE THEIR STRIPES.

19        BUT IF YOU DETER PEOPLE, THEY'LL AT LEAST, EVEN IF THEY'RE

20   NOT GOING TO BE ETHICAL, THEY WILL ACT ETHICALLY BECAUSE THEY

21   DON'T WANT TO SUFFER THE CONSEQUENCES.

22        AND SO I THINK SENDING THAT MESSAGE TO OTHER INDIVIDUALS

23   WHO OCCUPY SIMILAR POSITIONS IN SILICON VALLEY IS IMPORTANT.  A

24   LOT OF BUSINESS IN THIS VALLEY IS DONE ON TRUST, AND, YOU KNOW,

25   I TELL PEOPLE ABOUT SOME OF THE CASES WE HAVE AND THEY BLAME

1    THE VICTIMS BECAUSE THEY SHOULDN'T -- PEOPLE WHO LOOK AT IT

2    FROM THE OUTSIDE SAY, WELL, WHY DID THE VICTIM NOT ASK THESE

3    QUESTIONS?  WHY DID THEY NOT DO THIS?

4        AND WHEN YOU -- BUT WHEN YOU LIVE IN THIS WORLD, YOU

5    REALIZE YOU HAVE TO TRUST PEOPLE, AND MR. KAIL'S CO-WORKERS

6    TRUSTED HIM TO ACT ETHICALLY.  HE DID NOT.

7        SO THAT'S A LITTLE BIT OF A RAMBLE, BUT THAT'S MY

8    RESPONSE, YOUR HONOR, WITH RESPECT TO OTHER CASES AND WHAT YOU

9    SHOULD DO IN THIS CASE.

10        THE COURT:  ALL RIGHT.  THANK YOU.

11        MR. POLLAK, ANY COMMENTS THAT YOU'D LIKE TO MAKE?

12        OFFICER POLLAK:  YOUR HONOR, I'VE BEEN IN

13    COMMUNICATION WITH OFFICER GREER, WHO DID THE WORK IN THIS

14    CASE, AND BASED ON THE COURT'S RULING OF THE NEW GUIDELINE

15    RANGE, BASED ON THE PERCENTAGE FROM THE ORIGINAL VARIANCE,

16    OFFICER GREER RECOMMENDS 36 MONTHS IN CUSTODY.

17        THE COURT:  I WAS TRYING TO DO THAT CALCULATION.  I

18    REALLY APPRECIATE THAT COMING FROM YOU, MR. POLLAK, AT 36

19    MONTHS AS THE VARIANCE.  THAT'S VERY HELPFUL.

20        ALL RIGHT.  MS. JAYNE, LET ME TURN TO YOU FOR ANY LAST

21    COMMENTS, ESPECIALLY IN LIGHT OF MR. POLLAK'S COMMENT ON THE

22    PROBATION RECOMMENDATION.

23        MS. JAYNE:  THANK YOU, YOUR HONOR.

24        AND I DO APPRECIATE MR. POLLAK REACHING OUT TO HER TO GET

25    THAT INPUT.

1    AND, AGAIN, I WOULD SAY MR. WALDINGER SAID COURTS FIND

2    THAT PRISON IS APPROPRIATE IN THESE KINDS OF CASES.

3    COURTS ALSO FIND THAT PRISON IS NOT APPROPRIATE IN CERTAIN

4    INSTANCES.

5    AND THIS CASE PRESENTS -- YOU KNOW, WHEN YOU LOOK ACROSS

6    THE BOARD AT KICKBACK CASES, THIS ONE IS SO SIGNIFICANTLY

7    DIFFERENT BECAUSE, FOR EXAMPLE, IN THAT BHIKHA CASE, I BELIEVE

8    THE DEFENDANT WENT SO FAR AS TO CREATE FAKE EMPLOYEES OR A FAKE

9    CEO TO COME AND SPEAK TO -- CISCO I THINK WAS THE VICTIM IN

10   THIS CASE.  HE CREATED SUCH AN EXTENSIVE SCHEME TO DECEIVE

11   CISCO INTO THINKING THAT THERE WAS THIS THIRD PARTY VENDOR, AND

12   IT WASN'T EVEN THE COMPANY, IT WAS HIM.

13   THE KICKBACK CASES INVOLVE PUBLIC OFFICIALS, MEDICAL, AND

14   WHEN YOU LOOK, THERE'S JUST, THERE'S NOTHING IN RETURN FOR THE

15   FRAUD.

16   AND WHILE THE COURT -- IN OUR DISCUSSIONS, OF COURSE, WE

17   DISAGREE ON WHAT WAS THE VALUE.  IT IS FUNDAMENTALLY DIFFERENT

18   IN THAT PRODUCTS WERE DELIVERED.  THE VENDORS THOUGHT THEY WERE

19   DELIVERING WHAT WAS BEING ASKED.  THERE WASN'T A RETURN FROM

20   NETFLIX TO THESE VENDORS SAYING, WAIT A MINUTE, WE DIDN'T EVEN

21   GET -- WE JUST PAID OUT AND GOT NOTHING IN RETURN?

22   WHETHER A PARTICULAR EMPLOYEE FOUND IT USEFUL OR NOT,

23   THAT'S REALLY WHAT WE'RE GETTING AT HERE.

24   AND MR. KAIL MADE A FUNDAMENTAL MISTAKE, YOU KNOW, THAT

25   STARTED WITH CONFLICT OF INTEREST AND WHETHER THAT WAS

1    SUFFICIENTLY DISCLOSED AND WHETHER PUTTING SOMETHING ON

2    LINKEDIN SATISFIED IT OR NOT.

3         BUT IT IS DIFFERENT FROM THE HEARTLAND, I THINK, OF THE

4    KICKBACK CASES THAT WE READ ABOUT, THAT WE SEE.

5         AND AGAIN, I WOULD URGE THIS COURT NOT TO SENTENCE

6    MR. KAIL BECAUSE THIS MESSAGE HAS TO GO OUT THERE, BECAUSE THE

7    CONSEQUENCES OF BEING IN HIS SHOES, NOBODY WOULD WISH THAT ON

8    ANYBODY, AND I DON'T THINK SOMEBODY LOOKING AT THIS SITUATION,

9    REGARDLESS OF THE SENTENCE, SAYS, I'LL TAKE THAT RISK.

10        YOU KNOW, THE STUDIES DON'T NECESSARILY SUPPORT THAT THIS

11   TYPE OF GENERAL DETERRENCE, YOU KNOW, DETERS INDIVIDUALS FROM

12   GOING OUT AND COMMITTING VARIOUS TYPES OF CRIMES.

13        AND SO I WOULD ASK THE COURT TO REALLY LOOK HARD AT WHO

14   MR. KAIL IS, THE SCOPE AND THE DAMAGE IN THIS CASE, AND WHAT

15   REALLY IS APPROPRIATE FOR THE BEHAVIOR HERE AND THE COLLATERAL

16   CONSEQUENCES OF THAT CONVICTION WHICH ARE LIFE, LIFE LASTING,

17   AND THE CONSEQUENCES ON HIS ENTIRE WORLD.

18        AND THE COURT CAN CONSIDER FAMILY, CAN CONSIDER THAT HE'S

19   THE PRIMARY AND THE ONLY FINANCIAL PROVIDER IN HIS FAMILY, NOT

20   ONLY TO HIS IMMEDIATE FAMILY, BUT AS THE COURT READ, HE

21   SUPPORTS HIS MOTHER-IN-LAW, HAS ASSISTED HIS BROTHER, EVEN

22   OTHER FAMILY MEMBERS.  HE HAS A NEIGHBOR WHO HE PURCHASED A

23   HOUSE FOR IN HIS FAMILY'S HOMETOWN, ET CETERA.

24        SO IN ALL OF THOSE WAYS, HE'S ATTEMPTING TO BE A GOOD

25   CITIZEN, AND I DON'T THINK THAT THE COURT WILL EVER, EVER SEE

1    MR. KAIL AGAIN IN TERMS OF SPECIFIC DETERRENCE, ABSOLUTELY NOT.

2        THANK YOU.

3            THE COURT:  THANK YOU.

4        WELL, SENTENCING IS ALWAYS THE DIFFICULT PART OF THE

5    COURT'S JOB.  WE'VE SPENT A SIGNIFICANT AMOUNT OF TIME GOING

6    CAREFULLY OVER THE MATTERS IN ORDER TO COME TO THE CORRECT

7    SENTENCE.

8        I DO HAVE -- AND I HAVE CONSIDERED THE 3553(A) FACTORS IN

9    ORDER TO ENSURE A SENTENCE THAT IS SUFFICIENT, BUT NOT GREATER

10   THAN NECESSARY, TO COMPLY WITH THE PURPOSES OF SENTENCING.

11       I HAVE CONSIDERED THE NATURE AND CIRCUMSTANCES OF THE

12   CRIME, INCLUDING THAT MR. KAIL WAS CONVICTED OF 21 COUNTS OF

13   MAIL AND WIRE FRAUD, INCLUDING HONEST SERVICES FRAUD, AND SEVEN

14   COUNTS OF MONEY LAUNDERING.

15       THE SCHEME WAS CARRIED OUT BY MR. KAIL, WHO ABUSED HIS

16   POSITION OF TRUST AND AUTHORITY AT NETFLIX TO APPROVE CONTRACTS

17   WITH THIRD PARTY VENDORS IN EXCHANGE FOR KICKBACKS AND

18   LUCRATIVE ADVISOR AGREEMENTS TO THE DETRIMENT OF HIS EMPLOYER.

19       I DO CONCLUDE THAT THIS IS A SERIOUS CRIME AND THAT THERE

20   IS A NEED FOR DETERRENCE AND PUNISHMENT.

21       UNDER THE GUIDELINES, I WILL IMPOSE AN APPROPRIATE

22   SENTENCE TO PUNISH MR. KAIL FOR THE CRIMES, BUT NOT GREATER

23   THAN NECESSARY.

24       EQUALLY IMPORTANT, AS MS. JAYNE POINTS OUT, I DO NEED TO

25   CONSIDER, UNDER 3553(A), MR. KAIL'S PERSONAL CHARACTERISTICS.

1      I HAVE REVIEWED THE LETTERS THAT HE SUBMITTED, I THINK THE

2   MOST POIGNANT ONE BEING FROM HIS WIFE AND THE -- I CERTAINLY

3   TOOK NOTE OF HER APPEARANCE IN COURT EVERY DAY FOR TRIAL AND

4   THROUGH THIS.

5      I WILL SAY THAT, SADLY, MANY PEOPLE APPEAR BEFORE ME WHO

6   HAVE CHILDREN WHO WILL SUFFER BECAUSE OF THE CRIMES THEY'VE

7   BEEN CONVICTED OF, AND I -- IT'S HEARTBREAKING, AND IT'S TRUE

8   THAT CHILDREN SUFFER.

9      BUT PARENTS GET SENT TO PRISON EVERY DAY, REGARDLESS OF

10  THE FACT THAT THEIR CHILDREN WILL SUFFER.

11     AND I DO TAKE IT INTO CONSIDERATION.  I DO ACKNOWLEDGE

12  THAT TRAUMA TO THESE CHILDREN AND TO THE FAMILY, BUT IT DOES

13  NOT STAND OUT SEPARATELY AS AN UNUSUAL CIRCUMSTANCE.  IT IS A

14  SAD AND TRUE CIRCUMSTANCE OF THIS CONVICTION.

15     I DO NOTE THAT MR. KAIL GREW UP IN A SMALL MIDWESTERN TOWN

16  WHERE HIS FAMILY OWNED A FARM.  HE HAD A STABLE AND LOVING

17  CHILDHOOD AND ATTENDED COLLEGE, ATTENDING -- OBTAINING A DEGREE

18  IN COMPUTER SCIENCE.

19     HE MOVED TO CALIFORNIA IN APPROXIMATELY 2000 AND HAS HAD A

20  SUCCESSFUL CAREER IN TECHNOLOGY, RISING TO VICE PRESIDENT OF

21  I.T. OPERATIONS AT NETFLIX, AND THEREAFTER SERVING AT SEVERAL

22  HIGH LEVEL POSITIONS AT OTHER TECHNOLOGY COMPANIES.

23     MR. KAIL WAS A HIGHLY COMPENSATED EMPLOYEE AT THE TIME OF

24  THESE CRIMES.  HE IS MARRIED AND HAS TWO CHILDREN.  HE HAS

25  SUBMITTED NUMEROUS LETTERS OF SUPPORT FROM FAMILY MEMBERS,

1    PROFESSIONAL COLLEAGUES, AND FRIENDS.

2         HE HAS NO PRIOR CONVICTIONS, NO PRIOR CUSTODIAL TIME.

3         THERE'S ONLY A RECENT DUI CASE, WHICH I DO NOT CONSIDER TO

4    HAVE ANY EFFECT ON MY CONSIDERATION.

5         I DO FIND THAT A GUIDELINE SENTENCE IS TOO HARSH IN THIS

6    CASE.  I DO FIND THAT THE ENHANCEMENT THAT IS -- THAT SETS THE

7    GUIDELINE IS EXTRAORDINARILY HIGH, AND ALTHOUGH IT IS THE

8    PROPER ENHANCEMENT IN THIS CASE, I FIND THAT IT IS NOT

9    PARTICULARLY HELPFUL TO ME IN DETERMINING THE APPROPRIATE

10   SENTENCE UNDER ALL OF THE CIRCUMSTANCES.

11        IN TERMS OF THE ISSUE OF DETERRENCE, IT IS A FACTOR THAT I

12   AM TO CONSIDER.

13        AND I MUST SAY THAT IN THE CASES WHERE I AM CALLED UPON TO

14   RENDER SENTENCES, MOST OF THE CASES THAT I DEAL WITH HAVE AN

15   ELEMENT OF THE CRIME AS A PERSONAL CIRCUMSTANCE OF DESPERATION

16   OF THE DEFENDANT, AND IN THIS CASE, AND IN MOST WHITE COLLAR

17   CRIMES, I MUST SAY THE CIRCUMSTANCE OF THIS CRIME IS MORE

18   LIKELY GREED.  THAT IS A DISTINCTION.  THIS IS -- THERE WAS NO

19   REASON FOR THIS CRIME.

20        IT MAY BE A PARTICULAR SICKNESS IN SILICON VALLEY THAT WE

21   RUB SHOULDERS WITH TOO MANY BILLIONAIRES, AND NONE OF US CAN

22   GENERALLY EXPECT TO BECOME BILLIONAIRES OURSELVES.  BUT IT SETS

23   A STANDARD THAT MAKES PEOPLE WANT MORE AND IN MORE WAYS.

24        AND SO I CANNOT DISMISS THESE CRIMES AS NOT BEING SERIOUS.

25        I DON'T BELIEVE THE PUBLIC IS AT RISK.  I DON'T BELIEVE

1    THAT THERE IS A HIGH -- THAT THERE IS A SIGNIFICANT PROBABILITY

2    OF REOFFENSE.  I AGREE WITH MS. JAYNE ON THAT.

3         I AGREE THAT THERE'S BEEN -- THAT THE PENALTIES -- AND I

4    DON'T CONSIDER THE EXPENSE OF PUTTING ON A DEFENSE.

5         I DO CONSIDER THE FORFEITURE, THE RESTITUTION THAT I MUST

6    AWARD AS BEING PART OF THE PENALTY HERE.  THERE MAY BE A

7    FOLLOW-ON CIVIL SUIT FROM THE GOVERNMENT IF THEY CHOOSE TO

8    PURSUE THAT.

9         ALL OF THAT BEING SAID, I DO BELIEVE THAT PRISON IS

10   APPROPRIATE IN THIS CASE.  I HAVE GIVEN A GREAT DEAL OF THOUGHT

11   TO THE TERM OF THAT SENTENCE.  I WAS -- I WAS UNABLE TO COME TO

12   A DECISION BASED ON YOUR BRIEFING.  TODAY'S HEARING WAS

13   ESSENTIAL TO ME.

14        I HAVE FOUND MS. JAYNE'S COMMENTS ABOUT THE CASE TO BE

15   VERY HELPFUL THROUGHOUT THE CASE, AND CERTAINLY HER DETAILED

16   AND THOROUGH UNDERSTANDING OF EVERY ASPECT OF THE CASE.

17        THAT SAID, THE GOVERNMENT HAS RIGHTFULLY PURSUED AND

18   OBTAINED CONVICTION FOR 27 COUNTS OF FRAUD, OF DISHONESTY, AND

19   THE PUBLIC DESERVES THE PUNISHMENT, MR. KAIL DESERVES THE

20   PUNISHMENT, AND I THINK THERE IS A DETERRENT EFFECT HERE.

21        I'M GRATEFUL FOR THE MODIFIED RECOMMENDATION OF PRETRIAL

22   SERVICES, AND I CERTAINLY DO AGREE THAT A VARIANCE IS

23   APPROPRIATE HERE.

24        I WILL NOT SENTENCE MR. KAIL TO HOME CONFINEMENT.  I DO

25   NOT FEEL THAT THAT IS SUFFICIENT.

1    AND IT IS MY DETERMINATION THAT A SENTENCE OF 30 MONTHS IS

2    APPROPRIATE IN THIS CASE.

3    AND IF THERE'S NOTHING ELSE BEFORE I IMPOSE SENTENCE, THEN

4    I WILL GO AHEAD WITH THAT.

5    PURSUANT TO THE SENTENCING REFORM ACT OF 1984, IT IS THE

6    JUDGMENT OF THE COURT THAT MICHAEL KAIL IS HEREBY COMMITTED TO

7    THE CUSTODY OF THE BUREAU OF PRISONS FOR A TERM OF 30 MONTHS.

8    THIS TERM CONSISTS OF 30 MONTHS ON EACH OF THE COUNTS ONE

9    THROUGH FOUR, AND COUNTS SIX THROUGH TWENTY-NINE, ALL COUNTS TO

10   BE SERVED CONCURRENTLY.

11   UPON RELEASE FROM IMPRISONMENT, THE DEFENDANT SHALL BE

12   PLACED ON SUPERVISED RELEASE FOR A TERM OF THREE YEARS.  THIS

13   TERM CONSISTS OF TERMS OF THREE YEARS ON EACH OF COUNTS ONE

14   THROUGH FOUR AND COUNTS SIX THROUGH TWENTY-NINE, ALL SUCH TERMS

15   TO RUN CONCURRENTLY.

16   WITHIN 72 HOURS OF RELEASE FROM THE CUSTODY OF THE BUREAU

17   OF PRISONS, THE DEFENDANT SHALL REPORT IN PERSON TO THE

18   PROBATION OFFICE IN THE DISTRICT TO WHICH HE IS RELEASED.

19   WHILE ON SUPERVISED RELEASE, THE DEFENDANT SHALL NOT

20   COMMIT ANOTHER FEDERAL, STATE, OR LOCAL CRIME; SHALL COMPLY

21   WITH THE STANDARD CONDITIONS THAT HAVE BEEN ADOPTED BY THIS

22   COURT, EXCEPT THAT THE MANDATORY DRUG TESTING PROVISION IS

23   SUSPENDED; AND SHALL COMPLY WITH THE FOLLOWING ADDITIONAL

24   CONDITIONS, INCLUDING THAT THE DEFENDANT MUST COMPLY WITH THE

25   THIRD PARTY RISK NOTIFICATION.

1     AND I DO NOTE THAT I ADOPT THE JUSTIFICATIONS SET FORTH IN

2     THE PRESENTENCE REPORT.

3         YOU MUST NOT MAINTAIN A POSITION OF FIDUCIARY CAPACITY

4     WITHOUT THE PRIOR PERMISSION OF THE PROBATION OFFICER.

5         YOU MUST PAY ANY RESTITUTION, FINE, AND SPECIAL ASSESSMENT

6     THAT IS IMPOSED BY THIS JUDGMENT AND THAT REMAINS UNPAID AT THE

7     COMMENCEMENT OF THE TERM OF SUPERVISED RELEASE.

8         YOU MUST NOT OPEN ANY NEW LINES OF CREDIT AND/OR INCUR NEW

9     DEBT WITHOUT THE PRIOR PERMISSION OF THE PROBATION OFFICER.

10        YOU MUST PROVIDE THE PROBATION OFFICER WITH ACCESS TO ANY

11    FINANCIAL INFORMATION, INCLUDING TAX RETURNS, AND MUST

12    AUTHORIZE THE PROBATION OFFICER TO CONDUCT CREDIT CHECKS AND

13    OBTAIN COPIES OF INCOME TAX RETURNS.

14        YOU MUST COOPERATE IN THE COLLECTION OF DNA AS DIRECTED BY

15    THE PROBATION OFFICER.

16        YOU MUST SUBMIT YOUR PERSON, RESIDENCE, OFFICE, VEHICLE,

17    OR ANY PROPERTY UNDER YOUR CONTROL, INCLUDING ANY COMPUTERS,

18    CELL PHONES, OR OTHER ELECTRONIC DEVICES TO A SEARCH.  SUCH A

19    SEARCH MUST BE CONDUCTED BY A UNITED STATES PROBATION OFFICER

20    AT A REASONABLE TIME AND IN A REASONABLE MANNER BASED UPON

21    REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A VIOLATION

22    OF A CONDITION OF RELEASE.  FAILURE TO SUBMIT TO SUCH A SEARCH

23    MAY BE GROUNDS FOR REVOCATION.

24        MS. JAYNE:  EXCUSE ME, YOUR HONOR.  I'M SORRY.

25        ON THE SEARCH CONDITION, I SHOULD HAVE NOTED, WE DO

1    OBJECT.  WOULD THE COURT CONSIDER WAIVING THAT GIVEN THIS IS

2    NOT ANY TYPE OF CASE WITH DRUGS OR ANYTHING LIKE THAT?

3         THE COURT:  THIS IS BASED ON REASONABLE SUSPICION AS

4    OPPOSED TO NO CAUSE SEARCH, AND I THINK THAT IS APPROPRIATE.

5    IT REQUIRES REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A

6    VIOLATION, AND SO I WILL IMPOSE IT, NOTING YOUR OBJECTION.

7         FAILURE TO SUBMIT TO SUCH A SEARCH MAY BE GROUNDS FOR

8    REVOCATION.

9         YOU MUST WARN ANY RESIDENTS THAT THE PREMISES MAY BE

10   SUBJECT TO SEARCHES.

11        IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL PAY TO THE

12   UNITED STATES A SPECIAL ASSESSMENT OF $2,800.  PAYMENT SHALL BE

13   MADE TO THE CLERK OF THE UNITED STATES DISTRICT COURT,

14   450 GOLDEN GATE AVENUE, BOX 36060, SAN FRANCISCO, CALIFORNIA,

15   94102.

