**No. 21-10376**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MICHAEL KAIL,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
No. CR-18-00172
Hon. Beth Labson Freeman

_____

**EXCERPTS OF RECORD - VOLUME 2 OF 12**

_____

Lisa A. Mathewson
Mathewson Law LLC
123 South Broad Street, Suite 1320
Philadelphia, PA 19109
(215) 399-9592
lam@mathewson-law.com

*Attorney for Appellant Michael Kail*

Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Beth Labson Freeman, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
    VS.                         )    **NO. CR 18-00172 BLF**
                                )
MICHAEL KAIL,                   )
                                )
            Defendant.          )
_____)

San Jose, California
Tuesday, June 29, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

STEPHANIE M. HINDS
ACTING UNITED STATES ATTORNEY
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
BY: **COLIN C. SAMPSON**
**CHRISTOPHER KALTSAS**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

JAYNE LAW GROUP
803 Hearst Avenue
Berkeley, California 94710
BY: **JULIA M. JAYNE, ATTORNEY AT LAW**

Also Present:        **Lauren Noga, Law Clerk**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**Tuesday - June 29, 2021**                                    **11:07 a.m.**

                       **P R O C E E D I N G S**

                            ---o0o---

        **THE COURT:**  Okay.  Let's call the case and get your

appearances on the record.  We have a little bit of work to do

today.

        **THE CLERK:**  Calling Case 18-0172, United States versus

Michael Kail.

        Counsel, if you would please state your appearances.

        **MR. SAMPSON:**  Good morning, Your Honor.  Colin Sampson and

Chris Kaltsas for the United States.

        I also want to recognize our law clerk, Lauren Noga, who

is present.

        **THE COURT:**  And welcome to everyone.

        **MS. JAYNE:**  Good morning, Your Honor.  Julia Jayne on

behalf of Michael Kail, who's also present here.

        **THE COURT:**  Good morning.

        And good morning, Mr. Kail.

        All right.  This is the defense motion for acquittal and

for a new trial.

        Thank you all for waiting.  Trying to catch up on these

criminal cases is a big job, and I really am sorry you had an

hour of delay.  But thank you for your courtesy.

        Well, I think we have a number of things to talk about,

and I want to give you full opportunity for argument.  And I'll

1   start with Ms. Jayne.

2        But, Mr. Sampson, I'm concerned about a few things.  And

3   on the, what Ms. Jayne refers to as the pecuniary loss claims

4   or the mail fraud, wire fraud claims, under *U.S. v. Miller* --

5   and I'm referring to the Ninth Circuit version of that case --

6   it does appear that there needs to be evidence in the record

7   that Netflix lost money or property as opposed to just being

8   deceived.  And I'd like you to -- I think you've walked through

9   that, but I think you may -- you, also, I think, disagreed that

10  that was a requirement.

11       I'm sorry about this plexiglass.  It's causing us not to

12  see each other.

13       I'm also interested, although it has little effect, but my

14  job is to go through each count.  Count 16 of the indictment

15  that Ms. Jayne draws out appears to be criminalizing the lying

16  to one's boss.  And I just need you to help me out on that a

17  little bit as to -- and I don't think the argument even is that

18  a jury was wrong to credit evidence that showed that Mr. Kail

19  may have lied to Mr. Hastings.  But I don't know what the crime

20  is there.  And so if you could help me out with that as well.

21  As I say, it's a small thing perhaps, but I was interested in

22  that.

23       And on the -- I mean, the other major argument that

24  Ms. Jayne makes on the honest services fraud is the

25  quid pro quo.  I actually would agree that the requirement be

1  that the return favor be more than setting up a meeting or

2  giving access.  And I don't know that you actually addressed

3  that in your papers as to whether you agreed or disagreed.  And

4  if you could just touch on that.  I'm not sure any of the

5  charges actually were limited to gaining access only, but I'm

6  going to let you walk through that to some extent as well.

7      I've read your briefs.  It's not that I need you to repeat

8  all that detail.  But those were the things that Ms. Jayne

9  raised.  She raised a number of other issues, and I don't mean

10 to not credit them, but I wanted to point out that I was

11 interested in that.

12     **MR. SAMPSON:**  Shall I do that now, Your Honor?

13     **THE COURT:**  No.  I'm going to let Ms. Jayne start because

14 it's her motion.  I don't want to interrupt once we get

15 started.  And so I'm just looking to see if I have anything I

16 wanted Ms. Jayne to touch on in particular.

17     It's a nuanced point, I suppose, Ms. Jayne, certainly

18 because I deferred my ruling on the motion mid-trial that I

19 would consider the totality of the evidence; but that's not to

20 say that I weigh the evidence on the Rule 29 motion.  I don't

21 at all.  I look at the evidence in the light most favorable to

22 the verdict.  And so, as I say, it's a nuance that I don't know

23 that I could actually tell you how it's credited differently;

24 but clearly, I mean, I think you state the rule properly.

25     And on the new trial and on the Rule 29, I think it's my

1    job to go through count by count.  And some of it won't even --
2    some of it doesn't even affect sentencing.  But I'm not really
3    looking at that now.  I'm looking at the convictions
4    themselves.  And I certainly understand that.
5        So I want to give you full opportunity for argument, and
6    then I'll turn to the Government.  And, Ms. Jayne, I'll give
7    you the last word as well because it's your motion.  Okay?
8        **MS. JAYNE:**  Your Honor, thank you for that.
9        And, you know, I've covered quite a bit in my papers.
10       **THE COURT:**  You did.
11       **MS. JAYNE:**  And I am reluctant to just go back and
12   summarize it for Your Honor because I understand the Court
13   knows what I've written.  And so I'm wondering where to begin,
14   because there's a lot.  I don't really have something new at
15   this point.
16       **THE COURT:**  I wouldn't have expected that.
17       **MS. JAYNE:**  And I have the last word.
18       **THE COURT:**  So I really appreciate that.  As you can tell,
19   I'm really interested in being sure that the wire/mail fraud
20   counts are correct.
21       And the honest services fraud, I think you acknowledge,
22   does not have the requirement of the loss of money or property
23   but, instead, has the quid pro quo requirement.  And that has
24   to be more than just offering to set up a meeting.
25       So in a sense, it goes at the same evidence of the

1   contracts.  And I think there was ample evidence that Mr. Kail

2   signed contracts with each of these vendors with whom he had

3   the stock option adviser relationships.

4       But you might want to walk through some of that.

5       **MS. JAYNE:**  Okay.  And, Your Honor, absolutely with the,

6   what I'm calling, pecuniary fraud, *Miller* -- and this came down

7   very recently, because it used to be that "deceive or cheat"

8   was sufficient and now the law is abundantly clear.

9       And what does "and cheat" mean?  The word "cheat" is

10   defining the pecuniary fraud.  It's deceive and cheat the

11   person who you are deceiving; that is, the alleged victim of

12   the offense.

13       So in this case, Netflix, he would have not only had to

14   deceive them in some way but also cheated them out of -- I

15   mean, in this case, we're talking about money.

16       **THE COURT:**  Yes.

17       **MS. JAYNE:**  And so also, when you fail to see actual

18   economic harm, that's indicative of a lack of intent to deceive

19   and cheat, because --

20       **THE COURT:**  So there was ample evidence throughout the

21   trial of contracts that were signed or proofs of purpose that

22   were paid for or in regard to Platfora where the termination of

23   the relationship ended up with a payment to Platfora that a

24   jury could have credited with being payments that Netflix would

25   not otherwise have needed to make or amounts that were greater;

1  I mean, paying for the proof of concept when, in fact, it was

2  the practice not to.  Those are all -- that's cash.  And there

3  was a lot of evidence on that.

4      So the question is, if there's one or two of these

5  companies where there wasn't evidence of the overpayment, I

6  would look carefully to see if those got swept along in the

7  tide of some of the others.

8      But I'm looking at cash as well.  I don't disagree with

9  you.  And we actually talked about *U.S. v. Miller* when we did

10 the jury instructions because it's what caused the instruction

11 to change, I believe, in the Ninth Circuit model.

12     **MS. JAYNE:**  We did, and we included that "and" language.

13     **THE COURT:**  Yes.

14     **MS. JAYNE:**  But even, for example, if we're going to the

15 individual vendors, even with Platfora, there was no

16 evidence -- I don't think anybody testified -- and this may go

17 to -- this goes to every vendor -- that that money should not

18 have been paid; that Netflix should -- there were -- even

19 according to Mr. Hastings, proof of concepts in some instances

20 were paid, especially when it goes over a period of time.  It

21 may be a reduced payment, and that's what it was with Platfora.

22 The way that they wrote their contracts were that -- and there

23 was, at length, discussion about what kind of -- the

24 termination fee and what kind of contract this would be, was it

25 a paid proof of concept; and if they deliver their particular

1    Version 3.0, then it converts to a larger contract.

2        But even Yingkuan Liu testified -- never testified that we

3    shouldn't have been paying them.  He understood it was a

4    contract that he was terminating.  That was clear.

5        Nobody testified:  "What?  Money?  We shouldn't have been

6    paying them money.  That wasn't appropriate."  That simply

7    isn't in the record whatsoever.

8        It was a joint decision by Mr. Kail and Mr. Liu to

9    terminate the contract.  The question is:  Did that contract

10   actually call for that termination?

11       And there's -- and I cited this in my brief -- the

12   discussion of:  What happens now?  We delivered.  Yingkuan Liu

13   even acknowledged in e-mails:  Well, yeah, you've delivered

14   3.0.  Let's have a meeting to discuss what that's like.

15       There are several e-mails going to the point that it was

16   delivered.  It just didn't -- the decision was made:  It still

17   didn't meet our needs.  We still don't want it.

18       So they made a joint decision, and it turned out that the

19   $155,000 was a compromise to avoid a much larger potential

20   payment by Netflix.

21       Now, to conclude that Mr. Kail orchestrated -- that that

22   $155,000 was actually somehow orchestrated by him, that would

23   take speculation; that he conspired with Platfora that they

24   would pay this out; this would benefit them somehow.

25       This is where we get into my argument that much of the --

1   the only way to get to certain conclusions is to imagine

2   something that never was presented in evidence.

3        There was a conspiracy that they met; they discussed it.

4   Even though you can perhaps -- even if you take, okay, let's

5   say the jury discussed that, speculated that might have

6   happened.  Is there any evidence to back that up?

7        **THE COURT:**  So I guess one of my problems is that,

8   certainly, pure speculation by the jury would not support a

9   verdict.  But circumstantial evidence has the same weight as

10  direct evidence.  And if I determined that based on the

11  evidence submitted that's circumstantial, that a jury that

12  credits that circumstantial evidence could have drawn the

13  reasonable inference in favor of guilt, then it would be as

14  substantial as direct evidence.

15       **MS. JAYNE:**  It would.  But what is the circumstantial

16  evidence?  That's the question I'm posing.  There isn't even

17  circumstantial evidence that they conspired to have this fee

18  go -- that they would falsely claim to meet the requirements,

19  get Yingkuan Liu somehow on board to write in an e-mail that

20  they delivered this product.  It would take the manipulation --

21       **THE COURT:**  Well, but you just said --

22       **MS. JAYNE:**  -- by a number of people.

23       **THE COURT:**  -- the evidence was that something called

24  Version 3.0 was delivered but it didn't meet the requirements;

25  it was useless to Netflix.

1    And so I can put something in a blue box, and it doesn't

2    mean that the contents of the box is anything that's useful to

3    the company.  So, I mean, I think that's really what we're

4    getting at here in terms of a -- there could be -- a company

5    can push something out the door it calls Version 3.0; but if it

6    doesn't meet the underlying specs, it doesn't meet the needs of

7    the company as required, then it gets terminated.  It's junk to

8    the company.  Might be good for another company.

9    **MS. JAYNE:**  Well, I think what -- the specs were very

10   specific.  They really were.  They outlined what needs to be

11   delivered.  And that was agreed upon, what they needed.

12   Netflix was look- -- there was much evidence about, well, 3.0

13   is going to have this and there was discussion about that and

14   Yingkuan Liu even saying, "I want to meet to go over 3.0."

15   Perhaps it was a difference of opinion from Platfora's

16   perspective.  Here are the 25 things we promised to deliver.

17   Here you go.  We've delivered it and it works.

18   From Netflix's perspective, things are happening.  Perhaps

19   they've determined that:  We're going in a different direction,

20   or it's still -- yes, you've delivered, but it's still not

21   exactly what we're looking for.

22   There was testimony that Netflix was moving to a Google

23   DoubleClick platform which would render that less useful.

24   But that, by itself, this discussion of is it a violation

25   of the contract or isn't it, the opposite to that is not

1  circumstantial evidence that they colluded to have this

2  termination fee happen, regardless of what was happening in

3  terms of the actual delivery.

4      THE COURT:  Well, I don't think I have to go into

5  collusion and a conspiracy between Platfora and Mr. Kail in

6  order for this mail and wire fraud claim to be found to stand.

7      MS. JAYNE:  But if the conclusion is that that $155,000

8  was a lot -- was intended or actual economic loss to Netflix,

9  there has to be a meeting of the minds between Platfora and

10  Mr. Kail.  It's not just, oh, well, this happened.  There has

11  to be something behind that.  And that meeting of the minds,

12  essentially, it doesn't use the word "collusion," but there has

13  to be an agreement; right?  It's not just Mr. Kail terminates

14  and Platfora says:  Oh, great.  You know, we still get this

15  155,000.

16      If they're making that decision independently, which the

17  e-mails show they are, "What do we do now?" they discuss.

18  "What do we do now?"  They don't say, "Hey, let's hit up Mike

19  for that 155,000."

20      THE COURT:  Well, it's clearly a meeting of the minds

21  because Platfora agreed to accept that amount of money in lieu

22  of doing anything else.  And so I mean, I think you've already

23  laid that out that there was a meeting of the minds to make

24  this payment.

25      MS. JAYNE:  Well, the meeting of the minds was as to the

1   amount.

2       Platfora decided:  We're getting a termination fee.  Are

3   we going to pursue the balance of the contract, or is there

4   going to be some figure that's going to be worked out or go to

5   litigation?

6       There were three options:  pay the whole amount, settle,

7   essentially, or go to litigation.

8       So there was a meeting of the minds in terms of we

9   approach Mr. Kail who's in a position to make this decision as

10  to what that should be, but whether that was the result of a

11  scheme to defraud as opposed to violating a contract,

12  terminating a contract, whatever that may be, those are two

13  very different things.  And that's with respect to Platfora.

14      When you look at -- I think Yingkuan Liu's testimony and

15  his e-mails are very telling about his perspective.  This was,

16  again, a joint decision between them.  It wasn't Mike Kail

17  unilaterally.  It was Yingkuan Liu who received that product

18  and still had hesitations about it.

19      Even Tony Ralph was asked, "Did you ever tell Mr. Kail

20  'Don't do this.  Don't go forward.  This is a waste of money'?"

21      The answer was "No."

22      He had hesitation.  And Mr. Kail was constantly bringing

23  him, give the feedback, work it out.

24      Your Honor, remember, at the time, there was literally no

25  competitor.  There was not a product that could do what

1    Platfora could do.  Yingkuan Liu made that very clear.  Was

2    there something else that could do everything?  And this

3    particular product by the Marketing Department was needed and

4    used, frankly, used to gather their advertising analytics.  The

5    answer was "no."

6          They made a good faith effort, it seems, to use it.  At

7    the end of the day, whatever happened happened.  But what's

8    lacking and what requires only a speculative conclusion is that

9    this was -- the entire -- the entire ten months, or whatever,

10   was essentially a scam.  I mean, that's what the jury would

11   have to conclude and disregard everything that was presented

12   and instead:  Well, there must have been some other story that

13   we don't know about.

14        **THE COURT:**  Well, I do think we had about three days of

15   evidence setting up that this was a scam with Platfora.

16   I think we all sat through it.  It went on seemingly endlessly

17   at times.

18        **MS. JAYNE:**  And not a single -- yet not a single witness

19   testified that this money should have never been paid out.  Not

20   a single witness in those three days said, "Netflix took a

21   loss.  Netflix took the hit."

22        In fact, Rob Fry --

23        **THE COURT:**  Well --

24        **MS. JAYNE:**  -- did the opposite, testified --

25        **THE COURT:**  So I actually recall ample evidence that

1   working with Platfora, even on proof of concept, was never

2   paying off and that endless amounts of company time were

3   devoted to it.  Now, I don't know whether the expenditure of

4   time would qualify for being cheated, having to deal with this

5   proof of concept for so long.  Mr. Sampson can address that.

6   I'm focused on cash here.  But it's not that narrow.  It's also

7   not so broad to include intangibles.

8       I mean, so, for example, I don't think Mr. Sampson argues

9   that unauthorized use of a logo was property -- that would be

10  an intangible -- or loss, such as reputation.  I think those.

11  And so he doesn't argue that.

12      But I don't know about the investment of company time

13  where it was -- I recall testimony on Platfora that it was

14  clear from the beginning that this was going in the wrong

15  direction.

16      I'll let Mr. Sampson address that evidence.

17  **MS. JAYNE:**  Well, I think the only person who actually

18  testified to that, having hesitation, not that it was the wrong

19  direction, was Tony Ralph; that he had hesitation about whether

20  it's going to meet their needs.  But, again, he didn't

21  articulate that he thought it shouldn't be pursued, that it was

22  going the wrong direction.

23      Remember, there were e-mails where people were asking to

24  come to meetings.  Platfora was donating -- not donat- --

25  whatever -- was giving more resources because Netflix kept

1    asking "We want another meeting.  We want to go over this."  So

2    the whole time it was a two-way street when Netflix asks for

3    more training or more information or can we sit down with this.

4    I think there was even testimony from Theresa Vu where she was

5    being asked by Netflix's employees:  Can we get more

6    information?  Can we meet?  Can you provide us this?  Who's the

7    resource?

8         So it's constantly a work in progress, which is exactly

9    what a proof of concept is --

10        **THE COURT:**  Sure.  Sure.

11        **MS. JAYNE:**  -- that it's being worked through.

12        But I don't recall any testimony from anybody saying,

13   "This entire process was a waste of time and we wouldn't have

14   used this."  There's no one to rebut Mr. Kail's testimony that

15   the chief marketing officer was using this product, was

16   valuable, and that part of his direction from Mr. Hastings was

17   to work on digital ads, to compile this information of digital

18   ads.  It was part of his mission, and therefore, Platfora was

19   actually solving it.

20        And, again, there was all kinds of hiccups along the way,

21   yes; but it comes down to, I don't recall any testimony that at

22   the end of the day, it was all a scam.

23        And Platfora witnesses themselves, I think, repeatedly

24   testified, as did many witnesses, that there were different

25   tracks, the adviser agreement and the contract, and that there

1   was not -- again, we don't find testimony that there was any

2   sort of guarantee, that there was any sort of promise then that

3   somebody would get a shortcut, a cut in line.  That was argued

4   by the Government.  We just didn't see that materialize.

5   That's with respect to pecuniary fraud for Platfora.

6          Let me turn to my brief.

7          With respect -- you know, I can move on to --

8      **THE COURT:**  Well, I'll let you cover the ones that you

9   wish to.  You really did a very nice job in your briefing, but

10  I want you to be able to -- that doesn't mean that I would cut

11  off the argument.  I like argument.  So, go ahead.

12     **MS. JAYNE:**  Okay.  And, you know, I want to be mindful of

13  not repeating it because I had two opportunities here to write

14  about it.  So...

15         But I think it is very important to view these each

16  absolutely individually.  Individually, it's almost as if they

17  each were a separate trial because the facts are so different

18  and there's different individuals involved and different

19  exhibits as to each.

20         Vistara is another one where -- this is -- the overlapping

21  theme is that we don't hear from any witness that nobody should

22  have been -- nobody should have been paid.

23         And the Government cites saying that Rob Fry said he

24  thought it was free.  He absolutely never testified that he

25  thought Vistara was not getting paid.  He worked on it

for years and admitted that he just -- he didn't look one way
or the other whether it was getting paid or not because it's
not really -- it wasn't relevant to him.  But he admitted that
it was years.  And I think, you know, this is years later,
we're looking back; but at the time, it would be quite
surprising to think that a company was donating years of its
time at absolutely no -- at no cost.

But there's certainly disagreement at times about how
Vistara is operating, that it needs fixes, as every single
company does.  You know, Zoom even at this point needs fixes.

But overall, he continued to give them -- as I noted, in
favor of going with Vistara, they're expanding the use cases.
In some instances, we see that it's not Mr. Kail who's saying,
"I want more.  We want more users.  We want more data"; it's
the Netflix employees themselves.

And Vistara is one case of that, where Ashley Sprague and
Rob Fry write to Vistara, you know, "We need to expand the use
cases"; and, of course, that means more operations on Vistara's
part.  And there was actual evidence that the product ran on
thousands of -- we've gone over this.  They're not machines as
in right here, a piece of hardware.  They're virtual machines.

And what I learned was that 2000 is apparently very
little; that, typically, Vistara was running on 50,000 virtual
machines at another company.  So it was being run for a
particular -- for the data center at Netflix.  It had its

1  purpose in a particular -- just because it's not across the

2  company, I don't know that any product would really be useful

3  for every single division across the company.  That point,

4  I think, doesn't really have much merit.  It's whether -- for

5  the purpose that it was brought in for.

6       And so we look at where was the economic loss.  If

7  nobody's testifying that Vistara should have never been

8  implemented, should never have been paid, you know -- we have

9  people after the fact who went back and looked at these

10 contracts -- David Wells, Mr. Hastings -- and none of them went

11 back and testified:  Wow, I looked at those contracts, I looked

12 at those products, and we really spent a lot of money when we

13 shouldn't have.

14      They had the opportunity to do that.  They probably did do

15 that.  But they didn't say that because the evidence didn't

16 support that, because so many people use the products, found

17 them useful.

18      Now, companies move on; things change.  They move on to a

19 different product.  That's not to say that it's a waste of

20 money.  God knows how many products we didn't hear about that

21 were in and out of Netflix.  That's the way that it goes.

22      But Rob Fry, who worked across the board on so many

23 different products, his ultimate line was -- and I cited this,

24 I think, twice because I found it valuable -- "The products

25 that Mr. Kail introduced made sense for us."

1        And that's the bottom line; they made sense.

2        And we look at that in the time period that it was brought

3   in, what it was doing --

4        **THE COURT:**  But I don't think that's the point.  The

5   products and the start-ups could make sense, but more was paid

6   to these vendors than should have been along the way, and more

7   was paid in the contracts than should have been because of the

8   private agreements, the stock, and the advisory agreements.

9        And even to say, alone, that the initial contract offered

10  was reduced by Mr. Kail doesn't answer the question of the

11  other evidence that, even at the reduced amount, it was too

12  much.  And so the jury could have credited Mr. Kail's

13  testimony, but it didn't have to.  And so as long as

14  the Government had evidence in the case that even the amount

15  paid was too much, it doesn't matter that the jury -- the jury

16  was free to not credit the reduction.

17       I mean, you could -- you could offer to sell me this ink

18  pen for $12 and I pay 10.  It doesn't mean you saved me any

19  money, because it's a one-dollar ink pen.

20       **MS. JAYNE:**  Right.  But what was the -- there was no

21  evidence that it was too much.  I mean, that's --

22       **THE COURT:**  Well --

23       **MS. JAYNE:**  That's the -- not a single witness said, "That

24  was too much.  That cost too much."

25       **THE COURT:**  Well, "too much" being that it didn't perform

1  what we needed.  We didn't want it.  We had to pay for proof of

2  concept along the way which we don't normally do.

3       I think that's -- and I'm being general.  I mean,

4  Mr. Sampson's job is to narrow it down in the record for me,

5  which I believe he did.  But I think you painted too high a

6  level the savings to the company or the good value to the

7  company.

8       **MS. JAYNE:**  But if the company -- if the price is

9  appropriate for what they're delivering and they're delivering

10  what they should be delivering and nobody's saying they

11  shouldn't -- "We didn't need this.  We didn't need this much of

12  it" --

13       **THE COURT:**  Well, if that were the record, then maybe

14  you'd win.  But I think Mr. Sampson has a different view of the

15  evidence that came in.

16       **MS. JAYNE:**  And, you know, that can be addressed; but

17  complaints about --

18       **THE COURT:**  Because you really are, in your Rule 29

19  motion -- I agree with the Government that you are looking at

20  all the evidence that favors acquittal.  And I have to look at

21  all the evidence that favors conviction because I have to look

22  at what favors the verdict.

23       **MS. JAYNE:**  Your Honor --

24       **THE COURT:**  And you know that.

25       **MS. JAYNE:**  Yeah, I do know that.

1        **THE COURT:**  We all know that.  We all know that.

2        **MS. JAYNE:**  And I'm looking for the evidence to the

3   contrary.  And I see of course there was evidence of problems;

4   but I don't see where the problems -- or that the jury -- that

5   those problems rose to the level of a deception and a cheat to

6   Netflix.

7        From my understanding of this industry --

8        **THE COURT:**  Well, I don't think "deception" is a hard one

9   to get over.  You really argue "cheating" because you argue the

10  monetary loss.  And rightfully so, that's where your focus is.

11       **MS. JAYNE:**  The problems that any product has from this

12  industry -- I think it was abundantly clear that any product is

13  going to have problems.  Those problems -- there wasn't that

14  correlation that those problems were the cheat, those problems

15  caused economic harm to Netflix.

16       If we removed the -- let's just for a moment remove the

17  conflict of interest that the Government argued, and let's say

18  Mr. Kail was -- everybody knew that he was an adviser, just

19  hypothetically.  Would anything different have happened?  Would

20  there be any complaint about whether these companies should

21  have been introduced?

22       And there was -- and I asked so many witnesses:  At the

23  end of the day, you know, was there a problem with what he was

24  doing?  Because you now have hindsight to look back and say:

25  Should we have worked with this vendor, worked with that

```
 1   vendor, worked with this other vendor?  And there was not that
 2   conclusion.
 3        So the problem really was in the conflict and the lack of
 4   disclosure, not:  Boy, because he was doing all this, look at
 5   all these vendors we paid for that were total garbage.
 6        They didn't say that, and that's telling because it shows
 7   that nothing different may have happened.
 8        And I only bring that up because that shows the lack of
 9   economic harm.
10        THE COURT:  Well, I also wonder how much -- whether it's
11   relevant to consider that no matter what Netflix's aspirational
12   policies were, Mr. Kail was the boss.  Mr. Kail was the one who
13   was making the decisions.  And these are talented employees,
14   but they report to him.
15        MS. JAYNE:  They do.  But they have, perhaps unique to
16   Netflix, this power to be forthright.  It's in their duties to
17   convey honesty --
18        THE COURT:  Yes.
19        MS. JAYNE:  -- in their dealings; otherwise, they're being
20   disloyal employees.
21        And so the reason that that Exhibit 9 is so important,
22   because so many employees say, "You never pressured me."  This
23   is way before any of this came to light.  "You never pressured
24   me to work on anything.  You bring in great technology.  Your
25   ideas are so fantastic.  You introduce all these things, but
```

1   you never pressure."

2        And the witnesses said the same thing.  So either

3   everybody's lying and we're all speculating that, really,

4   they're harboring all this resentment and, instead, they all

5   choose to misrepresent --

6        **THE COURT:**  No, I'm not suggesting resentment.  I'm just

7   suggesting that when the boss is high on a company, that you

8   kind of read the body language and say:  Well, it's not my

9   money.  I guess I'll go along with this.

10       **MS. JAYNE:**  That may be the case.  But remember what

11  Rob Fry said.  He said, for example, with Vistara "Take a look

12  at" -- all he got from Mr. Kail was "Take a look at this."

13  There was no evidence that that "Take a look at this," boy, I

14  was really feeling like he was -- he was clear that "Take a

15  look at this" meant "Take a look; let me know what you think."

16  And that was consistent that it's:  Hey, take a look; have a

17  bite.

18       You know, it's not -- I think it's speculation to say that

19  there was something more, because we have this idea of

20  boss/employee.  Maybe that's the case in other companies, but

21  here, there just wasn't evidence of that.

22       And that's what the evidence bore out with all of these,

23  is here's an introduction.  Do what you will.

24       And, yes, he was the signatory, which across Netflix was

25  pretty generous in terms of who could sign contracts.  But

1    these contracts, he was the signatory.

2        But there wasn't evidence that he was actually the

3    decision-maker because, in every instance, there had to be the

4    buy-in of other individuals; there had to be this proof of

5    concept.  There were individuals that were constantly weighing

6    in.

7        And I can go through the -- as I noted with some of the

8    vendors, the contracts didn't even go to just him.  Yes, his

9    name was on the signature line.  Justin Slaten redlines certain

10   contracts.  Bill Burns reviews contracts.  The other guy,

11   David -- I have it -- he receives a copy of the contract.

12       So, yes, we can turn all the blame to him because he's the

13   signatory; but ultimately, nobody ever said it's just his

14   decision.  No matter what we say, no matter what we do,

15   Mr. Kail has the -- you know, he's the one who only made the

16   decision.  And the vendors corroborated the Netflix witnesses

17   that, yeah, we had to persuade them; they had to test it out.

18       So when you look at -- there's so much weight given.  You

19   look at he's the signatory; he's the boss.  Yes, but what

20   really happened?  You'd have to disregard all of that.  All of

21   the e-mails that showed multiple people having their eyes,

22   hands, feedback on this, and that's how we get there.

23       So if there's a promise of a contract, that would mean

24   you'd have to conclude that Mr. Kail is manipulating his entire

25   team and pushing them in a particular direction.  But nobody

1    said that.  We don't hear that.  "Well, you know, he told me to

2    review it, but really, he told me what the outcome should be."

3    Absolutely not.

4         So for that -- if the promise is a contract versus a

5    meeting versus an introduction, then we don't see the evidence

6    that supports that.

7         And I'm going kind of off --

8         **THE COURT:**  The problem is we're shifting over into honest

9    services, which is what I'd like to do.  I'd like move on to

10   your arguments on honest services fraud.

11        **MS. JAYNE:**  And I apologize.  I only really got to the

12   start with my item by item.  We can go back to that.

13        But with respect to the quid pro quo, the -- I think one

14   of the Government's arguments is that Mr. Kail expected a

15   payment.  And so how would the vendor know that?  Because we

16   don't see any evidence to support --

17        **THE COURT:**  Well, we had evidence for two weeks that

18   Mr. Kail went out and asked for the payments.

19        **MS. JAYNE:**  In exchange for the contract, not --

20        **THE COURT:**  All right.  Well --

21        **MS. JAYNE:**  Sorry.  In exchange for a contract.

22        **THE COURT:**  Well --

23        **MS. JAYNE:**  Because each of the vendors, as I said, and

24   the witnesses didn't -- there was never a single person that

25   said this was going to be the exchange.

1      **THE COURT:**  But that's not required.

2    **MS. JAYNE:**  And it doesn't have to be explicit.  And I

3  note that.  It doesn't have to be explicit.

4      **THE COURT:**  You did note that.

5    **MS. JAYNE:**  But when you look at it implicitly, the

6  documents and the evidence reveal the opposite.  And I think

7  that's why all these other people matter so much, that you have

8  to ignore all of them in each instance.

9      And I'll just jump to, for example, with Docurated.

10  The Government argues that with respect -- that Ashi Sheth said

11  that it was useless to the legal team.  Well, let's even assume

12  that it was used for the legal team, which there was no

13  evidence that it ever even was intended for the legal team.

14  There are other divisions that used Docurated:  financial

15  planning and analysis and marketing.  And there was no evidence

16  that those teams -- David Burt, that was the name of the

17  person.  That product was valuable to them.  David Burt was in

18  it from the beginning.  And then other people got on board:

19  Hey, I want this product too.

20      So as it grew, Mr. Kail wasn't even part of the equation

21  as the need for the product grew.  And that distorts or

22  diminishes the idea that his advisory shares were in exchange

23  for a contract.  Why have to work for it and convince all these

24  people if it's guaranteed, to begin with?

25      And, again, it would take only speculation that, really,

1   they had some back-alley meeting that no one testified, no one

2   knew about, and all these other people are just playing along.

3   It takes distorting all the evidence that actually came out to

4   reach that there was even an applied --

5        **THE COURT:**  Well, I suppose, though, that once you have

6   the unguarded statement of Mr. Werther and then Mr. Slootman's

7   testimony here in court about the elephant in the room,

8   you know, Mr. Werther backtracked in his deposition; but in his

9   unguarded -- I think it was in an e-mail, pay-to-play.  He knew

10  exactly what it was.  But he was a sophisticated man.  He knew

11  he wasn't going to own up to it.  None of these witnesses were

12  expected to come on to the witness stand and admit to

13  participating in what is being charged as criminal activity.

14  That's why it can be implicit.  That's why we look at the

15  results.

16       And, I mean, there certainly is a line between speculation

17  and a reasonable inference from evidence proved beyond a

18  reasonable doubt.  It's a tough line to draw.

19       **MS. JAYNE:**  And even with the assumption that no one's

20  going to go up there and admit that, so where are the -- there

21  are not -- I'm just going to -- I'm going to pause on the

22  pay-to-play because I'll come back to that.  But there are not

23  e-mails to impeach those witnesses; to show:  No, you may be

24  saying that there's not an agreement, but here's evidence of

25  that; here's evidence of what really happened, how you were

1   promised, guaranteed, whatever, this contract.

2       Instead, you see the history of what happened with each

3   vendor.  And, again, it involves many people's involvement to

4   get to the point where the contract actually gets signed.

5       Mr. Slootman testified that Mr. Kail wanted -- essentially

6   wanted to be -- he said that Mr. Kail was wanting to be some

7   kind of adviser and consultant and wanted some compensation for

8   that.

9       First of all, there was already a contract at that point;

10  so it's not clear what it is that he's trying to get in terms

11  of a contract with Netflix.  But he was offering his advisory

12  services for some financial reward.  And then nothing happened.

13      **THE COURT:**  Or he was offering the continued contract for

14  some money on the side, which is what the Government presented.

15      You know, Mr. Slootman's company was not one of the

16  companies that was a charged company.  Isn't that correct?

17      **MR. SAMPSON:**  That's right, Your Honor.

18      **THE COURT:**  Yeah.

19      **MR. SAMPSON:**  It was part of the scheme.

20      **MS. JAYNE:**  That's correct because --

21      **THE COURT:**  It was part of the scheme, yeah.

22      **MS. JAYNE:**  -- nothing happened.

23      **THE COURT:**  Except it was very revealing evidence.

24      **MS. JAYNE:**  In terms of -- it wasn't clear to me --

25      **THE COURT:**  A jury could have credited that as being a

1    shakedown.  Let's just be clear.

2        **MS. JAYNE:**  The jury certainly could have.

3        And at the end of the day, Mr. Slootman says he said "no,"

4    and nothing happened with the contract and nothing was ever --

5    nothing was ever -- and --

6        Or the jury could have credited it as being:  "I want to

7    be your adviser.  Pay me for that."

8        "No."

9        "Okay.  Bye."

10       He didn't say that he said, "I'm going to cancel."  I

11   don't think Slootman ever testified that "We're going to lose

12   the contract," something about the contract.  But offering his

13   services as an adviser, okay.

14       **THE COURT:**  All right.  So I am going to ask you to move

15   along, to wrap it up now, even though I know I wanted to hear

16   some of this detail.  But I'm just looking at the time.  And I

17   apologize for that.

18       **MS. JAYNE:**  There's a lot with -- you know, I've --

19   there's a lot with each vendor.  And I think if you take both

20   of the briefs, it really does cite to both exhibits and

21   testimony.

22       Your Honor, you want the Government to have a chance.  Is

23   that what I'm hearing?

24       **THE COURT:**  Well, I want you to finish up.  You had some

25   other issues, but I want you to take just a few minutes with it

1    so that I can turn to the Government.  Thank you.

2         **MS. JAYNE:**  You know, I would note, again, looking at each

3    individual one.

4         Netskope.

5         Netenrich is almost the clearest because, yes, there's the

6    commission, which could be viewed as a secret payment; but

7    Mr. Kail was almost invisible when it came to, after that

8    introduction, other people managed those Netenrich employees,

9    approved the invoices of those Netenrich employees, asked for

10   additional Netenrich employees and then, eventually, I think

11   they hired them as permanent employees.

12        And Mr. Kail was on the sidelines for most of this, other

13   than making that initial introduction.  So it would be the

14   quintessential evidence of:  Okay, perhaps a secret payment,

15   yes, that commission; but where's Netflix either overpaying or

16   not receiving a valuable service or the exchange that this

17   contract is -- was guaranteed or implicitly guaranteed by

18   Mr. Kail when so many other employees were requesting the

19   services of Netenrich?  We saw that in e-mails, and we heard

20   that in testimony as well, how they were managed themselves and

21   reported to Netflix employees.

22        As I noted, there's Maginatics and ElastiBox.  I didn't

23   get into detail in my reply brief because the Government didn't

24   address it in their brief in detail in terms of quid pro quo.

25   But we see, again, a similar pattern where other individuals

1   weigh in on the value of those products before it can go

2   anywhere.

3        And what's interesting about -- I skipped over Numerify --

4   is that did Netflix receive a bum product, let's say?  Well,

5   two employees of Netflix spoke on behalf of Numerify and its

6   value.  And then Ashley Sprague renewed that contract, which

7   defeats the idea that Netflix is paying for something that they

8   don't want, that they shouldn't, that's overpriced, when the

9   clear evidence is that the Netflix employees themself are in

10  favor of this.

11       And I do think it does hold a lot of weight that -- well,

12  I won't repeat myself on that in terms of, you know, looking

13  back, who complained about what.

14       I think at the end of the day, what the complaint was from

15  the Netflix management was:  He didn't tell us.  Not:  He made

16  bad decisions.  Not:  These vendors were a waste.  He wasted

17  our time.  He wasted our money.  But:  We didn't know about

18  this conflict of interest, these secret payments.  But nothing

19  beyond that.

20       And that was the bulk of the Government's case, which

21  doesn't get them -- doesn't get them per scaling to the

22  actual -- to honest services fraud.

23       **THE COURT:**  Okay.  Let me turn to Mr. Sampson.

24       **MR. SAMPSON:**  Your Honor, I'll try to be quick.

25       There was a lot of switching back and forth, I think, in

1    the defendant's argument between the honest services and the

2    pecuniary fraud.

3          There was one line that I do want to call out specifically

4    relating to there needing to be a meeting of the minds as to

5    the loss.  That is not correct.  Meeting of the minds,

6    Your Honor, is only for the quid pro quo.  It is not necessary

7    for the financial fraud, the loss of money to Netflix.

8    Mr. Kail could have done that without -- this is not a

9    conspiracy.  He could have done it on his own with material

10   misrepresentations -- material omissions, fraudulent

11   misrepresentations.

12         With respect to the amounts -- and there was a lot of talk

13   about Platfora -- Your Honor, it's not just the 155 at the end.

14   And I do dispute that there was no testimony.  Again, testimony

15   not required.

16         But Ms. Sylvia Sundholm wrote an e-mail to Mr. Kail in

17   April 2014, saying:  Do you have a different contract with

18   them?  Because the terms I'm looking at, we don't have to pay

19   them this money.  And Mr. Kail responded that it was a

20   negotiated exit for meeting their goals.

21         Now, that directly disputes Mr. Liu's e-mail -- I believe

22   it was Exhibit 629 -- where he informed Platfora:  You didn't

23   deliver.  You didn't deliver the deliverables on the 3.0

24   roadmap; so we're terminating.

25         And so the jury had ample evidence here to find -- any

1    reasonable juror could have used that direct evidence, as well

2    as reasonable inferences from that direct evidence, to find a

3    financial -- a financial fraud.

4        Backing out from -- and, by the way, just to correct

5    Your Honor, and I want to correct myself in my brief --

6    Ms. Jayne pointed it out -- please don't rely on Exhibit 462.

7    That was not admitted.  I was incorrect.

8        But, Your Honor, with respect to -- I think Your Honor

9    pointed out it was actually Michael Rossi who said

10   "pay-to-play."  He was responding --

11       **THE COURT:**  Oh, I'm sorry.  Thank you.

12       **MR. SAMPSON:**  He was responding to Mr. Werther, who said

13   that the strong suggestion was that "If we make him an adviser

14   and," I think it's, "be responsive like we are, we could get a

15   $600,000 three-year deal done by Labor Day."

16       And part of this is not just the amount of money.  It's

17   also the length of the contract.  We are far beyond *McDonnell*

18   to the extent *McDonnell* applies, because *McDonnell* was an

19   18 U.S.C. 201 public official bribery case; and the parties in

20   that case specifically agreed to define "bribe" to include

21   official acts, in the jury instructions.  In this case, this is

22   not an official acts case; he's not a public official.  And so

23   I would argue that this is not like *McDonnell*.

24       I do agree, and I think the jury instructions accurately

25   reflect *Miller*, pecuniary fraud.  The Government does allege a

1   pecuniary fraud.

2        Now, backing out from that to the indictment, Your Honor,

3   if you read the indictment, this is not nine schemes charged

4   two ways.  This is two schemes involving a number of companies.

5   The scheme is to defraud Netflix of its intangible right of

6   honest services through bribes and kickbacks, and it's the

7   scheme to defraud Netflix by committing Netflix to contracts

8   that were more favorable than otherwise.

9        Now, that's -- obviously, the financial component is,

10  under *Miller*, required; and the Government believes that each

11  of the wires that are charged are wires in furtherance of those

12  schemes.  Whether they were successful or not, whether they

13  were not successful, the jury had ample evidence to find that

14  Mr. Kail's statements, wires, approvals, DocuSigns were wires

15  in furtherance of these two schemes as alleged in the

16  indictment.  There's no variance from the trial evidence to the

17  indictment.

18       Your Honor asked specifically about -- well, just back to

19  Platfora, the litigation risk.  That was -- a lot of the

20  dispute of evidence here is from Mr. Kail's testimony in his

21  defense case.  When Ms. Jayne says there was no evidence or no

22  rebuttal, the Government was not required to put on a rebuttal

23  case.

24       And so, Your Honor, Mr. Kail had a *post hoc* rationale

25  about there could potentially be litigation.  These things were

1  drafted by lawyers; these were team decisions.  The jury

2  rejected that.  They had the opportunity to weigh Mr. Kail's

3  testimony.  Mr. Kail got a good faith instruction, and he

4  prevailed on Count 5.

5       And I should say, there was discussion about Docurated.

6  Docurated was -- one of the two counts was Count Five, and the

7  jury acquitted on both theories.  And that was the first

8  Docurated contract.  They found that it was the second, larger

9  Docurated contract -- I believe it was February 2014 for

10  120,000 -- that that was -- that there was a quid pro quo; that

11  it was a wire in furtherance of the fraud.

12       With respect to Count Sixteen, Your Honor, Count Sixteen

13  is an indis- -- well, I wouldn't say it's legally

14  indispensable; but it is an aspect of the case in which

15  Mr. Kail falsely tells Reed Hastings, his boss; the CFO, also

16  his boss; the HR partner, tells them:  I'm not formally helping

17  them.  It is a false denial, which Mr. Kail said he regretted,

18  but it was not true when he said it.  He said:  I'm not

19  formally helping them.  He had a -- he was -- he had a formal

20  contract with them as an adviser, and the contract had not been

21  terminated, except in his own mind, according to his testimony.

22       And so Count Sixteen, Your Honor, it is not required that

23  Count Sixteen be a crime in and of itself, although certainly

24  it's a false statement in furtherance of concealing the scheme.

25       **THE COURT:**  So on mail and wire fraud, because they're

1  separate counts, how would I find that there was some loss of

2  money or property to show cheating from Count Sixteen?  I have

3  to look at it separately.

4      **MR. SAMPSON:**  Yes, Your Honor.  So you look at everything

5  that happened after that false statement.  He was not under

6  suspicion.  He denied it, and I believe Mr. Hastings --

7      **THE COURT:**  So it seems to me that that's strong evidence

8  to support other counts, but I don't see how it stands by

9  itself.  That's --

10     **MR. SAMPSON:**  Yes, Your Honor.

11     **THE COURT:**  And I'm assuming for this argument, because I

12  actually think Mr. Kail didn't dispute that he lied to his boss

13  directly -- but lying to your boss isn't a crime.  We all know

14  that.  And it could be a lie that was in furtherance of this

15  scheme.  But how is this mail or wire fraud?  What was the loss

16  to Netflix because of that lie?

17     **MR. SAMPSON:**  Your Honor, the Platfora 155,000 happened a

18  number of weeks after this.

19     **THE COURT:**  But we already have a charge for Platfora.  So

20  I can't have more than one.  Well, I guess I can.

21     **MR. SAMPSON:**  You can, Your Honor.

22     **THE COURT:**  I mean, I can, with that multiplicity, it all

23  washes in sentencing, I suppose.

24     **MR. SAMPSON:**  But, Your Honor, so he signed the Netskope

25  contract after that.  He -- let's see.  After March 25th, 2014,

there was the Platfora.  He was continuing to get Vistara and
Netenrich commissions.

     And, by the way, Your Honor, the defense ignores Ashley
Sprague's testimony and Andy Telles's testimony in which they
exchange an e-mail -- I think it's 129 or 135 -- in which
Mr. Telles at Vistara says:  It looks like you're not really
using our product.  And Ashley says:  It's not deployed in any
spaces that we're aware of.

     At that point, Netflix had spent something like
$1 1/2 million on 2000 licenses.  And so, Your Honor, there was
ample evidence for the jury to reject the idea that this was
fair.

     Additionally, I believe it was Rob Fry -- it may have been
Ashi Sheth.  But there was testimony at the trial that there
were existing tools for monitoring devices in place at Netflix
and that this was -- this was a new tool that replaced some of
the old -- older tools.  Doesn't mean the older tools were
obsolete.  This was in addition.

     And so it's not just like Platfora -- and Platfora did
have those competitors.  Recall, there was the e-mail from
Theresa Vu about MicroStrategy and Tableau.

     And so, Your Honor, it's about duplicative services; it's
about services that the company didn't need, like Numerify,
which I believe the testimony was:  Good product, not right for
Netflix because of the way they do their IT tickets.

1        And so as to each count, Your Honor -- and going back

2    to --

3        **THE COURT:** And you went through -- this is all in your

4    papers.

5        **MR. SAMPSON:** It is, Your Honor.

6        **THE COURT:** This roadmap is there.

7        **MR. SAMPSON:** I'm happy to cut it short.

8        But I would say that this was --

9        **THE COURT:** I just want to make sure I have it all.

10        **MR. SAMPSON:** Yes.

11        **THE COURT:** Because it's hard to just take notes and go

12    hunt for this.

13        **MR. SAMPSON:** I think it's in bullet points.

14        **THE COURT:** Okay.

15        **MR. SAMPSON:** But, Your Honor, there's the pecuniary fraud

16    scheme; there's the honest services fraud scheme. And so

17    honestly, the lie to Reed Hastings falls in the honest services

18    bucket.

19        The way it falls in the financial fraud scheme is that

20    money was spent for a number of months after that until

21    Mr. Kail left that it wouldn't have spent had he said point

22    blank: You know what? I am helping them. But he lied. And

23    so it allowed the fraud to continue and it allowed the losses

24    to mount.

25        Thank you, Your Honor.

1    **THE COURT:**  Thank you.

2    Okay.  Ms. Jayne, did you have any final comments?

3    **MS. JAYNE:**  Just on that very last point, that had

4    Mr. Kail, let's say -- I think the point Mr. Sampson just made

5    was, had he said, "Yes, you know, I am helping these

6    companies," that Netflix wouldn't have spent any more money and

7    canceled all these contracts.

8    I think that's speculation.  We don't know what would have

9    happened if they'd had a discussion and he explained what would

10   have happened.  It's pure speculation that that e-mail then

11   triggered, you know, the continual payments.  We don't know

12   what -- how that would have been treated because it's only

13   speculation.

14   We know that other Netflix employees -- we heard this --

15   sat on the boards of various companies that did business with

16   Netflix.  It's not so much that it's happening; it's the lack

17   of disclosure, I think, that Netflix has the problem with.  So

18   we don't know exactly what would have happened thereafter.

19   Furthermore, I would note that the -- and I did note this

20   in my brief -- that the jury question is quite telling with

21   respect to quid pro quo.  There's the suggestion that they

22   thought that it doesn't have to be a two-way street, that

23   somebody could receive kickbacks without the giver knowing they

24   were providing kickbacks, which --

25   **THE COURT:**  So it's an interesting thing about jury

1  questions.  I don't -- I can't base my ruling on what I believe

2  was their internal discussion.  So it's not telling to me of

3  anything.

4      **MS. JAYNE:**  Okay.

5      **THE COURT:**  They reached a verdict, and I don't have the

6  right to know that, and they are a black box on their own

7  deliberations.

8      **MS. JAYNE:**  Okay.  And I cited that because I think it was

9  congruent with some of the other arguments I was making.

10     **THE COURT:**  Yeah.

11     **MS. JAYNE:**  And then, finally, to rebut the point about

12 *McDonnell*, I do think -- and this Court recognized -- that

13 those particular aspects of meeting, introductions, et cetera,

14 that couldn't be enough.  So it is --

15     **THE COURT:**  Sure.

16     **MS. JAYNE:**  That case is applicable.

17     **THE COURT:**  As far as it goes, yes, I would say.

18     **MS. JAYNE:**  Let me see if there was something else I

19 wanted to say on that point.

20         Again, you know, it's more or less each -- I would urge

21 the Court to go back to each of the set of facts cited in both

22 of the briefs and consider that the jury's verdict -- let me

23 put it this way:  The more that the inferential leap between

24 the fact and the proposition grows, the more that the probative

25 value of the evidence diminishes and the more we have to insert

1  what wasn't there.

2       That is permissible for a conclusion that this was not --

3  even giving deference to the Government's evidence, that that

4  was not the result of proof beyond a reasonable doubt.  And, of

5  course, with the Rule 33, there's --

6       **THE COURT:**  Yes.

7       **MS. JAYNE:**  -- broader opportunity for the Court.

8       There are a few other points that I raised having to do

9  with -- you know, there's the money laundering, which I think

10 we're not -- more or less not in dispute as to what happens,

11 depending on the Court's ruling on the other counts.

12      And then, of course, with the Rule 33, I ask the Court to

13 consider sort of the prejudice of some of the other evidence

14 that was admitted related to salary and other vendors.  And

15 that's laid out as well.

16      **THE COURT:**  Yes, it is.

17      **MS. JAYNE:**  I don't know that I have anything new to add

18 to that point.

19      **THE COURT:**  Okay.  All right.  Well, thank you all for

20 really extensive briefing.  It's a big job for everyone to go

21 back over it and to pull the evidence.  Even though we all sat

22 through it, the testimony, and have a good recollection, it's

23 not as precise as what you've provided to me, and I appreciate

24 that.

25      Takes a little bit of time to work through one of these.

1    And I think we -- did we set the sentencing hearing already?

2         **MS. JAYNE:**  We did.

3         **THE CLERK:**  Yes, Your Honor.  I believe it's September.

4         **THE COURT:**  September?  Oh, well, that's fine.

5         **THE CLERK:**  Yes.  September 14, Your Honor.

6         **THE COURT:**  Okay.  Well, you'll certainly have a ruling by

7    then.  So that won't be a problem.

8         All right.  And then we'll being looking at a whole

9    different host of issues if we get there.

10        All right.  Thank you, all.

11        **MS. JAYNE:**  Okay.  Thank you, Your Honor.

12        **MR. SAMPSON:**  Thank you.

13        **THE CLERK:**  Court is adjourned.

14             (Proceedings adjourned at 12:02 p.m.)

15                        ---o0o---

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR 18-00172 BLF |
|     Plaintiff, | ) |
| | ) VERDICT FORM |
|     v. | ) |
| | ) |
| MICHAEL KAIL, | ) |
| | ) |
|     Defendant. | ) |
| _____ | ) |

We, the jury in the above-entitled case, being first duly sworn, unanimously find the defendant, Michael Kail:

1. As to an April 6, 2013, transmission via DocuSign of signed 2012 stock option agreement regarding Netskope, Inc., as set forth in Count One of the Indictment:

    (a) __Guilty__ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

    (b) __Guilty__ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

2. As to a July 9, 2014, transmission via DocuSign of order form regarding Netskope, Inc., as set forth in Count Two of the Indictment:

    (a) __Guilty__ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in

1   violation of 18 U.S.C. § 1343.

2   (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in

3   violation of 18 U.S.C. §§ 1343 and 1346.

4   3. As to a July 10, 2014, transmission via DocuSign of end user license agreement regarding

5   Netskope, Inc., as set forth in Count Three of the Indictment:

6   (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in

7   violation of 18 U.S.C. § 1343.

8   (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in

9   violation of 18 U.S.C. §§ 1343 and 1346.

10  4. As to an April 30, 2013, transmission via DocuSign of advisory board agreement regarding

11  Maginatics, Inc., as set forth in Count Four of the Indictment:

12  (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in

13  violation of 18 U.S.C. § 1343.

14  (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in

15  violation of 18 U.S.C. §§ 1343 and 1346.

16  5. As to a May 30, 2013, transmission via DocuSign of Terms of Agreement regarding

17  Docurated, Inc., as set forth in Count Five of the Indictment:

18  (a) _Not Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in

19  violation of 18 U.S.C. § 1343.

20  (b) _Not Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in

21  violation of 18 U.S.C. §§ 1343 and 1346.

22  6. As to a June 3, 2013, transmission via DocuSign of strategic advisor agreement regarding

23  Docurated, Inc., as set forth in Count Six of the Indictment:

24  (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in

25  violation of 18 U.S.C. § 1343.

26  (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in

27  violation of 18 U.S.C. §§ 1343 and 1346.

28

VERDICT FORM,
CR-18-00172-BLF                                    2

7. As to a January 3, 2014, transmission via DocuSign of Addendum to Strategic Advisor Agreement regarding Docurated, Inc., as set forth in Count Seven of the Indictment:

   (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

   (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

8. As to a March 21, 2014, transmission via DocuSign of Terms of Agreement regarding Docurated, Inc., as set forth in Count Eight of the Indictment:

   (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

   (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

9. As to a June 15, 2013, transmission via DocuSign of order form regarding Elasticbox, Inc., as set forth in Count Nine of the Indictment:

   (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

   (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

10. As to a June 17, 2013, transmission via DocuSign of master services agreement regarding Elasticbox, Inc., as set forth in Count Ten of the Indictment:

    (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

    (b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

11. As to a November 27, 2013, transmission via DocuSign of order form regarding Elasticbox, Inc., as set forth in Count Eleven of the Indictment:

    (a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in

violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

12. As to a July 12, 2013, transmission via DocuSign of renewal order form regarding Sumo Logic, Inc., as set forth in Count Twelve of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

13. As to an August 2, 2013, transmission via DocuSign of advisory board agreement regarding Platfora, Inc., as set forth in Count Thirteen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

14. As to an August 22, 2013, transmission via DocuSign of amendment to evaluation agreement regarding Platfora, Inc., as set forth in Count Fourteen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

15. As to a September 19, 2013, transmission via DocuSign of software subscription license agreement regarding Platfora, Inc., as set forth in Count Fifteen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

16. As to a March 25, 2014, transmission via email titled "Fwd: sunshine" to the CEO of Netflix, Inc., as set forth in Count Sixteen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

17. As to a February 3, 2014, transmission via DocuSign of order form regarding VistaraIT, LLC, as set forth in Count Seventeen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

18. As to a February 3, 2014, transmission via DocuSign of advisor agreement regarding Numerify, Inc., as set forth in Count Eighteen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

19. As to a February 21, 2014, transmission via DocuSign of master subscription agreement regarding Numerify, Inc., as set forth in Count Nineteen of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Wire Fraud, in violation of 18 U.S.C. § 1343.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346.

20. As to a May 15, 2013, letter via U.S. Mail from Michael Kail to the Internal Revenue Service regarding Maginatics, Inc. shares, as set forth in Count Twenty of the Indictment:

(a) _Not Guilty_ (GUILTY/NOT GUILTY) of the charge of Mail Fraud, in

violation of 18 U.S.C. § 1341.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1346.

21. As to a June 14, 2013, mailing via Federal Express of advisory board paperwork related to Docurated, Inc., as set forth in Count Twenty-One of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Mail Fraud, in violation of 18 U.S.C. § 1341.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1346.

22. As to a March 14, 2014, mailing via Federal Express of commission checks from Netenrich, Inc. and VistaraIT, LLC, as set forth in Count Twenty-Two of the Indictment:

(a) _Guilty_ (GUILTY/NOT GUILTY) of the charge of Mail Fraud, in violation of 18 U.S.C. § 1341.

(b) _Guilty_ (GUILTY/NOT GUILTY) of Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1346.

23. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Three of the Indictment, as to an April 23, 2013, wire transfer of $25,422 from a Wells Fargo Bank account number ending in 3152 in the name of Unix Mercenary, LLC, to an account at TD Ameritrade in the name of Michael Kail.

24. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Four of the Indictment, as to a July 18, 2013, wire transfer of $70,000 from a Silicon Valley Bank account number ending in 2308 in the name of Unix Mercenary, LLC, to an account in the name of First American Title Company.

25. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Five of the Indictment, as to a

September 3, 2013, wire transfer of $60,000 from a Silicon Valley Bank account number ending in 2308 in the name of Unix Mercenary, LLC, to a Silicon Valley Bank account number ending in 2285 in the name of Michael Kail.

26. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Six of the Indictment, as to a September 3, 2013, wire transfer of $25,000 from a Silicon Valley Bank account number ending in 6623 in the name of Unix Mercenary, LLC, to a Silicon Valley Bank account number ending in 6619 in the name of Michael Kail.

27. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Seven of the Indictment, as to an October 8, 2013, wire transfer of $30,000 from a Silicon Valley Bank account number ending in 2308 in the name of Unix Mercenary, LLC, to a Silicon Valley Bank account number ending in 2285 in the name of Michael Kail.

28. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Eight of the Indictment, as to a September 22, 2014, wire transfer of $11,000 from a Silicon Valley Bank account number ending in 2308 in the name of Unix Mercenary, LLC, to a Silicon Valley Bank account number ending in 6619 in the name of Michael Kail.

29. _Guilty_ (GUILTY/NOT GUILTY) of the charge of Money Laundering, in violation of 18 U.S.C. § 1957, as set forth in Count Twenty-Nine of the Indictment, as to an October 24, 2014, wire transfer of $25,000 from a Silicon Valley Bank account number ending in 2308 in the name of Unix Mercenary, LLC, to a Silicon Valley Bank account number ending in 2285 in the name of Michael Kail.

DATED: _April 30_, 2021.

_PRESIDING JUROR_

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5   UNITED STATES OF AMERICA,     )  CR-18-00172 BLF
                                   )
 6                  PLAINTIFF,     )  SAN JOSE, CALIFORNIA
                                   )
 7            VS.                  )  APRIL 7, 2021
                                   )
 8   MICHAEL KAIL,                 )  VOLUME 1
                                   )
 9                  DEFENDANT.     )  PAGES 1-180
     _____ )

10

11                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE BETH LABSON FREEMAN
12                UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:   UNITED STATES ATTORNEY'S OFFICE
                          BY:  COLIN C. SAMPSON
15                             DANIEL KALEBA
                          450 GOLDEN GATE AVENUE, BOX 36055
16                        SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:   JAYNE LAW GROUP
                          BY:  JULIA M. JAYNE
18                        483 9TH STREET, SUITE 200
                          OAKLAND, CALIFORNIA  94607

19

20   ALSO PRESENT:        FRANCHESCA CHELI
                          BALJINDER HEER
21

22

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED WITH COMPUTER
```

1                UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

5    UNITED STATES OF AMERICA,    )  CR-18-00172 BLF
                              )
6               PLAINTIFF,   )  SAN JOSE, CALIFORNIA
                              )
7          VS.             )  APRIL 9, 2021
                              )
8    MICHAEL KAIL,           )  VOLUME 2
                              )
9              DEFENDANT.   )  PAGES 181-433
    _____  )
10

11              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE BETH LABSON FREEMAN
12         UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:   UNITED STATES ATTORNEY'S OFFICE
                        BY:  COLIN C. SAMPSON
15                           DANIEL KALEBA
                        450 GOLDEN GATE AVENUE, BOX 36055
16                      SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:   JAYNE LAW GROUP
                        BY:  JULIA M. JAYNE
18                      483 9TH STREET, SUITE 200
                      OAKLAND, CALIFORNIA  94607
19

20   ALSO PRESENT:       FRANCHESCA CHELI
                        LAURIE WORTHEN
21                      BALJINDER HEER

22

23   OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
         TRANSCRIPT PRODUCED WITH COMPUTER

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5    UNITED STATES OF AMERICA,     )  CR-18-00172 BLF
                             )
6               PLAINTIFF,   )  SAN JOSE, CALIFORNIA
                             )
7               VS.        )  APRIL 12, 2021
                             )
8    MICHAEL KAIL,           )  VOLUME 3
                             )
9              DEFENDANT.   )  PAGES 434-696
    _____  )
10

11                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE BETH LABSON FREEMAN
12           UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:   UNITED STATES ATTORNEY'S OFFICE
                        BY:  COLIN C. SAMPSON
15                           DANIEL KALEBA
                        450 GOLDEN GATE AVENUE, BOX 36055
16                       SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:   JAYNE LAW GROUP
                        BY:  JULIA M. JAYNE
18                       483 9TH STREET, SUITE 200
                       OAKLAND, CALIFORNIA  94607
19

20   ALSO PRESENT:       FRANCHESCA CHELI
                       LAURIE WORTHEN
21                      BALJINDER HEER

22

23   OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                          SAN JOSE DIVISION

 4

 5     UNITED STATES OF AMERICA,        )   CR-18-00172 BLF
                                        )
 6                      PLAINTIFF,      )   SAN JOSE, CALIFORNIA
                                        )
 7              VS.                     )   APRIL 13, 2021
                                        )
 8     MICHAEL KAIL,                    )   VOLUME 4
                                        )
 9                      DEFENDANT.      )   PAGES 697-968
       _____   )
10

11                     TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE BETH LABSON FREEMAN
12                  UNITED STATES DISTRICT JUDGE

13     A P P E A R A N C E S:

14     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  COLIN C. SAMPSON
15                                DANIEL KALEBA
                             450 GOLDEN GATE AVENUE, BOX 36055
16                           SAN FRANCISCO, CALIFORNIA  94102

17     FOR THE DEFENDANT:    JAYNE LAW GROUP
                             BY:  JULIA M. JAYNE
18                           483 9TH STREET, SUITE 200
                             OAKLAND, CALIFORNIA  94607
19

20     ALSO PRESENT:         FRANCHESCA CHELI
                             LAURIE WORTHEN
21                           BALJINDER HEER

22

23     OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                   CERTIFICATE NUMBER 9595
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
```

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5   UNITED STATES OF AMERICA,      )  CR-18-00172 BLF
                                   )
6                    PLAINTIFF,    )  SAN JOSE, CALIFORNIA
                                   )
7              VS.                 )  APRIL 14, 2021
                                   )
8   MICHAEL KAIL,                  )  VOLUME 5
                                   )
9                    DEFENDANT.    )  PAGES 969-1246
    _____)

10

11             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BETH LABSON FREEMAN
12             UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  COLIN C. SAMPSON
15                              DANIEL KALEBA
                           450 GOLDEN GATE AVENUE, BOX 36055
16                         SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:    JAYNE LAW GROUP
                           BY:  JULIA M. JAYNE
18                         483 9TH STREET, SUITE 200
                           OAKLAND, CALIFORNIA  94607

19

20   ALSO PRESENT:         FRANCHESCA CHELI
                           LAURIE WORTHEN
21                         BALJINDER HEER

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, CRR, RMR
                                 CERTIFICATE NUMBER 8074

24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN JOSE DIVISION

4

5    UNITED STATES OF AMERICA,        )   CR-18-00172 BLF
                                      )
6                    PLAINTIFF,       )   SAN JOSE, CALIFORNIA
                                      )
7            VS.                      )   APRIL 16, 2021
                                      )
8    MICHAEL KAIL,                    )   VOLUME 7
                                      )
9                    DEFENDANT.       )   PAGES 1260-1537
     _____   )

10

11            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BETH LABSON FREEMAN
12             UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  COLIN C. SAMPSON
15                              DANIEL KALEBA
                           450 GOLDEN GATE AVENUE, BOX 36055
16                         SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:    JAYNE LAW GROUP
                           BY:  JULIA M. JAYNE
18                         483 9TH STREET, SUITE 200
                           OAKLAND, CALIFORNIA  94607

19

20   ALSO PRESENT:         FRANCHESCA CHELI
                           LAURIE WORTHEN
21                         BALJINDER HEER

22   OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
23                               IRENE RODRIGUEZ, CSR, CRR, RMR
                                 CERTIFICATE NUMBER 8074

24

       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25          TRANSCRIPT PRODUCED WITH COMPUTER

```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                         SAN JOSE DIVISION

 4

 5     UNITED STATES OF AMERICA,        )   CR-18-00172 BLF
                                        )
 6                      PLAINTIFF,      )   SAN JOSE, CALIFORNIA
                                        )
 7              VS.                     )   APRIL 19, 2021
                                        )
 8     MICHAEL KAIL,                    )   VOLUME 8
                                        )
 9                      DEFENDANT.      )   PAGES 1538-1808
       _____   )

10

11                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE BETH LABSON FREEMAN
12                   UNITED STATES DISTRICT JUDGE

13     A P P E A R A N C E S:

14     FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                             BY:  COLIN C. SAMPSON
15                                DANIEL KALEBA
                             450 GOLDEN GATE AVENUE, BOX 36055
16                           SAN FRANCISCO, CALIFORNIA  94102

17     FOR THE DEFENDANT:    JAYNE LAW GROUP
                             BY:  JULIA M. JAYNE
18                           483 9TH STREET, SUITE 200
                             OAKLAND, CALIFORNIA  94607

19

20     ALSO PRESENT:         FRANCHESCA CHELI
                             LAURIE WORTHEN
21                           BALJINDER HEER

22     OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                   CERTIFICATE NUMBER 9595
23                                 IRENE RODRIGUEZ, CSR, CRR, RMR
                                   CERTIFICATE NUMBER 8074

24

25              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED WITH COMPUTER
```

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

5    UNITED STATES OF AMERICA,        )  CR-18-00172 BLF
                                      )
6                    PLAINTIFF,       )  SAN JOSE, CALIFORNIA
                                      )
7          VS.                        )  APRIL 20, 2021
                                      )
8    MICHAEL KAIL,                    )  VOLUME 9
                                      )
9                    DEFENDANT.       )  PAGES 1809-2034
     _____ )

10

11              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BETH LABSON FREEMAN
12              UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  COLIN C. SAMPSON
15                              DANIEL KALEBA
                           450 GOLDEN GATE AVENUE, BOX 36055
16                         SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:    JAYNE LAW GROUP
                           BY:  JULIA M. JAYNE
18                         483 9TH STREET, SUITE 200
                           OAKLAND, CALIFORNIA  94607

19

     ALSO PRESENT:         FRANCHESCA CHELI
20                         LAURIE WORTHEN
                           BALJINDER HEER
21                         RACHAEL E. MENY

22   OFFICIAL COURT REPORTERS:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, RMR
                                  CERTIFICATE NUMBER 8074

24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

```
1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5      UNITED STATES OF AMERICA,        )  CR-18-00172 BLF
                                        )
6                       PLAINTIFF,      )  SAN JOSE, CALIFORNIA
                                        )
7               VS.                     )  APRIL 21, 2021
                                        )
8      MICHAEL KAIL,                    )  VOLUME 10
                                        )
9                       DEFENDANT.      )  PAGES 2035-2254
       _____   )

10

11                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE BETH LABSON FREEMAN
12                 UNITED STATES DISTRICT JUDGE

13     A P P E A R A N C E S:

14     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:  COLIN C. SAMPSON
15                                 DANIEL KALEBA
                              450 GOLDEN GATE AVENUE, BOX 36055
16                            SAN FRANCISCO, CALIFORNIA  94102

17     FOR THE DEFENDANT:     JAYNE LAW GROUP
                              BY:  JULIA M. JAYNE
18                            483 9TH STREET, SUITE 200
                              OAKLAND, CALIFORNIA  94607

19

20     ALSO PRESENT:          FRANCHESCA CHELI
                              LAURIE WORTHEN
21                            BALJINDER HEER

22     OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                   CERTIFICATE NUMBER 9595
23                                 IRENE RODRIGUEZ, CSR, CRR, RMR
                                   CERTIFICATE NUMBER 8074

24

25             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
```

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5   UNITED STATES OF AMERICA,      )  CR-18-00172 BLF
                                   )
6                    PLAINTIFF,    )  SAN JOSE, CALIFORNIA
                                   )
7           VS.                    )  APRIL 23, 2021
                                   )
8   MICHAEL KAIL,                  )  VOLUME 11
                                   )
9                    DEFENDANT.    )  PAGES 2255-2533
    _____)

10

11               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BETH LABSON FREEMAN
12             UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:   UNITED STATES ATTORNEY'S OFFICE
                          BY:  COLIN C. SAMPSON
15                             DANIEL KALEBA
                          450 GOLDEN GATE AVENUE, BOX 36055
16                        SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:   JAYNE LAW GROUP
                          BY:  JULIA M. JAYNE
18                        483 9TH STREET, SUITE 200
                          OAKLAND, CALIFORNIA  94607

19

20   ALSO PRESENT:        FRANCHESCA CHELI
                          LAURIE WORTHEN
21                        BALJINDER HEER

22

23   OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5     UNITED STATES OF AMERICA,        )  CR-18-00172 BLF
                                       )
6                    PLAINTIFF,        )  SAN JOSE, CALIFORNIA
                                       )
7               VS.                    )  APRIL 26, 2021
                                       )
8     MICHAEL KAIL,                    )  VOLUME 12
                                       )
9                    DEFENDANT.        )  PAGES 2534-2549
      _____   )

10

11                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE BETH LABSON FREEMAN
12                UNITED STATES DISTRICT JUDGE

13    A P P E A R A N C E S:

14    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                            BY:  COLIN C. SAMPSON
15                               DANIEL KALEBA
                            450 GOLDEN GATE AVENUE, BOX 36055
16                          SAN FRANCISCO, CALIFORNIA  94102

17    FOR THE DEFENDANT:    JAYNE LAW GROUP
                            BY:  JULIA M. JAYNE
18                          483 9TH STREET, SUITE 200
                            OAKLAND, CALIFORNIA  94607

19

20    ALSO PRESENT:         LAURIE WORTHEN

21

22

23    OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
```

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          SAN JOSE DIVISION

4

5    UNITED STATES OF AMERICA,        )   CR-18-00172 BLF
                                      )
6                    PLAINTIFF,       )   SAN JOSE, CALIFORNIA
                                      )
7           VS.                       )   APRIL 30, 2021
                                      )
8    MICHAEL KAIL,                    )   VOLUME 13
                                      )
9                    DEFENDANT.       )   PAGES 2550-2657
     _____    )

10

11              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BETH LABSON FREEMAN
12              UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  COLIN C. SAMPSON
15                              CHRIS KALTSAS
                           450 GOLDEN GATE AVENUE, BOX 36055
16                         SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:    JAYNE LAW GROUP
                           BY:  JULIA M. JAYNE
18                         483 9TH STREET, SUITE 200
                           OAKLAND, CALIFORNIA  94607

19

20   ALSO PRESENT:         FRANCHESCA CHELI
                           LAURIE WORTHEN
21

22

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3 Before The Honorable Beth Labson Freeman, Magistrate Judge

4

5 UNITED STATES OF AMERICA,  )
            )
6     Plaintiff,   )
            )
7 vs.         )  No. CR 18-00172-BLF-1
            )
8 MICHAEL KAIL,     )
            )
9     Defendant.   )
 _____)
10

           San Jose, California
11          Friday, March 5, 2021

12 TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
    RECORDING 9:00 - 1:50 = 4 HOURS & 50 MINUTES
13

14 APPEARANCES:

15 For Plaintiff:
         United States Attorney's
16         Office
         450 Golden Gate Avenue
17         Box 36055
         San Francisco, California
18         94102
       BY: COLIN C. SAMPSON, ESQ.
19       BY: CHRISTOPHER KALTSAS, ESQ.

20         United States Attorney's
         Office
21         150 Almaden Boulevard
         Suite 900
22         San Jose, California 95113
       BY: DANIEL KALEBA, ESQ.
23

24    (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

1 APPEARANCES:  (Cont'd.)

2 For Defendant:
                                Jayne Law Group
3                               803 Hearst Avenue
                                Berkeley, California 94710
4                          BY:  JULIA MEZHINSKY JAYNE, ESQ.

5

6 Transcribed by:            Echo Reporting, Inc.
                            Contracted Court Reporter/
7                           Transcriber
                            echoreporting@yahoo.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

3

1  <u>Friday, March 5, 2021</u>                                    <u>9:00 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4          THE CLERK:  Calling case 18-0172, United States

5  versus Michael Kail.

6      Counsel, if you would please state your appearances,

7  and if we can begin with the Government and then move to

8  defendant.

9          MR. SAMPSON (via Zoom):  Good morning, your Honor.

10 Colin Samson and Daniel Kaleba for the United States.

11         THE COURT:  Good morning.

12         MR. KALEBA (via Zoom):  Good morning, your Honor.

13         THE COURT:  Good morning, Mr. Kaleba.

14         MS. JAYNE (via Zoom):  Good morning, your Honor.

15 Julia Jayne on behalf of Michael Kail.

16     Your Honor, his appearance has been waived.  Your Honor

17 said it was at his discretion to attend the jury instruction

18 conference.  However, he is on standby if there's any reason

19 for him to join.  But otherwise, he's allowed me to proceed

20 by Zoom in this process and without him present.

21         THE COURT:  All right.  Yes, his attendance is not

22 required, and I did indicate that he did not need to

23 participate.

24     Ms. Jayne, I'm having a little difficulty hearing you.

25 I don't know whether you're using a speaker on your computer

4

1  or headsets.

2          MS. JAYNE:  How about now?

3          THE COURT:  That's better.  Thank you.

4          MS. JAYNE:  I need to just scoot up a little bit.

5          THE COURT:  I have no reason to say anything to

6  Mr. Kail today.  If you feel you need to contact him, we can

7  take a break so you can telephone him, that would be fine.

8      Another question for you before we get started, I am

9  glad to record this session.  I don't have a court reporter.

10 Typically I do this in chambers with the agreement of

11 counsel that it does not need to be reported, but I don't

12 have a court reporter for this today.

13     There will be a tape recording, and I'm glad to leave

14 that on and then you can ask for a transcript.

15     So is that your desire?

16         MS. JAYNE:  Yes, please, your Honor.

17         THE COURT:  Okay.  Glad to do it.  That's

18 certainly an easy thing to do.

19     And do I have someone else joining us, Tiffany?

20         MR. SAMPSON:  Yes, your Honor.  Mr. Chris Kaltsas

21 can introduce himself.  He has been working with the

22 Government on the forfeiture issues.

23         THE COURT:  Okay.  Good morning.

24         MR. KALTSAS (via Zoom):  Good morning, your Honor.

25 Chris Kaltsas for the United States.

5

1          THE COURT:  Okay.  Are you going to join us for
2  the whole time?  Because we won't get to forfeiture until
3  the end.  You're welcome.  I appreciate your joining in.
4          MR. KALTSAS:  Your Honor, I'll keep my video off
5  and sound off, and then whenever I'm needed, I can appear
6  then.  Does that sound okay?
7          THE COURT:  It does, and I'm just thinking you
8  probably have a lot of other work to do.  If we're not
9  talking about your area of specialty, this won't be the most
10  interesting thing you do today.
11          MR. KALTSAS:  It's always interesting, your Honor,
12  but I will do that.
13          THE COURT:  All right.  I really appreciate you
14  taking part, and we do need expertise on forfeiture.  It's a
15  one-of-a-kind animal, isn't it.
16          MR. KALTSAS:  It sure is, your Honor.  It creates
17  my job, so I appreciate it.
18          THE COURT:  There you go.  All right.  Thank you.
19          MR. KALTSAS:  Thank you.
20          THE COURT:  All right.  So let me describe to you
21  how I want to proceed today and then we will get down to
22  business.
23      The way I handle jury instructions is that we are going
24  to talk through them.  We going to literally start at page
25  one and work our way all the way through the last page of

6

1  your jury instructions.  And there are a number of disputed
2  instructions, so it is going to take some time.
3      I fully expect we will be here all morning and I hope
4  we get done, but the goal is to have a set of jury
5  instructions at the end of this session.  We always need to
6  get back together at the end of the trial just to make sure
7  that the instructions remain correct based on what's
8  happened at trial.
9      But you're quite distracted at that point with
10 preparing your closing arguments, and the jury is waiting.
11 So that is not -- we don't send the jury home in order for
12 that conference to take place.  We do it at the end of the
13 last court day or the end of the last -- you know, the day
14 before so that the jury is not waiting.  That's why this
15 needs to be really quite complete.
16     And the second thing, one of you will prepare the final
17 set.  Who will that be?
18         MR. SAMPSON:  The Government can do it, your
19 Honor.
20         THE COURT:  All right.  Mr. Sampson, thank you for
21 that.
22     So I have marked things by hand.  We will talk about
23 them.
24     Mr. Sampson, I expect -- I know this is hard when we're
25 not sitting here together, but you'll take notes on the

7

1  instructions as well?

2          MR. SAMPSON:  I will, your Honor.

3          THE COURT:  Okay.  Thank you.

4      And then when we done and Mr. Sampson makes the

5  changes, he will circulate to Ms. Jayne for her approval as

6  to the form, that it conforms to what I've ordered to be

7  changed.  And then we will have that set of jury

8  instructions.

9      You received my notice about the change of the trial

10 date.  Let me explain that.  We are not open for trials yet,

11 but we fully expect that we will be open for trial by the

12 end of March.

13     However, another judge in San Jose has an in-custody-

14 time-not-waived trial on March 31st that took our jury

15 panel.  So we can start on April 7 and we have no other

16 competition for that date.

17     So I need you to to confirm that you are both -- that

18 you are all available on that day, and we will start on the

19 7th.

20          MS. JAYNE:  Your Honor, I did wish to address that

21 particular issue.  There are some complications in April,

22 but -- my screen keeps saying I'm signed out, but I see

23 myself and I assume --

24          THE COURT:  I see you too and I hear you, yes.  It

25 keeps telling me I'm signed out on another device.

8

1   Anyway, I understand the Court is attempting to have
2  safe and efficient jury trials.  And my request, not seeing
3  any general order prohibiting trials in March, I would
4  request if there's any way possible that we proceed in March
5  or --
6        THE COURT:  I don't have a jury panel for you in
7  March.  So we're not open, and then we have jury panels come
8  in two-week pieces.  We summons 1,000 people, hoping to get
9  100 who get through the Covid questions.
10   Another judge has priority for an in-custody-time-not-
11 waived.
12   I'm glad to have you come in March, Ms. Jayne, and you
13 can stay in my courtroom day to day until the courtroom
14 opens.  And I'm available.  I am more than glad to do that.
15   You and Mr. Kail and all of your witnesses can sit in
16 my courtroom.  In fact, it's empty.  And as soon as a jury
17 panel opens up, I will be there because I don't have other
18 trials going on.  And so I'm glad to come on the 22nd of
19 March and every day thereafter.  And you would sit in my
20 courtroom from 9:00 until 5:00 because it might be that
21 during that day a jury panel opens up.
22   So if you'd like to do that, it would be my pleasure.
23        MS. JAYNE:  Your Honor, I would not.  I wasn't
24 aware previously that there was another trial intervening.
25 But my request would be, if there's any way we could get a

*Echo Reporting, Inc.*

9

1 date certain.  And the reason is --

2          THE COURT:  It is a date certain.  April 7 is a

3 date certain.  I have confidence -- there's no other trial

4 that will interfere on that date.

5          MS. JAYNE:  Okay.  I do have some complications,

6 and I suppose I'll have to -- I'm supposed to move out of my

7 office during the time we're supposed to be in trial.

8      I also have some obligations to students which I have

9 to see if I can rearrange their final mock trial for my

10 trial advocacy class, which is -- I've been pushing off

11 rearranging.  And I'll see if I can do it during their

12 finals period, which I try not to do, which would be in May.

13 Typically, we conclude those before they're in their finals.

14      And the office, I truly can't move my office during

15 April.

16          THE COURT:  I'm sorry.  Okay.  I don't know what

17 to say.  The entire Northern District of California has a

18 backlog of trials that is a year long.

19      There are hundreds of trials that are in this position

20 of ready to go.  You have secured one of the earliest dates.

21 I only get in line with the other judges in a list of

22 priority for trials.

23      Obviously, in-custody trials have priority over out-of-

24 custody trials.  Civil cases fall behind those.  This is

25 what I have.  You won't get priority.  It could be years.

10

1    I'm not prepared to jerk around 30 other judges in the

2  Northern District of California when you have a date

3  available.  But I am glad to come on March 22nd and every

4  day thereafter.

5    And those are your choices, Ms. Jayne.  Those are your

6  choices.

7    The other trial, the defendant might take a plea or

8  file a motion that causes it to change.

9    I am glad to do that.  You know, I can be at the

10 courthouse every day.  It doesn't matter to me.  I'm glad

11 to.

12         MS. JAYNE:  That's all right.

13         THE COURT:  I can put my life on hold.  Are you

14 willing to?

15         MS. JAYNE:  Your Honor, I have been for a few

16 months in terms of my other clients, but no, I prefer not to

17 do that.  If there is not an available trial in March, I

18 will see what I can --

19         THE COURT:  We're closed.

20         MS. JAYNE:  Yes.

21         THE COURT:  There's no trial in March.  I put this

22 on the 22nd because I actually thought we'd be open on the

23 22nd -- I still think we will -- and that jury panel got

24 taken by a higher priority case.

25         MS. JAYNE:  Yes, I hear that now.  I didn't

11

1  realize that in advance.  I thought it was just a matter

2  of --

3          THE COURT:  I understand.

4          MS. JAYNE:  You know, I'm not sure what was

5  driving it, but I will see what I can do in April.

6          THE COURT:  All right.

7          MS. JAYNE:  Yeah, hopefully it won't be --

8          THE COURT:  All right.  So Mr. Sampson, I don't

9  actually think I need an exclusion of time to get us to

10 April 7.  So I'd like Ms. Jayne to give me an exclusion of

11 time, but she doesn't have to request it, I don't believe.

12     I doubt we've used any days, because we're pretty

13 careful about excluding time throughout.  Is that your

14 recollection?

15         MR. SAMPSON:  Your Honor, I think we're at 70 days

16 or very close to it.

17         THE COURT:  All right.  I am resetting the trial

18 to April 7.  That is a date certain.  However, I don't have

19 control of external forces.

20     I presume the Court will be open.  I have attempted to

21 communicate with counsel as quickly as I had information,

22 and I gave you this date as soon as I could be relatively

23 confident that it would be a solid date, and I still believe

24 that.

25     I did not anticipate that there was going to be a

12

1  time-not-waived-in-custody trial.  I don't poll the other

2  judges.  It would be presumptuous of me to do that.  I just

3  wait for information, and that jury panel got taken.  And it

4  doesn't refresh until -- I think it refreshes on April 1st.

5       We actually don't think we are going to be open until

6  April 6th.  And out of respect for counsel and witnesses, I

7  didn't want to schedule you on a date that we might open.  I

8  scheduled it on the 7th when we have a higher confidence

9  that we will.

10      And all I can say is, although I can't limit the amount

11 of time you use, under the circumstances over the next year

12 or so, I urge you to be as efficient as you can in putting

13 on your witnesses.

14      Of course, I already informed you that if my court day

15 hasn't ended but your available witnesses have dried up, you

16 will rest.  So I recommend that every one of your witnesses

17 appear on day one and stay in the courthouse from day to day

18 until they are called to ensure that you can keep going and

19 put on all of your evidence.

20      You do that by subpoena.  You have enormous power to

21 compel them.  And we will give them a comfortable bench out

22 in the hallway for days, and they can bring their sandwich

23 and eat out in the hallway.

24      But I have to respect the backlog of cases that we have

25 and get my case done so that another judge can begin a

13

1 trial. We're going to have one trial at a time in San Jose.

2 The funnel narrows incredibly, and I think you're very

3 fortunate to have a time. I feel fortunate. This case

4 needs to go to trial, and it's not doing anybody any good to

5 have it continue to wait.

6     So, Ms. Jayne, if you -- it would be nice if you

7 requested an exclusion of time, but I don't actually need

8 it.

9     MS. JAYNE: Your Honor, I'll take a look at the

10 statute to determine which applicable exclusion might apply.

11 I'll take another look at that after we're finished here.

12     And I understand the Court's position. I'm in a

13 difficult situation, but I will see what I can do.

14     And I assume this means the trial -- the first trial --

15 the jury selection is April 7th. The first day of trial is

16 April 8th and this trial goes until I suppose April 29th or

17 30th?

18     THE COURT: That's my estimate, yes. And so when

19 we do the questionnaire, we will ask the jury to be present

20 until -- let's see. I don't have my calendar.

21     My experience with criminal trials is they tend to go

22 quicker than estimated, which I greatly appreciate. We'll

23 tell the jury to be available until April 30.

24     I've gone over the jury selection process with you, I

25 believe, at the final pretrial. So I think we are set on

14

1  that.  The groups of 20 will be coming in, and I would
2  expect that -- it's certainly possible that two groups of 20
3  will be enough, but we will certainly have a third group
4  available as well.  And that we can do in one day.
5       Each group -- because you'll be limited in your voir
6  dire.  I will do a short voir dire.  They will have filled
7  out the questionnaire.  You may have challenged some jointly
8  for cause, so we won't even need to question them, and that
9  will move things along.
10      Okay.
11           MS. JAYNE:  Your Honor, so that would be coming
12 sometime at the end of March then?
13           THE COURT:  What would be coming at the end of
14 March?
15           MS. JAYNE:  The questionnaire.  I'm trying to
16 calculate how many days it was previously -- the
17 questionnaire that your Honor shares with us and we get back
18 to the Court with our peremptories.
19           THE COURT:  I will give that to you two days
20 before the jury selection, because we want to give the
21 jurors as much time to fill it out.  More will come in
22 closer, so if the jury I -- you will get the questionnaires
23 on -- I'll make sure that you get the questionnaire on the
24 morning of April 5.
25      I will need to receive a joint email from counsel by

*Echo Reporting, Inc.*

15

1 noon on April 6 on any agreed request to challenge jurors

2 for cause.  If you don't agree, I don't need to know about

3 the juror because we will just do oral voir dire.

4     And so if the list has nobody on it, that's fine.  It's

5 just an opportunity for you to save some of your time to

6 only voir dire people who you need to talk to, not ones you

7 already know are not appropriate.

8     Typically, when we get questionnaires back from 60 or

9 70 people, as many as eight or nine are jointly challenged

10 for cause.  It becomes pretty obvious, but maybe not in this

11 group.  I mean, you know, we will wait and see.

12     You will get an email with all the questionnaires that

13 you can then print out.  And then you'll email me on the 6th

14 because we have to call those jurors so that they don't come

15 in on the 7th.

16     So I need that by noon so that we can make those phone

17 calls to those jurors.

18     And then April 7, we will start at 9:00 a.m. with our

19 first batch of jurors.  And your peremptories will be done

20 once we secure a panel of -- I'm trying to think.  Did I say

21 we have three alternates in this case or two?  I think two

22 is plenty.

23          THE CLERK:  I believe it was two, your Honor.

24          THE COURT:  Two, good.  So once we have 32 jurors

25 who have passed for cause, you then have sufficient jurors

16

1 to pick your jury and use all of your peremptory challenges.

2 And so I say it's possible to get that in two tranches of 20

3 jurors each.  But if we need a third, that's fine.  You

4 know, we will just see what we get.

5      You will get the list of jurors in a randomized order

6 so you will know who you need to spend the most time with.

7 So I think that helps you a lot.

8      Okay.  Other questions before we turn to the

9 nitty-gritty of jury instructions?

10           MR. SAMPSON:  Your Honor, just on timing.

11           THE COURT:  Yes.

12           MR. SAMPSON:  I'm looking at April, and the

13 Government estimates that if openings are on the 8th --

14           THE COURT:  Yes.

15           MR. SAMPSON:  -- then we would likely be a

16 finishing on the 19th or the 20th.  And so I'm not

17 completely certain that the jurors need to be available

18 until the 30th, which would be about 10 days later.

19      But I think they should be available sometime early

20 that week, like maybe through the 26th or 27th.

21           THE COURT:  Oh, I appreciate that.

22      Ms. Jayne, how many days were you estimating for your

23 case?

24           MS. JAYNE:  It really depends on whether the

25 Government -- as of right now, it sounds like the Government

17

1 is calling most of the witnesses on my witness list, and

2 obviously I wouldn't call them again.

3          THE COURT:  Sure.

4          MS. JAYNE:  So that list seems to be shrinking.

5 That's why I think I had said maybe two to four days.

6          THE COURT:  So this case then go to the jury even

7 on the 23rd.  Is that what you're thinking?

8          MS. JAYNE:  Mr. Sampson, you said you'd be

9 concluded by what date, I'm sorry?

10          MR. SAMPSON:  Well, our last estimate was eight

11 trial days, so that would be the 19th, potentially the 20th.

12          THE COURT:  So Thursdays were dark.  Remember

13 that.

14          MR. SAMPSON:  Oh, your Honor, last week -- I'm

15 sorry, your Honor.

16          THE COURT:  Thursdays were dark, because I have my

17 civil calendar.

18          MR. SAMPSON:  Understood, your Honor.  Previously

19 I think your Honor had stated that we could go through the

20 five days.  So now Thursdays are dark?

21          THE COURT:  I'm sorry, if I said -- I've never

22 done that ever, so if I said that, that was mistaken.  But I

23 never have jury trials on Thursdays.

24          MS. JAYNE:  Your Honor, so that means April 9th

25 would actually be opening statements?

18

1          THE COURT:  Yes, it would.  Yes, it would.  The

2 jury will not be in.

3      And I have a pretrial conference on the 8th.  So some

4 Thursday afternoons I'm available but not in April.

5          MS. JAYNE:  Got it.  So April 9th.

6          THE COURT:  Yes.

7          MR. SAMPSON:  So, your Honor, that would push the

8 Government's likely resting day to the 20th.

9          THE COURT:  Okay.  So it still looks -- so it

10 looks like we may close the evidence by the 23rd.  You know,

11 I think I'm going to clear this jury through the 30th.

12      I actually think that the deliberations are little

13 complicated in this case because there are so many charges

14 and they're going to have to really think about each one.

15      So thank you for walking through that, Mr. Sampson.

16 That's really helpful to me.  And I think that keeping the

17 jury -- getting a jury that's available through the 30th is

18 going to give us a margin.

19      And I think as you all know, no juror ever complained

20 about finishing early.  So they really complain about the

21 cases -- feeling that it's finishing late.

22      But if we reserve them through the 30th and finish a

23 couple days early, they'll be very happy.  So that will be

24 good.

25      Okay.  I wish we didn't have to jam these trials in.

19

1 It's going to be a really rough year for all of us.  It's
2 going to be really rough year.

3     We thought it was hard when we didn't have any trials,
4 and we're going to look back fondly at how calm our lives
5 were by comparison.

6     You know, for most of us on the federal court, if we
7 have six or seven trials in a year, we're exhausted.  And I
8 think we could have -- depending on the priority, we could
9 have 20.  And so it's -- that's why I said these have to
10 move along.

11     In my civil cases, I've got a civil case coming up
12 sometime -- this may bump it out, but I'm going to give each
13 side five hours.  They're going to each get one day to put
14 on their evidence for the whole case.  That's all they get.
15 And that's just the way it is.

16     In your case, I can't do that.  But I can have a cattle
17 prod ready to move you along and do other things that keep
18 it moving, and I have to do that.  So I just ask you to be
19 really thoughtful about shortening the amount of time you
20 take.  But I'm not limiting you.

21     Okay.  So let's turn to jury instructions.  I hope
22 you -- I work from paper, but I hope you have a set in front
23 of you that you can use.

24     I will say that I was startled to receive amended jury
25 instructions.  I did take the redline, but I had already

20

1 reviewed these and I had already marked my copy. So you

2 should keep that in mind in the future with other judges, is

3 that that is not welcomed. That is not welcomed, unless you

4 thought I was going to cram last night and it wouldn't have

5 mattered.

6      Okay. So what I'd like to do is to literally start on

7 page one.

8      We look at even the stipulated instructions because

9 sometimes I've seen things on them. I want to make sure

10 that the format is correct.

11      I don't think I can use page numbers because I've got a

12 merged set. I've only put in the pages of the jury

13 instructions that you amended because I had marked all the

14 rest, and I wasn't going to reread them.

15      So I'll read the jury number at the top of the page,

16 and that should be consistent with whatever set you're

17 looking at. And I believe I have all of the corrected pages

18 in here. You didn't change everything.

19      So I'm on jury instruction number one.

20      And, Mr. Sampson, in terms of format, you will delete

21 the words "stipulated proposed."

22           MR. SAMPSON: Yes, your Honor.

23           THE COURT: And then it will say "Instruction

24 number one re duty of jury." And that footnote will

25 disappear.

21

1        MR. SAMPSON:  Yes, your Honor.

2        THE COURT:  Okay.  Then this is a standard

3   instruction.  I noticed a spacing error in line two between

4   the words "at" and "the."  If you would just correct that.

5        Going on to -- and then at the bottom of the page, of

6   course, we'll delete the footnote and you'll delete the

7   "given," "not given," and "source."  That will all come out.

8        MR. SAMPSON:  Oh, okay, your Honor.  So in the

9   final, we will take out "given," "not given."

10       THE COURT:  Right.  Thank you.  I appreciate that

11  you did it this way for me because I mark these.  When I do

12  this, I literally sign each one so that I have a copy

13  that -- sorry, can't share my screen.  I don't know how to

14  do that.  But then the clean set is what I will read and

15  hand to the jurors, because they get a copy -- they get the

16  jury instructions during deliberation.

17       So that's I'm walking through the formatting.  So it

18  will -- just like you've done.  It's going to say

19  "Instruction number one re duty of jury."  You will delete

20  the footnote mark, you will delete the "stipulated

21  proposed."  Is that clear?

22       MR. SAMPSON:  Yes, your Honor.  Yes, and I

23  apologize.  I'm trying to up my Internet speed.  I called my

24  Internet company yesterday, so I apologize if there's some

25  jerkiness.

22

1    One additional question I had as to all of these,

2  should the footer just say "Jury instructions" or should I

3  delete the footer?

4         THE COURT:  I think you can just delete the

5  footer.  If you want to keep the case number there, that's

6  fine.  It's fine to say jury instructions and case number.

7  I know that's kind -- but we do need to take off everything

8  that looks like it was draft.

9    Now, you will change the page number.  We'll just

10  normally paginate these with the final copy, but the jury

11  instruction number -- and you had already taken that into

12  account -- will never change, even if we delete an

13  instruction.  Okay?  So one -- well, one is going to be

14  always one.

15    Okay.  So I think we understand that.

16    And, Mr. Sampson, if you would just make a note, when

17  you have the final set of jury instructions to send to me,

18  I'm going -- you'll file it but I need you to email a Word

19  version to me.  Because this is in a public setting, I'm not

20  going to give you my email here, but I think Tiffany can

21  email you and Ms. Jayne my email address.  And that's

22  important that I have a Word copy.  In case we need to make

23  a quick change to something, I can facilitate that.  And if

24  there are bigger changes, then I'll send them back to you.

25    But an email communication with you during trial is

23

1 much more efficient than anything else we can do.  So you

2 will get emails from me.  Everyone will be copied on it.

3 They're generally logistic issues, but sometimes I look at

4 an instruction and want to change it and I send you back the

5 draft so that you can look at it.  It's a really efficient

6 way to manage it.

7       So I think we've got the format set, Mr. Sampson; is

8 that correct?

9             MR. SAMPSON:  Yes, your Honor.

10             THE COURT:  Good.  Okay.  Going on to number two,

11 "Charge and presumption of innocence."  And this is fine.

12 And I will give that one.

13       Number three, "What is evidence," that's fine.

14       Number four, "What is not evidence," that one is good.

15 These are all stipulated.

16       On number five, "Circumstantial evidence," I like to

17 give the example that is in the comment to the Ninth Circuit

18 instruction.  And so if you would add that.

19             MR. SAMPSON:  Yes, your Honor.

20             THE COURT:  I think it's the one with water on the

21 street.

22       Number six, "Rulings on objections" is fine.

23       Number seven, "Credibility of witnesses" is good.

24       Number eight, "Conduct of the jury" is -- let's just

25 see what -- so I thought it was interesting you chose to

24

1  take out the admonition that a mistrial could result.

2  Sometimes -- the Ninth Circuit actually sometimes recommends

3  that that be given before the jury is deadlocked.  It's sort

4  of the deadlocked jury charge, the Allen charge.

5      I don't think we need to give it, but I just wanted to

6  ask you if that was your thinking about it or what?

7          MR. SAMPSON:  Your Honor, it was simply a guess

8  that your Honor would not want to give it.

9          THE COURT:  Okay.  I don't normally give it, but I

10  just wanted -- I've often had deadlocked juries and had to

11  send them back with the Allen charge.  So I always review

12  the Ninth Circuit rules on it, and this is one of the things

13  they say, which I actually think a jury won't understand

14  what they're hearing if I give it in advance.

15      So I think it makes sense to take it out, but I just

16  wanted to address that.  So I will give this one as you

17  presented it.

18      Number nine is fine.

19      Number 10.  Here's another one where you took a guess,

20  and I would -- I have them leave their notes in the

21  courtroom, because we don't really have a jury room.  So if

22  you would make that change.

23          MR. SAMPSON:  Yes, your Honor.

24          THE COURT:  Number 11.  So I -- I give them

25  instruction before your closing, so if you would make that

25

1 change.  "I will instruct you on the law that applies and

2 the attorneys will make closing arguments" and then delete

3 "the attorneys will make closing arguments."  Okay?

4          MR. SAMPSON:  I'll switch them.

5          THE COURT:  Great.  I think you'll be happier

6 arguing after I've instructed them.

7     Number 12 is fine.  Bench conferences are unreported

8 unless we excuse the jury, which I probably will never do

9 because I can't have people moving around that much, but we

10 can step out in the hall.

11    Okay.  Number 13.  So this instruction says "We are

12 about to take our first break."  I don't give this

13 instruction when we take our first break.  I like to give it

14 in the introductory instructions and so I'd like to modify

15 line one, "We are about to begin the trial" as opposed to

16 "We are about to take our first break."  Okay?

17          MR. SAMPSON:  Yes, your Honor.

18          THE COURT:  And then in the caption, would you

19 take out "first recess"?

20          MR. SAMPSON:  Would your Honor like something else

21 in its place or just delete "first recess"?

22          THE COURT:  No, you can just delete that.  Every

23 time we take a break -- no, at the end of every day, I tell

24 them not to talk to anyone or form or express opinions.  But

25 I don't admonish them at every break.

*Echo Reporting, Inc.*

26

1    Okay.  Number 14 -- is there going to be stipulated --

2        MR. KALEBA:  Excuse me, your Honor.

3        THE COURT:  Oh, sorry.

4        MR. KALEBA:  I had a question for you just about

5    the trial logistics --

6        THE COURT:  Sure.

7        MR. KALEBA:  -- and with instruction number 13.

8    Will the jurors have access to the jury assembly room?

9    Or when we take a break, will they actually go out in the

10   hallway where we have of witnesses and counsel and other

11   members?

12       THE COURT:  No, their jury room will be courtroom

13   three.  And so that's where they will be.  They will have a

14   segregated place, just like they always do.  And they --

15   we'll have to instruct them not to remain in the hallway

16   during the breaks.

17   But yes, Mr. Kaleba, that's -- and of course all of

18   your witnesses need to be reminded that they're not to even

19   look at the jurors, but the jurors will not be mingling with

20   them.

21   And I don't know whether Netflix wants to send someone

22   to the trial.  I think there may have even been a request

23   for that.  There will be room in the courtroom for one

24   representative, so if you want to let them know that one

25   person can be in the courtroom, I will allow that.

27

1    But the jurors -- to have 14 jurors in that courtroom,
2  they're going to be wrapping around throughout the
3  courtroom, so that person will -- and I will give that
4  person a designated seat way up at the front, probably
5  behind the defense table in the audience, because there
6  won't be jurors all the way up there.
7    And we'll just see where the right spot is and that
8  person will be assigned a particular seat.  I'm not quite
9  sure where the jurors are going to be seated, but I want to
10 make sure that person doesn't mingle with the jurors.
11   Okay.  13 is done.
12   14, are there going to be any stipulated -- is there
13 going to any stipulated testimony?
14       MR. SAMPSON:  Your Honor, I believe we're
15 discussing this issue with the defense.  I'm not sure.  We
16 haven't proposed any stipulations with respect to particular
17 witnesses' testimony.  So I think this may be one that falls
18 out, but we have not reached that point yet.
19       THE COURT:  Okay.  I just like to make notes on
20 ones that are hold instructions so I can pull easily at the
21 end instead of having to read everything.  And that's fine.
22   Okay.  Then we get to the next one, 15, "Stipulation of
23 fact."  Is that in the same category?
24       MR. SAMPSON:  Yes, your Honor, although I think
25 it's more likely that we will have some stipulations.

28

1          THE COURT:  Okay.  So on stipulated facts, there

2 are -- it's interesting.  Any stipulation that is read to

3 the jury must be given to me in writing signed by both sides

4 and then you are to tell me when you want me to read it.

5      In terms of a stipulated fact, I generally do not put

6 those in the jury instructions because I don't put any facts

7 in the jury instructions.  They'll hear it like they hear

8 other evidence.

9      The instruction is that it's been established.  So why

10 don't you think about that.  If you disagree with me, I'm

11 glad to talk to you about it further.

12      But this instruction is fine.  It doesn't suggest that

13 they be written in here.  So I will put this one as a hold

14 and we'll see how the trial goes.

15      Okay.  Number 16 is the 404(b).  Is there any evidence

16 on this, Mr. Sampson?

17          MR. SAMPSON:  Your Honor, this was the subject of

18 your Honor's ruling.  It was a split ruling on the

19 Government's motion in limine number six.

20          THE COURT:  Yes.

21          MR. SAMPSON:  And so your Honor did rule that

22 certain categories were intrinsic evidence of the crime and

23 your Honor excluded others.  And so I believe that this

24 instruction should be held and may indeed be unnecessary.

25          THE COURT:  So -- and so Ms. Jayne didn't want

29

1 this instruction, so that's good.

2      So, Mr. Sampson, here's my concern.  You have to

3 disclose 404(b) information in advance, so when would that

4 happen?

5           MR. SAMPSON:  Well, your Honor, I believe we have

6 disclosed categories of 404(b) information, which was the

7 four that we discussed in the motion in limine.

8           THE COURT:  Right.  but I disallowed two --

9           MR. SAMPSON:  Yes.

10           THE COURT:  -- and said that four of them were

11 intrinsic, so they're not 404(b).  They're not other crimes

12 or wrongs.

13           MR. SAMPSON:  Correct, your Honor.  So with

14 without ruling, I'm not sure that there is any other 404(b)

15 evidence.

16           THE COURT:  Okay.  Ms. Jayne, your view?

17           MS. JAYNE:  I think that's correct in light of the

18 Court's ruling.

19           THE COURT:  Okay.  But, Mr. Sampson, you're not

20 withdrawing this one at this time?

21           MR. SAMPSON:  Well, your Honor, I think it's just

22 appropriate to hold it with the others, but I defer to your

23 Honor.

24           THE COURT:  I understand what you're saying, and

25 it's -- so if that's the case, you have to write the

30

1 instruction for me. You didn't write it, and I don't do

2 this on the fly.

3     So you gave this to me as a placeholder, and you

4 haven't written it. And this is the -- I guess -- you know,

5 I'm sure most judges do the bulk of the work on jury

6 instructions after the evidence is in, and that's fine. I

7 don't work well under stress. And I don't work well when

8 I'm tired.

9     So you're going to be more stressed and more tired than

10 I am, so I wouldn't be getting your best work either at the

11 end of the trial. So that's why we do this now.

12     And I don't have this instruction written.

13         MR. SAMPSON: I apologize for that, your Honor. I

14 believe that 404(b) may come up in a rebuttal case, and so I

15 understand that I have to disclose 404(b) evidence.

16     If we propose that the Court give this instruction

17 because it's applicable, we will edit it significantly to

18 fit the Government's 404(b) other acts theory.

19         THE COURT: So here's what -- that's fine. And

20 what I'm going to ask that you do is that upon your

21 disclosure to the defense of 404(b), that you prepare this

22 jury instruction.

23         MR. SAMPSON: Yes, your Honor. To the extent we

24 disclose any 404(b), we will edit significantly the

25 instruction.

31

1        THE COURT:  I don't know -- you know, I'm not

2  telling you when to disclose -- if you have 404(b), I'm not

3  telling you when to disclose it.  You'll do what you're

4  going to do and then Ms. Jayne will be able to make her

5  objections about timeliness.

6      So I have no role.  I don't care when you disclose it.

7  I'll just rule on whether it was appropriate after I see all

8  the circumstances.  Okay?

9        MR. SAMPSON:  Yes, your Honor.

10        THE COURT:  All right.  And, Ms. Jayne, do you

11  have any objection to that procedure?

12        MS. JAYNE:  No, your Honor.

13        THE COURT:  Okay, good.  So we're not going to

14  touch this one.  It will remain in rough form at this point

15  because it's on hold.

16      Number 17 is stipulated and that looks good.

17      Number 18 is fine.  That's fine.  All right.

18      So number 19, obviously, this is the alternative.  This

19  is a hold whether Mr. Kail testifies or not.  We'll hold

20  that.

21      Number 20, reasonable doubt.  That's agreed.

22      So let me just stop here.  The forfeiture portion of

23  the charges are effectively bifurcated from the main

24  offenses.  And the jury has to return a verdict of

25  conviction on Count 24 before they even move into the

32

1  forfeitures.  Is that correct?

2          MR. SAMPSON:  Yes, your Honor.

3          MR. KALTSAS:  That is correct, your Honor.

4          THE COURT:  Okay.  Thank you, Mr. Kaltsas.

5      And so the proof by preponderance of the evidence is

6  only applicable to the forfeiture charge, correct?

7          MR. KALTSAS:  That is correct.  The 1957 must be

8  proved beyond a reasonable doubt.

9          THE COURT:  Okay.  So I believe in your

10 instructions on forfeiture, that's where you put the

11 different standard of proof for those.

12         MR. KALTSAS:  That is correct.

13         THE COURT:  Okay.  And I think that makes sense,

14 and we don't need to confuse the jury.  There's nothing they

15 do in the case in chief that below beyond a reasonable

16 doubt.

17         MR. KALTSAS:  That is correct.

18         THE COURT:  Excellent.  Thank you.  Thank you.

19     Okay.  Then number 21 is agreed and I will give that

20 one.

21     Number 22 is agreed and I will give that one.

22     23 is agreed and I will give that one.

23     So here, let me just note that this is a repeat of the

24 direct and circumstantial evidence, which is -- and I don't

25 add the example on this one.

33

1    So this one's fine, Mr. Sampson.  It's just the first

2 time through.

3    And I will only say that when I -- I have the set of

4 introductory instructions and then at the close, some of

5 them you've repeated and that's great, it's makes my job a

6 little easier.  And I always go back and look to see if

7 there's anything else that I want to read them a second

8 time.

9    And so I might pull out some of the initial

10 instructions and reread them, but I don't need another copy

11 of them.  I just reread them.

12    But you have duplicated them, and I actually like that

13 a lot.

14    So I'm on 24, and that's agreed and I will give that

15 one.

16         MS. JAYNE:  Excuse me, your Honor, as we're on

17 24 -- not necessarily the instruction itself, but it's

18 reminded me of an issue I wanted to raise as I'm looking at

19 the jury's perception of a witness.  And I want to make this

20 ask, and I understand all the complications with it.

21    As I understand it, perhaps the witness is sitting

22 behind a barrier of some sort.

23         THE COURT:  Yes.

24         MS. JAYNE:  I would like to, at least for the

25 record, make the request that if they're behind a barrier,

34

1 that they're able to pull down their mask when they testify.

2    I did try a clear mask.  It was terrible.  It fogs up.

3 I couldn't wear it more than five minutes even in my own

4 house.  So -- that was my trial run.  So I would request

5 that if they're behind a barrier and far away, that they

6 pull it down so we can perceive and Mr. Kail has full

7 confrontation.

8    So that's my request, please.

9        THE COURT:  All right.  And I certainly understand

10 that.  We do have Plexiglas in the courtroom.  It is my

11 understanding from health officials that the Plexiglas

12 actually does nothing except to contain a sneeze or cough,

13 but normal breathing which sends the particles into the air

14 which rise, and rise above the Plexiglas because it's not a

15 cage, would be in the air in a room that has actually quite

16 good air circulation.

17    But there is no health directive that would suggest

18 that when people are indoors in a confined space, that

19 masking -- that Plexiglas is sufficient to protect health.

20 And so, although I will allow Mr. Kail to testify if he

21 chooses without a mask -- he may choose not to testify, but

22 I will certainly allow him to testify without a mask -- I

23 will not allow all of the witnesses to testify without a

24 mask.

25    If there is a particular witness that you feel where a

35

1 credibility issue is particularly keen and you would like to

2 make a specific request, I will consider it.

3      But foremost I have to consider the health of our

4 jurors.

5      But your objection is noted.  I appreciate that.

6      And I have heard that the clear masks are difficult,

7 that they fog up.  I've never tried one because no one has

8 to -- no one is judging my credibility.  They just might

9 disagree with me but not credibility.  So I mean I will be

10 wearing a mask the whole time as well.  And that will

11 probably take -- we'll probably be doing that for a year.

12      Okay.  But thank you for raising it.

13      All right.  So number 24 is -- we've covered.

14      Number 25, Mr. Sampson, I presume that the jury will be

15 given a copy of the indictment; is that correct?

16           MR. SAMPSON:  Yes, your Honor, I believe so.

17           THE COURT:  Okay, because the verdict form even

18 refers to it.  So that's fine.

19           MS. JAYNE:  I'm sorry, I thought they were no

20 longer getting the indictment since we agreed on a statement

21 for the jury.  I'm not sure why they would get the

22 indictment.

23           THE COURT:  So when I read your jury instructions

24 and your verdict form, there's no way -- you have not

25 prepared a verdict form that repeats the charge.  In fact, I

36

1 think it relies on the -- I think it references charge 23 in

2 the indictment. I think that's how it got written.

3      I don't think I have it here.

4           MS. JAYNE: That's probably -- that's probably

5 fine because they have to know what the counts are, but I

6 wasn't aware that they would be reviewing the indictment,

7 which isn't evidence and in fact the evidence might not

8 match the indictment, which has happened. In my last trial,

9 I was making an objection that the indictment was far

10 broader than the evidence that came in at trial.

11      So I would object to them seeing that, because there

12 sometimes could be a variance, and that's a basis for

13 various motions.

14           THE COURT: Let me just -- I'm just looking at --

15 okay. I think your verdict form is actually sufficient

16 without a copy of the indictment in their hands the way

17 you've written it. I don't have a problem with that.

18 You're tracking the indictment, which I think is wise, but I

19 think they have the information they need in order to

20 render -- in order to understand what they're considering.

21      But there were other places in the instructions that

22 were reliant on the indictment. And I will say, Ms. Jayne,

23 I don't remember the last time I sent an indictment in. So

24 I'm not -- you know, it's fine with me.

25           MS. JAYNE: Okay. Thank you.

37

1           THE COURT:  So I'm just looking -- just skipping

2  ahead to number 35.  Just in terms of the language, which is

3  what made me think of this, "You may determine whether a

4  defendant had an honest, good faith belief in the truth of

5  the specific misrepresentation alleged in the indictment."

6       Well, you see, that's -- and that's why I needed to ask

7  whether they were getting a copy of it.

8           MS. JAYNE:  I think it's sufficient to say once we

9  get to that one, just "alleged."

10          THE COURT:  Mr. Sampson, what's your view on that?

11          MR. SAMPSON:  Well, your Honor, if the indictment

12  is not going back and the parties have agreed on a joint

13  statement, I don't think it's an issue to delete the

14  references to the indictment as long as we refer to the

15  charges or the allegations.

16          THE COURT:  I think that's fine.

17       You know, as I say, I don't recall ever sending the

18  indictment in.  And sometimes, although not in this case,

19  the Government doesn't go forward on all of the charges once

20  they get to trial.  Whether they dismissed them or not

21  formally, I can't remember.  Okay.

22          MR. SAMPSON:  And, your Honor, if I may, I just

23  want to put a footnote in, as your Honor referred to the

24  verdict form.  This will come up when we discuss the wire

25  fraud instructions.

38

1     But Ms. Jayne and the Government have talked about the

2  Government's proposal to -- as we filed amended jury

3  instructions, there's a unanimity issue with respect to

4  the --

5          THE COURT:  I -- that was my note to you.  I

6  always, always ask whether we need the unanimity

7  instruction.

8          MR. SAMPSON:  Yes, your Honor.  So I think that

9  will come up in just a few minutes.  I just don't want to

10 not signal that that's an issue.

11         THE COURT:  So -- and I -- it's interesting.  In

12 state law, the default is to give the unanimity.

13     My reading of Ninth Circuit law is that it's not that

14 clear-cut that that's the default.  I think that the

15 unanimity issue may not be as -- run as deep in federal law,

16 but I think in this case it's probably a good idea.  Okay.

17 Hold.

18         MR. SAMPSON:  Yes --

19         THE COURT:  So let --

20         MR. SAMPSON:  I'm sorry, your Honor.  Go ahead.

21         THE COURT:  No, no.  I interrupted you.  Go ahead.

22         MR. SAMPSON:  Oh, no.  And I have a little bit of

23 authority I think in -- a case called Anquiano indicates

24 that where the evidence is somewhat complex --

25         THE COURT:  Yeah.

39

1          MR. SAMPSON:  -- that it's more appropriate.

2          THE COURT:  I think it is too.  I feel safer doing

3 but -- so I only had raised the question.

4      All right.  So let's -- thank you.  And let's go back

5 to number 25 because the indictment is not going to go to

6 the jury.

7      These changes are very simple.  "You are here only to

8 determine whether Defendant is guilty or not guilty of the

9 charges" and just take out "in the indictment."

10     Is that okay?

11         MR. SAMPSON:  Yes, your Honor.

12         THE COURT:  Ms. Jayne, do you agree?

13         MS. JAYNE:  Yes, I do.

14         THE COURT:  Good.  Okay.  So we'll make that

15 change.

16     And then the second sentence is "not on trial for any

17 conduct or offense not charged."  And, again we will just

18 take out "in the indictment."  Okay?  So we've got agreement

19 on that?

20         MR. SAMPSON:  Yes, your Honor.  And does your

21 Honor want the Government to scour for any references to the

22 indictment in these instructions and remove them?

23         THE COURT:  Yes.  I think I may have caught them.

24 We'll try to do that as we read, but you can do a word

25 search.  And then probably is a good backup for what we're

40

1  doing.

2      Okay.  Number 26.  Good.  This one's fine, doesn't need

3  any changes.

4      Number 27 is going to need a change.  Let's see, "the

5  indictment," so we will say the --

6          MS. JAYNE:  It could be "the charges alleged in

7  each count."

8          THE COURT:  "The offense alleged in each count"?

9          MS. JAYNE:  Yes.

10          THE COURT:  "The offense alleged in each count" or

11  "The offense is alleged to have been committed on or about

12  certain dates."  So "The offense charged in each count is

13  alleged to have been committed on or about certain dates."

14      Does that work?

15          MS. JAYNE:  Yes, your Honor.

16          MR. SAMPSON:  Your Honor, "The offense" -- sorry.

17  "The offense charged in each count is alleged to have been

18  committed on or about certain dates."

19          THE COURT:  Yes.  And then in the next paragraph

20  "Government must prove beyond a reasonable doubt that the

21  offenses were committed on dates reasonably near the dates

22  alleged."  Just, period, "alleged."

23      And I assume that the indictment will have those

24  dates -- I mean the verdict form will now have those dates.

25  I think it might already.

41

1          MR. SAMPSON:  I think we put the dates in the

2    verdict form, your Honor.

3          THE COURT:  Okay, good.  Okay.  So we're set on

4    that.  "It is not necessary to prove" -- okay so we're set

5    on that.

6       Number 28, "Other crimes or other acts."

7          MR. SAMPSON:  Your Honor, this is similar to 2.10,

8    which we already discussed.  The Government did propose

9    removing a number of the terms, but I think this should be

10   in same category.

11         THE COURT:  So we're going to hold this to see if

12   you have any 404(b) evidence, correct?

13      I'm not hearing you.

14         MR. SAMPSON:  Yes, your Honor.

15         THE COURT:  Okay.

16         MR. SAMPSON:  Oh, I'm sorry.  Yes, your Honor.

17         THE COURT:  Good, okay.

18      And, Ms. Jayne, you don't object to holding on this

19   one?

20         MS. JAYNE:  For holding on it, correct, yes.

21   Thank you, your Honor.

22         THE COURT:  Good, okay.

23      Number 29.  Let's see.  So I don't -- so is there

24   impeachment evidence coming in?  So this is a defense

25   instruction, I gather.

42

1          MS. JAYNE:  Your Honor, I think in looking at

2 the -- I think I was more considering impeachment in terms

3 of possibly inconsistent statements, but now that I'm giving

4 this a little more thought, perhaps it's not -- it doesn't

5 quite fit that scenario.  I don't believe anybody has any

6 prior convictions, or that I'm aware of in this case.

7          THE COURT:  Okay.  So are you withdrawing this

8 one?

9          MS. JAYNE:  If I could just --

10      Mr. Sampson, I don't think I received -- and I don't

11 know if you did check but I don't believe I received any

12 information on any witness.  I'm not sure if you looked into

13 that though.

14          MR. SAMPSON:  I don't believe that we have looked.

15 I believe I might know if they had, but I'm not aware of any

16 prior convictions of any witnesses.

17          MS. JAYNE:  Okay.  And I would just make that

18 request.  It was probably my initial discovery request, but

19 I would just make that request to double-check to ensure

20 that there aren't going to be any prior convictions that

21 would be the basis that would possibly serve as impeachment.

22          MR. SAMPSON:  I'm not sure if the Government is

23 obligated to search for prior convictions for witnesses, but

24 I will check.

25          THE COURT:  So this one -- I mean this is for

*Echo Reporting, Inc.*

43

1 impeachment for prior crimes, so this is probably going to

2 get pulled. Is this one of those that we're holding?

3          MS. JAYNE: We can hold it, your Honor. But I --

4          THE COURT: I'd rather take it out. I don't see

5 how this is going to come in --

6          MS. JAYNE: Only if something is uncovered about a

7 witness that I'm not aware of. At this moment, given the --

8 anyway, I'm not going to make presumptions so --

9          THE COURT: Are you withdrawing it or am I just

10 going to deny it?

11          MS. JAYNE: I'll withdraw it. That's fine.

12          THE COURT: Thank you.

13      Ms. Jayne, as I said, right before we instruct the jury

14 we go back over these. So why don't you make a note, if

15 something happens, it's easy to put it back in. Okay. And

16 it's something that I would give at the end of the trial.

17      So that one is withdrawn. Okay.

18      And there will be no 29, Mr. Sampson, but you're not

19 going to change the numbers at the top of the page. Okay?

20          MR. SAMPSON: Yes, your Honor.

21          THE COURT: All right. Number 30. So this is a

22 pretty standard instruction, but I gather that there is no

23 pure expert, someone who was retained to give opinions.

24 Rather we've got -- I can't remember what her --

25          MR. SAMPSON: Ms. Kikugawa is an FBI financial

44

1  analyst.

2          THE COURT:  Financial analyst.  She's not an

3  agent.  Okay.  So you only have -- and is she giving fact

4  testimony as well as expert opinion?

5          MR. SAMPSON:  Yes, your Honor.  That's the plan.

6          THE COURT:  Okay.  And do you disagree with that,

7  from what you know, Ms. Jayne?

8          MS. JAYNE:  I'm trying to recall whether she

9  really -- she's giving fact testimony?  I think she might

10 have been involved with some searches but --

11         MR. SAMPSON:  That's right.

12         MS. JAYNE:  Okay.  I mean I guess --

13         THE COURT:  So I think that number 31 covers the

14 expert opinions.

15     And so are you with -- Ms. Jayne, this is your

16 instruction.  Are you withdrawing it?

17         MS. JAYNE:  Yes.  That's fine.

18         THE COURT:  Okay.  So that one is withdrawn.  So

19 there will also be no number 30.

20     Then for number 31 on the dual role, so I -- when I

21 have the standard expert instruction, I read it with the

22 introductory instructions in that group of "Welcome to the

23 jury and here's," you know, but on the dual role testimony I

24 can either read it at the very beginning, which is what I

25 prefer than giving them an instruction right before her

45

1  testimony.

2      What's your thinking on it?

3          MR. SAMPSON:  Your Honor, I defer to the Court.  I

4  think it would be fine in either place.  I think the

5  numbering of the model indicates that it should be given

6  during trial, but if your Honor's practice --

7          THE COURT:  Right.

8      Ms. Jayne, do you have a preference?

9          MS. JAYNE:  I don't, your Honor.  In the beginning

10  is just fine.

11          THE COURT:  Okay.  So, yes, Mr. Sampson, you are

12  correct.  I take as one of the areas where a judge has the

13  most discretion, reasonably implemented, to decide the order

14  of the jury instructions.  So I'm not bound by -- the

15  Committee and the Ninth Circuit I think did a great job

16  but -- so we will change this "You will hear testimony from

17  Carlene Kikugawa who" -- let's see, yes -- "who will

18  testify" -- so let's make that change -- "to both facts and

19  opinions."

20      Okay.  Facts are -- you've got the bracket you've

21  already taken out, and then I think we're set.  Okay?  Did

22  I --

23          MR. SAMPSON:  Your Honor --

24          THE COURT:  Yes.

25          MR. SAMPSON:  -- just to be clear, there's a

46

1  reference to them previously having been instructed on

2  credibility, so I want to make sure that that would be given

3  at the beginning.

4          THE COURT:  Credibility is in that initial group

5  of instructions, yes.

6          MR. SAMPSON:  Thank you, your Honor.

7          THE COURT:  "Factors discussed earlier in these

8  instructions."  Yes, it will be earlier in these

9  instructions.  So that will still be accurate.

10      Okay.  Charts and summaries, that's fine.

11      The second charts and summaries.  Do you have any

12  charts and summaries that will be going into evidence?

13          MR. SAMPSON:  Your Honor, we believe we will be

14  noticing under 1006, at least several bank related

15  summaries.

16          THE COURT:  Okay.  I will recommend that if you

17  have charts and summaries that you're not sending in to the

18  jury, you might want to let them know that while you're

19  referring to them so that they don't get to the jury room

20  and say "Where is that great chart that I saw?"

21      Just a suggestion.

22      Okay.  Number 34, unknowingly.  So knowingly is an

23  element, isn't it, of the offense?

24          MR. SAMPSON:  Yes, Your Honor, I believe it is.

25  It is certainly an element of 1957.

47

1          THE COURT:  So there was a discrepancy here with

2   the Ninth Circuit instruction 5.7.  Let me just open up my

3   book to that.

4       And I just want to let you know that when I read these

5   instructions, an instruction like this that defines the term

6   from the elements instruction, I will read this after I've

7   read the elements.

8       So, again, you know, the Ninth Circuit is just putting

9   like things together, and I don't think they're really --

10  you know, they just have to be reorganized.

11      So there was a -- so, Mr. Sampson, I'm looking at the

12  instruction.  And I just want to see -- there is a

13  bracketed -- in yours, this bracketed second sentence.  Do

14  you see that?

15          MR. SAMPSON:  (No audible response.)

16          THE COURT:  I think we've lost him again.

17          MS. JAYNE:  He's frozen.

18          THE COURT:  Mr. Sampson, can you hear it anyway?

19          No.

20          Okay.  We'll get him to sign out and come back.

21          MS. JAYNE:  I'll watch out for him to rejoin, your

22  Honor.

23          THE COURT:  Okay.

24      Mr. Kaleba is going to have to jump in.  Surprise.

25      (Pause.)

48

1          MR. SAMPSON:  Hello, I'm --

2          THE COURT:  I hear you, but you're still frozen.

3          MR. SAMPSON:  -- back.

4          THE COURT:  Not much.

5          MR. SAMPSON:  I'm not sure -- your Honor, can you

6  hear me?  I'm going to try to login with my cell phone.

7          THE COURT:  Okay.

8          MR. SAMPSON:  I do apologize.

9          THE COURT:  So I think -- last March we had a

10  terrible time and we spent a lot of time and even more money

11  fixing ours at home, so I understand.  It's really hard.

12     So if you -- so mute your computer and then try to come

13  in with this -- you can do it by phone.

14     Isn't that right, Tiffany, to get the audio?

15          THE CLERK:  He could, your Honor, yes.

16          THE COURT:  And that way even if I lose your video

17  feed, I'll be able to hear you.

18          THE CLERK:  I think he joined by his phone, so

19  let's see.  There we go.

20          THE COURT:  Okay.  So are you going -- so I just

21  want to make sure you don't get feedback by having two feeds

22  open.

23          MR. SAMPSON:  Yes, your Honor.  I'm muting my

24  other line now.

25          THE COURT:  Good.  That will work.

*Echo Reporting, Inc.*

49

1          MR. SAMPSON:  I'm so sorry about that.

2          THE COURT:  No, it's harder for you.  I really

3   helps to see you, so I must say that -- even on the smaller

4   screen from your phone, it's a help to me.  I hope it's a

5   help to you too.

6          MR. SAMPSON:  Thank you, your Honor.  I'm supposed

7   to be getting my new Wi-Fi router this afternoon so I

8   apologize.

9          THE COURT:  I totally get it.  Okay.  So let's go

10  back.

11      We're on number 34 and I want to turn to the notes at

12  five point -- that says 5.6.  I've got the 2010 book so this

13  was renumbered, but do you have the current version of 5.7?

14  Because my notes may be incorrect, and I just can't print

15  out the Ninth Circuit instructions every time I have a jury

16  trial.

17          MR. SAMPSON:  Understood, your Honor.  I believe

18  that we were using the most recent instructions.  We have --

19          THE COURT:  I'm sure you were.  So can you pull up

20  the comments to 5.7?

21          MR. SAMPSON:  I'm working on that right now.

22          THE COURT:  Because I want to see if they remain

23  the same.

24          And so it says that "The second sentence of the

25  instruction should not be given when an element of the

50

1  offense requires the Government to prove the defendant knew

2  that what the defendant did was unlawful."

3       So that's my question to you.  Does the Government have

4  to prove -- is this specific intent that it was unlawful, or

5  is it general intent that was done knowingly?  That's what I

6  don't know the answer to.

7            MS. JAYNE:  Your Honor, that particular comment,

8  it actually cites to money laundering, so at a minimum we

9  would have to give it because -- at least the very last case

10  cited in that comment says, quote, "money laundering."

11           THE COURT:  So it says to take it out.  That

12  comment means deleting the sentence, not including it.

13      That's what I'm -- because it says the Government is

14  not required that he knew his acts were unlawful.  And my

15  question is does that come out?

16           MS. JAYNE:  Correct.  Sorry, yes.  So I believe

17  that knowingly --

18           MR. SAMPSON:  So, your Honor, I have the comment

19  up.

20      I apologize, Ms. Jayne.

21      I have the comment up and it says, "The instruction

22  should not be given when an element requires the Government

23  to prove that the defendant knew what the defendant did was

24  unlawful."

25      So, your Honor, I believe that the comment for the

51

1  addition -- the addition here should come out for knowingly

2  with respect to the money laundering.

3      The wire fraud, although it says knowingly as to some

4  elements, I believe it's also willfully.

5          THE COURT:  And that's fine, and what we are going

6  to need to do is to give an instruction that points that out

7  to the jury.

8      So I think what makes the most sense is that this

9  instruction as written be given for the honest services and

10  wire fraud charges.  And then we give a new instruction for

11  money laundering that takes this out and indicates -- and

12  actually points out to the jury that knowingly, as used in

13  regard to whatever counts it is, is defined as follows.

14      But you need to tell me whether --

15          MR. SAMPSON:  Your Honor, I apologize.  And I

16  think I want to withdraw my statement about willfulness.

17  I'm not sure it actually applies in the wire fraud context.

18  I know that --

19          THE COURT:  Well, this is knowingly.  This isn't

20  willful.

21          MR. SAMPSON:  Right, I understand.  I understand.

22          MS. JAYNE:  Right.  I think what's confusing, the

23  bracket almost -- if it said the Government is required to

24  prove, I think that's a correct statement of the law.  And

25  therefore --

52

1          THE COURT:  But the bracket says the Government is

2  not required to.

3          MS. JAYNE:  So it sounds like it should come out,

4  although it actually would be more helpful if it just said

5  "is."

6          THE COURT:  So "knowingly" appears in so many

7  different crimes, and this is a general instruction.  So

8  that that's the problem.

9      So does the -- so let's look at the -- was it 8123,

10 because let me just turn to the Ninth Circuit on that.

11         MR. SAMPSON:  And your Honor, while your Honor is

12 doing that, I would just point out that the three cases

13 cited in the comment to 5.7 are copyright infringement, a

14 Lacey Act violation, and money laundering.

15         THE COURT:  Right.

16         MR. SAMPSON:  So I do agree with Ms. Jayne that

17 that it should be given without that sentence with respect

18 to money laundering.

19         THE COURT:  So when I look at mail fraud, 8.123,

20 the element is "the defendant devised or knowingly

21 participated."  So I don't think in a scheme or plan --

22         MS. JAYNE:  So it likely goes -- knowingly should

23 just be given without that bracketed section pertaining to

24 all -- well, all relevant offense related instructions.

25         THE COURT:  And honest services fraud is a

*Echo Reporting, Inc.*

53

1  specific intent to defraud crime.  There aren't many

2  specific intent crimes, but --

3          MR. SAMPSON:  Your Honor, I will point out that

4  the instruction on the services fraud does not say specific

5  intent, 8.123.  It says that the defendant acted with the

6  intent to defraud.

7          THE COURT:  I'm looking at the notes, Mr. Sampson,

8  to 123 and it cites a case -- quite an old case -- honest

9  services fraud requires, quote, "a specific intent to

10 defraud."  It cites Kincaid-Chauncey.  I don't know the

11 case.  I'm sorry I didn't take a look at that.

12     Oh, here it is, 556 F.3d 923 at 941.  I'm looking at

13 8.123, the notes.

14         MR. SAMPSON:  I see that, your Honor.

15         THE COURT:  So I mean I generally consider these

16 notes to be accurate, but I leave it in your hands to tell

17 me that they're not.

18         MR. SAMPSON:  No, your Honor.  I don't have any

19 reason to dispute the citation in the commentary.  I just

20 noted that the elements themselves state that the defendant

21 acted with the intent to defraud in the first element

22 knowingly and in the fourth element, the intent to defraud.

23         THE COURT:  Okay.  Thank you.

24     So I'm going to now take us back to instruction 34.

25 And it looks as though the revision will be for all but

54

1  money laundering.  And that's a number of charges, right?

2         MR. SAMPSON:  1 through 20, your Honor -- 1

3  through --

4         THE COURT:  No, 1 through 20 are not money

5  laundering.  It's like 20 to 29 are money laundering?

6         MR. SAMPSON:  23 to 29 are money laundering.  I

7  just meant when you said all but money laundering.

8         THE COURT:  Okay.  So all but money laundering,

9  we're going to leave this second sentence in.  For money

10 laundering, we're going to take it out.  We're going to have

11 two different knowingly instructions.

12         Is that correct?

13         MS. JAYNE:  Your Honor, I think I got a little bit

14 confused there.  I thought when we are looking at 8.123,

15 there was also the knowing participation, "knowingly

16 participated."  And therefore, I thought that that was an

17 element and therefore the bracketed portion should come out

18 for all substantive offenses.

19         THE COURT:  So let's look at that.

20     No, it's -- you know, that's the problem with the word

21 "knowingly."  It has to be that the element is that the

22 defendant knew what the defendant did was unlawful as

23 opposed to knew that he did the act that was committed.

24 That's general intent.

25     So I knew I was putting money in my bank account,

55

1 that's not unlawful. But I did it knowingly. As opposed

2 to, I knew I was stabbing you, that's specific intent.

3     So sorry for the crass examples, but that's why this is

4 so tricky and that's why --

5         MS. JAYNE: It is. I think I hear the Court. If

6 knowing conduct as opposed to accidental versus knowing the

7 unlawfulness of it which is --

8         THE COURT: Knowing the unlawfulness, exactly.

9         MS. JAYNE: Okay. Okay.

10         MR. SAMPSON: Your Honor, I believe knowing the

11 unlawfulness gets into the question of willfulness, which I

12 don't think is at issue here, which is intentional violation

13 of a known legal duty.

14     Coming from the tax background that I do, willfulness

15 has a bit of a higher standard.

16         THE COURT: I know. I know it is, but I'm trying

17 to -- so the Ninth Circuit is citing a case that says in

18 money laundering cases, you don't give this second sentence.

19 That's my point here, and we have to resolve that.

20     So if you want to take a look at this U.S. v. Turman,

21 it says it right there for 5.7. And I'm going to -- Mr.

22 Sampson, if you want to pull that up or Mr. Kaleba wants to

23 do that.

24         MR. SAMPSON: I can work on that. Let me just get

25 the cite. 112 (sic) F.3d 1167.

56

1        THE COURT:  122 F.3d.

2        MR. SAMPSON:  Thank you.

3    I apologize, your Honor.  I'm just looking for the --

4        THE COURT:  I appreciate that you can do it.  You

5 know, this is why we do this now.

6    We haven't even gotten to the hard one.

7        MR. SAMPSON:  I think that's right.  Sorry, your

8 Honor.  There's quite a bit about the standard of review.

9        THE COURT:  So page 1169 is where the cite is, the

10 pin cite.

11        MR. SAMPSON:  All right.  It's a rather long

12 introduction by Judge Kozinski.

13    So I see that the district court and in that case

14 provided the instruction that "An act is done knowingly if

15 the defendant is aware of the act and does not act or fail

16 to act through ignorance, mistake or accident."  It gave the

17 additional sentence, "The Government is not required to

18 prove that he knew his acts or omissions were unlawful."

19    The defendant did not object.

20        MS. JAYNE:  I think it was error but they just

21 determined it was -- it was not plain error.

22        MR. SAMPSON:  It was --

23        MS. JAYNE:  I mean it was an error --

24        THE COURT:  It was instructional error?

25        MR. SAMPSON:  It does not -- I believe there was

57

1  not plain error.  It was not plain error to give the

2  instruction with the additional sentence.

3          MS. JAYNE:  Which means there was error, it

4  shouldn't have been given.  I mean --

5          MR. SAMPSON:  I'm sorry, your Honor.  The Court

6  found that there was not plain error.

7          THE COURT:  Okay.

8          MR. SAMPSON:  So it shouldn't have bene given.

9          MS. JAYNE:  That sounds right.

10          THE COURT:  And so what does that tell us about

11  this sentence for money laundering?

12          MS. JAYNE:  That it should not be given.

13          MR. SAMPSON:  That for money laundering it should

14  not be given.

15          THE COURT:  It should not have, so we're going to

16  have two separate knowingly instructions.  So we will give

17  the sentence for the honest services, mail and wire fraud

18  charges, 1 through 22.  Is that --

19          MR. SAMPSON:  Yes, your Honor.

20          THE COURT:  Okay.  So I'll need a second knowingly

21  instruction that I give after the 1957 instruction.

22          MR. SAMPSON:  So that will be 34A?

23          THE COURT:  Let's call it 34A, yes.

24          So that will work for Counts One through 22 and we

25  will get a new instruction for Counts 23 to 29.

*Echo Reporting, Inc.*

58

1      MR. SAMPSON:  So, your Honor, should the
2 instruction add references to the counts?
3      THE COURT:  "An act is done knowingly" -- so I
4 think it would make sense and I think we can say "in regard
5 to Counts One through 23."
6      MR. SAMPSON:  One through 22.
7      THE COURT:  One through 22, thank you, an act is
8 done knowingly.
9      And then the new one will say "In regard to Counts 23
10 to 29" and then it'll be different.  And I will read them at
11 separate times.  They will be separated and associated with
12 the elements instruction for those counts.  Okay?
13      MR. SAMPSON:  Yes, your Honor.
14      THE COURT:  Good.  All right.  So that's a big
15 change but I think that's helpful.
16      Okay.  Then let's go to 35, intent to defraud.  So here
17 I was really concerned.  This is where I think I first noted
18 this issue about the indictment because this says, "You may
19 determine whether a defendant has an honest, good faith
20 belief in the truth of the specific misrepresentations
21 alleged in the indictment."
22      And that's what I had a little meltdown about what are
23 we doing about the indictment?
24      MR. SAMPSON:  Yes, your Honor.
25      THE COURT:  So I'm now turning -- you know, I

59

1 flagged it. You tell me how to resolve it.

2          MS. JAYNE: I think if we just cut those words --
3 to me, it still make sense, specific misrepresentations
4 alleged by the Government.

5          THE COURT: How will they know which ones are
6 alleged? Because that's nowhere. How will they know what
7 that is? Because Ms. Jayne you are concerned that they not
8 consider other acts that were not alleged, so this was
9 protective of your position, I thought. I may be mistaken.

10          MS. JAYNE: Specific misrepresentation, let me
11 look at the --

12          MR. SAMPSON: Perhaps -- I'm sorry.

13          THE COURT: Let me go back to the verdict form.
14     So in the verdict form what you say is -- and I'm just
15 reading one: Blank guilty, not guilty of the honest
16 services, wire fraud, in violation of 1343 and 1346 as set
17 forth in Count One of the indictment as to an April 6, 2013
18 transmission via DocuSign of signed 2012 stock option
19 agreement regarding NetScope Inc.

20     I'm not even sure that that is proper English. Okay.

21          MR. SAMPSON: I'm sorry, your Honor. Which
22 document is -- are we --

23          THE COURT: I'm looking at your joint verdict form
24 because I'm trying to see how we're going to handle this
25 limitation of the misrepresentations alleged in the

60

1 indictment.  And I think there's a page of misreps in the

2 indictment, isn't there?

3          MR. SAMPSON:  Yes, your Honor.  Paragraph, I

4 believe it's 24.  24A through E.  Page five.

5          MS. JAYNE:  By the way, this language is coming

6 from the notes of 5.12 and it triggered -- and it might,

7 just might, be resolved by the defendant's proposed good

8 faith instruction.

9      The notes say this extra language is given as to

10 whether defendant acted in good faith and did not act with

11 an intent to defraud.

12      The defense contends there are no misrepresentations

13 but I think that commentary says -- I mean it literally is a

14 copy and paste of that specific misrepresentations alleged

15 in the indictment.  But it's certainly not necessary to

16 articulate specific misrepresentations alleged in the

17 indictment, because the issue just being addressed is the

18 intent to defraud, whether there's an honest, good faith

19 belief with respect to the intent to defraud.

20      I'm not sure that we even necessarily have to get into

21 specific misrepresentations, what are they.  And maybe we

22 can look at the good faith instruction and see if that

23 satisfies it.

24      Again, it goes to the intent to defraud as opposed to

25 specific statements or omissions.

61

1    MR. SAMPSON:  So, your Honor, with respect to
2 5.12, it's really just the first sentence, "An intent to
3 defraud is an intent to deceive and cheat."

4    The second paragraph comes from <u>Molinaro</u>, Ninth Circuit
5 1993.

6    MS. JAYNE:  That's the same.

7    MR. SAMPSON:  Which related to a similar but
8 different statute, bank fraud.

9    THE COURT:  So do we just take the second
10 paragraph out?

11    MR. SAMPSON:  Now that your Honor has teed up the
12 question of the specific misrepresentations, I think it
13 would be appropriate, and I'll explain why.

14    In paragraph 24, the Government lists five specific
15 false representations, promises, or omissions, but indicates
16 that it does not the universe.  It says "including but not
17 limited to the following."

18    And so the Government may prove those and potentially
19 other misrepresentations or omissions.  And so I'm not sure
20 that it's appropriate here.

21    In the bank fraud context it makes more sense because
22 they're typically very specific statements about someone's
23 assets going to the bank that constitutes the bank fraud.

24    THE COURT:  I'm glad to take it out.  So I don't
25 have 512.  That's a new instruction.  I have my old book and

62

1  I don't have two computers here so I can't pull that up.

2      But, Mr. Sampson, you're telling me that 5.12 merely

3  says an intent to defraud is an intent to deceive and cheat,

4  and that comes from --

5          MR. SAMPSON:  It's just a 12-word sentence, your

6  Honor.

7          THE COURT:  So, Ms. Jayne, do you agree to delete

8  the second paragraph and then give this --

9          MS. JAYNE:  I do.  I have an additional sentence

10 with respect to intent to defraud, and I also have a good

11 faith instruction which we can take up later.

12     I would like --

13         THE COURT:  We'll pick it up in -- I mean overall

14 I thought that it's part of the theory of your case and I'll

15 probably give that instruction at a high level.  Whether

16 there is tweaking of the language, we'll deal with later.

17     But so put it on the back burner, because I just want

18 to march through the pages so I don't miss anything.

19         MS. JAYNE:  Right.  But generally speaking, I

20 think it's appropriate because of how broad and vague that

21 specific misrepresentation is to take that out.

22         THE COURT:  And, Mr. Sampson, you agree.  This

23 instruction would just be the standard instruction and

24 delete paragraph two?

25         MR. SAMPSON:  I think it's appropriate to just

*Echo Reporting, Inc.*

63

1  give the first sentence, and we'll take up the question

2  about good faith at the time.  But the Government would

3  still object to that for various reasons.

4          THE COURT:  I understand that.  Okay.

5          MS. JAYNE:  Your Honor, there was a part of that

6  instruction that the defense was proposing, what it means to

7  act with intent to defraud.  It's in italics because we were

8  trying to highlight what was different.

9          THE COURT:  Yes.  So on your instruction, it was

10  unclear to me how you were doing this.

11      So if we have an intent to defraud is an intent to

12  deceive and cheat, then why do we need anything else?  That

13  describes it, deceive and cheat.  Those are pretty common

14  words.

15          MS. JAYNE:  I found this instruction specific to

16  honest services fraud in the 11th Circuit.  And it seemed to

17  specifically address in the honest services context, because

18  as it turns out -- this gets a little tricky -- the

19  Government has elected to, and we'll discuss this, add just

20  wire fraud, just mail fraud.

21      The deceive and cheat I think actually -- and that's

22  why I made some changes once they proposed that theory.  I

23  think it actually applies only to wire fraud and mail fraud

24  but not necessarily to honest services fraud because it's

25  not a pecuniary loss.

64

1     And therefore this particular instruction is addressing
2 the intent to cause loss of honest services.  It got really
3 tricky once --

4          THE COURT:  So what you're really saying -- see,
5 we haven't gotten to the substantive --

6          MS. JAYNE:  Yeah.

7          THE COURT:  This one you want me to read after
8 mail or wire fraud but not after honest services.  This
9 12-word "An intent to defraud is an intent to deceive and
10 cheat" as it relates to wire and mail fraud.

11          MS. JAYNE:  If those instructions are given, I
12 think that's correct, but my proposed instruction -- there
13 still has to be an intent to defraud honest services fraud.
14 It's not that it's not in the instruction.

15     But I think, as I obtained from the 11th circuit, it's
16 the intent to use false or fraudulent pretenses to cause a
17 loss of honest services.

18          MR. SAMPSON:  Your Honor, with respect to the 11th
19 Circuit cite from 2019, although it's pretty recent, Miller
20 is even more recent.  And I think Miller forecloses it
21 because Miller holds that you have to have the intent to
22 deceive and cheat.  This is with respect to wire fraud.

23     And so because Miller says you have to have both the
24 intent to deceive and to cheat, I'm not sure that the
25 additional paragraph should be included, because the one

*Echo Reporting, Inc.*

65

1  sentence is a correct statement of Ninth Circuit law with

2  respect to mail and wire fraud.

3          THE COURT:  Yes.  Let's put that wire fraud aside.

4  And now let's talk about honest services fraud.  That's what

5  Ms. Jayne is saying.  It would actually be -- she'd like a

6  different instruction for the honest services charge.

7      And let me just go to the elements for honest services

8  so I can --

9          MR. SAMPSON:  And, your Honor, my initial proposal

10 was deceive and cheat, and I really didn't delve into it

11 until the Government raised the issue and then as I was

12 analyzing it, I think I'm correct -- this is still novel --

13 that the deception is a bit different with honest services.

14         THE COURT:  Well, let's look -- I'm looking ahead

15 to number 42, which is honest services.  And I just want to

16 get a sense of where intent to defraud comes in.

17     So the elements are knowingly devised or participated.

18     Number two, the scheme consists of bribe or kickback.

19     Three, the defendant owed a fiduciary duty.

20     Four, the defendant acted with intent to defraud by

21 depriving Netflix of the right to honest services.

22     So cheating is really not -- right, it's different.  So

23 we're trying to address intent to defraud there.

24     And your language would be "To act with intent to

25 defraud means to act knowingly and with the specific intent

66

1  to use false or fraudulent pretenses, representations,

2  promises, or omissions, to cause the loss of honest

3  services.  The intent to deceive alone without the intent to

4  cause loss of honest services is not sufficient."

5          MS. JAYNE:  Well, I think instead of the "and

6  cheat," here we have deception plus intent to cause loss of

7  honest services as opposed to deception plus the intent to

8  cause pecuniary loss.

9          THE COURT:  Well, why isn't it enough to say the

10  intent to defraud is an intent to deceive and take out the

11  "and cheat" that's going to relate to wire and mail fraud?

12          MS. JAYNE:  Because those definitely are two

13  components, and I think <u>Miller</u> was speaking to that and

14  <u>Miller</u> wasn't dealing with honest services fraud.  But that

15  "and" is critical for that second part.  So just deception

16  alone, even in the honest services context, there has to be

17  an "and" something.  The question is what is that "and."

18          THE COURT:  So you're making this specific

19  intent -- that's like putting it in neon to me because there

20  aren't many specific intent crimes.  I'm not sure that this

21  one is.  It may be knowingly -- means to act knowingly -- it

22  means to knowingly use for -- let's see.

23          MS. JAYNE:  It's certainly a specific intent

24  crime, as your Honor I think recently cited that one case.

25          THE COURT:  Right.  Well, because I'm thinking of

67

1  the example that deceiving about not just -- deception

2  involving violation of company rules is not honest services

3  fraud crime.  So deception alone isn't enough.  I agree with

4  you, Ms. Jayne.

5      And, Mr. Sampson, we've got to draw that distinction

6  because -- and, you know, the fraud about keeping gifts is

7  not -- I think that, again, is a company rule issue.  It's

8  not a crime.

9          MR. SAMPSON:  Yes, Your Honor.  However, when

10  there is a duty to disclose, when there's an affirmative

11  duty -- and the Government's alleged that there was an

12  affirmative duty to disclose -- that --

13          THE COURT:  I see.  Duty or a company rule duty?

14          MR. SAMPSON:  A company policy or a company duty

15  of a fiduciary.

16          THE COURT:  Oh, of a fiduciary.  Okay.  Thank you.

17  Yes, I hear you on that.

18          MR. KALEBA:  Your Honor, if I may my step in, I'd

19  like to suggest, I do believe under <u>Miller</u> -- which I think

20  was a bank fraud actually, not even wire fraud -- with

21  respect to the need to include an intent to deceive and

22  cheat, the "and cheat" applies to a property interest.

23      It's not enough just to have an intent to deceive, but

24  it has to be directed towards a property interest.

25          THE COURT:  Right.

68

1          MR. KALEBA:  And most typically that property

2   interest is tangible.  It's money or property.

3       Honest services, the only wrinkle or the only

4   difference is it's an intangible right.  That's how -- it's

5   a pretty generic statutory definition number 1346, but we

6   believe the Government is still required to prove deception

7   and cheating.  The only difference is rather than money or

8   property, which is wire fraud, it's an intangible property

9   right, which is the right to honest services.

10          THE COURT:  So I think, Ms. Jayne --

11          MS. JAYNE:  That's what I said.

12          THE COURT:  I think Ms. Jayne has that in her

13   instruction, and she is -- okay.  We will use cheat for wire

14   fraud because the Ninth Circuit tells us to, but here, I

15   actually think that -- I think that maybe we can say for

16   honest services "An intent to defraud means to knowingly and

17   with specific intent to use false or fraudulent pretenses."

18   I think maybe that's how we define it.

19       I'm not --

20          MR. SAMPSON:  I -- I'm sorry.

21          THE COURT:  Because, Mr. Kaleba, it addresses your

22   point that we have to show that it's to cheat the company

23   out of an intangible, and I think that's what Ms. Jayne says

24   here.

25          MS. JAYNE:  That was where I ended up when I

69

1 started really parsing apart the pecuniary versus

2 intangible.

3          THE COURT:  Right.

4          MS. JAYNE:  And that's what this instruction is.

5 I think the 11th Circuit somehow captured that even before

6 Miller.

7          THE COURT:  Yes.

8          MR. SAMPSON:  Your Honor, I'm not sure that honest

9 services requires the intent to use false or fraudulent

10 pretenses, misrepresentations or promises.

11    I think it's simply sufficient that the defendant

12 knowingly sought to deprive the company of the intangible

13 right of its honest services and acted with the intent to

14 defraud.

15          THE COURT:  Okay.  That would be fine with me.  I

16 think that would be fair.

17          MS. JAYNE:  I don't believe that actually

18 captures -- what we're trying to do here is define "intent

19 to defraud."  You can't use the word in the definition.

20 We're defining the intent to defraud.

21          THE COURT:  Well, defraud for a very specific

22 purpose and not other purposes.

23    Mr. -- so I think for -- so this instruction is for

24 Counts One through 22.  We're going to delete "and cheat."

25 "An intent to defraud is an intent to deceive which

70

1  means" -- can we say that?

2          MS. JAYNE:  Your Honor, I just don't agree that

3  for honest services fraud it's just the intent to deceive.

4  It has to be -- as we just discussed, and Mr. Kaleba agreed,

5  "deceive and."

6          THE COURT:  You want to leave "cheat" in?  I'm

7  fine.

8      If you both want to leave "and cheat" in, I'm good with

9  it.

10          MS. JAYNE:  I don't.  I think, as I said, the

11  instruction where I have what the intent to defraud means

12  to --

13          THE COURT:  Okay.  You're ahead -- hold on.

14      I'm just at the introduction.  I know you want your

15  definition.  We're getting there.

16      But should this say "An intent to defraud is an intent

17  to deceive" or "an intent to deceive and cheat for honest

18  services"?

19          MS. JAYNE:  For honest services?

20          THE COURT:  Yes, that's the only one I'm doing.

21          MS. JAYNE:  I would just say --

22          THE COURT:  Because I would go on to say -- Ms.

23  Jayne, it would then go on, "which means to act knowingly"

24  and then we'll work on the rest of your definition.  I may

25  modify it.  I just want to get the introduction, so don't

71

1  get ahead of me on it.

2         MS. JAYNE:  Okay.

3         THE COURT:  It's important here on honest

4  services.  Are you asking it to say in or come out?

5         MS. JAYNE:  Under those parameters, I suppose I

6  would say leave in "and cheat."

7         THE COURT:  And do you have any objection to that,

8  Mr. Sampson?

9         MR. SAMPSON:  With respect to honest services,

10 your Honor, <u>Miller</u> does not extend to honest services.  And

11 so we don't believe it's necessary to include "and cheat."

12     And for the reasons Mr. Kaleba stated, 1343 covers

13 money and property by deception.  And honest services is a

14 conflict of -- a violation of your fiduciary duties, coupled

15 with a duty to disclose is sufficient to violate that.

16         THE COURT:  All right.

17         MR. SAMPSON:  So the cheating is not a necessary

18 element of honest services fraud as modified by 1346.

19         MS. JAYNE:  Your Honor, I think we all agree on

20 the second portion.  The problem I'm having is just that

21 initial sentence of it just as intent to deceive.  And

22 that's sort of declaratory at the outset.  It doesn't match

23 what follows, and that's why I'm struggling with just having

24 that there.

25         THE COURT:  This is the structure I'm proposing.

72

1   In regard to Count One through 22, "An intent to defraud is

2   an intent to deceive, which means to act knowingly and with

3   the specific intent to cause loss of honest services."

4       And you're saying it has to be by fraudulent means.

5   "intent to fraudulently cause" -- no, that doesn't make

6   sense.  "To use false or fraudulent pretenses."

7       You know, Mr. Kaleba, I actually think Ms. Jayne's is

8   fine.

9           MS. JAYNE:  And that's why it's a correct

10  statement of the law, that the intent to deceive alone

11  without the intent to cause loss of honest services is not

12  sufficient to prove intended fraud.

13          And, again, I took this from another instruction.

14  I didn't make it up.

15          THE COURT:  All right.  Thank you.  This -- all

16  right.  So first of all, let me just roll it all the way

17  back to the beginning so we're clear.

18      This instruction is only for honest services.  So it

19  will say "In regard to Counts One to 22, an intent to

20  defraud is an intent to deceive" -- and I'm just going to

21  run it together -- "which means to act knowingly and with

22  specific intent to use false or fraudulent pretenses,

23  representations, promises, or omissions, to cause the loss

24  of honest services.  Proving intent to deceive alone without

25  intent to cause loss of honest services is not sufficient to

73

1  prove intent to defraud."

2      I don't think I need that last sentence.  I think

3  that's actually confusing because we're defining intent to

4  defraud means to do this, and so I'm going to delete the

5  second sentence.

6      Okay.  Mr. Sampson, do you have that?

7          MR. SAMPSON:  I'm working hard to get that

8  correctly, your Honor.  So --

9          THE COURT:  Okay.  So up at the top, in number 35,

10  it will begin "In regard to Counts One to 22, an intent to

11  defraud is an intent to deceive" -- and then just for your

12  sake I'm down to what is marked as a footnote.  We're going

13  to cross off "to act with intent to defraud" and just

14  continue the sentence -- "which means to act knowingly and

15  with specific intent to use false or fraudulent pretenses,

16  representations, promises, or omissions, to cause the loss

17  of honest services," period.  Not giving the next sentence.

18  I think it's duplicative.

19          MR. SAMPSON:  So, your Honor, I understand and I

20  agree with that -- and I understand what your Honor's

21  thinking is with respect to honest services.

22      Now, the Government in paragraph 21 of the indictment

23  alleges two schemes.

24      One is -- and this is why we're proposing the straight

25  wire fraud and straight mail fraud instructions as well, and

74

1  we'll get into that.

2      But the Government is alleging both a violation of the

3  intangible right of honest services as well as a scheme to

4  defraud Netflix of money and property, quote, "by enabling

5  the vendors to, among other things, negotiate more favorable

6  contracts with Netflix than they would have been able to

7  obtain without the assistance of Mr. Kail."

8      So, your Honor, if --

9          THE COURT:  Which charges are those?

10         MR. SAMPSON:  I'm sorry?

11         THE COURT:  Which charges is that theory in?

12         MR. SAMPSON:  One through 22, your Honor.

13         THE COURT:  One through 22.

14         MR. SAMPSON:  So there are two schemes encompassed

15 within one through 22.  And, your Honor, this is why I was

16 getting into the unanimity issue for jury instructions,

17 which is that the defendant -- based on the indictment as it

18 stands and issued by the grand jury, the defendant could be

19 convicted of defrauding the company of money and property by

20 benefiting his interest in these companies and by

21 directing -- by defrauding the company by authorizing

22 payments beyond what Netflix was either obligated to pay or

23 otherwise used or through the violation of his -- by taking

24 bribes and kickbacks.

25     So it's two theories, your Honor.  The defendant was

*Echo Reporting, Inc.*

75

1  defrauded both ways, the Government alleges, not just an

2  honest services bribe and kickback scheme, but also the

3  company was defrauded of actual property cash.

4          THE COURT:  That's the wire fraud and mail fraud

5  claim.

6          MR. SAMPSON:  That's the wire fraud and mail fraud

7  instruction, your Honor, but --

8          THE COURT:  Right.  No, so -- so I was a little

9  thrown for a loop.  I understood that's what you were doing,

10 but I didn't see it coming I guess.

11         MS. JAYNE:  And I did not either, and that's I

12 think why my objections are there.

13         THE COURT:  Yeah.  So I agree with you that on

14 wire and mail fraud, this would not be the proper

15 instruction.

16     But your verdict form is not actually -- you're not

17 actually giving the jury two theories of honest service

18 fraud.  You're giving them two different crimes that Mr.

19 Kail could be convicted of under each count.

20         MR. SAMPSON:  And, your Honor, that's why the

21 verdict form needs to be amended.

22         THE COURT:  It does, yes.

23         MR. SAMPSON:  And I -- I apologize.

24         THE COURT:  Unanimity is -- I mean yes or no, I'm

25 not sure -- I like to give unanimity.  But you're going to

76

1 have two questions of guilty, not guilty for each of those

2 counts.

3          MR. SAMPSON:  Yes, your Honor, one for each

4 theory.

5          THE COURT:  Well, it's not a theory.  It's one for

6 each crime.

7          MR. SAMPSON:  One for each crime, yes, your Honor,

8 but it's one count --

9          THE COURT:  That encompasses two crimes.

10          MR. SAMPSON:  Two crimes, yes.

11          MS. JAYNE:  Your Honor, I -- I'm sorry.

12          THE COURT:  I guess, you know, I -- I went right

13 back to that indictment to see if you could go to the jury

14 on two separate crimes and you did -- you did charge it that

15 way.  It's clear as a bell that you've got 1343 and 13

16 whatever, the mail and wire fraud.

17          MR. SAMPSON:  Yes, your Honor.

18          THE COURT:  So I can't very well --

19          MS. JAYNE:  Well, your Honor, the code's 1343 has

20 to part of -- 1346 can't be alleged by itself I think

21 because it just says intangible right to honest services.

22     So there's no way they could have just alleged 1346.

23 So when I saw 1343, I assumed it was just defining 1346, not

24 that there was a whole separate crime charge.

25     I'm not sure that the indictment really -- I understand

77

1 they cite to that one half sentence, but I'm not sure that

2 that really has given notice.

3      MR. SAMPSON:  Your Honor, it does give notice.

4 It's alleged as an A and B.  It alleges that the scheme to

5 defraud was accomplished in two ways.

6      Your Honor, in the Government's first motions in

7 limine -- I know this was before Ms. Jayne came on -- the

8 Government addressed that in its opening argument about the

9 charges.

10      In our second motions in limine, document 80, the

11 Government described that in the opposition to the motion to

12 compel grand jury transcripts.

13      Document 81, we have the same description, the crimes.

14      And, your Honor, to the extent that it was not included

15 at the deadline for the pretrial, that's this attorney's

16 inadvertence.

17      However, it's in the indictment, and we think the

18 instruction should be given.  And we think that the verdict

19 form should be amended to cover both crimes, because the

20 elements are different.

21      THE COURT:  Okay.  So I think that's an accurate

22 summary of the record.

23      So let's go back now for -- so in regard to, I'm sorry,

24 honest services fraud -- is it honest services fraud or

25 honest services --

78

1        MR. SAMPSON:  Your Honor, I think honest services

2  fraud is just the common name given to crimes charged under

3  1343 and 1346.

4        THE COURT:  No, because we're splitting each

5  count, so this instruction -- so in regard to honest

6  services fraud charged in Counts One through 22 -- and then

7  we have our instruction.

8     We're going to have another instruction "In regard to

9  wire and mail fraud as charged in."  That's what I'm getting

10 at.

11    And then we need -- and maybe it's -- does this

12 instruction apply to money laundering, intent to defraud?  I

13 don't think so.

14        MR. SAMPSON:  No, your Honor.

15        THE COURT:  Okay.  So we need a second instruction

16 for mail, wire fraud.

17        MR. SAMPSON:  I'm sorry, your Honor.  Did you ask

18 money laundering or did you ask mail wire?

19        THE COURT:  I asked money laundering as well.  Is

20 that --

21        MR. SAMPSON:  That's unknowingly.  That was the

22 one we covered in 34.

23        THE COURT:  Okay.  So this instruction we've

24 worked out with Ms. Jayne's language applies to the portion

25 of Counts One through 22 related to honest services fraud.

79

1      You're going to prepare a second intent to defraud --

2  intent to defraud instruction that's going to begin "In

3  regard to the mail and wire fraud charged in Counts One

4  through 22, an intent to defraud is an intent to deceive and

5  cheat," correct?

6           MR. SAMPSON:  I believe that's all we need.

7           THE COURT:  And then we're done.  Okay?  But I

8  need a new instruction here, a 35A.  Okay?

9           MR. SAMPSON:  Yes, your Honor.  35A will be the

10 mail and wire.  35 regular will be honest services.

11          THE COURT:  Yes.

12          MS. JAYNE:  Or is it the other way around?  I'm

13 sorry.

14          THE COURT:  I don't care.  I shuffle them.  I

15 don't care about the numbers ultimately.

16          MS. JAYNE:  I have it as 35 -- and, your Honor,

17 just for the record I'll just note my objection that I do

18 propose that last sentence which gives it clarity, "Proving

19 intent to deceive alone without the intent to cause loss of

20 honest services is not sufficient to prove intent to

21 defraud."

22          THE COURT:  So noted.  Thank you.

23      Okay.  I think that jury is going to need that whole

24 week to deliberate, Mr. Sampson, with the verdict form

25 they're getting.

80

1          MR. SAMPSON:  I beginning to agree.

2          THE COURT:  Yeah.  Now, we've been going for

3   almost two hours.  I don't think we're even halfway done.

4   Would you like a five-minute break?  Do you want to keep

5   going for a little bit longer?  What's your preference?  I

6   don't want to torture you.

7          MR. SAMPSON:  I defer to the Court.  I defer to

8   Ms. Jayne.

9          MS. JAYNE:  I don't have to get up just yet so I

10  could probably go a little longer, but I can let the Court

11  know when I definitely do need a break.

12         THE COURT:  Okay.  Then we'll keep going.

13      All right.  We are on number 36, duty to deliberate.

14      I do actually like the term "presiding juror," so if

15  you would just make that change.

16         MR. SAMPSON:  You prefer "presiding juror"?

17         THE COURT:  I do.

18         MR. SAMPSON:  Okay.

19         THE COURT:  37.  And I think you have already

20  eliminated the language at the bottom "and a mistrial could

21  result."  That you've taken out, correct?

22         MR. SAMPSON:  Yes, your Honor.

23         THE COURT:  Okay.  37 is fine.

24      38 is fine on notes.

25      39 is fine on punishment.

81

1    40, if you would just delete the bracket "explain the

2 verdict form is needed."

3         MR. SAMPSON:  You're on 39, your Honor?

4         THE COURT:  Oh, I meant 40.  39 is fine.

5         MR. SAMPSON:  Yes, your Honor.

6         THE COURT:  Just take that out.  I do explain the

7 verdict form, but that's just a note to judge so we'll take

8 that out.

9    Number 41, communicating with the Court is fine.

10    Okay.  Now, we are at the hard part.  And we may be

11 referring back to other things.  I certainly understand

12 that.

13    So this instruction -- let me just make a couple of

14 comments.  There's no Ninth Circuit instruction on honest

15 services fraud, correct?

16         MR. SAMPSON:  Not quite, your Honor.  There is

17 8.12 -- I believe it's 8.124A.  It's honest services fraud

18 but with respect to bank fraud.  So it is slightly

19 different.  I can pull it up now.

20         THE COURT:  The one that I --

21         MR. SAMPSON:  It is authority, but it's not

22 directly on point for mail and wire fraud, your Honor.  And

23 it's a 8.1 -- I'm sorry.  8.126A.  I'm sorry, it is mail

24 fraud, so it is on point for the mail fraud charge.

25         THE COURT:  8.121?

*Echo Reporting, Inc.*

82

1    MR. SAMPSON:  It's 8.12 --

2    MR. KALEBA:  8.123.

3    THE COURT:  Oh, 123.  I copied all of these.  I

4 have that, yes.

5    MR. SAMPSON:  So maybe -- I'm sorry.  Perhaps,

6 your Honor, we should tackle the mail fraud instruction

7 first, just because there is a clear Ninth Circuit

8 instruction for honest services mail fraud --

9    THE COURT:  You're confusing me.

10    MR. SAMPSON:  -- and connect it to wire.

11    THE COURT:  I'm sorry, now you lost me.  I've got

12 one honest --

13    MR. SAMPSON:  Your Honor, I think it's fine to

14 take it up either way.  I'm just saying that because 43 is

15 honest services mail fraud and the Government is citing

16 directly to a model jury instruction, perhaps we should take

17 that up first.

18    THE COURT:  I just have to organize -- I've got

19 hundreds of pieces of paper here, and so I really apologize.

20 I don't mean to sound so persnickety about it.  But if I get

21 lost in the paper, I can't recover.

22    MR. SAMPSON:  Understood.  I understand

23 completely.

24    THE COURT:  So I'm just trying to stay organized

25 and when I got all the amendments, I kind of had a meltdown

83

1  on this.

2          MR. SAMPSON:  I'm sorry, your Honor.

3          THE COURT:  It's okay.  I mean I'm just trying

4  to -- I don't want to lose -- so I've got a -- because now I

5  have the amended and I have my original.

6      So on 42, you gave me an amended instruction.

7          MR. SAMPSON:  No, your Honor.  On 40, we gave an

8  amended 42A.

9          THE COURT:  You gave me an amended instruction.

10 I'm looking at it.

11         MR. SAMPSON:  Your Honor, I think the defense

12 instruction was amended.  I don't see redlines in the

13 Government's proposed instruction.

14         THE COURT:  That may be true, but you substituted

15 the entire instruction at document 141.  And it starts with

16 "Government's proposed instruction."  Isn't that correct?

17         MR. SAMPSON:  Your Honor, I'm looking at a color

18 copy of document 141.

19         THE COURT:  Yes, that's all I want to know.  We're

20 looking at 141.  That's my only question.  You're going

21 beyond me.  I'm not saying what parts were amended, but you

22 gave me an amended instruction.

23         MR. SAMPSON:  Yes, your Honor.

24         THE COURT:  Okay.  And then I have -- I copied

25 what Judge Koh did in her case that you refer to in your

*Echo Reporting, Inc.*

84

1 notes.

2          MR. SAMPSON:  Yes.

3          THE COURT:  And then I have the original but

4 superseded instruction 42.

5     I'm just trying to organize this so I can move on and

6 come back to it.  And I have duplicate copies of things.

7 That's why -- I've done something with my own paper, but if

8 we're not all looking at the same thing, we won't have jury

9 instructions.

10          MS. JAYNE:  Also, if it's document 141, if you

11 know which page is being looked at, then I can follow along

12 as well, because that's a PDF.

13          MR. SAMPSON:  Ms. Jayne, the Court can confirm,

14 but I'm looking at page 54 of that document.

15          MS. JAYNE:  Right.  So that's wire fraud, honest

16 services.

17          THE COURT:  I just don't know -- okay.  I think I

18 have -- okay.  That's where I made a mistake.  So document

19 141, I had just put in the wrong -- all right.

20     Page 64 is a different instruction.  I'm just trying to

21 collect what is instruction 42, and I'm struggling with

22 that.  I'm not --

23          MR. SAMPSON:  Page 54, your Honor, not 64.

24          THE COURT:  So is there an amended -- yes.  That's

25 amended.  That's number 42.  So you want to go to 42A?  Is

85

1 that where you want us to go?

2          MR. SAMPSON:  No, your Honor.  We can tackle 42.

3      I was proposing that we go to 43, simply because there

4 is a on-point jury instruction.  However, mail and wire only

5 have one slight variation on one element.  So I'm fine with

6 starting with 42.

7          THE COURT:  Okay.  I want to make sure I have

8 these in the right order.  I may continue to need help from

9 you.  I really struggled to collate.  That's why the

10 amendment was so hard.

11      Okay.  I'm looking at amended number 42.  And I've got

12 a big packet of things that go with it.  And this is built

13 off of -- now, this says Counts One through 19 and we've

14 been talking Counts One through 22.

15          MR. SAMPSON:  Yes, your Honor.  One through 19 are

16 wire fraud.

17          THE COURT:  Ah, and then mail.  Thank you, thank

18 you.  So this is wire fraud honest services.

19      So I've never given a verdict to the jury that is this

20 confusing.

21      Okay.  So in general I like the formatting of the

22 Government's instruction that lists and highlights the

23 different terms that are defined.

24      That's just format, Ms. Jayne, but it's much easier to

25 access as the jury is evaluating the elements and what they

86

1  mean.  So I just want to say that the format I want to use.

2  I like that quite well.

3      And then -- so that I understand this then, for honest

4  services fraud, Mr. Sampson, it is still under both those

5  code sections because 1346 alone is not sufficient, correct?

6          MR. SAMPSON:  That's right.

7          THE COURT:  Okay.  But 1343 can stand alone.

8          MR. SAMPSON:  It can.

9          THE COURT:  And you're charging it alone here.

10          MR. SAMPSON:  Correct.

11          THE COURT:  Okay.  I'm going to --

12          MS. JAYNE:  And, your Honor, just for clarity, the

13  defendant's proposed instruction, the italicized portion are

14  the differences from the Government's.

15          THE COURT:  So let me move to your version and

16  that is something I might -- okay.  So if it's not

17  italicized, then you are accepting the Government's

18  language?

19          MS. JAYNE:  That's correct, then everything is the

20  same.

21          THE COURT:  And did you delete any of the

22  Government's language?

23          MS. JAYNE:  No.  I believe it was only additions.

24          THE COURT:  Okay.  And --

25          MR. KALEBA:  Well, no, I do see one.  I'm looking

87

1    at the first element, which is the knowingly devised scheme.

2              THE COURT:  Right.

3              MR. KALEBA:  It should include "the defendant

4    devised or knowingly participated in a scheme."

5              MS. JAYNE:  Okay.  I think that's just -- wait.

6    I'm sorry, then that's just sort of different phrasing of

7    the same thing.

8              THE COURT:  Well --

9              MS. JAYNE:  Yes, sorry.  Devised or knowingly --

10   knowingly devised or participated in a scheme.  Okay.

11             THE COURT:  Well, I noted in one place that there

12   was actually what seemed like a mistake in the second

13   element.  Let's see.  This is wire fraud.

14       This is the wire fraud one, the first one?

15             MS. JAYNE:  This is the wire fraud.  And I

16   apologize.  I think I put "knowingly devised a scheme or

17   plan to deprive."  But the Government has "devised or

18   knowingly devised."

19             THE COURT:  I don't have anything -- what do I

20   have from the Ninth Circuit on wire fraud?  Which

21   instruction is that?  I didn't copy that one.

22             MR. KALEBA:  It's 8.123.  That's the model.

23             THE COURT:  The model says mail fraud.

24             MR. KALEBA:  Right, but that's -- we just changed

25   "wire" for "mail" on one of the elements, but otherwise the

88

1  articulation is the same.

2          THE COURT:  They are the same?  Thank you, Mr.

3  Kaleba.  I thought you were telling me that they were

4  different, but I didn't know that they were.  Okay.

5          MS. JAYNE:  I think the Government had a typo.  I

6  think the Government is copying the Ninth Circuit and the

7  Ninth Circuit doesn't say "devised or knowingly devised or

8  participated."  It just says "devised or knowingly

9  participated" --

10          THE COURT:  That's what I thought.  It's a typo.

11  Right.

12      So should we look at -- so Mr. Sampson, would you track

13  your own version, but I'm going to be looking at Ms.

14  Jayne's --

15          MR. SAMPSON:  Yes.

16          THE COURT:  -- because she tells me she adopted

17  yours with additions.  But if she deleted anything in yours,

18  I want you to tell me.

19          MR. SAMPSON:  I will call it out, your Honor.

20          THE COURT:  All right.  So I'm looking at Ms.

21  Jayne's and I'm looking at document 141 at page 57.  Are we

22  all at the same place?

23          MR. SAMPSON:  Yes.

24          THE COURT:  Good.  Okay.  So "Mr. Kail is charged

25  in Counts One to 19" and we'll take out -- well, we can

89

1  leave in "of the indictment."  I mean we don't have to

2  delete that -- "with wire fraud, in violation of sections"

3  blah, blah "of code."  "In order for Mr. Kail to be found

4  guilty, the Government must prove each of the following

5  elements."  That's fine.

6      "First, Mr. Kail knowingly" -- you know, I hate to do

7  this to you.  Would you bold the words "first" and "second"

8  and "third"?

9          MR. SAMPSON:  Yes, your Honor.

10         THE COURT:  I'd really like to call that out

11 because they have to find each of these beyond a reasonable

12 doubt.

13     "Mr. Kail knowingly devised a scheme or plan to deprive

14 Netflix of the right of honest services and" --

15         MS. JAYNE:  Your Honor, that should say "devised

16 or knowingly participated."

17         MR. SAMPSON:  Agreed.

18         MS. JAYNE:  I think each of us has made a mistake

19 there.  It shouldn't be "knowingly devised" but it should

20 just be "devised or knowingly participated."

21         THE COURT:  "Defendant devised or knowingly

22 participated."

23         MR. SAMPSON:  And, your Honor, the defense

24 instruction says "Mr. Kail."  I'm not sure if it should be

25 "Mr. Kail" or "Defendant."

90

1          THE COURT:  So I always prefer to use names, but
2  if you want to say "Defendant Michael Kail is charged," I'm
3  happy to do that.

4          MR. SAMPSON:  Understood.

5          THE COURT:  So do you want to do that, "Defendant
6  Michael Kail"?

7          MR. SAMPSON:  I think in the intro paragraph is
8  fine and after that we can say "Mr. Kail."

9          THE COURT:  Yes.  I'm glad -- I mean I resist
10  reducing an individual to the term "Defendant."  I just
11  don't like that, but the jury needs to know he's the one.

12      Okay.  So "Defendant Michael Kail is charged" -- and
13  that's all fine.

14      "First, Mr. Kail."  And "knowingly" stays in?

15          MR. SAMPSON:  "Devised or knowingly participated."

16          THE COURT:  Okay, "devised or knowingly
17  participated in a plan to deprive Netflix of honest
18  services."  And then Ms. Jayne is adding "by means of false
19  or fraudulent pretenses."

20      So why am I repeating this when we've had this already
21  in your knowingly instruction?

22          MS. JAYNE:  We have this now in the intent to
23  defraud instruction.  I think -- you know, I had it just for
24  clarity.  There is some redundancy to it, I agree.  It
25  doesn't mean it's not true at this stage.  I think just for

91

1    clarity.

2         MR. SAMPSON:  Your Honor, the Government's

3    position is that that turns it into regular wire fraud and

4    is not tailored to honest services fraud, which is the

5    violation of a fiduciary duty coupled with knowledge.

6         And so we're not sure that it should include the

7    italicized false or fraudulent pretenses representation.

8         THE COURT:  I'm going to take that out so it will

9    track the Government's version.

10        "Second," it looks like there's no -- so the addition

11   here, Mr. Sampson, is the addition "quid pro quo."  I

12   actually think that's an accurate statement of the law that

13   it needs to be a quid pro quo.

14        MR. SAMPSON:  Yes, your Honor.  I agree that it's

15   an accurate statement.  It is later -- quid pro quo is, I

16   think, discussed later in the definitions.  I'm not sure

17   it's required to be in the elements.  Because a bribe or

18   kickback can't be a bribe or kickback unless there's quid

19   pro quo so it's duplicative.

20        MR. KALEBA:  I just note that "bribe" was dropped

21   from Ms. Jayne's version.  It should say "a bribe or

22   kickback."

23        THE COURT:  Thank you.

24        MS. JAYNE:  I'm sorry, and that was -- "bribe or."

25        THE COURT:  Thank you, Mr. Kaleba.  Yes, thank you

92

1  for tracking your version of it because I just can't read

2  all of these at once.

3          MS. JAYNE:  I as well, but I do think this is a

4  complicated instruction and the more that the jury

5  understands it, this exchange is that quid pro quo we're

6  referring to.

7          THE COURT:  So complicated requires explanation,

8  but we don't have to repeat things, because I need to be

9  careful not to overemphasize.

10     The Government says -- I thought there was something --

11  oh, so in the model instruction, Mr. Sampson -- well, I

12  guess both of you have left out from 8.123:  The exchange

13  may be express or may be implied from the surrounding

14  circumstances.

15          MR. SAMPSON:  No, your Honor.  The defense

16  included it and I see we did not.  And I don't object to it

17  being in, given that it's in the model.

18          THE COURT:  Okay.  So you're okay with that in

19  "Second"?  Okay.  So it wasn't highlighted there.  Okay.

20  Good.

21     So "Second, the scheme or plan consists of a bribe or

22  kickback in exchange for Mr. Kail's services.  The exchange

23  may be express or may be implied from all the surrounding

24  circumstances."

25     So that --

93

1        MS. JAYNE:  So is the Court cutting "a quid pro
2   quo"?

3        THE COURT:  Well, I want to -- let me look back
4   back -- where do you have it in your definitions?

5        MS. JAYNE:  I have it --

6        THE COURT:  Let me ask the Government.  Let me ask
7   because I just want to see how the Government was doing it.

8        MS. JAYNE:  Oh, the Government.

9        MR. SAMPSON:  Yes, your Honor.  It's in section
10  two, the bribe or kickback.  Second sentence, "Bribery and
11  kickbacks involve the exchange of a thing of value for
12  services by a fiduciary, in other words, a quid pro quo, a
13  Latin phrase meaning this for that or these for those."

14       THE COURT:  Okay.  Then I don't need to repeat it
15  here.  We'll take out the parenthetical.

16       "Third" -- again, I'm back to Ms. Jayne's version --
17  "Mr. Kail owed a fiduciary duty to Netflix" and she says
18  that tracks the Government's version.  Is that correct?

19       MR. SAMPSON:  Yes, your Honor.  We say "Netflix,
20  Inc." and that's fine.

21       THE COURT:  Okay.  "Fourth, Mr. Kail acted
22  with" -- so --

23       MS. JAYNE:  I've crossed out "and to cheat."

24       THE COURT:  I'm sorry, what?

25       MS. JAYNE:  This is -- I hope your Honor is

94

1 looking at the version where I crossed off "and to cheat."

2 My original version had "cheat" but I've crossed that out.

3          THE COURT:  You took out "specific intent."

4          MS. JAYNE:  And I'm not sure why I did that.

5          THE COURT:  I'm not either.

6          MS. JAYNE:  I think I meant to focus on the "and

7 to cheat."  So sorry, I think -- I intended it to be "Mr.

8 Kail acted with a specific intent to defraud by depriving

9 Netflix of its right to honest services."

10          THE COURT:  This is interesting because the model

11 instruction does not say "specific intent."

12          MS. JAYNE:  But the comments do.  I mean there's

13 no non-specific intent.

14          THE COURT:  No, the word "specific" -- it can be

15 general intent or specific intent and it's a very big

16 difference.

17          MS. JAYNE:  Oh, in that context.

18          THE COURT:  That's my concern.  You added

19 specific, and then you were taking it out.

20     Specific is not in the jury instruction from the Ninth.

21          MS. JAYNE:  Except that, as your Honor noted, in

22 the comments, "Honest services fraud requires a specific

23 intent to defraud," Kincaid-Chauncey case.

24          THE COURT:  Yes.

25          MS. JAYNE:  And I think I made a mistake.  I did

*Echo Reporting, Inc.*

95

1  not intend to cross off "specific."  I intended to just

2  cross out "and to cheat."

3          THE COURT:  I'm looking for the note in 123 and it

4  must be in the new version.  Let me just --

5          MS. JAYNE:  Nobody's claiming this is a general

6  intent crime.

7          MR. SAMPSON:  Your Honor, we're not disputing

8  <u>Kincaid-Chauncey</u>.

9          THE COURT:  Okay.  So we're going to put

10  "specific" back in but take "and cheat" out.

11          MS. JAYNE:  That's correct.  That was after.

12          THE COURT:  Okay.  "Fourth, Mr. Kail acted with a

13  specific intent to defraud by depriving Netflix of its right

14  to honest services."  Correct?

15          MR. SAMPSON:  Yes, your Honor.

16          THE COURT:  Okay.  "Fifth."  So your fifth is

17  completely unrelated to the Ninth Circuit's fifth.

18          MS. JAYNE:  That's correct.  I'm adding in a

19  definition -- essentially defining "act."

20          THE COURT:  So I'm going to take that out because

21  we've done that.  And I presume -- let me go back to what

22  the Government had.  So they have to find it was material.

23  That's an element of the statutory offense and so --

24          MS. JAYNE:  Yes, I do have material, but I have

25  the statements made or facts omitted were material.

96

1          THE COURT:  Or "were material."  Sorry, sorry.

2          MS. JAYNE:  As opposed to just "act."  But either

3 way --

4          THE COURT:  No, I'm not going to --

5          MS. JAYNE:  -- materiality is obviously there.

6          THE COURT:  Okay.  I'm going to use the Ninth

7 Circuit version here, which is --

8          MS. JAYNE:  "Mr. Kail's act" because we're -- to

9 be consistent.

10          MR. SAMPSON:  Yes, your Honor.

11          THE COURT:  Okay.  So that will then say "Mr.

12 Kail's act was material."

13          MR. SAMPSON:  And, your Honor, I believe that it

14 should say "it had a tendency to influence or was capable of

15 influencing," and then the Government says "a person's" but

16 it should be "an entity's acts."

17          THE COURT:  You say "Netflix acts" or she does.

18 Is "Netflix" okay or is it broader?  Does it include all the

19 vendors?

20          MR. SAMPSON:  Your Honor, I think it may be

21 broader.  So I would say "a person or entity's acts."

22          MS. JAYNE:  But the only victim here is Netflix.

23 The vendors can't possibly be part of this.  There's no

24 allegation that the vendors were defrauded.

25          MR. SAMPSON:  Well, your Honor --

97

1        MS. JAYNE:  I mean that definitely can't be

2    argued.

3        MR. SAMPSON:  The Government's proof at trial is

4    expected to include false statements made by the defendant

5    to vendors as well.

6        THE COURT:  We'll say "a person or entity's acts."

7        MS. JAYNE:  But I would note -- this is clear case

8    law -- that the one defrauded is the one that had to part

9    with money or property, or the one defrauded has to be the

10   one deprived of honest services.

11       So even if, even if there were false statements to

12   other parties, if they're not deprived of any money or

13   property, they can't be part of the allegations.

14       THE COURT:  All right.  Well, we can leave this

15   one vague, "of a person or entity."

16       MS. JAYNE:  I'm just concerned that there might be

17   arguments or positions taking that are inconsistent with the

18   law.

19       THE COURT:  Okay.  And then the sixth element,

20   everyone agrees on as set forth in the defendant's version?

21       MS. JAYNE:  Yes.

22       MR. SAMPSON:  Let me just compare it quickly, your

23   Honor.

24       It's a little bit different from the Government's.  So

25   it says "used or caused someone to use" -- oh, the

98

1  defendant's is consistent with the model.  So we'll make it

2  consistent with the model.

3          THE COURT:  Okay, good.

4      All right.  Now we get to the definitions, and so these

5  definitions should be in the order of the elements.

6      And so, Ms. Jayne, you reorganized them.  You start

7  with fiduciary and that to me would be confusing.

8          MS. JAYNE:  I just copied the Ninth Circuit.

9          THE COURT:  Oh, did you?

10         MS. JAYNE:  Yes.  Does the Government have them in

11  a different order?

12         THE COURT:  Yes, we did.

13         MS. JAYNE:  Oh.

14         THE COURT:  Yes, you did.  There's no question

15  about that.  Okay.

16     Did you modify the Ninth Circuit, except where you --

17  let me back up.

18     Are your italics a change from the Ninth Circuit or a

19  change from the defense -- from the prosecution?

20         MS. JAYNE:  It's just a straight-up addition that

21  was not in the Ninth Circuit or the Government's, but the

22  fiduciary duty and the mere fact, those two I took directly

23  from the Ninth Circuit.

24         THE COURT:  Okay.  And, Mr. Sampson, do you do

25  disagree with that?

*Echo Reporting, Inc.*

99

1    MR. SAMPSON:  Except for the possessive, your
2 Honor, so "person or entity."  Here it says "entity."  It
3 says "his."  I think it should be a "person or entity" and
4 "its."

5    THE COURT:  Okay.

6    MR. SAMPSON:  Sorry, your Honor, I wasn't an
7 English major.

8    THE COURT:  That works.  So you'll make those
9 changes?

10    MR. SAMPSON:  I will, your Honor.

11    THE COURT:  Okay.  So fiduciary duty for --

12    MS. JAYNE:  But are we doing person -- I'm sorry,
13 what person -- there's no doubt that this wasn't like a
14 personal relation -- the only alleged victim is an entity.

15    MR. SAMPSON:  The alleged victim is the entity,
16 your Honor, but an entity acts through people and so false
17 statements were made to people.

18    MS. JAYNE:  But the fiduciary duty isn't to a
19 person.

20    THE COURT:  So -- okay.  I'm looking at Ms.
21 Jayne's:  A fiduciary duty exists whenever one entity places
22 special trust and confidence in another person, the
23 fiduciary, in reliance on the -- that the fiduciary will
24 exercises his discretion and experience.

25    So there's nothing -- that's all fine in what Ms. Jayne

100

1  wrote.  I don't see anything wrong in her first paragraph,

2  do you, Mr. Sampson?  Do you have any objection?

3          MR. SAMPSON:  The entity being Netflix, when an

4  entity, yeah.

5          THE COURT:  Because the fiduciary --

6          MR. SAMPSON:  Your Honor --

7          THE COURT:  -- duty is owed to Netflix, not to any

8  individual at Netflix.

9          MR. SAMPSON:  Yes, your Honor.  I understand.  I

10 think it's fine.

11         THE COURT:  Okay.  Then the next paragraph, "The

12 mere fact that a business relationship arises between two

13 persons does not mean that either" -- oh, okay.

14    So I think you can say "The mere fact that a business

15 relationship arises between" --

16         MS. JAYNE:  Yeah, the Ninth Circuit didn't give

17 that bracketed portion, though they should have.

18         THE COURT:  Right.  So we could say -- this isn't

19 hard -- that --

20         MS. JAYNE:  Between a person and an entity?

21         THE COURT:  Sure.  The mere fact that a business

22 relationship arises between two persons or a person and

23 entity.  Can we just say "or" or do we want to limit it

24 limited to our situation here?

25         MR. SAMPSON:  I would propose deleting the word

101

1  "two" and having "a business relationship arises between

2  persons or" -- well, I'm sorry, your Honor.  That may not be

3  right.

4          MS. JAYNE:  It should just be -- it doesn't even

5  need two -- you're correct -- "between a person and an

6  entity."

7          MR. SAMPSON:  "A person."

8          MS. JAYNE:  Yes.  To track the preceding

9  paragraph.

10         THE COURT:  I'm sorry.  So it will say "The mere

11 fact that a business relationship arises between" -- tell me

12 the language again.

13         MS. JAYNE:  "Between a person and an entity."

14         MR. SAMPSON:  I think that's fine, your Honor.

15         THE COURT:  Do you want to use the word "entity"

16 or "company"?

17         MS. JAYNE:  It doesn't matter.  I think it's just

18 to be consistent, but --

19         THE COURT:  Well, we want to be consistent, but

20 I'm just saying "entity" is sort of weird.  "Entity" is

21 fine, okay.

22         MR. SAMPSON:  "Company" is fine on these facts,

23 your Honor.

24         THE COURT:  So you'll have the drafting pen.  You

25 can decide.  "The mere fact that a business relationship

102

1  arises between a person and an entity does not mean that

2  either owes a fiduciary duty to the other.  If one person

3  engages or employs" -- so, again --

4        MR. SAMPSON:  I would propose deleting just the

5  first -- the word "person."  "If one engages or employs

6  another."

7        THE COURT:  That's good, "and thereafter directs,

8  supervises, the person so employed is not necessarily a

9  fiduciary."  Fine.  "Rather only when one party places and

10 the other accepts the special trust and confidence usually

11 involving professional expertise, that fiduciary" -- and so

12 that's all fine, right?

13       MR. SAMPSON:  Yes.

14       THE COURT:  Okay.  And, Ms. Jayne, where did you

15 get the next paragraph?

16       MS. JAYNE:  Let me look at my argument.

17    I got it from 8.121 and 8.124.  Yeah, because for some

18 reason -- and it's not clear why this would be omitted from

19 honest services fraud because this portion seems relevant.

20 But that's where.

21       THE COURT:  So this -- 8.121 talks about this

22 duty, duty to disclose the omitted facts.

23    Mr. Sampson, it certainly does come right out of the

24 8.121 for mail fraud.

25       MR. SAMPSON:  Right, your Honor, but this is

103

1  honest services in which the fraud is completed when someone
2  violates their fiduciary duty coupled with the duty to
3  disclose.

4      So the defense instructions continually refer to false
5  statements.  And, your Honor, I'm not sure that that's part
6  of the honest services component of wire or mail fraud.

7          MS. JAYNE:  So, Mr. Sampson -- oh, sorry.

8          MR. SAMPSON:  No, go ahead.

9          MS. JAYNE:  You just said "duty to disclose."  If
10 there was an allegation of a duty to disclose, then you have
11 to define what that means and that duty -- and that's where
12 this language comes from.  Duty can arise out of the
13 fiduciary relationship -- or whatnot.  That's the issue
14 here.

15         MR. SAMPSON:  Well, additionally, the Government
16 alleges affirmative false statements and not merely
17 omissions.  And so this is just related to an omissions
18 theory.

19         MS. JAYNE:  Right.  But if you're going to cut the
20 omissions theory, then we can cut this definition.  But if
21 you're including it -- there has to be a duty if you're
22 going under an omissions theory, even --

23         THE COURT:  It does.  That's hornbook law.

24         MS. JAYNE:  Right.

25         MR. KALEBA:  I just think the source of confusion

104

1  is that it's -- this is only one possible basis of liability

2  which is omissions liability.  And I think it could confuse

3  the jurors if it's just sitting right there, because the

4  first time I read this, I kind of read right through that

5  omissions of material facts from the sentence.

6          THE COURT:  Right.

7          MR. KALEBA:  So I would just -- I think it's a

8  question of placing.  It needs to be in the appropriate

9  place because it addresses just one unique theory of

10 liability -- basis of liability.

11         THE COURT:  Well, let's say "in regard to

12 omissions only."  "In regard to omissions of material fact

13 only, you must find."

14     Does that address it, Mr. Kaleba?

15         MR. KALEBA:  Yes, it tracts the language of 121.

16         THE COURT:  "Omissions of material fact only, you

17 must find that Mr. Kail had a duty to disclose the omitted

18 facts."

19     I'm even glad to add a sentence, "This paragraph does

20 not apply to misrepresentations."  Are you -- would that

21 assist?

22         MR. KALEBA:  Yes, your Honor, or "does not apply

23 to false or fraudulent pretenses or representations."

24         THE COURT:  "Does not apply to" -- can I leave it

25 to you to fill in what it does not apply to?

105

1          MR. KALEBA:  Yes, your Honor.

2          MR. SAMPSON:  "This does not apply to false

3  statements, omissions," et cetera from the model.

4          MS. JAYNE:  Don't say "omissions."  It does apply

5  to omissions.

6          MR. SAMPSON:  Thank you.  Thank you.  "Does not

7  apply to false statements" --

8          THE COURT:  And we don't use "et cetera" in the

9  instruction, but you will fill in the things it doesn't

10 apply to, Mr. Sampson.  And then Ms. Jayne can look at it.

11 Does that work?

12         MR. SAMPSON:  That's fine, your Honor.

13         THE COURT:  Okay.  Then the next paragraph is the

14 one sentence.  Is there any objection to that, "A wiring is

15 caused"?

16         MR. SAMPSON:  No, your Honor.  That's from the

17 instruction.

18         THE COURT:  And then "It need not have been

19 reasonably foreseeable."  That one is okay too?

20     And I'm also asking, can we take out "or foreign"?  "A

21 scheme or interstate or foreign wire communication"?  You

22 left the bracket in there.  I didn't know.

23     And I think in yours you have "foreign."  I didn't know

24 why you --

25         MR. SAMPSON:  Your Honor, I'm not aware of foreign

*Echo Reporting, Inc.*

106

1  wires.  I believe they're all domestic.

2          THE COURT:  Let's take that out.

3          MS. JAYNE:  It's in two places so we have to cut

4  it in both.

5          THE COURT:  Where else?  Yes, above at line 16 as

6  well.

7          MS. JAYNE:  "Must be reasonably foreseeable that

8  some wire communication would occur in furtherance of the

9  scheme at an interstate" -- cut "foreign" -- "wire

10  communication unless it actually occurred."

11          MR. SAMPSON:  Yes, your Honor.  I only see one on

12  that page.

13          THE COURT:  There are two, line 16 and line 18.

14          MR. SAMPSON:  Sorry, yes, it was hanging.

15          THE COURT:  So then in -- there's a new paragraph

16  that has nothing to do with fiduciary duty but -- we're

17  moving on to a different issue.  So we've covered fiduciary

18  duty.

19      And then there's -- let's see, the Government has a --

20  you have a lengthy section.  Your number two is "The bribe

21  or kickback in exchange for services."

22          MR. SAMPSON:  And, your Honor, I believe the

23  Government's section two is from Rojas, Judge Koh's

24  instruction.

25          THE COURT:  I think it is.

*Echo Reporting, Inc.*

107

1        MS. JAYNE:  And mine comes from the Seventh
2   Circuit pattern instruction and 41 U.S.C. 522, the statute
3   that defines "kickback" in the public context.  And so there
4   were some adjustments to a company stock being the official
5   act.

6        THE COURT:  So the Government's version includes
7   the quid pro quo portion that you want, Ms. Jayne.

8        MS. JAYNE:  That part if -- in mine, let me look.
9     Right, because it was cut at the top, we would need to
10  include at least that somewhere.

11       THE COURT:  So, Mr. Sampson, you don't actually
12  define what a kickback is.

13       MR. SAMPSON:  No, your Honor.  I think that the
14  definition provided -- I think it's from 42 U.S.C., maybe
15  section 52.  I think it's appropriate for kickback, but then
16  bribe is not defined.

17    And so I think that the first paragraph, which is from
18  Judge Koh's instruction, appropriately defines what both
19  are, which are -- it's the exchange of a thing of value for
20  services by a fiduciary.

21    So, your Honor, we can go further into what exactly the
22  legal definition of a kickback is.

23       THE COURT:  Yeah, I don't think we need so much.
24  I think what the Government has is fine.

25       MS. JAYNE:  Which portion?  I don't object to that

*Echo Reporting, Inc.*

108

1  first sentence if we're cutting -- the second element that

2  the Government must prove.  That paragraph makes sense.  And

3  I --

4          THE COURT:  But I'm not going to include your

5  lengthy one at page 58 of this instruction.  I do -- so

6  looking at page 59 now.

7      And, Mr. Sampson, Ms. Jayne has a last sentence

8  "undisclosed conflicts of interest, secret payments or

9  undisclosed self-dealing alone is not sufficient."  I think

10  that's a correct statement of the law.

11          MR. SAMPSON:  Your Honor, I'm not sure about the

12  secret payments but the other two, I believe that's a

13  correct statement of the law.

14          THE COURT:  Okay.  Well, if we take out "secret

15  payments" --

16          MS. JAYNE:  I did take that directly from -- and I

17  have the cite.  I think that's <u>Anspach</u> but let me just --

18          MR. SAMPSON:  That's an 11th Circuit case?

19          MS. JAYNE:  Right.  That is "conflicts of

20  interest, secret payments or undisclosed self-dealing."  I

21  mean I took that directly from --

22          THE COURT:  So it's not a quid pro quo.  I mean it

23  made alone without the quid pro quo is why it wouldn't be

24  enough.

25          MR. SAMPSON:  Well, your Honor, I think it's

*Echo Reporting, Inc.*

109

1 actually that alone without a duty to disclose.

2          MS. JAYNE:  No.

3          THE COURT:  Well, I'm concerned -- yeah, well,

4 there has to be a duty, but there also has to be a quid pro.

5 That's what we've said.

6          MS. JAYNE:  So the secret payment was from the

7 Anspach case, and the conflict of interest and undisclosed

8 self-dealing comes from Skilling.

9          THE COURT:  Yes, it does.

10          MR. SAMPSON:  Well, I'm not sure it makes much

11 difference, your Honor, because the Government intends to

12 prove essentially beyond what's stated here, and the secret

13 payments were essentially part of the Government's case.

14          THE COURT:  So I would like -- although I'm not

15 willing to give Ms. Jayne's paragraph that says the term

16 "kickback" because I think the Government has covered it, I

17 would like you to add her sentence, "Undisclosed conflicts

18 of interest, secret payments or undisclosed self-dealing

19 alone is not sufficient."  I'd like you to add that.

20      And I don't know quite where you want to put it.  Maybe

21 after the -- right in this paragraph on kickbacks, after

22 "meaning this for that or these for those," and then just

23 put that sentence in.

24          MR. SAMPSON:  Yes, your Honor.

25          THE COURT:  Good.  Okay.

110

1      Then I don't have any problem with the remainder of the

2  Government's section here.  Ms. Jayne, do you?

3           MS. JAYNE:  Let me scroll back up.

4           THE COURT:  I think we've gotten through all of

5  yours now.

6           MS. JAYNE:  Let me just look at -- it was quite

7  lengthy.  And we're talking about after the first -- the top

8  of page 55.

9           THE COURT:  Correct.

10           MS. JAYNE:  "The defendant and the payor" -- let

11  me just read through that real quick, your Honor.

12           THE COURT:  Okay.

13      (Pause.)

14           MS. JAYNE:  I'm not sure what case this comes

15  from.  "It is not a defense to claim the defendant would

16  have taken lawful action even without having accepted a

17  thing of value."

18           THE COURT:  Well, that abrogates quid pro quo.  So

19  if you would have done it anyway, then it's not a quid pro

20  quo by definition.

21           MS. JAYNE:  I'm not sure that's what this is

22  saying.

23           THE COURT:  So this --

24           MS. JAYNE:  It's saying it's not a defense whereas

25  non-quid pro quo is a defense.

111

1        THE COURT:  Mr. Kail can't say "I would have done
2 this anyway."  But he can defend against quid pro quo and
3 say "I didn't do it for something of value.  I was doing it
4 anyway."
5        MS. JAYNE:  But this is saying that's not a
6 defense.  That's the concern.
7        THE COURT:  So I'm not sure that's correct, Mr.
8 Sampson.
9        MR. SAMPSON:  Your Honor, I think the focus of the
10 paragraph is on the act being lawful in and of itself, the
11 contract itself being lawful and not illegal in nature.
12        MS. JAYNE:  What contract?
13        THE COURT:  Oh.
14        MR. SAMPSON:  The official act.
15        THE COURT:  Okay.  So this needs to say it is not
16 a defense to the claim that defendant's conduct was
17 otherwise lawful.
18        MS. JAYNE:  It seems to be opposite of this,
19 correct.  It is --
20        MR. SAMPSON:  But, your Honor, I think that the
21 paragraph which comes from Rojas is getting at the point of
22 honest services, which is that it's violated when there is a
23 bribe or kickback paid to a fiduciary.  It is not a defense
24 to that that the contract is beneficial or valuable or ended
25 up being a good business decision.

*Echo Reporting, Inc.*

112

1       And I think that's what this paragraph is getting at.

2            THE COURT:  That's what you aren't saying.

3            MS. JAYNE:  But that's not what you're actually

4  saying.  You're actually saying even if there wasn't a quid

5  pro quo -- I mean that's the thing.  If the action would

6  have been taken in spite of the exchange, that's a defense.

7  That's the precise defense.

8            MR. SAMPSON:  The Government disagrees.  That is

9  not a legal defense to violating your fiduciary duty through

10  bribes and kickbacks.

11            MS. JAYNE:  This is not --

12            THE COURT:  But I think it's not a defense that

13  the company benefit.  That's what I think you're trying to

14  say.  And that alone I think is fine.  You can't say "Well,

15  I had a kickback but Netflix made off with -- they got a

16  better contract because of it."

17            MS. JAYNE:  That's true, except to the extent that

18  it's a defense to wire fraud.  Not honest services fraud,

19  but to wire fraud that actually requires a pecuniary loss.

20            THE COURT:  Well, because --

21            MS. JAYNE:  So for this purpose, that's correct,

22  but that's not what this paragraph says.

23            THE COURT:  Well, I think this paragraph is not

24  precise.  And I would allow you to say it is not a defense

25  to claim that Netflix benefitted from the conduct.

113

1        MS. JAYNE:  I wrote down "It is not a defense to

2  claim that Netflix benefitted from the conduct."

3        MR. SAMPSON:  I would say the alleged conduct.

4        MS. JAYNE:  Sure.

5        MR. SAMPSON:  But would the last sentence be

6  appropriate, your Honor?

7        THE COURT:  Let me just --

8        MS. JAYNE:  No, it's not.

9        THE COURT:  Let me just read it.

10        Yes, I think the last sentence is fine.

11        MS. JAYNE:  Your Honor, I would object to that.  I

12  didn't see that in any case law.  I understand it's maybe

13  citing to -- and I'm not sure if that case was appealed or

14  what happened, but I've never seen case law that honest

15  services is not concerned with the wisdom of the results of

16  defendant's decisions.

17     I think that goes a step too far and tells the jury

18  something that is not necessary for them to consider.

19     The manner in which the defendant makes the decisions,

20  it's not -- it just seems to take it a step too far away

21  from quid pro quo.

22        MR. SAMPSON:  Your Honor, I anticipate --

23        MS. JAYNE:  The way a defendant made his decisions

24  could have been completely independent of the alleged

25  kickback and that is relevant, his decision-making

114

1 absolutely.  If he had the best interest of the company in

2 mind in making his decisions, that's a complete defense.

3          THE COURT:  Say that again.

4          MS. JAYNE:  If his decision-making was based on

5 having the best interest of the company in mind as opposed

6 to being triggered by or happening as a result of the

7 alleged kickback, that is a defense.

8          THE COURT:  So I took a bribe to benefit Netflix.

9 That will be interesting to sell to the jury.

10          MS. JAYNE:  Well, you're using the word "bribe."

11          THE COURT:  Because it has to be a bribe or

12 kickback.

13          MS. JAYNE:  Right.  So it can be stated

14 differently.

15      I took particular payments that had nothing to do with

16 my decision-making --

17          THE COURT:  Then it's not a bribe.

18          MS. JAYNE:  -- in this particular contract.

19          THE COURT:  Well, then you're arguing it's not a

20 bribe, that's all.

21          MS. JAYNE:  That's right.  That's right, but I

22 think this last sentence attacks the decision-making in a

23 way that's not necessary.  I think it just goes a step too

24 far, inviting error.

25          THE COURT:  Well --

115

1          MS. JAYNE:  I'm not objecting to the Court in its
2  correct statement of the law.  But the benefit, I just don't
3  know that we need something extra there.

4          THE COURT:  Okay.  I'm going to allow that last
5  sentence, Mr. Sampson, with the -- I'm deleting everything
6  above it and substituting "It is not a defense to claim that
7  Netflix benefitted from the alleged conduct.  The offense of
8  honest services fraud is not concerned with the wisdom or
9  results of defendant's decisions but rather with the manner
10  in which the defendant makes his or her decisions."

11      Okay.  And then the next paragraph about not actually
12  succeeding, I think that's fine.

13      And, again, this "knowingly devised or participated,"
14  isn't it "devised or knowingly participated," Mr. Sampson?

15          MR. SAMPSON:  I will make that change.

16          MS. JAYNE:  And I'm going to object to the next
17  sentence.  Again, there's not authority for this to --

18          THE COURT:  You're objecting to what the
19  Government must prove or you're going on to the next
20  paragraph?

21          MS. JAYNE:  Oh, sorry.  I thought we were going to
22  the next paragraph, "Also because people rarely ask."

23          THE COURT:  Okay.  I just want to make sure.  I'm
24  just reading that too.

25          MS. JAYNE:  I think this defeats quid pro quo.  I

116

1 mean it's saying they don't have to prove it.

2      MR. SAMPSON:  I don't think so.  I think it covers

3 scenarios in which there's a quid pro quo, a payment in

4 expectation of something but that there may also have been

5 other motives as well.  So it can't just be -- the crime is

6 committed when there is a quid pro quo, even if there are

7 other motives for it.

8      I think that dovetails with the not concerned with the

9 wisdom or results of the decisions.

10      THE COURT:  Well, why can't we make this simpler

11 and say the quid pro quo need not be the only reason for --

12      MS. JAYNE:  But, your Honor, if there's another

13 reason that's not quid pro quo, that is a defense.  I think

14 this confuses --

15      THE COURT:  Well, but what if there are two

16 reasons for it, one illegal and one legal, and they are both

17 substantial reasons?

18      MS. JAYNE:  I can't even conceptualize what that

19 means or factually how that plays out.  Either the act is in

20 exchange for the kickback or it's not.

21      MR. KALEBA:  Well, if I may add.  For example,

22 this is the Holzer case from the Seventh Circuit.  If a

23 judge takes a bribe from a defendant and gives the defendant

24 the same sentence she was going to give the defendant

25 without taking the bribe, the judge has committed the crime

117

1 of honest services.

2    So even if I'm just focusing, boiling down this

3 paragraph, it's the lines 17 through 19, that I think are

4 kind of the core issue.  If you find that the giver offered

5 or provided a thing of value in exchange for the services,

6 it makes no difference.

7         THE COURT:  That's all we need to have.  I just

8 think we --

9         MS. JAYNE:  But that's already stated.  There's no

10 defense that Netflix benefitted.  We've addressed that.

11         THE COURT:  Well --

12         MR. KALEBA:  And --

13         THE COURT:  -- this is the bribe and kickback

14 provider, not Netflix.  This is the vendor who is providing

15 the bribe.

16         MR. SAMPSON:  The paragraph covers both.  The next

17 sentence --

18         MR. KALEBA:  Right, and then the next sentence is

19 the second part of it.  Exactly.  Sorry, Colin.

20         MR. SAMPSON:  No, that's fine.

21         THE COURT:  Well, I think -- I'd like to boil it

22 down, but I don't actually have a problem with the content.

23    All right.  I'm going to give that.  That's okay.

24         MS. JAYNE:  Okay, your Honor.  And I object that

25 it's -- I don't believe it's a correct statement of the law.

118

1  I think it defeats the defendant's defense and overstates

2  and sort of nullifies quid pro quo.

3          THE COURT:  Okay.  I think it reiterates the quid

4  pro quo, just as Mr. Kaleba suggests.

5      Okay.  Let's move on.  And your objection, I do note

6  that.

7      The "Anything of value includes," is there any

8  objection to that?

9          MS. JAYNE:  I'm going to object that I don't

10 believe it's necessary.  And, again, I'm not --

11         THE COURT:  You don't think it's necessary?

12         MS. JAYNE:  The other instructions in other -- and

13 any Circuit instructions that include that, so I'm going to

14 object to that.

15         MR. SAMPSON:  Your Honor, this case involves not

16 just cash but it also involves stock options.  And although

17 options are not necessarily shares themselves, it's an

18 option --

19         THE COURT:  I think it's an inoffensive statement.

20 I will allow that.

21     Okay.  Then fiduciary duty, we've already covered

22 through the defense request.  So we can move on, correct?

23         MR. SAMPSON:  Yes.  And I think they're

24 essentially identical.

25         THE COURT:  Right.

119

1          MR. SAMPSON:  So we'll delete the Government.

2          THE COURT:  Okay.  Then materiality, any objection

3  to that?  It seems pretty straightforward.

4          MS. JAYNE:  No, I thought we already defined it.

5  But that's fine.  Oh --

6          MR. SAMPSON:  I'm sorry.  I would just add "a

7  person or entity's acts" or -- because I think that's

8  consistent with what we discussed before.

9          THE COURT:  Which -- "The fifth element that the

10  Government must prove is that defendant's acts were

11  material, that is, it had a natural tendency to

12  influence" -- oh, "a person or entity's acts."  Good.

13  That's fine.

14      And then "use of wire or radio communication."  Is

15  there any objection to that?

16          MS. JAYNE:  One moment.

17      No.

18          THE COURT:  Okay.  All right.  I think we've got

19  an instruction.

20      Have I left out anything covered in your instruction?

21  I don't believe so, Ms. Jayne.  I think we got through

22  yours.

23      And, Mr. Sampson --

24          MR. SAMPSON:  Your Honor --

25          THE COURT:  Yes.

120

1          MR. SAMPSON:  -- I would just propose that the

2   defense -- there's a single sentence about wiring, that we

3   just put that before -- we put that into the Government's

4   number five, "use of wire."

5          THE COURT:  Oh.

6          MR. SAMPSON:  So maybe make it the second

7   sentence?

8          THE COURT:  I don't know where that is in Ms.

9   Jayne's.

10         MR. SAMPSON:  On page 58, third paragraph from the

11  bottom, line 14 of 15.

12         THE COURT:  Oh, "a wiring is caused"?

13      So no objection to that, Ms. Jayne?

14         MS. JAYNE:  No.

15         THE COURT:  Good.  Thank you.

16         MS. JAYNE:  Is that going at the end of that

17  paragraph?

18         THE COURT:  No, he was going to put in as -- make

19  it the new second sentence.

20         MS. JAYNE:  The new second sentence.  Okay.

21      (Pause.)

22         THE COURT:  Okay.  So now we have finished number

23  42.

24      All right.  So now it's noon.  We're going to finish

25  this -- I'd really like to finish this today.  We can take

121

1  an hour or 45 minutes to have lunch and come back.

2      What's your preference?

3          MS. JAYNE:  The shorter the better because I'd

4  like to finish this today too, as far as a break.

5          MR. SAMPSON:  I think that's fine with the

6  Government, your Honor.

7          THE COURT:  So how much of a break do you want to

8  take right now?  I think we need a break.

9          MS. JAYNE:  I'm fine with 30 or --

10          THE COURT:  30 is good.

11          MR. SAMPSON:  30 is fine, your Honor.

12          THE COURT:  Tiffany, is that okay?

13          THE CLERK:  Yes, your Honor.

14          THE COURT:  Okay.  So we'll close this out and

15  come back in in 30 minutes, so that will be right at 12:30.

16          MR. SAMPSON:  Yes.

17          MS. JAYNE:  All right.  Thank you, your Honor.

18          MR. SAMPSON:  Thank you, your Honor.

19      (Proceedings recessed to reconvene.)

20

21

22

23

24

25

122

1                    AFTERNOON SESSION

2                         --oOo--

3          THE COURT:  Okay.  I believe we are back together.

4   Everyone is here.  Hopefully you had a chance to swallow a

5   little bit of lunch and move around a little.  I too want to

6   finish this up.  I hope we don't have too much farther to go

7   on it.

8       So I'm to move on to what is now the 42A instruction,

9   and that's page 64, marked down at the bottom, document 141.

10      I recognize, Ms. Jayne, your objection entirely to this

11  being presented to the jury as a separate charge, a separate

12  count -- there's like 100 counts against Mr. Kail right

13  now -- but I think in looking back in the record, I think

14  it's been adequately alleged, and you've made your

15  objection.  It's noted on the record.

16      Okay.  So let me just start with your first argument,

17  Ms. Jayne, because I think we need to address this.  You

18  cite _Kelly_ to modify the crime, the first element being that

19  "The defendant knowingly devised a scheme or plan to defraud

20  or a scheme or plan for obtaining money or property by means

21  of false pretenses."

22      And you suggest that _Kelly_ confirms that it's all about

23  obtaining money or property.  Is that -- did I summarize

24  that?

25          MS. JAYNE:  Yes.  Essentially, your Honor, the

123

1   argument is -- in the event the Court is giving it, which I

2   hear the Court saying they are.

3           THE COURT:  Yeah.

4           MS. JAYNE:  This argument is building up to the --

5   if it is being given, there are supplemental -- at the

6   bottom, there are supplemental proposed instructions.  And

7   in the redline, it doesn't look like it's underlined, but it

8   is.  "Property defined" and "scheme to defraud," they're

9   both underlined.  You just can't tell with the redline.

10      The proposal here is in light of <u>Kelly</u> and in light of

11  all these cases cited in terms of what is truly money or

12  property, that these supplemental instructions are necessary

13  because even the amendments to the Ninth Circuit

14  instructions I think were before <u>Kelly</u>.

15          THE COURT:  So let me just --

16          MS. JAYNE:  At the bottom of page 67 is where the

17  definitions begin, if the Court were to give --

18          THE COURT:  I don't think I made a copy of <u>Kelly</u>.

19  I'm sorry, so I don't have it back to refer back to.

20          MS. JAYNE:  And I've given quite a number of cites

21  from it and that's in the pages of argument.

22          THE COURT:  Yeah.  And so you would -- obviously,

23  it's a brand-new decision, the model jury instructions

24  haven't kept up with it.

25      So, Mr. Sampson, what's your take on that?

124

1          MR. SAMPSON:  I'm sorry, your Honor.  I did miss a
2   little of the back-and-forth.  I'm having connection
3   problems on my phone now.
4          THE COURT:  Oh.
5          MR. SAMPSON:  But generally, your Honor, I'm not
6   sure it's appropriate to include both obtaining property
7   and -- I'm sorry?
8          THE COURT:  Oh, now we're losing you.
9          MR. SAMPSON:  I am logged in on my computer and so
10  why don't I give that a try.  It will only take a second.
11          THE COURT:  Okay.
12          MR. SAMPSON:  Your Honor, I'm trying to join from
13  my computer and then I'll switch the audio over and hope
14  that that works, and I apologize.
15          THE COURT:  No, I hear you.  Okay.  Well, we'll
16  just make it work.
17       (Pause.)
18          MR. SAMPSON:  And to avoid duplication, I think I
19  have to log out of one.
20          THE COURT:  You at least have to put it on mute.
21  I don't know if you have to log out, but you have to put it
22  on mute.
23          MR. SAMPSON:  Can your Honor hear me?
24          THE COURT:  I can.  And if you could take the
25  video off the other one, that would help me.

125

1          MR. SAMPSON:  Thank you.

2          THE COURT:  Oh, I lost you on your computer -- oh,

3  no, maybe I didn't.  Okay.  I got --

4          MR. SAMPSON:  You lost me on the phone?

5          THE COURT:  On the phone.

6      Okay.  All right.  So the question is does <u>Kelly</u> change

7  this instruction to require that the victim lost money or

8  property.

9      And if I misstate that, Ms. Jayne, please help me.

10         MS. JAYNE:  That was exactly the issue.  These

11 other issues, the right to contract, other things that

12 aren't actual money or property, I think that was why that

13 conviction was overturned.  This was the one in New Jersey,

14 Bridgegate as it was called.

15         THE COURT:  Yes --

16         MS. JAYNE:  There were incidental costs.

17         THE COURT:  Yeah, it was a little -- the facts in

18 <u>Kelly</u> are so different that it was a little hard to track.

19         MR. SAMPSON:  Yes, your Honor.  The Government

20 agrees.  It's an official corruption case, it's a government

21 employee case.  And I think that the Ninth Circuit

22 instruction is just tried and true and should be given.

23         THE COURT:  So, Mr. Sampson, but this is where we

24 bring in deceive and cheat, and it's not just about fraud

25 but it's depriving of property, isn't it, or money?

126

1           MR. SAMPSON:  It is money or property, yes.

2           THE COURT:  Okay.  So then the question still

3 remains, even if <u>Kelly</u> isn't an exact overlay on this, I am

4 concerned about "devised a scheme or plan to defraud" being

5 separate from "a scheme or plan for obtaining money or

6 property by means of false representations."

7           MS. JAYNE:  Your Honor, money obviously doesn't

8 need to be defined, but the key here is defining property.

9 I think that's something --

10          THE COURT:  I couldn't hear that.  Say that again.

11          MS. JAYNE:  I said the issue is not obviously

12 defining money.  It's defining what is property.  And that

13 was the key in <u>Kelly</u>, and I think we'll see this in

14 instructions over the year being modified to comport with

15 this, is what is property.

16          THE COURT:  Okay.

17          MS. JAYNE:  They're various rights, but they're

18 not property.  And that's what this is about is define

19 property and scheme to defraud property.  That's -- the

20 instructions were as narrow as can be to comport with --

21          THE COURT:  So you're just adding a definition of

22 property --

23          MS. JAYNE:  And scheme to --

24          THE COURT:  Defraud.

25          MS. JAYNE:  Of property, not changing the money

127

1  portion.  Nobody needs it to be defined.

2            THE COURT:  Right.

3            MR. SAMPSON:  I'm not sure if Mr. Kaleba has other

4  thoughts, but I don't have strong feelings about deleting

5  the words "scheme or plan to defraud" as long as we keep

6  "scheme or plan for obtaining money or property by false or

7  fraudulent pretenses."

8            MS. JAYNE:  So I'm not proposing changing anything

9  in your instruction.  I'm proposing --

10           THE COURT:  Right.  That's what I'm seeing.  Okay.

11 There's an agreement to give the instruction with the

12 elements with definitions.  Is that your position, Ms.

13 Jayne?

14           MS. JAYNE:  My position is if the Court is going

15 to give it -- I mean I object to the entirety of it, let me

16 make that clear -- but if it's being given, the model

17 instruction is fine as it is, but in light of <u>Kelly</u>, a

18 supplemental instruction, just like after <u>Miller</u> if the

19 Ninth Circuit hadn't changed that language, we would be

20 manually changing "deceive and to cheat."

21      The Ninth Circuit was able to come in, make that

22 change, but the Ninth Circuit hasn't come around post <u>Kelly</u>.

23 But I believe it will.

24           THE COURT:  But I'm just trying to understand.

25 Would you make this an instruction that is completely

*Echo Reporting, Inc.*

128

1   separate from 42A and make it a 42B?

2          MS. JAYNE:  I don't know that it's -- either way.

3   For example, we have instructions we've discussed where we

4   say we define materiality.  We define -- you know, we've

5   done it both ways where intent to defraud is separate.

6       I think could be either way.

7          THE COURT:  Well, I'm only --

8          MS. JAYNE:  -- but it's just qualifying --

9          THE COURT:  Because you worded this a property --

10  you related yours -- I'm looking at page 68 -- "as used in

11  the mail and wire fraud instructions," which means I can't

12  include this within the wire fraud instruction.

13         MS. JAYNE:  Your Honor, I did that to be succinct.

14  I think this could follow mail fraud and wire fraud or we

15  can put it in twice and just delete the word "mail" on the

16  wire one and delete the word "wire" on the mail one.

17         THE COURT:  I prefer to do it twice and have a

18  complete instruction.

19         MS. JAYNE:  Twice, that's fine.

20         MR. SAMPSON:  So, your Honor, the Government is

21  looking at the actual proposed instruction on page 68, their

22  proposed definition.  I don't object to the first two

23  sentences, but then the rest of it is essentially saying

24  what is not on a services fraud.

25      And if this is a definition that should be included in

129

1  the wire and mail fraud statutes, a scheme to defraud money

2  or property, then it shouldn't have all of these caveats

3  about employer policies --

4          THE COURT:  Right.

5          MR. SAMPSON:  -- business decisions.  That

6  confuses the issues, I believe.

7          THE COURT:  All right.  I actually agree.  Let me

8  break this up.

9      So the first paragraph on page 68 you don't object to.

10          MR. SAMPSON:  The first two sentences.  The last

11 two are problematic in the Government's view.

12          MS. JAYNE:  The last one is expressly addressed in

13 Kelly.  That's the issue here.

14          MR. SAMPSON:  Well, I'm not sure Kelly is

15 applicable to a straight wire fraud or mail fraud theory.

16      Kelly applies to honest services fraud.

17          MS. JAYNE:  Well, no, there were multiple charges

18 there.  But the idea is -- it doesn't apply to honest

19 services because honest services fraud isn't property.

20 That's the whole point.

21          THE COURT:  You know what, I think -- I don't

22 define things, but I'm going to take out the second two

23 sentences, so the right to make business decisions.  We've

24 talked about that elsewhere.  And the next sentence:  An

25 employee's right to its honest services is not property

130

1 either. I think we're going to define it by what it is.

2 And then at line four, you just say "scheme to defraud

3 the victim of" quote, "property - defined." I don't

4 understand.

5 MS. JAYNE: This is underlined. This is where,

6 because of the redline, your Honor can't tell that it's

7 another definition. I should have bolded it instead of --

8 THE COURT: But what's the definition?

9 "Accordingly" is the definition?

10 MS. JAYNE: "Accordingly," yes.

11 THE COURT: Oh, okay. We don't have to --

12 MS. JAYNE: This is the header.

13 THE COURT: We're going to say "a scheme to

14 defraud the victim of property is." Okay.

15 Okay. "A scheme is" -- well, then this doesn't really

16 work. It's not a definition. I mean you don't make this a

17 definition.

18 MS. JAYNE: I could certainly reword it to be a --

19 I think it's more of an explanation.

20 THE COURT: I'm not sure we need this at all. The

21 last sentence, "scheming to influence" -- so I'm not sure I

22 understand any of this. And I think that this is really

23 your argument, based on the remainder of the instructions.

24 MS. JAYNE: Well, your Honor, this is the critical

25 difference with mail and wire fraud. It's causing the

131

1 victim to pay out more or receive less pecuniary value than

2 it otherwise would have.  This is what distinguishes it from

3 honest services.

4            THE COURT:  That's fine, but that's not what you

5 said here.

6            MS. JAYNE:  I do have that.

7            THE COURT:  This is your argument.  This is not a

8 jury instruction.  "Even if you find defendant violated his

9 employer's policies, this is not standing alone enough."  We

10 said that already.

11     "The Government must prove that defendant's scheme to

12 take something of economic value."  We just said that above,

13 from the victim.  This is just repetitive of what we've

14 already said.

15            MS. JAYNE:  I think the last sentence in terms of

16 pay out more, receive less, that's the crux of it as well.

17            THE COURT:  I'm not going to -- this scheme to

18 defraud, it makes no sense to me and I'm not going to allow

19 it.

20     Okay.  So let me just go back.

21     Mr. Sampson, because this is a second run-through for

22 the jury on the same charges, I think maybe it should say at

23 the very beginning, "The defendant is also charged in Counts

24 One through 19 with wire fraud."

25            MR. SAMPSON:  I agree, your Honor.

132

1       THE COURT:  Okay.  All right.  So I'm to give the
2  Government's instruction.
3       I'm going to add the definition of property with -- a
4  part of the definition of property, the first two sentences.
5       And I'm going to deny the scheme to defraud.  You can
6  argue all of that, but I'm not prepared to give that.  I
7  don't actually even understand what you're saying in
8  relation to what this instruction is trying to do.
9       MS. JAYNE:  So the instruction will start with
10 "The Government has also"?
11      THE COURT:  The instruction is exactly the way the
12 Government prepared it in terms of the elements.  I'm just
13 saying "The defendant is also charged in Counts One through
14 19."  The elements are one, two, three, four.
15      And then the omission theory you don't object to, I
16 presume, is that correct, in the Government's version, duty
17 to disclose, that's all -- you --
18      MS. JAYNE:  I probably should go line by line with
19 the Ninth Circuit.  I don't remember if I did that.  But
20 I'll look over that.
21      THE COURT:  Okay.
22      MR. SAMPSON:  And, your Honor, with respect to the
23 identical paragraph about omissions, I think you added the
24 word "only."  I defer to the Court as to whether you want to
25 include "only."

133

1        THE COURT:  Yes, okay.  Yeah, if you want to bring

2   that language forward to make it clear.  This doesn't apply

3   to the misreps and -- that would be fine.

4        MS. JAYNE:  So if we're tracking 8.123, I think

5   the first element needs to be -- sorry, I'm trying to

6   find --

7        THE COURT:  You want 8.123 --

8        MS. JAYNE:  I think that's the one the

9   Government's tracking.  I'm just looking -- okay.

10       MR. SAMPSON:  Well, it's actually --

11       MS. JAYNE:  You were going to make those changes,

12   right, "knowingly participated"?

13       MR. SAMPSON:  Just to confirm, the Government's

14   instruction I think is 8.124, the straight wire fraud

15   instruction.

16       THE COURT:  I'm sorry, I didn't --

17       MS. JAYNE:  8.124 and then your -- I have to find

18   it, sorry.  Now I'm lost on my Word document.

19    42A.  Let me make sure I'm on the right -- okay.

20    And then we're talking about page 64 as compared to

21   8.124.  Is that right, Mr. Sampson?

22       MR. SAMPSON:  Yes.  8.124.  I'm just going through

23   the four elements.  And what we proposed in the redline

24   format I believe is word for word.  It includes the optional

25   paragraph about "to convict based on the omission of

134

1 material fact." But it is otherwise word for word.

2          MS. JAYNE: Okay. "The defendant knowingly

3 devised" -- okay.

4      Okay. And then at the end of it will be the additional

5 two sentences or --

6          THE COURT: And then will be the addition of

7 property which will say "A property interest is an economic

8 interest," your first two sentences on page 68.

9          MS. JAYNE: Thank you.

10          THE COURT: Okay. Mr. Sampson, you have all of

11 that?

12          MR. SAMPSON: I have all of that. Your Honor,

13 just to confirm, should I include the word "only," line 16

14 on page 64 after the -- before the first comma? Because

15 that would be consistent with what we discussed for 42.

16          THE COURT: That's not quite -- let me go back to

17 that language.

18          MS. JAYNE: Which line?

19          MR. SAMPSON: 16.

20          MS. JAYNE: Line 16 on page 64.

21          MR. SAMPSON: "To convict defendant of wire fraud

22 based on omissions or material facts only."

23          THE COURT: Well, it doesn't quite read properly.

24          MS. JAYNE: You added that?

25          MR. SAMPSON: The word "only" and that's because

135

1  when we were discussing Ms. Jayne's instruction for 42, it's

2  an identical paragraph, but we amended it to say, "with

3  regard to omissions of material facts only."

4          THE COURT:  But it has to say "In regard to,"

5  which is what it doesn't say.  That's why it doesn't quite

6  flow.

7          MR. SAMPSON:  I see.

8          THE COURT:  So in 42, we said "In regard to

9  omissions of material fact only, you must find."  So here,

10 rather than in determining -- or rather "To convict."  So

11 that was the change.

12     "In regard to omissions of material fact" and then

13 "only, you must find that."  And then at the end we added

14 "This paragraph does not apply to," and you were going to

15 make the list of what it didn't apply to.  Okay?  That's the

16 parallel, and I think that makes -- it just flows better.

17 Okay?

18     Are we ready to move on?

19          MR. SAMPSON:  Yes, your Honor.  So for this one, I

20 should add "This paragraph does not apply to honest

21 services"?

22          THE COURT:  No.  It doesn't apply to

23 misrepresentations --

24          MR. SAMPSON:  I see, yes, false statements, yes.

25          THE COURT:  False statements.  Omissions require

136

1  the duty but the false statements don't.  Okay?

2          MR. SAMPSON:  Yes, your Honor.

3          THE COURT:  So we're not even talking about honest

4  services here.  This is not the honest services instruction.

5      Okay.  43.  This is back to honest services, but with

6  the mail fraud so "Defendant Michael Kail is charging

7  counts, 22 to 29 with violation of."

8      Okay.  So --

9          MS. JAYNE:  But I think it actually should say

10 honest services -- I think this can track the one we already

11 did, but it's mail instead of wire.  And I think the opening

12 paragraph can be amended just a little bit to be clear that

13 this is now referring to honest services mail fraud.

14         THE COURT:  So it says "Mail fraud," dash, "honest

15 services."  You just want to switch that to say "Honest

16 services mail fraud"?

17         MS. JAYNE:  No, no.  I mean that first line I

18 think this was, again, written before the Government added

19 the alternate theory.

20         THE COURT:  That's correct.

21     Do you agree, Mr. Sampson?

22         MR. SAMPSON:  I agree.  And I agree that we should

23 do that to 42 as well.

24         THE COURT:  Yes.  Yes.

25         MR. SAMPSON:  That's page --

137

1           THE COURT:  And you have that.

2           MR. SAMPSON:  Oh, it's --

3           THE COURT:  So you did that in 42.  You said "The

4   crime of honest services fraud by" -- wire communication.

5   So this -- and you can make it parallel or just say, "Honest

6   services mail fraud."

7           MR. SAMPSON:  Yes, your Honor, except that I

8   thought we were not going to use the Government's proposed

9   introductory paragraph and we were going to use the

10  defendant's in 42.

11          THE COURT:  Oh, that's --

12          MS. JAYNE:  Use yours.  Colin, just use yours

13  because you have -- I think I didn't change it because I

14  forgot or that was before you had made the alternate theory.

15          MR. SAMPSON:  And they're essentially -- okay.

16  Understood.  Understood.

17          THE COURT:  So is this only -- so both of you make

18  the same statement here.  In the caption you call it 1341

19  and 1346.  But in the first paragraph you only say 1341.  So

20  that's a mistake, isn't it?

21          MR. SAMPSON:  We can add 1346.

22          THE COURT:  Well, you need to because you have a

23  separate one for 1341, don't you?

24          MR. SAMPSON:  That's right.

25          MS. JAYNE:  Yes.

138

1    THE COURT:  Okay.  And then the instruction -- so
2  whose introduction do you want to use?

3    MS. JAYNE:  I think the Government's because mine
4  was prior to knowing that there would be an alternative
5  theory.

6    THE COURT:  Okay.  So "Defendant Michael Kail is
7  charged in Counts 20 through 22 with honest services mail
8  fraud, in violation of sections 1341 and 1346 of Title 18 of
9  the U.S. Code.  In order for the defendant to be found
10  guilty of these charges, the Government must prove each of
11  the following elements beyond a reasonable doubt.  First,
12  the defendant devised" or knowingly -- can we take out
13  "devised of" again?

14    Do you see that typo there, Mr. Sampson?

15    MR. SAMPSON:  Yes, your Honor, "devised or
16  knowingly participated."

17    THE COURT:  Right, "in the scheme."  Okay.

18    So are the elements -- then this will be identical,
19  substituting "mailing" for "wire," to 42.

20    MR. SAMPSON:  Just confirming.  I believe that's
21  right.

22    THE COURT:  Okay.

23    MR. SAMPSON:  And I will put the first word of
24  each paragraph in bold.

25    THE COURT:  Thank you, yes.

139

1           MR. SAMPSON:  And refer to "Mr. Kail" and not "the
2  defendant."

3           THE COURT:  I'd prefer that, yes.

4           MR. SAMPSON:  The word "specific" for specific
5  intent, your Honor?

6           THE COURT:  Yes.

7           MR. SAMPSON:  The fourth paragraph.

8           THE COURT:  Yes.

9           MR. SAMPSON:  And for fifth paragraph, "person or
10 entity's acts."

11          THE COURT:  "Person or entity" -- yes.

12     Okay.  Is that -- now, what about all the definitions.
13 Because the definitions are included in 42 for a different
14 crime, you would need to bring them forward to this one and
15 repeat them.  And that's typically -- so when I read them,
16 it's really tedious.  But when the jury is looking at a
17 particular account, I'd like them to all be together.  Okay?

18          MS. JAYNE:  Right, so they don't have to keep
19 looking back for another one.

20          THE COURT:  So we don't have to find them.  That's
21 right, that's right.

22     So we will add -- and I think they're all the same,
23 aren't they?

24          MS. JAYNE:  Except for wire, mail.

25          THE COURT:  Except for the wire versus mail.

140

1    MR. SAMPSON:  Yes, your Honor.  Understood.

2    THE COURT:  So that one we can do.  So we're

3 essentially done with this one.

4    Okay.  Then we go to 42A.  And I note Ms. Jayne's

5 objection to this instruction, and that is noted for the

6 record.

7    So now, this is the straight mail fraud.

8    MS. JAYNE:  This is the same.  We've already done

9 this.

10    THE COURT:  We've done this.  So I only noted -- I

11 think this is a typo at line 16, "to convict the defendant

12 of wire fraud," it says.  That should be "mail."

13    MR. SAMPSON:  Thank you, your Honor.

14    THE COURT:  And if there were any definitions,

15 then you'll carry them forward.

16    MS. JAYNE:  That's going to be exactly the same

17 except for "mail" or "wire," right?

18    THE COURT:  Yes.

19    MS. JAYNE:  That's 42A.

20    THE COURT:  Yes.  Okay.  All right.  So now we are

21 at the good faith defense.

22    I would like you to also -- and I'm going to find mine

23 too -- go back to instruction 35, because I'm wondering if

24 these can't be combined or at least read one after the

25 other.  And let me just find --

141

1     MR. SAMPSON:  That's on page 45, your Honor.

2     THE COURT:  Yes, I got it.  Thank you.

3     So I note that number 35 on intent to defraud is

4 limited, so we -- okay, we were adding a 35A.  So we've got

5 35 for honest services and 35A will be for mail and wire

6 fraud.  None of this applies to money laundering.  So this

7 is two instructions.  We split 35.

8     But isn't the good faith an additional concept related

9 to intent to defraud?

10     MS. JAYNE:  Yes.

11     THE COURT:  So I'm glad to make your good -- I

12 mean it's your theory of the case.  I have an obligation to

13 give your instructions for your theory, and it may be that

14 44 is just going to be given after 35, and 35 is to be given

15 after 42 and 43.

16     So I'm just really pulling that forward.  I just wanted

17 us to look back at this, because we talked about this a

18 moment ago when we talked about 35.  And so if they're

19 either combined or one read after the other, we may be able

20 to shorten this.

21     MS. JAYNE:  I'm fine with having it in different

22 places when it relates to a particular instruction.

23     THE COURT:  So if I have a 35 and a 35A -- oh, I

24 see.  We may only need one of these because this would apply

25 to all counts.  Is that what you're saying?

142

1          MS. JAYNE:  Well, I'm not going to overstate.  It
2  does apply to wire fraud and mail fraud and frankly honest
3  services fraud.

4          THE COURT:  Any of the services.  Okay.

5          MS. JAYNE:  Yes.  And, again, I didn't have
6  that --

7          THE COURT:  Is a complete defense to wire fraud,
8  mail fraud and honest services?

9          MS. JAYNE:  Yes.  I think that's correct.

10          MR. SAMPSON:  Your Honor, the Government does
11  object to the language.  So going to paragraph -- sorry,
12  model instruction 5.12, the paragraph that was given in
13  <u>Molinaro</u> is very different from this paragraph.  It doesn't
14  say it's a complete defense.

15      And so in addition to the Government's argument that
16  <u>Molinaro</u> -- that this instruction is not necessary under
17  <u>Shipsey</u> and I think <u>Miller</u> --

18          THE COURT:  Well, <u>Shipsey</u> was overruled, but maybe
19  not on that ground.

20          MS. JAYNE:  I think I was just taking it from
21  Judge Breyer's instruction.  Yeah, that was in <u>Prince</u> the
22  complete defense language.

23          THE COURT:  Well, I don't have good faith in my
24  old book, so I can't -- I'm sorry.

25          MS. JAYNE:  And there's <u>Almani</u> (phonetic).

*Echo Reporting, Inc.*

143

1    THE COURT:  I guess I need to print out a new
2 binder.  This is too old now.
3    MS. JAYNE:  My argument just cites to various
4 cases --
5    THE COURT:  But, Mr. Sampson, you were telling me
6 this doesn't track the Ninth Circuit instruction.
7    MR. SAMPSON:  Well, your Honor, there is not an
8 actual Ninth Circuit instruction on good faith.
9    THE COURT:  Oh, okay.
10    MR. SAMPSON:  But 5.12, which is essentially 35
11 that we're discussing --
12    THE COURT:  Yes.
13    MR. SAMPSON:  -- the other side of the coin --
14 provides a paragraph that would be proposed and was approved
15 in Molinaro, but it is not the same as what's proposed by
16 the defense here.
17    So I'm saying that if there is a good faith
18 instruction, it should reflect what Molinaro provided and
19 not necessarily --
20    THE COURT:  And I don't know what that is.  That's
21 something I don't have in front of me.
22    MR. SAMPSON:  Yes, your Honor.  I can read it from
23 the Ninth Circuit website.
24    MS. JAYNE:  That was, again, about the specific
25 misrepresentations alleged in the indictment, which I think

144

1  we discussed as just too broad and too vague.  So instead of

2  that, I was taking the language used by Judge Breyer and of

3  course inserting charges of wire fraud, mail fraud, honest

4  services fraud, as opposed to what they --

5        MR. SAMPSON:  Well, I think Judge Breyer's

6  instruction, which is quoted on page 76, is also different

7  from the proposed instruction here.

8        THE COURT:  I'm sorry, can you read it to me.  I

9  don't know what it says.

10        MR. SAMPSON:  Judge Breyer's instruction?

11        THE COURT:  I don't have that.  I'd love to --

12        MS. JAYNE:  It's in my argument following my

13  proposed instruction, it's right there.  So on page --

14        MR. SAMPSON:  76.

15        THE COURT:  I'm sorry.  I'm at page 67.  So is

16  that the "Nevertheless if you find."  I'm trying to find it.

17        MS. JAYNE:  If you go to ECF 141 --

18        THE COURT:  I've got it.

19        MS. JAYNE:  -- page 74.

20        THE COURT:  I've got it.

21     So, yeah --

22        MR. SAMPSON:  Oh, I'm sorry.  There's another

23  Judge Breyer quote two pages later --

24        THE COURT:  Oh.

25        MR. SAMPSON:  -- from the Reyes case.  I'm sorry.

145

1     So, yes, the block quote -- well, the block quote is
2   also different.

3           THE COURT:  So I like what Judge Breyer said.
4   This I think dovetails better with the intent to defraud.
5   "Good faith is a complete defense to the charge of wire
6   fraud.  A defendant is not required to prove good faith.
7   The Government must prove intent to defraud beyond a
8   reasonable doubt."

9     I like that, and I think that's helpful.  "An honestly
10  held opinion or an honestly formed belief cannot provide
11  fraudulent intent, even if the opinion or belief is
12  mistaken."

13          MS. JAYNE:  And of course we would say "Good faith
14  is a complete defense to" -- there it was wire fraud, but
15  here we would add the others.

16          THE COURT:  Of course.  Why don't we give Judge
17  Breyer's instruction, all three of those paragraphs.

18          MR. SAMPSON:  Your Honor, the Government doesn't
19  object if the Court thinks the good faith instruction is
20  appropriate.  As we argued in the objection to this
21  instruction, however, the defendant -- there has to be some
22  support -- some foundation in the evidence to give it.

23    And so the Government after the defense case may object
24  if the defense does not provide any support for the good
25  faith defense.

146

1        THE COURT:  And I think that is certainly

2  justified for you to reserve that objection.

3        MR. SAMPSON:  Thank you, your Honor.

4        THE COURT:  Ms. Jayne, I would like -- instead of

5  what you provided, I would like to give Judge Breyer's

6  instruction.

7        MS. JAYNE:  Okay.

8        THE COURT:  And I think that applies to mail,

9  wire, and honest services fraud.  Do you agree?

10        MS. JAYNE:  I do.

11        THE COURT:  So if you would prepare that.

12        MS. JAYNE:  So it will be mail fraud, wire fraud,

13  and honest services fraud.

14        MR. SAMPSON:  Your Honor, perhaps we should say

15  "Good faith is a complete defense to the charges One

16  through" --

17        THE COURT:  Oh, "of mail fraud, wire fraud, and

18  honest services fraud alleged in Counts One through 22."

19  Does that work?

20        MS. JAYNE:  Yes.

21        MR. SAMPSON:  It works for the Government.

22        THE COURT:  Okay.  So you will -- that's how we

23  will do number 44.

24      Okay.  We're at number 45.  And this is stipulated.

25  You will just bold the first, second, third, fourth and

147

1  fifth for me.  And there are no objections to it.

2      That's a relief, after what we've been through.

3          MR. SAMPSON:  We're almost done.

4          THE COURT:  Okay.  So now, Mr. Kaltsas, this is

5  your turn.

6      We are going to turn to a whole new realm that --

7          MR. KALTSAS:  Happy to do so, your Honor.

8          THE COURT:  I bet you are.  We've gotten a lot --

9  okay.  I want to -- let's see.

10     And, Mr. Sampson, we've agreed, you're going to add a

11 unanimity instruction.  We didn't actually look at one.

12         MR. SAMPSON:  So, your Honor, 7.9 in the model, it

13 doesn't actually provide language necessarily.  But there is

14 a lengthy commentary.  I was looking at it during our short

15 break.

16     With your Honor's brief indulgence, I'm going to go to

17 that section.

18         THE COURT:  Yeah, I have that.  Yes.

19         MR. SAMPSON:  And it looks like -- in one of the

20 last paragraphs, first sentence, it looks like it should be

21 added to maybe the verdict instruction with the words, "With

22 all of you agreeing as to" blank.

23         THE COURT:  You know what I'm going to recommend

24 you do, Mr. Sampson, open up the California State jury

25 instruction on unanimity and see if that helps you with

*Echo Reporting, Inc.*

148

1 language.  You'll have to compare it to the federal law
2 that, but it's a big deal -- I said it's a big deal in state
3 law.  And so you just might find language that you find
4 helpful.
5          MR. SAMPSON:  I will look at it, your Honor.  I
6 don't have a quick link to that, but I will find it.
7          MS. JAYNE:  Mr. Sampson, also if you want to just
8 me over a draft, I'll start with your draft and then respond
9 to that, redline, et cetera.
10          MR. SAMPSON:  Thank you.
11      So let's now turn to forfeiture.
12      Mr. Kaltsas, I gather you've made a little bit of a
13 specialty of this area?
14          MR. KALTSAS:  I'm a forfeiture Assistant United
15 States Attorney, your Honor.  So it's complicated enough
16 that it merits a specialty.
17          THE COURT:  And, you know, when I worked in the
18 District Attorney's Office in San Mateo, they have
19 specialist in that office as well, so I'm familiar with
20 that, yes.  It wasn't me.  And that was a long time ago.
21      So let me tell you what I think the bottom line is,
22 having read your briefs.  And then I'm going to wind it back
23 and hear some arguments, but I want you to know where I am,
24 so you can tell me where I'm wrong.
25      I think that the dispute between you is whether the

149

1 entire property is subject to forfeiture or only the $70,000

2 or that percentage of the value.

3     I don't think that's a jury issue.  I think it --

4 ultimately it's an Eighth Amendment issue, but I don't think

5 the jury makes the determination.

6     And I don't even see anything in Ms. Jayne's

7 instruction that would allow the jury to make that decision.

8 Her verdict form tells the jury it's 3.2 percent, as opposed

9 to what percent do you think it is that has the nexus.

10     It seems to me from reading what you've given me and

11 reading the statutes -- and I'm not really relying on 1957,

12 because that's the crime.  I'm relying on 982, which is the

13 forfeiture statute, and that puts us in a different realm.

14     So it appears to me that the only issue for the jury to

15 determine is the nexus, which makes this whole conversation

16 pretty straightforward.

17     I think, Mr. Kaltsas, that's what you told me in your

18 brief?  That was your position?

19         MR. KALTSAS:  That is the United States' position,

20 your Honor.

21     So as far as any percentages or how much of a property

22 is forfeitable, that's something the Court can take up after

23 the jury makes the determination regarding nexus.  And

24 that's also the appropriate time to handle things like

25 amendment challenges or anything like that.

*Echo Reporting, Inc.*

150

1    But as far as the jury's role, it is pretty limited.
2 And Rule 32.2 gives the Court a lot of leeway to handle a
3 lot of things after the jury makes its determination.

4          THE COURT:  It does.  Let me just -- let's see.
5 And I don't actually understand what a facilitation theory
6 is.  Mr. Kaltsas, are you going to tell me that's not your
7 theory or do I need to understand it?

8          MR. KALTSAS:  So, your Honor, it's not exactly the
9 theory, but there are different levels of what's
10 forfeitable, depending on what statute you're talking about.

11    So facilitation is typically something we talk about in
12 the drug context.  So if there's a drug transaction, for
13 example, you can take a car that is used to deliver drugs,
14 let's say, across the Bay Area or a house that is used as
15 sort of like a stash house or something.

16    But wire fraud and stuff like that, it's limited to the
17 proceeds of the crime.  So that's a proceeds theory.

18    Money laundering kind of encompasses all of that to
19 what's called involved-in property.  So anything that
20 facilitates the criminal activity that's charged, that kind
21 of gets lumped in to the forfeiture.

22          THE COURT:  Well, there's nothing here that --
23 you're not alleging anything that facilitated the money
24 laundering.  This is kind of the fruits of the money
25 laundering, how it was used to benefit Mr. Kail.  Would that

151

1 be right?

2      MR. KALTSAS:  That's right.  So because the

3 property was the subject to the money laundering

4 transaction, that's included in the involved-in language of

5 the statute.

6      THE COURT:  It's involved in, but not as a

7 facilitation theory.

8      MR. KALTSAS:  Correct.

9      THE COURT:  Okay.  I just wanted to understand.

10 Ms. Jayne made that in her supplemental reply or her -- I

11 don't know what brief that was, her last one that she filed.

12   And I -- let me just get -- so is it your position, Mr.

13 Kaltsas, that 21 U.S.C. 853 is not relevant to me?

14      MR. KALTSAS:  Your Honor, it will become relevant

15 later.  It's a lot of like the procedural aspects of

16 forfeiture.  It's confusing because the earlier parts of the

17 statute are also the drug forfeiture statute.  But it's

18 incorporated by reference in 982 and a whole bunch of other

19 statutes just because it gives you the steps of how

20 post-trial proceedings go.

21   So it's not so relevant for our discussion right now,

22 but I just wanted to put it on your radar because it will

23 become relevant later.

24      THE COURT:  Okay.  So I'm looking at the Rule

25 32.2, forfeiture phase of the trial.  It says the -- "After

*Echo Reporting, Inc.*

ER-528

152

1 a verdict of guilty" --

2          MR. KALTSAS:  It is a lengthy rule, your Honor.

3          THE COURT:  -- "the court must determine what

4 the" -- "the court must determine" -- that's what I'm

5 stopping on -- "what property is subject to forfeiture under

6 the statute."

7      And so there's no dispute that the house is the

8 property, or is it that the UNIX mercenary account is the

9 property?

10          MR. KALTSAS:  The house would be the property in

11 this case, your Honor.  And that applies only when we do

12 have specific property.

13      So I'm sure you're familiar, your Honor, in a lot of

14 cases we have forfeiture money judgments.  There is no right

15 to a jury trial in those cases.

16          THE COURT:  Okay.  But then it goes on to say,

17 "The court must determine the nexus."  That's where -- I'm

18 just looking at the role.  But it's clearly the role of the

19 jury to determine the nexus.

20          MR. KALTSAS:  Right.

21          THE COURT:  That's just the rule of -- okay.  Here

22 we jury determination.  Okay.  So now I'm looking at the

23 sentence called "Jury determination."  "In any case tried

24 before a jury," that's what we want to be at.

25          MR. KALTSAS:  5(b) is I think the relevant one

153

1 here.  Even though it's a special verdict form, it's a

2 little misleading.  But the language there is asking the

3 jury to determine whether the Government has established the

4 requisite nexus between the property and the offense

5 committed by the defendant.

6     So that is the limitation of the jury's role.

7         THE COURT:  Yes, okay.

8         MR. KALTSAS:  As far as anything else, the Court

9 will take it up after the trial.

10        THE COURT:  All right.  And so, like punishment,

11 the jury can be admonished that they're not to consider

12 the -- I'm saying the amount of property.  That's probably

13 the wrong language -- subject to forfeiture.  That's

14 something for the Court to take up at a later time, just

15 like we say with punishment.  Is that your view?

16        MR. KALTSAS:  That is my view, your Honor.  And if

17 it's helpful to the Court, forfeiture has been always

18 characterized as a part of sentencing.  So that makes a lot

19 of --

20        THE COURT:  Yes.  And just like certain other

21 factual things like prior convictions that can add to

22 sentencing, the Sixth Amendment gives a right to a trial by

23 jury on those issues.

24        MR. KALTSAS:  It does, except there are some

25 unique quirks of forfeiture law where the aprendre and all

154

1  those different things don't necessarily apply.

2       THE COURT:  Got it.

3       MR. KALTSAS:  But, yes, it's definitely

4  consideration.

5       THE COURT:  Okay.  All right.  And so I want to

6  deal at this level before we look at specific language of

7  jury instructions that will become much easier if we have

8  these issues taken care of.

9     So I think I understand the Government's position.

10    Mr. Kaltsas, I'll return to you after I hear from Ms.

11 Jayne.

12    Ms. Jayne, I actually think your analysis went in a

13 direction I don't need to go in under 1956 and 1957.  I

14 think this is under 982 and Rule 32.2.

15    So let me hear your argument.

16       MS. JAYNE:  Your Honor, I think it's because the

17 justification language, some of the justification from the

18 Government came from cases involving facilitation and other

19 theories.

20    I think in reality, when it's tied to a 1957 offense,

21 you cannot take more than the proceeds.  And the proceeds

22 are never going to be beyond the $70,000.

23    I don't know that Mr. Kaltsas is even contesting --

24 disagrees with that because this isn't the type of offense

25 where it's being -- where it's being concealed or the

155

1 commingling is relevant in that regard.

2     And so given that we never get past $70,000, it seemed
3 superfluous that the jury would be deciding the -- it
4 sounded like they were deciding on the entire property.

5     In reality, what's going to happen if there is any
6 forfeiture is that the Government should pursue substitute
7 property.

8     Cash in this case is going to be substitute property
9 because the $70,000 no longer fits the $70,000.  It's been
10 incorporated into 2.7 --

11          THE COURT:  So do you -- but so let's just pull
12 back.  Do you agree that the jury is only deciding the nexus
13 issue and not the amount of the forfeiture or scope of the
14 forfeiture?

15          MS. JAYNE:  I think that's correct.

16          THE COURT:  Okay.

17          MS. JAYNE:  The jury is deciding nexus between --
18 however that 70,000 sits, whether it sits attached -- the
19 nexus is truly -- and I appreciate the simplicity that Mr.
20 Kaltsas presented.  I think that is their question.  Somehow
21 the language of the verdict form and instructions purported
22 to have the jury making a broader decision than that.

23          THE COURT:  Good.  So I would recommend then for
24 the jury phase of the case that the instruction add a
25 sentence that advises the jury that it is not for them to

*Echo Reporting, Inc.*

156

1 consider the amount of the forfeiture. That is up to the

2 Court, just like we do with any punishment. And so then I

3 think the instructions can become simple.

4    And, Ms. Jayne, all of these arguments that you're

5 making will be before the Court after -- if there's a

6 verdict against your client.

7         MS. JAYNE: So as I understand it -- I appreciate

8 that, your Honor. Thank you.

9    And I think there's a lot of forfeiture questions. I

10 don't know if all this language is needed, but as I hear it,

11 the jury could be deciding is there a nexus between the

12 proceeds in Count 24 and -- and what?

13         THE COURT: Well, do we have the Government's

14 verdict form on that? Where will I find your verdict form?

15 Was that given to me earlier?

16         MR. SAMPSON: Your Honor, the Government's special

17 verdict form regarding forfeiture -- I'm sorry, your Honor.

18 I believe it's at 107.

19         THE COURT: I have a -- let's see. I have it,

20 yes.

21         MR. SAMPSON: And, your Honor, I would just point

22 out -- and Mr. Kaltsas can reiterate this -- but I believe

23 that your proposed addition is in one of the Government's

24 instructions after number 1. And I'm looking for it now.

25         THE COURT: Well, I have a Government's special

*Echo Reporting, Inc.*

157

1 verdict form on forfeiture. "We, the jury, find a special

2 verdict as to the following property. We, the jury,

3 unanimously find the property identified above is involved

4 in or traceable to property involved in and with a nexus

5 to" -- oh my god -- "the money laundering conviction in

6 Count 24 of the indictment, a violation of 1957, and further

7 unanimously find the property is forfeitable under 18 U.S.C.

8 982."

9      Is that what you still want as your verdict, Mr.

10 Kaltsas?

11          MR. KALTSAS:  Your Honor, subject to Mr. Sampson,

12 I think that would be an appropriate verdict form.

13          THE COURT:  Does it need to be that cumbersome?

14 Is that the language that's required?  It's impenetrable to

15 me.

16          MS. JAYNE:  I'm sorry.  I don't have it in front

17 of me.

18          MR. KALTSAS:  I think we can probably simplify it

19 a little bit, your Honor.

20          THE COURT:  That would be great.

21          MR. KALTSAS:  Make it a little bit easier for the

22 jury.

23          THE COURT:  Make it easier for me.

24      So it's interesting because Ms. Jayne had a very

25 straightforward -- so I'm looking at --

158

1    Ms. Jayne, I think you gave me a new one here as well.
2 Let me go to yours.  I need your most --

3         MS. JAYNE:  Yes, I put it in ECF 121.  Of course,
4 now I can't find the Government's so I have to go to ECF.

5         MR. SAMPSON:  It's -- the Government's is at 107.

6         MS. JAYNE:  107.  Okay.  Sorry.  I'm going to have
7 to go to Pacer.

8         THE COURT:  I thought you gave me a new verdict
9 form.  I have your original one.

10         MS. JAYNE:  Right.  Your Honor, the verdict form,
11 I didn't actually give a new verdict form, but I put it in
12 the body of the ECF 121, which was my brief in support of
13 forfeiture.

14         THE COURT:  What page?

15         MS. JAYNE:  It's on page -- ECF 121, page seven.
16 I just said --

17         THE COURT:  So I don't have that.  I have your
18 original one where you said -- you describe the property.
19 Just in terms of taking out -- I have -- the copy that you
20 submitted didn't have the ECF stamps at the top.

21    So you say, "We, the jury, find a special verdict form
22 as to the following property."  And we would just take out
23 3.2 percent, but we would just say "the real property
24 improvement at."

25    "We, the jury, unanimously find the property identified

*Echo Reporting, Inc.*

159

1 above is property involved in or traceable to property

2 involved in, and with a nexus to money laundering conviction

3 of," "a violation," "and further unanimously find that this

4 property is forfeitable."

5     So, Mr. Kaltsas, would you look at that. That seems

6 just a little simpler.

7          MR. KALTSAS: Yes, your Honor. I believe that's

8 going to be -- let's see. That would be at Pacer 101, I

9 believe, your Honor.

10          THE COURT: I'm sorry. Yes, thank you. I don't

11 have that.

12          MS. JAYNE: I can tell you -- 101 -- sorry, I

13 thought you were asking.

14     "We, the jury, find" -- it just sort of lists the

15 property but --

16          THE COURT: You have to identify the property.

17 And then you have to -- I think you two can work on this.

18     I mean you have to redo the verdict forms anyway, so I

19 think that's not going to be hard.

20     So let's return to the jury instructions. What Ms.

21 Jayne wrote looks fine and we just -- instead of saying "3.2

22 percent of the property," we're saying "the property."

23          MS. JAYNE: And just very quickly, there were some

24          (Portions of proceedings unavailable.)

25          (Proceedings adjourned at 1:50 p.m.)

1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney

2  HALLIE HOFFMAN (DCBN 210020)
   Chief, Criminal Division

3  COLIN SAMPSON (CABN 249784)
   DANIEL KALEBA (CABN 223789)

4  Assistant United States Attorney

5       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
6       Telephone: (415) 436-7020
        FAX: (415) 436-7009
7       Colin.Sampson@usdoj.gov

   Attorneys for United States of America

8

9  JULIA JAYNE (CABN 202753)
   Jayne Law Group

10      483 9ᵗʰ Street, Ste. 200
        Oakland, CA 94607
11      Phone: (415) 623-3600
        Fax: (415) 623-3605
12      Email: julia@jaynelawgroup.com

13 Attorney for Defendant Michael Kail

                   UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
                        SAN JOSE DIVISION

16 UNITED STATES OF AMERICA,              No.  18 CR 172 BLF
           Plaintiff,
17              v.                        [AMENDED JOINT AND DISPUTED] JURY
                                          INSTRUCTIONS
18 MICHAEL KAIL,
           Defendant.                     HearingPretrial:      March 19January 14,
19                                        2021
                                          Trial:        MarchFebruary 122, 2021
20                                        Court:        Hon. Beth Labson Freeman

21        The United States of America, represented by Assistant United States Attorneys Daniel Kaleba

22 and Colin Sampson, and Defendant Michael Kail, represented by Julia Jayne, hereby respectfully submit

23 the following Amended Proposed Jury Instructions to be used in the trial of the above referenced matter.

   AMENDED JOINT AND DISPUTEDPROPOSED JURY INSTRUCTIONS,
   Case No. 18 CR 172 BLF              1

DISPUTED INSTRUCTION NO. 42 RE:

WIRE FRAUD – HONEST SERVICES (18 U.S.C.§§ 1343 and 1346)

**Government's Proposed Instruction:**

Defendant Kail is charged in Counts One through Nineteen with the crime of honest services fraud by wire or radio communication in interstate commerce. In order for the defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant devised or knowingly devised or participated in a scheme or plan to deprive Netflix, Inc. of its right of honest services;

Second, the scheme or plan consists of a bribe or kickback in exchange for the defendant's services;

Third, the defendant owed a fiduciary duty to Netflix, Inc.

Fourth, the defendant acted with the intent to defraud by depriving Netflix, Inc. of the right of honest services;

Fifth, the defendant's act was material; that is, the act had a natural tendency to influence, or was capable of influencing, a person's acts; and

Sixth, the defendant transmitted, or caused to be transmitted, any writing, signal, or sound by means of a wire or radio communication in interstate commerce.

**1. The Scheme or Plan to Deprive Honest Services**.

The first element that the government must prove is that the defendant knowingly devised or participated in a scheme or plan to deprive Netflix, Inc. of its right to his honest services. A "scheme" is any plan or course of action formed with the intent to accomplish some purpose. Thus, to find the defendant guilty of this offense, you must find that the defendant devised or participated in a plan or course of action involving bribes or kickbacks given or offered to the defendant.

**2. The Bribe or Kickback in Exchange for Services**.

The second element that the government must prove is that the scheme or plan consisted of a

bribe or kickback in exchange for defendant's services. Bribery and kickbacks involve the exchange of a thing or things of value for services by a fiduciary, in other words, a quid pro quo (a Latin phrase meaning "this for that" or "these for those").

The defendant and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. Rather, the intent to exchange may be established by circumstantial evidence, based upon the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

It is not a defense to claim that a defendant would have taken a lawful action even without having accepted a thing of value. In other words, it is not a defense that the offer or promise of anything of value was made to the defendant in exchange for a service or act that is actually lawful, desirable, or even beneficial to his employer. The offense of "honest services" fraud is not concerned with the wisdom or results of the defendant's decisions, but rather with the manner in which the defendant makes his or her decisions.

Also, it is not necessary for the government to prove that the scheme actually succeeded, or that any act was actually taken by the defendant in the course of the scheme. What the government must prove is that the defendant knowingly devised or participated in a scheme or artifice to defraud Netflix, Inc. of its right to defendant's honest services through bribes or kickbacks.

Also, because people rarely act for a single purpose, the giver need not have offered or provided the thing of value only in exchange for specific services, and the defendant need not have solicited or accepted the thing of value only in exchange for those services. If you find beyond a reasonable doubt that the giver offered or provided a thing of value in exchange for the performance of services, then it makes no difference that the giver may also have had another lawful motive for providing a thing of value. Likewise, if you find beyond a reasonable doubt that the defendant solicited or received a thing of value in exchange for the services, then it makes no difference that the defendant may also have had another lawful motive for soliciting or accepting the thing of value.

"Anything of value" includes things possessing intrinsic value, whether tangible or intangible,

that the person giving or offering or the person soliciting or receiving considers to be worth something.

### 3. The Fiduciary Duty.

A "fiduciary" duty exists whenever one entity places special trust and confidence in another person–the fiduciary–in reliance that the fiduciary will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the entity, such that the entity relaxes the care and vigilance that it would ordinarily exercise, and the fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the other entity based on such reliance.

The mere fact that a business relationship arises between two persons does not mean that either owes a fiduciary duty to the other. If one person engages or employs another and thereafter directs, supervises, or approves the other's actions, the person so employed is not necessarily a fiduciary. Rather, as previously stated, it is only when one party places, and the other accepts, a special trust and confidence—usually involving the exercise of professional expertise and discretion—that a fiduciary relationship exists.

### 4. Materiality.

The fifth element that the government must prove is that the defendant's act or actions were material; that is, it had a natural tendency to influence, or was capable of influencing, a person's acts

### 5. Use of the Wire or Radio Communications.

The final element that the government must establish is that the defendant used a wire or radio communication in interstate commerce to carry out or to attempt to carry out the scheme or plan. To "use a wire or radio communication in interstate commerce" means to send information across state lines by means of wire, including telephone or telegraph lines, or radio communication. It includes email, the electronic transfer of funds, Internet communications, or other electronic communication using wires or radios, as long as the communication or transmission of information is between states.

GIVEN _____

NOT GIVEN _____

GIVEN AS MODIFIED _____

Source: *United States v. Rojas*, 5:10-CR-931-LHK (N.D. Cal. 2011), ECF No. 82 – modified; Ninth AMENDED JOINT AND DISPUTEDPROPOSED JURY INSTRUCTIONS,

Case No. 18 CR 172 BLF                    56

ER-540

1  Circuit Model Criminal Jury Instruction 8.123 – modified

2  **Government's Argument In Support of Instruction**:

3  This instruction begins with the six elements provided in the Ninth Circuit's Instruction 8.123 for

4  honest services frauds, and adopts the instruction given in *United States v. Rojas*, 5:10-CR-931-LHK

5  (N.D. Cal. 2011, ECF No. 82) which provides several important definitions not provided elsewhere in

6  these Instructions, such as honest services, fiduciary duty, materiality, and use of interstate wires.

Defendant's proposed instruction, after reciting the elements and defining "fiduciary," introduces and

7  advances numerous potential defenses or examples of conduct that do not amount of a violation of the

statute, and should be rejected.

8

9  **Defense Proposed Instruction:**

10  Mr. Kail is charged in Counts 1-19 of the Indictment with wire fraud in violation of Sections

11  1343 and 1346 of Title 18 of the United States Code. In order for Mr. Kail to be found guilty of each of

those charges, the government must prove each of the following elements beyond a reasonable doubt:

12  First, Mr. Kail knowingly devised a scheme or plan to deprive Netflix of the right to honest

13  services *by means of false or fraudulent pretenses, representations, promises, or omitted facts[3]*;

14  Second, the scheme or plan consists of a kickback in exchange for Mr. Kail's services *(a quid

pro quo).* The "exchange" may be express or may be implied from all the surrounding circumstances;

15

16  Third, Mr. Kail owed a fiduciary duty to Netflix;

17  Fourth, Mr. Kail acted with the ~~specific~~ intent to defraud ~~and to cheat~~ by depriving Netflix of its

right to honest services;

18  Fifth, *the statements made or facts omitted as part of the scheme were material*; that is, *they* had

19  a natural tendency to influence, or was capable of influencing, Netflix's acts; and

20  Sixth, Mr. Kail used, or caused someone to use, an interstate wire communication to carry out or

21  attempt to carry out an essential part of the scheme.

22  _____

[3] Instructions in *italics* represent language added by Defendant to the model instruction.

23

A "fiduciary" duty exists whenever one entity places special trust and confidence in another person–the fiduciary–in reliance that the fiduciary will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the entity, such that the entity relaxes the care and vigilance that it would ordinarily exercise, and the fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the other entity based on such reliance.

The mere fact that a business relationship arises between two persons does not mean that either owes a fiduciary duty to the other. If one person engages or employs another and thereafter directs, supervises, or approves the other's actions, the person so employed is not necessarily a fiduciary. Rather, as previously stated, it is only when one party places, and the other accepts, a special trust and confidence—usually involving the exercise of professional expertise and discretion—that a fiduciary relationship exists.

*To convict Mr. Kail of wire fraud based on omission[s] of material fact[s], you must find that Mr. Kail had a duty to disclose the omitted fact[s] arising out of a relationship of trust. That duty can arise either out of the aforementioned formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinary exercise.*

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate [or foreign] in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and an interstate [or foreign] wire communication must have actually occurred in furtherance of the scheme.

*The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to an employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a contract or purchasing relationship. A kickback occurs when an employee agrees to accept or receive, or accepts or receives, directly or indirectly,*

*something of value from another person in exchange for a promise for, or performance of, favorable treatment, and the act itself provides the source of the funds to be kicked back.*

*Undisclosed conflicts of interest, secret payments or undisclosed self-dealing alone, is not sufficient.*

**ARGUMENT IN SUPPORT OF DEFENDANT'S DISPUTED JURY INSTRUCTION NO. 42 RE WIRE FRAUD**:

First Element: "by means of false or fraudulent pretenses, representations, promises, or omitted facts"

Mr. Kail is not only charged with a violation of 18 U.S.C. § 1346 (honest services fraud) but he is also charged with Wire Fraud in Counts 1-19 in violation of Section 1343 and Mail Fraud in Counts 20-22 in violation of Section 1341.

The Ninth Circuit Model Instruction for Honest Services Fraud, No. 8.123, is a rough compilation of the Mail Fraud Instruction (No. 8.121) and the language from 18 U.S.C. § 1346. In response to *McNally..v United States*, 483 U.S. 350 (1987), Congress enacted 18 U.S.C. § 1346, which provides that the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services. Instruction 8.123 falls short, however, in adequately explaining the *means* by which the scheme or plan to defraud another of the right to honest services (rather than the right to money or property) could be effectuated. The Mail Fraud Instruction (8.121) and the Wire Fraud Instruction (8.124) both include the means by which the fraudulent scheme is carried out; that is, by "means of false or fraudulent pretenses, representations, or promises, or omitted facts."

Indeed, the Indictment against Mr. Kail, in describing the scheme to defraud, includes language that he devised a scheme to obtain money or property by "means of materially false and fraudulent representations, promises, and omissions and to deprive Netflix of its intangible right to honest services." Indict. ¶ 24 (Dkt. 1).

As such, the jury must be informed the means by which the scheme was carried out.

Second Element: Adding "Quid Pro Quo"

While an employee may have a duty to exercise his discretion and expertise with the utmost

honesty and forthrightness in the interests of the employer/entity, honest-services fraud does not extend to all or even most violations of that duty. *United States v. Aunspaugh*, 792 F.3d 1302, 1309 (11th Cir. 2015). That was the square holding of *Skilling v. United States*, 561 U.S. 358, 368 (2010).
For example, honest services fraud does <u>not</u> extend to an earned but undisclosed profit. *Aunspaugh* at 1310.

Post-*Skilling*, it is clear that the scope of the honest services wire fraud statute is limited to schemes involving bribes or kickbacks. *Skilling v. United State,* 561 U.S. at 409. The U.S. Supreme Court was clear that conflicts of interest or undisclosed self-dealing, by themselves, do not constitute violations of Section 1346. *Id.* at 410. *See United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013). Further, the addition of the "quid pro quo" terminology assures that the jury would <u>only</u> convict if there is proof beyond a reasonable doubt of a quid pro quo exchange. *See United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016) (using "quid pro quo" language in instructions); *United States v. Nouri*, 711 F.3d 129, 139 (2nd Cir. 2013) ("to violate the right to honest services, the charged conduct must involve a quid pro quo, i.e., an 'intent to give or receive something of value in exchange for an ….act.'" (cite omitted)).

The quid pro quo component is a critical distinction that should be articulated to the jury.

~~Fourth Element: Deceive~~ **and** ~~Cheat~~

~~Ninth Circuit Model Instruction No. 8.123 for honest services mail fraud is outdated in light of *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020), in which the Ninth Circuit held that wire fraud requires the intent to deceive and to cheat, i.e., to deprive a victim of money or property by means of deception, overruling *United States v. Shipsey,* 363 F.3d 962 (9th Cir. 2004), *United States v. Treadwell,* 593 F.3d 990 (9th Cir. 2010) and *United States v. Livingston.* 725 F.3d 1141 (9th Cir. 2013). The Ninth Circuit concluded that the model instruction was erroneous, holding that:~~

~~Like the mail fraud statute from which it is derived, the wire fraud statute, in plain and simple language, criminalizes the use of interstate wires to further, not mere deception, but a scheme or artifice to defraud or obtain money or property, i.e., in every day parlance, to cheat someone out of something valuable. It follows that to be guilty of wire fraud, a defendant must act with the intent not only to make false~~

<u>AMENDED</u> JOINT <u>AND DISPUTED</u>~~PROPOSED~~ JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                     60

1   ~~statements or utilize other forms of deception,~~ **but also to deprive a victim of money or property by**

2   **means of those deceptions.** ~~In other words, a defendant must intend to deceive~~ *and* ~~cheat.~~

3   *~~Id.~~* ~~at \*4 (emphasis added). The Court noted that this has long been the law of other circuits. In~~

    ~~September 2020, the 9th Circuit updated the model instructions for mail fraud (8.121) and wire fraud~~

4   ~~(8.124) to include the "deceive and cheat" language.~~

5   ~~Thus, Mr. Kail requests an instruction requiring the jury to find that his specific intent to defraud must~~

6   ~~including language of deception and cheating, in accordance with~~ *~~Miller~~* ~~and the updated mail and wire~~

7   ~~fraud instructions.  Articulating the "specific intent to defraud" in the language of this instruction makes~~

    ~~the intent element abundantly clear for the jury.~~ *~~See United States v. Bohonus~~*~~, 628 F.2d 1167, 1172 (9th~~

8   ~~Cir. 1980) ("there is no fraudulent scheme without specific intent").~~

9   ~~Defendant's proposed instruction seeks to incorporate the holding in~~ *~~Miller~~*~~, while also making it very~~

10  ~~clear for the jury what is and what is~~ *~~not~~* ~~honest services fraud pursuant to~~ *~~Skilling v. United States~~*~~.~~

    Fifth Element: Defining Materiality

11
12          Defendant's proposal of additional language to the fifth element regarding <u>materiality</u>

13  incorporates the language of the mail and wire fraud instructions in Pattern Instruction Nos. 8.121, 8.124

    (mail fraud, wire fraud). Defendant's proposed instruction clarifies that the materiality element pertains

14  to the statements made or facts omitted. *See United States v. Milanovic*, 678 F.3d 713, 727 (9th Cir.

15  2012) ("the misrepresentation or omission at issue for an 'honest services' fraud conviction must be

16  'material' such that the misinformation or omission would naturally tend to lead or is capable of leading

    a reasonable employer to change its conduct."); *United States v. Aunspaugh*, 792 F.3d at 1309. The

17  proposed instruction merely defines what "act" ought to be evaluated for materiality.

18  Definition: Omission Explained

19          Defendant seeks the direct language from the mail (8.121) and wire fraud (8.124) instructions,

    defining the parameters of conviction on an omissions theory:

20
            To convict Mr. Kail of wire fraud based on omission[s] of material fact[s], you must find that
21          Mr. Kail had a duty to disclose the omitted fact[s] arising out of a relationship of trust. That duty
            can arise either out of the aforementioned formal fiduciary relationship, or an informal, trusting
22          relationship in which one party acts for the benefit of another and induces the trusting party to
            relax the care and vigilance which it would ordinary exercise.

23  <u>Amended</u> Joint <u>and Disputed</u>~~Proposed~~ Jury Instructions,
    Case No. 18 CR 172 BLF                61

                                                                                    ER-545

The definition must be given, as the Indictment alleges an omissions theory as well as a theory of material misrepresentations. The jury must find a duty to disclose prior to convicting on an omission theory. *See United States v. Shields*, 844 F.3d 819, 822-23 (9th Cir. 2016) (jury must find a relationship creating a duty to disclose in order to convict defendants of wire fraud based on any material omissions).

Definition: Kickback Explained

In the absence of a definition in the Ninth Circuit Pattern Instructions, the defense instruction includes the definition of "kickback" to provide a common definition for all parties and jurors. The proposed language is taken from *Skilling* and adapted from the definition of "kickback" found in 41 U.S.C. § 52(2)[4] (which pertains more specifically to public contracts).

The final sentence in the defendant's proposed definition of kickback is taken directly from the Seventh Circuit Pattern Instruction which states:

> A kickback occurs when a [public official] [employee] [corporate officer] [union official] [defendant] [demands, solicits, seeks, or asks for, or agrees to accept or receive, or accepts or receives], directly or indirectly, something of value from another person in exchange for a promise for, or performance of [an official act], and the act itself provides the source of the funds to be "kicked back."[5]

Defendant's instruction substituted the bracketed "official act" for "favorable treatment" in alignment with the language in 41 U.S.C. § 52(2), since this case does not involve the public sector.

Undisclosed conflict of interest, secret payments or undisclosed self-dealing, by itself, does not constitute a violation of the wire or mail fraud statutes. *United States v. Aunspaugh* 792 F.3d at 1309 ("An employee who steers work to himself usually acts for his own self-interest. That self-interest often interferes with the employee's obligation to get the best deal for the employer. That is the very definition of self-dealing.") The Eleventh Circuit held that without proper instruction regarding kickbacks, a jury could find that payments were a kickback even if the payments were compensation for services actually

---

[4] 41 U.S.C. § 52(2): The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract.

[5] Instructions found at http://www.ca7.uscourts.gov/pattern-jury-instructions/Pattern_Criminal_Jury_Instructions_2012ed_includes_2015-2019_changes.pdf, pg. 435.

AMENDED JOINT AND DISPUTED~~PROPOSED~~ JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                    62

ER-546

1   rendered on the project, rather than payments to induce the employee to steer work to the contractor or

2   reward him for doing so). Thus, because a secret payment or self-dealing, after *Skilling*, is not enough to

3   violate the wire or mail fraud statutes, the additional language in the instruction seeks to make this point

    abundantly clear.

4       In sum, the supplemental language in Defendant's proposed instruction seeks to avoid error and

5   ambiguity regarding the precise definitions of wire fraud, honest services fraud, and kickbacks.

1

DISPUTED INSTRUCTION NO. 42A RE:

2

WIRE FRAUD (18 U.S.C. § 1343)

3

The defendant is charged in Counts One through Nineteen of the indictment with wire fraud in

violation of Section 1343 of Title 18 of the United States Code. In order for the defendant to be found

4

guilty of that charge, the government must prove each of the following elements beyond a reasonable

5

doubt:

6

First, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan

for obtaining money or property by means of false or fraudulent pretenses, representations, or

7

promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent

8

representations;

9

Second, the statements made or facts omitted as part of the scheme were material; that is,

they had a natural tendency to influence, or were capable of influencing, a person to part with

10

money or property;

11

Third, the defendant acted with the intent to defraud, that is, the intent to deceive and

12

cheat; and

13

Fourth, the defendant used, or caused to be used, an interstate wire communication to

carry out or attempt to carry out an essential part of the scheme.

14

In determining whether a scheme to defraud exists, you may consider not only the defendant's

15

words and statements, but also the circumstances in which they are used as a whole.

16

To convict defendant of wire fraud based on omissions of material facts, you must find that

17

defendant had a duty to disclose the omitted facts arising out of a relationship of trust. That duty can

18

arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party

acts for the benefit of another and induces the trusting party to relax the care and vigilance which it

19

would ordinarily exercise.

20

A wiring is caused when one knows that a wire will be used in the ordinary course of business or

21

when one can reasonably foresee such use.

22

It need not have been reasonably foreseeable to the defendant that the wire communication

23

AMENDED JOINT AND DISPUTEDPROPOSED JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                    64

would be interstate in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme.

**GOVERNMENT'S ARGUMENT IN SUPPORT OF INSTRUCTION:**

This instruction is Ninth Circuit Model Jury Instruction 8.124 for wire fraud. The Indictment alleges that Defendant's scheme to defraud, in addition to depriving his employer of its intangible right of honest services, also defrauded his employer of "money and property by enabling the vendors to, among other things, negotiate more favorable contracts with Netflix than they would have been able to obtain without the assistance of Kail." *See* Indictment, ECF No. 1, ¶ 19(a). Defendant may be convicted under either or both fraud theories. Moreover, 18 U.S.C. §1346 merely clarifies that the fraud crimes (including wire fraud and mail fraud) include honest services fraud. Because the Indictment alleges both a scheme to defraud Netflix of money and property and a scheme to deprive it of its right to Defendants' honest services, and therefore Defendant could be convicted under a money-or-property theory as well, instructions for 18 U.S.C. § 1343 (and § 1341, discussed below) should be given.

**DEFENDANT'S ARGUMENT AGAINST INSTRUCTION 42A:**

Defendant opposes this instruction and maintains that instructions on Honest Services Fraud (Nos. 42 and 43) are sufficient to comport with the Indictment. In the alternative, the Defendant proposes supplemental definitions of "property" and "scheme to defraud the victim of property" in light of the holding in *Kelly v. United States*, 140 S. Ct. 1565 (2020).

Right to Control Assets is not Property Fraud

Property fraud requires both "obtaining" property and a corresponding "depriving" from the victim. *Kelly,* 140 S. Ct. 1565. Therefore, schemes to steer a contract to someone who would not have gotten it honestly – the right to decide how to use one's money – are not property fraud. Schemes to

1  unlawfully obtain a contract are, as is charged here, honest services fraud, not pecuniary fraud.

2  The Third Circuit set forth the test to determine whether the "right to control" assets is a

3  protected property interest under the mail and wire fraud statutes in *United States v. Zauber*, 857 F.2d
   137 (3rd Cir. 1988). In *Zauber*, the administrators of a pension fund schemed to and caused the pension

4  fund to invest money in an entity; in return, the entity paid the administrators kickbacks from the entity's

5  share of profits. *Id.* at 140-142. The money used to invest in the entity was withdrawn from another

6  company in which the pension fund had been invested. *Id.* at 140-41. Later, when extra administrators
   were added to the pension fund, they discovered that the entity was violating multiple provisions of the

7  investment contract. *Id.* at 141. The new administrators also discovered the entity was only paying a 9%

8  return on investment, whereas the company the pension fund was previously invested in had paid

9  17%. *Id.* The government argued "that the defendants deprived the pension fund of control over its

10 money" because the pension fund had lost control over how its money was used. *Id.* at 146.

11 The Third Circuit rejected this argument in *Zauber* because "defendants [], as trustees of the
   pension fund, had the power and authority to invest the fund's monies with others. We fail to see what

12 the defendants 'appropriated' in this case." *Id.* at 147.

13 The *Zauber* court explained that defendants cannot scheme to defraud an entity if the alleged

14 scheme is to exercise control over assets the entity has given the defendants the power and authority to
   control. *Id.* at 147-48. The court added that the "right to conduct business free of false, fictitious and

15 fraudulent information" is an intangible right that does not supply the "economic benefit ground"

16 required to sustain a money-or-property fraud conviction. *Zauber*, 857 F.2d at 143.

17 Further, in *Zauber*, the indictment alleged that the defendants conspired to defraud the pension

18 fund of "money and property and of the right to honest, faithful, prudent and diligent services by its
   employees." *Id.* at 143. Despite that language, the Court held that there was no allegation in the

19 indictment of "*an actual* money or property loss to the fund itself." *Id.* (emphasis added).

20 Similarly, here, the Indictment against Mr. Kail generally alleges a loss of "money and property"

21 but does not allege that Netflix *actually* lost any money or property. As a result, the Indictment itself is

22

23

deficient in alleging a theory of pecuniary harm; the only theory "actually" articulated is honest services fraud.

These cases confirm that schemes to steer a contract to a party that would not obtain it honestly contemplate depriving the victim only of its intangible right to honesty in business affairs, not of "property."

In the Alternative – Supplemental Instructions

If this Court were to give Government's proposed instructions on mail and wire fraud (Instruction Nos. 42A and 43A), then Defendant proposes supplemental language be included to comport with *Kelly*, as the Ninth Circuit Model instructions do not.

Despite what appears to be disjunctive statutory language ("scheme or artifice to defraud, or for obtaining money or property …"), mail fraud is a unitary offense. *Kelly,* 140 S. Ct. at 1571 (citing *McNally v. United States,* 483 U.S. 350, 358 (1978). *Kelly* confirms that "depriving" a victim of property and "obtaining" that property are two sides of the same coin: the object of the scheme must be "obtaining by fraud" property of which the victim is "deprive[d]."14 *Id.* 1571, 1574. *Accord Skilling,* 561 U.S. at 400 (property fraud comprises schemes "in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other"); *Cleveland v. United States,* 531 U.S. 12, 15 (2000) ("the thing obtained" must have been "property" held by victim).

Accordingly, a scheme that enriches the offender is not property fraud unless it "deprives" the victim of the property. *E.g.*, *Skilling,* 561 U.S. at 400. And a scheme that deprives the victim of property is not property fraud unless "obtaining" the property was an object of the scheme. *Kelly,* 140 S. Ct. at 1571. In short, economic harm is the hallmark of property fraud and as such, the jury must be property instructed, as proposed below.

**Supplemental Proposed Instructions**

If this Court were to give Government's proposed instruction on mail and wire fraud (Instruction Nos. 42A and 43A), then Defendant proposes that the following definitions of "property" be included since the Ninth Circuit Model instructions have not been modified to comport with *Kelly.*

Property – Defined

AMENDED JOINT AND DISPUTED PROPOSED JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                    67

A property interest is an economic interest. Thus, the term "property" as used in the mail and wire fraud instructions, means money or another form of property with economic value. The right to make business decisions based on accurate information is not "property." An employer's right to its employee's honest and faithful service is not "property" either.

Scheme to Defraud the Victim of "Property" – Defined

Accordingly, even if you find that the defendant violated his employer's policies, this is not, standing alone, a scheme to defraud the employer of "property." The government must prove beyond a reasonable doubt that the defendant schemed to take something of economic value from the victim. Scheming to influence the award of a contract is not mail or wire fraud unless the scheme contemplates causing the victim to pay out more, or receive less, pecuniary value than it otherwise would have.

DISPUTED INSTRUCTION NO. 43 RE MAIL FRAUD – HONEST SERVICES

(18 U.S.C.§§ 1341 and 1346)

**Government's Proposed Instruction No. 43:**

Defendant Michael Kail is charged in Counts Twenty through Twenty-Two mail fraud in violation of Section 1341 of Title 18 of the United States Code. In order for the defendant to be found guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant devised or knowingly devised or participated in a scheme or plan to deprive Netflix, Inc. of its right of honest services;

Second, the scheme or plan consists of a bribe or kickback in exchange for the defendant's services;

Third, the defendant owed a fiduciary duty to Netflix, Inc.;

Fourth, the defendant acted with the intent to defraud by depriving Netflix, Inc. of the right of honest services;

Fifth, the defendant's act was material; that is, the act had a natural tendency to influence, or was capable of influencing, a person's acts; and

Sixth, the defendant used, or caused someone to use, the mails to carry out or to attempt to carry out the scheme or plan.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

GIVEN _____

NOT GIVEN _____

GIVEN AS MODIFIED _____

Source: Ninth Circuit Model Criminal Jury Instruction 8.123 – modified

**Government's Argument in Support of Instruction:**

AMENDED JOINT AND DISPUTED PROPOSED JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                    69

ER-553

**Defense Proposed Instruction:**

Mr. Kail is charged in Counts 20-22 of the Indictment with mail fraud in violation of Sections 1341 and 1346 of Title 18 of the United States Code. In order for Mr. Kail to be found guilty of each of those charges, the government must prove each of the following elements beyond a reasonable doubt:

First, Mr. Kail knowingly devised or participated in a scheme or plan to deprive Netflix of the right to honest services by *means of false or fraudulent pretenses, representations, promises, or omitted facts*;

Second, the scheme or plan consists of a kickback in exchange for Mr. Kail's services *(a quid pro quo)*. The "exchange" may be express or may be implied from all the surrounding circumstances;

Third, Mr. Kail owed a fiduciary duty to Netflix;

Fourth, Mr. Kail acted with the ~~specific~~ intent to defraud ~~and to cheat~~ by depriving Netflix of his right to honest services;

Fifth, *the statements made or facts omitted as part of the scheme were material*; that is, *they* had a natural tendency to influence, or was capable of influencing, Netflix's acts; and

Sixth, Mr. Kail used, or caused someone to use, the mails to carry out or attempt to carry out the scheme or plan.

A "fiduciary" duty exists whenever one entity places special trust and confidence in another person–the fiduciary–in reliance that the fiduciary will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the entity, such that the entity relaxes the care and vigilance that it would ordinarily exercise, and the fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the other [entity based on such reliance.

The mere fact that a business relationship arises between two persons does not mean that either owes a fiduciary duty to the other. If one person engages or employs another and thereafter directs, supervises, or approves the other's actions, the person so employed is not necessarily a fiduciary. Rather, as previously stated, it is only when one party places, and the other accepts, a special

trust and confidence—usually involving the exercise of professional expertise and discretion—that a fiduciary relationship exists.

To convict Mr. Kail of mail fraud based on omission[s] of material fact[s], you must find that Mr. Kail had a duty to disclose the omitted fact[s] arising out of a relationship of trust. That duty can arise either out of the aforementioned formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinary exercise.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter whether the scheme or plan was successful or that any money or property was obtained.

The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to an employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a contract or purchasing relationship. A kickback occurs when an employee agrees to accept or receive, or accepts or receives, directly or indirectly, something of value from another person in exchange for a promise for, or performance of, favorable treatment, and the act itself provides the source of the funds to be kicked back.

Undisclosed conflicts of interest, or undisclosed self-dealing, is not sufficient.

**ARGUMENT IN SUPPORT OF DEFEDANT'S DISPUTED JURY INSTRUCTION NO. 43 RE HONEST SERVICES MAIL FRAUD**:

The defendant's proposed instruction is a modification to Ninth Circuit Model Instruction No. 8.123.

For Defendant's argument and citations in support of this instruction, please refer to Argument in Support of Disputed Instruction No 42 re Honest Services Wire Fraud.

AMENDED JOINT AND DISPUTED PROPOSED JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                      71

DISPUTED INSTRUCTION NO. 43A RE:

MAIL FRAUD (18 U.S.C. § 1341)

The defendant is charged in Counts Twenty through Twenty-Two of the indictment with mail fraud in violation of Section 1341 of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

Fourth, the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole.

To convict defendant of wire fraud based on omissions of material facts, you must find that defendant had a duty to disclose the omitted facts arising out of a relationship of trust. That duty can arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise.

A mailing is caused when one knows that the mails will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the material mailed was itself false or deceptive so long as the mail was used as a part of the scheme, nor does it matter

whether the scheme or plan was successful or that any money or property was obtained.

**GOVERNMENT'S ARGUMENT IN FAVOR OF INSTRUCTION:**

*See* Government's Argument in Favor of Instruction No. 42A, above.

**DEFENDANT'S ARGUMENT AGAINST INSTRUCTION 43A:**

*See* Defendant's Argument ~~in Favor~~Opposing ~~of~~ Instruction No. 42A, above.

GIVEN _____

NOT GIVEN _____

GIVEN AS MODIFIED _____

Source: Ninth Circuit Model Criminal Jury Instruction 8.121

AMENDED JOINT AND DISPUTED~~PROPOSED~~ JURY INSTRUCTIONS,
Case No. 18 CR 172 BLF                    73

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION


 4

    UNITED STATES OF AMERICA,      )   CR-18-00172-BLF
 5                                  )
                     PLAINTIFF,     )   SAN JOSE, CALIFORNIA
 6                                  )
            VS.                     )   DECEMBER 11, 2018
 7                                  )
    KAIL,                           )   PAGES 1-17
 8                                  )
                     DEFENDANT      )
 9                                  )
    _____)
10
                   TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE BETH LABSON FREEMAN
                 UNITED STATES DISTRICT JUDGE
12
                    A P P E A R A N C E S
13


14


15      FOR THE PLAINTIFF:      BY:  JOSEPH HEATHCLIFF AINLEY
                                AINLEY & ASSOCIATES, APC
16                              1494 HAMILTON WAY, SUITE 100
                                SAN JOSE, CA 95125
17


18


19      FOR THE DEFENDANT:      BY:  COLIN CHRISTOPHER SAMPSON
                                UNITED STATES ATTORNEY'S OFFICE
20                              NORTHERN DISTRICT OF CALIFORNIA
                                TAX DIVISION
21                              450 GOLDEN GATE AVENUE, BOX 36055
                                SAN FRANCISCO, CA 94102
22


23      OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                     CERTIFICATE NUMBER 13185
24


25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1            SAN JOSE, CALIFORNIA              DECEMBER 11, 2018

2                      P R O C E E D I N G S

3       (COURT CONVENED AT 9:12 A.M.)

4            THE CLERK:  CALLING CASE 18-0172.  UNITED STATES V.

5    MICHAEL KAIL.

6            COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

7            MR. SAMPSON:  GOOD MORNING, YOUR HONOR.

8       COLIN SAMPSON FOR THE UNITED STATES.

9            MR. AINLEY:  GOOD MORNING, YOUR HONOR.

10      JOSEPH AINLEY FOR DEFENDANT MICHAEL KAIL.

11           THE COURT:  MR. AINLEY, GOOD MORNING.  MR. KAIL, GOOD

12   MORNING.

13      OKAY.  THIS IS THE DEFENSE MOTION TO DISMISS BASED UPON

14   THE FAILURE OF THE INDICTMENT TO PROPERLY CHARGE FOR, LET ME

15   SEE IF I CAN SUMMARIZE THIS, FOR ECONOMIC HARM.

16      SO LET ME HEAR FROM THE DEFENSE FIRST.  OF COURSE I

17   REVIEWED YOUR PAPERS, AND APPRECIATE THE BRIEFING.

18           MR. AINLEY:  THANK YOU, YOUR HONOR.

19      THE ALLEGATION IN THIS CASE IS -- SORRY, THE ALLEGATION

20   TODAY IS THAT THE DICTA IN THE NINTH CIRCUIT DECISION OF

21   UNITED STATES V. MILOVANOVIC AFFORDS THE COURT THE OPPORTUNITY

22   AS A CASE OF FIRST IMPRESSION, TO DISMISS AN HONEST SERVICES

23   FRAUD CASE IN THE PRIVATE SECTOR, WHEN THERE'S INSUFFICIENT

24   ALLEGATION OF ECONOMIC HARM.

25           IF I COULD JUST READ THE QUOTE, WHICH WAS IN THE MOVING
```

```
 1    PAPERS AT PAGE 5, MILOVANOVIC OF COURSE WAS A CONTRACTOR TO THE

 2    STATE OF WASHINGTON, SO HE WAS IN THE PUBLIC SPHERE.  THE

 3    COURT, WHICH DOESN'T ADDRESS PRIVATE ACTORS ANYWHERE IN THE

 4    CONTEXT OF THE DECISION --

 5             THE COURT:  IT WAS NOT CALLED UPON TO DO SO BECAUSE

 6    IT WAS A GOVERNMENT AGENCY.

 7             MR. AINLEY:  EXACTLY.

 8        OUT OF -- FOR NO REASON AT ALL, THE COURT STATES IN A

 9    SETOFF PARAGRAPH, "WE DO NOT NEED TO DECIDE WHETHER IN A

10    PRIVATE SECTOR CASE, THERE MIGHT BE A REQUIREMENT THAT ECONOMIC

11    DAMAGES BE SHOWN," AND THIS IS IN THE CONTEXT OF 1346, "BECAUSE

12    THIS CASE INVOLVES HONEST SERVICES FRAUD COMMITTED AGAINST THE

13    PUBLIC FOR WHICH NO ECONOMIC DAMAGES NEED BE SHOWN.  WE LEAVE

14    THAT QUESTION FOR ANOTHER DAY."

15        AND I COMPLETELY AGREE WITH THE GOVERNMENT ON THIS THAT

16    ALL OF THE CASES LEADING UP TO THIS CASE HAVE INDEED FOUND THAT

17    YOU DO NOT NEED ECONOMIC INJURY IN ORDER TO CRIMINALLY ALLEGE A

18    VIOLATION OF 1346.  BUT, AND CLEARLY THE NINTH CIRCUIT IS

19    OBVIOUSLY AWARE OF THAT AS WELL, IT GOES OUT OF ITS WAY TO SAY,

20    WE WILL REVISIT THIS ISSUE WHEN THE PROPER CASE PRESENTS

21    ITSELF.

22             THE COURT:  SURE.

23        AND IT'S AN EN BANC DECISION, SO OF COURSE WE ASSUME THAT

24    IT WAS A VERY INTENTIONAL STATEMENT, I DON'T DISAGREE WITH YOU

25    ON THAT.
```

4

1      YOU KNOW, I APPRECIATE THAT THE -- THAT YOU HAVE POINTED

2   OUT THAT THE NINTH CIRCUIT HAS LEFT THIS AS AN OPEN QUESTION.

3      BUT IN REVIEWING THE MILOVANOVIC CASE AND CONSIDERING THE

4   REASONS THAT BRIBERY AND KICKBACKS ARE ILLEGAL AGAINST A PUBLIC

5   AGENCY, EVEN IN THE ABSENCE OF DIRECT ECONOMIC HARM TO THE

6   PUBLIC AGENCY, I'M NOT SEEING A BIG DIVIDE BETWEEN GOVERNMENT

7   AGENCIES AND COMPANIES AND PRIVATE ACTORS, AND ESPECIALLY WITH

8   A PUBLICLY TRADED COMPANY.

9      I FAILED TO SEE THE DISTINCTION, EVEN IF YOU PUT IN MY LAP

10  TO MAKE A DECISION, I DON'T -- I'M NOT SEEING THE DISTINCTION

11  AS CLEARLY AS YOU DO.

12      MR. AINLEY:  I THINK, AND WE CITED TO THIS IN THE

13  MOVING PAPERS, THERE ARE SEVERAL CASES THAT TALK ABOUT THE

14  VIOLATION OF THE PUBLIC TRUST.

15      THE COURT:  YES.

16      MR. AINLEY:  IN THE PRIVATE CONTEXT, THAT TRUST OR

17  THE SCOPE OF THE DUTY IS, I WOULD SUBMIT, NARROWER OR LESS THAN

18  THE INJURY TO THE PUBLIC TRUST WHICH EXISTS.

19      THE COURT:  PERHAPS NARROWER, BUT NOT SO DISTINCTLY

20  DIFFERENT THOUGH.

21      I MEAN, YOU THINK ABOUT THE NUMBER OF CONSUMERS THAT ARE

22  AFFECTED BY PRICE INCREASES THAT ARE PASSED ON TO THEM.  I'M

23  NOT ACTUALLY EVEN SURE THAT THE GOVERNMENT HASN'T ALLEGED

24  ECONOMIC HARM.  AND I WILL HEAR FROM MR. SAMPSON ON THAT.

25      AND IT MAY BE THAT I DON'T ACTUALLY NEED TO REACH THE

1    ISSUE, BECAUSE THE GOVERNMENT CERTAINLY OFFERS ME THAT OPTION

2    AS WELL.  AND IT'S ALWAYS BETTER TO RULE NARROWLY AND NOT TAKE

3    ON A NEW AREA OF THE LAW.

4        SO WHY DON'T YOU ADDRESS THE ISSUE OF WHETHER OR NOT THERE

5    HAS BEEN ECONOMIC HARM ALLEGED, BECAUSE THE GOVERNMENT

6    CERTAINLY POINTS THAT OUT.

7            MR. AINLEY:  YOUR HONOR, THAT ACTUALLY BRINGS IN A

8    QUESTION.

9        I HAD MOVED EX PARTE TO FILE UNDER SEAL, INTERROGATORY

10   RESPONSES PROVIDED BY NETFLIX IN AN UNDERLYING CIVIL CASE.  AND

11   I DON'T REALLY KNOW THE STATUS ON THAT.

12           THE COURT:  WELL, IF I'VE RULED ON IT, YOU WOULD KNOW

13   THE STATUS OF IT.  BUT WE DON'T NEED TO DISCUSS THE CONTENT

14   WHICH YOU ARE SEEKING TO SEAL.

15       THERE IS THE THRESHOLD QUESTION OF WHETHER I CAN EVEN

16   CONSIDER THAT AT THIS STAGE, BECAUSE YOU ARE ESSENTIALLY

17   TELLING ME INFORMATION THAT WOULD BE -- THAT HAS TO DO WITH

18   TRUTH OF THE UNDERLYING ASSERTIONS IN THOSE RESPONSES.  AND

19   THAT WILL NEVER BE FOR ME TO DETERMINE, THAT WILL BE FOR 12

20   GOOD PEOPLE SITTING IN THE JURY BOX TO DECIDE.

21       AND WHETHER OR NOT THOSE RESPONSES ARE FORECLOSED, ANY

22   OTHER POSITION ON THE ISSUE THAT IS THE SUBJECT OF THE

23   RESPONSE, I THINK IS REALLY NOT SOMETHING FOR ME TO DETERMINE.

24           MR. AINLEY:  YOUR HONOR, YES.

25       I WOULD AGREE WITH YOU THAT YOU COULDN'T JUDICIALLY NOTICE

```
1    THE TRUTH OF THE STATEMENT.

2         THE COURT:  THEN WHAT'S THE POINT -- SO OTHERWISE I'M

3    SIMPLY MAKING JUDICIAL NOTICE THAT IN ANOTHER CASE, THE COMPANY

4    MADE A RESPONSE TO A DISCOVERY REQUEST, PERIOD.

5         MR. AINLEY:  MADE A STATEMENT THAT IT HAD NO

6    INJURIES.

7         THE COURT:  WHAT'S THE POINT OF TAKING NOTICE OF WHAT

8    IT SAYS IF I'M NOT -- WHAT'S THE RELEVANCE, IF I'M NOT TAKING

9    NOTICE OF THE TRUTH OF IT?

10        MR. AINLEY:  WELL, BECAUSE IF THIS IS THE PUTATIVE

11   VICTIM, AND THE VICTIM, FOR EXAMPLE, PRESENTS AND SAYS,

12   ACTUALLY I'M NOT A VICTIM AT ALL, I'VE SUFFERED NO LOSS.

13        THE COURT:  OF COURSE THAT'S NOT ACTUALLY WHAT THEY

14   SAID, BECAUSE IT WAS, WE CONTINUED TO DO OUR INVESTIGATION.

15        MR. AINLEY:  WELL, YES, IT WAS COUCHED IN

16   INTERROGATORY EASE, I WOULD AGREE WITH THAT.

17        THE COURT:  SO I HAVE TO LOOK AT WHAT THEY ACTUALLY

18   SAID, NOT WHAT YOU ARE READING INTO IT.

19        MR. AINLEY:  I BELIEVE WHAT THEY SAID, YOUR HONOR, I

20   WAS CAREFUL NOT TO QUOTE THE ACTUAL RESPONSE, BUT I BELIEVE

21   WHAT THEY SAID IS THEY DO NOT MAKE THE CONTENTION THAT THEY, IN

22   EFFECT, PAID OVER THE ODDS FOR ANY CONTRACT THAT WAS ENTERED

23   INTO THROUGH MR. KAIL.

24        AND THAT IS THE CLAIM.  THE GIST OF THE SCHEME WAS THAT

25   MR. KAIL, THIS IS PARAGRAPH 17 OF THE INDICTMENT, AND THEN
```

```
1      PARAGRAPH 21, MR. KAIL DEPRIVED NETFLIX OF ITS MONEY PROPERTY

2      BY ENABLING VENDORS TO NEGOTIATE MORE FAVORABLE CONTRACTS WITH

3      NETFLIX THAN THEY WOULD HAVE BEEN ABLE TO DO WITHOUT HIS

4      ASSISTANCE.  AND NETFLIX SAYS, WE DON'T CONTEND THAT WE PAID

5      MORE THAN WE WOULD OTHERWISE HAVE PAID.

6            THE COURT:  MR. SAMPSON, LET ME HEAR FROM THE

7      GOVERNMENT.

8            MR. SAMPSON:  YES, YOUR HONOR.

9      JUST WORKING BACKWARDS RESPONDING TO THE NETFLIX POSITION.

10     THE POSITION THAT A PRIVATE COMPANY OR THE VICTIM IN THIS

11     CASE, PARTICIPATES IN CIVIL LITIGATION, IS NOT BINDING ON THE

12     GOVERNMENT.

13     EVEN IF IT WERE, YOUR HONOR, A FULL READING OF THOSE

14     INTERROGATORY RESPONSES IN OTHER INTERROGATORIES, I BELIEVE

15     CLEARLY INDICATES THAT NETFLIX DID LEAVE OPEN THE POSITION THAT

16     THEY HAD BEEN ECONOMICALLY HARMED.

17     BUT A CONSERVATIVE LEGAL POSITION BY A NONPARTY OR A

18     NONGOVERNMENT CANNOT COLLATERALLY ESTOP THE GOVERNMENT FROM

19     MAKING THAT ASSERTION.

20           THE COURT:  IT MIGHT JUST BE GOOD IMPEACHMENT IF

21     SOMEONE IS ON THE STAND.

22           MR. SAMPSON:  FAIR ENOUGH.

23           THE COURT:  AND THAT'S ALL I SAW IN IT, AND THAT'S

24     WHY I DON'T THINK IT'S REALLY APPROPRIATE FOR ME TO LOOK AT

25     THAT AT A MOTION TO DISMISS.
```

1        GO AHEAD.

2             MR. SAMPSON:  YES, YOUR HONOR.

3        SIMILARLY, IT WOULD NOT BE APPROPRIATE FOR THE COURT TO

4   LOOK AT THE SEARCH WARRANT AFFIDAVITS AT THIS TIME.

5             THE COURT:  I DIDN'T ACTUALLY GET THOSE.  I DIDN'T

6   SEE THOSE.

7        I HAD -- THEY WERE REFERENCED, AND I HAD -- WHAT I HAD IN

8   THE TWO ENVELOPES WERE INTERROGATORY RESPONSES.  SO DID YOU --

9   ACTUALLY, I DON'T KNOW WHY I WOULD PARSING ALL OF THAT.  YOU

10  ESSENTIALLY ARE TRYING TO DEPRIVE THE GOVERNMENT OF ITS

11  CHARGING AUTHORITY, AS OPPOSED TO -- I HAVE, IN ONE ENVELOPE, I

12  RECEIVED --

13            MR. AINLEY:  YES, YOUR HONOR.

14       THOSE WERE THE DOCUMENTS, THE INTERROGATORY RESPONSES TO

15  BE FILED UNDER SEAL.

16            THE COURT:  THESE ARE THE -- I DIDN'T -- SO ALL I'M

17  SAYING IS I DIDN'T GET.

18            MR. AINLEY:  I'M SORRY.  THEY WERE ATTACHED AS

19  EXHIBIT B.

20            THE COURT:  WHICH WERE THEY?

21            MR. SAMPSON:  THEY WERE FILED AS DOCUMENT 23-2.

22            THE COURT:  IT'S NICE THAT THEY WERE FILED.  WERE

23  THEY DELIVERED TO ME?

24            MR. AINLEY:  YES, YOUR HONOR, THEY SHOULD HAVE BEEN.

25  I DIDN'T DO IT MYSELF, BUT THEY WERE MESSENGERED OVER.

1      THE COURT:  I CAN'T -- I HAVE DOCUMENT 23 AND I HAVE

2   DOCUMENT 22, AND I HAVE -- I DIDN'T GET IT.  I DON'T KNOW WHAT

3   HAPPENED.  IF YOU DELIVERED IT, THANK YOU.  I CAN'T TELL YOU

4   WHAT HAPPENED.  I DON'T HAVE IT.

5      WHY WOULD I BE LOOKING AT THE SEARCH WARRANT APPLICATION?

6      MR. AINLEY:  WELL, THE SEARCH WARRANT APPLICATION,

7   WHICH WAS FILED AND THEN UNSEALED AT THE LAST HEARING, IS

8   ESSENTIALLY THE INDICTMENT AT LARGE.  THE INDICTMENT TRACKS

9   DIRECTLY THE SEARCH WARRANT AFFIDAVIT.  156 PAGES, AND THERE'S

10  NOT A CLAIM ANYWHERE IN THAT 156 PAGES THAT NETFLIX SUFFERED

11  ECONOMIC HARM.

12      THE COURT:  PERHAPS I DON'T UNDERSTAND A SEARCH

13  WARRANT, BUT I DIDN'T THINK THAT A SEARCH WARRANT CONTAINED THE

14  TOTALITY OF THE INFORMATION THE GOVERNMENT HAD WHEN IT PRESENTS

15  THE GRAND JURY ISSUES FOR AN INDICTMENT.  AM I MISTAKEN?

16      MR. SAMPSON:  IN ALMOST EVERY CASE, YOUR HONOR, AND I

17  THINK I CAN FIND IT IN THESE SEARCH WARRANT AFFIDAVITS, IT

18  SAYS, I'M ONLY PROVIDING ENOUGH INFORMATION TO ESTABLISH

19  PROBABLE CAUSE.

20      HOWEVER, AGAIN, THE GOVERNMENT'S POSITION IS THAT THE

21  COURT IS BOUND BY THE FOUR CORNERS OF THE INDICTMENT IN

22  REVIEWING IT FOR SUFFICIENCY.

23      THE COURT:  IT'S NOT MY JOB TO TEST THE PLEADING BY

24  WHETHER IT'S SUPPORTED BY OTHER DOCUMENTATION.  THAT'S WHAT THE

25  JURY DOES.  THIS IS NOT A TRIAL.  AND ALL I'M LOOKING AT HERE,

1    ALL I CAN LOOK AT HERE, IS WHETHER THE INDICTMENT ALLEGES THE

2    ELEMENTS OF THE CRIMES CHARGED AND SUFFICIENT INFORMATION TO

3    PUT MR. KAIL ON NOTICE OF THE CHARGES AGAINST HIM.

4         AND SO HERE, IT DOES APPEAR THAT READING THE SEARCH

5    WARRANT IS NOT SOMETHING THAT I NEED TO DO.  AS I SAY, I WILL

6    HAVE TO HUNT IT DOWN, I DON'T KNOW WHERE IT IS, BUT CLEARLY YOU

7    DID YOUR JOB IN PROVIDING IT TO ME.

8         GO AHEAD, MR. SAMPSON.

9              MR. SAMPSON:  SO YOUR HONOR, WITH RESPECT TO THE

10   MOTION TO DISMISS, I JUST WANT TO RESPOND TO THREE ISSUES.

11        FIRST AND FOREMOST, THE GOVERNMENT DOES ALLEGE ECONOMIC

12   HARM.  PARAGRAPH 21(A) STATES THAT -- ALLEGES THAT NETFLIX WAS

13   FORCED INTO CONTRACTS THAT WERE LESS FAVORABLE THAN IT WOULD

14   OTHERWISE HAVE ENTERED INTO, HAD MR. KAIL NOT BEEN CONFLICTED

15   BY THE BRIBES AND KICKBACKS.

16        SO THERE IS ECONOMIC HARM ALLEGED.  AND READING IT IN

17   LIGHT MOST FAVORABLE TO THE NONMOVING PARTY, THAT ISSUE THAT

18   MILOVANOVIC DICTA LEFT OPEN IS REALLY NOT FOR THE COURT TO

19   DETERMINE.

20        YOUR HONOR, ADDITIONALLY THE STATUTE IS NEUTRAL, BLIND AS

21   TO PUBLIC OR PRIVATE.  COURTS HAVE PUT A GLOSS ON IT, BUT THE

22   GOVERNMENT'S POSITION IS THAT THE STATUTE WOULD, 1346 WOULD BE

23   COMPLETELY DEPRIVED OF ALL MEANING IF THE COURT MADE

24   DISTINCTIONS ABOUT ECONOMIC HARM.  IF ECONOMIC HARM WAS A

25   REQUIRED ELEMENT, IT WOULD JUST BE WIRE FRAUD.  THERE WOULD BE

1    NO INTANGIBLE RIGHT OF HONEST SERVICES, IT WOULD RENDER THE

2    STATUTE MEANINGLESS.

3            AND THIRD, YOUR HONOR -- WELL, THAT WAS ACTUALLY IT.

4            THE COURT:  OKAY.

5        MR. AINLEY, ANYTHING TO FINISH UP?

6            MR. AINLEY:  I WAS JUST GOING TO SAY, YOUR HONOR, ON

7    MILOVANOVIC, THE SKILLING DECISION IS SIMILAR BECAUSE PRIOR TO

8    SKILLING, OF COURSE, THERE WAS NO REQUIREMENT -- STRIKE THAT.

9    THERE WAS NO DISTINCTION BETWEEN SELF DEALING, CONFLICT OF

10   INTEREST, BRIBERY AND KICKBACKS.  THE DECISION MADE BY THE

11   COURT WAS REALLY NEW, IT WAS NOVEL, IT WAS A WAY TO LIMIT THE

12   REACH OF WHAT POTENTIALLY IS A STATUTE THAT REACHES EVERY FORM

13   OF HUMAN CONDUCT.

14       AND THE BRIGHT LINE TEST SEEMS TO BE FROM THE SUPREME

15   COURT, WITHOUT ANY PARTICULAR LOGICAL REASON.  IT'S JUST

16   DECIDED UPON AS A STOPPING POINT.

17           THE COURT:  SO THAT'S WHAT THE UNITED STATES SUPREME

18   COURT GETS TO DO, BUT IT'S NOT WHAT A DISTRICT JUDGE GETS TO

19   DO.

20           MR. AINLEY:  TRUE.

21           THE COURT:  ALL RIGHT.  THANK YOU.

22       YOU KNOW, I APPRECIATE THE EFFORT THAT WENT INTO THE

23   BRIEFING.  I WILL ISSUE A WRITTEN ORDER.  I AM GOING TO DENY

24   THE MOTION.

25           FIRST AND FOREMOST, I FIND THAT THE GOVERNMENT HAS

1    ADEQUATELY ALLEGED ECONOMIC HARM IN THE INDICTMENT.  AND I DO

2    FIND THAT IT'S NOT CLEAR TO ME THAT ALLEGATION IS NECESSARY,

3    BUT IT'S BEEN MADE.  I GUESS WE WILL BE REVISITING THIS ISSUE

4    LATER AS TO WHETHER IT'S AN ELEMENT OF THE OFFENSE AND NEEDS TO

5    BE PROVED.

6         BUT I ACTUALLY DON'T SEE A SIGNIFICANT DISTINCTION IN THE

7    HARM TO THE PUBLIC BETWEEN ALLEGATIONS OF BRIBES AND KICKBACKS

8    AGAINST PUBLIC AGENCIES AND BRIBES AND KICKBACKS INVOLVING A

9    PRIVATE PARTY THAT DERIVES ITS INCOME FROM A BASE OF CONSUMERS

10   THAT ARE PAYING FOR THE HARMS DONE BY BRIBES AND KICKBACKS

11   WHERE PRUDENT.

12        SO I'M NOT SURE I NEED TO REACH THAT ISSUE AND I MAY NOT

13   NEED TO REACH IT.  LOOKING AT THE FOUR CORNERS OF THIS

14   INDICTMENT, I'M SATISFIED THAT IT MEETS EVEN THE REQUIREMENT

15   THAT THE DEFENSE SUGGESTS, BUT I DON'T FIND THAT A REQUIREMENT

16   OF ECONOMIC HARM IS EVEN NECESSARY.

17        OKAY.  THANK YOU.

18             MR. AINLEY:  THANK YOU, YOUR HONOR.

19             THE COURT:  SO LET'S SEE, WHERE ARE WE IN TERMS OF

20   OUR STATUS ON THIS CASE, THOUGH, GOING FORWARD?

21             MR. AINLEY:  WE HAVE A HEARING ON THURSDAY THE 13TH

22   IN FRONT OF JUDGE DEMARCHI.

23             THE COURT:  OKAY.

24             MR. AINLEY:  A DISCOVERY MOTION.

25             THE COURT:  DISCOVERY.

1       BUT I DON'T HAVE ANYTHING COMING UP FOR US, AND WE NEED --

2    ARE YOU ASKING FOR FURTHER STATUS TO BE SET AT SOME POINT IN

3    THE FUTURE?

4       MR. AINLEY:  YES, YOUR HONOR.

5    AND WE WOULD LIKE TO EXCLUDE TIME, OF COURSE.

6       THE COURT:  AND WHAT KIND OF TIMELINE WOULD BE

7    APPROPRIATE?  I'M SURE CASES LIKE THIS HAVE A FAIRLY LONG

8    PERIOD OF TIME FOR INVESTIGATION.

9       MR. AINLEY:  YES.  END OF FEBRUARY, EARLY MARCH?

10       THE COURT:  MR. SAMPSON, WHAT'S THE GOVERNMENT'S

11    POSITION ON THAT?

12       MR. SAMPSON:  WE DON'T OPPOSE FEBRUARY OR EARLY MARCH

13    FOR STATUS.  I DON'T KNOW IF THERE ARE ADDITIONAL MOTIONS.

14       THE COURT:  SO I DON'T KNOW WHAT THE TIMELINE IS ON

15    THIS CASE.  I DO LIKE TO SET A FINAL MOTIONS DATE, BUT WE DON'T

16    HAVE A TRIAL DATE SET.

17       MR. AINLEY:  WE DO NOT.  NO, YOUR HONOR.

18       THE COURT:  AND SO USUALLY I DON'T SET A FINAL

19    MOTIONS DATE UNTIL I SET A TRIAL DATE, BECAUSE I DON'T KNOW

20    WHAT YOU'RE LOOKING AT.  I DON'T KNOW WHETHER THIS CASE WILL BE

21    READY FOR TRIAL IN 90 DAYS OR A YEAR.

22    AND YOU HEARD ME SAY MY CRIMINAL CALENDAR IS PRETTY BOOKED

23    THIS YEAR.  I DON'T PAY ATTENTION TO MY CIVIL CASES, THEY HAVE

24    TO GIVE WAY TO THE CRIMINAL CASES, BUT YOU DON'T GET TO BUMP

25    ANOTHER CRIMINAL CASE.

1      SO I DON'T KNOW, AND I DON'T KNOW WHETHER THE PARTIES ARE

2   LOOKING AT RESOLUTION SHORT OF TRIAL OR NOT, AND YOU MAY NOT

3   KNOW THAT YET EITHER IF THE DISCOVERY IS STILL BEING GATHERED.

4           MR. AINLEY:  YES, YOUR HONOR.

5           THE COURT:  OKAY.  HAS THE GOVERNMENT GIVEN OVER ALL

6   THE DISCOVERY IT HAS?

7           MR. SAMPSON:  YES, YOUR HONOR.

8      THERE ARE A FEW REMAINING THINGS TO BE PRODUCED, AND WE

9   ARE PROCESSING IT RIGHT NOW.  THOSE INCLUDE PHOTOGRAPHS FROM

10  THE SEARCH WARRANT, THEY INCLUDE SOME DIGITAL DOCUMENTS THAT

11  WERE SEIZED AND REVIEWED.  IT IS NOT A GREAT DEAL OF

12  INFORMATION, BUT WE PLAN TO PRODUCE THAT HOPEFULLY BEFORE THE

13  HOLIDAY.

14           THE COURT:  THAT'S GOOD.  THAT'S IMPORTANT.

15      ALL RIGHT.  LET'S SET A FURTHER STATUS DATE.

16           THE CLERK:  FEBRUARY 26TH.  THE LAST WEEK IN

17  FEBRUARY.

18           THE COURT:  OKAY.  IS THAT AVAILABLE FOR EVERYONE?

19           MR. SAMPSON:  YES, YOUR HONOR.

20           MR. AINLEY:  YES, YOUR HONOR.

21           THE COURT:  OKAY.

22      AND MR. AINLEY, IS THERE A REQUEST TO EXCLUDE TIME UNTIL

23  THAT DATE FOR EFFECTIVE PREPARATION?

24           MR. AINLEY:  YES, YOUR HONOR.

25           THE COURT:  ALL RIGHT.

```
 1         THEN I WILL SET THIS ON FEBRUARY 26TH AT 9:00 A.M.  I WILL
 2    EXCLUDE TIME UNTIL THAT DATE FOR EFFECTIVE PREPARATION OF
 3    COUNSEL.
 4         THERE WILL BE A WRITTEN ORDER ON THIS MOTION, OF COURSE,
 5    BUT YOU DO KNOW MY RULING.  AND I WILL DEAL WITH THE SEALING
 6    REQUEST IN THAT MOTION.  AND I THINK THAT TAKES CARE OF
 7    EVERYTHING.
 8         AT THE NEXT STATUS, I'M REALLY GOING TO BE WANTING A
 9    PRETTY GOOD TIMELINE ON WHERE THE CASE IS.  I WILL EXPECT THAT
10    ALL THE DISCOVERY HAS BEEN TURNED OVER AND REVIEWED BY THAT
11    TIME, SO THERE SHOULD BE A GOOD SENSE OF WHERE YOU'RE HEADED.
12              MR. SAMPSON:  YES, YOUR HONOR.
13         AND THE GOVERNMENT WOULD ASK THAT THE PARTIES BE PREPARED
14    TO DISCUSS TRIAL DATES AT THAT TIME.
15              THE COURT:  OKAY.
16         AND WOULD THE GOVERNMENT PREPARE A STIP AND ORDER FOR THE
17    EXCLUSION OF TIME?
18              MR. SAMPSON:  WE WILL.
19              THE COURT:  I DO APPRECIATE THAT.
20         YES.  AND IF THERE ARE GOING TO BE ANY DISCUSSIONS AMONG
21    YOU FOR OTHER RESOLUTION, I HOPE THAT WILL GET STARTED EARLY IN
22    THE NEW YEAR.
23              MR. SAMPSON:  THANK YOU, YOUR HONOR.
24              MR. AINLEY:  VERY GOOD.
25         THANK YOU, YOUR HONOR.
```

1          THE COURT:  THANK YOU.

2     THANK YOU, MR. KAIL.

3     (THE PROCEEDINGS WERE CONCLUDED AT 9:31 A.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

   UNITED STATES OF AMERICA,      )   CR-18-00172-BLF
5                                  )
                   PLAINTIFF,      )   SAN JOSE, CALIFORNIA
6                                  )
           VS.                     )   SEPTEMBER 25, 2018
7                                  )
   KAIL,                           )   PAGES 1-32
8                                  )
                   DEFENDANT       )
9                                  )
   _____  )
10
                 TRANSCRIPT OF PROCEEDINGS
11       BEFORE THE HONORABLE BETH LABSON FREEMAN
                UNITED STATES DISTRICT JUDGE
12
                A P P E A R A N C E S
13

14

15   FOR THE PLAINTIFF:      BY:   COLIN CHRISTOPHER SAMPSON
                             UNITED STATES ATTORNEY'S OFFICE
16                           NORTHERN DISTRICT OF CALIFORNIA
                             TAX DIVISION
17                           450 GOLDEN GATE AVENUE, BOX 36055
                             SAN FRANCISCO, CA 94102
18

19   FOR THE DEFENDANT:      BY:  JOSEPH HEATHCLIFF AINLEY
                             AINLEY & ASSOCIATES, APC
20                           1494 HAMILTON WAY, SUITE 100
                             SAN JOSE, CA 95125
21

22

23   OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                  CERTIFICATE NUMBER 13185
24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1        SAN JOSE, CALIFORNIA                    SEPTEMBER 25, 2018

 2                          P R O C E E D I N G S

 3        (COURT CONVENED AT 9:00 A.M.)

 4             THE CLERK:  YOUR HONOR, CALLING CASE 18-CR-00172.

 5        UNITED STATES OF AMERICA VERSUS MICHAEL KAIL.

 6        COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 7             MR. AINLEY:  GOOD MORNING, YOUR HONOR.

 8        JOSEPH AINLEY APPEARING FOR MICHAEL KAIL.

 9             MR. SAMPSON:  GOOD MORNING, YOUR HONOR.

10        COLIN SAMPSON FOR THE UNITED STATES.

11             THE COURT:  GOOD MORNING.

12        GOOD MORNING, MR. KAIL.

13             ALL RIGHT.  I GUESS WE HAVE BOTH A STATUS AND WE HAVE TWO

14        MOTIONS BROUGHT BY THE DEFENSE.

15             I HAVE REVIEWED THE PAPERWORK.  THANK YOU FOR FILING IT.

16        MR. AINLEY, IN THE FUTURE, I WILL NOT ENTERTAIN MOTIONS THAT

17        REDUCE THE COURT'S TIME TO CONSIDER YOUR PAPERS, AND THAT'S

18        WHAT HAPPENED HERE.

19             MR. AINLEY:  YES, YOUR HONOR.  THANK YOU.

20             THE COURT:  I GATHER WHEN YOU WRITE PAPERS, YOU WANT

21        ME TO READ THEM, I THINK USUALLY THAT'S DESIRED.

22             MR. AINLEY:  YES, YOUR HONOR.

23             THE COURT:  SO THAT WON'T HAPPEN AGAIN.  I WILL

24        SIMPLY STRIKE THE MOTION.

25             MR. AINLEY:  THANK YOU, YOUR HONOR.
```

```
 1              THE COURT:  ALL RIGHT.

 2          SO IS THERE AN ORDER YOU WISH TO TAKE THESE UP?  THE BILL

 3      OF PARTICULARS REQUEST OR THE ONE ON DOCUMENTS?

 4              MR. AINLEY:  I THINK WE CAN START WITH THE BILL OF

 5      PARTICULARS, YOUR HONOR.

 6              THE COURT:  OKAY.

 7              MR. AINLEY:  AND MY CONCERNS REGARDING THE BILL OF

 8      PARTICULARS ARE THAT THE -- AS LAID OUT IN THE PAPERS, THE

 9      ALLEGATIONS OF THE COMPLAINT, OR THE INDICTMENT, EXCUSE ME, ARE

10      NONSPECIFIC.  THERE IS NO ACTUAL TRANSACTION IDENTIFIED OR

11      ALLEGED.  THERE IS NO MISREPRESENTATION IDENTIFIED OR ALLEGED.

12      NONE OF THE INDIVIDUALS WHO MR. KAIL, ACCORDING TO THE

13      INDICTMENT, WOULD HAVE HAD TO HAVE TAKEN KICKBACKS FROM ARE

14      IDENTIFIED, THERE'S SIMPLY A LIST OF COMPANIES UPON WHICH

15      MR. KAIL SAT ON CONSUMER ADVISORY BOARD.

16          IN ADDITION TO THESE SEVEN COMPANIES, AS THE PEOPLE KNOW,

17      THERE WERE ANOTHER 50 COMPANIES FOR WHICH MR. KAIL WAS ON THE

18      ADVISORY BOARD.

19          IF YOU LOOK AT THE CASE LAW, YOUR HONOR, WHEN YOU HAVE A

20      FRAUD CLAIM WHICH IS INHERENTLY VAGUE, I THINK THE CASES HAVE

21      BEEN FAIRLY CONSISTENT IN SAYING THAT A BILL OF PARTICULARS IS

22      APPROPRIATE.  AND I WOULD CITE THE COURT TO, U.S. V.

23      BORTNOVSKY, 820 F.2D 572, SECOND CIRCUIT DECISION FROM 1987.

24              THE COURT:  IS THAT IN YOUR PAPERS?

25              MR. AINLEY:  NO, IT'S NOT, YOUR HONOR.  THAT'S WHY
```

1       I'M REFERENCING IT RIGHT NOW.

2           AND THAT APPELLATE DECISION WAS AN INSURANCE FRAUD CLAIMS.

3       THERE WAS SOME ALLEGED FAKE BURGLARIES, THERE ARE ALSO SOME

4       GENUINE BURGLARIES.  AND THE COURT HELD THAT GIVEN THE

5       VAGUENESS OF THE ALLEGATIONS, THE NONSPECIFIC NATURE OF THE

6       TRANSACTIONS ALLEGED, THE DEFENDANT WOULD BE PUT IN THE

7       POSITION OF PROVING HIS INNOCENCE, AS OPPOSED TO THE PEOPLE

8       PROVING GUILT AS TO SPECIFIC TRANSACTIONS.

9           THAT'S WHAT WE HAVE HERE.  IF YOU LOOK AT PAGE 7 OF THE

10      ATTORNEY'S MOTION, WHAT YOU WILL SEE IS AN ASSERTION THAT THE

11      CASE CAN BE PROVEN BY IMPLICATION, WHICH IS TRUE.  THERE'S NO

12      DISPUTE THAT A 1346 VIOLATION CAN BE PROVEN BY IMPLICATION, AND

13      A JURY CAN CONVICT BASED UPON INFERENCE.

14          THAT IS THE PROBLEM IN THIS CASE.  AT PAGE 7, THE

15      UNITED STATES, "DEFENDANT FUNDAMENTALLY MISREADS THE

16      REQUIREMENTS FOR A VIOLATION OF THE HONEST SERVICES STATUTE.

17      AN EXCHANGE FOR PURPOSES OF THE QUID PRO QUO REQUIREMENT MAY BE

18      EXPRESS OR IMPLIED, AND THUS ANSWERS QUESTION KAIL ASKS, MAY

19      NOT BE FOUND SOLELY IN THE DOCUMENTS."

20          THAT'S TRUE.  WE DON'T HAVE AN ANSWER FOR ANYTHING, NOT

21      FOUND IN THE DOCUMENTS.  WE HAVE NO IDEA WHO THE ALLEGED

22      CO-CONSPIRATORS OR UNINDICTED CO-CONSPIRATORS --

23              THE COURT:  I DON'T THINK A CONSPIRACY HAS BEEN

24      ALLEGED HERE, SO I DON'T KNOW WHY YOU ARE JUMPING TO

25      CO-CONSPIRATORS HERE.

1          MR. AINLEY:  WELL, IT'S ANALOGOUS TO THAT.

2          THE COURT:  THAT'S INTERESTING, BECAUSE THAT'S

3     EXACTLY THE GOVERNMENT'S POINT IS THAT IT'S NOT A CONSPIRACY.

4          AND I'M NOT GOING TO MAKE THIS OUT TO BE A CONSPIRACY IN

5     ORDER TO FIT THIS INTO THE CASES YOU CITE ME WHERE A BILL OF

6     PARTICULARS HAS BEEN ORDERED WHEN IT IS A COMPLEX CONSPIRACY

7     INVOLVING MANY CO-CONSPIRATORS, CO-DEFENDANTS, UNINDICTED

8     CO-CONSPIRATORS.  THAT'S NOT WHAT I HAVE HERE.

9          SO I WOULD LIKE YOU TO DIRECT ME TO CASES THAT DO NOT

10    INVOLVE CONSPIRACIES, BECAUSE THIS CASE IS IN NO WAY ANALOGOUS

11    TO A CONSPIRACY.

12         MR. AINLEY:  VERY GOOD, YOUR HONOR.

13         AS I SAID, U.S. V. BORTNOVSKY, UNITED STATES V. SHTEYMAN,

14    S-H-T-E-Y-M-A-N, AND THAT'S CITED AS 10-CR-347(SJ) EASTERN

15    DISTRICT NEW YORK, 2011.

16         THE COURT:  I DON'T KNOW THAT CITATION.  TELL ME THAT

17    AGAIN?  I DON'T EVEN KNOW WHAT THAT CITATION IS.

18         MR. AINLEY:  YOUR HONOR, I HAVE TO CONFESS, I DON'T

19    EITHER, BUT THAT'S WHAT I GOT FROM MY CASE CITE.  IT'S

20    10-CR-327(SJ), EASTERN DISTRICT OF NEW YORK, MAY 23, 2011.

21         THE COURT:  I DON'T KNOW WHAT THAT IS.  I DON'T KNOW

22    IF THAT'S CITABLE.  10-CO?

23         MR. AINLEY:  10-CR.

24         MR. SAMPSON:  IT SOUNDS LIKE A LOCAL CRIMINAL CASE

25    DOCKET, 10-CR.

1        THE COURT:  YOU SAID IT WAS -- WELL, BUT THAT

2    WOULD -- THANK YOU.  OH, C-R.  THIS WASN'T IN WESTLAW?

3        MR. AINLEY:  THIS IS A DIFFERENT CASE, IT WAS CALLED

4    CASE TEXT.  IT DID NOT CITE TO WESTLAW.

5        THE COURT:  ARE YOU LEAVING THIS COPY WITH ME?

6        MR. AINLEY:  YES, YOUR HONOR.

7        THE COURT:  ALL RIGHT.  OKAY.

8    TEN DEFENDANTS IN THIS ACTION HAVE BEEN INDICTED FOR

9    ALLEGEDLY PARTICIPATING IN A MEDICARE FRAUD SCHEME.

10    THIS WASN'T A CONSPIRACY CASE?

11        MR. AINLEY:  I DON'T BELIEVE SO, YOUR HONOR, NO.

12    I THINK A LOT OF THESE CASES HAVE MULTIPLE DEFENDANTS, BUT

13    THE ALLEGATION IS NOT CONSPIRACY.

14        THE COURT:  USUALLY WHEN THERE'S A SCHEME, THERE'S A

15    CONSPIRACY, BUT THEIR DECISION IS QUITE LENGTHY, SO I WILL HAVE

16    TO READ IT.

17        MR. AINLEY:  YES, YOUR HONOR, THAT'S TRUE.  AND IN

18    THIS CASE, A SCHEME IS ALLEGED, OF COURSE.

19        THE COURT:  YES, THAT'S TRUE, THAT'S TRUE.

20        MR. AINLEY:  AGAINST MR. KAIL.

21    I ALSO CITE THE COURT TO --

22        THE COURT:  NONE OF THESE WERE IN YOUR PAPERS?

23        MR. AINLEY:  NO, YOUR HONOR.

24        THE COURT:  WAS THERE A REASON THAT YOU ARE PUTTING

25    ME THROUGH THIS?  WHY DID I PREPARE FOR THIS CASE IF I COULDN'T

1    PREPARE?  I HAVE NEVER SEEN A PRESENTATION LIKE THIS.  THESE

2    ARE OLD CASES.  THESE WEREN'T DECIDED SINCE YOU FILED YOUR

3    BRIEF TWO WEEKS AGO.

4          MR. AINLEY:  NO, YOUR HONOR.

5          THE COURT:  WHEN -- I MEAN, THIS IS JUST NOT -- I'M

6    NOT TAKING A HALF BAKED MOTION.

7       ARE WE GOING TO PUT THIS OVER?  MY CALENDARS ARE FULL FOR

8    ANOTHER MONTH.  THAT'S WHY I HAD TO HAVE YOU COME IN TODAY AND

9    SHORT CIRCUIT THE TIME I HAD TO READ THIS.

10      HOW MANY MORE CASES DO YOU HAVE FOR ME TO READ THAT YOU

11   DIDN'T CITE?

12         MR. AINLEY:  I APOLOGIZE, YOUR HONOR.  I THOUGHT YOU

13   WANTED ME TO REFER YOU TO THE CASES.

14         THE COURT:  I THOUGHT YOU WERE GOING TO REFER ME BACK

15   TO THE CASES YOU CITED IN YOUR BRIEF.  WHEN WERE YOU GOING TO

16   GIVE THE GOVERNMENT AN OPPORTUNITY TO READ AND RESPOND TO THESE

17   CASES?

18         MR. AINLEY:  WELL, I THINK THE GOVERNMENT DID RESPOND

19   TO THE CASES WE CITED.

20         THE COURT:  NOT THE ONES YOU ARE JUST READING TO ME

21   NOW, IF THEY WEREN'T CITED IN YOUR OPENING PAPERS.

22         MR. AINLEY:  WE DID CITE TO A NUMBER OF CASES,

23   APPROXIMATELY TEN CASES IN THE OPENING BRIEF.

24         THE COURT:  I THINK YOU UNDERSTAND THAT IN THE

25   FUTURE, WHEN PAPERS ARE DUE, THAT YOU NEED TO CITE THE CASES,

1    UNLESS THERE IS SOMETHING THAT HAS TRANSPIRED SINCE THE PAPERS

2    WERE FILED, BUT JUST COMPLETING YOUR RESEARCH AFTER YOU FILE

3    YOUR PAPERS IS NOT ACCEPTABLE.

4           MR. AINLEY:  YES, YOUR HONOR.

5           THE COURT:  ANY OTHER COMMENTS ON THE BILL OF

6    PARTICULARS REQUEST?

7           MR. AINLEY:  NO, YOUR HONOR.

8           THE COURT:  FROM THE GOVERNMENT?

9           MR. SAMPSON:  YOUR HONOR, JUST BRIEFLY.

10       A BILL OF PARTICULARS IS APPROPRIATE WHERE A DEFENDANT IS

11   NOT ADEQUATELY APPRISED OF THE CHARGES.

12       IN THIS 29-COUNT INDICTMENT, THERE IS AN EXTENSIVE

13   RECITATION OF THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD HIS

14   EMPLOYER OF ITS INTANGIBLE RIGHT TO HONEST SERVICES.

15       IT INCLUDES THE WAY IN WHICH MR. KAIL IS ALLEGED TO HAVE

16   DIRECTED PAYMENTS OF NETFLIX TO CERTAIN VENDORS, AND THE WAY IN

17   WHICH HE RECEIVED KICKBACKS IN THE FORM OF CASH PAYMENTS KEYED

18   TO THE AMOUNT OF THE CONTRACTS, AS WELL AS STOCK AND STOCK

19   OPTIONS IN SOME OF THESE ENTITIES AS AN ADVISOR OR CUSTOMER

20   ADVISOR TO SOME OF THESE ENTITIES.

21          THE COURT:  SO I HAVE -- YES.  I THINK THE INDICTMENT

22   DOES THAT, IN TERMS OF THE METHODS, AND GENERAL EXAMPLES OF THE

23   MANNER IN WHICH THE ALLEGED SCHEME WAS CARRIED OUT.

24       BUT MR. AINLEY MAKES THE POINT THAT THEY ARE TRYING TO HIT

25   A MOVING TARGET.  AND NOT SPEAKING OF MR. KAIL, BUT LET'S SAY A

1    DEFENDANT MIGHT BE CONCERNED THAT THERE ARE A NUMBER OF THINGS

2    THAT OCCURRED DURING THE TIME PERIOD THAT THE GOVERNMENT MAY OR

3    MAY NOT DENOMINATE AS FRAUDULENT AND ILLEGAL, AND IT WOULD THEN

4    BE UP TO THE DEFENDANT TO PREPARE A CASE ON ITEMS 1 THROUGH 10,

5    ONLY TO COME TO TRIAL AND SEE YOU ARE GOING TO PRESENT ITEMS 11

6    THROUGH 20.

7         AND SO IN TERMS OF THE BILL OF PARTICULARS, THAT IS

8    CONCERNING THAT I DON'T THINK IT'S THE GOVERNMENT'S JOB TO

9    CONNECT ALL THE DOTS FOR THE DEFENSE.  AND A BILL OF

10   PARTICULARS, AS YOU SAY, IS NOT A DISCOVERY TOOL.

11        BUT THERE GENERALLY IS SOME MIDDLE GROUND.  I DON'T THINK

12   THAT THE HUNTER INDICTMENT IS A PROPER ANALOGY BECAUSE

13   CONGRESSMAN HUNTER IS A PUBLIC FIGURE AND THE INDICTMENT IS

14   DROPPED INTO AN INTENSELY POLITICAL SITUATION WITH AN ELECTION

15   OCCURRING ONLY A FEW WEEKS AFTER THE INDICTMENT.

16        AND SO THE REASONS FOR GOING ABOVE AND BEYOND THE LEGAL

17   REQUIREMENT OF AN INDICTMENT, I THINK ARE APPARENT TO ANYONE

18   WHO READS THE NEWSPAPER OCCASIONALLY.  BUT HERE, THAT'S MY

19   CONCERN.

20             MR. SAMPSON:  WELL, YOUR HONOR, THIS INDICTMENT DOES

21   GO ABOVE AND BEYOND THE LEGAL REQUIREMENTS.  IT ALLEGES THE

22   NAMES OF THE NINE COMPANIES, IT ALLEGES THE DATES OF THE

23   TRANSACTIONS, COMMUNICATIONS, CONTRACTS, THAT ARE ALLEGED IN

24   COUNTS 1 THROUGH 22.

25        AND WITH RESPECT TO THE MONEY LAUNDERING, YOUR HONOR, IT

1    EXPLAINS THE WAY IN WHICH MONEY WAS MOVED THROUGH MR. KAIL'S

2    LLC, THROUGH ACCOUNTS IT CONTROLLED, TO HIMSELF, AND TO AN

3    ESCROW COMPANY FOR THE PURCHASE OF HIS HOUSE.

4          THE COURT:  SHOW ME WHERE YOU ARE TALKING ABOUT THE

5    DATES.

6          MR. SAMPSON:  YOUR HONOR, IF YOU LOOK AT THE CHART ON

7    PAGE 5 OF THE INDICTMENT, IT SHOWS WITH RESPECT TO EACH WIRE

8    FRAUD COUNT, IT GIVES A DATE AND IT DESCRIBES THE WIRE FRAUD,

9    HOW IT WAS CONDUCTED.

10    DOCUSIGN IS A WAY TO SIGN CONTRACTS.  DOCUSIGN IS

11    LOCATED -- ITS SERVERS ARE NOT LOCATED IN CALIFORNIA.  THE

12    TRANSMISSION OF THE DOCUSIGN AGREEMENT IS A WIRE FOR PURPOSES

13    OF THE WIRE FRAUD STATUTE.

14          THE COURT:  SURE.

15          MR. SAMPSON:  SIMILAR WITH USE OF GMAIL.  THERE ARE

16    NUMEROUS DOCUSIGN CONTRACTS, ORDER FORMS, LICENSES, AGREEMENTS,

17    THEY ARE STATED WITH RESPECT TO EACH COMPANY THEY RELATE TO.

18    WITH RESPECT TO THE MAIL FRAUD, YOUR HONOR, SIMILARLY

19    THERE'S THREE MAIL FRAUD COUNTS THAT DESCRIBES THE MAILINGS,

20    THE DATES, AND THE COMPANY AND THE TYPE OF DOCUMENT IT RELATES

21    TO.

22          THE COURT:  OKAY.

23          MR. SAMPSON:  AND THE MONEY LAUNDERING GIVES AN

24    ACCOUNT NUMBER, IT GIVES A DATE, AND IT SAYS THE AMOUNT OF

25    MONEY THAT WAS TRANSFERRED.

1      YOUR HONOR, THE INDICTMENT ADEQUATELY APPRISES MR. KAIL OF

2   THE NATURE OF THE CHARGES.  IN ADDITION, WE HAVE GIVEN THE VAST

3   MAJORITY OF THE GOVERNMENT'S DISCOVERY THAT IT COLLECTED DURING

4   THE INVESTIGATION IN THIS MATTER.  AND FOR THOSE REASONS, THE

5   MOTION FOR BILL OF PARTICULARS, IN ADDITION TO IT BEING LATE,

6   SHOULD BE DENIED.

7           THE COURT:  OKAY.

8       MR. AINLEY, ANY FINAL COMMENTS ON THIS MOTION?

9           MR. AINLEY:  NO.

10      MY ONLY COMMENTS WOULD BE, YOUR HONOR, THAT THESE

11  DESCRIPTORS ARE SIMPLY A SINGLE ACT OF SOMETHING IN THE MAIL OR

12  WIRING SOMETHING.  THERE'S 200,000 DOCUMENTS, THERE IS ANY

13  NUMBER OF DIFFERENT COMBINATIONS OF WAYS THE GOVERNMENT CAN PUT

14  TOGETHER TO CREATE AN IMPLICATION OF A FRAUD, AND THAT APPEARS

15  TO BE WHERE THEY ARE GOING.

16          THE COURT:  WELL, SO, IT SEEMS TO ME THAT RELATES

17  MORE TO YOUR SECOND MOTION ON THE DOCUMENTS, BECAUSE IF THE

18  GOVERNMENT HAS -- IF I DETERMINE THE GOVERNMENT HAS ADEQUATELY

19  PUT YOU ON NOTICE OF THE TRANSACTION WHICH FORMS THE BASIS OF

20  THE CRIME ALLEGED, THEN THE METHOD OF PROOF OF THAT TRANSACTION

21  IS SEPARATE FROM THE BILL OF PARTICULARS.

22      SO I THINK MAYBE THAT'S THE DISTINCTION HERE.  AND ON THE

23  DOCUMENTS, HOW THE GOVERNMENT IS GOING TO GO ABOUT PROVING IT,

24  I MEAN, IT'S ALWAYS AN ISSUE IN A CASE AS TO, ARE THERE

25  EYEWITNESSS, ARE THERE GOING TO BE, WAS THERE A CAMERA, WAS

1    THERE A CONFESSION.  I MEAN, ALL THE DIFFERENT THINGS THAT

2    COULD GO INTO PROVING ANY CRIME, ARE NOT SET FORTH IN THE

3    INDICTMENT.  AN INDICTMENT DOESN'T SAY THE VICTIM WILL TESTIFY,

4    AN EYEWITNESS WILL TESTIFY, A LAB ANALYST WILL TESTIFY ABOUT

5    DNA.  IT DOESN'T TELL YOU THAT.

6        THERE ARE LOTS OF WAY TO PROVE THAT SOMEONE WAS THE PERSON

7    WHO COMMITTED THE CRIME, BUT IT'S NOT SET FORTH IN THE BILL OF

8    PARTICULARS.

9            MR. AINLEY:  CERTAINLY, YOUR HONOR.

10       IN THE CASE WHERE THERE'S AN ALLEGED FRAUD CLAIM WHERE

11    THERE'S AN ALLEGED KICKBACK, THERE HAVE TO BE SOME TYPE OF

12    KICKBACKS INVOLVED, ACTUAL MONEY GOING FROM ONE POCKET TO

13    ANOTHER POCKET.

14            THE COURT:  SURE.

15            MR. AINLEY:  INDIVIDUALS OUT THERE WHO PARTICIPATE IN

16    THAT.  AND THAT IS MISSING FROM THE INDICTMENT.

17            THE COURT:  SO YOU WANT AN -- YOU WANT THE NAMES OF

18    THE PEOPLE WHO SENT THE MONEY TO MR. KAIL?

19            MR. AINLEY:  WHO ALLEGEDLY GAVE THE KICKBACKS, YES,

20    AND WHEN THEY DID SO.  BECAUSE THIS IS ALLEGED TO HAVE TAKEN

21    PLACE OVER THE PERIOD OF THREE YEARS THAT MR. KAIL WAS EMPLOYED

22    WITH NETFLIX.

23            THE COURT:  YES, IT CERTAINLY IS OVER A PERIOD OF

24    TIME.

25        SO THE FIRST CHART ON PAGE 5 SETS FORTH A TRANSMISSION,

1    THAT'S NOT A MONEY TRANSFER, THAT IS THE SIGNING OF THE

2    DOCUMENT THAT -- IS THAT CORRECT?

3            MR. SAMPSON:  STOCK OPTION AGREEMENTS RELATED TO

4    KICKBACKS.  YES, YOUR HONOR.

5            THE COURT:  OH, SO THE STOCK OPTION, THAT WOULD BE

6    THE ALLEGED APRIL 6, 2013 CIRCUMSTANCE WHERE YOU ALLEGE THAT

7    MR. KAIL RECEIVED STOCK OPTIONS WHICH FORM THE BASIS OF THE

8    KICKBACK?

9            MR. SAMPSON:  YES, YOUR HONOR.

10            THE COURT:  OKAY.  BUT LET'S LOOK AT THE SECOND ONE,

11    TRANSMISSION VIA DOCUSIGN OF NETSKOPE, INC. ORDER FORM.  I

12    DON'T KNOW WHAT THAT MEANS.

13            MR. SAMPSON:  THAT IS THE OBLIGATION THAT MR. KAIL

14    SIGNED ON BEHALF OF NETFLIX TO DIRECT BUSINESS TO NETSKOPE.

15        SO THERE'S THE STOCK OPTION AGREEMENT AND THEN THERE'S THE

16    QUID PRO QUO.

17            THE COURT:  I SEE.

18        OKAY.  I THINK I UNDERSTAND THAT BETTER.  THANK YOU.

19        OKAY.  LET'S MOVE TO THE --

20            MR. AINLEY:  CAN I MAKE ONE FINAL POINT?

21            THE COURT:  YES, OF COURSE.

22            MR. AINLEY:  THE FINAL POINT IS THE GOVERNMENT HAS

23    INFORMALLY ADVISED THAT THE REASON THAT THESE PARTICULAR

24    COMPANIES WERE SELECTED TO LIST IN THE INDICTMENT IS BECAUSE

25    OPTIONS AND CASH CHANGED HANDS ALLEGEDLY.  BUT THERE'S NO

1    REFERENCE ANYWHERE HERE TO THE CASH.

2         SO AGAIN, I THINK WE ARE STUCK WITH THE SAME PROBLEM THAT

3    MR. KAIL ENTERED INTO THESE TYPES OF AGREEMENTS WITH A UNIVERSE

4    OF COMPANIES, ONLY A VERY SMALL NUMBER OF WHICH ARE REPRESENTED

5    HERE.  AND THE ALLEGED FRAUD INCLUDES CASH PAYMENTS AS WELL AS

6    WHATEVER SENDING DOCUMENTS OVER THE WIRES.

7         THE COURT:  IS THERE A RESPONSE ON THAT?

8         MR. SAMPSON:  YOUR HONOR, I'M CERTAIN THE INDICTMENT

9    INDICATES THAT CASH WAS PART OF THE HONEST SERVICES FRAUD WITH

10   RESPECT TO AT LEAST TWO COMPANIES, NETENRICH AND VISTARAIT.

11   MR. KAIL'S KICKBACKS WERE A SET PERCENTAGE OF THE CONTRACTS

12   WITH NETFLIX, 12 AND 15 PERCENT, RESPECTIVELY.

13        I BELIEVE THE INDICTMENT INDICATES THAT HE DID RECEIVE

14   CASH.

15        THE COURT:  BUT IS IT GENERICALLY THAT HE RECEIVED

16   CASH, OR DO YOU SPECIFY WHICH TRANSACTIONS INVOLVED CASH?

17        MR. SAMPSON:  YOUR HONOR, I WILL HAVE TO CONSULT THE

18   INDICTMENT, BUT THE GOVERNMENT'S EVIDENCE WOULD BE THAT

19   NETENRICH AND VISTARA DID PAY ACCORDING TO EACH INVOICE OR

20   ACCUMULATION OF INVOICES, I THINK ON A MONTHLY BASIS.

21        MR. AINLEY:  YOUR HONOR, PARAGRAPH 23 OF THE

22   INDICTMENT ALLEGES THAT AS TO NETENRICH, PLATFORA, NETSKOPE,

23   NUMERIFY, MAGINATICS, SUMO LOGIC, DOCURATED, ELASTICBOX,

24   MR. KAIL DIRECTED THEM TO PAY KICKBACKS IN THE FORM OF STOCK

25   OPTIONS.

1      MR. SAMPSON:  AND YOUR HONOR, PARAGRAPH 22 SAYS THAT

2  NETENRICH AND VISTARAIT PAID KICKBACKS TO A BANK ACCOUNT IN

3  UNIX MERCENARY'S NAME.

4      MR. AINLEY:  RIGHT.

5      IT CLEARLY DOES AS TO VISTARAIT AND NETENRICH.  AS TO THE

6  OTHER ENTITIES, THOSE OTHER ENTITIES FROM A UNIVERSE OF 52 OR

7  53 PLUS, APPARENTLY WERE SELECTED BECAUSE CASH ALLEGEDLY

8  CHANGED HANDS.  BUT THAT'S NOT HERE.

9      MR. SAMPSON:  I'M NOT SURE WHAT MR. AINLEY IS

10  STATING.

11      THERE IS A UNIVERSE OF COMPANIES THAT MR. KAIL WAS

12  AFFILIATED WITH.  THE GOVERNMENT DID NOT ALLEGE A WIRE FRAUD

13  WITH RESPECT TO EACH ONE.

14      THE COURT:  RIGHT, RIGHT.

15      SO YOU ARE NOT GOING TO COME TO TRIAL AND FIND

16  COMPANIES -- CHARGES AGAINST MR. KAIL INVOLVING THOSE OTHER

17  COMPANIES, BECAUSE THE INDICTMENT DOESN'T COVER THOSE, CORRECT?

18      MR. SAMPSON:  CORRECT.  AS I INDICATED --

19      THE COURT:  AND I DON'T THINK THE INDICTMENT SAYS

20  CASH WAS TRANSFERRED AS TO EVERY ALLEGED TRANSACTION.

21      MR. SAMPSON:  CORRECT, YOUR HONOR.

22      MR. AINLEY:  BUT APPARENTLY THAT IS THE CASE.  AND

23  THAT IS WHAT THE GOVERNMENT --

24      THE COURT:  I THINK MAYBE YOU ARE OVERREADING THE

25  INDICTMENT.  I'M NOT EVEN SEEING WHAT YOU ARE TALKING ABOUT.

1      THERE'S AN ALLEGATION IN PARAGRAPH 22 THAT THERE WAS CASH

2   INVOLVED IN THE TRANSACTIONS WITH NETENRICH AND VISTARAIT.

3   THERE DOESN'T APPEAR TO BE AN ALLEGATION OF -- IT'S EITHER HERE

4   IN BLACK AND WHITE OR IT'S NOT, AS TO WHETHER THERE WERE CASH

5   TRANSACTIONS WITH THE OTHER ALLEGED COMPANIES.

6      AND YOU ARE TRYING TO FIND -- YOU WANT TO COMMIT THE

7   GOVERNMENT TO -- I MEAN, I'M NOT SURE WHAT YOU ARE TRYING TO

8   COMMIT THE GOVERNMENT TO, FRANKLY.

9          MR. AINLEY:  WELL, THE GOVERNMENT CAN AMEND ITS

10   INDICTMENT AS IT CHOOSES.

11         THE COURT:  WELL, ABSOLUTELY THEY CAN.  THEY COULD

12   BRING ALL THE REST OF THE 52 COMPANIES IN IF THEY WANT.  THAT

13   HAS NOTHING TO DO WITH THE BILL OF PARTICULARS.

14         MR. AINLEY:  CORRECT, YOUR HONOR.

15      MY POINT IS THAT THESE PARTICULAR COMPANIES WERE SELECTED,

16   APPARENTLY BECAUSE THE ALLEGATION OR THE EVIDENCE THAT THE

17   GOVERNMENT INTENDS TO PRESENT AT TRIAL, WILL BE THAT MR. KAIL

18   RECEIVED CASH FROM THESE COMPANIES IN ADDITION TO OPTIONS.

19         THE COURT:  I DIDN'T SEE IN THE INDICTMENT THAT

20   SUGGESTS THERE WAS CASH WITH REGARD TO EVERY COMPANY.  I DON'T

21   SEE THAT.

22      BUT I DON'T WANT TO PUT WORDS IN THE GOVERNMENT'S MOUTH.

23   I MEAN, IT LOOKS AS THOUGH CASH MAY HAVE BEEN, IT'S ALLEGED

24   THAT CASH WAS INVOLVED IN SOME TRANSACTIONS.

25         MR. SAMPSON:  CASH WAS INVOLVED IN AT LEAST TWO,

1    YOUR HONOR.  WITH RESPECT TO THE REMAINDER, THERE WERE STOCK

2    AND STOCK OPTIONS.

3              THE COURT:  RIGHT.

4              MR. SAMPSON:  MR. KAIL DID NOT EXERCISE ALL OF HIS

5    STOCK OPTIONS.  THAT DOES NOT MEAN THAT SOMETHING OF VALUE WAS

6    NOT GIVEN IN EXCHANGE.

7              THE COURT:  OH, I UNDERSTAND THAT.

8         WE ARE TALKING ABOUT CASH, MEANING AN ENVELOPE OF CASH OR

9    A TRANSFER TO A BANK ACCOUNT, NOT A STOCK OPTION.  A STOCK

10   OPTION IS NOT CASH.

11             MR. AINLEY:  CORRECT, YOUR HONOR.

12        24(A) OF THE INDICTMENT, KAIL CONCEALED FROM NETFLIX THAT

13   HE MADE ARRANGEMENTS WITH VENDORS TO PAY IN KICKBACKS OF CASH

14   AND STOCK OPTIONS.

15             THE COURT:  YES, YES.  ALL RIGHT.

16             MR. AINLEY:  SO EVIDENTLY, THE CASH ALLEGATION IS A

17   TRANSACTION WHICH IS NOT A STOCK OPTION TRANSACTION.

18             THE COURT:  I THINK THAT'S CERTAINLY -- I DON'T THINK

19   ANYONE WOULD DISAGREE WITH THAT.  AND THERE ARE ALLEGATIONS OF

20   STOCK OPTION IN THE CHART.  WE SEE NUMBER ONE IS A STOCK OPTION

21   AGREEMENT.

22             MR. AINLEY:  THERE'S NO ALLEGATION OF CASH IN THOSE

23   ACCOUNTS.

24             THE COURT:  THERE'S THE ALLEGATION IN -- PARAGRAPH 22

25   HAS AN ALLEGATION OF CASH.

1    MR. AINLEY:  I'M SORRY, YOUR HONOR, I WAS REFERRING

2  TO THE CHART MR. SAMPSON REFERRED TO EARLIER.

3    THE COURT:  THE CHART DOESN'T APPEAR TO IDENTIFY CASH

4  AS TO ANY COUNT.

5    MR. SAMPSON:  IT DOESN'T ALLEGE CASH AS A WIRE,

6  YOUR HONOR, BUT THE RECEIPT OF CASH WAS PART OF THE QUID PRO

7  QUO ALLEGED IN COUNTS 1 THROUGH 22.

8    THE COURT:  OKAY.

9  EVEN IF I WERE TO ORDER A BILL OF PARTICULARS, YOU ARE NOT

10 GOING TO GET THE QUESTIONS ANSWERED THAT YOU ARE ASKING HERE.

11    MR. AINLEY:  YOU HONOR, I WOULD SETTLE FOR THE

12 IDENTITY OF THE INDIVIDUALS OF THESE COMPANIES.

13    THE COURT:  WELL, THAT'S A DIFFERENT QUESTION.

14  IF I ORDER A BILL OF PARTICULARS, I JUST ORDER A BILL OF

15 PARTICULARS, I DON'T ORDER THE GOVERNMENT TO DISCLOSE

16 PARTICULAR INFORMATION.

17  AND I'M GOING TO ORDER, IF I WERE TO AGREE WITH YOU, IT

18 WOULD BE TO REQUIRE THE GOVERNMENT TO COMPLY WITH RULE 7(F) TO

19 GIVE -- AND THAT WOULD BE TO DESCRIBE THE THEORIES AND

20 ADEQUATELY PUT YOUR CLIENT ON NOTICE OF THE CHARGES AGAINST

21 HIM.  AND I TAKE IT IN CONSIDERATION OF ALL OF THE DISCOVERY

22 THAT HAS BEEN PRODUCED AS WELL.

23  I'M NOT LEANING IN YOUR FAVOR ON THIS.  I THINK THAT THE

24 GOVERNMENT HAS SHOWN THAT THERE IS REASONABLE, ADEQUATE

25 DISCLOSURE UNDER THE RULES.

1       LET'S TALK ABOUT THE DOCUMENT SITUATION.  I CERTAINLY

2   RECOGNIZE THAT THIS IS A DOCUMENT-INTENSIVE CASE, AND IT IS AN

3   EXTREMELY BURDENSOME TASK FOR A DEFENDANT TO WADE THROUGH

4   DOCUMENTS IN THE TRUNCATED PERIOD OF TIME THAT YOU HAVE,

5   COMPARED TO THE GOVERNMENT'S OPEN ENDED AMOUNT OF TIME AND

6   ACCESS TO UNLIMITED RESOURCES TO EVALUATE EVIDENCE BEFORE AN

7   INDICTMENT IS BROUGHT.  I RECOGNIZE THAT.

8       THAT BEING SAID, THE GOVERNMENT IS NOT REQUIRED TO CONNECT

9   ALL THE DOTS FOR THE DEFENSE.  AND SO WHAT I'M LOOKING AT HERE

10  IS, I THINK IT'S PREMATURE FOR THE GOVERNMENT TO HAVE TO GIVE

11  YOU A LIST OF TRIAL EXHIBITS, WHICH IS ESSENTIALLY WHAT YOU'RE

12  ASKING FOR, BECAUSE I HAVEN'T EVEN SET A TRIAL DATE.

13      BUT I DO THINK THAT YOU'RE ENTITLED TO MORE THAN WHAT

14  WOULD BE THE NORMAL SEVEN-DAY NOTICE OF THE TRIAL EXHIBITS.

15  AND I AM CERTAINLY WILLING TO SET A DATE WELL IN ADVANCE OF

16  TRIAL FOR THAT DISCLOSURE TO GIVE YOU ADEQUATE TIME.

17      BUT AT THIS JUNCTURE, I DON'T SEE THE ENTITLEMENT.  AND I

18  THINK IN THE CASES THAT YOU CITED -- AND I PULLED ANDERSON,

19  THAT SEEMED TO BE THE ONE YOU FIRST CITED.  THAT'S JUST THE ONE

20  I PULLED.  AND IT APPEARS TRIAL HAD BEEN SET IN THAT CASE.  AND

21  IT'S JUST SO EARLY IN THIS CASE, AND THAT'S WHERE I THINK YOU

22  MADE GOOD POINTS, BUT IT MAY BE JUST PREMATURE.

23          MR. AINLEY:  VERY WELL, YOUR HONOR.

24          THE COURT:  ANY COMMENT BY THE GOVERNMENT?

25          MR. SAMPSON:  YOUR HONOR, I JUST NOTE THAT THE

1    GOVERNMENT HAS ALREADY SUBSTANTIALLY DIRECTED THE DEFENDANT TO

2    A SMALLER SUBSET OF THE GOVERNMENT'S DISCOVERY THAT RELATES

3    DIRECTLY TO WHAT IS ALLEGED IN THE INDICTMENT.  THAT IS

4    DOCUMENTS RELATED TO THE NINE COMPANIES AS WELL AS HIS

5    EMPLOYER, NETFLIX, AS WELL AS HIS BANKS.  THAT IS APPROXIMATELY

6    40 PERCENT OF THE 200,000 PAGE, NOT DOCUMENTS, BUT PAGES THAT

7    HAVE NOW BEEN PRODUCED.

8         THAT IS, I HAVE TO PUT IN A CAVEAT THAT THERE MAY BE

9    EVIDENCE ELSEWHERE THAT RELATES TO THE CHARGES OR MIGHT BE

10   USEABLE UNDER 404(B).  BUT I AM TRYING TO DIRECT COUNSEL FOR

11   DEFENDANT TO THE MOST RELEVANT PORTIONS.  BUT HE DOES -- I

12   CAN'T REPLACE HIS OBLIGATION TO REVIEW SUCH DOCUMENTS.

13            THE COURT:  I MEAN, FRANKLY, IF I WERE TO AGREE WITH

14   YOU AND REQUIRE THE GOVERNMENT WITHIN 60 DAYS TO PRODUCE THAT

15   LIST, AND TRIAL ISN'T SET FOR ANOTHER YEAR, THE GOVERNMENT

16   WOULD BE WELL WITHIN ITS RIGHTS TO COME BACK OVER AND OVER

17   ASKING TO AUGMENT THE LIST AS THEY PREPARE FOR TRIAL.

18        ALL RIGHT.  ANY OTHER COMMENTS ON THAT?

19            MR. AINLEY:  NO, YOUR HONOR.

20            THE COURT:  ALL RIGHT.

21        WHERE ARE WE IN -- I DON'T KNOW WHETHER WE ARE READY TO

22   SET THE CASE FOR TRIAL, BECAUSE OBVIOUSLY THAT HELPS US TO KNOW

23   WHERE WE ARE GOING.  I GENERALLY DON'T PUSH FOR A TRIAL SETTING

24   UNTIL YOU ARE REALLY READY, BECAUSE I'M REALLY NOT GOING TO

25   CHANGE THE TRIAL DATE ONCE WE SET IT.

1      SO I DON'T THINK WE HAD -- WE HAD NOT AGREED THAT THIS

2   WOULD BE A TRIAL SETTING STATUS CONFERENCE, SO I'M NOT ASKING

3   YOU TO DO THAT NOW, BUT I'M JUST WONDERING WHAT YOUR THINKING

4   IS.

5      MR. AINLEY:  YOUR HONOR, WE JUST RECEIVED

6   APPROXIMATELY 80,000 DOCUMENTS, OR PAGES OF DOCUMENTS THIS

7   MORNING, BRINGING THE TOTAL, I BELIEVE TO SOMEWHERE AROUND

8   240,000 PAGES OF DOCUMENTS.  WHICH, AS THEY HAVE BEEN PRODUCED

9   IN TIF, FORMAT ARE DIFFICULT TO REVIEW.

10      I BELIEVE THE GOVERNMENT -- IT'S A VERY AWKWARD FORMAT.

11   AND THE GOVERNMENT HAD INDICATED THEY WOULD PRODUCE THEM AS PDF

12   FILES WHICH ARE MUCH EASIER TO MANAGE AND MANIPULATE AND ARE

13   SEARCHABLE.

14      THE GOVERNMENT HAS SINCE DECLINED TO DO SO, SO WE ARE

15   STUCK WITH THE UNWIELDING TIF FORMAT.

16      MR. SAMPSON:  I DISAGREE.

17      WE HAVE PRODUCED THE DOCUMENTS IN A FORMAT THAT MR. AINLEY

18   HAS INDICATED IS DIFFICULT FOR HIM TO REVIEW.  HE COULD

19   PURCHASE A VIEWING PLATFORM.

20      TODAY, I NOW REPRODUCED EVERYTHING.  IT IS IN TIF FORM,

21   BUT IT COMES WITH A VIEW THAT ALLOWS HIM TO REVIEW IT.  I DID

22   IT BECAUSE HIS REQUEST FOR OUR PDF'S, I CONSULTED OUR ALS UNIT,

23   THEY INDICATED IN ORDER TO CREATE IT TO PDF, IT WOULD CREATE

24   110,000 SEPARATE PDF'S WHICH WOULD BE QUITE UNWIELDING IN HIS

25   OWN RIGHT.

```
 1            SO I THINK THE GOVERNMENT HAS MET AND EXCEEDED ITS

 2      OBLIGATIONS.

 3                 THE COURT:  HOW EXPENSIVE IS THIS PLATFORM?

 4                 MR. SAMPSON:  WE GAVE HIM A FREE VERSION.  I DON'T

 5      KNOW ON HOW MUCH IT COSTS.

 6                 THE COURT:  YOU DO HAVE A VERSION SO YOU CAN SEARCH

 7      THEM IN THIS FORMAT?

 8                 MR. AINLEY:  NO, NOT REALLY.  IT'S KIND OF LIKE A

 9      BABY VIEWER DEVICE, IT'S ONE OF THOSE VERY LIMITED

10      FUNCTIONALITY THINGS.

11            THE TROUBLE WITH TIF IS THEY ARE JUST HUGE PIXEL-INTENSIVE

12      FILES.  EACH DOCUMENT IS IT'S OWN SEPARATE FILE.  THEY ARE

13      OPTICAL CHARACTER RECOGNITION, THEY ARE NOT SEARCHABLE.

14            PDF FILES, YOU SIMPLY PUT THEM INTO ACROBAT, AND YOU CAN

15      MOVE ONE DOCUMENT FROM ONE PLACE TO THE NEXT.

16                 THE COURT:  HOW EXPENSIVE IS IT FOR THE GOVERNMENT TO

17      PRODUCE THE PDF'S?

18                 MR. SAMPSON:  I DON'T KNOW THE ANSWER, I KNOW IT IS

19      EXTREMELY LABOR-INTENSIVE.

20                 THE COURT:  THAT'S WHERE IT BECOMES EXPENSIVE.

21                 MR. SAMPSON:  WELL, UNDERSTOOD, YOUR HONOR.

22            I DON'T HAVE A PRICE ESTIMATE, AND I'M NOT SURE WHAT THE

23      GOVERNMENT'S OBLIGATIONS ARE WITH RESPECT TO THAT.

24                 MR. AINLEY:  WELL, THIS WAS ACTUALLY OFFERED.

25                 I MEAN, I GUESS RECOLLECTIONS DISAGREE, BUT I THINK THE
```

1    ISSUE IS NOT BEING SURPRISED ON THE EVE OF TRIAL THAT I DIDN'T

2    LIKE THE FORMAT.  THIS IS AFTER OUR JULY 10TH CONFERENCE.  I

3    MADE THE SPECIFIC REQUEST TO HAVE PDF'S, AND THE GOVERNMENT'S

4    POSITION IS IT DOESN'T HAVE TO PRODUCE THOSE.

5         THE COURT:  YOU ARE ASKING THE GOVERNMENT TO EXTEND

6    MONEY TO CHANGE THE FORMAT OF THE DOCUMENTS IT'S GIVEN YOU.

7         SO THIS COULD BE -- I MEAN, IF YOU WERE -- IF THIS WAS ALL

8    IN BOXES, OF COURSE IT'S NOT READABLE EITHER.  IF IT WAS PAPER,

9    ARE YOU SUGGESTING THE GOVERNMENT WOULD NOT BE ALLOWED TO GIVE

10   YOU BANKERS BOXES FULL OF PAPER DOCUMENTS?

11        MR. AINLEY:  NO.  WELL, ACTUALLY PAPER DOCUMENTS ARE

12   QUITE READILY SEARCHABLE, I THINK.

13        THE COURT:  SO I'M -- I MEAN, I KNOW HOW TO SEARCH

14   PAPER DOCUMENTS, BUT I DON'T KNOW WHAT YOU'RE CONFRONTED WITH

15   WITH THE FORMAT YOU HAVE.

16        MR. AINLEY:  OKAY.  EACH DOCUMENT IN TIF IS A FILE.

17   IT'S NOT A DOCUMENT.

18        SO THE DOCUMENT, YOU CAN'T OPEN A FILE.  NORMALLY YOU

19   WOULD OPEN A FILE FOLDER AND YOU WOULD HAVE A LIST OF DOCUMENTS

20   INSIDE AND YOU CAN PICK BETWEEN THEM.  TIF REQUIRES YOU TO GO

21   DOCUMENT BY DOCUMENT.

22        THE COURT:  AND CLOSE THE FILE AND GO BACK?

23        MR. AINLEY:  EXACTLY.  AND YOU CANNOT SEARCH IT

24   BECAUSE, IT'S AN OPTICAL CHARACTER RECOGNITION FORMAT.  IT'S

25   BASED ON PIXEL DENSITY, IT'S NOT BASED ON TEXT.

```
1            THE COURT:  ALL RIGHT.  SO IF THE GOVERNMENT IS

2    VIEWING THESE THINGS WITH GREATER EASE, HOW ARE YOU DOING THAT?

3            MR. SAMPSON:  WE ARE USING A VIEWER CALLED ECLIPSE.

4        NOW, MR. AINLEY IS HOLDING, AND I GIVE IT TO HIM THIS

5    MORNING, A REPRODUCTION OF THE GOVERNMENT'S DISCOVERY IN A

6    VIEWER CALLED THE ECLIPSE LIGHT VIEWER, IT'S NOT THE FULL

7    LICENSED VERSION, BUT IT IS A FREE VERSION WE HAVE REPRODUCED.

8        I SUSPECT THAT IT WILL BE SUBSTANTIALLY EASIER FOR HIM TO

9    REVIEW THE DISCOVERY NOW, AND WE DID THAT AT HIS REQUEST.

10           THE COURT:  I GUESS I DON'T KNOW HOW MUCH ECLIPSE

11   COSTS, THE LICENSED VERSION AS OPPOSED TO THE FREE VERSION.

12           MR. SAMPSON:  I DON'T KNOW EITHER, YOUR HONOR.

13           THE COURT:  YOU KNOW, I DON'T KNOW WHETHER WE ARE

14   TALKING A FEW HUNDRED OR HUNDREDS OF THOUSANDS OF DOLLARS.

15       FOR THE GOVERNMENT TO PURCHASE SOMETHING IN A SENSE MONEY,

16   IS NO OBJECT COMPARED TO A SINGLE DEFENDANT.  SO I'M AT A LOSS

17   AS TO WHERE WE ARE.  IT MAY BE PERFECTLY REASONABLE FOR THE

18   DEFENDANT TO PURCHASE THE LICENSED SOFTWARE THAT WOULD ALLOW

19   THE READING, BUT I'M -- I CAN'T COMMENT ON IT BECAUSE I DON'T

20   KNOW WHAT WE ARE TALKING ABOUT.  I DON'T KNOW WHO SHOULD BEAR

21   THE BURDEN HERE.

22       AND SO WITHOUT THAT COST ESTIMATE, YOU KNOW, WHEN A

23   DEFENDANT HAS TO HIRE A FORENSIC ACCOUNTANT TO REVIEW

24   DOCUMENTS, THEY DON'T HAVE THE GOVERNMENT PAY FOR IT.

25       SO HERE, IF YOU HAVE TO PURCHASE SOME SOFTWARE, AGAIN, I
```

1    DON'T KNOW WHERE -- I'M AT SEA ON THIS.

2         MR. AINLEY:  YOUR HONOR, I THINK THE PROBLEM IS EVEN

3    IF YOU HAVE THIS ECLIPSE VIEWER, WHICH I'VE LOOKED AT BRIEFLY

4    ONLINE, THE FREE VERSION, FOR WHAT I THINK IS INCLUDED IN THIS,

5    I DON'T BELIEVE THESE DOCUMENTS ARE SEARCHABLE, MANAGEABLE,

6    FILEABLE OR MANIPULATABLE IN THE WAY THAT PDF'S ARE.

7    TYPICALLY, IF IT'S A TEXT-BASED PROGRAM, YOU CAN LOOK FOR

8    SOMETHING.

9         THE COURT:  OKAY.

10   SO I DON'T KNOW OF ANY REQUIREMENT THAT THE GOVERNMENT

11   PROVIDE THE DOCUMENTS IN THE PARTICULAR WAY DEFENSE COUNSEL

12   WOULD LIKE TO LOOK AT THEM.

13   IF THESE ARE READABLE AND ACCESSIBLE AND SEARCHABLE, I

14   THINK YOU CAN HIRE SOMEONE WHO CAN DO IT IN THE SLOW WAY OR YOU

15   CAN PURCHASE THE SOFTWARE.

16   OR, I SUPPOSE, I MEAN, OBVIOUSLY YOU CAN'T CONVERT THEM TO

17   PDF, IS THAT WHAT YOU ARE TELLING ME?

18        MR. AINLEY:  CORRECT.

19        THE COURT:  OKAY.  THAT MAKES SENSE.

20        MR. SAMPSON:  I DON'T KNOW ONE WAY OR ANOTHER,

21   YOUR HONOR.

22        THE COURT:  HAVE YOU LOOKED INTO WHETHER YOU CAN

23   CONVERT THEM TO PDF?

24        MR. AINLEY:  YES.  AS OF NOW, YES.  WHAT I HAVE, IT

25   REQUIRES YOU OPEN EACH FILE, CLOSE EACH FILE.  THAT'S 200,000

1    TIMES.

2           THE COURT:  ISN'T THAT WHAT THE GOVERNMENT WILL HAVE

3    TO DO?

4           MR. AINLEY:  I DON'T KNOW.  I DON'T KNOW IF HIS

5    ECLIPSE VIEWER LETS YOU PRINT THEM OFF OR NOT.

6           MR. SAMPSON:  THE ECLIPSE VIEWER CONSOLIDATES ALL OF

7    THE SOURCES OF DOCUMENTS AND THE DOCUMENT TYPES, AND YOU ARE

8    ABLE TO SEARCH, TAG, AND PAGE THROUGH DOCUMENTS SEQUENTIALLY.

9       I HAVEN'T USED THE FREE VERSION, I'M NOT SURE WHAT IT

10   ENTAILS.

11          THE COURT:  WELL, ABSENT KNOWING WHAT KIND OF COST

12   WOULD BE INVOLVED IN PURCHASING THE PROPRIETARY SOFTWARE THAT

13   WOULD ALLOW THE DEFENDANT TO VIEW THE DOCUMENTS IN THE SAME

14   MANNER AS THE PROSECUTION, I'M NOT INCLINED TO ORDER THE

15   GOVERNMENT TO CREATE A DIFFERENT FORMAT FOR THE CONVENIENCE OF

16   THE DEFENSE.  I DON'T SEE ANY REQUIREMENT FOR THAT, AND I'M NOT

17   AWARE OF ANY AUTHORITY THAT WOULD REQUIRE IT.

18      I MEAN, IN FACT, YOU ARE ASKING TO HAVE -- YOU JUST HAVE A

19   PREFERRED METHOD OF SEARCHING THE DOCUMENTS, WHICH IS FINE, BUT

20   THAT DOESN'T COME ON THE GOVERNMENT'S TAB.  AND YOU DON'T KNOW

21   HOW MUCH THIS PROPRIETARY SOFTWARE WOULD COST.  I MEAN, I DON'T

22   KNOW, I HAVE NO IDEA.

23          MR. AINLEY:  THAT'S TRUE, YOUR HONOR.

24          THE COURT:  YOU WILL HAVE TO CHECK.

25          MR. AINLEY:  TODAY --

1        THE COURT:  THE FREE VERSION MAY BE TOTALLY

2    INADEQUATE, THAT'S WHY MAYBE IT'S FREE.  I MEAN, YOU KNOW, I

3    GET THAT.  BUT, YOU KNOW, IF THE LICENSE IS $500, WE ARE

4    TALKING ABOUT SOMETHING INSUBSTANTIAL.  YOUR CLIENT HAS SPENT

5    THAT MUCH DURING THIS MOTION.  AND IF IT'S $500,000, IT MAY BE

6    ANOTHER MATTER.  I JUST DON'T KNOW.  SO THAT'S SOMETHING FOR

7    ANOTHER DAY.

8        I WILL -- I'M NOT GOING TO REQUIRE THE GOVERNMENT TO GIVE

9    A LIST OF TRIAL EXHIBITS AT THIS TIME.  I THINK IT'S PREMATURE

10    AND I THINK IT BECOMES AN INAPPROPRIATE DISCOVERY TOOL AS

11    OPPOSED TO ALLOWING FOR PROPER TRIAL PREPARATION.

12        I WILL REQUIRE THAT LIST WELL IN ADVANCE OF TRIAL.  SO I

13    WANT THE GOVERNMENT TO UNDERSTAND THAT.  I WOULD THINK THAT

14    60 DAYS IS REASONABLE, AND I WOULD BE WILLING TO HEAR A

15    LENGTHIER ADVANCE ON THOSE DOCUMENTS, TO HEAR ARGUMENT ON IT

16    ONCE WE SET TRIAL.

17        BUT I THINK WHEN WE DO SET THE CASE FOR TRIAL, THAT WOULD

18    BE THE TIME TO PUT THE GOVERNMENT ON NOTICE OF WHEN IT WILL

19    HAVE TO HAVE ITS TRIAL EXHIBIT LIST PREPARED.

20        AND, YOU KNOW, THEN WE WILL HAVE TO DISCUSS CERTAIN

21    CIRCUMSTANCES.  IT COULD BE GROUNDS FOR EXPANDING THAT LIST AS

22    WE GET CLOSER TO TRIAL, BECAUSE I'M NOT GOING TO HAVE THE

23    GOVERNMENT HAVE ITS OPENING STATEMENT, CLOSING ARGUMENT AND

24    WITNESS LIST PREPARED THAT MUCH IN ADVANCE OF TRIAL.  BUT WE

25    WOULD HAVE NARROWED THE UNIVERSE, SUBSTANTIALLY, THAT I THINK

1    IT WOULD BE OF GREATER ASSISTANCE.

2         THE COURT:  ALL RIGHT.

3       WHAT IS OUR -- WHAT'S NEXT UP FOR US?  WHEN WOULD YOU LIKE

4    TO RETURN?  I OF COURSE WILL DO A WRITTEN ORDER ON THESE

5    MOTIONS.

6         MR. AINLEY:  YOUR HONOR, WE HAVE SOME PENDING

7    DISCOVERY ISSUES AS WELL.  MADAM CLERK INDICATED THAT DECEMBER

8    THE 11TH WAS NOT AVAILABLE FOR MOTION HEARINGS, I DON'T KNOW IF

9    THAT'S FOR CASE MANAGEMENT CONFERENCES.

10      I BELIEVE MR. SAMPSON IS NOT AVAILABLE DECEMBER 18TH,

11   WHICH BRINGS US TO JANUARY 8TH OR JANUARY 22ND.  I THINK I MAY

12   HAVE A CONFLICT ON JANUARY THE 8TH.

13        MR. SAMPSON:  YOUR HONOR, I'M UNAVAILABLE

14   JANUARY 22ND.

15        THE COURT:  WHAT ABOUT DECEMBER 18TH, IS THAT

16   AVAILABLE?

17        MR. AINLEY:  I'M AVAILABLE.

18        MR. SAMPSON:  I WILL BE IN SAN FRANCISCO IN

19   BANKRUPTCY COURT.

20        THE COURT:  AND YOU ARE NOT AVAILABLE ON THE 11TH

21   EITHER?

22        MR. SAMPSON:  THE 11TH OF DECEMBER, I AM AVAILABLE,

23   YOUR HONOR.

24      I AM SCHEDULED TO BE IN TRIAL FOR THE ENTIRE MONTH OF

25   NOVEMBER, BUT IF THE MOTION IS FILED ON NOVEMBER 27TH, I SHOULD

1      BE ABLE TO RESPOND TO IT ON THE 4TH.

2           BUT I THINK MR. AINLEY SAID --

3           OH, THE COURT WAS UNAVAILABLE THE 11TH.

4                MR. AINLEY:  IT'S AVAILABLE TO ME.  MADAM CLERK

5      INDICATED YOUR HONOR HAD A STOP ON THAT DATE.

6                THE COURT:  HOW MANY MOTIONS ARE YOU TALKING ABOUT?

7                MR. AINLEY:  TWO.

8                THE COURT:  WHAT DO WE HAVE SET ON THE 11TH?

9           (OFF-THE-RECORD DISCUSSION.)

10               THE COURT:  OKAY.  I THINK THAT DECEMBER 11TH MAKES

11     SENSE.  I DON'T THINK THIS GETS BETTER BY WAITING UNTIL MID

12     JANUARY.  AND SINCE I'M NOT IN TRIAL ON DECEMBER 11TH, IT

13     BECOMES A LITTLE BIT EASIER FOR ME.

14          AND THAT MOTION WILL BE FILED NO LATER THAN THE 20TH.

15     SHOULD IT NOT BE FILED ON THAT DAY?  I WILL NOT -- I WILL NOT

16     HEAR IT ON THE 11TH.  THE MOTION WILL PROBABLY BE DELAYED UNTIL

17     FEBRUARY AT THAT POINT, BECAUSE THE REMAINDER OF MY CALENDARS

18     WILL OF COURSE FILL UP.  I'M PUTTING THIS IN TO ASSIST YOU IN

19     MOVING THE CASE ALONG.

20               MR. AINLEY:  THANK YOU, YOUR HONOR.

21               THE COURT:  OKAY.

22          ALL RIGHT.  AND SO I WILL SET THIS FOR FURTHER STATUS ON

23     DECEMBER 11TH AT 9:00, AND DISCOVERY MOTIONS; IS THAT CORRECT?

24               MR. AINLEY:  YES, YOUR HONOR.

25               THE COURT:  OKAY.

1          AND IS THERE A REQUEST TO EXCLUDE TIME FOR EFFECTIVE

2     PREPARATION OF COUNSEL LEADING UP UNTIL THAT DATE?

3               MR. AINLEY:  YES, YOUR HONOR.

4               THE COURT:  ALL RIGHT THEN, I WILL EXCLUDE TIME UNTIL

5     DECEMBER 11, 2018 FOR EFFECTIVE PREPARATION.

6          I WILL HEAR DISCOVERY MOTIONS ON THAT DAY.  THAT'S TWO

7     MOTIONS, THAT'S NOT GOING TO BE THREE OR FOUR.

8               MR. AINLEY:  NO, YOUR HONOR.

9               THE COURT:  BECAUSE I ONLY HAVE SO MUCH TIME.  AND

10    THEY ARE TO BE FILED IN THE TIME SET FORTH IN THE RULES.

11              MR. AINLEY:  YES, YOUR HONOR.

12         THANK YOU.

13              MR. SAMPSON:  YOUR HONOR, ONE ADDITIONAL MATTER.

14         I WOULD JUST ASK THAT THE SEARCH WARRANTS IN THIS CASE BE

15    UNSEALED.  MR. KAIL'S COUNSEL HAS REQUESTED THE SEARCH

16    WARRANTS.  I HAVE THEM HERE.  I CAN PROVIDE THEM IF THEY ARE

17    UNSEALED.

18              THE COURT:  OKAY.

19         OBVIOUSLY NO OBJECTION TO THAT.  AND DO YOU NEED THAT IN

20    WRITING AS WELL?

21              MR. SAMPSON:  I BELIEVE IT CAN JUST BE IN THE MINUTE

22    ORDER, YOUR HONOR.

23              THE COURT:  OKAY.  I WILL ASK IT BE IN THE MINUTES.

24         I WILL UNSEAL THE SEARCH WARRANTS AT THE REQUEST OF THE

25    UNITED STATES ATTORNEY.  AND THEY ARE BEING HANDED TO

1    MR. AINLEY.

2              MR. SAMPSON:  THANK YOU, YOUR HONOR.

3              THE COURT:  IS THAT EVERYTHING?  THANK YOU VERY MUCH.

4              MR. AINLEY:  THANK YOU, YOUR HONOR.

5         (THE PROCEEDINGS WERE CONCLUDED AT 9:41 A.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SEALED BY ORDER OF COURT

E-filing

# United States District Court

FOR THE
**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN JOSE

**CR 18 00172 BLF**

HRL

FILED

APR 26 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES OF AMERICA,

V.

MICHAEL KAIL,

DEFENDANT(S).

---

# INDICTMENT

18 U.S.C. §§ 1343, 1346 – Wire Fraud
18 U.S.C. §§ 1341, 1346 – Mail Fraud
18 U.S.C. § 1957 – Money Laundering
18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c) –
Criminal Forfeiture

---

A true bill.

_Chr Oaks_
Foreman

Filed in open court this ___26___ day of
___April___ ___2018___.

Clerk
USMJ

Bail, $ _____

No Bail Arrest Warrant

DOCUMENT NO.
INITIALS

1.

DISTRICT COURT
CRIMINAL CASE

ER-605



1  ALEX G. TSE (CABN 152348)
2  Acting United States Attorney

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  UNITED STATES OF AMERICA,        )   Criminal No.
                                     )
12        Plaintiff,                 )   VIOLATIONS: 18 U.S.C. §§ 1343, 1346 –
                                     )   Wire Fraud; 18 U.S.C. §§ 1341, 1346 – Mail
13        v.                         )   Fraud; 18 U.S.C. § 1957 – Money Laundering;
                                     )   18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28
14  MICHAEL KAIL,                    )   U.S.C. § 2461(c) – Criminal Forfeiture
                                     )
15        Defendant.                 )   (SAN JOSE VENUE)
                                     )
16  _____  )   UNDER SEAL

17

18                        I N D I C T M E N T

19  The Grand Jury charges:

20                          INTRODUCTION

21        At all times relevant to this indictment, with all dates being approximate and all date ranges both

22  approximate and inclusive:

23        1.    Defendant MICHAEL D. KAIL ("KAIL") was an individual living in Los Gatos,

24  California.  KAIL began working for Netflix, Inc. ("Netflix") in 2011.  From November 1, 2011, until

25  his employment ended in August, 2014, KAIL held the title of Vice President of IT Operations.  As an

26  employee of Netflix, KAIL was assigned, and used, a Netflix email address.

27        2.    Unix Mercenary, LLC, was a single-member company owned by KAIL.  KAIL

28  registered Unix Mercenary, LLC with the California Secretary of State on February 8, 2012.

3.      Netflix was a company headquartered in Los Gatos, California.

4.      From at least January 1, 2012, through December 31, 2014, Netflix email addresses containing the domain "@netflix.com" were hosted by Google, Inc. through its Gmail service. During that period, Netflix employees' emails were hosted on computer servers located outside of the state of California.

5.      DocuSign, Inc., ("DocuSign") was a company that provided electronic document signing services for corporate and individual clients. DocuSign was headquartered in San Francisco, California. From at least January 1, 2012, through December 31, 2014, servers hosting DocuSign's customer contracts and other customer data were located outside of the state of California.

6.      Netenrich, Inc. ("Netenrich"), was a company headquartered in San Jose, California. During 2012 through 2014, some Netenrich employees were contracted to work at Netflix.

7.      VistaraIT, Inc. ("VistaraIT"), formerly VistaraIT, LLC, was a company headquartered in San Jose, California. VistaraIT had the same business address as Netenrich, Inc.

8.      Platfora, Inc. ("Platfora"), was a company located in San Mateo, California. Platfora was founded in 2011.

9.      Numerify, Inc. ("Numerify"), was a company located in Cupertino, California. Numerify was founded in 2012.

10.     Netskope, Inc. ("Netskope"), was a company located in Los Altos, California. Netskope was founded in 2012.

11.     Maginatics, Inc. ("Maginatics"), was a company located in Mountain View, California. Maginatics was founded in 2010.

12.     Sumo Logic, Inc. ("Sumo Logic"), was a company located in Redwood City, California. Sumo Logic was founded in 2010.

13.     CFTG, Inc., doing business as Docurated ("Docurated"), was a company located in New York, New York. Docurated was founded in 2012.

14.     ElasticBox, Inc. ("ElasticBox"), was a company located in San Francisco, California. ElasticBox was founded in 2011.

15.     In his role as Vice President of Internet Technology at Netflix, KAIL had authority to

1 enter into contracts with third parties on behalf of Netflix, and could approve payment of invoices by

2 Netflix, to third parties. KAIL had access to confidential company information of Netflix. KAIL also

3 had access to confidential information shared with Netflix by third parties, including bids from vendors.

4 THE SCHEME TO DEFRAUD

5      16.    Beginning no later than February 29, 2012, and continuing through July 31, 2014, KAIL

6 did knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud

7 as to a material matter, to obtain money and property by means of materially false and fraudulent

8 pretenses, representations, promises, and omissions, and to deprive Netflix of its intangible right to

9 KAIL's honest services.

10      17.    The gist of the scheme was that KAIL used his position as Vice President of Internet

11 Technology at Netflix to approve contracts with and payments to vendors, including Netenrich, Inc., and

12 VistaraIT, Inc. In return for these contracts and payments, Netenrich, VistaraIT, and others paid KAIL

13 kickbacks, including payments determined as a percentage of the business they did with Netflix. Certain

14 vendors to Netflix also awarded KAIL shares of stock and stock options in exchange for KAIL

15 approving contracts with Netflix.

16      18.    KAIL, VistaraIT, and Netenrich used the terms "referral fees," "arrangement," "my

17 portion," and "invoice value" to hide the nature of the kickback payments.

18      19.    It was further part of the scheme that KAIL registered Unix Mercenary, LLC, with the

19 California Secretary of State and opened bank accounts in that business's name for the purpose of

20 receiving kickback payments. KAIL used the kickback payments to pay for personals expenses.

21      20.    It was further part of the scheme that KAIL directed communications to his home address

22 and a personal email address to avoid detection of the scheme by Netflix.

23      21.    This scheme deprived Netflix of the following: (a) its money and property by enabling

24 the vendors to, among other things, negotiate more favorable contracts with Netflix than they would

25 have been able to obtain without the assistance of KAIL; and (b) its intangible right to KAIL's honest

26 services.

27      22.    KAIL directed Netenrich and VistaraIT to pay kickbacks to a bank account in Unix

28 Mercenary's name, opened for the purpose of receiving the proceeds of the fraud scheme.

INDICTMENT,
*UNITED STATES V. MICHAEL KAIL*       3

ER-608

23.     KAIL directed Netenrich, Platfora, Netskope, Numerify, Maginatics, Sumo Logic, Docurated, and Elasticbox to pay him kickbacks in the form of stock options in exchange for KAIL approving contracts for those companies to provide services to Netflix.

24.     As part of the scheme to defraud Netflix, KAIL engaged in conduct and made material false representations, promises, and omissions, including, but not limited to, the following:

        a.   KAIL concealed from Netflix that he made arrangements with vendors and prospective vendors to make kickback payments of cash and stock options to KAIL in exchange for KAIL approving contracts and invoices between Netflix and those vendors;

        b.   KAIL's advisory agreements with vendors to Netflix falsely affirmed that he had no conflicts of interest preventing him from acting as an advisor to such companies;

        c.   KAIL directed that payments be sent to his personal address. When KAIL received communications from Netflix suppliers by email about payments or stock options that had been granted to him, he instructed suppliers to send future correspondence to his private email address. KAIL also met with individuals to discuss compensation at locations away from Netflix's Los Gatos, California headquarters;

        d.   When questioned about the purpose and accounting of some VistaraIT invoices, KAIL misrepresented to other Netflix employees the services provided under the invoices; and

        e.   When questioned by Netflix's Chief Executive Officer about conflicts of interest, KAIL falsely denied that he was receiving compensation from vendors to Netflix.

## USE OF WIRES AND MAILINGS

25.     KAIL used email communications to carry out an essential part of the scheme to defraud by signing and transmitting contracts electronically using the DocuSign service. KAIL also used email communications through his personal email account and his netflix.com email account, both hosted by Google, to carry out an essential part of the scheme to defraud. KAIL did so by negotiating, calculating, requesting, and discussing his kickbacks from Netenrich, VistaraIT, and other companies listed in Counts One through Nineteen, below.

INDICTMENT,
*United States v. Michael Kail*                                     4

ER-609

26.     Kail used and directed others to use United States Mail and Federal Express to send executed advisory agreements and stock options paperwork to and from the companies listed in Counts Twenty through Twenty-Two, below.

<u>COUNTS ONE THROUGH NINETEEN</u>: (18 U.S.C. §§ 1343 and 1346 – Wire Fraud)

27.     The factual allegations at Paragraphs One through Twenty-Six are realleged and incorporated herein.

28.     On or about the dates alleged below, in the Northern District of California and elsewhere, the defendant,

MICHAEL KAIL,

having knowingly and intentionally devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing such a scheme and artifice and attempting to do so, did knowingly cause to be transmitted, by means of wire communications in interstate and foreign commerce, specifically the interstate wires described in the table immediately below, each communication being a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 1 | 4/6/2013 | Transmission via DocuSign of signed Netskope, Inc. 2012 Stock Incentive Plan Stock Option Agreement |
| 2 | 7/9/2014 | Transmission via DocuSign of Netskope, Inc. Order Form |
| 3 | 7/10/2014 | Transmission via DocuSign of Netskope, Inc. End User License Agreement |
| 4 | 4/30/2013 | Transmission via DocuSign of Maginatics, Inc. Advisory Board Agreement |
| 5 | 5/30/2013 | Transmission via DocuSign of Docurated, Inc. Terms of Agreement |
| 6 | 6/3/2013 | Transmission via DocuSign of Docurated, Inc. Strategic Advisor Agreement |
| 7 | 1/3/2014 | Transmission via DocuSign of Docurated, Inc. Amendment to Strategic Advisor Agreement |
| 8 | 3/21/2014 | Transmission via DocuSign of Docurated, Inc. Terms of Agreement |
| 9 | 6/15/2013 | Transmission via DocuSign of Elasticbox, Inc. Order Form |
| 10 | 6/17/2013 | Transmission via DocuSign of Elasticbox, Inc. Master Services Agreement |
| 11 | 11/27/2013 | Transmission via DocuSign of Elasticbox, Inc. Order Form |

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 12 | 7/12/2013 | Transmission via DocuSign of Sumo Logic, Inc. Netflix Sumologic Renewal Order Form |
| 13 | 8/2/2013 | Transmission via DocuSign of Platfora, Inc. Advisory Board Agreement |
| 14 | 8/22/2013 | Transmission via DocuSign of Platfora, Inc. Amendment One To Evaluation Agreement |
| 15 | 9/19/2013 | Transmission via DocuSign of Platfora, Inc. Software Subscription License Agreement |
| 16 | 3/25/2014 | Transmission via email, "Fwd: sunshine" to Netflix CEO |
| 17 | 2/3/2014 | Transmission via DocuSign of VistaraIT Order Form |
| 18 | 2/3/2014 | Transmission via DocuSign of signed Numerify, Inc. Advisor Agreement |
| 19 | 2/21/2014 | Transmission via DocuSign of signed Numerify, Inc. Master Subscription Agreement |

Each in violation of Title 18, United States Code, Sections 1343 and 1346.

COUNTS TWENTY THROUGH TWENTY-TWO: (18 U.S.C. §§ 1341 and 1346 – Mail Fraud)

29. The factual allegations at Paragraphs One through Twenty-Six are realleged and incorporated herein.

30. On or about the dates alleged below, in the Northern District of California and elsewhere, the defendant,

MICHAEL KAIL,

having knowingly and intentionally devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing such a scheme and artifice and attempting to do so, did knowingly cause to be sent through the United States Postal Service and private and commercial interstate carriers the following matters, each mailing being a separate count of this Indictment:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 20 | 5/15/2013 | Letter via Certified U.S. Mail from KAIL to Internal Revenue Service re: Election Under Section 83(b) of the Internal Revenue Code for 30,000 shares of Maginatics, Inc. stock |
| 21 | 6/14/2013 | Federal Express mailing of Docurated Advisory Board paperwork |
| 22 | 3/14/2014 | Federal Express mailing of commission checks from Netenrich, Inc. and VistaraIT, Inc. |

Each in violation of Title 18, United States Code, Sections 1341 and 1346.

INDICTMENT,
*UNITED STATES V. MICHAEL KAIL*                6

COUNTS TWENTY-THREE THROUGH TWENTY-NINE: (18 U.S.C. § 1957 – Money Laundering)

31.     The factual allegations contained in Paragraphs One through Twenty-Six are realleged and incorporated herein.

32.     On or about the dates alleged below, in the Northern District of California and elsewhere, the defendant,

MICHAEL KAIL,

did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, transferring funds from a bank account in the name of Unix Mercenary, LLC to himself and to an escrow company for the purchase of his residence, which were received in the form of bribes and kickbacks from Netenrich, VistaraIT, and Netskope, related to Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, as alleged in Counts One through Three and Eighteen, and Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 1346, as alleged in Count Twenty-Two:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 23 | 4/23/2013 | Transfer of $25,422 from Unix Mercenary Wells Fargo Bank checking account #3152 to Kail TD Ameritrade account |
| 24 | 7/18/2013 | Wire $70,000 from Unix Mercenary Silicon Valley Bank checking account #2308 to First American Title Company |
| 25 | 9/3/2013 | Transfer $60,000 from Unix Mercenary Silicon Valley Bank checking account #2308 to Kail Silicon Valley Bank savings account #2285 |
| 26 | 9/3/2013 | Transfer of $25,000 from Unix Mercenary Silicon Valley Bank checking account #6623 to Kail Joint Silicon Valley Checking Account |
| 27 | 10/8/2013 | Transfer $30,000 from Unix Mercenary Silicon Valley Bank checking account #2308 to Kail Silicon Valley Bank savings account #2285 |
| 28 | 9/22/2014 | Transfer $11,000 from Unix Mercenary Silicon Valley Bank checking account #2308 to Kail Silicon Valley Bank joint checking account #6619 |
| 29 | 10/24/2014 | Transfer $25,000 from Unix Mercenary Silicon Valley Bank checking account #2308 to Kail Silicon Valley Bank savings account #2285 |

Each in violation of Title 18, United States Code, Section 1957.

FORFEITURE ALLEGATION:     (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1); 28 U.S.C. § 2461(c))

33.     The factual allegations contained in Counts One through Twenty-Two are hereby realleged for the purpose of alleging forfeiture to the United States of America pursuant to Title 18,

1 United States Code, Section 981(a)(l)(C) and Title 28, United States Code, Section 2461(c).

2      34.    Upon conviction of any of the offenses in violation of Title 18, United States Code,

3 Sections 1341 or 1343 set forth in Counts One through Twenty-Two of this Indictment, or any of them,

4 the defendant,

5                                  MICHAEL KAIL,

6 shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section

7 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which

8 constitutes or is derived from proceeds traceable to the offenses, including but not limited to the sum of

9 money equal to the total amount of proceeds defendant obtained or derived from, directly or indirectly,

10 from the violation.

11      35.    The factual allegations contained in Counts Twenty-Three through Twenty-Nine are

12 hereby realleged for the purpose of alleging forfeiture to the United States of America pursuant to Title

13 18, United States Code, Section 982(a)(1).

14      36.    Upon conviction of any of the offenses in violation of Title 18, United States Code,

15 Section 1957 set forth in Counts Twenty-Three through Twenty-Nine of this Indictment, or any of them,

16 the defendant,

17                                  MICHAEL KAIL,

18 shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1)

19 any property, real or personal, involved in such offense, including but not limited to the real property

20 and improvements at 234 Almendra Drive, Los Gatos, California 95030.

21      37.    If any of the property described above, as a result of any act or omission of the defendant:

22           a.   cannot be located upon the exercise of due diligence;

23           b.   cannot be located upon the exercise of due diligence;

24           c.   has been transferred or sold to, or deposited with, a third party;

25           d.   has been placed beyond the jurisdiction of the court;

26           e.   has been substantially diminished in value; or

27           f.   has been commingled with other property which cannot be divided without difficulty;

28 the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

INDICTMENT,
*UNITED STATES V. MICHAEL KAIL*         8

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18 United States Code, Sections 981(a)(1)(C), 982(a)(1), Title 28 United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

SENTENCING ALLEGATIONS

38.     With respect to the charges in this Indictment, for the purposes of determining the maximum alternative fine, pursuant to Title 18, United States Code, Section 3571(d), the defendant,

MICHAEL KAIL,

derived gross gains of approximately $690,000, and the victim suffered losses of at least approximately $716,000.

A TRUE BILL

DATED: April 26, 2018

FOREPERSON

ALEX G. TSE
Acting United States Attorney

BARBARA J. VALLIERE
Chief, Criminal Division

Approved as to Form:

COLIN SAMPSON
Assistant United States Attorney

INDICTMENT,
*UNITED STATES V. MICHAEL KAIL*                    9

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

18 U.S.C. §§ 1343, 1346 – Wire Fraud
18 U.S.C. §§ 1341, 1346 – Mail Fraud
18 U.S.C. § 1957 – Money Laundering
18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c) –
Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misde-
    meanor
☒ Felony

PENALTY: 18 U.S.C. §§ 1343, 1346 – 20 yrs prison, $1,000,000 fine, 3 yrs
supervised release, $100 special assessment; 18 U.S.C. §§ 1341,
1346 – 20 yrs prison, $1,000,000 fine, 3 yrs supervised release,
$100 special assessment; 18 U.S.C. § 1957 – 10 yrs prison, $250,000
fine, 3 yrs supervised release, $100 special assessment ⊞

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

### DEFENDANT - U.S

▶ MICHAEL KAIL

DISTRICT COURT NUMBER

*FILED*
*APR 26 2018*
*SUSAN Y. SOONG*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*
*SAN JOSE*

CR 18 00172 BLF

HRL

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FEDERAL BUREAU OF INVESTIGATION

☐ person is awaiting trial in another Federal or State Court,
give name of court

_____

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40. Show District

_____

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:                                         SHOW
    ☐ U.S. ATTORNEY ☐ DEFENSE       DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant                                   MAGISTRATE
                                            CASE NO.
☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under

Name and Office of Person
Furnishing Information on this form         ALEX G. TSE

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)          Colin Sampson, AUSA

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
      summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction     } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

   If answer to (6) is "Yes", show name of institution

Has detainer    ☐ Yes    If "Yes"
been filed?     ☒ No      give date
                          filed

**DATE OF**                Month/Day/Year
**ARREST**

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED**       Month/Day/Year
**TO U.S. CUSTODY**

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT        Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance    *Where defendant previously apprehended on complaint, no new summons or
                                       warrant needed, since Magistrate has scheduled arraignment
Defendant Address:

234 Almendra Dr., Los Gatos, CA         Date/Time: _____ Before Judge: _____

Comments:                                                              ER-615