**No. 21-10376**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

      v.

MICHAEL KAIL,

   Defendant-Appellant.

———————————————————

**BRIEF FOR THE UNITED STATES AS APPELLEE**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 18-CR-172-BLF
———————————————————

**ISMAIL J. RAMSEY**
United States Attorney

**MERRY JEAN CHAN**
Chief, Appellate Section, Criminal Division

**ROSS D. MAZER**
Assistant United States Attorney

450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7033

**Attorneys for Plaintiff-Appellee**
September 18, 2024          **UNITED STATES OF AMERICA**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(b), Netflix, Inc. is a corporate victim in this matter.  Pursuant to Rule 26.1(a), Netflix, Inc. has no parent company, and the government is not aware of any publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

JURISDICTION, TIMELINESS, AND BAIL STATUS..........................................1

ISSUES PRESENTED................................................................................2

STATEMENT OF THE CASE......................................................................2

    A.    Charges and pretrial litigation ................................................2

    B.    The government's case at trial ................................................4

        1.    Netflix prohibited employees from accepting undisclosed compensation from third-party vendors or potential vendors......4

        2.    Kail awarded contracts to vendors in exchange for cash, stock options, and other compensation...................................7

            (i)    Platfora....................................................................9

            (ii)    Netenrich & Vistara.........................................13

            (iii)    Docurated........................................................15

            (iv)    ServiceNow.....................................................16

            (v)    Numerify..........................................................17

            (vi)    Maginatics.......................................................18

            (vii)    Sumo Logic......................................................18

            (viii)    Netskope.........................................................20

            (ix)    ElasticBox.......................................................20

         3.    Kail transferred the vendor payments between accounts to conceal the source of the funds ...............................21

        4.    The fallout    ...........................................................24

i

C.    Jury instructions, verdict, post-trial motions, and sentencing............25

SUMMARY OF ARGUMENT ........................................................................27

ARGUMENT ..................................................................................................28

    I.     THERE WAS NO CONSTRUCTIVE AMENDMENT....................28

        A.    Standard of review ..................................................................28

        B.    There was no constructive amendment.....................................29

        C.    Any challenge to the indictment is waived and otherwise
            barred.......................................................................................31

    II.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY
        ON PROPERTY FRAUD, AND SUFFICIENT EVIDENCE
        SUPPORTED THE JURY'S VERDICT ...............................................32

        A.    Standard of review ..................................................................32

        B.    The evidence of property fraud was legally sufficient ............33

        C.    Kail's contrary arguments are meritless ..................................37

        D.    The court properly instructed the jury on property fraud ........39

            1.    Background..................................................................39

            2.    The court properly instructed the jury ...........................41

            3.    Any instructional error was harmless ............................49

    III.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY
        ON HONEST-SERVICES FRAUD, AND SUFFICIENT
        EVIDENCE SUPPORTED THE JURY'S VERDICT .......................49

        A.    Standard of review ..................................................................49

B.  The evidence of honest-services fraud was legally sufficient....................................................................50

C.  The court properly instructed the jury on honest-services fraud ......................................................................53

    1.  Background................................................................53

    2.  The court properly instructed the jury ............................55

    3.  Any instructional error was harmless ............................58

IV.  THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON MONEY LAUNDERING ...........................................................59

A.  Standard of review ....................................................59

B.  Background .................................................................59

C.  The court properly instructed the jury .......................................60

D.  Any error was harmless ...........................................................62

V.  KAIL'S PUBLIC TRIAL CLAIM IS WAIVED AND OTHERWISE MERITLESS ..................................................................................63

A.  Standard of review ....................................................63

B.  Background .................................................................63

C.  Analytical framework ...............................................64

D.  Kail waived his public trial claim .............................66

E.  Alternatively, Kail's public trial claim is foreclosed and otherwise meritless....................................................67

    1.  Plain error review applies ..............................................67

    2.  There was no public trial violation ................................67

VI.    THE DISTRICT COURT PROPERLY CAUCLUATED THE
AMOUNT OF LOSS ............................................................70

    A.    Standard of review ....................................................70

    B.    The court did not clearly err....................................70

CONCLUSION....................................................................72

STATEMENT OF RELATED CASES ..................................73

CERTIFICATE OF COMPLIANCE ......................................74

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Carpenter v. United States*, 484 U.S. 19 (1987) ........................................................ 43

*Cadavid v. Gipson*, 798 F. App'x 982 (9th Cir. 2020) ............................................ 66

*Ciminelli v. United States*, 598 U.S. 306 (2023) .................................. 34, 42, 46, 47

*Kelly v. United States*, 590 U.S. 391 (2020) ...................................................... 34, 36

*Levine v. United States*, 362 U.S. 610 (1960) ............................................................ 66

*McNally v. United States*, 483 U.S. 350 (1987) ........................................................ 44

*Peretz v. United States*, 501 U.S. 923 (1991) ............................................................ 66

*Schmuck v. United States*, 489 U.S. 705 (1989) ........................................................ 37

*Skilling v. United States*, 561 U.S. 358 (2010) ...................................................... 3, 45

*United States v. Allen*, 34 F.4th 789 (9th Cir. 2022) ........................................ 65, 67

*United States v. Baker*, 923 F.3d 390 (5th Cir. 2019) ............................................ 45

*United States v. Bellot*, --- F. 4th ---, 2024 WL 3883519 (9th Cir. Aug. 21, 2024) ................................................................................................................ 29, 31

*United States v. Betts-Gaston*, 860 F.3d 525 (7th Cir. 2017) ........................... 39, 70

*United States v. Christi*, 682 F.3d 138 (1st Cir. 2012) ............................................ 66

*United States v. Cuevas-Lopez*, 934 F.3d 1056 (9th Cir. 2019) ............................. 45

*United States v. Depue*, 912 F.3d 1227 (9th Cir. 2019) .......................................... 63

*United States v. Elk-Booth*, 481 F. App'x 326 (9th Cir. 2012) ....................... 31, 32

*United States v. Flores*, 725 F. App'x 478 (9th Cir. 2018) ....................................31

*United States v. Garcia-Paz*, 282 F.3d 1212 (9th Cir. 2002) ...............................29

*United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023) ...........................................49

*United States v. Gutierrez-Calderon*, No. CR 2016-0009, 2019 WL 3859753 (D.V.I. Aug. 16, 2019) ............................................................................................66

*United States v. Hanly*, 589 F. App'x 391 (9th Cir. 2015) ....................................62

*United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004) ........................................43

*United States v. Hougen*, 76 F.4th 805 (9th Cir. 2023) ........................ 63, 67, 68, 69

*United States v. Jinian*, 725 F.3d 954 (9th Cir. 2013) ...........................................37

*United States v. Kaplan*, 836 F.3d 1199 (9th Cir. 2016) ........................... 47, 48, 57

*United States v. Kimbrew*, 406 F.3d 1149 (9th Cir. 2005) .....................................70

*United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009) .......................50

*United States v. Knapp*, 120 F.3d 928 (9th Cir. 1997) .............................. 59, 61, 62

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2017) ................................. 33, 47, 56

*United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc) .........................32

*United States v. Mancuso*, 718 F.3d 780 (9th Cir. 2013) .......................................32

*United States v. McCarron*, 30 F.4th 1157 (9th Cir. 2022) ....................................32

*United States v. McCormick*, 72 F.3d 1404 (9th Cir. 1995) ...................................32

*United States v. Milheiser*, 98 F.4th 935 (9th Cir. 2024)........................................33

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)................................ 3, 34, 42

*United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) ..................................50

*United States v. Porat*, 76 F.4th 213 (3d Cir. 2023) ..................................................45

*United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001) .........................32

*United States v. Redzic*, 627 F.3d 683 (8th Cir. 2010) ............................................30

*United States v. Rivera*, 682 F.3d 1223 (9th Cir. 2012) ..........................................65

*United States v. Santos*, 501 F. App'x 630 (9th Cir. 2012) ............................. 65, 69

*United States v. Sherlock*, 962 F.2d 1349 (9th Cir. 1989) .......................................65

*United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) ................................... 64, 69

*United States v. Singh*, 995 F.3d 1069 (9th Cir. 2021) ...........................................29

*United States v. Stargell*, 738 F.3d 1018 (9th Cir. 2013) .......................................70

*United States v. Stein*, 37 F.3d 1407 (9th Cir. 1994) ..............................................61

*United States v. Tuan Ngoc Luong*, 965 F.3d 973 (9th Cir. 2020) .........................28

*Waller v. Georgia*, 467 U.S. 39 (1984) ....................................................................65

## FEDERAL STATUTES

U.S. Const. amend. VI ....................................................................................... 64, 65

18 U.S.C. § 1341 ....................................................................... 2, 3, 33, 34, 42

18 U.S.C. § 1343 ....................................................................... 2, 3, 33, 34, 42

18 U.S.C. § 1346 .....................................................................................2, 3

18 U.S.C. § 1957 .....................................................................................2, 59

18 U.S.C. § 3231 ........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

## FEDERAL RULES

Fed. R. App. P. 4 ..................................................................................... 2

Fed. R. App. P. 10 .................................................................................. 64

No. 21-10376

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

      v.

MICHAEL KAIL,

    Defendant-Appellant.

_____

## BRIEF FOR THE UNITED STATES AS APPELLEE

Defendant-Appellant Michael Kail appeals his convictions, following a jury trial, for mail and wire fraud, honest-services fraud, and money laundering. These convictions stemmed from evidence that Kail used his position as a vice president at Netflix, Inc., to approve money-losing or worthless contracts with third-party vendors in exchange for bribes and kickbacks. On appeal, Kail raises sufficiency, instructional, and other challenges which ignore the trial evidence and otherwise lack merit. This Court should affirm.

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231; this Court, under 28 U.S.C. § 1291. Judgment was entered on December 16, 2021, 1-ER-10, and

Kail timely appealed, 12-ER-3176; Fed. R. App. P. 4(b)(1)(A)(1). He remains on bail pending appeal. CR-307.[1]

## ISSUES PRESENTED

1.     Whether the indictment was constructively amended.

2.     Whether the jury (a) had sufficient evidence to convict and (b) was properly instructed on mail and wire fraud under a money-or-property theory.

3.     Whether the jury (a) had sufficient evidence to convict and (b) was properly instructed on mail and wire fraud under an honest-services theory.

4.     Whether the jury was properly instructed on money laundering.

5.     Whether the district court's public trial rulings were plain error.

6.     Whether the district court properly calculated the loss amount.

## STATEMENT OF THE CASE

### A.     Charges and pretrial litigation

On April 26, 2018, a federal grand jury charged Kail in a 29-count indictment with 19 counts of wire fraud, 18 U.S.C. §§ 1343, 1346 (Counts 1-19); three counts of mail fraud, 18 U.S.C. §§ 1341, 1346 (Counts 20-22); and seven counts of money laundering, 18 U.S.C. § 1957 (Counts 23-29). 2-ER-606-14. The

---

[1] ER refers to Kail's excerpts of record; SER to the government's supplemental excerpts of record; CR to the record of the district court clerk; and AOB to Appellant-Kail's opening brief.

mail and wire fraud counts alleged two theories of liability: that Kail defrauded Netflix of (1) money and property, and (2) its right to his honest services. *Id.*[2]

In executing these schemes, as discussed below, the indictment alleged that Kail fraudulently awarded Netflix contracts to nine vendors. *Id.* Most of the mailings and interstate wires charged in the indictment were linked to particular vendors: Platfora (Counts 13-15), Netenrich (Count 22), Vistara (Counts 17 and 22), Docurated (Counts 5-8 and 21), Numerify (Counts 18-19), Maginatics (Counts 4 and 20), Sumo Logic (Count 12), Netskope (Counts 1-3), and Elastic Box (Counts 9-11). 2-ER-610-11. The wire charged in Count 16 was an email from Kail to Netflix's CEO. 2-ER-610.

In November 2018, Kail moved to dismiss the fraud charges, arguing that the indictment failed to allege a risk of foreseeable economic harm to Netflix, which he claimed was an element of private sector honest-services fraud. CR-23.