16        DURING IMPRISONMENT, PAYMENT OF CRIMINAL MONETARY

17   PENALTIES ARE DUE AT A RATE OF NOT LESS THAN $25 PER QUARTER,

18   AND PAYMENT SHALL BE THROUGH THE BUREAU OF PRISONS INMATE

19   FINANCIAL RESPONSIBILITY PROGRAM.

20        IT IS FURTHER ORDERED THAT THE DEFENDANT SHALL PAY TO THE

21   UNITED STATES A FINE IN THE AMOUNT OF $50,000.  DURING

22   IMPRISONMENT, PAYMENT OF THE FINE IS DUE AT A RATE OF NOT LESS

23   THAN $25 PER QUARTER, AND PAYMENT SHALL BE THROUGH THE BUREAU

24   OF PRISONS INMATE FINANCIAL RESPONSIBILITY PROGRAM.

25        ONCE THE DEFENDANT IS ON SUPERVISED RELEASE, THE FINE MUST

1    BE PAID IN MONTHLY PAYMENTS OF NOT LESS THAN $1,000, OR AT

2    LEAST 10 PERCENT OF EARNINGS, WHICHEVER IS GREATER, TO COMMENCE

3    NO LATER THAN 60 DAYS FROM PLACEMENT ON SUPERVISION.

4        NOTWITHSTANDING ANY PAYMENT SCHEDULE SET BY THE COURT, THE

5    UNITED STATES ATTORNEY'S OFFICE MAY PURSUE COLLECTION THROUGH

6    ALL AVAILABLE MEANS IN ACCORDANCE WITH 18 U.S. CODE, SECTIONS

7    3613 AND 3644(M).

8        FINE PAYMENTS SHALL BE MADE TO THE CLERK OF THE

9    UNITED STATES DISTRICT COURT, ATTENTION FINANCIAL UNIT,

10   450 GOLDEN GATE AVENUE, BOX 36060, SAN FRANCISCO, CALIFORNIA,

11   94102.

12       THERE IS A REQUEST FROM NETFLIX FOR RESTITUTION, THE GROSS

13   AMOUNT BEING $1,745,000, WITH A SETOFF FOR AMOUNTS PREVIOUSLY

14   PAID IN THE AMOUNT OF $473,000, AND THE REQUEST FOR RESTITUTION

15   IS $1,272,000.

16       MS. JAYNE, IS THERE AN OBJECTION TO THE AMOUNT OF

17   RESTITUTION?

18           MS. JAYNE:  YES, YOUR HONOR.

19           THE COURT:  ALL RIGHT.  MR. KAIL HAS THE RIGHT TO A

20   HEARING ON THE RESTITUTION AMOUNT.

21       MR. WALDINGER, IS -- I THINK WE NEED TO JUST SET THIS FOR

22   A RESTITUTION HEARING.

23           MR. WALDINGER:  THAT'S FINE, YOUR HONOR.  AS LONG AS

24   YOUR HONOR INTENDS TO ANNOUNCE THAT YOU INTEND TO IMPOSE A

25   RESTITUTION ORDER AND SET A HEARING WITHIN 90 DAYS, THAT'S

1    FINE.

2         MY FEELING WAS THAT THE COURT COULD IMPOSE THAT TODAY.  IT

3    SEEMS LIKE YOUR FINDINGS ON LOSS AMOUNT ARE GOING TO CARRY

4    STRAIGHT OVER TO RESTITUTION.

5         THE COURT:  IT MAY.  BUT I THINK THAT MS. JAYNE HAS

6    ASSERTED THE RIGHT TO A HEARING AND I THINK SHE'S ENTITLED TO

7    THAT.

8         I WILL IMPOSE RESTITUTION.  I HAVE NO REASON NOT TO.  I

9    CAN'T -- I HAVE NO REASON THAT I COULD STATE ON THE RECORD TO

10   NOT PAY RESTITUTION.  I HAVE FOUND A FRAUD LOSS TO NETFLIX.

11   WE'RE ONLY DEALING WITH THE AMOUNT.

12        AND SO THAT WILL BE MY ORDER, AND I WILL DEFER THE ACTUAL

13   AMOUNT TO A HEARING, WHICH I'M GLAD TO SET WITHIN 90 DAYS.

14        I WILL URGE THE PARTIES TO MEET AND CONFER TO TRY TO REACH

15   A RESOLUTION OF THE RESTITUTION AMOUNT.  WITH ALL OF THE OTHER

16   FINDINGS NOW HAVING BEEN MADE IN THE CASE, I THINK THAT THAT

17   IS -- IT'S REASONABLE THAT YOU MAY BE ABLE TO REACH THAT

18   RESOLUTION.  I THINK YOU SHOULD BE ABLE TO COME TO A MEETING

19   RECOGNIZING THE OUTER LIMITS OF YOUR VARIOUS POSITIONS.

20        I WILL SET A RESTITUTION HEARING -- TIFFANY, HOW DOES -- I

21   WOULD SET THIS EITHER FOR FEBRUARY 11 OR 22.

22        MR. WALDINGER:  DID YOU SAY FEBRUARY 11TH OR 22ND,

23   YOUR HONOR?

24        THE COURT:  YES.  ONE'S A FRIDAY, THE OTHER IS A

25   TUESDAY RIGHT AFTER THE THREE-DAY WEEKEND.

1        THE CLERK:  ON THE 22ND, YOUR HONOR, YOU HAVE

2   CURRENTLY SCHEDULED TWO POSSIBLE CHANGE OF PLEAS, A SENTENCING,

3   AND MAYBE AN EVIDENTIARY HEARING.

4        THE COURT:  OH, THAT WOULDN'T BE VERY GOOD, WOULD IT?

5        THE CLERK:  NO.

6        THE COURT:  HOW ABOUT THE 11TH THEN?

7        THE CLERK:  THE 11TH YOU HAVE NOTHING SET.

8        THE COURT:  OKAY.

9        MR. WALDINGER:  I THINK THAT WOULD WORK FOR THE

10  GOVERNMENT, YOUR HONOR.

11        THE COURT:  MS. JAYNE?

12        MS. JAYNE:  FEBRUARY 11TH WOULD WORK.

13      AND, YOUR HONOR, SINCE WE'RE SCHEDULING A HEARING, THERE

14  IS ONE MORE HEARING THAT I WOULD REQUEST, AND THAT IS FOR A

15  MOTION FOR BAIL PENDING APPEAL.

16      SHOULD THAT BE HEARD ON THAT SAME DAY?

17        THE COURT:  WELL, I WAS GOING TO GET TO THAT.

18        MS. JAYNE:  OH, OKAY.

19        THE COURT:  YES, I -- ONCE AN APPEAL IS FILED, I

20  WOULD EXPECT SUCH A MOTION.  I WOULD INVITE SUCH A MOTION.  I

21  THINK IT IS -- THERE ARE MANY REASONS WHY THAT MIGHT BE A

22  REASONABLE DETERMINATION.

23      I WOULD -- I THINK THAT MAY BE THE PROPER DAY TO DO THAT,

24  AND THEN YOU CAN DO THE -- THE APPEAL, OF COURSE, HAS TO BE

25  FILED LONG BEFORE THAT, AND SO I THINK SETTING THAT -- I WILL

1    SET A SURRENDER DATE BEYOND FEBRUARY SO THAT WE CAN TAKE CARE

2    OF ALL OF THIS, AND THAT WAY MR. KAIL WILL HAVE FULL

3    OPPORTUNITY TO BRIEF THAT ISSUE.

4         MS. JAYNE: YES, THANK YOU, YOUR HONOR. YES, THE

5    NOTICE OF APPEAL HAS TO BE FILED WITHIN TEN DAYS OF THE

6    JUDGMENT, AND SO THEN I'D EXPECT MY BRIEFING, YOU KNOW, BACKED

7    UP FROM FEBRUARY 11TH. I'LL TAKE CARE OF THAT.

8         THE COURT: OKAY. SO I'M GOING TO SET THE

9    RESTITUTION HEARING AT 9:00 O'CLOCK ON FEBRUARY 11. I'M NOT --

10   I'M NOT EXPECTING AN EVIDENTIARY HEARING WITH WITNESSES, BUT IF

11   THERE'S GOING TO BE ONE, YOU HAVE TO LET ME KNOW IN ADVANCE.

12   SO I WILL EXPECT THAT YOU WILL LET ME KNOW THAT -- I MEAN,

13   CERTAINLY YOU'LL BE -- IF YOU'RE FILING ANYTHING, I MUST HAVE

14   IT AT LEAST SEVEN DAYS IN ADVANCE OF THE HEARING.

15        IF YOU WANT TO FILE A JOINT -- OR CONCURRENT MOTIONS,

16   PAPERS, THEY WOULD BE DUE NO LATER THAN FEBRUARY 4TH, AND I'M

17   GOING TO TELL YOU THEY WILL BE DUE BY NOON ON THAT DAY.

18        IF THERE IS A REQUEST FOR BAIL, YOU'LL FILE THAT SO THAT

19   THE GOVERNMENT HAS TIME TO OPPOSE IT.

20        MR. KAIL, YOU MAY APPEAL YOUR CONVICTION CONSISTENT WITH

21   THE WAIVERS IN YOUR PLEA AGREEMENT, AND IF YOU FEEL THAT YOUR

22   PLEA WAS SOMEHOW UNLAWFUL OR INVOLUNTARY, OR THERE IS SOME

23   OTHER FUNDAMENTAL DEFECT IN THE PROCEEDING. ANY NOTICE OF

24   APPEAL MUST BE FILED WITHIN 14 DAYS OF ENTRY OF JUDGMENT OR

25   WITHIN 14 DAYS OF FILING A NOTICE OF APPEAL BY THE GOVERNMENT.

1    IF YOU CANNOT AFFORD TO PAY THE COST OF AN APPEAL OR FOR

2    AN ATTORNEY TO REPRESENT YOU ON APPEAL, YOU HAVE THE RIGHT TO

3    APPLY FOR LEAVE TO APPEAL IN FORMA PAUPERIS, WHICH MEANS THAT

4    YOU CAN ASK THE COURT TO WAIVE THE FILING FEE.

5    ON APPEAL, YOU MAY APPLY FOR COURT APPOINTED COUNSEL.

6    I WILL SET A SURRENDER DATE -- I'M LOOKING AT A SURRENDER

7    DATE IN MARCH.

8    ANY OBJECTION TO THAT, MR. WALDINGER?

9    MR. WALDINGER:  BASED ON YOUR HONOR'S RULINGS AND

10   WHAT YOU WANT TO DO ON FEBRUARY 11TH, NO, YOUR HONOR.

11   THE COURT:  MARCH 8, IS THAT -- THAT'S A TUESDAY,

12   TIFFANY.  IS THAT A REASONABLE DAY?

13   THE CLERK:  YES, YOUR HONOR.

14   THE COURT:  OKAY.

15   MS. JAYNE:  AND, YOUR HONOR, THAT'S ASSUMING THAT

16   THE -- THAT THE OTHER MOTION, THE BAIL MOTION IS HEARD ON

17   FEBRUARY 11TH?

18   THE COURT:  WELL, I HAVE NO APPEAL AND I HAVE NO BAIL

19   MOTION, SO I'M JUST SETTING A SURRENDER DATE.

20   MS. JAYNE:  OKAY.

21   THE COURT:  THAT I HAVE TO DO.  OKAY?

22   I -- YOU CAN ALWAYS ASK FOR A CONTINUANCE OF THE SURRENDER

23   DATE.  I HAVE FREQUENTLY DONE THAT.  IT'S OFTEN DONE WITH THE

24   STIPULATION OF THE GOVERNMENT FOR REASONS THAT ARE STATED.

25   MR. KAIL, I ANTICIPATE THAT YOU WILL RECEIVE NOTIFICATION

1    FROM THE BUREAU OF PRISONS AS TO WHERE YOU ARE TO REPORT.  YOU

2    MUST REPORT BY 2:00 P.M. ON THE DATE OF YOUR SURRENDER,

3    MARCH 8, 2022.  IF YOU ARE NOTIFIED OF A LOCATION, YOU MUST

4    PRESENT YOURSELF THERE.  IF YOU HEAR NOTHING, THEN I RECOMMEND

5    FIRST THAT YOU CONTACT MS. JAYNE SO THAT SHE CAN CONTACT

6    PROBATION AND DETERMINE WHERE YOU ARE TO SURRENDER.

7        IF YOU KNOW NOTHING ELSE ON THAT DAY, YOU MUST PRESENT

8    YOURSELF HERE AT THE COURTHOUSE TO PROBATION TO SURRENDER BY

9    THAT DATE, AND THE UNITED STATES -- TO THE UNITED STATES

10   MARSHALS, AND THEY WILL THEN TAKE YOU INTO CUSTODY ON THAT DAY.

11       BUT PLEASE, THERE -- PLEASE COMMUNICATE THROUGH YOUR

12   ATTORNEY AS TO THAT SURRENDER IF THERE'S ANY CONFUSION.

13       MS. JAYNE, ONCE THAT APPEAL IS -- OR NOTICE OF APPEAL IS

14   FILED, IT WOULD CERTAINLY BE THE TIME FOR YOU TO FILE A REQUEST

15   FOR BAIL PENDING APPEAL, AND I CERTAINLY CAN, I THINK,

16   ANTICIPATE THE GROUNDS FOR THAT.  AND I CERTAINLY WILL LOOK

17   FORWARD TO YOUR PAPERS AND THE GOVERNMENT'S PAPERS IF THEY

18   CHOSE TO OPPOSE IT.

19           MS. JAYNE:  AND JUST TWO THINGS, YOUR HONOR.

20       ONE, SHOULD I GO AHEAD, WHEN I FILE THAT, JUST PLUG IN THE

21   DATE OF FEBRUARY 11TH, OR SHOULD I CONTACT THE CLERK TO SEE --

22           THE COURT:  YOU SHOULD PUT IT ON -- I THINK THAT

23   MAKES SENSE, DON'T YOU, MR. WALDINGER? -- ON FEBRUARY 11TH.

24           MR. WALDINGER:  I DO, YOUR HONOR.  AND I -- I DON'T

25   WANT TO JAMB MS. JAYNE UP, BUT I WOULD THINK IF SHE COULD FILE

1    THAT MOTION NO LATER THAN A MONTH FROM TODAY, WHICH WOULD BE

2    JANUARY 14TH, THAT WOULD GIVE THE GOVERNMENT A COUPLE OF WEEKS

3    TO RESPOND AND GIVE MS. JAYNE A WEEK IF YOUR HONOR WOULD LIKE A

4    REPLY ON THAT MOTION.

5         THE COURT:  WELL, ANY REPLY MUST BE FILED SEVEN DAYS

6    IN ADVANCE OF THE HEARING, SO JUST -- AND IT'LL BE NOON ON

7    FEBRUARY 4 IS THE LAST PAPER.

8         SO WHY DON'T YOU -- AND, FRANKLY, I DON'T THINK IT'S A

9    COMPLICATED MOTION TO REQUEST, SO -- SO I -- THE 14TH MAY BE

10   TOO LATE, UNLESS -- YOU NEED TO WORK OUT A BRIEFING SCHEDULE,

11   AND THEN AS LONG AS THE LAST PAPER IS A WEEK IN ADVANCE OF THE

12   HEARING, THEN I'M FINE ON THAT.  OKAY?

13        MR. WALDINGER:  VERY GOOD, YOUR HONOR.  THANK YOU.

14        MS. JAYNE:  THANK YOU.

15   AND, YOUR HONOR, IF I COULD JUST HAVE ONE MOMENT WITH

16   MR. KAIL?  THERE'S ONE OTHER THING THAT I NEGLECTED.

17        THE COURT:  YES.

18   (DISCUSSION OFF THE RECORD BETWEEN MS. JAYNE AND THE

19   DEFENDANT.)

20        MR. KALTSAS:  YOUR HONOR, WHILE MS. JAYNE IS SPEAKING

21   WITH MR. KAIL --

22        THE COURT:  YES.

23        MR. KALTSAS:  -- I JUST REQUEST THE COURT ORALLY

24   INCORPORATE THE PRELIMINARY ORDER OF FORFEITURE TO THE COURT'S

25   RULING AT THIS TIME, JUST TO -- PURSUANT TO RULE 32.2, WHEN THE

1    COURT ORDERS FORFEITURE BEFORE SENTENCING, IT SHOULD BE

2    INCORPORATED INTO THE PRONOUNCEMENT OF THE SENTENCE.  SO IF THE

3    COURT WOULD JUST ORALLY INCORPORATE THE RULING ON THE

4    PRELIMINARY FINDING.

5           THE COURT:  THANK YOU.

6        MS. JAYNE, YOU HAVE NO OBJECTION TO THAT?

7           MS. JAYNE:  I'M SORRY, I DIDN'T HEAR, YOUR HONOR.

8           THE COURT:  MR. KALTSAS IS REQUESTING THAT SINCE I

9    ISSUED A PRELIMINARY ORDER OF FORFEITURE, THAT I INCORPORATE

10    THAT RULING INTO THE SENTENCE.  THAT DOES -- THAT SAYS NOTHING

11    ABOUT THE RIGHTS OF THIRD PARTIES TO CONTEST THE FORFEITURE.

12    IT'S ONLY A PRELIMINARY RULING.

13           MS. JAYNE:  CORRECT.  WOULD THAT THEN TRIGGER THE

14    THIRD PARTY --

15           THE COURT:  I THINK THAT'S ALREADY BEEN TRIGGERED.

16           MR. KALTSAS:  YOUR HONOR, ONCE EVERYTHING IS IN,

17    WE'LL BE SENDING OUT NOTICES TO ANY THIRD PARTY, AND THAT'LL

18    TRIGGER IT.

19           MS. JAYNE:  SO THAT TRIGGERS.  OKAY.  THANK YOU.  I

20    WAS CONFUSED ABOUT THAT.

21        YES, I'M OKAY WITH THAT.

22           THE COURT:  OKAY.  THANK YOU.  THEN THE COURT DOES

23    INCORPORATE INTO THIS SENTENCE ITS WRITTEN PRELIMINARY ORDER OF

24    FORFEITURE IN THE AMOUNT SET FORTH IN THE ORDER.

25           MR. KALTSAS:  THANK YOU, YOUR HONOR.

 1          THE COURT:  YES, AND THANK YOU FOR REMINDING ME OF

 2     THAT.

 3          AND I THOUGHT I HAD ONE MORE THING I WANTED TO MENTION.

 4     LET'S SEE.

 5          OH, I HAVE MADE A VERY DETAILED RULING ON THE FRAUD LOSS

 6     AMOUNT ON THIS RECORD.

 7          MR. WALDINGER, SOME JUDGES ISSUE A WRITTEN ORDER ON THIS.

 8     DO YOU FEEL THAT THAT IS NECESSARY?  OR IS THE RECORD

 9     SUFFICIENT?

10          MR. WALDINGER:  I THINK IN THIS CASE, WITH A FULL

11     TRIAL, YOUR HONOR, AND NUMEROUS EXHIBITS, I THINK THAT THE

12     RECORD IS COMPLETE AND WE DON'T -- I DON'T THINK WE NEED A

13     SEPARATE RULING FROM YOUR HONOR.

14          THE COURT:  ALL RIGHT.  I TRY TO STATE ALL MY REASONS

15     ON THE RECORD.

16        MS. JAYNE, YOU AGREE WITH THAT?

17          MS. JAYNE:  I THINK THAT'S FINE, YOUR HONOR.

18          THE COURT:  OKAY, GOOD.  THEN I WILL NOT BE ISSUING A

19     FURTHER WRITTEN ORDER.

20          AND JUST SO THAT THE RECORD IS CLEAR ON THAT RULING, I

21     THINK I SAID IT OVER AND OVER AGAIN, I DID MAKE THE RULING

22     BASED ON A PREPONDERANCE OF THE EVIDENCE, BECAUSE THE REQUESTED

23     CONSIDERATION OF FRAUD LOSS WAS FOR LOSS REGARDING CRIMES OF

24     CONVICTION AND NOT UNCHARGED CONDUCT, AND THAT WAS MY

25     DETERMINATION.

1    SO, AGAIN, JUST FOR -- THAT'S THE KIND OF THING I WOULD

2    HAVE PUT IN AN ORDER.  I KNOW THAT THAT WAS AN ISSUE OF

3    CONTENTION, AND THAT WAS MY CONSIDERATION.

4        AND I WENT THROUGH MY REASONS FOR DETERMINING THE NET LOSS

5    TO NETFLIX AND NOT JUST THE GROSS LOSS.

6        SO I THINK THAT IS -- I THINK THAT'S EVERYTHING I WOULD

7    HAVE PUT IN A WRITTEN ORDER THAT I MIGHT NOT HAVE MENTIONED

8    TODAY.

9        ALL RIGHT.

10        MS. JAYNE:  OH, YOUR HONOR, THE ONE MATTER THAT I HAD

11    TAKEN A SMALL BREAK FOR, YOUR HONOR, THE DEFENDANT OBVIOUSLY

12    CAN REQUEST A PARTICULAR FACILITY.  TO THE EXTENT THE BUREAU OF

13    PRISONS HONORS THAT, THAT IS UP TO THEM.

14        BUT ON MR. KAIL'S BEHALF, WE WOULD REQUEST ACTUALLY FCI

15    SAFFORD, AND IT'S IN ARIZONA.  THAT'S THE ONE WE REQUEST, AND

16    THE REASON FOR THAT IS OUR UNDERSTANDING IS THAT, YOU KNOW, THE

17    BUREAU OF PRISONS, IT'S -- THERE'S A LOT OF RESTRICTIONS WITH

18    COVID AND THERE'S LIMITED PROGRAMS IN MANY OF THESE FACILITIES.

19        BUT APPARENTLY IN ARIZONA IT'S A LITTLE BIT -- THERE'S

20    MORE OPPORTUNITIES FOR PROGRAMMING AND OTHER WAYS TO MAKE USE

21    OF THE TIME WHILE YOU ARE THERE.

22        AND SO ALTHOUGH IT'S A LITTLE BIT FURTHER, I'VE HAD

23    CLIENTS IN LOMPOC AND IT'S BEEN JUST DREADFUL.

24        THE COURT:  I KNOW IT HAS.

25        MS. JAYNE:  SO THAT'S THE ONE THAT WE WOULD REQUEST,

1    TO THE EXTENT THAT THE BUREAU OF PRISONS WILL RESPECT THAT, IF

2    THE COURT COULD INCLUDE A REFERRAL TO FCI SAFFORD.

3           THE COURT:  ALL RIGHT.  I WILL MAKE THE REFERRAL, THE

4    REQUEST FOR FCI STAFFORD IN ARIZONA.

5       THIS COURT NOTES FOR THE RECORD THAT I AM NOT AWARE OF

6    WHETHER MR. KAIL'S CLASSIFICATION WOULD MAKE HIM ELIGIBLE FOR

7    THAT FACILITY.  BUT MY RECOMMENDATION IS NOT IN ANY WAY TO

8    INFLUENCE THE CLASSIFICATION OF MR. KAIL.  BUT THE REQUEST

9    IS -- WILL CERTAINLY BE MADE.

10       I THINK THAT TAKES CARE OF EVERYTHING THIS MORNING.

11       I APPRECIATE THE THOROUGHNESS OF ALL OF THESE HEARINGS.

12   WE HAD A LOT TO GET THROUGH.

13       I WILL SEE YOU AGAIN ON FEBRUARY 11.

14       AND LET ME REITERATE THAT I URGE YOU TO MEET AND CONFER TO

15   DISCUSS A RESOLUTION OF THE RESTITUTION AMOUNT.  I THINK THAT

16   KNOWLEDGE OF THE VARIOUS ARGUMENTS IS ALREADY SET, AND THAT

17   CERTAINLY NETFLIX AS THE VICTIM WILL NEED TO BE CONSULTED, BUT

18   IT MAY BE THAT A CAREFUL CONSIDERATION OF THE LIKELY OUTCOME

19   WILL BRING THE PARTIES TO A RESOLUTION, AND I WOULD URGE THAT.

20           MR. WALDINGER:  THANK YOU, YOUR HONOR.

21           THE COURT:  ALL RIGHT.  THANK YOU ALL.

22           MR. WALDINGER:  AND, YOUR HONOR, WITH RESPECT TO THE

23    REFERRAL FOR ARIZONA, I THINK IT'S SAFFORD.

24           THE COURT:  SAFFORD, OKAY.

25           MR. WALDINGER:  WITHOUT A T.

1          MS. JAYNE:  S-A-F-F-O-R-D.  THANK YOU.

2          THE COURT:  THANK YOU.  I MISSTATED IT.  SAFFORD.

3     THANK YOU.

4        ALL RIGHT.  I THINK WE ARE CONCLUDED.

5          MR. WALDINGER:  THANK YOU, YOUR HONOR.

6          MR. KALTSAS:  THANK YOU, YOUR HONOR.

7          MS. JAYNE:  THANK YOU, YOUR HONOR.

8          THE CLERK:  COURT IS ADJOURNED.

9        (THE PROCEEDINGS WERE CONCLUDED AT 12:51 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                         CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18         DATED:  MARCH 9, 2022