---

[2] The mail and wire fraud statutes generally prohibit "any scheme or artifice to defraud" a victim of "money or property" by means of material misrepresentations or actionable omissions. *See* 18 U.S.C. §§ 1341, 1343; *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) ("[T]o be guilty of [mail or] wire fraud, a defendant must act … to deprive a victim of money or property by means of [material] deceptions."). The honest-services fraud statute defines the term "scheme or artifice to defraud," as used in the mail and wire fraud statutes, to "include[ ] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Honest-services fraud is thus not a standalone crime but a theory of mail or wire fraud. *See Skilling v. United States*, 561 U.S. 358, 404 (2010). Like the opening brief, this brief will refer to non-honest-services mail and wire fraud simply as "property fraud."

The court denied this motion, holding that even if a risk of economic harm was required, the "indictment sufficiently allege[d] that Kail's charged scheme caused Netflix to suffer economic harm."  SER-8-9.

At a pretrial conference on March 5, 2021, the government proposed a specific unanimity instruction and special verdict form, which would require the jurors to specify as to each fraud count whether Kail was guilty under a property theory, honest-services theory, or both.  2-ER-450-51.  Kail objected that the indictment alleged only an honest-services theory.  2-ER-453-54.  The court overruled this objection explaining that it was "clear as a bell" the indictment alleged both theories.  2-ER-453.

After delays due to the COVID-19 pandemic and other factors, CR-64, CR-120, CR-129, trial commenced on April 7, 2021, CR-201.  The government called 29 witnesses and introduced over 200 exhibits.  1-ER-240-41.  The defense called four witnesses including Kail.  10-ER-2472.

### B.    The government's case at trial

#### 1.    *Netflix prohibited employees from accepting undisclosed compensation from third-party vendors or potential vendors*

Netflix was founded in 1999 as a company that mailed DVDs to subscribers. 3-ER-667.  Around 2007, Netflix began transitioning to a streaming model for movies and other forms of entertainment, and migrating its software applications onto a cloud environment.  3-ER-666-72; 4-ER-1036.  In 2011, Netflix Chief

Executive Officer (CEO) Reed Hastings hired Kail as Director of Information Technology, and then promoted him to Vice President of Information Technology (I.T.). 4-ER-1037-38. As a vice president, Kail had authority to sign contracts and incur liabilities on behalf of Netflix up to $1 million. 9-ER-2306-07.

Netflix preferred developing solutions to technological problems internally. 3-ER-767; 6-ER-1570. But sometimes it would buy a solution from a third-party vendor or subcontractor. 3-ER-669-70; 8-ER-2077. A vendor could run the gamut from a legacy company like Microsoft to a technology ("tech") startup. 6-ER-1570. When dealing with a startup, Netflix engineers would test out the potential vendor's software for a probationary period called a "proof-of-concept" before offering a paid contract. 3-ER-670, 3-ER-764. A proof-of-concept required Netflix to expend time and resources evaluating the new product. 3-ER-764-65; 4-ER-1005; 6-ER-1572-73.

The benefits to a startup of a contract with Netflix were immense. 3-ER-854; 5-ER-1170; 6-ER-1422; 7-ER-1869, 7-ER-1907-09. Apart from the revenue, a startup would get feedback from Netflix engineers for improving its product. 6-ER-1572; 8-ER-2182. More importantly, a relationship with Netflix was seen by potential investors and customers as a badge of approval. 3-ER-854; 6-ER-1575; 8-ER-2143. Startups would jump at the chance for a contract with Netflix even if they lost money on the deal itself. 7-ER-1835; 8-ER-2143.

5

Netflix's policy against conflicts of interest, with which Kail was familiar, provided that an employee "must never use or attempt to use their position with the company to obtain improper personal benefits." 3-ER-813-15; 4-ER-1041, 4-ER-1048; 9-ER-2251; SER-116. The policy defined a conflict of interest as a situation in which the interests or benefits of the employee appeared to conflict with those of the company. 4-ER-1048; SER-116. Hastings testified that an employee was required to "sunshine" a potential conflict, a Netflix term for disclosing the conflict to the employee's supervisor or the company's general counsel. 4-ER-1050; *accord* 9-ER-2307 (Netflix required disclosure of any "perceived conflict of interest, or anywhere close [to] a conflict of interest"). Furthermore, Hastings and other Netflix executives testified that it would be "totally inappropriate and clearly a conflict" for an employee in a position to approve a contract with a vendor to accept cash, stock options, or other compensation from the vendor. 4-ER-1061, 4-ER-1065-67; 6-ER-1577 ("Being compensated while also doing business and signing contracts" with a vendor was "forbidden" and a "black and white issue."); 9-ER-2355 (describing this arrangement as a "pure conflict of interest"); *accord* 3-ER-787, 3-ER-837; 4-ER-1007-08; 9-ER-2329-34.

### 2. *Kail awarded contracts to vendors in exchange for cash, stock options, and other compensation*

From February 2012 to July 2014, Kail awarded contracts on behalf of Netflix to vendors paying him in cash and stock options.[3] His scheme generally worked as follows. Kail would engage a startup with an unproven product and few if any customers. *See, e.g.*, 6-ER-1680; 7-ER-1732. These companies were eager for the technical expertise and legitimacy that attended a relationship with Netflix. *See, e.g.*, 7-ER-1835; 8-ER-2143. Kail would intimate that if a company hired him as a paid "advisor," he would deliver a contract with Netflix. *See, e.g.*, 4-ER-1128; 12-ER-3127.[4] The company would do so, paying Kail in cash and stock options. 3-ER-860; 6-ER-1495; SER-156 -57. Shortly before or after being paid, Kail would approve a proof-of-concept agreement with the company followed by one or more paid contracts. *See, e.g.*, 5-ER-1260. He would do this even when Netflix engineers recommended against purchasing the company's software, or when the company offered no value to Netflix whatsoever. 8-ER-2082-84; 9-ER-2267.

Kail's scheme encompassed at least nine separate companies: Platfora, Netenrich, Vistara, Docurated, Numerify, Maginatics, Sumo Logic, Netskope, and

---

[3] A stock option is issued at a company's current value, so that if the value goes up, the person holding the option can buy shares at the lower price and immediately profit. 6-ER-1648-49.

[4] Tech companies hired advisors or industry experts to provide references and help grow their business. *See, e.g.*, 3-ER-861.

Elastic Box.  *See* SER-185.  Netflix spent time and money evaluating these companies' software, and paid them a total of approximately $6.6 million.  SER-185; 3-ER-764; 4-ER-1005; 6-ER-1572.  They, in turn, paid Kail several hundred thousand dollars' worth of stock options and over $550,000 in cash.  SER-185; *see, e.g.* 9-ER-2377.  The following chart illustrates this flow of money:



SER-185.

Kail covered up his financial stake in the vendors.  He personally signed each contract on behalf of Netflix.  *See, e.g.*, 7-ER-1771-72; 8-ER-2149, 8-ER-2158.  He concealed the existence of contracts from employees who would have questioned them.  4-ER-990-93, 4-ER-1000-05; 6-ER-1587-88; 9-ER-2260-67.  He lied about and failed to disclose that he was taking compensation from vendors.  3-

ER-719, 3-ER-787; 4-ER-994, 4-ER-1075; 8-ER-2133; 9-ER-2270, 9-ER-2319;

SER-119.  And he laundered vendor payments through a straw corporation, Unix

Mercenary, LLC, 5-ER-1255; SER-186, and transferred the vendor-derived funds

between multiple bank accounts, often opening and closing the accounts shortly

before and after major transfers, 9-ER-2411; SER-186.

Kail was involved with all the vendors concurrently, but for clarity's sake,

each is discussed in turn.

(i)  <u>Platfora</u>

Platfora was a startup developing software to help visualize and interpret

large data sets.  3-ER-673; 4-ER-928.  Around May 2013, Kail was introduced to a

member of Platfora's marketeering team through a mutual friend.  5-ER-1203-04.

In June 2013, Kail signed a proof-of-concept agreement with Platfora.  3-ER-857-

59.  During the proof-of-concept period, Kail had drinks with Platfora CEO Ben

Werther.  4-ER-1126-28; *see* 12-ER-3127.  Werther emailed his colleagues the

next day that Kail had asked for a paid advisor position.  4-ER-1128; 12-ER-3127.

Kail had indicated that if Platfora gave him equity in the company, he would

approve a Netflix contract within the month.  4-ER-1128; 12-ER-3127 ("The

strong suggestion was that if we do that, and remain responsive like we have been,

we'd be able to get a $600k 3 year deal done by Labor Day.").  Platfora's sales

director replied, "Clearly he has been working the grey area between [ ] advisor

and leveraging the Netflix logo for personal advantage." 4-ER-1129; 12-ER-3127. Days later, Platfora made Kail an advisor and gave him 75,000 stock options. 3-ER-860-64. Kail emailed Werther, "I look forward to helping you in both a Netflix and Advisory capacity." 5-ER-1177; SER-129. Kail then extended Platfora's proof-of-concept with Netflix. 4-ER-886. He also shared with Platfora confidential pricing information on some of Platfora's competitors. 5-ER-1209-13; SER-130.

Meanwhile, the Netflix engineers who evaluated Platfora's software recommended against implementing it at Netflix. *See, e.g.*, 9-ER-989. Advertising Technology Director Tony Ralph, for whose division the software was being tested, did not believe Platfora added value to the tools Netflix was already using. 3-ER-686-93, 3-ER-709-12; SER-131; *see also* 3-ER-676-79. In September 2013, Kail met with Ralph, Werther, and others. 3-ER-700-04; 4-ER-895; SER-134. Ralph testified about the meeting that his "most distinct recollection was an uneasy feeling in [his] stomach" that Kail was supporting Platfora for the "wrong reasons." 3-ER-704-05. Kail approved a contract with Platfora for $10,000 monthly for seven months, followed by an annual subscription fee of $250,000. 4-ER-896-97; SER-135. Werther would later email his colleagues that Kail's approval of the contract "clearly [involved] some pay-to-play." 4-ER-904-07; 12-ER-3138.

Kail kept Platfora informed of the failure of its software at Netflix.  4-ER-908-13; SER-141-45.  In one email, Kail indicated that he had just tried to advocate for the software with one of his engineers, but that he could "only do so much pushing from [his] side without having a conflict or being draconian."  4-ER-913; SER-141-45.  After reading Kail's email, Platfora's Chief Financial Officer (CFO) emailed his colleagues, "Maybe we need to really cozy up to [this engineer] and … show him some love.  Potentially give him some 'advisory shares' and introduce him to a VC—Kail's play."  4-ER-913; SER-141-45.

Kail also tried to keep the Platfora deal quiet.  Gagan Hasteer, Netflix's Director of Engineering, assumed that Kail had passed on Platfora because of the negative engineering reviews until the engineers who had evaluated the software discovered the contract by accident.  9-ER-990-93; SER-140.  Yet by early 2014, it was clear that Platfora was not being used at Netflix.  *See, e.g.*, 3-ER-707.  In an email on which Kail was copied, a Netflix engineer observed that no one was using the software and asked, "[H]ow much time are we spending investing in maintaining/upgrading it?"  3-ER-777-78; SER-138-39.

Netflix conducted performance evaluations using a "360 review," a system where any employee could evaluate any other.  3-ER-716; 4-ER-982.  In their respective evaluations, Ralph and Hasteer questioned Kail's involvement with Platfora and other vendors.  Ralph noted that Kail was having "parallel

11

conversation with C-level execs of our vendors as the team [was] having

contradictory conversations with other contacts." 3-ER-717-18; 12-ER-3106.

Hasteer was more pointed about Kail's decision-making as regards Platfora:

> The evaluation team including two engineers from my
> team concluded that Tableau was better than Platfora. I
> also communicated this to you in one of our 1-1s. I am
> sure Tony [Ralph] did the same. The engineers were
> disappointed when you purchased Platfora because they
> did not understand the reasoning behind it. Your
> potential involvement as an advisor with some of these
> vendors also creates the perception of a conflict of
> interest.

4-ER-996-98; 12-ER-3105. In referring to Kail's potential involvement as an

advisor, Hasteer believed that Kail was potentially advising startups in a volunteer

capacity only. 4-ER-995-96.

After reading Hasteer's review, Hastings emailed Kail, "[Y]ou want to avoid

any potentially conflicting financial relationships with anyone we might do

business with." 4-ER-1070-75; SER-118, SER-119. Hastings stated, "You are

free to volunteer your time to anyone where you want to, but not to take any comp

(stock, options, cash, etc.)." *Id.* Kail replied that he was "not formally helping

[Platfora]," SER-119, which Hastings understood to mean that Kail was not being

paid, 4-ER-1075.