19

20

21

22

23

24

25

1

2

3         **UNITED STATES DISTRICT COURT**

4        **NORTHERN DISTRICT OF CALIFORNIA**

5             **SAN JOSE DIVISION**

6

7   UNITED STATES OF AMERICA,        Case No. 18-cr-00172-BLF-1

8            Plaintiff,

9          v.             **ORDER DENYING MOTION FOR**
                                 **JUDGMENT OF ACQUITTAL AND**

10  MICHAEL KAIL,             **MOTION FOR NEW TRIAL**

11            Defendant.

12

13       Defendant Michael Kail moves this Court for a post-verdict judgment of acquittal or, in the

14 alternate, a new trial. Mot., ECF 250. Because the trial evidence was sufficient to permit a reasonable

15 juror to find the essential elements of the underlying counts of conviction, and because the interests

16 of justice do not necessitate a new trial, Kail's motion is DENIED.

17   **I.**     **BACKGROUND**

18       A grand jury charged Kail with nineteen counts of pecuniary wire fraud and honest services

19 wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, three counts of pecuniary mail and honest

20 services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346, and seven counts of money

21 laundering, in violation of 18 U.S.C. § 1957. Indictment, ECF 1. Kail was charged with 29 counts

22 total. The charges flowed from an alleged scheme in which Kail used his position as a Vice President

23 at Netflix, Inc. ("Netflix") to approve contracts with third-party vendors in exchange for kickbacks

24 in the form of commission fees and lucrative advisor agreements. *Id*. ¶¶ 16-24.[1] This scheme was

25

26

27 _____

28 [1] The government charged Kail for conduct implicating nine Netflix vendors. Counts One, Two, and
Three charged Kail with wire fraud related to his dealings with NetSkope, Inc. ("NetSkope"). Jury

*United States District Court*
*Northern District of California*

allegedly carried out in two ways: by depriving Netflix of money or property and by depriving Netflix of Defendant's honest services. *Id*. ¶ 21.

At trial, the government's case-in-chief spanned nine days, during which time the jury heard testimony from 29 witnesses and viewed hundreds of exhibits. *See generally* Tr. Vols. 2-10. As to each fraud count, the jury was asked to specify the theory of liability under which it convicted Kail—money-or-property fraud, honest services fraud, or both. *See United States v. Pelisamen*, 641 F.3d 399, 406 (9th Cir. 2011). After deliberating for four days, the jury delivered a split verdict, finding Kail guilty of 28 counts. Jury Verdict, ECF 230. This motion followed.

## II. DISCUSSION

### A. Rule 29

Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

The Court's review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

Verdict. Counts Four and Twenty charged Kail with mail or wire fraud related to his dealings with Maginatics, Inc. ("Maginatics"). *Id*. Counts Five, Six, Seven, Eight, and Twenty-One charged Kail with mail or wire fraud related to his dealings with Docurated, Inc. ("Docurated"). *Id*. Counts Nine, Ten, and Eleven charged Kail with wire fraud related to his dealings with ElasticBox, Inc. ("ElasticBox"). *Id*. Count Twelve charged Kail with wire fraud related to his dealings with Sumo Logic, Inc. ("Sumo Logic"). *Id*. Counts Thirteen, Fourteen, and Fifteen charged Kail with wire fraud related to his dealings with Platfora, Inc. ("Platfora"). *Id*. Count Sixteen charged Kail with wire fraud related to an email he sent to Netflix CEO Reed Hastings on March 25, 2014. *Id*. Count Seventeen charged Kail with wire fraud related to his dealings with VistaraIT, LLC. ("Vistara"). *Id*. Counts Eighteen and Nineteen charged Kail with wire fraud related to his dealings with Numerify, Inc. ("Numerify"). *Id*. Count Twenty-Two charged Kail with mail fraud related to his dealings with Vistara and NetEnrich, Inc. ("NetEnrich"). *Id*.

2

United States District Court
Northern District of California

doubt." *Id.* at 319 (emphasis original); se*e also McDaniel v. Brown*, 558 U.S. 120 (2010) (reaffirming this standard); *accord United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir.2010) (en banc). This rule establishes a two-step inquiry:

> First, a ... court must consider the evidence presented at trial in the light most favorable to the prosecution.... [And s]econd, after viewing the evidence in the light most favorable to the prosecution, the ... court must determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." This second step protects against rare occasions in which "a properly instructed jury may ... convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]"

*Nevils*, 598 F.3d at 1164 (quoting *Jackson*, at 319) (emphasis in original).

Pursuant to Rule 29, Kail argues that the government failed to adduce sufficient evidence (1) that Kail defrauded Netflix of property, (2) of a quid pro quo, and (3) of Kail's specific intent to deceive and cheat. Mot. at 3-21. He also argues that he must be acquitted for the seven counts of money laundering because the government did not prove the underlying criminal conduct. Mot. at 21-22. The government disagrees, and directs the Court to evidence supporting the jury verdict. *See generally* Opp., ECF 251.

### 1. *Pecuniary Fraud: Scheme to Defraud Netflix of Property*

The money-or-property fraud charged in Counts 1 through 22 required proof that Kail knowingly devised a scheme or plan for obtaining money or property by means of false or fraudulent representations or omissions; that the statements made or omitted were material; that he acted with the specific intent to deceive and cheat; and that wires or mails were used. Jury Instr. Nos. 42A, 43A, ECF 226; 18 U.S.C. §§ 1341, 1343; 9th Cir. Model Jury Instrs. §§ 8.121, 8.124; *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003); *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1085 (2021). Kail now argues that he must be acquitted on all pecuniary fraud counts because the government failed to prove a scheme to defraud Netflix of money or property. Mot. at 3-10.

3

"Wire fraud requires the intent to deceive and cheat — in other words, to deprive the victim of money or property by means of deception." *Miller*, 953 F.3d at 1103; *see also Shaw v. United States*, 137 S. Ct. 462, 469 (2016) (holding that the bank fraud statute requires that the alleged scheme to defraud deceive and deprive the victim of something of value). The jury instructions defined a property interest as "an economic interest" and property as "money or another form of property with economic value." Jury Instr. Nos. 42A, 43A.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Kail's scheme defrauded Netflix of property. *See Jackson v. Virginia*, 443 U.S. at 319. Throughout trial, the government offered evidence that Kail entered into contracts that ran afoul of Netflix's standards and were otherwise unfavorable to Netflix. The scheme to deprive Netflix often manifested as Kail entering into contracts for technology his team considered subpar. For example, Kail introduced the vendor Netskope to Netflix. Tr. Vol 5 at 1143:15-17. Rob Fry, who worked in Netflix's I.T. Department and reported to Kail, evaluated Netskope's technology and made an internal recommendation that Netflix should not "move towards production." *Id.* at 1144:1-15. According to Fry, Netskope "never, for us, achieved that scale that it needed for us to fully deploy it." *Id.* at 1143:23-25. Kail himself acknowledged flaws with Netskope's product, telling the company in an email that it's "probably good that it was me and not something else" just days before signing a $112,500 contract with the company in July 2014. Exhibit 462 (July 5 email from Kail to Netskope); Exhibit 464 (contracted signed by Kail on July 9).

Similarly, Fry testified that after Kail brought Vistara into Netflix, Fry "started to take a look at [the technology]." Tr. Vol. 5 at 1140:10-12. Fry ultimately determined that "it was going to take a while to get [Vistara] to where we needed them to be to replace the existing tools that we already had implemented" and that there was not a "broad rollout . . . because we never trusted it or got it to the point or trusted it enough to replace the existing tools." Tr. Vol. 5, 1141:2-25. Fry testified that he did not believe Vistara made it past a proof of concept and that the technology never was in

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"production" at Netflix. Tr. Vol. 5, 1142:1-14. Ashi Sheth, a Senior Systems Engineering Manager in Netflix's IT Operations group, corroborated Fry's testimony, stating that Vistara was the "wrong solution" for IT equipment tracking, given Netflix's headquarters-based environment. Tr. Vol. 8 at 1647:11-20. Sheth communicated this to Bobby Meneses, who reported directly to Kail. *Id*. at 1648:12-18. Ashley Sprague, who reported to Kail at the time, determined after testing Vistara's product that "[Netflix] had other technology that was doing a better job, so it was not a good fit," and reported this negative evaluation back to Kail. Tr. Vol. 9 at 1822:20-24. Sprague—who headed Netflix's I.T. Department after Kail left the company in 2014—further testified that Vistara software was never "in production" at Netflix and was "not even in limited use." *Id*. at 1826:3-6; *see also* Exhibit 235 (email from Sprague to Vistara). Despite this feedback, Kail approved monthly billings for 2,000 Vistara devices in June 2012. Tr. Vol. 4 at 911:7-14; Tr. Vol. 9 at 1830:4-13; Exhibit 209 (technology proposal signed by Kail). Sprague was "surprised" when she ultimately learned that Netflix was paying Vistara for its software. Tr. Vol. 9 at 1828:11-12. This evidence supports a finding by the jury that Kail economically harmed Netflix by signing contracts for inferior technology. *See United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).

The government also introduced evidence that Kail approved a payment of $155,000 to Platfora at the demand of Platfora's CEO and CFO outside of the terms of the contract. Exhibit 327 (Platfora contract); Exhibit 1110 (email between Platfora employees discussing that the company needed $155,000 from Netflix to avoid de-booking); Exhibit 351 (email from Sundholm to Kail stating "Were you expecting the final Platfora invoice to be $155K? . . . from my calculations we should owe $80k to date; we have paid $60K so far."); Tr. Vol. 11 at 2325:11-12, 22-24. This payment was prompted after Netflix's Yingkuan Liu cancelled the Platfora contract in April 2014, just two months into its first phase. Exhibit 629 (email from Liu to Platfora). Viewing this evidence in a light most favorable to the prosecution, a juror could have concluded that Netflix made an unnecessary payment and suffered financial detriment by virtue of the kickbacks and commissions

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kail received. *See United States v. Osser*, 864 F.2d 1056, 1063 (3rd Cir. 1988) (upholding a pecuniary mail fraud conviction where "the jury . . . was charged explicitly that it could find financial detriment to the [victim] as a result of the kickbacks and commissions received by [the Defendant].").

While some of the evidence before the Court is circumstantial, it nonetheless supports a reasonable inference that Kail's scheme defrauded Netflix of money or property by enabling vendors to enjoy more favorable contracts with Netflix than they otherwise would have been able to attain. A rational juror could have inferred that had Kail not been paid kickbacks by the third-party companies, Netflix would have paid less for said contracts—or would not have entered them at all. The prosecution introduced evidence that Kail received sizable commission fees for entering into contracts with Vistara and NetEnrich. Exhibit 107 (referral agreement); Tr. Vol 4 at 819:23-820:7. This testimony alone would support such an inference; but the government further introduced evidence that when Netflix procurement employee Sylvia Sundholm reviewed an invoice for Vistara and NetEnrich contractors, she reached out to Kail because it was "unclear what was being delivered" and the hourly rate for the contractors was "higher than agreed." Exhibit 229; Tr. Vol 4 at 942:23-943:24.

This evidence satisfies the scheme to deprive element as to all twenty-two counts of pecuniary fraud. *See* Jury Instr. Nos. 42A, 43A; 18 U.S.C. §§ 1341, 1343. Kail suggests that the government was required to offer evidence that Kail deprived Netflix of economic value as to each and every count of wire or mail fraud, *see* Reply at 8, but the law does not require this particularization. Kail is charged with two schemes to defraud—one of which deprived Netflix of money or property and one of which deprived Netflix of Kail's honest services. *See* Indictment ¶ 21. The government need not prove twenty-two individual schemes to defraud Netflix of money or property, but rather that a common scheme to defraud existed and that Kail used wires or mails in furtherance of the scheme. *See United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016); *United States*

*v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013); *Woods*, 335 F.3d at 997. This principle is well-settled. Indeed, it is this logic that blunts the effect of Fed. R. Evid. 404(b) and allows for the introduction of uncharged transactions to prove the existence of a scheme to defraud. *See, e.g.*, *United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016) ("The uncharged transactions, therefore, are part of the charged offense—the fraudulent scheme as a whole—not 'other' crimes or 'other' acts evidence."). And it is this logic that allows the government to charge Kail with wire fraud for sending an email to Netflix CEO Reed Hastings in which he denied that he was formally helping Platfora and implied that he was assisting them on a solely volunteer basis. Exhibit 13; *see* Mot. at 20. While Kail's email to Hastings did not in and of itself deprive Netflix of money or property, it allowed him to conceal and further the scheme as a whole.

To escape this conclusion, Kail cites to caselaw he believes suggests that the evidence the government proffered at trial does not fall within the definition of property. None of these cases carry the day. *Kelly v. United States* involved wire fraud on the Port Authority arising from a scheme by public officials to impose traffic gridlock on Fort Lee, New Jersey. 140 S.Ct. 1565, 1568 (2020). The public officials limited Fort Lee's access lanes to the George Washington Bridge—an entryway into Manhattan—to punish the Fort Lee mayor for refusing to endorse New Jersey Governor Chris Christie in his reelection bid. *Id*. Kail argues that the Supreme Court's opinion in *Kelly* "reiterates the 'economic loss' requirement and confirms that property fraud requires conversion: a 'taking of property' from the victim and converting it to another's benefit." Mot. at 4 (quoting *Kelly*, 140 S. Ct. at 1573). The Court does not disagree. But the Supreme Court's holding in *Kelly* was guided by the fact that the object of the public officials' scheme was to reallocate the bridge's access lanes— a regulatory power—and that any corresponding loss of property—the time and labor expended by Port Authority employees—was a mere "implemental cost[]" of the scheme. *Kelly*, 140 S. Ct. at 1573-1574. Such reasoning cannot extend here, where the loss to the victim was far more than an "incidental byproduct of the scheme." *Id*. Indeed, as the Court discussed above, there is evidence

7

that Kail directly contemplated that the contracts he signed deprived his employer of economic value.

Nor does *Skilling v. United States* provide Kail an escape hatch. Defendant cites to this case for the proposition that a schemer's gain must "mirror" a victim's loss. Mot. at 4 (citing *Skilling*, 561 U.S. 358, 400 (2010)). According to Kail, this means "schemes to steer a contract to someone who would not have gotten it honestly are not property fraud unless they also contemplate causing economic harm –**causing the victim to give up more, or receive less, economic value** than it otherwise would have." *Id.* (citing *McNally v. United States*, 483 U.S. 350, 360 (1987)) (emphasis in original). Kail persists: "[t]he government's theory was that the scheme deprived Netflix of its interest in conflict-of-interest-free employees signing contracts and the ability to make business decisions based on truthful information. But that interest is not 'property' within the meaning of the mail and wire fraud statutes, as described above." *Id.* at 4-5.

*Skilling* involved a challenge to the honest services wire fraud statute—not the money-or-property wire fraud statute underpinning the convictions at issue here. *Skilling*, 561 U.S. at 399. Nonetheless, the Supreme Court in *Skilling* highlighted that, in contrast to honest services fraud, pecuniary fraud requires that "the victim's loss of money or property supplied the defendant's gain." *Id.* at 400. This guidance is in accord with other Supreme Court and Ninth Circuit precedent, which is clear that pecuniary fraud schemes must contemplate the deprivation of a financial or property interest. *Shaw*, 137 S. Ct. at 469 (2016) (a "scheme [to defraud] must be one to deceive the [victim] and deprive it of something of value."); *Miller*, 953 F.3d at 1103 ("[W]ire fraud requires the intent to deceive and cheat—in other words, to deprive the victim of money or property by means of deception."); *see also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) ("the government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."); *United States v. Walters*, 997 F.2d 1219, 1227 (7th Cir. 1993) ("A deprivation is a necessary but not a sufficient condition of mail

fraud. Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement."). To sustain a pecuniary fraud conviction, however, the government need not proffer evidence that the scheme was successful, *i.e.*, that it, in fact, resulted in economic or property loss to the victim. *Lindsey v. United States*, 332 F.2d 688 (9th Cir. 1964) ("[t]here is no requirement (for a conviction under 18 U.S.C. 1343) that the victim be actually deceived, but only that there be a scheme to defraud."), *cert. den*. 371 U.S. 922; *United States v. Pollack*, 534 F.2d 964, 971 (D.C. Cir. 1976) ("The fraud statutes speak alternatively of devising or intending to devise a scheme to defraud and do not require that the deception bear fruit for the wrongdoer or cause injury to the intended victim as a prerequisite to successful prosecution . . . [S]uccess of the scheme and loss by a defrauded person are not essential elements of the crime under 18 U.S.C. §§ 1341, 1343 . . . "), *cert. denied*, 429 U.S. 924 (1976).

The Court agrees with Defendant that the instant case and *Skilling* both involve undisclosed conflicts of interest. *See* Mot. at 4-5; *Skilling*, 561 U.S. at 413. But the similarities end there. Even ignoring that *Skilling* concerned honest services fraud, the government introduced evidence at trial that Kail's scheme anticipated depriving Netflix of property by entering into unfavorable contracts or contracts that provided Netflix with inferior products. *See Finazzo*, 850 F.3d at 111 (2d Cir. 2017) ("This economic harm can be manifested directly—indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received."). Kail insists that the government was required to introduce evidence that "comparative[ly] lower-priced or higher-quality vendors for the same product . . . 'lost out' on a contract as a result of Mr. Kail's actions." Mot. at 5. But this directive is too granular; the government was free to prove that Kail intended to deprive Netflix of property in other ways as well. And, indeed, it did so.

It is this evidence that undermines Defendant's reliance on *McNally v. United States*, 483 U.S. 350, 356 (1987), *United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) and *United States v. Zauber*, 857 F.2d 137 (3rd Cir. 1988). Mot. at 5-7. In each of these cases, the reviewing

9

United States District Court
Northern District of California

court highlighted the absence of any evidence of economic loss in the fraud scheme. *McNally* was a kickback case; as a condition of winning a contract to insure the state of Kentucky, an insurance agency promised to funnel a portion of its commissions to other agencies for the defendants' benefit. 483 U.S. at 352-53. The indictment alleged a scheme to deprive Kentucky of its "right to have [its] business and its affairs conducted honestly" and "free from … dishonesty [and] deceit." *Id*. at 354 n.4. Reviewing the record for proof that the scheme deprived Kentucky of "property," the Court found none—because "[i]t was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance." *Id*. at 360 (emphasis added). Here, the indictment clearly alleges and the government offered evidence supporting an inference that Netflix would have entered into more favorable contracts with vendors absent Kail's scheme. *See* Indictment ¶ 21.

In *Bruchhausen*, the defendant was convicted of wire fraud for scheming to smuggle American technology to Soviet Bloc countries. 977 F.2d at 466. The Ninth Circuit reversed the convictions, finding that the technology manufacturers received "full sale price for their products" and that the government's potential forfeiture interest in the technology was too "ethereal" to be considered a property interest. *Id*. at 467. Here, the government offered the jury ample evidence to support a finding that the contracts Kail entered into on behalf of Netflix left money on the table. Kail's insistence that *Bruchhausen* required the government to present evidence of "comparative lower-priced or higher-quality vendors for the same product" is thus inapt. Mot. at 5.