In March 2014, Netflix engineers evaluated a new version of Platfora's

software but concluded that it still did not perform effectively. 3-ER-806. On

12

March 31, 2014, Kail resigned from his position as a Platfora advisor, explaining that he could no longer "serve in a capacity that [he] fe[lt] benefits the company." SER-146.  On April 18, 2014, a Netflix engineer gave written notice to Platfora that Netflix was terminating their contract because some of the software's "key features … are not fully deployed or still need improvement."  3-ER-767-69, 3-ER-787-90; SER-170.  The contract provided that if Platfora failed to improve its product in certain ways, Netflix could terminate by April 28, 2014, without being liable for the annual subscription fee.  4-ER-902; SER-136-37.

Platfora was in a financial bind because it had already accounted for the anticipated revenue.  4-ER-920-23.  There were internal discussions at Platfora about getting Kail to approve a final payment of $155,000, the amount needed to avoid having to revise Platfora's annual accounting.  *Id.*  Werther noted that Kail was in a jam and would be "looking for an out."  4-ER-923.  Platfora invoiced Netflix $155,000.  4-ER-923-25.  A Netflix purchasing manager advised Kail that Netflix did not owe this amount, but Kail characterized the invoice as a "negotiated exit" and authorized payment.  5-ER-1391-92; SER-147-48.

(ii)  Netenrich & Vistara

Netenrich was a startup that helped companies outsource their I.T. needs.  5-ER-1246; 6-ER-1487.  Vistara was a wholly owned subsidiary of Netenrich that sold I.T. software.  6-ER-1489, 6-ER-1547.  Kail had known Netenrich founder

13

Varma Kunaparaju since the 1990s.  5-ER-1249, 5-ER-1309.  In January 2012, they discussed a potential opportunity for Netenrich at Netflix.  5-ER-1250-51. Kail subsequently accepted paid advisor positions at Netenrich and Vistara for a total of 100,000 stock options in Netenrich.  5-ER-1266-75.

Netenrich and Vistara relied on "partners" or outside companies to help sign up new customers in exchange for commissions.  5-ER-1254.  Around February 2012, Netenrich and Vistara entered into partner agreements with Unix Mercenary, LL.C., a company of which Kail was the owner and sole member.  5-ER-1254-56, 5-ER-1277; 6-ER-1554.  A Netflix purchasing manager testified that Netflix typically would not offer a multi-year contract to a startup.  5-ER-1378-80.  Yet between March and June 2012, Kail approved multi-year contracts with Netenrich and Vistara, which paid Kail (through Unix Mercenary) monthly commissions of 12% and 15% of Netflix's billings.  5-ER-1259-61, 5-ER-1277, 5-ER-1289, 5-ER-1295.  In one instance, Kail emailed Kunaparaju that he had expedited approval of Netenrich and Vistara invoices at Netflix, and that "in reciprocal" for this service, Kail expected expedited payment of over $30,000 in personal commissions.  5-ER-1277-78; SER-126.

But Vistara's software was not a good fit for Netflix.  6-ER-1583.  An engineer who evaluated the software testified that Netflix "never trusted it or got it to the point we trusted it enough to replace the existing tools."  6-ER-1583.  Ashley

Sprague, another engineer who later succeeded Kail as head of I.T., testified that Netflix had "other technology that was doing a better job, so [Vistara] was not a good fit." 9-ER-2257. Kail reported these concerns to Vistara. *See, e.g.*, 5-ER-1303; 12-ER-3125 (noting "the team's overall dissatisfaction with Vistara"); 5-ER-1302; SER-127 (noting "serious performance problems with Vistara").

Kail never told Sprague or other colleagues at Netflix that he had signed a paid contract with Vistara. 9-ER-2260-61; *see also* 6-ER-1584, 6-ER-1611. Indeed, when Sprague met with Kunaparaju following Kail's departure from Netflix around the end of July 2014, she was surprised to learn that Netflix had a contract with Vistara. 9-ER-2266-67.

(iii)    Docurated

Alex Gorbansky and Irene Tserkovny founded Docurated in 2012 as a startup developing software for indexing information within large data sets. 6-ER-1417-20, 6-ER-1458. Kail approved a proof-of-concept agreement for Docurated. 6-ER-1419-20. Kail met with Gorbansky and Tserkovny on May 29, 2013, the last day of the proof-of-concept period. 6-ER-1424-26. On May 30, Kail approved a one-year contract with Docurated for $21,600. 6-ER-1423, 6-ER-1433-34. On May 31, Docurated made Kail an advisor and gave him 28,000 stock options, which Kail would later exercise. 6-ER-1426-32, 6-ER-1437-41.

15

In September 2013, Kail moved into a new house in Los Gatos, California. 6-ER-1453. Gorbansky sent him a housewarming gift, an old map of California whose value Gorbansky could not recall at trial. 6-ER-1454-55. In January 2014, Docurated gave Kail another 50,000 stock options. 6-ER-1442-44. Around March 2014, Kail signed another one-year contract with Docurated for $120,000. 6-ER-1448-50, 6-ER-1464-65; SER-160. In June 2014, Gorbansky sent Kail a bottle of Dom Perignon Champaigne. 6-ER-1454-55.

A Netflix engineer, meanwhile, determined that the Docurated software had to be replaced. 8-ER-2082-84. Sprague, who also reviewed the software, agreed that it had no value for Netflix. 9-ER-2267. Kail never told Sprague that he had already approved contracts with Docurated. 9-ER-2268. Following Kail's departure around July 2014, Netflix discontinued its relationship with Docurated and replaced its software with an application that Netflix developed internally. 6-ER-1468, 6-ER-1481; 8-ER-2085, 8-ER-2130-31.

(iv)   ServiceNow

ServiceNow sold software designed for support departments such as I.T. and human resources. 6-ER-1631. ServiceNow was not a startup: it had gone public in 2012 with a valuation of about $2 billion, and had a contract with Netflix that predated 2011. 6-ER-1632.[5] In early 2013, Kail had dinner with ServiceNow

---

[5] Kail was not charged for conduct related to ServiceNow.

CEO Frank Slootman. 6-ER-1634, 6-ER-1638. During the dinner, Kail mentioned "an elephant in the room," namely that ServiceNow was benefiting from its relationship with him, but that it was "not a two-way street." 6-ER-1635. Kail added that many companies offered advisor positions with stock options. 6-ER-1636. Slootman felt "taken aback because [he] just was not used to being propositioned … in that manner." 6-ER-1636-37.

After the dinner, Kail emailed Slootman that he typically received stock options worth one-fifth to one-half of one percent of the company. 6-ER-1640; 12-ER-3147. Slootman ultimately declined, believing that by doing so he risked losing ServiceNow's contract with Netflix. 6-ER-1638. Slootman considered it "awkward" and "unusual" for a customer representative to negotiate on behalf of himself instead of his employer. 6-ER-1640-41.

        (v)   <u>Numerify</u>

Numerify was a startup developing software to make data analytics available to I.T. departments. 6-ER-1651-52. In February 2014, Numerify made Kail an advisor and gave him 36,000 stock options. 6-ER-1657, 6-ER-1661-63. About two weeks later, Kail approved a three-year contract with Numerify for $85,000 annually. 6-ER-1667-69; *see also* 7-ER-1701-02. This was among Numerify's first paid contracts. 6-ER-1680. A Netflix engineer tasked with evaluating Numerify's software concluded that it was not useful for Netflix. 8-ER-2088-89.

17

(vi) <u>Maginatics</u>

Maginatics was a startup developing software that would allow applications to operate in the cloud.  7-ER-1844-45, 7-ER-1865-66.  Kail met Maginatics CEO Amarjit Gill through a mutual friend.  7-ER-1868-69.  In March 2013, Kail approved a one-year contract with Maginatics.  7-ER-1846, 7-ER-1869-71.  In April 2013, Maginatics made Kail an advisor and gave him 30,000 stock options. 7-ER-1878-79.  Netflix engineers reported that Maginatics's software was slow and lacked key features.  7-ER-1861.  Nevertheless, Kail approved a three-year contract for $60,000 annually, even though Gill indicated that he was amenable to reaching an agreement at a lower price.  7-ER-1857, 7-ER-1862-63; 12-ER-3139.

In addition to stock options, Kail requested "monthly cash flow in return for advisory services."  7-ER-1888; SER-156.  Gill testified that Maginatics did not pay advisors in cash because unlike stock options, cash would not provide an incentive to grow the company.  7-ER-1889.  Instead, Maginatics gave Kail another 30,000 stock options.  7-ER-1891.  Kail exercised the options, earning over $100,000.  7-ER-1881-83; 9-ER-2377.

(vii) <u>Sumo Logic</u>

Sumo Logic was a startup developing software to analyze machine data and provide analytics in real time.  7-ER-1731-32, 7-ER-1902-04.  In June 2012, Kail was negotiating with Sumo Logic for both a deal with Netflix and an advisor

position for himself.  7-ER-1738; SER-164, SER-165.  In July 2012, Kail approved a one-year contract with Sumo Logic for $300,000.  7-ER-1746-48, 7-ER-1803; SER-161-63.  In August 2012, Sumo Logic made Kail an advisor and gave him 30,000 stock options.  7-ER-1755, 7-ER-1765; *see also* SER-166-67 (drafting advisor agreement as early as June 2012).  Sumo Logic CEO Vance Loiselle testified that he expected Kail to be the company's "internal champion" at Netflix. 7-ER-1742.  In July 2013, Kail renewed Sumo Logic's contract for another two years for $400,000 annually.  7-ER-1776, 7-ER-1924; SER-162.  Two days later, Sumo Logic gave Kail another 20,000 stock options.  7-ER-1767-71, 7-ER-1779-80.

But Sumo Logic's software was failing at Netflix.  *See, e.g.*, 7-ER-1761, 7-ER-1783, 7-ER-1786-88, 7-ER-1919; 8-ER-2104-05.  Sumo Logic's sales director testified that Netflix was giving them a "very, very, very long list of items that we could do better at or needed to still build."  7-ER-1920.  Kail emailed Loiselle that the "general feedback is 'Sumo is unusable.'"  7-ER-1788; 12-ER-3143; *see also* 7-ER-1919, 7-ER-1783.  Yet days before leaving his job at Netflix, Kail approved payment of $400,000 to Sumo Logic for the second year of its contract.  7-ER-1927-28; SER-169, SER-171.

(viii)   Netskope

Netskope was a startup developing cyber-security software as a cloud service, but it would not have a commercially available product until the end of 2013.  8-ER-1979.  Kail met Netskope CEO Sanjay Beri through an investor at a venture capital firm.  8-ER-1980.  In November 2012, Netskope made Kail an advisor and gave him 26,500 stock options and cash payments of $5,000 monthly.  8-ER-1984-85, 8-ER-2022-23, 8-ER-2032.  In early 2013, Kail approved a proof-of-concept agreement followed by a contract with Netskope.  8-ER-1996.  A Netflix engineer who evaluated Netskope's software testified that he had recommended against implementing it at Netflix.  6-ER-1585-86, 6-ER-1618.  Kail also wrote to Netskope that its software was "continuously failing."  8-ER-2013; SER-153.  In November 2013, Netskope gave Kail another 45,500 stock options as well as continued cash payments of $5,000 monthly.  8-ER-2005, 8-ER-2009, 8-ER-2011.  In July 2014, days before he left Netflix, Kail signed another one-year contract with Netskope for $112,500.  8-ER-2015-16, 8-ER-2032; SER-149-52.

(ix)   ElasticBox

ElasticBox was a startup trying to help companies move their software applications into the cloud.  8-ER-2135-36.  In early 2013, Kail met ElasticBox CEO Ravi Srivatsav through a venture capitalist.  8-ER-2138-39.  ElasticBox had six or seven employees at the time and no paying customers.  8-ER-2139, 8-ER-

2142. ElasticBox made Kail an advisor and gave him 10,000 stock options. 8-ER-2147. Kail "coached" ElasticBox on how to price its product in negotiations with Netflix. 8-ER-2152. Following a proof-of-concept, Kail signed a three-year contract with ElasticBox for $600,000 annually. 8-ER-2148-49; *see also* 8-ER-2145-46. In November 2013, he signed an amended three-year contract for $1.45 million annually. 8-ER-2160, 8-ER-2209.