In *Zauber*, the administrators of an employee pension fund were charged with money-or-property fraud for causing the fund to invest money in an entity whose principals then paid kickbacks to the fund administrators. 857 F.2d at 140–41. In support of its indictment, the government argued that the pension fund suffered an actual loss of money or property because the pension fund was deprived of control over its money. The Third Circuit, focusing on a footnote in *McNally*, reasoned that said footnote "suggests ... that such a theory is too amorphous to constitute

United States District Court
Northern District of California

a violation of the mail fraud statute as it is currently written." *Id*. at 147. In a subsequent decision, the appellate court cabined the reach of its decision in *Zauber*:

> *Zauber* must be read carefully. In that case, the indictment and the charge to the jury were focused solely on the deprivation of the employee's honest services by the receipt of kickbacks. *There was no evidence of property loss nor was the jury asked to consider whether the taking of kickbacks constituted a monetary loss to the victimized pension fund.* Indeed, the trial court instructed the jury that 'it is absolutely irrelevant whether or not there was any loss in pension benefits, as well as whether or not the pension fund is presently financially strong.'"

*Osser*, 864 F.2d at 1063 (emphasis added) (quoting *Zauber*, 857 F.2d at 145). In other words, the holding in *Zauber* was motivated by the *complete* absence of any evidence of financial loss. The court in *Osser* went on to uphold a pecuniary mail fraud conviction where "the jury . . . was charged explicitly that it could find financial detriment to the [victim] as a result of the kickbacks and commissions received by [the Defendant]." *Id*. at 1063.

At bottom, the jury was presented with ample evidence from which to conclude that Defendant intended to defraud his employer of property by paying for products the company did not need at all or far beyond what was needed, paying for products after the company stopped using them, and paying amounts beyond Netflix's contractual obligation. The pecuniary fraud convictions stand.

### 2. *Honest Services Fraud: Quid Pro Quo*

The honest services fraud charged in Counts 1 through 22 required proof that Kail knowingly devised a scheme to deprive Netflix of its right of honest services money or property; that the scheme consisted of exchanging bribes or kickbacks for Kail's services (the quid pro quo); that Kail acted with the specific intent to defraud; that Kail's act was material; and that wires or mails were used. Jury Instr. Nos. 42, 43; *see also* 18 U.S.C. §§ 1341, 1343, 1346; 9th Cir. Model Jury Instr. §§ 8.123, 8.124; *Skilling v. United States*, 561 U.S. at 413; *United States v. Milovanovic*, 678 F.3d 713, 722, 727 (9th Cir. 2012) (en banc); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 941-943 (9th Cir.

United States District Court
Northern District of California

2009). The instruction further stated that "[b]ribery and kickbacks involve the exchange of things or things of value for services by a fiduciary, in other words, a quid pro quo (a Latin phrase meaning 'this for that' or 'these for those.'" Jury Instr. Nos. 42, 43. Kail now asks the Court to acquit him on all honest services fraud counts, arguing that there was no proof of quid pro quo between himself and any third-party vendor. Mot. at 10-20. According to Kail, "the most that the jury could have found from the testimony of witnesses was undisclosed conflicts of interest, secret payments, or undisclosed self-dealing." *Id*. at 10.

The Court disagrees. There can be no dispute that honest services fraud requires something more than undisclosed conflicts of interest. *Skilling*, 561 U.S. at 413. In *United States v. Skilling*, the Supreme Court considered the case of Enron Corporation officer Jeffrey Skilling, who was indicted for allegedly engaging in a scheme to deceive investors about Enron's financial status by manipulating Enron's financial data and making false and misleading statements to investors and the Securities and Exchange Commission. *Id.* at 368-369. Skilling was charged with conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. §§ 371, 1343, and 1346 by depriving Enron and its shareholders of the intangible rights of his honest services. *Id.* The Supreme Court overturned his convictions under these charges, holding that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law," *id.* at 409 (emphasis in original), and that Skilling's conduct did not fall within § 1346's proscription "[b]ecause [his] alleged misconduct entailed no bribe or kickback," *id.* at 368. In so holding, the high court emphasized that "[t]he 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 2930 (emphasis added) (citation omitted); *see also Milovanovic*, 678 F.3d at 726 (holding that a breach of a trust relationship not arising to a formal fiduciary duty suffices for purposes of honest services fraud under 18 U.S.C. §§ 1341 and 1346). The Court did not explicitly define the meaning of a kickback under 18 U.S.C. § 1346; it did, however, cite to other statues defining kickbacks from which the honest services fraud statute draws.

ER-251

*Id.* at 412-413. For example, the Supreme Court looked to 41 U.S.C. § 52(2), which defines the "term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]." *Id.* (alterations in original).

Kail's conduct implicates far more than the undisclosed conflicts of interest at issue in *Skilling.* The record, viewed in a light most favorable to the prosecution, supports a finding by a rational trier of fact that Kail accepted or solicited compensation from vendors in exchange for landing those vendors Netflix contracts. *Jackson*, 443 U.S. at 319. The existence of a quid pro quo was never so clear as when the government introduced evidence concerning Netflix vendor Platfora. The government introduced evidence that Platfora CEO Ben Werther, after meeting with Kail, stated that "the strong suggestion was if we [grant Defendant a quarter point of equity in Platfora], and remain responsive like we have been, we'd be able to get a $600k[2] 3 year deal [with Netflix] done by Labor Day." Exhibit 309; *see also* Werther Deposition, Vol. 1 at 150-151 ("[Kail] likes to have that advisory relationship because it means that he's got an ability to influence and make sure that the products are going to end up being the products that Netflix ultimately needs.") Platfora employee Michael Rossi agreed with Werther that Kail was "working the grey area between [Customer Advisory Board] and leveraging the Netflix logo for personal advantage." *Id.*; *see also* Exhibit 333 (email from Werther to Rossi stating "[t]here is clearly some pay-to-play there"). Yet another Platfora employee, Theresa Vu, signaled the existence of a quid pro quo between Platfora and Kail, stating in an email with Werther that "Kail has equity now so he owes us more than a normal customer" and that the compensation meant that Kail "would have at least tried a little harder

---

[2] That Platfora employee Mike Rossi originally proposed a $800k-900k deal with Netflix, Exhibit 317, does not blunt the other evidence supporting an inference that Kail accepted compensation from Platfora in exchange for signing a vendor contract with Netflix.

13

ER-252

with his [public relations] team" on a testimonial. Tr. Vol. 4 at 781:2-21; *see also* Exhibit 330. Kail himself acknowledged that Platfora was not worth $100,00 per year and that Netflix could "do more, faster, with our HIVE database, Pig, and Tableau," which were existing tools at Netflix. Exhibit 321; Tr. Vol. 3 at 454:9-17.

This type of evidence permeated trial. Shortly after Defendant was offered a compensated advisory position at Sumo Logic, he told the CEO of Sumo Logic "I believe that Sumo Logic will be a great success at Netflix as well as a myriad of other customers. I greatly look forward to assisting with both." Exhibit 603 (June 21, 2012 email); Exhibit 623 (stock option grant). Defendant kept Sumo Logic employees abreast of his efforts for them at Netflix: "I'm pushing my teams to use the tool, but the performance issues are problematic," Exhibit 614 (March 21, 2013 email), and "I am rapidly losing internal 'champions' and general feedback is 'Sumo is unusable,'" Exhibit 628 (March 10, 2014 email); *see also* Exhibit 627. In August 2014, upon finding out that Kail was leaving Netflix, a Sumo Logic executive thanked Kail for "making sure the Year 2 of our last deal went through." Exhibit 631. After initially denying a meeting with ElasticBox, Exhibit 651 (February 2013 email from Kail telling ElasticBox that "I don't have any compelling use cases for ElasticBox at this time"), Defendant was offered a compensated advisory position and within one minute agreed to "work on the intro to the internal [Netflix] team," Exhibit 652 (March 2013 email from Kail telling ElasticBox "will work on the intro to the internal team"). During an off-campus meeting between Kail and Docurated's CEO and CTO that occurred at the end of a Docurated pilot, Kail "mentioned that" he works "closely with some start-ups and venture firms" and was offered "a[ ]way to formalize things" by way of an advisory position. Exhibit 555 (email from Docurated summarizing in-person meeting). Kail signed a paid contract with Docurated on May 30, 2013. Exhibit 553. Less than a week later, Kail became a Docurated advisor and was granted stock options. Exhibit 556. When Kail informed Docurated that he was leaving Netflix, a Docurated executive asked him what the "best way forward" was, to which Kail replied "[b]est to try to leverage Sabry."

14

United States District Court
Northern District of California

Exhibit 563.

While some of this aforementioned evidence indicates the existence of an implicit quid pro quo, *see United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012), the government also introduced evidence of explicit quid pro quo. Frank Slootman, CEO of Netflix vendor ServiceNow, Inc., testified that Kail solicited stock warrants from him during a dinner meeting. Tr. Vol. 5 at 1190:3-7, 1192:1-21, 1198:2-3. Slootman considered Netflix "a crowning customer because of the Netflix brand" and considered Kail "the top I.T. executive at Netflix . . . [h]e was our customer in that capacity." *Id*. at 1190:18-1191:8. At the dinner, the two discussed "what we could do to the product, make the product better, the kind of feedback that a customer would provide." *Id*. at 1193:9-11. When Slootman asked Kail if there was "anything else that [ServiceNow, Inc.] could do better," Kail responded: "there is an elephant in the room here. . . you're getting a lot of value out of this relationship. But, you know, it's not a two-way street." *Id*. at 1193:12-22. Slootman testified that he was "taken aback" by "being propositioned," but was concerned that a failure to grant warrants to Kail "might sour the relationship." *Id*. at 1194:9-11, 1195:13-15. Kail told Slootman that his standard equity ask was via an advisory agreement, "1/5th of a percent to 1 half of a percent, 2 year vesting." *Id*. at 1198:2-3; *see also* Exhibit 680. The exchange was unusual to Slootman, who explained that in his experience "people are negotiating for their employers and that's more normal. But people negotiating for their own account is unusual in our experience." Tr. Vol. 5 at 1199:2-4. As another example, NetEnrich co-founder Varma Kunaparaju pointed out to NetEnrich Vice President Rhagu Kamath that "since Mike works for Netflix and there could be all sorts of conflicts of interest, kickback implications" in signing Kail on as a referral partner. Exhibit 118; *see also* Tr. Vol. 5 at 1086:9-17 (describing company meeting in which NetEnrich decided to "move past" the conflict of interest with Kail and to "treat Unix Mercenary just like how we would treat any other referral partner.)

Kail raises a laundry list of objections to this conclusion. For example, he contends that

15

"[t]he payments and stock options . . . were compensation for his independent work as an advisor." Mot. at 11. This reasoning mirrors the testimony Kail offered when he took the stand. *See, e.g.*, Tr. Vol. 10 at 2153:22-24, 2159:7-2160:8. But a rational juror could have chosen to reject this explanation and to credit the evidence of quid pro quo introduced throughout trial. *See United States v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989) ("We 'must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.'" (quoting *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir.1977)). Elsewhere, Kail insists that "not a single witness testified to a specific expectation of a benefit" and that "[i]n fact, the vendors testified they did not grant stock options or make any payments to Mr. Kail with the expectation of anything at all with respect to Netflix." Mot. at 12. While witnesses implicated in the scheme unsurprisingly distanced themselves from the bribes and kickbacks during live testimony, there was ample contemporaneous documentary evidence that illustrated a quid pro quo scheme. *See, e.g.*, Exhibit 309. Finally, Kail argues that the jury's first note—inquiring "For there to be a bribe or a kickback does the giver have to know it's in for exchange [sic] for services beyond lawful services?" ECF 227-1—indicates that "the jury was contemplating the fact that no vendor testified to any *knowledge* of bribery, kickback, or an expectation of action on Mr. Kail's part with respect to Netflix." Mot. at 13 (emphasis in original). But this Court has already concluded that there was ample evidence of a quid pro quo scheme. And Kail does not challenge the underlying jury instructions, which the Court directed the jury to review in response to the note.

In sum, evidence demonstrates a kickback scheme, in which Kail bartered his power to sign Netflix vendor contracts for referral commissions and plum advisor agreements in which he earned stock options or warrants. *See* Jury Instr. Nos. 42, 43 (Bribery and kickbacks involve the exchange of things or things of value for services by a fiduciary, in other words, a quid pro quo (a Latin phrase meaning 'this for that' or 'these for those.'")).

16

ER-255

### 3.  Specific Intent

Kail next argues that the government failed to prove that he had the specific intent to deceive and cheat Netflix. Mot. at 21. The government bore the burden of proving Kail's intent beyond a reasonable doubt. Jury Instr. No. 44; *see United States v. Sayakhom*, 186 F.3d 928, 940 (9th Cir. 1999), *amended*, 197 F.3d 959 (9th Cir. 1999). "Good faith is a complete defense to charges of wire fraud, honest services wire fraud, mail fraud, and honest services mail fraud." *Id*. An "honestly held opinion or an honestly formed belief cannot provide fraudulent intent – even if the opinion or belief is mistaken." *Id*.; *see Sayakhom*, 186 F.3d at 940 ("One who expresses an opinion honestly held by her or belief honestly entertained by her is not chargeable with fraudulent intent even though her opinion is erroneous or her belief is mistaken. And similarly, evidence which establishes only that a person made a mistake in judgment or an error in management or was careless does not establish fraudulent intent.").

Kail argues that his intent to deceive and cheat was "undermined by the good faith instruction because [he] testified that he did not believe he was required to inform Netflix of his stock options." Mot. at 12. But Kail's testimony cannot shoulder the heavy burden this argument demands. The government introduced ample evidence that Kail was aware that Netflix required employees to disclose financial conflicts. Netflix's Code of Ethics required "conduct free from fraud or deception" and "ethical handling of actual or apparent conflicts of interest between personal or professional relationships." Exhibit 3. The Code of Ethics further defined a conflict of interest "where the interests or benefits of one person or entity conflict or appear to conflict with the interests or benefits of [Netflix]," and required disclosure of such conflicts. *Id*. Annual emails to all Netflix employees contained a summary of these policies. *See, e.g.*, Exhibit 5; *see also* Exhibit 1 (Netflix Culture Deck); Exhibit 14 (Hastings' memorialization of discussion about financial conflict avoidance with Kail). Documentary evidence of Kail's dealings paint a picture of deception. Kail took steps to conceal his kickbacks, directing checks to his personal residence and communications to his

personal Gmail address. Exhibit 146; Exhibit 147. He cut his team members out of discussions with vendors from which he received kickbacks. Exhibit 114; Exhibit 328; Exhibit 555. He lied to his boss, Netflix CEO Reed Hastings. Exhibit 147. It was more than reasonable, in light of this substantial evidence, for the jury to discount Kail's own self-serving testimony and find that he did not act in good faith.

### 4. Money Laundering

To establish a violation of 18 U.S.C. § 1957, the government must have proven the following elements beyond a reasonable doubt: (1) Mr. Kail knowing engaged or attempted to engage in a monetary transaction; (2) Mr. Kail knew that the transaction involved criminally derived property; (3) the property had a value of over $10,000; and (4) the property was derived from wire or mail fraud and occurred in the United States. Jury Instr. No. 45; *see also* 18 U.S. § 1957; 9th Cir. Model Jury Instr. § 8.150. Kail now argues that "the money laundering counts cannot stand if the mail and wire fraud counts are overturned" is inconsistent with the Court's obligation to view the evidence in the light most favorable to the verdict. Mot. at 23. Kail's argument is moot. This Court has already concluded that evidence supported Kail's mail and wire fraud convictions. The money laundering convictions stand.

***

Defendant's motion for acquittal is DENIED.

### B. Rule 33

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Ninth Circuit described the standard for granting a new trial in *United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992), which it reaffirmed in *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000):

> [A] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. The court is not obliged to view the evidence in the light most

United States District Court
Northern District of California

18

> favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses . . . If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Kellington*, 217 F.3d at 1097 (internal quotation marks and citations omitted). The court may also consider evidentiary and procedural errors in weighing the motion for new trial. *See, e.g., United States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (new trial granted in light of four erroneous evidentiary rulings).

Kail bases his Rule 33 motion on the sufficiency of the evidence, as raised in his Rule 29 motion; on the introduction of "other act" evidence; on the introduction of his exact salary; and on the speculation of the jurors about start-up culture. Mot. at 22-25. Whether considered individually or in the aggregate, none of these bases provide Kail with a successful basis for relief.

First, for the reasons discussed while analyzing Kail's Rule 29 motion, the Court declines to grant a new trial based on the insufficiency of the evidence. While Rule 33 permits the district court to review the evidence at trial more holistically, see *Alston*, 974 F.2d at 1211, such a review does not lead this Court to conclude that the evidence "'preponderates sufficiently heavily against the verdict.'" *Id*. (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980)). A complete review of the record here does not leave the Court with "a strong doubt as to the defendant's guilt." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).

Kail's suggestion that his conviction can be traced to juror speculation, as opposed to the sufficiency of the evidence offered by the government, fails for similar reasons. Kail insists that the

> evidence showed a very common web of relationships among Silicon Valley companies where many startups – to gain visibility, prestige, introductions in a very crowded field – offered compensation in the form of stock options to various reputable and technically-savvy people in the industry on a regular basis. This was a culture not of corruption, but of nurturing visibility, credibility and product development in a way that is relatively costless to the small

19

startup (in terms of stock options).

Mot. at 23. He further argues that the jury's four-day deliberation evinces that this was "a very close case where a culture of 'paid' assistance – unfamiliar to them – may have led some jurors to convict based on facts that do not actually constitute guilt. Hence, it appears that speculation played a large role in their verdict." Mot. at 23. The Court cannot agree. The jury's deliberations were hardly lengthy in light of the fact that the verdict form required that they reach a decision on 53 charges. To the extent that a jury *could* have reached a decision with more expediency, the lengthy deliberations suggest only that the jurors took their constitutional responsibility seriously. This conclusion is buttressed by the sufficiency of the evidence to support each element of each charge. The Court has made extensive findings on this issue when discussing Rule 29 and sees no reason to rehash those findings again and instead concludes, based on those findings, that the jury need not have engaged in bald speculation to reach its verdict.

Nor will the Court grant Defendant relief based on the introduction of Kail's salary at trial. In response to Defendant's Motion *in Limine* No. 3, the Court held that "Kail's precise salary is not relevant because the scheme alleged does not implicate Kail's salary." ECF 125 at 15. The Court cautioned that should the defense open the door to this topic, the "[g]overnment may walk through it." *Id*. During direct examination, Kail testified that "I never viewed my role at Netflix or any other company as a 9:00 to 5:00 job. It was always on, especially in I.T. and it was about—it's not about hours worked, it's about delivering results and being available and delivering leadership and direction." Tr. Vol. 10 at 2160:19-23. In response to the question "Did you believe you could carry out your responsibilities at Netflix while also having extra work on the side?", Kail responded "I believe I could and I believe I did." *Id*. at 2160:24-2161:2. He also testified that he did not believe there was any prohibition at Netflix in taking on side work, and that the side work he took on did not interfere with his work at Netflix. *Id*. at 2192:9-15. During cross examination, the government asked Defendant what his salary was at Netflix. Tr. Vol. 10 at 2231:12-2232:17. Over objection of

20

defense counsel, the Court permitted Kail to respond. *Id*. The Court later made the following record:

> I do believe the door was opened based upon the testimony of Mr. Kail, and in considering the context of this case, the amount of the income and the sophistication of a Silicon Valley jury, I don't believe that there will be any prejudicial effect to the admission of that information. I think that it -- Mr. Kail earned a generous and comfortable income, but he was not a billionaire on that salary. And the jury has seen a number of billionaires come through our courtroom, so I think in light of the case, the sophistication of people living in Silicon Valley, which is what our jury is, that there is no prejudicial effect. The probative value is modest, I will say, but I still believe the door was opened and I believe there was no prejudice.

Tr. Vol. 11 at 2276:5-19. Defendant maintains that such testimony was in contravention to Rule 403 and his Motion *in Limine* No. 3. Mot. at 25. He argues that "[i]t is thus reasonable to conclude that the prejudicial effect of his salary – coupled with the jury's reliance on speculation rather than actual trial testimony – improperly influenced the jury's verdict." *Id*. Reviewing the government's questioning and Defendant's testimony anew, the Court finds that Kail's testimony opened the door to the line of questioning, thus rendering Kail's salary probative as to Kail's intent to defraud. Kail's salary, in light of his testimony regarding his work hours and Netflix's expectations of him, served to undermine his testimony that he did not believe he was forbidden from engaging in paid side work with Netflix vendors. This probative value, while "modest," outweighed any prejudicial effect. *See* Fed. R. Evid. 403. Indeed, Kail earned a salary on par with other high-level executives at technology companies in Silicon Valley.

Finally, the Court turns to consider the government's introduction of uncharged scheme conduct. In Defendant's Motion *in Limine* No. 4, Kail moved "to exclude evidence of Mr. Kail doing business with unnamed companies other than the nine [outlined in the indictment]." ECF 125 at 16 (alteration in original) (quotation marks omitted). The Court found that

> [t]he uncharged scheme conduct described in . . . Defendant's fourth motion *in limine* is admissible because it is part of the charged conduct and does not constitute "other crimes" evidence under Rule 404(b). Wire and mail fraud require that a defendant formed or

21

United States District Court
Northern District of California

intended to form a scheme to defraud. 18 U.S.C. §§1341, 1343. [Evidence that Defendant received shares or share options from other companies that did business or sought to do business with Netflix] speak[s] directly to whether Kail formed a scheme to defraud—a necessary element of the charged conduct. The uncharged acts are thus part and parcel of the charged conduct –the fraudulent scheme as a whole.

*Id*. at 18; *see also id*. at 18-19 (discussing *Loftis*, 843 F.3d at 1176). To reduce potential prejudice to Defendant, the Court limited the government to introducing this evidence "where (1) the company was a Netflix vendor; (2) Kail was involved in the contract between Netflix and the vendor; and (3) Kail received something of value from the vendor." *Id*. at 20. During the government's cross-examination of Kail, it asked Kail about his dealings with eleven companies not mentioned in the Indictment: RelateIQ, Pure Storage, Onelogin, Cyphort, Snaplogic, BlueBox, Cloudmeter, Box, Plivo, Tidemark, and Workday. Tr. Vol. 10 at 2233:5-2242:17. According to Kail, the government failed to establish the three parameters as to nine of the companies. Mot. at 24.