Around March 2014, ElasticBox gave Kail another 15,000 stock options. 8-ER-2162-63. ElasticBox also would give him "personalized gifts, like bottles of wine, [and] things of that nature." 8-ER-2172. Srivatsav never told his sales director that Kail was being compensated. 8-ER-2211-12. The sales director testified that had he known this, he would "absolutely not" have negotiated with Kail on behalf of Netflix because it would have been "unethical." 8-ER-2214-15.

### 3. Kail transferred the vendor payments between accounts to conceal the source of the funds

An FBI forensic accountant traced the cash payments that Kail received from Netenrich, Vistara, and Netskope. 9-ER-2420-25.[6] In March 2012, Kail incorporated Unix Mercenary, LLC. 9-ER-2365-67. In June 2012, he opened checking and savings accounts in the name of Unix Mercenary at Wells Fargo

---

[6] The money laundering counts (Counts 23 to 29) were based on financial transactions involving payments from Netenrich and Vistara. 2-ER-612. The count linked to each transaction is noted in parentheses.

Bank. 9-ER-2373-75, 9-ER-2393. He began depositing payments from Netenrich and Vistara into these accounts. *See* SER-186.

Kail also had accounts in his own name at TD Ameritrade, Charles Schwab Bank, and checking and savings accounts at Silicon Valley Bank (SVB). 9-ER-2407. He deposited the payments he received from Netscope into his personal account at Charles Schwab. 10-ER-2479. Kail closed his Unix Mercenary accounts at Wells Fargo in July 2013. 9-ER-2418. He then opened checking and savings accounts in the name of Unix Mercenary at SVB and began depositing payments from Netenrich and Vistara into these accounts. 9-ER-2402-04, 9-ER-2424-26; SER-172-83.

Kail transferred vendor-derived funds from his Unix Mercenary accounts to his personal accounts. *See* SER-186. On April 23, 2013, he transferred $25,422 from a Unix Mercenary account at Wells Fargo to a personal account at TD Ameritrade. 9-ER-2428-29 (Count 23). On September 3, 2013, Kail transferred $60,000 from his Unix Mercenary savings account at SVB to his personal savings account at SVB. 9-ER-2435 (Count 25). On the same day, he transferred $25,000 from his Unix Mercenary checking account at SVB to his personal checking account at SVB. 9-ER-2456 (Count 26). On October 8, 2013, Kail transferred $30,000 from his Unix Mercenary savings account at SVB to his personal savings account at SVB. 9-ER-2436 (Count 27). On September 22, 2014, he transferred

$11,000 from his Unix Mercenary savings account at SVB to his personal checking account at SVB. 9-ER-2437 (Count 28). On October 24, 2014, he transferred $25,000 from his Unix Mercenary savings account at SVB to his personal savings account at SVB. 9-ER-2437 (Count 29).

Kail also moved vendor-derived funds between the Unix Mercenary accounts that he controlled. On July 15, 2013, he transferred approximately $133,000 from his Unix Mercenary savings account at Wells Fargo to his Unix Mercenary savings account at SVB. 9-ER-2434-35. And on July 18, 2013, he transferred $70,000 from his Unix Mercenary savings account at SVB to an escrow account at a title company. 9-ER-2435 (Count 24). He used these funds as a down payment on his new house in Los Gatos. 9-ER-2381-84, 9-ER-2404.

The following chart illustrates this series of transactions:



SER-186.

### 4. The fallout

Netflix CFO David Wells met with Kail in November 2014, about four months after Kail had left the company. 9-ER-2341-42. Wells said that Netflix had discovered two instances of him awarding contracts to vendors paying him commissions. *Id.* Kail asked if Wells knew of any other vendors, but Wells did not answer. 9-ER-2342. Kail never suggested this was a misunderstanding or not a conflict of interest. 9-ER-2342.

Apart from the economic losses, the revelations about Kail cost Netflix in reputation, morale, and credibility. 6-ER-1590; 9-ER-2336-40. Kail's vendor scheme "call[ed] into question each one of those [competitive bidding] processes,"

24

9-ER-2339, and required Netflix to rebuild trust "internally and externally with [its] vendors," 9-ER-2270.  Sprague testified that after Kail's scheme became public, vendors were more likely to offer personal compensation in exchange for a contract with Netflix.  6-ER-590.

### C.    Jury instructions, verdict, post-trial motions, and sentencing

In its final instructions, the court charged the jury on the elements of property fraud, honest-services fraud, and money laundering.  For the fraud counts, the court instructed the jury on specific unanimity, asking them to specify as to each count the theory of liability, if any, of which Kail was guilty:  property fraud, honest-services fraud, or both.  SER-91.  The court also instructed the jury consistent with the defense theory of the case, that good faith was a complete defense to the charges.  SER-88.

The jury convicted Kail on the fraud counts (Counts 1 to 22) under both theories of liability, except on Count 5, for which it acquitted him of both theories, and Count 20, for which it acquitted him of the property fraud theory.  2-ER-359-64.  The jury also convicted Kail on all of the money laundering counts (Counts 23 to 29).  2-ER-364-65.

The court denied Kail's motion for judgment of acquittal or a new trial.  1-ER-240-64.  In rejecting his challenge to the property fraud counts, the court found "ample evidence from which to conclude that [Kail] intended to defraud his

employer of property by paying for products the company did not need at all or far beyond what was needed, paying for products after the company stopped using them, and paying amounts beyond Netflix's contractual obligation." 1-ER-250. The court similarly rejected Kail's challenge to his honest-services fraud convictions, finding ample evidence of "a kickback scheme, in which Kail bartered his power to sign Netflix vendor contracts for referral commissions and plum advisor agreements in which he earned stock options." 1-ER-255.

At sentencing, the court determined a loss amount of $1,505,000, which consisted of the value of the Vistara and second Docurated contracts. 1-ER-201; *see* 1-ER-195. The court found that Netflix had obtained no value from these contracts whatsoever. 1-ER-168, 1-ER-177-78. The court limited its loss calculation to the Vistara and second Docurated contracts to avoid having to disentangle the fraudulent or inflated portions of other vendor contracts from the value of any legitimate services provided under those contracts. *See* 1-ER-124, 1-ER-131-39, 1-ER-168, 1-ER-171.

The court found a total offense level of 26, and a criminal history category I, for a guidelines range of 63 to 78 months. 1-ER-203. On December 14, 2021, the court sentenced Kail to 30 months in prison. 1-ER-224; 1-ER-3. In imposing this sentence, the court opined that "the government ha[d] rightfully pursued and obtained conviction[s] for 27 counts of fraud, of dishonesty, and the public

26

deserves the punishment, Mr. Kail deserves the punishment, and I think there is a deterrent effect here." 1-ER-223.

## SUMMARY OF ARGUMENT

1. The indictment was not constructively amended. It alleged property and honest-services fraud, the two theories submitted to the jury.

2a. The evidence of property fraud was legally sufficient. The government presented overwhelming evidence that Kail defrauded Netflix of over a million dollars by, among other things, lying about receiving compensation from vendors and concealing the existence of contracts from his colleagues at Netflix. 2b. The court properly instructed the jury on property fraud. Kail is wrong to argue that in addition to deceiving and cheating a victim of property, a defendant must personally "obtain" the same property directly from the victim. The instructions also correctly defined "property," and did not permit a conviction on an invalid right-to-control-information theory.

3a. The evidence of honest-services fraud was legally sufficient. The government presented overwhelming evidence of a scheme to deprive Netflix of its right to Kail's honest services in exchange for bribes and kickbacks from vendors. 3b. The court properly instructed the jury on honest-services fraud. Notably, the instructions required a finding that vendors paid bribes or kickbacks in exchange

27

for Kail's services as a Netflix employee, and that Kail's misrepresentations were material to Netflix.

4.  The court properly instructed the jury on money laundering.  Under binding precedent, the instructions were phrased as to correctly require a finding that Kail knew his monetary transactions involved funds derived from unlawful activities.

5.  The court did not err, let alone plainly, in imposing minor limitations on the number of spectators in the courtroom during a pandemic.  The court made available a live audio feed of the trial and granted every request for physical attendance.

6.  The court properly calculated the loss amount based on the value of the Vistara and second Docurated contracts, finding that Netflix obtained no value from them whatsoever.

## ARGUMENT

## I.     THERE WAS NO CONSTRUCTIVE AMENDMENT

### A.     Standard of review

The Court reviews a constructive amendment claim de novo.  *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 984 (9th Cir. 2020).

### B.     There was no constructive amendment

Kail's "constructive amendment" claim is straightforward:  that the indictment alleged honest-services fraud, but that he was tried for both property and honest-services fraud.  AOB-22-26.  Kail is wrong.

There are two ways an indictment can be constructively amended:  "first, by 'substantially altering' the crime charged in the indictment to the point that it becomes 'impossible to know whether' the grand jury would have indicted for the new crime; and second, by the government presenting a 'distinctly different' set of facts at trial than those alleged in the indictment."  *United States v. Bellot*, --- F. 4th ---, 2024 WL 3883519, at *3 (9th Cir. Aug. 21, 2024) (quoting *United States v. Singh*, 995 F.3d 1069, 1078-79 (9th Cir. 2021)).  The Court will not find a constructive amendment unless "the difference between the indictment and the jury instructions allowed the defendant to be convicted on the basis of *different behavior* than that alleged in the original indictment."  *United States v. Garcia-Paz*, 282 F.3d 1212, 1216 (9th Cir. 2002).

Applying these principles, there was no constructive amendment because the indictment alleged property fraud.  First, the indictment alleged that between February 2012 and July 2014, Kail devised a scheme involving both property and honest-services fraud:  that is, a scheme "to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and

29

omissions, and to deprive Netflix of its intangible right to KAIL's honest services." 2-ER-608 ¶ 16. Second, the indictment listed deprivations of property and honest services as distinct objects of Kail's scheme. It alleged that Kail "deprived Netflix of the following: (a) its money and property by enabling the vendors to, among other things, negotiate more favorable contracts with Netflix than they would have been able to obtain without the assistance of KAIL; and (b) its intangible right to KAIL's honest services." 2-ER-608 ¶ 21. Third, each of the fraud counts included an allegation that Kail devised a scheme "to obtain money and property." 2-ER-610 ¶ 28, 2-ER-611 ¶ 30. Because the indictment plainly alleged a theory of property fraud, submitting that theory to the jury was not a constructive amendment. *See United States v. Redzic*, 627 F.3d 683, 688-90 (8th Cir. 2010) (rejecting constructive amendment claim, and holding that indictment sufficiently alleged both property and honest services theories of fraud).

In urging otherwise, Kail fails to analyze the language of the indictment. AOB-21-22. He instead asks the Court to infer a constructive amendment because he had initially believed the government was proceeding on an honest-services theory only. AOB-22-24. But Kail's process- and deadline-related arguments, *see id*, do not speak to the contents of the indictment, as the district court recognized. During a discussion of the government's proposed specific unanimity instruction at the pretrial conference, the court stated, "I went right back to that indictment to see

if you could go to the jury on two separate crimes and you did -- you did charge it that way. It's clear as a bell." 2-ER-453. Kail offers nothing to undermine the court's conclusion.

Nor does Kail argue that he was convicted on the basis of different behavior than that alleged in the indictment, the key factor in a constructive amendment analysis. *See, e.g.*, *Bellot*, 2024 WL 3883519, at *6 (no constructive indictment where grand jury was "presented with the same behavior which was presented to the trial jury"); *United States v. Flores*, 725 F. App'x 478, 481 (9th Cir. 2018). In fact, he recognizes that the same behavior underlay both theories. *See* AOB-9 (acknowledging that property and honest-services fraud schemes involved "the same conduct"), AOB-21-22, AOB-27 (fraud schemes involved the same "factual theory"). Thus, submitting a property fraud theory to the jury did not constructively amend the indictment.

## C. Any challenge to the indictment is waived and otherwise barred

Relatedly, Kail asserts that the government's case resembled a "chimera" that improperly combined elements of property and honest-services fraud. *See, e.g.*, AOB-12, AOB-13, AOB-27, AOB-28, AOB-38. If this is meant to suggest a challenge to the indictment, Kail waived it by failing to raise it before trial. *See United States v. Elk-Booth*, 481 F. App'x 326, 327 (9th Cir. 2012) (holding that

31

defendant waived duplicity claim by failing to raise it before trial) (citing *United States v. McCormick*, 72 F.3d 1404, 1409 (9th Cir. 1995)).