A review of Kail's testimony reveals that the government made good on their promise—in part. *See, e.g.,* Tr. Vol. 10 at 2233:5-2234:8 (testifying that he introduced RelateIQ to his team and made money from RelateIQ advisory shares); *id*. at 2239:14-2240:4 (testifying that he was a compensated advisor to Pure Storage and that a Netflix team working under Defendant had business with Pure Storage); *id*. at 2236:6-2237:2 (testifying that he introduced Snaplogic into Netflix and received advisory options from Snaplogic); *id. at* 2241:1-17, Tr. Vol. 11 at 2357:10-20 (testifying that he was an advisor to BlueBox, which had a paid proof of concept at Netflix). But this promise was incomplete. *See, e.g*., Tr. Vol. 10 at 2234:10-2235:10 (testifying that he had advisory options from Onelogin, a Netflix vendor); *id*. at 2140:12, 2242:2-12 (testifying that Netflix "moved to Workday financials" and Defendant took part in a "friends and family program" to buy its stock at its initial public offering); *id*. at 2238:9-2239:2 (testifying that he was on an uncompensated "informal customer council," but did not recall asking for compensation from the CEO).

United States District Court
Northern District of California

United States District Court
Northern District of California

While the Court is displeased by this failure by the government, it cannot find that the error merits a new trial. Kail's argument is styled as an objection to the admission of evidence about Netflix vendors unnamed in the indictment. Mot. at 23 ("Admission of Other Companies Undermined the Validity of the Verdicts"). But what Kail ultimately objects to is not the admission of evidence about other vendors, but the government's line of questioning—which is not evidence. In response to this questioning, Kail equivocated, denied knowledge or memory, or provided a benign response. It is not clear to the Court, in the context of this generally self-serving testimony, what admitted *evidence* Kail believes violates Fed. R. Evid. 403. *See* Mot. at 24 (arguing the government violated Fed. R. Evid. 403 without identifying prejudicial evidence). An independent review of Kail's testimony does not reveal any statement prejudicial or adverse to his case.

In reply, Kail reframes his motion as an attack on the government's line of questioning itself. Reply at 14-15 (citing *United States v. Davenport*, 753 F.2d 1460, 1463 (9th Cir. 1985) and *United States v. Meserve*, 271 F.3d 314, 326 (1st Cir. 2001)). The Court acknowledges that certain questions may in and of themselves be prejudicial. *Davenport*, 753 F.2d at 1463 ("The prejudice to the defendant was, thus, created by the question itself rather than by the testimony given in response."); *Meserve*, 271 F.3d at 326 (rejecting argument by the government that "[n]o answer to the challenged question having been given, no evidence was admitted, and thus there is no error to correct."). But neither case Kail cites is analogous to the circumstances before the Court here. In *United States v. Meserve*, the First Circuit considered the government's cross-examination of a defense witness. 271 F.3d at 323. During the questioning, the government asked the witness about disorderly person and assault convictions and asked if he was a "tough guy" since he had been in a lot of fights in his day. *Id*. Defendant argued that the witnesses' convictions were not permissible subjects of cross-examination under Fed. R. Evid. 609(a) and that the questions about the witness being a "tough guy" were improper character evidence under Fed. R. Evid. 608. *Id*. The appellate court agreed, although ultimately found such errors harmless. *Id*. at 331. Unlike the testimony

elicited from the witness in *Meserve*, the testimony elicited from Kail about vendors unnamed in the indictment does not run afoul to any evidentiary rule.

In *United States v. Davenport*, the defendant was convicted of robbing the Olympics Saving & Loan Bank in San Francisco. 753 F.2d at 1461-1462. During trial, an employee of Wells Fargo Bank testified that she was with the defendant at his apartment during the robbery. *Id*. at 1462. The Ninth Circuit considered whether a new trial was merited where the government asked this alibi witness "Did you ever tell Mary Mabes that the defendant had told you he wanted you to help him rob the Wells Fargo Bank?" *Id*. at 1463. The court found that it did, explaining:

> The question arguably was probative of the witness' possible bias and self-interest, and her credibility was therefore in issue. *See* Fed.R.Evid. 608(b). If the witness denied the question, the jury could believe or disbelieve her answer. Her denial would, however, leave uncontraverted the insinuation that the defendant had planned to engage in additional bank robberies. The prejudice to the defendant was, thus, created by the question itself rather than by the testimony given in response.

*Id*. The government's question, according to the Ninth Circuit, created a "danger" because it allowed the government to "waft an unwarranted innuendo into the jury box, knowing that the witness' denial will only serve to defend her credibility, while leaving uncontradicted the reference to the defendant's prior bad conduct." *Id*. Such a danger was particularly "acute" given "the insinuation [involved] inadmissible propensity evidence." *Id*.

Kail points to no situation in which the government "rel[ied] upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation." *Id*. (citing Wigmore, Evidence (3rd ed. 1940) § 988). The government's questioning here was straightforward and was not intertwined with impermissible testimony. *See, e.g*., 2239:6 ("Were you an advisor to Plivo?"), 8 (You had an advisor agreement with Plivo?"). Kail was able to deny any question without leaving any insinuations unaddressed. Unlike the questioning in *Davenport*, the government's questioning here did not in and of itself implicate propensity evidence forbidden by Fed. R. Evid.

404. As the Court explained at length in its Order on Motions *in Limine*, Kail's uncharged dealings with the third-party vendors were "part of the charged offense – the fraudulent scheme as a whole – and the government was permitted to introduce evidence of uncharged transactions to prove the first element of wire fraud – the existence of a scheme to defraud." ECF 125 at 19 (discussing *Loftis*, 843 F.3d at 1176). Given the extensive evidence about Kail's dealings with the vendors charged in the indictment, the Court cannot find that the questions, with what little facts Kail could recall, were so prejudicial such that denying a new trial would result in a miscarriage of justice.

***

At bottom, the evidence does not preponderate so heavily against the verdict that a miscarriage of justice has occurred. Defendant's motion for a new trial is DENIED.

**IT IS SO ORDERED.**

Dated: August 25, 2021

_____

BETH LABSON FREEMAN
United States District Judge

ER-264

1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3      SAN JOSE DIVISION

4

5  UNITED STATES OF AMERICA,        )  CR-18-00172 BLF
                                    )
6                  PLAINTIFF,       )  SAN JOSE, CALIFORNIA
                                    )
7          VS.                      )  APRIL 23, 2021
                                    )
8  MICHAEL KAIL,                    )  VOLUME 11
                                    )
9                  DEFENDANT.       )  PAGES 2255-2533
   _____ )

10

11            TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BETH LABSON FREEMAN
12            UNITED STATES DISTRICT JUDGE

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  COLIN C. SAMPSON
15                             DANIEL KALEBA
                          450 GOLDEN GATE AVENUE, BOX 36055
16                        SAN FRANCISCO, CALIFORNIA  94102

17  FOR THE DEFENDANT:    JAYNE LAW GROUP
                          BY:  JULIA M. JAYNE
18                        483 9TH STREET, SUITE 200
                          OAKLAND, CALIFORNIA  94607

19

20  ALSO PRESENT:          FRANCHESCA CHELI
                           LAURIE WORTHEN
21                         BALJINDER HEER

22

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595

24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1    DESERVES.