Even if such a claim were not waived, any problem with the indictment was cured when the district court provided a special verdict form for property and honest-services fraud and instructed the jury on specific unanimity. *See United States v. Ramirez-Martinez*, 273 F.3d 903, 915 (9th Cir. 2001) (providing that a duplicitous indictment is cured by providing a specific unanimity instruction), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186, 1188 & n.2 (9th Cir. 2007) (en banc); *Elk-Booth*, 481 F. App'x at 327; *see also United States v. Mancuso*, 718 F.3d 780, 787 (9th Cir. 2013). Thus, if Kail's rhetoric implies a challenge to the indictment, it is waived and otherwise precluded by the special verdict form and specific unanimity instruction.

## II. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON PROPERTY FRAUD, AND SUFFICIENT EVIDENCE SUPPORTED THE JURY'S VERDICT

### A. Standard of review

In evaluating a sufficiency challenge, this Court "must construe the evidence in the light most favorable to the prosecution, and only then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McCarron*, 30 F.4th 1157, 1162 (9th Cir. 2022) (citation and quotation marks omitted).

In evaluating a challenge to jury instructions, the Court reviews the "formulation of jury instructions for abuse of discretion, but review[s] de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case." *United States v. Liew*, 856 F.3d 585, 595-96 (9th Cir. 2017).

When a defendant does not object to jury instructions at trial, the Court reviews those instructions for plain error. *United States v. Sanders*, 421 F.3d 1044, 1050 (9th Cir. 2005). To meet that standard, the defendant must show "(1) error, (2) that is plain, and (3) that affect[s] substantial rights." *Id.* (citation omitted). If the defendant does so, the Court may exercise its discretion to grant relief "only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted).

## B. The evidence of property fraud was legally sufficient

The property fraud statutes prohibit using the mail or wires to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343; *see United States v. Milheiser*, 98 F.4th 935, 942 n.4 (9th Cir. 2024) (mail, wire, and bank fraud statutes interpreted *in pari materia*). Although these statutes are phrased in the disjunctive, the Supreme Court has "understood the 'money or property' requirement to limit the 'scheme or artifice to defraud' element because

33

the common understanding of the words 'to defraud' when the statute was enacted referred to wronging one in his property rights." *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (citation and quotation marks omitted).

Accordingly, the government must prove not only that the defendant "'engaged in deception,' but also that money or property was 'an object of [his] fraud.'" *Ciminelli*, 598 U.S. at 312 (quoting *Kelly v. United States*, 590 U.S. 391, 402 (2020)). To sustain a property fraud conviction, the government must prove that the defendant used the mail or interstate wires to execute a scheme to deprive a victim of property through material misrepresentations or actionable omissions. *See* 18 U.S.C. §§ 1341, 1343; *Miller*, 953 F.3d at 1101.

Based on the trial evidence described above, *supra* p. 4-25, a rational juror could have found that Kail intentionally devised a scheme to deprive Netflix of property. Kail awarded lucrative, multi-year contracts to unproven vendors despite Netflix's practice of awarding single-year contracts to startups. He awarded contracts despite negative reviews from the engineers who evaluated the vendors' software or clear evidence that the software was failing at Netflix. He renewed contracts for failing technology days before leaving his job at Netflix, understanding that he would not be responsible for the results. And he concealed the existence of contracts from his colleagues, indicating that he knew the contracts were not defensible on merit. As the district court recognized in denying Kail's

34

motion for judgment of acquittal, a rational juror could have inferred that "had Kail not been paid kickbacks by the third-party companies, Netflix would have paid less for said contracts—or would not have entered them at all." 2-ER-245.

Some examples stand out. Kail approved contracts with Platfora even though Netflix already had a license for software that outperformed Platfora's. *See* 3-ER-697-98; 4-ER-998. Kail directed payment of $155,000 to Platfora after Netflix had already terminated its contract, and a purchasing manager correctly informed him that Netflix did not owe this amount. 5-ER-1391-92; *see also* SER-170, SER-135-37. Kail approved a contract with Docurated for software that had no value for Netflix, and which Netflix was able to replace with an internally built application without paying a vendor. 6-ER-1468; 8-ER-2085, 8-ER-2130. In short, the district court correctly identified "ample evidence from which to conclude that [Kail] intended to defraud his employer of property by paying for products the company did not need at all or far beyond what was needed, paying for products after the company stopped using them, and paying amounts beyond Netflix's contractual obligation." 1-ER-250; *supra* pp. 4-25.

Furthermore, Kail carried out his scheme through misrepresentations material to Netflix. For example, he repeatedly denied accepting compensation from vendors that he introduced to Netflix, *see, e.g.*, 4-ER-1070-75, and concealed the existence of vendor contracts from his colleagues at Netflix, *see, e.g.*, 6-ER-

1587-88 (after Kail's departure, Netflix "uncovered" that Kail had "paid large sums of money" to Vistara and Netskope); 4-ER-1002 (Kail lied to Hasteer about Platfora contract); 9-ER-2260-67 (Kail concealed Vistara contract from Sprague and others). These lies were plainly material because they allowed Kail to continue his fraudulent scheme with impunity and concealed from Netflix how and why the company was spending its own money.

Depriving Netflix of money and property, moreover, was not an "incidental byproduct" of Kail's scheme but rather "an object of the fraud." *See Kelly*, 590 U.S. at 402. The most striking example were the commissions on contracts with Netenrich and Vistara, where Kail earned a percentage of every dollar Netflix lost. *See* 5-ER-1259-61, 5-ER-1277, 5-ER-1289. Kail also accepted monthly cash payments from Netskope during the pendency of its contract with Netflix. 8-ER-1984-85, 8-ER-2022-23. And beyond that, Kail would dangle the prospect of a contract with Netflix in exchange for equity in a potential vendor and would often receive stock options within days or weeks of approving such a contract. *See, e.g.*, 4-ER-1128; 6-ER-1635-41. Based on this evidence, a rational juror would have had no trouble finding that depriving Netflix of money and property was an object, and indeed the lynchpin, of Kail's scheme.

A rational juror also could have found that the charged mailings and interstate wires furthered Kail's scheme. This required the mailing or wire to be a

"step in the plot" or "incident to the execution of the scheme." *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (citations omitted); *Schmuck v. United States*, 489 U.S. 705, 711 (1989). Here, the mailings and wires consisted of vendor contracts with Netflix, paperwork related to advisor agreements for Kail, and a commission check, 2-ER-610-11, all critical to the success of Kail's scheme, *see supra*, pp. 4-9. The advisor paperwork also helped conceal the scheme by disguising bribes and kickbacks as legitimate forms of compensation. *See Jinian*, 725 F.3d at 964 ("in furtherance of" element satisfied where mailing or wire is intended to conceal fraudulent scheme).[7]

### C.   Kail's contrary arguments are meritless

Kail's arguments, on the other hand, are built on a false premise: that his scheme to defraud was limited to non-disclosure of his conflicts of interest. AOB-44 ("disclosure would have negated the alleged fraud"); AOB-6 (scheme limited to non-disclosure of outside compensation), AOB-9, AOB-77. In reality, Kail's scheme was to profit by obligating Netflix to pay for inferior and ill-suited technology. He did this by lying about his financial stake in vendors, his reasons

---

[7] Kail fails to identify which mailings or wire transmissions he believes were not in furtherance of his scheme, and has therefore waived any such argument. His suggestion that the district court's loss calculation undermines the "in furtherance of" element generally, AOB-45-47, is addressed below at page 38.

for supporting the use of vendors' software at Netflix, and the existence of vendor contracts that he had personally approved.

Nor would Kail have complied with Netflix's conflict-of-interest policy simply by disclosing vendor payments. Netflix employees were not allowed to accept compensation from a vendor while acting as the decisionmaker on a contract with that vendor whether they disclosed the compensation or not. Hastings instructed Kail regarding Platfora and similar vendors that Kail was free to volunteer his time but "not to take any comp (stock, options, cash, etc.)." 4-ER-1070-75. Netflix employees also testified to this fact at trial. *See, e.g.*, 4-ER-1061 (describing this scenario as "totally inappropriate"); 6-ER-1577 (this arrangement was "forbidden" and a "black and white issue"); *accord* 9-ER-2329-34, 9-ER-2352-55; 3-ER-787, 3-ER-837; 4-ER-1007-08. Even if Kail believes portions of the record would support a different interpretation, on sufficiency review the evidence must be construed in favor of the verdict.

Kail also points to the district court's loss calculation at sentencing to argue that the charged mailings and wires were not in furtherance of his scheme. AOB-45-47. He contends that because the loss amount was limited to contracts with Vistara and Docurated, the court must have "found *no* economic harm to Netflix" with respect to the other vendors. AOB-46. Not so. For vendors that arguably provided *any* legitimate services, the court did not attempt to subtract the value of

those services from the value of the otherwise fraudulent contracts. *See, e.g.*, 1-ER-131-39, 1-ER-168. The court took this conservative approach because of the difficulty in identifying "the dividing line between legitimate and illegitimate services." *See, e.g.*, *United States v. Betts-Gaston*, 860 F.3d 525, 540 (7th Cir. 2017). The court limited its loss calculation to the Vistara and second Docurated contracts because the trial evidence supported a finding that Netflix obtained no value from these contracts at all. 1-ER-168, 1-ER-177-78.

### D. The court properly instructed the jury on property fraud

#### *1. Background*

In March 2021, the parties filed amended proposed jury instructions. 2-ER-537. The government proposed using this Court's model instructions on property fraud. 2-ER-548-49. Kail proposed adding two paragraphs at the end of this instruction, defining "property." 2-ER-551-52. The court issued the model instructions and part of Kail's proposed definition. SER-77-78.

The court instructed the jury on the elements of property fraud:

> **First**, Mr. Kail knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts….
>
> **Second**, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

39

> **Third**, Mr. Kail acted with the specific intent to defraud, that is, the intent to deceive and cheat; and

> **Fourth**, Mr. Kail used, or caused to be used, an interstate [mail or wire] communication to carry out or attempt to carry out an essential part of the scheme.

SER-77-78, SER-82-83. The court also instructed the jury on the first part of Kail's definition of "property":

> A property interest is an economic interest. Thus, the term "property" as used in the wire fraud instructions, means money or another form of property with economic value.

SER-77-78, SER-82-83.

The court declined to instruct on the rest of Kail's proposed definition:

> …. The right to make business decisions based on accurate information is not "property." An employer's right to its employee's honest and faithful service is not "property" either.

> Accordingly, even if you find that the defendant violated his employer's policies, this is not, standing alone, a scheme to defraud the employer of "property." The government must prove beyond a reasonable doubt that the defendant schemed to take something of economic value from the victim. Scheming to influence the award of a contract is not mail or wire fraud unless the scheme contemplates causing the victim to pay out more, or receive less, pecuniary value than it otherwise would have.

2-ER-551-52; SER-78, SER-83; *see* AOB-31-33.

In addition, the court instructed the jury on good faith, an instruction Kail had requested as reflecting "the defendant's theory of the case." SER-31, SER-88. The court instructed in pertinent part that "[g]ood faith is a complete defense" to charges of property and honest-services fraud, and that an "honestly held opinion or an honestly formed belief cannot provide fraudulent intent—even if the opinion or belief is mistaken." SER-88. The court further instructed that "an honest belief that a business venture would ultimately succeed does not constitute good faith if Mr. Kail intended to deceive Netflix by making material representations that he knew to be false or fraudulent." *Id.*

### 2. *The court properly instructed the jury*

Kail argues that these instructions permitted a conviction for an invalid theory of property fraud: one in which he did not "obtain" money or property directly from Netflix but rather through a third-party vendor. AOB-29-30. But Kail did not dispute this aspect of the government's theory below. He requested an instruction, quoted above, that "property" did not include various intangible rights. This instruction was unrelated to whether a defendant who deprives a victim of what is unquestionably property may use a third party as a vehicle for profiting from his fraudulent scheme. Indeed, the defense theory was that the alleged scheme was limited to non-disclosure of conflicts of interest—that is, a scheme to deceive, but not to cheat, Netflix. *See, e.g.*, 11-ER-2901-11. Kail did not suggest

41

that he had to "obtain" property directly from Netflix to commit fraud. He fails to show how his requested instruction would have addressed his appellate claim, or how the court plainly erred by not instructing the jury *sua sponte* that the involvement of a third-party vendor negates a theory of property fraud.