2        THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT HAVE BEEN

3    STATED TO YOU.  THOSE FACTS ARE NOW CONCLUSIVELY ESTABLISHED.

4        DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS ONE THROUGH

5    NINETEEN WITH HONEST WIRE SERVICES FRAUD, IN VIOLATION OF

6    SECTION 1343 AND 1346 OF TITLE 18 OF THE UNITED STATES CODE.

7    IN ORDER FOR MR. KAIL TO BE FOUND GUILTY OF THESE CHARGES, THE

8    GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A

9    REASONABLE DOUBT:

10       FIRST, MR. KAIL DEVISED OR KNOWINGLY PARTICIPATED IN A

11   SCHEME OR PLAN TO DEPRIVE NETFLIX, INC., OF ITS RIGHT OF HONEST

12   SERVICES.

13       SECOND, THE SCHEME OR PLAN CONSISTS OF A BRIBE OR KICKBACK

14   IN EXCHANGE FOR MR. KAIL'S SERVICES.  THE EXCHANGE MAY BE

15   EXPRESS OR MAY BE IMPLIED FROM ALL OF THE SURROUNDING

16   CIRCUMSTANCES.

17       THIRD, MR. KAIL OWED A FIDUCIARY DUTY TO NETFLIX, INC.

18      FOURTH, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD

19   BY DEPRIVING NETFLIX, INC., OF THE RIGHT OF HONEST SERVICES.

20       FIFTH, MR. KAIL'S ACT WAS MATERIAL, THAT IS, IT HAD A

21   NATURAL TENDENCY TO INFLUENCE OR WAS CAPABLE OF INFLUENCING A

22   PERSON OR ENTITY'S ACTS.

23       SIXTH, MR. KAIL USED OR CAUSED TO BE USED AN INTERSTATE

24   WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY OUT AN

25   ESSENTIAL PART OF THE SCHEME.

1        NUMBER ONE, THE SCHEME OR PLAN TO DEPRIVE HONEST SERVICES.

2        THE FIRST ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

3    THE DEFENDANT KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR

4    PLAN TO DEPRIVE NETFLIX, INC., OF ITS RIGHT TO HIS HONEST

5    SERVICES.

6        A SCHEME IS ANY PLAN OR COURSE OF ACTION FORMED WITH THE

7    INTENT TO ACCOMPLISH SOME PURPOSE.  THUS, TO FIND THE DEFENDANT

8    GUILTY OF THIS OFFENSE, YOU MUST FIND THAT THE DEFENDANT

9    DEVISED OR PARTICIPATED IN A PLAN OR SOURCE OF ACTION INVOLVING

10   BRIBES OR KICKBACKS GIVEN OR OFFERED TO THE DEFENDANT.

11       NUMBER TWO.  THE BRIBE OR KICKBACK IN EXCHANGE FOR

12   SERVICES.

13       THE SECOND ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

14   THE SCHEME OR PLAN CONSISTED OF A BRIBE OR KICKBACK IN EXCHANGE

15   FOR MR. KAIL'S SERVICES.  BRIBERY AND KICKBACKS INVOLVE THE

16   EXCHANGE OF A THING OR THINGS OF VALUE FOR SERVICES BY A

17   FIDUCIARY, IN OTHER WORDS, A QUID PRO QUO (A LATIN PHRASE

18   MEANING "THIS FOR THAT" OR "THESE FOR THOSE").

19       THE DEFENDANT AND THE PAYOR NEED NOT STATE THE QUID PRO

20   QUO IN EXPRESS TERMS, FOR OTHERWISE THE LAW'S EFFECT COULD BE

21   FRUSTRATED BY KNOWING WINKS AND NODS.  RATHER, THE INTENT TO

22   EXCHANGE MAY BE ESTABLISHED BY CIRCUMSTANTIAL EVIDENCE, BASED

23   UPON THE DEFENDANT'S WORDS, CONDUCT, ACTS, AND ALL THE

24   SURROUNDING CIRCUMSTANCES DISCLOSED BY THE EVIDENCE AND THE

25   RATIONAL OR LOGICAL INFERENCES THAT MAY BE DRAWN FROM THEM.

2403

1          IT IS NOT A DEFENSE TO THE CLAIM THAT NETFLIX BENEFITED

2     FROM THE ALLEGED CONDUCT.  THE OFFENSE OF "HONEST SERVICES"

3     FRAUD IS NOT CONCERNED WITH THE WISDOM OR RESULTS OF THE

4     DEFENDANT'S DECISIONS, BUT RATHER WITH THE MANNER IN WHICH THE

5     DEFENDANT MAKES HIS OR HER DECISIONS.

6          ALSO, IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT

7     THE SCHEME ACTUALLY SUCCEEDED, OR THAT ANY ACT WAS ACTUALLY

8     TAKEN BY THE DEFENDANT IN THE COURSE OF THE SCHEME.

9          WHAT THE GOVERNMENT MUST PROVE IS THAT THE DEFENDANT

10    KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR ARTIFICE TO

11    DEFRAUD NETFLIX, INC. OF ITS RIGHT TO DEFENDANT'S HONEST

12    SERVICES THROUGH BRIBES OR KICKBACKS.

13         ALSO, BECAUSE PEOPLE RARELY ACT FOR A SINGLE PURPOSE, THE

14    GIVER NEED NOT HAVE OFFERED OR PROVIDED THE THING OF VALUE ONLY

15    IN EXCHANGE FOR SPECIFIC SERVICES, AND THE DEFENDANT NEED NOT

16    HAVE SOLICITED OR ACCEPTED THE THING OF VALUE ONLY IN EXCHANGE

17    FOR THOSE SERVICES.

18         IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE GIVER

19    OFFERED OR PROVIDED A THING OF VALUE IN EXCHANGE FOR THE

20    PERFORMANCE OF SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

21    GIVER MAY HAVE HAD ANOTHER LAWFUL MOTIVE FOR PROVIDING A THING

22    OF VALUE.

23         LIKEWISE, IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE

24    DEFENDANT SOLICITED OR RECEIVED A THING OF VALUE IN EXCHANGE

25    FOR THE SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

1    DEFENDANT MAY ALSO HAVE HAD ANOTHER LAWFUL MOTIVE FOR

2    SOLICITING OR ACCEPTING THE THING OF VALUE.

3         "ANYTHING OF VALUE" INCLUDES THINGS POSSESSING INTRINSIC

4    VALUE, WHETHER TANGIBLE OR INTANGIBLE, THAT THE PERSON GIVING

5    OR OFFERING OR THE PERSON SOLICITING OR RECEIVING CONSIDERS TO

6    BE WORTH SOMETHING.

7         UNDISCLOSED CONFLICTS OF INTEREST, SECRET PAYMENTS OR

8    UNDISCLOSED SELF-DEALING ALONE, IS NOT SUFFICIENT TO CONSTITUTE

9    HONEST SERVICES FRAUD.

10        NUMBER THREE.  FIDUCIARY DUTY.

11        A "FIDUCIARY" DUTY EXISTS WHENEVER ONE COMPANY PLACES

12   SPECIAL TRUST AND CONFIDENCE IN ANOTHER PERSON -- THE FIDUCIARY

13   -- IN RELIANCE THAT THE FIDUCIARY WILL EXERCISE HIS DISCRETION

14   AND EXPERTISE WITH THE UTMOST HONESTY AND FORTHRIGHTNESS IN THE

15   INTERESTS OF THE ENTITY, SUCH THAT THE ENTITY RELAXES THE CARE

16   AND VIGILANCE THAT IT WOULD ORDINARILY EXERCISE, AND THE

17   FIDUCIARY KNOWINGLY ACCEPTS THAT SPECIAL TRUST AND CONFIDENCE

18   AND THEREAFTER UNDERTAKES TO ACT ON BEHALF OF THE OTHER ENTITY

19   BASED ON SUCH RELIANCE.

20        THE MERE FACT THAT A BUSINESS RELATIONSHIP ARISES BETWEEN

21   A PERSON AND A COMPANY DOES NOT MEAN THAT EITHER OWES A

22   FIDUCIARY DUTY TO THE OTHER.  IF ONE ENGAGES OR EMPLOYS ANOTHER

23   AND THEREAFTER DIRECTS, SUPERVISES, OR APPROVES THE OTHER'S

24   ACTIONS, THE PERSON SO EMPLOYED IS NOT NECESSARILY A FIDUCIARY.

25   RATHER, AS PREVIOUSLY STATED, IT IS ONLY WHEN ONE PARTY PLACES,

1    AND THE OTHER ACCEPTS, A SPECIAL TRUST AND CONFIDENCE --

2    USUALLY INVOLVING THE EXERCISE OF PROFESSIONAL EXPERTISE AND

3    DISCRETION -- THAT A FIDUCIARY RELATIONSHIP EXISTS.

4         WITH REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO

5    CONVICT, YOU MUST FIND THAT MR. KAIL HAD A DUTY TO DISCLOSE THE

6    OMITTED FACT ARRIVING OUT OF A RELATIONSHIP OF TRUST.  THAT

7    DUTY CAN ARISE EITHER OUT OF THE AFOREMENTIONED FORMAL

8    FIDUCIARY RELATIONSHIP, OR AN INFORMAL, TRUSTING RELATIONSHIP

9    IN WHICH ONE PARTY ACTS FOR THE BENEFIT OF ANOTHER AND INDUCES

10   THE TRUSTING PARTY TO RELAX THE CARE AND VIGILANCE WHICH IT

11   WOULD ORDINARILY EXERCISE.  THE REQUIREMENT THAT YOU FIND A

12   DUTY TO DISCLOSE IN ORDER TO CONVICT DOES NOT APPLY TO

13   MATERIALLY FALSE STATEMENTS.

14        NUMBER FOUR.  MATERIALITY.

15        THE FIFTH ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

16   MR. KAIL'S ACT OR ACTIONS WERE MATERIAL; THAT IS, THAT IT HAD A

17   NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF INFLUENCING, A

18   PERSON'S ACTS.

19        NUMBER FIVE.  USE OF WIRE OR RADIO COMMUNICATIONS.

20        THE FINAL ELEMENT THAT THE GOVERNMENT MUST ESTABLISH IS

21   THAT THE DEFENDANT USED A WIRE OR RADIO COMMUNICATION IN

22   INTERSTATE COMMERCE TO CARRY OUT OR TO ATTEMPT TO CARRY OUT THE

23   SCHEME OR PLAN.  A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE

24   WILL BE USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN

25   REASONABLY FORESEE SUCH USE.  TO "USE A WIRE OR RADIO

1  COMMUNICATION IN INTERSTATE COMMERCE" MEANS TO SEND INFORMATION

2  ACROSS STATE LINES BY MEANS OF WIRE, INCLUDING TELEPHONE OR

3  TELEGRAPH LINES, OR RADIO COMMUNICATIONS.  IT INCLUDES E-MAIL,

4  THE ELECTRONIC TRANSFER OF FUNDS, INTERNET COMMUNICATIONS, OR

5  OTHER ELECTRONIC COMMUNICATION USING WIRES OR RADIOS, AS LONG

6  AS THE COMMUNICATION OR TRANSMISSION OF INFORMATION IS BETWEEN

7  STATES.

8      IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE TO THE

9  DEFENDANT THAT THE WIRE COMMUNICATION WOULD BE INTERSTATE IN

10  NATURE.  RATHER, IT MUST HAVE BEEN REASONABLY FORESEEABLE TO

11  THE DEFENDANT THAT SOME WIRE COMMUNICATION WOULD OCCUR IN

12  FURTHERANCE OF THE SCHEME, AND AN INTERSTATE WIRE COMMUNICATION

13  MUST ACTUALLY HAVE OCCURRED IN FURTHERANCE OF THE SCHEME.

14      WIRE FRAUD.

15      THE DEFENDANT IS ALSO CHARGED IN COUNTS ONE THROUGH

16  NINETEEN WITH WIRE FRAUD IN VIOLATION OF SECTION 1343 OF

17  TITLE 18 OF THE UNITED STATES CODE.  IN ORDER FOR MR. KAIL TO

18  BE FOUND GUILTY OF THAT CHARGE, THE GOVERNMENT MUST PROVE EACH

19  OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

20      FIRST, MR. KAIL KNOWINGLY DEVISED A SCHEME OR PLAN TO

21  DEFRAUD, OR A SCHEME OR PLAN FOR OBTAINING MONEY OR PROPERTY BY

22  MEANS OF FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR

23  PROMISES, OR OMITTED FACTS.  DECEITFUL STATEMENTS OF

24  HALF-TRUTHS MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

25      SECOND, THE STATEMENTS MADE OR FACTS OMITTED AS PART OF

1    THE SCHEME WERE MATERIAL; THAT IS, THEY HAD A NATURAL TENDENCY

2    TO INFLUENCE, OR WERE CAPABLE OF INFLUENCING, A PERSON TO PART

3    WITH MONEY OR PROPERTY;

4         THIRD, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD;

5    THAT IS, THE INTENT TO DECEIVE AND CHEAT; AND,

6         NUMBER FOUR, MR. KAIL USED, OR CAUSED TO BE USED, AN

7    INTERSTATE WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY

8    OUT AN ESSENTIAL PART OF THE SCHEME.

9         IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

10   CONSIDER NOT ONLY THE DEFENDANT'S WORDS AND STATEMENTS, BUT

11   ALSO THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

12        IN REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO CONVICT

13   YOU MUST FIND THAT DEFENDANT HAD A DUTY TO DISCLOSE THE OMITTED

14   FACTS ARRIVING OUT OF A RELATIONSHIP OF TRUST.  THAT DATA CAN

15   ARISE EITHER OUT OF A FORMAL FIDUCIARY RELATIONSHIP, OR AN

16   INFORMAL, TRUSTING RELATIONSHIP IN WHICH ONE PARTY ACTS FOR THE

17   BENEFIT OF ANOTHER AND INDUCES THE TRUSTING PARTY TO RELAX THE

18   CARE AND VIGILANCE WHICH IT WOULD ORDINARILY EXERCISE.  THE

19   REQUIREMENT THAT YOU FIND A DUTY TO DISCLOSE IN ORDER TO

20   CONVICT DOES NOT APPLY TO MATERIALLY FALSE STATEMENTS.

21        A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE WILL BE USED

22   IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN REASONABLY

23   FORESEE SUCH USE.  IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE

24   TO THE DEFENDANT THAT THE WIRE COMMUNICATION WOULD BE

25   INTERSTATE IN NATURE.  RATHER, IT MUST HAVE BEEN REASONABLY

1    FORESEEABLE TO THE DEFENDANT THAT SOME WIRE COMMUNICATION WOULD

2    OCCUR IN FURTHERANCE OF THE SCHEME, AND AN INTERSTATE WIRE

3    COMMUNICATION MUST ACTUALLY HAVE OCCURRED IN FURTHERANCE OF THE

4    SCHEME.

5        A PROPERTY INTEREST IS AN ECONOMIC INTEREST.  THUS, THE

6    TERM "PROPERTY" AS USED IN THE WIRE FRAUD INSTRUCTIONS, MEANS

7    MONEY OR ANOTHER FORM OF PROPERTY WITH ECONOMIC VALUE.

8        DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS TWENTY THROUGH

9    TWENTY-TWO WITH HONEST SERVICES MAIL FRAUD IN VIOLATION OF

10   SECTIONS 1341 AND 1346 OF TITLE 18 OF THE UNITED STATES CODE.

11   IN ORDER FOR MR. KAIL TO BE FOUND GUILTY OF THESE CHARGES, THE

12   GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A

13   REASONABLE DOUBT:

14       FIRST, MR. KAIL DEVISED OR KNOWINGLY PARTICIPATED IN A

15   SCHEME OR PLAN TO DEPRIVE NETFLIX, INC. OF ITS RIGHT OF HONEST

16   SERVICES;

17       SECOND, THE SCHEME OR PLAN CONSISTS OF A BRIBE OR KICKBACK

18   IN EXCHANGE FOR MR. KAIL'S SERVICES;

19       THIRD, MR. KAIL OWED A FIDUCIARY DUTY TO NETFLIX, INC.;

20       FOURTH, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD

21   BY DEPRIVING NETFLIX, INC. OF THE RIGHT TO HONEST SERVICES;

22       FIFTH, MR. KAIL'S ACT WAS MATERIAL; THAT IS, THE ACT HAD A

23   NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF INFLUENCING, A

24   PERSON'S OR ENTITY'S ACTS; AND,

25       SIXTH, MR. KAIL USED, OR CAUSED SOMEONE TO USE, THE MAILS

1     TO CARRY OUT OR TO ATTEMPT TO CARRY OUT THE SCHEME OR PLAN.

2          NUMBER 1.  SCHEME OR PLAN TO DEPRIVE HONEST SERVICES.

3          THE FIRST ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

4     THE DEFENDANT KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR

5     PLAN TO DEPRIVE NETFLIX, INC. OF ITS RIGHT TO HIS HONEST

6     SERVICES.  A "SCHEME" IS A PLAN OR COURSE OF ACTION FORMED WITH

7     THE INTENT TO ACCOMPLISH SOME PURPOSE.  THUS, TO FIND THE

8     DEFENDANT GUILTY OF THIS OFFENSE, YOU MUST FIND THAT THE

9     DEFENDANT DEVISED OR PARTICIPATED IN A PLAN OR COURSE OF ACTION

10    INVOLVING BRIBES OR KICKBACKS GIVEN OR OFFERED TO THE

11    DEFENDANT.

12          NUMBER 2.  THE BRIBE OR KICKBACK IN EXCHANGE FOR SERVICES.

13          THE SECOND ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

14    THE SCHEME OR PLAN CONSISTED OF A BRIBE OR KICKBACK IN EXCHANGE

15    FOR DEFENDANT'S SERVICES.  BRIBERY AND KICKBACKS INVOLVE THE

16    EXCHANGE OF A THING OR THINGS OF VALUE FOR SERVICES BY A

17    FIDUCIARY; IN OTHER WORDS, A QUID PRO QUO (A LATIN PHRASE

18    MEANING "THIS FOR THAT" OR "THESE FOR THOSE ").

19          THE DEFENDANT AND THE PAYOR NEED NOT STATE THE QUID PRO

20    QUO IN EXPRESS TERMS, FOR OTHERWISE THE LAW'S EFFECT COULD BE

21    FRUSTRATED BY KNOWING WINKS AND NODS.  RATHER, THE INTENT TO

22    EXCHANGE MAY BE ESTABLISHED BY CIRCUMSTANTIAL EVIDENCE, BASED

23    UPON THE DEFENDANT'S WORDS, CONDUCT, ACTS, AND ALL THE

24    SURROUNDING CIRCUMSTANCES DISCLOSED BY THE EVIDENCE AND THE

25    RATIONAL OR LOGICAL INFERENCES THAT MAY BE DRAWN FROM THEM.

1       IT IS NOT A DEFENSE TO THE CLAIM THAT NETFLIX BENEFITED

2  FROM THE ALLEGED CONDUCT.  THE OFFENSE OF "HONEST SERVICES"

3  FRAUD IS NOT CONCERNED WITH THE WISDOM OR RESULTS OF THE

4  DEFENDANT'S DECISIONS, BUT RATHER WITH THE MANNER IN WHICH THE

5  DEFENDANT MAKES HIS OR HER DECISIONS.

6       ALSO, IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT

7  THE SCHEME ACTUALLY SUCCEEDED, OR THAT ANY ACT WAS ACTUALLY

8  TAKEN BY THE DEFENDANT IN THE COURSE OF THE SCHEME.

9       WHAT THE GOVERNMENT MUST PROVE IS THAT THE DEFENDANT

10  KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR ARTIFICE TO

11  DEFRAUD NETFLIX, INC. OF ITS RIGHT TO DEFENDANT'S HONEST

12  SERVICES THROUGH BRIBES OR KICKBACKS.

13       ALSO, BECAUSE PEOPLE RARELY ACT FOR A SINGLE PURPOSE, THE

14  GIVER NEED NOT HAVE OFFERED OR PROVIDED THE THING OF VALUE ONLY

15  IN EXCHANGE FOR SPECIFIC SERVICES, AND THE DEFENDANT NEED NOT

16  HAVE SOLICITED OR ACCEPTED THE THING OF VALUE ONLY IN EXCHANGE

17  FOR THOSE SERVICES.

18       IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE GIVER

19  OFFERED OR PROVIDED A THING OF VALUE IN EXCHANGE FOR THE

20  PERFORMANCE OF SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

21  GIVER MAY ALSO HAVE HAD ANOTHER LAWFUL MOTIVE FOR PROVIDING A

22  THING OF VALUE.

23       LIKEWISE, IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE

24  DEFENDANT SOLICITED OR RECEIVED A THING OF VALUE IN EXCHANGE

25  FOR THE SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

```
 1        DEFENDANT MAY ALSO HAVE HAD ANOTHER LAWFUL MOTIVE FOR

 2        SOLICITING OR ACCEPTING THE THING OF VALUE.

 3             "ANYTHING OF VALUE" INCLUDES THINGS POSSESSING INTRINSIC

 4        VALUE, WHETHER TANGIBLE OR INTANGIBLE, THAT THE PERSON GIVING

 5        OR OFFERING OR THE PERSON SOLICITING OR RECEIVING CONSIDERS TO

 6        BE WORTH SOMETHING.

 7             UNDISCLOSED CONFLICTS OF INTEREST, SECRET PAYMENTS, OR

 8        UNDISCLOSED SELF-DEALING ALONE IS NOT SUFFICIENT TO CONSTITUTE

 9        HONEST SERVICES MAIL FRAUD.

10             3.  FIDUCIARY DUTY.

11             A "FIDUCIARY" DUTY EXISTS WHENEVER ONE COMPANY PLACES

12        SPECIAL TRUST AND CONFIDENCE IN ANOTHER PERSON -- THE

13        FIDUCIARY -- IN RELIANCE THAT THE FIDUCIARY WILL EXERCISE HIS

14        DISCRETION AND EXPERTISE WITH THE UTMOST HONESTY AND

15        FORTHRIGHTNESS IN THE INTEREST OF THE ENTITY, SUCH THAT THE

16        ENTITY RELAXES THE CARE AND VIGILANCE THAT IT WOULD ORDINARILY

17        EXERCISE, AND THE FIDUCIARY KNOWINGLY ACCEPTS THAT SPECIAL

18        TRUST AND CONFIDENCE AND THEREAFTER UNDERTAKES TO ACT ON BEHALF

19        OF THE OTHER ENTITY BASED ON SUCH RELIANCE.

20             THE MERE FACT THAT A BUSINESS RELATIONSHIP ARISES BETWEEN

21        A PERSON AND A COMPANY DOES NOT MEAN THAT EITHER OWES A

22        FIDUCIARY DUTY TO THE OTHER.  IF ONE ENGAGES OR EMPLOYS ANOTHER

23        AND THEREAFTER DIRECTS, SUPERVISES, OR APPROVES THE OTHER'S

24        ACTIONS, THE PERSON SO EMPLOYED IS NOT NECESSARILY A FIDUCIARY.

25        RATIONAL, AS PREVIOUSLY STATED, IT IS ONLY WHEN ONE PARTY
```

1    PLACES, AND THE OTHER ACCEPTS, A SPECIAL TRUST AND

2    CONFIDENCE -- USUALLY INVOLVING THE EXERCISE OF PROFESSIONAL

3    EXPERTISE AND DISCRETION -- THAT A FIDUCIARY RELATIONSHIP

4    EXISTS.

5         WITH REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO CONVICT

6    YOU MUST FIND THAT MR. KAIL HAD A DUTY TO DISCLOSE THE OMITTED

7    FACTS ARISING OUT OF A RELATIONSHIP OF TRUST.  THAT DUTY CAN

8    ARISE EITHER OUT OF THE AFOREMENTIONED FORMAL FIDUCIARY

9    RELATIONSHIP, OR AN INFORMAL, TRUSTING RELATIONSHIP IN WHICH

10   ONE PARTY ACTS FOR THE BENEFIT OF ANOTHER AND INDUCES THE

11   TRUSTING PARTY TO RELAX THE CARE AND VIGILANCE WHICH IT WOULD

12   ORDINARILY EXERCISE.  THE REQUIREMENT THAT YOU FIND A DUTY TO

13   DISCLOSE IN ORDER TO CONVICT DOES NOT APPLY TO MATERIALLY FALSE

14   STATEMENTS.

15        MATERIALITY.

16        THE FIFTH ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

17   THE DEFENDANT'S ACT OR ACTIONS WERE MATERIAL; THAT IS, IT HAD A

18   NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF INFLUENCING, A

19   PERSON'S ACTS.

20        NUMBER 5.  USE OF THE MAILS.

21        A MAILING IS CAUSED WHEN ONE KNOWS THAT THE MAILS WILL BE

22   USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN

23   REASONABLY FORESEE SUCH USE.  IT DOES NOT MATTER WHETHER THE

24   MATERIAL MAILED WAS ITSELF FALSE OR DECEPTIVE SO LONG AS THE

25   MAIL WAS USED AS PART OF THE SCHEME, NOR DOES IT MATTER WHETHER

1    THE SCHEME OR PLAN WAS SUCCESSFUL OR THAT ANY MONEY OR PROPERTY

2    WAS OBTAINED.

3         THE DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS TWENTY

4    THROUGH TWENTY-TWO WITH MAIL FRAUD IN VIOLATION OF SECTION 1341

5    OF TITLE 18 OF THE UNITED STATES CODE.  IN ORDER FOR MR. KAIL

6    TO BE FOUND GUILTY OF THAT CHARGE, THE GOVERNMENT MUST PROVE

7    EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

8         FIRST, MR. KAIL KNOWINGLY DEVISED A SCHEME OR PLAN TO

9    DEFRAUD, OR A SCHEME OR PLAN FOR OBTAINING MONEY OR PROPERTY BY

10   MEANS OF FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR

11   PROMISES, OR OMITTED FACTS.  DECEITFUL STATEMENTS OF

12   HALF-TRUTHS MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

13        SECOND, THE STATEMENTS MADE OR FACTS OMITTED AS PART OF

14   THE SCHEME WERE MATERIAL; THAT IS, THEY HAD A NATURAL TENDENCY

15   TO INFLUENCE, OR WERE CAPABLE OF INFLUENCING, A PERSON TO PART

16   WITH MONEY OR PROPERTY;

17        THIRD, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD;

18   THAT IS, THE INTENT TO DECEIVE AND CHEAT; AND,

19        FOURTH, MR. KAIL USED, OR CAUSED TO BE USED, THE MAILS TO

20   CARRY OUT OR ATTEMPT TO CARRY OUT AN ESSENTIAL PART OF THE

21   SCHEME.

22        IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

23   CONSIDER NOT ONLY THE DEFENDANT'S WORDS AND STATEMENTS, BUT

24   ALSO THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

25        WITH REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO CONVICT

1    YOU MUST FIND THAT DEFENDANT HAD A DUTY TO DISCLOSE THE OMITTED

2    FACT ARISING OUT OF A RELATIONSHIP OF TRUST.  THAT DUTY CAN

3    ARISE EITHER OUT OF A FORMAL FIDUCIARY RELATIONSHIP, OR AN

4    INFORMAL, TRUSTING RELATIONSHIP IN WHICH ONE PARTY ACTS FOR THE

5    BENEFIT OF ANOTHER AND INDUCES THE TRUSTING PARTY TO RELAX THE

6    CARE AND VIGILANCE WHICH IT WOULD ORDINARILY EXERCISE.  THE

7    REQUIREMENT THAT YOU FIND A DUTY TO DISCLOSE IN ORDER TO

8    CONVICT DOES NOT APPLY TO MATERIALLY FALSE STATEMENTS.

9         A MAILING IS CAUSED WHEN ONE KNOWS THAT THE MAILS WILL BE

10   USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN

11   REASONABLY FORESEE SUCH USE.  IT DOES NOT MATTER WHETHER THE

12   MATERIAL MAILED WAS ITSELF FALSE OR DECEPTIVE SO LONG AS THE

13   MAIL WAS USED AS PART OF THE SCHEME, NOR DOES IT MATTER WHETHER

14   THE SCHEME OR PLAN WAS SUCCESSFUL OR THAT ANY MONEY OR PROPERTY

15   WAS OBTAINED.

16        A PROPERTY INTEREST IS AN ECONOMIC INTEREST.  THUS, THE

17   TERM "PROPERTY" AS USED IN MAIL FRAUD INSTRUCTIONS, MEANS MONEY

18   OR ANOTHER FORM OF PROPERTY WITH ECONOMIC VALUE.

19        WITH RESPECT TO HONEST SERVICES WIRE FRAUD CHARGED IN

20   COUNTS ONE THROUGH NINETEEN, IN VIOLATION OF 18 U.S. CODE

21   SECTIONS 1343 AND 1346, AND HONEST SERVICES MAIL FRAUD CHARGED

22   IN COUNTS TWENTY THROUGH TWENTY-TWO, IN VIOLATION OF 18 U.S.

23   CODE SECTIONS 1341 AND 1346, AND INTENT TO DEFRAUD IS AN INTENT

24   TO DECEIVE AND CHEAT, WHICH MEANS TO ACT KNOWINGLY AND WITH A

25   SPECIFIC INTENT TO USE FALSE OR FRAUDULENT PRETENSES,

1    REPRESENTATIONS, PROMISES OR OMISSIONS TO CAUSE LOSS OF HONEST

2    SERVICES.

3          WITH RESPECT TO WIRE FRAUD CHARGED IN COUNTS ONE THROUGH

4    NINETEEN, IN VIOLATION OF 18 U.S. CODE SECTION 1343, AND MAIL

5    FRAUD CHARGED IN COUNTS TWENTY THROUGH TWENTY-TWO, IN VIOLATION

6    OF 18 U.S. CODE SECTION 1341, AN INTENT TO DEFRAUD IS AN INTENT

7    TO DECEIVE AND CHEAT.

8          IN REGARD TO COUNTS ONE THROUGH NINETEEN CHARGING WIRE

9    FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1343 AND HONEST

10   SERVICES WIRE FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1343

11   AND 1346, AND COUNTS TWENTY TO TWENTY-TWO CHARGING MAIL FRAUD

12   IN VIOLATION OF 18 U.S. CODE SECTION 1341 AND HONEST SERVICES

13   MAIL FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1341 AND 1346,

14   AN ACT IS DONE KNOWINGLY IF MR. KAIL IS AWARE OF THE ACT AND

15   DOES NOT ACT OR FAIL TO ACT THROUGH IGNORANCE, MISTAKE, OR

16   ACCIDENT.  YOU MAY CONSIDER EVIDENCE OF MR. KAIL'S WORDS, ACTS,

17   OR OMISSIONS, ALONG WITH ALL THE OTHER EVIDENCE, IN DECIDING

18   WHETHER HE ACTED KNOWINGLY.

19         IN REGARD TO COUNTS TWENTY-THREE THROUGH TWENTY-NINE

20   CHARGING MONEY LAUNDERING IN VIOLATION OF 18 U.S. CODE SECTION

21   1957, AN ACT IS DONE KNOWINGLY IF MR. KAIL IS AWARE OF THE ACT

22   AND DOES NOT ACT OR FAIL TO ACT THROUGH IGNORANCE, MISTAKE, OR

23   ACCIDENT.  THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT

24   MR. KAIL KNEW THAT HIS ACTS OR OMISSIONS WERE UNLAWFUL.  YOU

25   MAY CONSIDER EVIDENCE OF MR. KAIL'S WORDS, ACTS, OR OMISSIONS,

1       ALONG WITH ALL THE OTHER EVIDENCE IN DECIDING WHETHER HE ACTED

2       KNOWINGLY.

3            GOOD FAITH IS A COMPLETE DEFENSE TO CHARGES OF WIRE FRAUD,

4       HONEST SERVICES WIRE FRAUD, MAIL FRAUD, AND HONEST SERVICES

5       MAIL FRAUD AS ALLEGED IN COUNTS ONE THROUGH TWENTY-TWO.

6       MR. KAIL IS NOT REQUIRED TO PROVE GOOD FAITH.  THE GOVERNMENT

7       MUST PROVE INTENT TO DEFRAUD BEYOND A REASONABLE DOUBT.

8            AN HONESTLY HELD OPINION OR AN HONESTLY FORMED BELIEF

9       CANNOT PROVIDE FRAUDULENT INTENT EVEN IF THE OPINION OR BELIEF

10      IS MISTAKEN.

11           NEVERTHELESS, IF YOU FIND THAT MR. KAIL ACTED WITH

12      RECKLESS DISREGARD FOR THE TRUTH OF A MATERIAL

13      MISREPRESENTATION, SUCH A FINDING IS INCONSISTENT WITH GOOD

14      FAITH.  THUS, AN HONEST BELIEF THAT A BUSINESS VENTURE WOULD

15      ULTIMATELY SUCCEED DOES NOT CONSTITUTE GOOD FAITH IF MR. KAIL

16      INTENDED TO DECEIVE NETFLIX BY MAKING MATERIAL REPRESENTATIONS

17      THAT HE KNEW TO BE FALSE OR FRAUDULENT, OR IF MR. KAIL ACTED

18      WITH RECKLESS DISREGARD FOR THE TRUTH OF A MATERIAL

19      MISREPRESENTATION.

20           THE DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS

21      TWENTY-THREE THROUGH TWENTY-NINE WITH MONEY LAUNDERING IN

22      VIOLATION OF SECTION 1957 OF TITLE 18 OF THE UNITED STATES

23      CODE.  IN ORDER FOR MR. KAIL TO BE FOUND GUILTY OF THAT CHARGE,

24      THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND

25      A REASONABLE DOUBT:

1      FIRST, MR. KAIL KNOWINGLY ENGAGED OR ATTEMPTED TO ENGAGE

2  IN A MONETARY TRANSACTION;

3      SECOND, MR. KAIL KNEW THAT THE TRANSACTION INVOLVED

4  CRIMINALLY DERIVED PROPERTY;

5      THIRD, THE PROPERTY HAD A VALUE GREATER THAN $10,000;

6      FOURTH, THE PROPERTY WAS, IN FACT, DERIVED FROM WIRE FRAUD

7  OR MAIL FRAUD; AND,

8      FIFTH, THE TRANSACTION OCCURRED IN THE UNITED STATES.

9      THE TERM "MONETARY TRANSACTION" MEANS THE DEPOSIT,

10 WITHDRAWAL, TRANSFER, OR EXCHANGE, IN OR AFFECTING INTERSTATE

11 COMMERCE, OF FUNDS OR A MONETARY INSTRUMENT BY, THROUGH, OR TO

12 A FINANCIAL INSTITUTION.

13     THE TERM "FINANCIAL INSTITUTION" MEANS AN INSURED BANK

14 UNDER THE FEDERAL DEPOSIT INSURANCE ACT, A COMMERCIAL BANK OR

15 TRUST COMPANY, OR A CREDIT UNION.

16     THE TERM "CRIMINALLY DERIVED PROPERTY" MEANS ANY PROPERTY

17 CONSTITUTING, OR DERIVED FROM, THE PROCEEDS OF A CRIMINAL

18 OFFENSE.  THE GOVERNMENT MUST PROVE THAT MR. KAIL KNEW THAT THE

19 PROPERTY INVOLVED IN THE MONETARY TRANSACTION CONSTITUTED, OR

20 WAS DERIVED FROM, PROCEEDS OBTAINED BY SOME CRIMINAL OFFENSE.

21 THE GOVERNMENT DOES NOT HAVE TO PROVE THAT MR. KAIL KNEW THE

22 PRECISE NATURE OF THAT CRIMINAL OFFENSE, OR KNEW THE PROPERTY

23 INVOLVED IN THE TRANSACTION REPRESENTED THE PROCEEDS OF WIRE

24 FRAUD OR MAIL FRAUD.

25     ALTHOUGH THE GOVERNMENT MUST PROVE THAT OF THE PROPERTY AT

1      ISSUE MORE THAN $10,000 WAS CRIMINALLY DERIVED, THE GOVERNMENT

2      DOES NOT HAVE TO PROVE THAT ALL OF THE PROPERTY AT ISSUE WAS

3      CRIMINALLY DERIVED.

4           ALL RIGHT.  I'M GOING TO STOP HERE.  I KNOW THAT'S A LOT

5      FOR YOU TO ABSORB.  THERE'S SOME REPETITION.

6           BUT I THINK THAT WILL HELP YOU WHEN YOU ACTUALLY TAKE A

7      LOOK AT THESE JURY INSTRUCTIONS.

8           SO NOW I AM GOING TO TURN TO THE ATTORNEYS FOR THEIR

9      CLOSING ARGUMENTS.

10          THE GOVERNMENT MAKES THE FIRST CLOSING ARGUMENT, AND THEN

11     THE DEFENSE HAS THE OPPORTUNITY, AND THE GOVERNMENT, BECAUSE IT

12     BEARS THE BURDEN OF PROOF, MAY MAKE A FINAL CLOSING ARGUMENT

13     AND WILL RESERVE TIME FOR THAT.

14          MR. SAMPSON, ARE YOU READY FOR THE CLOSING ARGUMENT?

15               MR. SAMPSON:  YES, YOUR HONOR.  WE'RE JUST SETTING

16     UP.

17               THE COURT:  OKAY.

18          (PAUSE IN PROCEEDINGS.)