Nor is there any merit to Kail's position on appeal. Kail correctly points out that while the fraud statutes are phrased in the disjunctive ("scheme or artifice to defraud, or for obtaining money or property"), the Supreme Court has understood the obtaining-money-or-property requirement to limit the scheme-to-defraud element. *See* AOB-30; *Ciminelli*, 598 U.S. at 312. This Court reached the same conclusion in *Miller*, holding that a scheme to defraud requires a scheme to "deceive and cheat." *See* 953 F.3d at 1101.

But Kail goes further. He insists that property fraud now requires a scheme to "deceive + cheat + *obtain* property" from a victim. AOB-30 (emphasis added). And he seems to interpret "obtain" to mean "personally and directly obtain," thereby precluding a conviction where a defendant uses a third party to profit from a scheme otherwise designed to deceive and cheat a victim. *See* AOB-15-20. But the "obtaining" clause on which Kail relies does not refer to obtaining property "from" the victim. *See* 18 U.S.C. §§ 1341, 1343. Kail's contrary argument would collapse the distinction between fraud and extortion despite their different statutory language. Whereas the Hobbs Act "expressly requires the Government to prove

42

that the defendant 'obtain[ed] property from another,'" property fraud requires that "the defendant has merely deprived another of a property right." *United States v. Hedaithy*, 392 F.3d 580, 602 n.21 (3d Cir. 2004) (quoting 18 U.S.C. § 1951(b)(2) (defining extortion)).

What is more, a property fraud conviction may arise from a scheme to deprive a victim of the right to intangible *property*—as distinct from an intangible right—even though the intangible property in question cannot be "obtained" directly or otherwise. In *Carpenter v. United States*, the Supreme Court upheld property fraud convictions arising from a scheme to deprive the Wall Street Journal of its "property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of" a column. 484 U.S. 19, 23-26 (1987). But the *Carpenter* defendants could not be considered to have "obtained" the Journal's right to exclusivity over the information. *See id.* at 26-27; *accord Hedaithy*, 392 F.3d at 601 (explaining that *Carpenter* defendants may have "obtained" Journal's confidential business information, but that "the conduct on which the Court focused was the act of fraudulently depriving the Journal of the exclusive use of its information"). *Carpenter* and similar intangible property cases further belie the idea that a defendant must personally and directly obtain property from a victim.

43

Kail relies on *McNally v. United States*, 483 U.S. 350 (1987), an honest-services fraud case. In *McNally*, the defendants awarded a state contract to an insurance agency in exchange for the agency's promise to funnel a portion of its commissions to other agencies for the defendants' benefit. *Id.* at 352-53. But the indictment did not allege that the defendants deprived the state of any money or property, nor did the district court so instruct the jury. *Id.* at 355 n.4, 360. The Supreme Court opined that in a kickbacks case like *McNally*, the government might have proven a deprivation of property with evidence that the state would have paid a lower premium or secured better insurance absent the defendants' fraud. *Id.* at 360.

Unlike in *McNally*, here the indictment alleged that Kail deprived Netflix of money and property "by enabling the vendors to, among other things, negotiate more favorable contracts with Netflix than they would have been able to obtain" without his assistance. 2-ER-608. The district court instructed the jury that it had to find that Kail devised a scheme to deprive Netflix of property, which it defined as "money or another form of property with economic value." SER-77-78, SER-82-83. And the government presented exactly what *McNally* said would constitute property fraud: "ample evidence from which to conclude that [Kail] intended to defraud his employer of property by paying for products the company did not need at all or far beyond what was needed, paying for products after the company

44

stopped using them, and paying amounts beyond Netflix's contractual obligation."
1-ER-250 (order denying Rule 29 motion); *supra* pp. 4-25.

Kail points to language in *Skilling*, another honest-services fraud case:
"Unlike fraud in which the victim's loss of money or property supplied the
defendant's gain, with one the mirror image of the other, the honest-services theory
targeted corruption that lacked similar symmetry."  561 U.S. at 400 (internal
citation omitted); AOB-15, AOB-30.  But as other courts have observed, "*Skilling*
invokes the 'mirror-image' concept only to highlight the basic structural difference
between honest-services fraud and property fraud.  It does not, however, prescribe
a necessary condition for property fraud."  *United States v. Porat*, 76 F.4th 213,
221-22 (3d Cir. 2023); *United States v. Baker*, 923 F.3d 390, 403 (5th Cir. 2019)
("*Skilling* did not impose a 'mirror image' requirement for wire fraud ….
Moreover, no court has held that a 'mirror image' transaction is necessary."), *cert
denied*, 140 S. Ct. 2565 (2020).  "[A]bsent a strong reason to do so, [this Court]
will not create a direct conflict with other circuits," *United States v. Cuevas-Lopez*,
934 F.3d 1056, 1067 (9th Cir. 2019), and no such reason exists here.  To sustain
Kail's convictions for property fraud, the Court need only conclude that the
involvement of third-party vendors did not invalidate a scheme otherwise intended
to deprive Netflix of property through material misrepresentations.  To hold
otherwise would exclude from the federal fraud statutes any scheme sophisticated

45

enough to make use of a third party, an outcome unsupported by law or common sense.[8]  Simply put, the district court instructed the jury on a valid theory of property fraud.

Kail posits two additional arguments.  He claims that the court should have instructed the jury on the rest of his proposed definition of "property," and that without this additional language, the instructions permitted a conviction on the right-to-control theory that *Ciminelli* invalidated.  AOB-31-35.  He is wrong.  Kail's proposed instruction would have reminded the jurors that neither the "right to make business decisions based on accurate information," nor an employer's "right to its employee's honest and faithful services," constitutes property.  2-ER-551-52; AOB-31.  It also would have reminded them that the defendant must "scheme[ ] to take something of economic value from the victim." *Id.*  The existing instructions already conveyed this information.

In *Ciminelli*, the defendant was convicted of property fraud based on a bid-rigging scheme that enabled Ciminelli's construction company to win bids for state-funded projects, which were administered by a nonprofit agency.  598 U.S. at 310.  In the indictment, and at trial, the government relied solely on the Second

---

[8]  Even if a scheme to defraud a victim of property solely for the benefit of a third party would conceivably present a more difficult question, the Court need not consider it here because Kail personally obtained money from his scheme to defraud Netflix.

Circuit's right-to-control theory of property fraud, which defined property to include the intangible right to "potentially valuable economic information necessary to make discretionary economic decisions." *Id.* The jury was instructed that the term "property" included "intangible interests, such as the right to control the use of one's assets." *Id.* at 311. The Supreme Court reversed and remanded, holding that the "right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." *Id.* at 316-17.

Unlike in *Ciminelli,* here the district court did not instruct the jury that the term "property" included intangible rights. Quite the opposite, the court defined "property" as "money or another form of property with economic value." Standing alone, this instruction ruled out a conviction on a right-to-control or other intangible-right theory. A defendant is "not entitled to any particular form of instruction, nor is he entitled to an instruction that merely duplicates what the jury has already been told." *United States v. Kaplan*, 836 F.3d 1199, 1215 (9th Cir. 2016). At a minimum, the court did not abuse its discretion in defining what property *is* without listing examples of what it is *not*. *See Liew*, 856 F.3d at 595-96 ("the formulation of jury instructions" is reviewed for abuse of discretion).

Kail argues that the instructions failed to convey that his misrepresentations had to be material specifically to Netflix. AOB-34. But Kail did not object to the

47

instruction on this basis below or propose relevant alternative language. *See* 2-ER-551-52. He is entitled at most to plain-error review, a standard he does not try to meet. This is not surprising. The jury was instructed, for example, that good faith was not a defense if Kail "intended to deceive Netflix by making material representations that he knew to be false or fraudulent," SER-88, which entailed that Kail was charged with intending to deceive Netflix through material misrepresentations. The court did not err by not reminding the jury *sua sponte* of what it already understood.

Looking for a more favorable standard of review, Kail asserts that the instructions failed to capture the defense theory. AOB-36. But Kail did not request a "defense theory" instruction, and it is not clear to which aspects of the defense theory he is referring. *See* AOB-35 ("All of these issues were key to the defense theory."); *see also Kaplan*, 836 F.3d at 1215 ("[A] judge need "not include proposed instructions that are not necessary to explain to the jury the legal effect of the theory of the defense." (citation omitted)). The defense argued at trial that Kail's scheme was limited to non-disclosure, and that Kail acted in good faith by selecting vendors he believed likely to succeed at Netflix. *See, e.g.*, 11-ER-2901, 11-ER-2911, 11-ER-2914, 11-ER-2947. The instructions defined "property" so as to exclude a conviction for non-disclosure alone, *see* SER-77-78, and provided that good faith was a "complete defense" to charges of property fraud, SER-88. These

instructions covered the defense theory. Indeed, Kail requested the good-faith instruction as reflecting "the defendant's theory of the case." SER-31; *see United States v. Griffin*, 76 F.4th 724, 740 (7th Cir. 2023) (good-faith instruction captured defense theory).

### 3. *Any instructional error was harmless*

By any measure, an instructional error would have been harmless. The government emphasized in closing that Kail had to "defraud[ ] Netflix out of money," *see, e.g.*, 11-ER-2060-62, and gave examples of him doing so, *see, e.g.*, 11-ER-2874, 11-ER-2882. The government further emphasized that it had to prove a scheme to defraud *Netflix*. *See, e.g.*, 11-ER-2895 (stating that jury must decide if government proved "that Mr. Kail was engaged in fraud schemes against his former employer, Netflix"); *accord* 11-ER-2858, 11-ER-2893. Considering the overwhelming evidence of Kail defrauding Netflix of over a million dollars, any instructional error was harmless.

## III. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON HONEST-SERVICES FRAUD, AND SUFFICIENT EVIDENCE SUPPORTED THE JURY'S VERDICT

### A. Standard of review

The standard of review for evaluating sufficiency and instructional claims is set out above. *Supra* pp. 32-33.

**B.** **The evidence of honest-services fraud was legally sufficient**

To prove honest-services fraud, the government had to show that Kail devised a scheme to deprive Netflix of its intangible right to Kail's honest services; that Kail owed a fiduciary duty to Netflix; that Kail solicited or accepted bribes or kickbacks in exchange for his honest services (the quid pro quo); that his act was material; and that he used the mail or interstate wires to further his scheme. SER-73-75; *United States v. Milovanovic*, 678 F.3d 713, 727-28 (9th Cir. 2012). On appeal, Kail challenges only the evidence of a quid pro quo. AOB-62-66. A quid pro quo may be express or implied from the surrounding circumstances. SER-73; *United States v. Kincaid-Chauncey*, 556 F.3d 923, 939 (9th Cir. 2009).

Kail relies on vendor representatives who testified they did not believe they were bribing Kail in exchange for contracts with Netflix. AOB-62-66. But as the district court explained in denying Kail's motion for judgment of acquittal, "While witnesses implicated in the scheme unsurprisingly distanced themselves from the bribes and kickbacks during live testimony, there was ample contemporaneous documentary evidence that illustrated a quid pro quo scheme." 1-ER-255.[9]

Platfora is an obvious example. Platfora gave Kail stock options just days after he made the "strong suggestion" that doing so would result in a contract with Netflix. 4-ER-1128; 12-ER-3127. Kail then emailed Platfora's CEO that he

---

[9] Of course, conflicts in the evidence must be resolved in favor of the verdict.

would help the company "in both a Netflix and Advisory capacity." 5-ER-1177; SER-129. Platfora's sales director emailed his colleagues, "Clearly [Kail] has been working the grey area between [ ] advisor and leveraging the Netflix logo for personal advantage." 4-ER-1129; 12-ER-3127. Platfora's CEO would later write that Kail's role in securing a contract with Netflix "clearly [involved] some pay-to-play." 4-ER-904-07; 12-ER-3138. These statements reflected a shared understanding that in exchange for stock options, Kail would give Platfora favorable treatment that violated his fiduciary duty to Netflix.