19               MR. SAMPSON:  JUST ONE MOMENT, YOUR HONOR.

20          (PAUSE IN PROCEEDINGS.)

21          **(MR. SAMPSON GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

22     **GOVERNMENT.)**

23               MR. SAMPSON:  NETFLIX WAS ON THE CUTTING EDGE.  IT

24     WAS A LEADER IN I.T. MOVING INTO THE CLOUD.  MR. KAIL WAS THE

25      HEAD OF I.T.  HE KNEW HOW IMPORTANT HIS POSITION THERE WAS.

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5     UNITED STATES OF AMERICA,        )  CR-18-00172 BLF
                                        )
 6                     PLAINTIFF,       )  SAN JOSE, CALIFORNIA
                                        )
 7              VS.                     )  APRIL 7, 2021
                                        )
 8     MICHAEL KAIL,                    )  VOLUME 1
                                        )
 9                     DEFENDANT.       )  PAGES 1-180
       _____ )
10

11                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE BETH LABSON FREEMAN
12                UNITED STATES DISTRICT JUDGE

13     A P P E A R A N C E S:

14     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  COLIN C. SAMPSON
15                                DANIEL KALEBA
                             450 GOLDEN GATE AVENUE, BOX 36055
16                           SAN FRANCISCO, CALIFORNIA  94102

17     FOR THE DEFENDANT:    JAYNE LAW GROUP
                             BY:  JULIA M. JAYNE
18                           483 9TH STREET, SUITE 200
                             OAKLAND, CALIFORNIA  94607
19

20     ALSO PRESENT:         FRANCHESCA CHELI
                             BALJINDER HEER
21

22

23     OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
```

1    IS EACH OF YOU.

2        AND SOME OF YOU, I'M SURE, HAVE SERVED ON JURIES BEFORE,

3    MORE LIKELY IN STATE COURT, BUT IT COULD HAVE BEEN IN FEDERAL

4    COURT AS WELL.

5        AND REALLY BEING A JUROR IS THE BACKBONE OF OUR JUSTICE

6    SYSTEM.  WHAT YOU DO AS JURORS IS WHAT MAKES OUR COMMUNITY

7    BELIEVE IN OUR JUDICIAL SYSTEM BECAUSE THE PROCESS OF SELECTING

8    EACH OF YOU THAT WE'RE ABOUT TO GO THROUGH GIVES THE COMMUNITY

9    CONFIDENCE THAT WE'RE DOING OUR JOB.

10        AND OUR COURTROOMS ARE OPEN TO THE PUBLIC.  AGAIN, BECAUSE

11    OF COVID, WE'RE NOT LETTING INTERESTED CITIZENS COME INTO THE

12    COURTROOM.  BUT THEY'RE LISTENING.  WE HAVE A TELEPHONE LINE

13    THAT IS OPEN FOR THE COMMUNITY TO LISTEN IN, AND WE WELCOME AND

14    HOPE THAT PEOPLE ARE LISTENING AND BEING PART OF THE JUDICIAL

15    PROCESS, JUST LIKE THE DOOR TO THE COURTROOM WOULD NORMALLY BE

16    OPEN AND MEMBERS OF THE PUBLIC COULD COME AND SIT AND WATCH.

17    WE DON'T DO ANYTHING IN SECRET.

18        NOW, WHEN YOU SERVE ON A JURY, IT CAN SEEM LIKE A PRETTY

19    DAUNTING TASK.  KIND OF SCARY, ACTUALLY, BECAUSE FOR MOST OF

20    YOU, YOU DIDN'T GO TO LAW SCHOOL, YOU HAVEN'T STUDIED THE LAW,

21    YOU HAVEN'T -- MAYBE YOU HAVEN'T BEEN ON A JURY AND MAYBE HAVE

22    NEVER EVEN BEEN IN A COURTROOM BEFORE.

23        AND I KNOW A LOT OF YOU PROBABLY LOOK AT ME AND SAY, WELL,

24    SHE CAN DO IT, BECAUSE CERTAINLY I'VE BEEN TO LAW SCHOOL, I

25    PRACTICED LAW FOR A LONG TIME, I'VE BEEN A JUDGE FOR A LONG

1           UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3 Before The Honorable Beth Labson Freeman, Magistrate Judge

4

5 UNITED STATES OF AMERICA,    )
                            )

6        Plaintiff,     )
                            )

7 vs.                 )   No. CR 18-00172-BLF-1
                            )

8 MICHAEL KAIL,         )
                            )

9        Defendant.    )
10 _____)

                       San Jose, California

11                     Friday, March 5, 2021

12  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
       RECORDING  9:00 - 1:50 = 4 HOURS & 50 MINUTES

13

14 APPEARANCES:

15 For Plaintiff:

                       United States Attorney's

16                      Office
                       450 Golden Gate Avenue

17                       Box 36055
                       San Francisco, California

18                       94102
             BY:  COLIN C. SAMPSON, ESQ.

19             BY:  CHRISTOPHER KALTSAS, ESQ.

20                       United States Attorney's
                      Office

21                       150 Almaden Boulevard
                       Suite 900

22                       San Jose, California 95113
              BY:  DANIEL KALEBA, ESQ.

23

24       (APPEARANCES CONTINUED ON NEXT PAGE)

25

49

1          MR. SAMPSON:  I'm so sorry about that.

2          THE COURT:  No, it's harder for you.  I really

3  helps to see you, so I must say that -- even on the smaller

4  screen from your phone, it's a help to me.  I hope it's a

5  help to you too.

6          MR. SAMPSON:  Thank you, your Honor.  I'm supposed

7  to be getting my new Wi-Fi router this afternoon so I

8  apologize.

9          THE COURT:  I totally get it.  Okay.  So let's go

10  back.

11      We're on number 34 and I want to turn to the notes at

12  five point -- that says 5.6.  I've got the 2010 book so this

13  was renumbered, but do you have the current version of 5.7?

14  Because my notes may be incorrect, and I just can't print

15  out the Ninth Circuit instructions every time I have a jury

16  trial.

17          MR. SAMPSON:  Understood, your Honor.  I believe

18  that we were using the most recent instructions.  We have --

19          THE COURT:  I'm sure you were.  So can you pull up

20  the comments to 5.7?

21          MR. SAMPSON:  I'm working on that right now.

22          THE COURT:  Because I want to see if they remain

23  the same.

24          And so it says that "The second sentence of the

25  instruction should not be given when an element of the

50

1 offense requires the Government to prove the defendant knew

2 that what the defendant did was unlawful."

3     So that's my question to you.  Does the Government have

4 to prove -- is this specific intent that it was unlawful, or

5 is it general intent that was done knowingly?  That's what I

6 don't know the answer to.

7         MS. JAYNE:  Your Honor, that particular comment,

8 it actually cites to money laundering, so at a minimum we

9 would have to give it because -- at least the very last case

10 cited in that comment says, quote, "money laundering."

11        THE COURT:  So it says to take it out.  That

12 comment means deleting the sentence, not including it.

13     That's what I'm -- because it says the Government is

14 not required that he knew his acts were unlawful.  And my

15 question is does that come out?

16        MS. JAYNE:  Correct.  Sorry, yes.  So I believe

17 that knowingly --

18        MR. SAMPSON:  So, your Honor, I have the comment

19 up.

20     I apologize, Ms. Jayne.

21     I have the comment up and it says, "The instruction

22 should not be given when an element requires the Government

23 to prove that the defendant knew what the defendant did was

24 unlawful."

25     So, your Honor, I believe that the comment for the

51

1 addition -- the addition here should come out for knowingly

2 with respect to the money laundering.

3     The wire fraud, although it says knowingly as to some

4 elements, I believe it's also willfully.

5         THE COURT:  And that's fine, and what we are going

6 to need to do is to give an instruction that points that out

7 to the jury.

8     So I think what makes the most sense is that this

9 instruction as written be given for the honest services and

10 wire fraud charges.  And then we give a new instruction for

11 money laundering that takes this out and indicates -- and

12 actually points out to the jury that knowingly, as used in

13 regard to whatever counts it is, is defined as follows.

14     But you need to tell me whether --

15         MR. SAMPSON:  Your Honor, I apologize.  And I

16 think I want to withdraw my statement about willfulness.

17 I'm not sure it actually applies in the wire fraud context.

18 I know that --

19         THE COURT:  Well, this is knowingly.  This isn't

20 willful.

21         MR. SAMPSON:  Right, I understand.  I understand.

22         MS. JAYNE:  Right.  I think what's confusing, the

23 bracket almost -- if it said the Government is required to

24 prove, I think that's a correct statement of the law.  And

25 therefore --

53

1  specific intent to defraud crime.  There aren't many

2  specific intent crimes, but --

3         MR. SAMPSON:  Your Honor, I will point out that

4  the instruction on the services fraud does not say specific

5  intent, 8.123.  It says that the defendant acted with the

6  intent to defraud.

7         THE COURT:  I'm looking at the notes, Mr. Sampson,

8  to 123 and it cites a case -- quite an old case -- honest

9  services fraud requires, quote, "a specific intent to

10 defraud."  It cites <u>Kincaid-Chauncey</u>.  I don't know the

11 case.  I'm sorry I didn't take a look at that.

12     Oh, here it is, 556 F.3d 923 at 941.  I'm looking at

13 8.123, the notes.

14        MR. SAMPSON:  I see that, your Honor.

15        THE COURT:  So I mean I generally consider these

16 notes to be accurate, but I leave it in your hands to tell

17 me that they're not.

18        MR. SAMPSON:  No, your Honor.  I don't have any

19 reason to dispute the citation in the commentary.  I just

20 noted that the elements themselves state that the defendant

21 acted with the intent to defraud in the first element

22 knowingly and in the fourth element, the intent to defraud.

23        THE COURT:  Okay.  Thank you.

24     So I'm going to now take us back to instruction 34.

25 And it looks as though the revision will be for all but

54

1　money laundering.  And that's a number of charges, right?

2　　　　　MR. SAMPSON:  1 through 20, your Honor -- 1

3　through --

4　　　　　THE COURT:  No, 1 through 20 are not money

5　laundering.  It's like 20 to 29 are money laundering?

6　　　　　MR. SAMPSON:  23 to 29 are money laundering.  I

7　just meant when you said all but money laundering.

8　　　　　THE COURT:  Okay.  So all but money laundering,

9　we're going to leave this second sentence in.  For money

10　laundering, we're going to take it out.  We're going to have

11　two different knowingly instructions.

12　　　　　Is that correct?

13　　　　　MS. JAYNE:  Your Honor, I think I got a little bit

14　confused there.  I thought when we are looking at 8.123,

15　there was also the knowing participation, "knowingly

16　participated."  And therefore, I thought that that was an

17　element and therefore the bracketed portion should come out

18　for all substantive offenses.

19　　　　　THE COURT:  So let's look at that.

20　　　　No, it's -- you know, that's the problem with the word

21　"knowingly."  It has to be that the element is that the

22　defendant knew what the defendant did was unlawful as

23　opposed to knew that he did the act that was committed.

24　That's general intent.

25　　　　So I knew I was putting money in my bank account,

55

1 that's not unlawful.  But I did it knowingly.  As opposed

2 to, I knew I was stabbing you, that's specific intent.

3      So sorry for the crass examples, but that's why this is

4 so tricky and that's why --

5           MS. JAYNE:  It is.  I think I hear the Court.  If

6 knowing conduct as opposed to accidental versus knowing the

7 unlawfulness of it which is --

8           THE COURT:  Knowing the unlawfulness, exactly.

9           MS. JAYNE:  Okay.  Okay.

10          MR. SAMPSON:  Your Honor, I believe knowing the

11 unlawfulness gets into the question of willfulness, which I

12 don't think is at issue here, which is intentional violation

13 of a known legal duty.

14      Coming from the tax background that I do, willfulness

15 has a bit of a higher standard.

16          THE COURT:  I know.  I know it is, but I'm trying

17 to -- so the Ninth Circuit is citing a case that says in

18 money laundering cases, you don't give this second sentence.

19 That's my point here, and we have to resolve that.

20      So if you want to take a look at this U.S. v. Turman,

21 it says it right there for 5.7.  And I'm going to -- Mr.

22 Sampson, if you want to pull that up or Mr. Kaleba wants to

23 do that.

24          MR. SAMPSON:  I can work on that.  Let me just get

25 the cite.  112 (sic) F.3d 1167.

*Echo Reporting, Inc.*

56

1       THE COURT:  122 F.3d.

2       MR. SAMPSON:  Thank you.

3   I apologize, your Honor.  I'm just looking for the --

4       THE COURT:  I appreciate that you can do it.  You

5   know, this is why we do this now.

6   We haven't even gotten to the hard one.

7       MR. SAMPSON:  I think that's right.  Sorry, your

8   Honor.  There's quite a bit about the standard of review.

9       THE COURT:  So page 1169 is where the cite is, the

10  pin cite.

11      MR. SAMPSON:  All right.  It's a rather long

12  introduction by Judge Kozinski.

13  So I see that the district court and in that case

14  provided the instruction that "An act is done knowingly if

15  the defendant is aware of the act and does not act or fail

16  to act through ignorance, mistake or accident."  It gave the

17  additional sentence, "The Government is not required to

18  prove that he knew his acts or omissions were unlawful."

19  The defendant did not object.

20      MS. JAYNE:  I think it was error but they just

21  determined it was -- it was not plain error.

22      MR. SAMPSON:  It was --

23      MS. JAYNE:  I mean it was an error --

24      THE COURT:  It was instructional error?

25      MR. SAMPSON:  It does not -- I believe there was

*Echo Reporting, Inc.*

57

1  not plain error.  It was not plain error to give the

2  instruction with the additional sentence.

3          MS. JAYNE:  Which means there was error, it

4  shouldn't have been given.  I mean --

5          MR. SAMPSON:  I'm sorry, your Honor.  The Court

6  found that there was not plain error.

7          THE COURT:  Okay.

8          MR. SAMPSON:  So it shouldn't have bene given.

9          MS. JAYNE:  That sounds right.

10          THE COURT:  And so what does that tell us about

11  this sentence for money laundering?

12          MS. JAYNE:  That it should not be given.

13          MR. SAMPSON:  That for money laundering it should

14  not be given.

15          THE COURT:  It should not have, so we're going to

16  have two separate knowingly instructions.  So we will give

17  the sentence for the honest services, mail and wire fraud

18  charges, 1 through 22.  Is that --

19          MR. SAMPSON:  Yes, your Honor.

20          THE COURT:  Okay.  So I'll need a second knowingly

21  instruction that I give after the 1957 instruction.

22          MR. SAMPSON:  So that will be 34A?

23          THE COURT:  Let's call it 34A, yes.

24          So that will work for Counts One through 22 and we

25  will get a new instruction for Counts 23 to 29.

*Echo Reporting, Inc.*

58

1        MR. SAMPSON:  So, your Honor, should the

2   instruction add references to the counts?

3        THE COURT:  "An act is done knowingly" -- so I

4   think it would make sense and I think we can say "in regard

5   to Counts One through 23."

6        MR. SAMPSON:  One through 22.

7        THE COURT:  One through 22, thank you, an act is

8   done knowingly.

9     And then the new one will say "In regard to Counts 23

10  to 29" and then it'll be different.  And I will read them at

11  separate times.  They will be separated and associated with

12  the elements instruction for those counts.  Okay?

13       MR. SAMPSON:  Yes, your Honor.

14       THE COURT:  Good.  All right.  So that's a big

15  change but I think that's helpful.

16     Okay.  Then let's go to 35, intent to defraud.  So here

17  I was really concerned.  This is where I think I first noted

18  this issue about the indictment because this says, "You may

19  determine whether a defendant has an honest, good faith

20  belief in the truth of the specific misrepresentations

21  alleged in the indictment."

22     And that's what I had a little meltdown about what are

23  we doing about the indictment?

24       MR. SAMPSON:  Yes, your Honor.

25       THE COURT:  So I'm now turning -- you know, I

91

1 clarity.

2    MR. SAMPSON:  Your Honor, the Government's
3 position is that that turns it into regular wire fraud and
4 is not tailored to honest services fraud, which is the
5 violation of a fiduciary duty coupled with knowledge.

6    And so we're not sure that it should include the
7 italicized false or fraudulent pretenses representation.

8    THE COURT:  I'm going to take that out so it will
9 track the Government's version.

10    "Second," it looks like there's no -- so the addition
11 here, Mr. Sampson, is the addition "quid pro quo."  I
12 actually think that's an accurate statement of the law that
13 it needs to be a quid pro quo.

14    MR. SAMPSON:  Yes, your Honor.  I agree that it's
15 an accurate statement.  It is later -- quid pro quo is, I
16 think, discussed later in the definitions.  I'm not sure
17 it's required to be in the elements.  Because a bribe or
18 kickback can't be a bribe or kickback unless there's quid
19 pro quo so it's duplicative.

20    MR. KALEBA:  I just note that "bribe" was dropped
21 from Ms. Jayne's version.  It should say "a bribe or
22 kickback."

23    THE COURT:  Thank you.

24    MS. JAYNE:  I'm sorry, and that was -- "bribe or."

25    THE COURT:  Thank you, Mr. Kaleba.  Yes, thank you

92

1  for tracking your version of it because I just can't read

2  all of these at once.

3          MS. JAYNE:  I as well, but I do think this is a

4  complicated instruction and the more that the jury

5  understands it, this exchange is that quid pro quo we're

6  referring to.

7          THE COURT:  So complicated requires explanation,

8  but we don't have to repeat things, because I need to be

9  careful not to overemphasize.

10      The Government says -- I thought there was something --

11  oh, so in the model instruction, Mr. Sampson -- well, I

12  guess both of you have left out from 8.123:  The exchange

13  may be express or may be implied from the surrounding

14  circumstances.

15          MR. SAMPSON:  No, your Honor.  The defense

16  included it and I see we did not.  And I don't object to it

17  being in, given that it's in the model.

18          THE COURT:  Okay.  So you're okay with that in

19  "Second"?  Okay.  So it wasn't highlighted there.  Okay.

20  Good.

21      So "Second, the scheme or plan consists of a bribe or

22  kickback in exchange for Mr. Kail's services.  The exchange

23  may be express or may be implied from all the surrounding

24  circumstances."

25          So that --

93

1          MS. JAYNE:  So is the Court cutting "a quid pro

2    quo"?

3          THE COURT:  Well, I want to -- let me look back

4    back -- where do you have it in your definitions?

5          MS. JAYNE:  I have it --

6          THE COURT:  Let me ask the Government.  Let me ask

7    because I just want to see how the Government was doing it.

8          MS. JAYNE:  Oh, the Government.

9          MR. SAMPSON:  Yes, your Honor.  It's in section

10   two, the bribe or kickback.  Second sentence, "Bribery and

11   kickbacks involve the exchange of a thing of value for

12   services by a fiduciary, in other words, a quid pro quo, a

13   Latin phrase meaning this for that or these for those."

14         THE COURT:  Okay.  Then I don't need to repeat it

15   here.  We'll take out the parenthetical.

16       "Third" -- again, I'm back to Ms. Jayne's version --

17   "Mr. Kail owed a fiduciary duty to Netflix" and she says

18   that tracks the Government's version.  Is that correct?

19         MR. SAMPSON:  Yes, your Honor.  We say "Netflix,

20   Inc." and that's fine.

21         THE COURT:  Okay.  "Fourth, Mr. Kail acted

22   with" -- so --

23         MS. JAYNE:  I've crossed out "and to cheat."

24         THE COURT:  I'm sorry, what?

25         MS. JAYNE:  This is -- I hope your Honor is

94

1 looking at the version where I crossed off "and to cheat."

2 My original version had "cheat" but I've crossed that out.

3          THE COURT:  You took out "specific intent."

4          MS. JAYNE:  And I'm not sure why I did that.

5          THE COURT:  I'm not either.

6          MS. JAYNE:  I think I meant to focus on the "and

7 to cheat."  So sorry, I think -- I intended it to be "Mr.

8 Kail acted with a specific intent to defraud by depriving

9 Netflix of its right to honest services."

10          THE COURT:  This is interesting because the model

11 instruction does not say "specific intent."

12          MS. JAYNE:  But the comments do.  I mean there's

13 no non-specific intent.

14          THE COURT:  No, the word "specific" -- it can be

15 general intent or specific intent and it's a very big

16 difference.

17          MS. JAYNE:  Oh, in that context.

18          THE COURT:  That's my concern.  You added

19 specific, and then you were taking it out.

20      Specific is not in the jury instruction from the Ninth.

21          MS. JAYNE:  Except that, as your Honor noted, in

22 the comments, "Honest services fraud requires a specific

23 intent to defraud," Kincaid-Chauncey case.

24          THE COURT:  Yes.

25          MS. JAYNE:  And I think I made a mistake.  I did

*Echo Reporting, Inc.*

95

1  not intend to cross off "specific."  I intended to just

2  cross out "and to cheat."

3           THE COURT:  I'm looking for the note in 123 and it

4  must be in the new version.  Let me just --

5           MS. JAYNE:  Nobody's claiming this is a general

6  intent crime.

7           MR. SAMPSON:  Your Honor, we're not disputing

8  Kincaid-Chauncey.

9           THE COURT:  Okay.  So we're going to put

10 "specific" back in but take "and cheat" out.

11          MS. JAYNE:  That's correct.  That was after.

12          THE COURT:  Okay.  "Fourth, Mr. Kail acted with a

13 specific intent to defraud by depriving Netflix of its right

14 to honest services."  Correct?

15          MR. SAMPSON:  Yes, your Honor.

16          THE COURT:  Okay.  "Fifth."  So your fifth is

17 completely unrelated to the Ninth Circuit's fifth.

18          MS. JAYNE:  That's correct.  I'm adding in a

19 definition -- essentially defining "act."

20          THE COURT:  So I'm going to take that out because

21 we've done that.  And I presume -- let me go back to what

22 the Government had.  So they have to find it was material.

23 That's an element of the statutory offense and so --

24          MS. JAYNE:  Yes, I do have material, but I have

25 the statements made or facts omitted were material.

96

1          THE COURT:  Or "were material."  Sorry, sorry.

2          MS. JAYNE:  As opposed to just "act."  But either

3  way --

4          THE COURT:  No, I'm not going to --

5          MS. JAYNE:  -- materiality is obviously there.

6          THE COURT:  Okay.  I'm going to use the Ninth

7  Circuit version here, which is --

8          MS. JAYNE:  "Mr. Kail's act" because we're -- to

9  be consistent.

10          MR. SAMPSON:  Yes, your Honor.

11          THE COURT:  Okay.  So that will then say "Mr.

12  Kail's act was material."

13          MR. SAMPSON:  And, your Honor, I believe that it

14  should say "it had a tendency to influence or was capable of

15  influencing," and then the Government says "a person's" but

16  it should be "an entity's acts."

17          THE COURT:  You say "Netflix acts" or she does.

18  Is "Netflix" okay or is it broader?  Does it include all the

19  vendors?

20          MR. SAMPSON:  Your Honor, I think it may be

21  broader.  So I would say "a person or entity's acts."

22          MS. JAYNE:  But the only victim here is Netflix.

23  The vendors can't possibly be part of this.  There's no

24  allegation that the vendors were defrauded.

25          MR. SAMPSON:  Well, your Honor --

*Echo Reporting, Inc.*

97

1       MS. JAYNE:  I mean that definitely can't be

2  argued.

3       MR. SAMPSON:  The Government's proof at trial is

4  expected to include false statements made by the defendant

5  to vendors as well.

6       THE COURT:  We'll say "a person or entity's acts."

7       MS. JAYNE:  But I would note -- this is clear case

8  law -- that the one defrauded is the one that had to part

9  with money or property, or the one defrauded has to be the

10  one deprived of honest services.

11    So even if, even if there were false statements to

12  other parties, if they're not deprived of any money or

13  property, they can't be part of the allegations.

14       THE COURT:  All right.  Well, we can leave this

15  one vague, "of a person or entity."

16       MS. JAYNE:  I'm just concerned that there might be

17  arguments or positions taking that are inconsistent with the

18  law.

19       THE COURT:  Okay.  And then the sixth element,

20  everyone agrees on as set forth in the defendant's version?

21       MS. JAYNE:  Yes.

22       MR. SAMPSON:  Let me just compare it quickly, your

23  Honor.

24    It's a little bit different from the Government's.  So

25  it says "used or caused someone to use" -- oh, the

106

1  wires.  I believe they're all domestic.

2          THE COURT:  Let's take that out.

3          MS. JAYNE:  It's in two places so we have to cut

4  it in both.

5          THE COURT:  Where else?  Yes, above at line 16 as

6  well.

7          MS. JAYNE:  "Must be reasonably foreseeable that

8  some wire communication would occur in furtherance of the

9  scheme at an interstate" -- cut "foreign" -- "wire

10 communication unless it actually occurred."

11         MR. SAMPSON:  Yes, your Honor.  I only see one on

12 that page.

13         THE COURT:  There are two, line 16 and line 18.

14         MR. SAMPSON:  Sorry, yes, it was hanging.

15         THE COURT:  So then in -- there's a new paragraph

16 that has nothing to do with fiduciary duty but -- we're

17 moving on to a different issue.  So we've covered fiduciary

18 duty.

19      And then there's -- let's see, the Government has a --

20 you have a lengthy section.  Your number two is "The bribe

21 or kickback in exchange for services."

22         MR. SAMPSON:  And, your Honor, I believe the

23 Government's section two is from Rojas, Judge Koh's

24 instruction.

25         THE COURT:  I think it is.

*Echo Reporting, Inc.*

107

1    MS. JAYNE:  And mine comes from the Seventh
2 Circuit pattern instruction and 41 U.S.C. 522, the statute
3 that defines "kickback" in the public context.  And so there
4 were some adjustments to a company stock being the official
5 act.

6    THE COURT:  So the Government's version includes
7 the quid pro quo portion that you want, Ms. Jayne.

8    MS. JAYNE:  That part if -- in mine, let me look.
9    Right, because it was cut at the top, we would need to
10 include at least that somewhere.

11    THE COURT:  So, Mr. Sampson, you don't actually
12 define what a kickback is.

13    MR. SAMPSON:  No, your Honor.  I think that the
14 definition provided -- I think it's from 42 U.S.C., maybe
15 section 52.  I think it's appropriate for kickback, but then
16 bribe is not defined.

17    And so I think that the first paragraph, which is from
18 Judge Koh's instruction, appropriately defines what both
19 are, which are -- it's the exchange of a thing of value for
20 services by a fiduciary.

21    So, your Honor, we can go further into what exactly the
22 legal definition of a kickback is.

23    THE COURT:  Yeah, I don't think we need so much.
24 I think what the Government has is fine.

25    MS. JAYNE:  Which portion?  I don't object to that

108

1 first sentence if we're cutting -- the second element that

2 the Government must prove.  That paragraph makes sense.  And

3 I --

4          THE COURT:  But I'm not going to include your

5 lengthy one at page 58 of this instruction.  I do -- so

6 looking at page 59 now.

7      And, Mr. Sampson, Ms. Jayne has a last sentence

8 "undisclosed conflicts of interest, secret payments or

9 undisclosed self-dealing alone is not sufficient."  I think

10 that's a correct statement of the law.

11          MR. SAMPSON:  Your Honor, I'm not sure about the

12 secret payments but the other two, I believe that's a

13 correct statement of the law.

14          THE COURT:  Okay.  Well, if we take out "secret

15 payments" --

16          MS. JAYNE:  I did take that directly from -- and I

17 have the cite.  I think that's <u>Anspach</u> but let me just --

18          MR. SAMPSON:  That's an 11th Circuit case?

19          MS. JAYNE:  Right.  That is "conflicts of

20 interest, secret payments or undisclosed self-dealing."  I

21 mean I took that directly from --

22          THE COURT:  So it's not a quid pro quo.  I mean it

23 made alone without the quid pro quo is why it wouldn't be

24 enough.

25          MR. SAMPSON:  Well, your Honor, I think it's

*Echo Reporting, Inc.*

109

1 actually that alone without a duty to disclose.

2          MS. JAYNE:  No.

3          THE COURT:  Well, I'm concerned -- yeah, well,

4 there has to be a duty, but there also has to be a quid pro.

5 That's what we've said.

6          MS. JAYNE:  So the secret payment was from the

7 <u>Anspach</u> case, and the conflict of interest and undisclosed

8 self-dealing comes from <u>Skilling</u>.

9          THE COURT:  Yes, it does.

10          MR. SAMPSON:  Well, I'm not sure it makes much

11 difference, your Honor, because the Government intends to

12 prove essentially beyond what's stated here, and the secret

13 payments were essentially part of the Government's case.

14          THE COURT:  So I would like -- although I'm not

15 willing to give Ms. Jayne's paragraph that says the term

16 "kickback" because I think the Government has covered it, I

17 would like you to add her sentence, "Undisclosed conflicts

18 of interest, secret payments or undisclosed self-dealing

19 alone is not sufficient."  I'd like you to add that.

20      And I don't know quite where you want to put it.  Maybe

21 after the -- right in this paragraph on kickbacks, after

22 "meaning this for that or these for those," and then just

23 put that sentence in.

24          MR. SAMPSON:  Yes, your Honor.

25          THE COURT:  Good.  Okay.

119

1    MR. SAMPSON:  So we'll delete the Government.

2    THE COURT:  Okay.  Then materiality, any objection

3 to that?  It seems pretty straightforward.

4    MS. JAYNE:  No, I thought we already defined it.

5 But that's fine.  Oh --

6    MR. SAMPSON:  I'm sorry.  I would just add "a

7 person or entity's acts" or -- because I think that's

8 consistent with what we discussed before.

9    THE COURT:  Which -- "The fifth element that the

10 Government must prove is that defendant's acts were

11 material, that is, it had a natural tendency to

12 influence" -- oh, "a person or entity's acts."  Good.

13 That's fine.

14    And then "use of wire or radio communication."  Is

15 there any objection to that?

16    MS. JAYNE:  One moment.

17    No.

18    THE COURT:  Okay.  All right.  I think we've got

19 an instruction.

20    Have I left out anything covered in your instruction?

21 I don't believe so, Ms. Jayne.  I think we got through

22 yours.

23    And, Mr. Sampson --

24    MR. SAMPSON:  Your Honor --

25    THE COURT:  Yes.

122

1                    AFTERNOON SESSION

2                        --oOo--

3          THE COURT:  Okay.  I believe we are back together.

4  Everyone is here.  Hopefully you had a chance to swallow a

5  little bit of lunch and move around a little.  I too want to

6  finish this up.  I hope we don't have too much farther to go

7  on it.

8          So I'm to move on to what is now the 42A instruction,

9  and that's page 64, marked down at the bottom, document 141.

10         I recognize, Ms. Jayne, your objection entirely to this

11  being presented to the jury as a separate charge, a separate

12  count -- there's like 100 counts against Mr. Kail right

13  now -- but I think in looking back in the record, I think

14  it's been adequately alleged, and you've made your

15  objection.  It's noted on the record.

16         Okay.  So let me just start with your first argument,

17  Ms. Jayne, because I think we need to address this.  You

18  cite <u>Kelly</u> to modify the crime, the first element being that

19  "The defendant knowingly devised a scheme or plan to defraud

20  or a scheme or plan for obtaining money or property by means

21  of false pretenses."

22         And you suggest that <u>Kelly</u> confirms that it's all about

23  obtaining money or property.  Is that -- did I summarize

24  that?

25              MS. JAYNE:  Yes.  Essentially, your Honor, the

131

1 victim to pay out more or receive less pecuniary value than

2 it otherwise would have.  This is what distinguishes it from

3 honest services.

4          THE COURT:  That's fine, but that's not what you

5 said here.

6          MS. JAYNE:  I do have that.

7          THE COURT:  This is your argument.  This is not a

8 jury instruction.  "Even if you find defendant violated his

9 employer's policies, this is not standing alone enough."  We

10 said that already.

11     "The Government must prove that defendant's scheme to

12 take something of economic value."  We just said that above,

13 from the victim.  This is just repetitive of what we've

14 already said.

15          MS. JAYNE:  I think the last sentence in terms of

16 pay out more, receive less, that's the crux of it as well.

17          THE COURT:  I'm not going to -- this scheme to

18 defraud, it makes no sense to me and I'm not going to allow

19 it.

20     Okay.  So let me just go back.

21     Mr. Sampson, because this is a second run-through for

22 the jury on the same charges, I think maybe it should say at

23 the very beginning, "The defendant is also charged in Counts

24 One through 19 with wire fraud."

25          MR. SAMPSON:  I agree, your Honor.

132

1    THE COURT:  Okay.  All right.  So I'm to give the
2  Government's instruction.
3    I'm going to add the definition of property with -- a
4  part of the definition of property, the first two sentences.
5    And I'm going to deny the scheme to defraud.  You can
6  argue all of that, but I'm not prepared to give that.  I
7  don't actually even understand what you're saying in
8  relation to what this instruction is trying to do.
9    MS. JAYNE:  So the instruction will start with
10  "The Government has also"?
11    THE COURT:  The instruction is exactly the way the
12  Government prepared it in terms of the elements.  I'm just
13  saying "The defendant is also charged in Counts One through
14  19."  The elements are one, two, three, four.
15    And then the omission theory you don't object to, I
16  presume, is that correct, in the Government's version, duty
17  to disclose, that's all -- you --
18    MS. JAYNE:  I probably should go line by line with
19  the Ninth Circuit.  I don't remember if I did that.  But
20  I'll look over that.
21    THE COURT:  Okay.
22    MR. SAMPSON:  And, your Honor, with respect to the
23  identical paragraph about omissions, I think you added the
24  word "only."  I defer to the Court as to whether you want to
25  include "only."