The parties' subsequent conduct reinforced this conclusion. Kail turned over confidential information to Platfora on the prices that Netflix had negotiated with its competitors. 5-ER-1209-13; SER-130. A rational juror could have concluded that such a clear violation of Kail's fiduciary duty was in exchange for a bribe disguised as a payment for advisory services. Kail also approved a contract with Platfora despite negative engineering reviews of its software. Later, Kail approved an extra-contractual payment of $155,000 despite clear evidence that Netflix did not owe this amount. Kail's preference for Platfora was so unjustifiable on merit that his colleagues took notice. Tony Ralph came to believe Kail was supporting Platfora for the "wrong reasons." 3-ER-704-05. Gagan Hasteer observed Kail had never explained why he chose to ignore the engineers' conclusion that Netflix already had software that outperformed Platfora's. 12-ER-3105. A rational juror

could have found a quid pro quo the best explanation for Kail's preference for Platfora and willingness to violate his fiduciary duty on its behalf.

The same is true of other vendors. Kail approved contracts within days or weeks of accepting stock options and despite negative engineering reviews of their software. These factors and the number of companies involved strongly supported an inference that Kail was holding up his end of a quid pro quo. Certain examples stand out. Kail expected Netenrich to expedite payment of over $30,000 in personal commissions in exchange for Kail's expediting payment of Netenrich invoices at Netflix. SER-126. Kail told ServiceNow CEO Frank Slootman that there was an "elephant in the room," intimating that ServiceNow should offer him stock options to maintain its contract with Netflix. 6-ER-1635-41. Sumo Logic's CEO testified that in exchange for stock options, he expected Kail to act as the company's "internal champion" at Netflix, 7-ER-1742, a far cry from the advisory services for which Kail was purportedly being paid. Kail also "coached" ElasticBox on how to price its product in negotiations with Netflix, 8-ER-2152, another violation of his fiduciary duty. Faced with even part of this evidence, a rational juror could have found that Kail's fiduciary duty to Netflix had been bought and paid for. The evidence of honest-services fraud was more than sufficient.

52

**C.** **The court properly instructed the jury on honest-services fraud**

### 1. *Background*

In its final instructions, the court defined an "intent to defraud" as "an intent to deceive and cheat, which means to act knowingly and with the specific intent to use false or fraudulent pretenses, representations, promises or omissions to cause loss of honest services." SER-84. The court then instructed the jury on the elements of honest-services fraud:

> **First**, Mr. Kail devised or knowingly participated in a scheme or plan to deprive Netflix, Inc. of its right of honest services;

> **Second**, the scheme or plan consists of a bribe or kickback in exchange for Mr. Kail's services. The 'exchange' may be express or may be implied from all the surrounding circumstances;

> **Third**, Mr. Kail owed a fiduciary duty to Netflix, Inc.

> **Fourth**, Mr. Kail acted with the specific intent to defraud by depriving Netflix, Inc. of the right of honest services;

> **Fifth**, Mr. Kail's act was material; that is, the act had a natural tendency to influence, or was capable of influencing, a person or entity's acts; and

> **Sixth**, Mr. Kail used, or caused to be used [a mailing or an interstate wire] ….

SER-73, SER-79.

The court further instructed the jury on each element:

**1. The Scheme or Plan to Deprive Honest Services.**

The first element that the government must prove is that the defendant knowingly devised or participated in a scheme or plan to deprive Netflix, Inc. of its right to his honest services….

**2. The Bribe or Kickback in Exchange for Services.**

The second element that the government must prove is that the scheme or plan consisted of a bribe or kickback in exchange for Mr. Kail's services. Bribery and kickbacks involve the exchange of a thing or things of value for services by a fiduciary, in other words, a quid pro quo (a Latin phrase meaning "this for that" or "these for those").

….

… What the government must prove is that the defendant knowingly devised or participated in a scheme or artifice to defraud Netflix, Inc. of its right to defendant's honest services through bribes or kickbacks.

….

Undisclosed conflicts of interest, secret payments or undisclosed self-dealing alone, is not sufficient to constitute honest services [mail or] wire fraud.

….

**4. Materiality.**

The fifth element that the government must prove is that Mr. Kail's act or actions were material; that is, it had a natural tendency to influence, or was capable of influencing, a person's acts.

54

SER-73-75. The paragraph stating that undisclosed conflicts of interest, secrets payments, or undisclosed self-dealing are insufficient to constitute a bribe or kickback was included at Kail's request and over the government's objection. *See* 2-ER-542-43. The court declined to give the rest of Kail's proposed definition of "kickback," which stated:

> The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided to an employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a contract or purchasing relationship. A kickback occurs when an employee agrees to accept or receive, or accepts or receives, directly or indirectly, something of value from another person in exchange for a promise for, or performance of, favorable treatment, and the act itself provides the source of the funds to be kicked back.

2-ER-542-43; *see also* AOB-50-51.

The court instructed that good faith was a "complete defense" to honest-services fraud, and that an honestly held opinion or belief "cannot provide fraudulent intent—even if the opinion or belief is mistaken." SER-88.

### 2. *The court properly instructed the jury*

Kail argues that these instructions (1) permitted the jury to convict upon finding that Kail accepted compensation for his advisory services and (2) without finding a misrepresentation or omission material to Netflix. AOB-50, AOB-55. The relevant inquiry is whether the "instructions as a whole are misleading or

inadequate to guide the jury's deliberation." *Liew*, 856 F.3d at 596 (citation omitted).[10]

First, Kail asserts that the honest-services instruction allowed the jury to convict upon finding that "vendors compensated Mr. Kail in 'exchange' for his consulting 'services,' not for acts he took as a Netflix employee." AOB-50, AOB-53. But Kail overlooks that the jury also had to find a bribe or kickback. On his interpretation, the jury would have to find that vendors *bribed* him in exchange for legitimate advisory services, which would make no sense.

Moreover, the instructions conveyed that the word "services" referred to services that Kail provided the vendors in his capacity as a Netflix employee. *Contra* AOB-50-55. The jury had to find that Kail owed a fiduciary duty to Netflix, and that he accepted a bribe or kickback defined in part as the "exchange of a thing or things of value for services by a fiduciary." This language conveyed that the "services" in question were those taken in Kail's capacity as a Netflix fiduciary. The jury also had to find that Kail acted with the specific intent to defraud Netflix by depriving Netflix of its right to his honest services. Requiring a specific intent to defraud Netflix ruled out a conviction based solely on providing advisory services to a vendor. The jury was also instructed at Kail's request that

---

[10] Kail's arguments would fail under any standard of review but are more accurately construed as challenging the formulation of the jury instructions and reviewed for abuse of discretion.

undisclosed conflicts of interest or self-dealing did not constitute honest-services fraud, yet another instruction that precluded a conviction for non-disclosure of outside compensation.

Kail points to a jury note asking whether the giver of a bribe or kickback had to know it was in "exchange for *services beyond lawful services*." *See* AOB-54 (emphasis in AOB). As the district court recognized in responding to the same argument, the jury was asking whether the vendors had to have "any *knowledge* of*" the bribe or kickback. 1-ER-255. The fact that the note referred to Kail's advisory work as "lawful services" confirms that the jurors understood payment for these services was not a valid basis for conviction.

No more availing is Kail's second argument, that the instructions permitted a conviction without a misrepresentation or omission material to Netflix. *See* AOB-55. The jury had to find that Kail acted with the specific "intent to defraud" Netflix of its right to honest services, meaning an intent to use misrepresentations or actionable omissions to cause loss of honest services. SER-84. The instructions then required the jury to find that Kail's act was "material." SER-73. Kail argues that the court should have reiterated the language about a misrepresentation elsewhere in its honest-services instruction, AOB-56, but a defendant is "not entitled … to an instruction that merely duplicates what the jury has already been told," *Kaplan*, 836 F.3d at 1215 (citation omitted). Kail suggests that the

instructions should have defined "material" as capable of influencing "Netflix's acts" instead of "a person or entity's acts." AOB-57-59. But the definition of "material" was legally correct, and the instructions were clear that the misrepresentation had to be material to Netflix. For example, the first element required the jury to find that Kail devised a scheme to defraud Netflix of its right to his honest services; the second, that the scheme involved a bribe or kickback in exchange for Kail's honest services to Netflix; the third, that Kail owed a fiduciary duty to Netflix; and the fourth, that Kail acted with the specific intent to defraud Netflix. These instructions required a finding that Kail intended to defraud Netflix by means of a material misrepresentation or actionable omission.

### 3. Any instructional error was harmless

Alternatively, any instructional error was harmless. In closing, the government made clear that to convict Kail of honest-services fraud, the jury had to find that vendors paid him kickbacks in exchange for approving contracts and providing other services in his capacity as a Netflix employee. *See, e.g.*, 11-ER-2858 (describing rules governing Netflix employees), 11-ER-2859 ("Mr. Kail understood what was required from him … as a trusted member of the Netflix team."), 11-ER-2861 (describing "a scheme to defraud Netflix … by taking bribes and kickbacks"). The government also made clear that the jury had to find a misrepresentation material to Netflix. *See, e.g.*, 11-ER-2895 ("[Kail] concealed the

material facts of his conflict from his employer … to violate Netflix's right to his unconflicted, honest services.").  There was no dispute about these points, and as described above, the evidence proving honest-services fraud was overwhelming.

## IV.  THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON MONEY LAUNDERING

### A.    Standard of review

This Court reviews de novo whether an instruction misstated an element of the offense.  *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997).  When a defendant fails to object to a jury instruction at trial, the Court reviews the instruction for plain error.  *Sanders*, 421 F.3d at 1050.

### B.    Background

In its final instructions, the court provided a definition of "knowingly" specific to the money laundering counts, stating:

> In regard to Counts 23 through 29, charging Money Laundering in violation of 18 U.S.C. § 1957, an act is done knowingly if Mr. Kail is aware of the act and does not act or fail to act through ignorance, mistake, or accident.  *The government is not required to prove that Mr. Kail knew that his acts or omissions were unlawful.* You may consider evidence of Mr. Kail's words, acts, or omissions, along with all the other evidence, in deciding whether he acted knowingly.

SER-87; 11-ER-2853 (emphasis added).[11]

---

[11]  The italicized language is the only part of the money laundering instructions that Kail challenges on appeal.  AOB-68.  Although it appears from the transcript of the

The court then instructed on the elements on money laundering:

> **First**, Mr. Kail knowingly engaged or attempted to engage in a monetary transaction;
>
> **Second**, Mr. Kail knew the transaction involved criminally derived property;
>
> **Third**, the property had a value greater than $10,000;
>
> **Fourth**, the property was, in fact, derived from wire fraud or mail fraud; and
>
> **Fifth**, the transaction occurred in the United States.

SER-89; 11-ER-2855-56.

The court also defined the term "criminally derived property" as used in the second element:

> The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The government must prove that Mr. Kail knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense.

SER-89; 11-ER-2855-56.

## C. The court properly instructed the jury

Kail argues that the italicized sentence in the definition of "knowingly" negated the second element of money laundering: that Kail had to *know* the

_____

pretrial conference that the parties agreed this language was better omitted, *see* 1-ER-293-94, neither side objected when the instruction was given.

transaction involved criminally derived property.  AOB-68.  He is wrong.  In *United States v. Stein*, on which Kail solely relies, the Court held that it was error to give a general instruction on knowledge without in some way clarifying that the defendant had to know the funds underlying the money laundering counts included criminally derived proceeds.  37 F.3d 1407, 1409-10 (9th Cir. 1994); *see also Knapp*, 120 F.3d at 931 (discussing *Stein*).

In *Knapp*, however, the district court's instructions differed from *Stein*'s in two respects.  First, the court issued a 'knowingly' instruction specific to the money laundering charges:  "An act is done knowingly if the defendant is aware of the act and does not act or fail to act through ignorance, mistake or accident.  *As to money laundering*, the government is not required to prove that the defendant knew that his acts or omissions were unlawful."  120 F.3d at 932 (emphasis in *Knapp*).  Second, the court gave an additional instruction not included in *Stein*:  "The term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the defendant knew that the property involved in the transaction represented proceeds from some form … of activity that constitutes a felony under federal or state law."  *Id.*  *Knapp* held that these instructions "directly address[ed] the possibility that the jury could have omitted the second element of money laundering and convicted without finding Knapp knew the money represented illegal drug proceeds."  *Id.*

61

So too here.  As in *Knapp*, the court provided a definition of "knowingly" specifically tailored to the money laundering counts.  SER-87.  Also as in *Knapp*, the court defined "criminally derived property" so as to remind the jurors that the "government must prove that Mr. Kail knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense."  SER-89.