```
 1

 2                    IN THE UNITED STATES DISTRICT COURT

 3                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

 4                             SAN JOSE DIVISION

 5

    UNITED STATES OF AMERICA,        )   CR-18-00172-BLF
 6                                    )
                     PLAINTIFF,       )   SAN JOSE, CALIFORNIA
 7                                    )
                 VS.                  )   JANUARY 14, 2021
 8                                    )
    KAIL,                             )   PAGES 1-89
 9                                    )
                    DEFENDANT         )
10                                    )
    _____  )
11
                        TRANSCRIPT OF PROCEEDINGS
12            BEFORE THE HONORABLE BETH LABSON FREEMAN
                    UNITED STATES DISTRICT JUDGE
13
                        A P P E A R A N C E S
14

15         FOR THE PLAINTIFF:      BY:  COLIN CHRISTOPHER SAMPSON
                                        DANIEL KALEBA
16                                 UNITED STATES ATTORNEY'S OFFICE
                                   NORTHERN DISTRICT OF CALIFORNIA
17                                 TAX DIVISION
                                   450 GOLDEN GATE AVENUE, BOX 36055
18                                 SAN FRANCISCO, CA 94102

19         FOR THE DEFENDANT:      BY:  JULIA MEZHINSKY JAYNE
                                   JAYNE LAW GROUP
20                                 803 HEARST AVE.
                                   BERKELEY, CA 94710
21

22

23         OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                         CERTIFICATE NUMBER 13185
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
```

1    FOLLOWED UP WITH A WRITTEN ORDER.

2        LET ME JUST SAY THAT CERTAINLY OUR TRIAL IS SET ON

3    FEBRUARY 22ND.  I AM NOT CHANGING THE DATE OF THE TRIAL BECAUSE

4    I DON'T KNOW THE STATUS OF OUR COURTHOUSE AT THAT TIME.  I WILL

5    BE CANDID THOUGH, I THINK IT'S UNLIKELY THAT WE WILL BE OPEN

6    FOR JURY TRIALS IN FEBRUARY, BUT AS OF TODAY, OUR COURT IS

7    CLOSED THROUGH THE END OF JANUARY, AND I'M PROBABLY GOING TO

8    PUT YOU ON A WEEK-TO-WEEK BASIS BASED ON THE INFORMATION I HAVE

9    SO THAT THE TRIAL CAN GO FORWARD.  IT'S NOT THE KIND OF THING

10   THAT I'M GOING TO KICK OUT SIX MONTHS, BECAUSE I DON'T HAVE ANY

11   TIME THEN.  BUT WE WILL WAIT.

12       I WILL GET YOU BACK ON A ZOOM CALL ONCE I KNOW WHAT'S

13   HAPPENING IN FEBRUARY, BUT YOU SHOULD BE -- YOU SHOULD PLAN TO

14   GO FORWARD IN FEBRUARY AT THIS TIME.  AND WITH THIS FINAL

15   PRETRIAL CONFERENCE, THINGS WILL BE IN GOOD ORDER.

16       SO LET ME -- I WANT TO GO THROUGH SORT OF THE PROTOCOL ON

17   THE TRIAL.  I ALWAYS THINK THAT WHAT I DO IS FAIRLY

18   STRAIGHTFORWARD, BUT EVERY JUDGE THINKS THAT, AND THEN WE ALL

19   DO IT DIFFERENTLY.

20       THERE ARE THINGS THAT ARE DIFFERENT BECAUSE OF THE

21   COVID-19, IN TERMS OF JURY SELECTION, AND I'M GLAD TO GO OVER

22   THAT WITH YOU NOW.  I WOULD ANTICIPATE YOU MAY WISH TO GO OVER

23   SOME THINGS AGAIN BEFORE WE ACTUALLY START THE TRIAL.

24       LET ME TELL YOU THAT MY HOURS FOR TRIAL ARE 9 TO 5, WITH

25   THESE EXCEPTIONS:  ON TUESDAYS, WE START AT 10:00 BECAUSE I

1    HAVE MY CRIMINAL CALENDAR, AND ON THURSDAYS WE ARE GENERALLY

2    DARK ALL DAY.

3        IF WE GET BEHIND, I WILL RESERVE THE OPPORTUNITY TO CALL

4    THE JURY IN ON A THURSDAY AFTERNOON SO THAT WE CAN CATCH UP.

5    AND JURY DELIBERATIONS TAKE PLACE ALL WEEK WITHOUT -- I CAN DO

6    MY OTHER HEARINGS WHILE THE JURY IS DELIBERATING.

7        AND I'VE HAD A TRIAL ALREADY UNDER THESE RESTRICTIONS, SO

8    I HAVE A REALLY GOOD IDEA OF HOW IT WORKS.  AND I WOULD SAY

9    THAT YOU SHOULD ANTICIPATE THAT ONCE THE JURY IS SELECTED, IT

10   REALLY IS GOING TO MOVE ALONG MUCH THE WAY IT NORMALLY DOES.

11   THE DIFFERENCE THIS TIME IS THAT I NEED TO IMPRESS UPON YOU THE

12   NEED TO MOVE YOUR CASE ALONG AS FAST AS POSSIBLE, TO ENSURE THE

13   JURY IS IN THE COURTHOUSE AS LITTLE AS THEY NEED TO BE.  I

14   DON'T IMPOSE TIME LIMITS ON YOUR PRESENTATION OF EVIDENCE, BUT

15   THERE ARE SOME THINGS THAT I WILL STRICTLY ENFORCE WITH NO

16   EXCEPTIONS.

17       IF WE GET TO THE END OF A COURT DAY AND YOU HAVE RUN OUT

18   OF WITNESSES, YOU WILL HAVE RESTED.  I WANT TO BE -- LET ME SAY

19   THAT AGAIN, IF WE HAVE REACHED THE END OF THE DAY AND YOU HAVE

20   RUN OUT OF WITNESSES, YOU ARE DONE.

21       SO IF THAT MEANS YOUR WITNESSES ALL NEED TO BE IN THE

22   COURTHOUSE FROM DAY ONE UNTIL THE END OF THE TRIAL, THAT'S WHAT

23   YOU NEED TO DO.  I WILL NOT WAIT FOR YOU TO BRING WITNESSES IN,

24   THEY ALL HAVE TO BE HERE.  AND MISESTIMATING THE AMOUNT OF TIME

25   YOUR OPPONENT WILL BE TAKING WITH A WITNESS WILL NOT BE AN

1     AND SO YOU CAN'T JUST SHOW UP AT 8:30 AND EXPECT US TO BE

2     THERE.  SO BEFORE YOU LEAVE EVERY NIGHT, YOU WILL LET US KNOW

3     IF YOU NEED THE 8:30 TIME SLOT, OKAY?

4              MS. JAYNE:  OKAY.  THANK YOU.

5              THE COURT:  AND MANY DAYS, YOU WON'T, THINGS WILL

6     MOVE SMOOTHLY, I'M SURE.

7              MR. KALEBA:  EXCUSE ME, YOUR HONOR.

8         SINCE WE ARE TALKING LOGISTICS, I HAD A QUESTION ABOUT

9     WHICH COURTROOM WE WOULD BE IN.  WOULD IT BE YOURS, OR THE

10    CEREMONIAL?

11             THE COURT:  IT WILL BE THE CEREMONIAL.  MY COURTROOM

12    ACTUALLY IS THE JURY DELIBERATION ROOM.

13        SO YOU SHOULD KNOW THAT THE JURY DOESN'T GET THAT NICE

14    CLOSE EXPERIENCE OF CHATTING WITH EACH OTHER IN A SMALL

15    ENVIRONMENT.  THEY ARE GOING TO BE SOCIALLY DISTANCED IN A BIG

16    COURTROOM FOR THEIR DELIBERATIONS.  AND I DON'T GO IN,

17    OBVIOUSLY, BUT I HEAR IT'S BEEN OKAY.

18        AND SO WHEN THEY ARE -- SO WE WILL USE THE BIG COURTROOM.

19    AND FRANKLY, FOR CRIMINAL TRIALS, I PREFER IT.

20             MS. JAYNE:  AND YOUR HONOR, ON THE TOPIC OF

21    LOGISTICS, AND I APOLOGIZE IF YOUR HONOR COVERED THIS EARLIER,

22    BUT IN TERMS OF WHO CAN BE IN THE COURTROOM, SO FOR EXAMPLE, IS

23    ANY SPECTATOR ALLOWED?

24        I PLAN TO HAVE A PARALEGAL, POSSIBLY MY ASSOCIATE,

25    MR. KAIL'S WIFE.

1        THE COURT:  NO.  EACH OF YOU, THERE CAN BE A CASE

2    AGENT, AND OF COURSE MR. KAIL, AND ONE ASSISTANT, WHETHER IT'S

3    AN ATTORNEY ASSISTANT OR A PARALEGAL.

4        HOWEVER, IF YOU NEED SOMEONE TO RUN THE EXHIBITS, A TECH

5    PERSON, I WILL ALLOW A TECH PERSON, BUT THAT'S IT.

6        SO ANYONE ELSE WILL BE ABLE TO PARTICIPATE IN OBSERVING

7    THE TRIAL THROUGH AN AT&T TELEPHONE LINE THAT WILL BE AVAILABLE

8    AT ALL TIMES.  AND WITH A CRIMINAL TRIAL, THE COURTROOM HAS TOO

9    MANY PEOPLE IN IT.

10        MS. JAYNE:  UNDERSTOOD.  SO ONE PARALEGAL.

11        THE COURT:  WHAT'S THAT?

12        MS. JAYNE:  SO ONE PARALEGAL.

13        THE COURT:  ONE PARALEGAL.  I KNOW, I KNOW, IT'S

14    HARD.

15        THEY CAN BE OUTSIDE THE DOOR, BUT THEY CAN'T BE IN THE

16    COURTROOM.  AND I WILL TELL YOU, MS. JAYNE, I WANT TO JUST BE

17    CANDID, I THINK IT'S HIGHLY UNLIKELY THAT WE WILL KEEP THE

18    FEBRUARY 22ND DATE.

19        MS. JAYNE:  THAT WAS MY PRESUMPTION, I JUST AM TRYING

20    TO GET A SENSE OF WHEN THIS MIGHT HAPPEN.

21        THE COURT:  BUT MY VIEW IS, I GUESS I DON'T HAVE MY

22    DIFFERENT CALENDARS, BUT YOU KNOW, THIS MAY BE, IT COULD BE MID

23    MARCH OR EARLY APRIL.  AND WE WON'T BE THROUGH THE PANDEMIC, WE

24    JUST WON'T HAVE THIS, IT WILL JUST LOOSEN UP SOME.

25        AND I DON'T HAVE ANY IN-CUSTODY CRIMINAL TRIALS UNTIL THE