As this Court has repeatedly held, these instructions made it impossible for the jury to convict Kail without finding that he knew the charged monetary transactions involved proceeds derived from unlawful activities.  *See Knapp*, 120 F.3d at 932; *United States v. Fujinaga*, No. 19-10222, 2022 WL 671018, at *4 (9th Cir. Mar. 7, 2022) (no plain error where "the money laundering instruction itself further defined 'criminally derived property'"); *United States v. Hanly*, 589 F. App'x 391 (9th Cir. 2015).

### D.    Any error was harmless

Alternatively, any error was harmless.  Overwhelming evidence established that Kail laundered money he knew to be derived from a criminal offense.  This evidence included the timing and redundancy of the monetary transactions, the opening and closing of bank accounts shortly before or after the monetary transactions, and the use of a straw corporation and a title company to conceal the

62

source of vendor-derived funds.  Kail does not seriously contend otherwise.  *See* AOB-69.

## V.  KAIL'S PUBLIC TRIAL CLAIM IS WAIVED AND OTHERWISE MERITLESS

### A.  Standard of review

Kail waived his public trial claim precluding appellate review.  *See United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (en banc).  Alternatively, his claim is reviewed for plain error.  *United States v. Hougen*, 76 F.4th 805, 810-11 (9th Cir. 2023).

### B.  Background

At the pretrial conference in March 2021, the parties discussed how to conduct a trial during the COVID-19 pandemic.  1-ER-312.  Defense counsel asked whether "any spectator would be allowed" in the courtroom, stating, "I plan to have a paralegal, possibly my associate, [and] Mr. Kail's wife."  1-ER-314.  The court stated that it would allow a case agent and each side lead counsel, an attorney or a paralegal assistant, and a tech person to run the exhibits.  1-ER-315.  The court noted that anyone could participate in observing the trial through an AT&T telephone line.  *Id.*  Following this discussion, the court twice reset Kail's trial due to the pandemic.  CR-120, CR-129.

As trial neared, however, the court expanded the list of persons who could be present in the courtroom.  Kail's wife was allowed to, and did, attend trial.

AOB-72; 1-ER-221; SER-114.[12]  The court also issued written orders granting

motions for a Netflix representative, SER-36, an attorney for three witnesses, SER-

37, outside counsel for Netflix, SER-38-42, and an attorney for another witness,

SER-43, to attend in person.  As the court would later observe, "All specific

requests for physical attendance at trial were granted."  SER-115.

The record indicates that still more people were present in the courtroom.

At the end of the first full day of trial, the court observed the presence of spectators

whom the court did not recognize.  3-ER-867-68.  After dismissing the jury for the

day, the court asked, "Are these still jurors in the courtroom?"  *Id.*  When the clerk

answered in the negative, the judge replied, "Okay, good.  I didn't recognize them

as jurors."  *Id.*

## C.    Analytical framework

The Sixth Amendment guarantees a criminal defendant the right to a public

trial.  U.S. Const. amend. VI.  Some restrictions on public access are too trivial to

implicate the Sixth Amendment.  *United States v. Shryock*, 342 F.3d 948, 974 (9th

---

[12]  Not mentioned in Kail's brief is his effort, while this appeal was pending, to
settle the record under Fed. R. App. P. 10(c) to indicate that during an off-the-
record proceeding prior to trial, the district court excluded his wife from jury
selection.  CR-335; *see* SER-114-15.  The court found that Kail's trial counsel had
never asked for Kail's wife to attend jury selection, and that, in fact, Kail's wife
attended the entire trial and "generally sat in the second row of the gallery behind
the defense table."  SER-114-15.  Kail does not dispute these findings on appeal.
AOB-72.

Cir. 2003). The defendant bears the initial burden of demonstrating that a "closure" occurred, *i.e.*, that the limitations on public access were meaningful enough to implicate the Sixth Amendment. *United States v. Santos*, 501 F. App'x 630, 633 (9th Cir. 2012).

A closure may be total or partial. *United States v. Allen*, 34 F.4th 789, 796 (9th Cir. 2022). A total closure occurs where "*all* persons other than witnesses, court personnel, the parties and their lawyers are excluded for the duration" of the relevant proceeding. *Id.* at 797 (quoting *United States v. Rivera*, 682 F.3d 1223, 1236 (9th Cir. 2012))). A total closure is justified if it is narrowly tailored to serve an overriding interest. *Waller v. Georgia*, 467 U.S. 39, 45 (1984); *see also United States v. Sherlock*, 962 F.2d 1349, 1356 (9th Cir. 1989) (holding that *Waller* framework applies only to "total" closures).

A partial closure occurs where the court has "excluded only a limited number of persons from the courtroom, either for the duration of the proceeding or for a limited period of time." *Allen*, 34 F.4th at 797. A partial closure is justified if it is narrowly tailored to serve a substantial interest. *Rivera*, 682 F.3d at 1236 (citation omitted). If a party moves for a closure, the court must hold a hearing, make factual findings to support the closure, and consider reasonable alternatives. *Id.*

### D. Kail waived his public trial claim

The Supreme Court has held that the "failure to object to closing [the] courtroom is [a] waiver of [the] right to [a] public trial." *Peretz v. United States*, 501 U.S. 923, 936-37 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960))). In applying *Peretz* and *Levine*, "courts have concluded that such a waiver may be effectuated by either the defendant's affirmative acquiescence in the closure or his failure to timely object." *United States v. Gutierrez-Calderon*, No. CR 2016-0009, 2019 WL 3859753, at *7 (D.V.I. Aug. 16, 2019), *aff'd*, 2023 WL 2770822 (3d Cir. Apr. 4, 2023); *United States v. Christi*, 682 F.3d 138, 142 (1st Cir. 2012) (Souter, J.); *Cadavid v. Gipson*, 798 F. App'x 982, 985 (9th Cir. 2020) ("[A] defendant can waive his right to a public trial by failing to object to the trial's closure." (citing *Peretz*)).

Applying this precedent, Kail has waived his public trial claim. Conscious of the global pandemic, defense counsel did not object when the court initially proposed limiting public access. 1-ER-312-15. Rather than object to the proposed limitations, counsel requested that "a paralegal, possibly [an] associate, [and] Mr. Kail's wife" be allowed to attend. 1-ER-314. The court granted these requests,

66

and Kail never sought to revisit the issue during trial. His waiver precludes appellate review.[13]

### E. Alternatively, Kail's public trial claim is foreclosed and otherwise meritless

#### 1. *Plain error review applies*

Kail urges de novo review, AOB-70, insinuating that any objection to the court's initial proposed limitations on public access would have been futile, AOB-72. Any such argument would border on disingenuous. In the months leading to trial, the court revised its initial proposal by granting every request for physical attendance at trial, including that of Kail's wife. SER-114-15. An objection clearly would not have been futile. Kail's forfeited claim should be reviewed for plain error.

#### 2. *There was no public trial violation*

But there was no violation regardless of the standard of review. This Court has addressed the right to a public trial in the context of the COVID-19 pandemic in two recent cases: *Allen*, 34 F.4th 789, and *Hougen*, 76 F.4th 805. In *Allen*, the defendant objected to the proposed closure and requested a live video feed of the trial. 34 F.4th at 793. The district court overruled this objection: it made available

---

[13] In *Hougen*, discussed below, this Court rejected the defendant's public trial claim on plain error review, without reaching the government's alternative argument that by failing to object to the closure, the defendant had waived appellate review of his claim entirely. 76 F.4th at 814 n.4.

a live audio feed, but otherwise closed the courtroom without exception.  *Id.* Applying de novo review, this Court held that while the pandemic was an "overriding interest" justifying a closure, the restrictions on public access were not "narrowly tailored" to serve that interest.  *Id.* at 797-98.  The district court could have preserved the defendant's public trial right, for example, by allowing a "limited number of members of the public to view the trial in the courtroom," such as by asking for a list of "specifi[c] individuals, such as family members or journalists," who wished to attend.  *Id.* at 798-800.

The record in *Hougen* was much the same:  the district court closed the courtroom but made available a live audio feed of the trial.  76 F.4th at 808. Hougen did not object to the closure, however, so this Court reviewed for plain error.  *Id.* at 810, 813.  The Court resolved the issue under the fourth prong of the plain error test, holding that Hougen had failed to show that any error would "seriously impugn the fairness, integrity, or public reputation" of the judiciary.  *Id.* at 811.  The Court identified factors that preserved some public access to the trial: a live audio feed, publicly available transcripts, and at least one article about the trial in the press.  *Id.* at 811 & n.3.  It concluded that limiting public access to a trial amid a pandemic would not impugn public perception of the judiciary so much as vacating an otherwise fair conviction.  *Id.* at 812-13.

Kail's public trial claim would fail even under de novo review. Considering the presence of unknown spectators in the courtroom, 3-ER-867-68, Kail has not even met his initial burden of demonstrating that the court imposed non-trivial restrictions on public access rising to the level of a closure. *See Shryock*, 342 F.3d at 974; *Santos*, 501 F. App'x at 633. But even if he had demonstrated a closure, he does not dispute that the pandemic created an overriding interest in limiting public access. AOB-75. And as *Allen* observed, a district court can preserve a defendant's public trial right by allowing a limited number of spectators in the courtroom—precisely what the court did here by granting every request for physical attendance.

Regardless, *Hougen* forecloses Kail's claim under the fourth prong of plain error review. The same factors that preserved a reasonable degree of public access in *Hougen* were present here: a live audio feed, publicly available transcripts, and press coverage. A fourth factor, not present in *Hougen*, defeats Kail's public trial claim singlehandedly: the physical presence of at least some members of the public including a representative of the victim, lawyers for various witnesses, and Kail's wife. As in *Hougen*, even assuming an error occurred, limiting public access to a trial amid a global pandemic would not impugn public perception of the judiciary so much as vacating an otherwise fair conviction.

69

## VI.   THE DISTRICT COURT PROPERLY CAUCLUATED THE AMOUNT OF LOSS

### A.   Standard of review

The Court reviews the district court's interpretation of the sentencing guidelines de novo, its application of the guidelines for abuse of discretion, and its factual findings for clear error.  *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005).  "A calculation of the amount of loss is a factual finding reviewed for clear error."  *United States v. Stargell*, 738 F.3d 1018, 1024 (9th Cir. 2013).

### B.   The court did not clearly err

Kail's cursory challenge to his loss amount is meritless.  *See* AOB-76-77.  The court found an actual loss of $1,505,000, the combined value of the Vistara and second Docurated contracts.  1-ER-201; *see* 1-ER-195.  This calculation was extremely conservative.  Where a vendor arguably provided any legitimate services, the court did not try to subtract the value of those services from the value of the contracts.  *See, e.g.*, 1-ER-131-39, 1-ER-168; *see Betts-Gaston*, 860 F.3d at 540 (noting that in calculating loss, courts of appeals have struggled to find "the dividing line between legitimate and illegitimate services").  The court limited the loss amount to the Vistara and second Docurated contracts, where the trial evidence supported a finding that Netflix obtained no value at all.  1-ER-168, 1-ER-177-78.

70

Kail does not directly challenge this finding on appeal. *See* AOB-77. Instead, he argues that the court "misapprehended the but-for causation standard," claiming a lack of evidence that "Netflix would have paid less, or gotten a better product," absent Kail's fraudulent scheme. *Id*. This argument is hard to fathom considering the court's finding that Netflix obtained zero value from its contracts with Vistara and Docurated. And despite Kail's contrary implication, his scheme was not limited to non-disclosure of a conflict of interest. As described above, the evidence showed that but for the compensation Kail received from Vistara and Docurated, Netflix would not have contracted with these vendors. *See, e.g.*, 6-ER-1583-84; 8-ER-2084-85. Indeed, after Kail left Netflix around July 2014, Netflix replaced Docurated's software with an application that Netflix developed internally without paying a third-party vendor. At a minimum, Kail cannot show clear error.

## CONCLUSION

For the reasons set forth above, this Court should affirm the district court.

Dated: September 18, 2024          Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

MERRY JEAN CHAN
Chief, Appellate Section, Criminal Division

/s/ *Ross D. Mazer*
ROSS D. MAZER
Assistant United States Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 17. STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  21-10376

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**          */s/ Ross D. Mazer*          **Date** September 18, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

73

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  __21-10376_____

I am the attorney or self-represented party.

**This brief contains __15,550__ words,** including __207__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated September 4, 2024.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  __/s/ Ross D. Mazer_____  **Date** September 18, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

74